IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| WILLIAM MAXWELL | § | |
| | § | |
| V. | § | CAUSE  NO.  _____ |
| | § | |
| WARDEN GARRIDO | § | |

## MEMORANDUM IN SUPPORT OF §2241

To the Honorable Magistrate Hawthorne:

COMES NOW, William Maxwell ("Maxwell"), and files this Memorandum in Support of his §2241, and for just cause would show unto the Court as follows:

## PRELIMINARY STATEMENT

Maxwell files for relief under 28 U.S.C. §2241, seeking substantive Due Process, declaratory, and injunctive relief using the mandated 28 U.S.C. §2241 forms provided to inmates at FCI-Beaumont-Low. This Memorandum in Support follows. Maxwell seeks relief under long standing precedent in Wedelstedt v. Wiley, 477 F.3d 1160 (10th Cir. 2007); Levine v. Apker, 455 F.3d 71, 87 (2d Cir. 2006); Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 249 (3rd Cir. 2005); Fults v. Sanders, 442 F.3d 1088, 1092 (8th Cir. 2006); and Rodriguez v. Smith, 541 F.3d 1180, 1183-1184 (9th Cir. 2008).

Each of these cases establish that Title 18 U.S.C. §3621 establishes the methodology by which the BOP must determine the housing of inmates. These cases establish that the BOP must

1

conduct a good faith assessment based on specifically enumerated rationale contained in 18 U.S.C. §3621.

In Chevron U.S.A., Inc. v. National Resources Defense Counsel, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed. 2d 694 (1984), the Court establishes a paradigm regarding the deference, if any, to be afforded a government agency in its application and interpretation of statutory language. The Court clarified that when Congress spoke in clear and unambiguous language there is no deference afforded to the agency or its interpretation. Id.

Here, as demonstrated below, and as noted in the exhibits attached hereto, the Bureau of Prisons ("BOP") failed and refused to do so, conducted an arbitrary and capricious campaign in bad faith to obstruct Maxwell's substantive Due Process rights. Further, in violation of Maxwell's substantive due process rights, the BOP has failed and refused to create a methodology or regulations to permit or evaluate an inmate's application to be transferred to a CCC (halfway house) prior to the end of the inmate's sentence. Maxwell seeks declatory and injunctive releif, as well as substantive due process relief.

## FACTUAL AND PROCEDURAL BACKGROUND

1) Beginning in March of 2020, Maxwell filed his application for transfer to halfway house, home confinement, and/or compassionate release under 18 U.S.C. §3621, 18 U.S.C. §3624, 18 U.S.C. §3582, and the CARES Act.[1]

---

1. Maxwell acknowledges that this Court is not the proper forum for 18 U.S.C. §3582 relief and expressly does not seek compassionate release from this Court, as that exclusive jurisdiction would reside with the United States District Court for New Jersey. (As a point of reference, my direct appeal is being filed--after seven [7] years--having been sent back to the trial court twice previously. While my direct appeal is pending, the United States District Court for New Jersey does not have jurisdiction to consider an 18 U.S.C. §3582.)

2)   On March 26, 2020, Attorney General Barr issued his memorandum for the Director of the Bureau of Prisons, which instructed the BOP that "there are some at-risk inmates who are non-violent and pose minimal likelihood of ricidivism and who might be safer serving their sentences in home confinement rather than BOP facilities." (See Exhibit 1.) (Exhibits are attached to the §2241 Form, and herein, for ease of reference.)

3)   On March 29, 2020, Maxwell provided notice to his Unit Manager Rivera and requested a transfer to home confinement under the Attorney General's memorandum. (See Exhibit 2.)

4)   Accompanying the March 29, 2020 notice to Unit Manager Rivera, Maxwell provided a Pre-Release Plan for Re-entry. (See Exhibit 3.) It was tendered to Unit Manager Rivera.

5)   On April 7, 2020, following the enactment of the CARES Act and the Attorney General's declaration of impaired BOP operations thereunder, pursuant to 18 U.S.C. §3621, 3624, 3582, and 34 U.S.C. §60541 (which inform the BOP decisions regarding eligibility for transfer to halfway house and home confinement under the §3621(b)(1)-(5) factors), Maxwell provided an additional notice to Unit Manager Rivera regarding Maxwell's request to transfer to halfway house under 18 U.S.C. §3621 and/or home confinement under 18 U.S.C. §3624(c) and the CARES Act. (See Exhibit 4.)

3

6)   On April 8, 2020, counsel for Maxwell contacted Warden F.J. Garrido via fax regarding Maxwell. (See Exhibit 5.)  In it, counsel addressed all the requisite particulars for Maxwell's transfer to halfway house or home confinement under 18 U.S.C. §3621 or 18 U.S.C. §3624 (as modified by the CARES Act) respectively.

7)   On April 10, 2020, Warden F.J. Garrido notified Maxwell of his High Risk concern, due to Maxwell's life long moderate to severe asthma, of the adverse or deadly consequences of COVID-19. (See Exhibit 6.)

8)   On April 12, 2020, Maxwell was cleared for transfer to halfway house or home confinement by his Unit Team (Case Manager, Unit Manager); CMC (Case Manager Cooridinator); SIS (Special Investigative Services--acknowledging that Maxwell has no current violence, history of violence, gang-related activity, or sexual activity while in the BOP); and the medical department in compliance with BOP policy, the CARES Act, and 18 U.S.C. §3621, 3624, and 34 U.S.C. §60541 (elderly release program methodology).

9)   On April 16, 2020, Maxwell signed his transfer documents, BP-A0210 "Institutional Refferal to CCC Placement."  (See Exhibit 7.)  The form indicates approval for transfer to halfway house or home confinement by Unit Manager Rivera, confirmed by ISM Staff Edward Pitre and CMC Deanne Moore.  Maxwell was to be released to halfway house-home confinement on 6/30/2020.

4

10)   On or about April 16, 2020, John Maxwell, Jr., Reg. No. 43685-177,[2] William Maxwell's brother, also effected his transfer documents. John Maxwell was in the same criminal case as William Maxwell, See Cause No. 11-740,[3] and convicted of the same charges. John Maxwell is (was at the time) sixty-eight (68) years old but does not have asthma. John Maxwell was housed at FCI-Millington-Camp (Mid-Atlantic Division). John Maxwell was transferred to home confinement on May 1, 2020, and remains on home confinement today. (In violation of 18 U.S.C. §3621(b), the BOP at FCI-Beaumont-Low and South Central Region is treating William Maxwell differently from an inmate with exactly the same charge, exactly the same criminal history and family circumstance, exactly the same judicial comments, exactly the same §3621(b) factor analysis.)

11)   On or about April 30, 2020, counsel for Maxwell sent a follow-up correspondence to Warden Garrido, again establishing Maxwell's request and grounds for transfer to halfway house and home confinement under 18 U.S.C. §3621, §3624, as amended by the CARES Act. (See Exhibit 8.)

12)   On May 26, 2020, Maxwell was approved to transfer to a residence with an approved release plan, by the United States District Court, Southern District of Texas Probation Office. (See Exhibit 9.)

---

2. When John Maxwell is referenced, his full name is used ("John Maxwell") to distinguish him from William Maxwell ("Maxwell").

3. United States v. Nicodemo Scarbo, et., Cause No. 11240, United States District Court for the District of New Jersey (Camden Vicintage).

5

13)  Maxwell's latest PATTERN recidivisim score is a (-21) on a scale of (0-48) and (-10) on a scale of 0-40 on the violence scale.  In other words, Maxwell's score is far below the lowest number of -0- for both recidivism and violence.  (See Exhibit 10.)

14)  Maxwell's quarantine date (for COVID-19) came and went, as did his release date and this underlying administrative remedy followed.

15)  As of the time of this drafting the "COVID-19 Safer Detention Act" (SB-312, HB-3669) was pending in Congress and is believed to be law at the time the Court will address these matters.  It is therefore briefed, in the alternative, however the primary grounds for relief are under 18 U.S.C. §3621, §3624 statute interpretation and application, declatory and injunctive relief, and substantive due process violations (to include declaratory and injunctive relief).[4]

## CHRONOLOGY

March 26, 2020 --  A.G. Barr issues Memo to BOP.  (See Exhibit 1.)

March 29, 2020 --  Maxwell gives notice to his Unit Manager to be transferred to home confinement under the CARES Act. (See Exhibit 2.)

---

4.  For purposes of efficiency, Maxwell requested relief for the same factual situation (transfer to halfway house--home confinement) under three (3) separate statutory grounds. 18 U.S.C. §3621, which governs transfers; 18 U.S.C. §3624(c)(2), home confinement modified under the CARES Act; 18 U.S.C. §3582, compassionate release.

6

March 29, 2020 --    Pre-release plan provided to Unit Manager Rivera. (See Exhibit 3.)

April 03, 2020 --    A.G. Barr issued notice that COVID-19 was adversely affecting the operations of the BOP. President Trump declared a National Emergency under COVID-19, pursuant to the CARES Act.

April 07, 2020 --    Second notice to Unit Manager Rivera. (Exhibit 4.)

April 08, 2020 --    Counsel for Maxwell sent notice to Warden F.J. Garrido regarding Maxwell's transfer to halfway house / home confinement. (See Exhibit 5.)

April 10, 2020 --    Warden F.J. Garrido notified Maxwell of his high risk from COVID-19 due to his moderate to severe asthma and age. (See Exhibit 6.)

April 12, 2020 --    Maxwell was approved for transfer to halfway house / home confinement by his Unit Team (Case Manager and Unit Manager); CMC (Case Manager Coordinator); SIS (Special Investigative Services); and medical. (Exhibit 7.)

April 16, 2020 --    Maxwell signed his BP-A0210 Form "Institutional Referral to CCC Placement." (See Exhibit 7.)

7

April 16, 2020 -- On or about April 16, 2020, John Maxwell, Jr., Reg. No. 43685-177, Maxwell's co-defendant, convicted of the exact same charges, went into quarantine.

April 30, 2020 -- Counsel for Maxwell sent a second correspondence to Warden F.J. Garrido regarding Maxwell's transfer to halfway house / home confinement. (See Exhibit 8.)

May 01, 2020 -- Co-defendant John Maxwell, Jr., convicted of the identical charges (who had been at Millington Camp for four [4] years) was transferred to halfway house / home confinement.

May 26, 2020 -- Probation Department for the Southern District of Texas approved Maxwell's release plan and transfer address. (See Exhibit 9.)

June 30, 2020 -- Maxwell's transfer date came and passed with no action by BOP.

## ADMINISTRATIVE REMEDY

16)    On the BOP's continued delay of Maxwell's release, Maxwell filed a BP-8, beginning the administrative remedy process.    In his BP-8 remedy, Maxwell requested transfer to halfway house / home confinement under 18 U.S.C. §3621, 3624 and 3582(c)(1)(A)(i).[5]

---

5.   The Safer Detention Act, in relevant part, allows for judicial review of the BOP's decisions under the CARES Act's expansion of 18 U.S.C. §3624(c)(2) and Elderly Release under 34 U.S.C. §60541, among other provisions.

8

17)    At the outset, it should be noted that, while Maxwell requested relief under three (3) separate statutes: 18 U.S.C. §3621; 18 U.S.C. §3624(c) and the CARES Act; and 18 U.S.C. §3582(c)(1)(A)(i), the BOP never, throughout the entire administrative remedy process, responded to anything but the 18 U.S.C. §3624(c) and the CARES Act, waiving its objections and response otherwise. See 28 C.F.R. §542.15(b)(2) (Inmate may not raise in an Appeal issues not raised in the lower filings). Fundamental fairness imposes the same estoppel on the BOP.

18)    In response to Maxwell's BP-8 at the informal level, after being approved by the Case manager, Unit Manager, CMC, R&D (Receiving and Discharge--confirming no detainers or outstanding charges), SIS, and medical department (See Exhibit 7); the "acting" Associate Warden Cutright opined that "Maxwell doesn't meet the 50% rule," and was therefore denied transfer.[6]

19)    Maxwell sought to appeal his denial of transfer by informal relief (BP-8), but was informed by a Case Manager for a different unit (Ms. McCowan), that the Warden was not accepting BP-9 administrative remedies, and for Maxwell to complete an electronic e-mail to the warden. Maxwell, nevertheless, completed a BP-9 request to the Warden. FCI-Beaumont-Low promptly lost it. Maxwell completed a second BP-9, noting that the BOP lost his prior BP-9; his electronic cop-out to the Warden

---

6.    It is important to note that, at the time of Maxwell's approval for transfer on April 12, 2020, there was no "50% rule" requiring inmates to serve 50% of their sentence prior to transfer to halfway house or home confinement under 18 U.S.C. §3624(c), post passage of the CARES Act on or before March 30, 2020. That 50% rule came from a BOP executive memo issued on April 22, 2020. (See Exhibit 23.) Further, using a percentage of sentence as a basis for denial under §3624(c), after the CARES Act, violates §3621.

9

CARES Act, violates the clear language of 18 U.S.C. §3621(b). The BOP's arbitrary and capricious actions are done based on Memoranda issued during the CARES Act enactment. Further, after Maxwell's consideration and approval under the 18 U.S.C. §3621(b)(1)-(5) factors, the BOP arbitrarily added a 50% requirement of the sentence served (no such requirement exists). (See Exhibits __14__ and __15__ and __19__.) The BOP in violation of 18 U.S.C. §3621(b) and 3624 has imposed improper restrictions (post-CARES Act). Further, the BOP has issued multiple memoranda and changed the proper consideration, each time violating 18 U.S.C. §3621(b)(1)-(5). Maxwell seeks injunctive releif prohibiting the BOP from evaluating Maxwell for CCC or home confinement on factors other than 18 U.S.C. §3621(b)(1)-(5), and/or §3624, as modified by the CARES Act.

30)    For purposes of the CARES Act; in 2018, Congress modified §3624(c)(2) and §3621(c)(1) to maximize the amount of time spent in home confinement by inmates. Despite being the law in 2018, the BOP did not change its policies and issue its new guidelines until May 3, 2021. (See Exhibit 22). Specifically:

> "Home confinement authority--The Authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph."

17

[As noted by the CARES Act, that amount of time is <u>not limited</u> to 6 months during the COVID-19 pandemic under the CARES Act.]

> "The Bureau interprets the language to refer to inmates that have lower risk of reoffending in the community as defined by individual PATTERN Scores, and reentry needs that can be addressed without RRC placement. The Bureau currently utilizes home confinement for these inmates. Accordingly, staff should refer eligible inmates for the maximum amount of time permitted under the statutory requirements."

(See Exhibit 21).

**31)** A series of cases undergird Maxwell's relief.

In <u>Chevron U.S.A., Inc., v. Natural Resources Defense Counsel, Inc.</u>, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed. 2d 694 (1984), the Court teaches the proper analysis for the Court. Under the <u>Chevron</u> framework the Court must "first determine[ ] if Congress had directly spoken to the precise question at issue, in such a way that the intent of Congress is clear." <u>Id</u>. (Citation and internal quotation marks omitted). "If the intent of Congress is clear, that is the end of the matter, for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Rodriguez v. Smith</u>, 541 F.3d 1180, 1183-1184 (9th Cir. 2008) (citing <u>Chevron</u>, 467 U.S. at 842-843 (footnote omitted). Five (5) separate circuits have interpreted the language of 18 U.S.C. §3621(b) as clear and unambiguous. ("We cannot agree with the First Circuit that the categorical failure to comply with unambiguously expressed

18

Congressional intent can be rationalized away. Rather, we agree with the Second, Third, Eighth, and Tenth Circuits' conclusions [regarding] ... the unambiguous congressional intent expressed in §3621(b)." Id. 541 F.3d at 1188; c.f. Wedelstedt v. Wiley, 477 F.3d 1160, 1161-62 (10th Cir. 2007); Levine v. Apker, 455 F.3d 71, 87 (2d Cir. 2006); Fults v. Sanders, 442 F.3d 1088, 1090-91 (8th Cir. 2006); Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 249 (3rd Cir. 2005)).

As a result, the language of 18 U.S.C. §3621(b) expresses the clear and unambiguous will of Congress.

32) The collection of more than six Circuit Courts rationale establish that statute 18 U.S.C. §3621(b) provides the following:

* The BOP "may at any time ... direct the transfer of a prisoner from one penal or correctional facility to another." 18 U.S.C. §3621(b).

* "Although §3624(c) surely imposes an affirmative obligation on the BOP, wherever practicable, to place an inmate in a CCC or other form of community confinement as the inmate's release date nears, §3624(c) has no bearing on whether a CCC may be considered as a place of imprisonment at some earlier point in a prisoner's period of incarceration." Wedelstedt, 477 F.3d at 1166.

* Section 3621(b) articulates clear and unambiguous congressional intent that all placement and transfer determinations be

19

carried out with reference to each of the five factors enumerated in §3621(b)(1)-(5) (emphasis added). Wedelstedt, 477 F.3d at 1166, accord Levine, 455 F.3d at 81; Futes, 442 F.3d at 1092; Woodall, 432 F.3d at 245; Rodriguez, 541 at 1186; Goldings v. Winn, 383 F.3d 17, 22-23 (1st Cir. 2004).

* When the BOP considers solely the length of an inmate's sentence as a basis to deny transfer to CCC it violates 18 U.S.C. §3621 and now 18 U.S.C. §3624(c)(2) under the CARES Act. Fults, 442 F.3d at 1092.

* The failure and refusal of the BOP to consider, in good faith, Maxwell's request to transfer to CCC under the 18 U.S.C. §3621(b)(1)-(5) factors violates Maxwell's substantive due process. Levine, 455 F.3d at 87 ("Section 3621(b) establishes clear parameters for the BOP's exercise of discretion in making prison placements and transfers. By sorting prisoner's eligibility for [CCCs] only according to the portion of time served, the BOP has unlawfully exercised these parameters from the statute") (emphasis added); Fults, 442 F.3d at 1092 ("[T]he BOP ... conflicts with §3621(b) ... by excluding an entire class of inmates--those not serving the final ten percent of their sentences--from the opportunity to be transferred to a CCC."); Woodall, 432 F.3d at 249; accord, Rodriguez, 541 F.3d at 1186.

20

\*   28 U.S.C. §2241 is the proper vehicle to challenge the BOP's failure to properly, in good faith, consider Maxwell's request to transfer to CCC under 18 U.S.C. §3621(b) without consideration of the amount of time remaining on his sentence. Levine, 455 F.3d at 78 ("We find that a habeas petition under 28 U.S.C. §2241 is the proper vehicle to challenge confinement in a federal correctional center rather than a CCC") (internal citations omitted) The Supreme Court has indicated that "unlawful [ ] confine[ment] in the wrong institution" falls within the ambit of §2241 habeas corpus relief, because it concerns the unlawful imposition of physical restraint. Preiser v. Rodriguez, 411 U.S. 475, 486, 93 S.Ct. 1827, 36 L.Ed. 2d 439 (1974); c.f. Abdul-Malik v. Hawk-Sawyer, 403 F.3d 72, 7 (2d Cir. 2005); Hernandez v. Campbell, 204 F.3d 861, 864 (9th Cir. 2000) (per curiam); United States v. Jalili, 925 F.2d 889, 893 (6th Cir. 1991); Montez v. McKinna, 208 F.3d 862, 865 (10th Cir. 2000); Woodall, 432 F.3d at 242-44. In Woodall, the Third Circuit explained that challenges to regulations, memos in this case, that limit a prisoner's placement in a community correctional center ("CCC") may be brought under a §2241. The Court noted that "[c]arrying out a sentence through detention in a CCC is very different from carrying out a sentence in an ordinary penal institution. Id. at 243. (CCCs "often include an employment

21

component under which a prisoner may leave on a daily basis to work in the community." Id. Inmates may "be eligible for weekend passes, overnight passes, or furloughs. Id. Thus, "placement in a CCC represents more than a simple transfer." Id. The Third Circuit explained that such a challenge, which "crosses the line beyond a challenge to, for example, a garden variety prison transfer, "is a challenge to the execution of the prisoner's sentence and therefore properly brought under §2241. Id. at 243-44.

* The Second Circuit has held that a federal inmate's challenge to the BOP's RRC placement policies and regulations is a challenge to the execution of the sentence, which is properly brought under §2241. Levine, 455 F.3d at 77-79.

33) The BOP in its policy statements references 18 U.S.C. §3621(b) as noted in appendix.

34) The Circuits teach that there are two (2) classes of inmates who are entitled to reside at CCC contingent on an analysis of the 18 U.S.C. §3621(b)(1)-(5) factors. 477 F.3d at 1167. (Section 3621(b) articulates clear and unambiguous congressional intent that all placement and transfer determinations be carried out with reference to each of the five factors enumerated in §3621(b)(1)-(5). In promulgating regulations pursuant to this statute, the BOP must not contradict

22

Congress' clear intent.   Chevron, 467 U.S. at 843, n.9 ("The judiciary ... must reject administrative constrictions which are contrary to clear congressional intent").

These two classes are (1) those who are seeking transfer to a CCC prior to the end of their sentence; and (2) those who are seeking transfer at the end of their sentence.  Section 3621(b) governs both.  However, 18 U.S.C. §3624(c) is mandatory at the end of a sentence, and §3621(b) informs transfer both before end of sentence and under §3624(c) at end of sentence.  Goldings v. Winn, 383 F.3d 17, 25-26 (1st Cir. 2004)[9]; Fults v. Sanders, 442 F.3d 1088, 1092 (8th Cir. 2005)[10]; Woodall, 432 F.3d at 250[11]; Levine, 455 F.3d at 81-82 (Congress used the word "and" rather

---

9.   "The first sentence of §3621(b) imposes a duty on the BOP to place those prisoners who have been committed to the custody of the BOP.  It does not further define 'place of imprisonment' and certainly does not provide that the BOP may not place prisoners in a CCC.  The second sentence of this subsection gives content to the first; it explains where prisoners may be placed and grants the BOP discretionary authority to choose that place of imprisonment from among 'any' available or correctional institution."  (internal citations omitted).  "Congress could have, but did not, exclude any particular type of penal or correctional facility from the BOP's designation or transfer authority.  Instead, it defined 'place of imprisonment' broadly but unambiguously as 'any penal or correctional facility' that meets minimum standards of health and habitability.  Hence, the relevant question in considering whether the BOP has discretion under §3621(b) to transfer Goldings to a CCC is whether a CCC qualifies as a 'penal or correctional facility.'  If it does, then the text of the statute dictates that it also qualifies as a place of imprisonment."  Id.  [ ] "...We hold that 18 U.S.C. §3621(b) authorizes the BOP to transfer Goldings to a CCC at any time during his prison term."  383 F.3d at 28-29.  (emphasis added).

10.   (Failure of the BOP to consider inmates for transfer to CCC during the entire term of their sentence and not merely the final period of pre-release described as obligatory--as to the BOP--in 18 U.S.C. §3624(c)).

11.   (The statute as a whole, if it is to have practical effect, indicates that the factors enumerated must be considered in making determinations regarding where to initially place an inmate, as well as whether or not to transfer him.  [ ] [Section] 3624 does not determine when the BOP should consider CCC placement, but when it must provide it.  The clear language of §3624(c) mandates that the BOP "shall" assure that a prisoner is given appropriate pre-release conditions that are focused on re-entry, if "practicable."  The statute [18 U.S.C. §3624(c)] requires the BOP not just to consider, but to actually place an inmate in a CCC or like facility ... when that is possible.)

23

than "or" to unify its five concerns. All five factors listed must be considered) (internal citations omitted). After enumerating five (5) factors, Section 3621(b) places one (1) additional restriction of the BOP: "In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status." 18 U.S.C. §3621(b). But here, the BOP did expressly that sending Michael Cohen and Paul Manifort to home confinement before either had served 50% of their sentences. (See Exhibit 23) (See also BOP Memo, Exhibit 21 ).

It is therefore beyond reproach that inmates are eligible to be placed or transferred to CCC (halfway house) at any time during their sentence and not merely at the end (last 12 months-- see 18 U.S.C. §3624(c)(1)) of their sentence.

## THE FIRST STEP ACT

**35)** In 2018, Congress passed the First Step Act which modified several prison statutes and imposed regulations, relevant here, on the BOP. Those statutes are mandatory obligations on the BOP.

A handful of memoranda have been sent out by the BOP, but no policy statements have been issued nor inmates transferred to CCC under the First Step Act. Neither has the BOP transferred inmates, not at the end of their sentences, to CCC, nor is there policy statements providing for a methodology, in keeping with 18 U.S.C. §3621(b), for transferring inmates to CCC, after an individualized analysis, prior to the end of their sentences. (As required by 18 U.S.C. §3621(b)(1)-(5), the First Step Act, and the CARES Act.) (1.13.2022, BOP published FSA rules infra)

24

36) The First Step Act added 18 U.S.C. §3632 Development of Risk and Needs Assessment System. The law provides:

"(c) Housing and Assignment Decisions. The system <u>shall</u> provide guidance on program grouping and housing assignment determinations and, after accounting for the safety of each prisoner and other individuals at the prison, provide that prisoners with a similar risk level be grouped together in housing and assignment decisions to the extent practicable.

(d) Evdience-Based Recidivism Reduction Program Incentives and Productive Activities Rewards. The system shall provide incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs as follows:

[ ]

(2) Transfer to institution closer to release residence. A prisoner who is successfully <u>participating</u> in an evidence-based recidivism program <u>shall</u> be considered by the Bureau of Prisons for placement in a facility [using the 18 U.S.C. §3621(b)(1)-(5) factors] closer to the prisoner's release residence <u>upon request from the prisoner</u> and subject to--

25

> (A) bed availablity at the transfer facility;
>
> (B) the prisoner's security designation; and
>
> (C) the recommendation from the Warden of the prison at which the prisoner is incarcerated at the time of making the request. (emphasis added)
>
> (3) Additional Policies. The Director of the Bureau of Prisons _shall_ develop additional policies to provide appropriate incentives for successful _participation_ and completion of evidence-based recidivism reduction program. The incentives _shall_ include not less than 2 of the following:
>
> > (C) consideration of transfer to preferred housing units (_including transfer to different prison facilities_)

(emphasis added)

37) Section 3625 of Title 18 defines "Evidence-Based Recidivism Reduction Programs as:

> (3) Evidence-Based Recidivism Reduction Program. The term 'evidence-based recidivism reduction program' means

26

either a group or individual activity that--

(A)   has been shown by empircal evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism;

(B)   is designed to help prisoners succeed in their communities upon release from prison; and

(C)   may include

(xi)   a prison job, including through a prison work program.   (Emphasis added)

[ ]

(5)   Productive Activity--The term 'productive activity' means either a group or individual activity that is designed to allow prisoners determined as having a minimum or low risk of recidivism to remain productive and thereby maintain a minimum or low risk of recidiviating and may include the delivery of the programs described in paragraph (1) to other prisoners.

27

## ANALYSIS

38) Maxwell's argument and authorities provide that:

I.   The BOP may, upon request of a prisoner transfer the prisoner to CCC (halfway house) at any time during the prisoner's incarceration under both Title 18 U.S.C. §3621(b) and 18 U.S.C.:3624(c) (during the CARES ACT's application) or to home confinement.

II.  The BOP must in good faith perform an individualized analysis of Maxwell's request and must not rely on a percentage of sentence served under both 18 U.S.C.§§ 3621(b) and §3624(c) analyses.

III. The BOP must not treat Maxwell differently when it comes to inmate placement and transfer to halfway house or home confinement decisions, differently from high economic status individuals. 18 U.S.C.§3621(b)

IV.  The BOP must consider, under the First Step Act, transferring Maxwell to the Houston RRC for his ongoing successful participation in productive activities and programming during his entire time in prison considering his BRAVO score and his PATTERN Score and exemplary conduct in prison.

V.   Alternatively, the Safer Detention Act provides for judicial review expressly of the BOP's denials of transfer to RRC or home confinement.

VI.  Maxwell seeks declaratory and injunctive relief regarding the BOP's use of a percentage of an inmate's sentence as a determining factor in deciding whether to transfer an inmate to halfway house or home confinement (during CARES ACT); that multiple memos issued by the BOP

28

violate §3621(b); that the BOP is interpreting the First Step Act inaccurately; and that the BOP's consideration to transfer Maxwell to home confinement was in bad faith.

## APPLICATION

I.  The BOP may, upon request of a prisoner, transfer the prisoner to CCC (halfway house) at any time during the prisoner's incarceration under both Title 18 U.S.C. §3621(b) and 18 U.S.C.§3624(c) (during the CARES ACT's application) or to home confinement.

A.  After Rodriguez v. Smith, 541 F.3d 1180 (9th Cir. 2008); Wedelstedt v. Wiley, 477 F.3d 1160 (10th Cir. 2007); Levine v. Apker, 455 F.3d 71 (2d Cir. 2006); Fults v. Sanders, 442 F.3d 1088 (8th Cir. 2006); and Woodall v. Bureau of Prisons, 432 F.3d 235 (3d. Cir. 2005) it is established that Maxwell can be transferred at any time during his sentence to a CCC using the 18 U.S.C. §3621(b)(1)-(5) factors to determine his eligibility. See supra, @ ¶34; c.f. Elwood v. Jeter, 386 F.3d 842, 846-847 (8th Cir. 2004) (In Elwood, brought under §2241, the 8th Circuit held the BOP has authority and discretion to place an offender in any suitable correctional facility for all or part of a offender's sentence and that the BOP is not limited by the provisions of 18 U.S.C.§3624(c)); Goldings v. Winn, 383 F.3d 17, 23-27 (1st Cir. 2004) (holding that §3624(c) does not prohibit the BOP from transferring prisoners to CCC before the end of their sentence and that §3621(b) confers discretionary authority on the BOP to execute such transfers. There is no language in §3621(b) that limits the BOP's designation authority ... It expressly provides that the BOP may at any time ... direct the transfer of a prisoner from one correctional facility to another.

29

It applies both before and at end of sentence under 18 U.S.C.§3624(c). 383 F.3d at 23-25 (internal citations omitted)).

B. The statute 18 U.S.C. §3621(b)(1)-(5) clearly control the transfer of a prisoner before the end of sentence and under the CARES ACT modification of §3624(c). The CARES ACT did not modify §3621(b). See 18 U.S.C. §3624(c)(4) (Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the BOP under Section 3621 [18 U.S.C.§3621]; 3624(c)(6) (Issuance of Regulations. -- The Director of the BOP shall issue regulations pursuant to this subsection not later than 90 days after the date of the enactment of the Second Chance Reauthorization Act of 2018 [enacted December 21, 2018] which shall ensure placement in community correctional facility by the BOP is (A) conducted in a manner consistent with Section 3621(b) of this title [18 U.S.C."3621(b)].

1) Section 3621(b)(1)-(5) clearly controls transfers and placement in BOP institutions. Supra.

2) Section 3624(c) decisions are also based on the §3621(b)(1)-(5) factors. Rodriguez, 541 F.3d at 1186 (intent of Congress conveyed in §3621(b), which expressly instructs that all placement and transfer determinations take into consideration each of the five factors enumerated in the statute. That Congress intended the BOP to apply each of the factors is evidenced by the invocation of the word "and" between the fourth and fifth factors. See Wedelstedt, 477 F.3d. at 1165; see also Hawaiian Telephone Co. v. Public Utilities Com'n., 827 F.2d 1264, 1273 (9th Cir. 1987) (noting that use of the conjunctive indicates that all of the

30

conditions listed be met).

    a) The Second Circuit agreed. See <u>Levine</u>, 455 F.3d at 82 (noting that §3621(b) authorizes the BOP to place a prisoner where it wishes so long as it considers the five factors). C.f. <u>Woodall</u>, 432 F.3d at 247 ; <u>Fultz</u>, 442 F.3d at 1092.

    b) To construe §3624(c)(2) [especially after the passage of the CARES Act] separate from the exclusive 18 U.S.C. 3621(b)(1)-(5) factors violates the express will of Congress. <u>Woodall</u>, 432 F.3d at 247; <u>Levine</u>, 455 F.3d at 85 ("categorical rule-making, like all forms of agency regulation must be consistent with unambiguous Congressional instructions..."); <u>Fultz</u>, 442 F.3d at 1091.

II. The BOP must in good faith perform an individualized analysis of Maxwell's request and must not rely on a percentage of sentence served under both 18 U.S.C.§§ 3621(b) and §3624(c) analyses.

A. As <u>Levine</u> teaches an individualized approach and not categorical approach must be construed. 455 F.3d at 86 (of the five statutory factors, at least three -- the nature and circumstances of a prisoner's offense, the history and characteristics of the prisoner, and any statement by the Court that imposed the sentence -- are specific to the individual prisoners).

B. The BOP's sole [expressly stated] credible basis for denial of Maxwell's request for transfer under §3621(b) or §3624(c) (The CARES ACT) is the percentage of his sentence

31

served. See Exhibits __14__ and __26__.

1) The BOP after-added bad faith reasons violates the Administrative Procedures Act (APA) prohibition against adding new claims or defenses as the administrative remedy progresses. See Exhibit __15__.

2) The BOP's after-added bath faith reasons are fanciful.

a) John Maxwell, William Maxwell's brother, convicted in the same case for the same offenses also signed his BP-A0210 Transfer Form on or about April 16, 2020, the same as William Maxwell and was on home confinement since May 1, 2020.

b) The Warden in his initial response to counsel did not parrot the newly raised factor. See Exhibit __14__. There the Warden's sole denial is based on percentage of sentence served, not the §3621(b)(1)-(5) factors.

c) The Warden subsequently, falsely, postulated that Maxwell did not have a CDC comorbidity health risk due to COVID. See Exhibit __15__. But on April 10, 2020, the Warden gave Maxwell his notice of designation as "high risk" due to COVID-19. See Exhibit __6__.

d)The after-added allegation of a violence conviction is belied by John Maxwell's placement on home confinement [treating John Maxwell differently from William Maxwell] and the statements by the trial court to the contrary. See Exhibits __16__ and __22__.

32

The government, further, stipulated that Maxwell was not a danger to the community or a flight risk at his bail hearing (pending appeal). See Exhibit 22.

e) The BOP's own evaluation tools reveal that Maxwell has no risk of recidivism or violence. See Maxwell's PATTERN Score. Exhibit 10.

f) The BOP's SIS department found that Maxwell had no history or incidents of violence, gang related activity or sexual activity in prison. See Exhibit 7.

g) BOP memorandum preclude institutional or regional special considerations for CCC. See Exhibit 21. John Maxwell, in a different institution and region, has been treated differently that William Maxwell. John Maxwell was at Milington Camp in Tenneessee (not in South Central Region) and has been transferred to home confinement.(See Endnote 1)

h) Michale Coeh and Paul Manifort had similar charges and were released to home confinement. See Exhibit 23 and 7. They were treated differently than Maxwell based on social and economic status.

i) The Warden/BOP blocks the Unit Team Staff's determination that inmates are eligible for transfer to CCC prior to the end of sentence. For example, when Maxwell's Unit Team performed an individual April 12, 2020, it wrote:

33

"Inmate Maxwell is being referred for Home Confinement placement under the provisions contained in the First Step Act for placement of eligible elderly offenders or eligible terminally ill offenders. Inmate Maxwell is currently 60 years old [now 62 years old], serving a 240 month sentence for Racketeering Conspiracy, Wire Fraud Conspiracy, [and] Money Laundering. His criminal history and inmate disciplinary record reveal no charges or convictions involving violence, escape or sexually related offenses.

"In addition to meeting these requirements of the FSA Elderly Home Confinement, inmate Maxwell also meets the criteria listed in Attorney General's COVID-19 Pandemic memorandum. As previously noted, Inmate Maxwell is 60 years old, and medical staff at FCI Beaumont have determined he is an "at risk" vulnerable inmate. Inmate Maxwell is currently classified as a three point low security inmate, and has a PATTERN Recidivism Score of Minimum. The SIS Department at FCI Beaumont Low has confirmed that Inmate Maxwell has not engaged in any violent or gang related activity, and he has maintained a clear disciplinary record. If approved for home confinement, Inmate Maxwell would reside in a motor home at 4400 Country Club Dr., Dickinson, TX 77539. The telephone contact number is 832-287-8739. It is believed Maxwell will not pose a danger to the community." See Exhibit __7__.

But after advising Maxwell's counsel in May 2020 that Maxwell was denied solely for percentage of sentence served (Exhibit __14__) the BOP then sought to fabricate a basis to deny Maxwell for home confinement or halfway house. (See endnote 2)

The BOP did not address in its fabricated denial any legitimate basis under §3621(b)(1)-(5) factors for denial Maxwell's request for transfer to halfway house or home confinement (under the CARES ACT). The BOP further

34

deviated from its own policy regarding an inmate's unit team being the sole persons to determine inmate placement halfway house or home confinement under §§3621(b) and 3624(c).

III. THE BOP MUST NOT TREAT MAXWELL DIFFERENTLY FROM HIGH ECONOMIC OR STATUS INDIVIDUALS.

A. Title 18 U.S.C. §3621(b) provides, as part of the individualized analysis regarding transfer that Maxwell cannot be treated differently than other high economic or high status inmates. Maxwell, Michael Cohen, and Paul Manifort have similar white collar offenses and yet both Cohen and Manifort were afforded home confinement while both had more than 50% remaining on their sentences and more than 18 months till their release date.

IV. The BOP must consider Maxwell under the First Step Act for transfer to the Houston CCC (a closer to home prison) for his participation in productive activities and programming his entire time in prison and considering his BRAVO (Security score) and PATTERN Score. See ¶¶ 35-37 supra.

On November 15, 2021, the Office of Inspector General issued its scathing "Management Advisory Memorandum" to the BOP's [then, now former] Director Michael Carvajal noting the BOP's abysmal and absolute failure to implement the now three-year old First Step Act. See Exhibit 26 . The BOP in its response bemoans its ability to reach agreement with the "union" due to "CDC" protocols and the need to mitigate transmission of the COVID-19 virus. See Appx 1 to Exhibit 26 . The OIG replies that the

35

BOP's response is not well taken and, as it pertains to the enactment of the First Step Act, "the BOP has not yet applied time credits to inmates sentences. See Appx' to Exhibit 26.

Additionally, the BOP having run out of delaying tactics, waited until two days before the "drop dead" date (January 15, 2022) to begin to apply time credits. On January 13, 2022  the BOP published its proposed final rule to be published in the C.F.R. regarding the First Step Act. (See. 28 C.F.R. 523 and 541) See Exhibit 27. Therein, the Bop notes the comments it received to its original publication of proposed rules in 2020 (opened for comment). In its final enactment and publication (Exhibit 27) the BOP notes the comments, responses, and decisions. In most cases the BOP acknowledged the comments and corrected its proposed rules (28 C.F.R. §§523 and 541).

However, the final publicized rule, while making substantial improvements over the original proposed rules, has a major error that are outside the BOP's Congressional delegated authority and violate the express language of Congress, in contravention of <u>Chevron</u> <u>supra</u>.

A. The First Step Act contains the mandatory language "shall" on 112 different occasions. See generally, Pub. L. 115-391, title I, §101(a), Dec. 21, 2018. The BOP, heretofore has been instructed by Congress typically with permissive language (i.e. "may") in carrying out its duties. But here, Congress left little doubt that its clear and unambiguous intent was that the BOP "Shall" take certain actions regarding inmates.

For example, compare and contrast the statute and C.F.R. as follows:

36

**Title 18 U.S.C. §3632(d)(4)(C)** ("Application of time credits toward prerelease custody or supervised release. -- Time credits earned under this paragraph ... **shall** be applied toward time in prerelease custody or supervised release. The Director ... **shall** transfer eligible prisoners ... into prerelease custody or supervised release...")

**WITH**

> **28 C.F.R. §523.44** "Application of FSA Time Credits."
>
> (b) Consideration for application of FSA Time Credits. Where otherwise permitted by this subpart, the Burean **may** apply FSA Time Credits toward prerelease custody or early transfer to supervised release under 18 U.S.C. §3624(g) ...";
>
> (c) Prerelease custody. The Bureau **may** apply earned FSA Time Credits toward prerelease custody only when an eligible inmate has, in addition to satisfying the criteria in paragraph (b) of this section..."

As noted *supra* the BOP is not at liberty to juxtapose permissive language for mandatory statutory language. This transportation of "may" for "shall" appears several times in the final rules and is improper and must be corrected. (Maxwell seeks declaratory relief regarding this issue)

Next, compare and contrast the statute and C.F.R. as follows:

**18 U.S.C. §3632(d)(4)(B)** (Availability. - A prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed --

(i) prior to the date of enactment of this subchapter; or

37

(ii)    during official detention prior to the date that the prisoner's sentence commences under section 3585(a).

**<u>WITH</u>**

**28 C.F.R. §523.42** Earning First Step Act Time Credits.

(a) When an eligible inmate begins earning FSA Time Credits. An eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau Facility where the sentence will be served).

(b) Dates of participation in EBRRs or PAs.

(1) An inmate cannot earn FSA Time Credits for programming **<u>or activities</u>** in which he or she participated before December 21, 2018, the date of enactment of the First Step Act of 2018.

(2) An eligible inmate, as defined in this subpart, may earn FSA Time Credits for programming **<u>and activities</u>** in which he or she participated from December 21, 2018, until January 14, 2020.

The statute does not mention any restriction on **<u>productive activities</u>**. As noted <u>supra</u>, the negative inference canon of statutory construction, necessarily excludes the item not noted in the statute. Productive Activities, from time inmemoriam, has included prison jobs and work programs. <u>Supra.</u> Congress could have noted "productive activities" exclusion prior to December 21, 2108, but did not do so.

38

The inclusion of productive activities along with productive programming in the language of 28 C.F.R. §523.42 does not make logical sense. The sense of the First Step Act is to encourage inmates to participate in EBRR programming and productive activities to reduce their risk of recidivism and to maintain their reduced recidivism status by productive activities (such as prison jobs, which heretofore has been defined as productive activities throughout the various state and federal prison systems. The First Step Act, postscriptively of its enactment, December 18, 2018, describes prison jobs as productive programming).

Maxwell seeks declaratory relief regarding this particular issue.

Attached hereto is Maxwell's Affidavit indicating that he has continually engaged in productive activities during his entire prison term entitling him to 42-48 months of earned time credits (see end note 3). The BOP with its January 13, 2022 publication agrees that all inmates are so entiled.

V.  Because the "Safer Detention Act" is before Congress, which provides therein, for independent Court jurisdiction to consider these claims, Maxwell notes it but reserves briefing, in the alternative, should such be applicable.

39

VI.   Maxwell seeks declaratory relief and injunctive relief; declaring the BOP's use of a percentage of an inmate's sentence is not an appropriate factor in determining halfway house (CCC) or home confinement (during the CARES ACT enactment period); that multiple memoranda issued by the BOP (regarding the CARES ACT and use of sentencing as a determinative factor violate 18 U.S.C. §3621(b); that the BOP's final rules promulgation (28 C.F.R. §§523.42 and 523.44 as noted herein are improper usurpations of Congress authority and are not reflective of the clear and unambiguous language of the statutes referenced herein with particularity; and that finally their uses in determining Maxwell's eligibility for transfer to CCC (or home confinement during the CARES ACT enactment period) is not permitted.

A.  The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust administrative remedies prior to filing a lawsuit in federal court challenging prison conditions under 42 U.S.C. §1983 or any other Federal law. 42 U.S.C. §1997e(a). "[E]xhaustion requirements are designed to ... give the agency a fair and full opportunity to adjudicate their claims" before the plaintiff proceeds to file and action in federal court. Woodford v. Ngo, 548 U.S. 81, 90, 126 S.ct. 2378, 165 L.ED.2d 368 (2006). Maxwell has fully and finally exhausted all administrative remedies prior to filing this suit. While the §2241 petition is the proper format for seeking relief, declaratory and injunctive relief may be sought as part and parcel of the §2241 cause of action.

40

Maxwell does not seek an unqualified right to be transferred to CCC (halfway house) or home confinement, rather Maxwell simply seeks transfer (and determination and processing by the BOP) in accordance with 18 U.S.C. §3621 and §3624 (during the CARES Act enactment)) pursuant to law (substantive due process). FCI-Beaumont-Low is not following the §3621 statutes when making its decisions to transfer inmates, prior to end of sentencing, or under the CARES ACT, using the 3621(b)(1)-(5) factors.

Additionally, Maxwell, seeks earned time credits toward RRC and home confinement under the First Step Act (for which Maxwell has earned between 42 and 48 months time credits) but has not properly applied the earned time credits. Maxwell seeks declaration regarding the First Step Act time credits; declaration regarding the proper methodology for the BOP to consider Maxwell's request for transfer to CCC (before the end of his term of imprisonment) or home confinement (during the CARES ACT enactment period). Maxwell seeks injunctive relief, to prohibit the BOP from acting otherwise in its individual consideration of Maxwell's transfer. Maxwell seeks a good faith consideration pursuant to §3621. All relief is properly brought under §2241.

Title 28 U.S.C. § 2241, a writ of habeas corpus shall not extend to a prisoner unless "[h]e is in custody in violation of the Constitution or laws ... of the United States." Here, the execution of Maxwell's sentence - involving the increased level of restrain at a non-CCC facility qualifies as "custody for purposes of §2241. See <u>Preiser v. Rodriguez</u>, 441 U.S. 475,

41

486, 93 S.Ct. 1827, 36 L.ED. 2d 439 (1973) (stating that "unlawful [] confine[ment] in the wrong institution" falls within the ambit of §2241); Krist v. Ricketts, 504 F.2d 887, 887 (5th Cir. 1974) (stating, "Generally, habeas corpus has been available to persons who seek release from solitary confinement within the context of general incarceration"); Ledesma v. United States, 445 F.2d 1323, 1324 (5th Cir. 1971)(stating that district court correctly analyzed that a challenge to the designation of the place of confinement could be brought via §2241). At least six circuit courts have held the same. Levine, 445 F.3d at 77-79; Woodall, 432 F.3d at 241-44; Wedelstedt, 477 F.3d at 1161, 1168-69; Fults, 442 F.3d at 1089; Lopez v. Davis, 531 U.S. 230, 236, 121 S.Ct. 714, 148 L.ED.2D 635 ((2001) (Without discussing scope of available relief, allowed §2241 challenges to certain BOP regulations regarding eligibility for sentence reduction upon completion of a substance abuse program); c.f. Cook v. Wiley, 208 F.3d 1314, 1316-17 (11th Cir. 2000).

The Court further, in Lopez noted the difference in permissible language in 18 U.S.C. §3621 and mandatory language §3621. In Lopez the court analyzed 18 U.S.C. §3621(e)(2)(B) permissive language and noted the its difference with the otherwise mandatory language of §3621. Id. 431 U.S. at 241. There the Court observed "Congress' use of the permissive "may" in §3621(e)(2)(B) contrasts with the legislators' use of a mandatory "shall" in the very same section. Elsewhere in §3621, Congress used "shall" to impose discretionless obligations ... e.g. §3621(b) and §3624(c) ("The Bureau shall designate the

42

place of the prisoner's imprisonment ... In designating the place of imprisonment or making transfers [including under §3624(c) under the CARES ACT -- as the CARES ACT did not modify the mandatory language of §§3621 or 3624] under this subsection, there shall be no favoritism given to prisoners of high social or economic status." As such, it is well settled that the BOP "shall" properly consider Maxwell under the ¶3621(b)(1)-(5) factors without considering a percentage of sentence served for transfer to RRC or home confinement under the CARES ACT.

In short, §2241 is the proper format to resolve the substantive due process complaints of Maxwwell (since he has exhausted his administrative remedies) regarding the failure of the BOP to properly preform the §3621(b) analysis when considering the transfer of Maxwell to RRC or home confinement under the CARES ACT (which modified §3624(c)' length of time an inmate is mandated to by on home confinement.)

Additionally, the First Step Act permits, in addition to time credits, inmates to earn extra minutes for phone use (510 minutes per month for phone or video conferencing), extra spending limits on commissary, broader product selection on commissary, and transfer to preferential housing unit to include transfer to halfway house closer to home. See 18 U.S.C.§3632(d)(1)(2)(3). Typically, benefits such as phone, commissary, email privileges are not protected because they are privileges and as such no relief is available under the §2241 habeas corpus. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.ED.2D. 935 (1974) (When inmate has liberty interest, revocation must comply with minimal procedural requirements).

43

Further, Courts do not typically review prison administrative actions unless they are arbitrary and capricious. <u>Stewart v. Thigpen</u>, 730 F.2d 1002, 1005 (5th Cir. 1984). But here, where the statute uses mandatory language ("Shall"), the BOP is not at liberty to simply ignore the statute and fail to provide the phone minutes, the expanded commissary spending limits and products (FCI-Beaumont-Low has actually lowered the spending limits to $90 dollars every two weeks from $180 dollars ($360 per month), the transfers to RRC (halfway houses long acknowledged to be a BOP prison facility), preferential housing units, video conferencing, or other benefits earned by the inmates under the First Step Act. See §3632(d)(1)(2)(3). Further still, the BOP acknowledges that inmates have earned these privileges and will be not penalized because of the COVID lockdown situation. See 28 C.F.R. §523.41 (c)(3) (Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EMRR programs or PAs [productive activities] will not ordinarily affect eligible inmate's "successfully participation" for the purposes of FSA Time Credit eligibility). In other words, an inmate will still be considered to be "successfully participating" and therefore are eligible for the ancillary benefits afforded by the First Step Act.

The BOP has further noted that inmates have been earning time credits since December 2018. And yet, despite the three years of lead time, the BOP is not offering, providing, or making any progress towards, preferential housing units for participating inmates, nor phone minutes under the First Step Act, nor expanded commissary, nor transfers to halfway house

44

while a qualified inmate is successfully participating in EBRRs or receiving equivalent participating credits.

Maxwell seeks declaration regarding these failures of the BOP (not for disciplinary purposes which is not relevant here) to make available <u>any</u> of the ancillary benefits of the First Step Act, in addition to the earned time credits.

PRAYER

FOR THESE REASONS, Maxwell prays for declaratory and injunctive relief inside the §2241 paradigm for the BOP's failure to properly follow the 18 U.S.C. §3621(b) factors and the mandatory language in §3624(c) when considering his transfer to halfway house or home confinement, under the CARES ACT (substantive due process). Maxwell seeks declaratory and injunctive relief for the BOP's failure to properly follow the First Step Act, to properly credit time credits. Maxwell seeks declaratory and injunctive relief for the BOP's failure to provide the ancillary mandatory benefits under the First Step Act. Maxwell, seeks specific declarations as noted herein regarding the First Step Act, to include the juxtaposition of the permissive "may" with the mandatory "shall" in the BOP's publication of rules regarding the First Step Act (See 28 U.S.C. §§523.40-44). Maxwell seeks declaratory relief regarding the participation in productive activities (inmate work) prior to December 21, 2018 (productive activities are not excluded under the statute -- See 18 U.S.C. §3632(d)(4)(B)(A prisoner may not earn time credits ... [for] reduction program ... (i) prior to the date of enactment of this subchapter [enacted Dec. 21, 2018]; or (ii) during official detention prior to the date that

45

the prisoner's sentence commences under section 3585(a)) and the BOP's final rule 28 C.F.R. §523.42(b)(1) (An inmate cannot earn FSA Time Credits for programming <u>or activities</u> in which he or she participated before December 21, 2018, the date of enactment of the First Step Act of 2018). The BOP improperly added productive activities to the pre-act exclusionary period, which statutorily is confined to productive programming. Maxwell seeks such other and additional relief to which his petition entails and/or to which he may be entitled at law or in equity.

Respectfully submitted,

William Maxwell
Reg # 71944-279
FCI-Beaumont-Low
P.O. Box 26020
Beaumont, Texas 77720
Pro se'

## VERIFICATION

I hereby certify that the material factual allegations contained herein are within my personal knowledge and are true and correct to the best of my knowledge and belief. I make this declaration pursuant to 28 U.S.C. §1746 and under penalties of perjury.

2/11/2022
Date

William Maxwell

46

## CERTIFICATE OF SERVICE

I hereby certify pursuant to 28 U.S.C. § 1746 and under penalties of perjury that I placed this package in the BOP internal mail system on ___Feb  1_____, 2022.

_2/1/2022_
Date

_William Maxwell_
William Maxwell

47

## END NOTES

1) June 24, 2010 Memorandum from BOP Assistant Director Program Director, provides in part:

Individual Assessment Regarding using 18 U.S.C. §3621(b) factors. "These individual assessments occur as part of the inmate classification and program review process [performed every six months by Unit Manager and Team], with the Unit Manager holding decision making responsibility at the Unit level. Institution or region-specific parameters for RRC placement decision making are prohibited. (John Maxwell, Paul Manafort and Michael Cohen were all in different institutions as different regions and all received different treatment from the BOP -- the definition of arbitrary and capricious --i.e. standardless -- treatment) Here, Unit Team approved Maxwell's transfer to home confinement. The acting AW (Cutright), exceeding her authority, violating the BOP memoranda, the statutory authority conferred on the BOP by 18 U.S.C. §§ 3621(b); 3624(c) (During the Cares Act Period); 3632 First Step Act provisions, arbitrarily and capriciously denied Maxwell's transfer to home confinement in a standardless manner, or, in using the wrong standards (percentage of sentence remaining). See Exhibit 14.

2) The transfer to home confinement under the CARES ACT is also governed by the §3621(b) factors. The CARES ACT did not the requirement of the BOP to do a §3621(b) analysis when transferring inmates to CCC or home confinement.

48

## END NOTES - 2

3) Title 18 U.S.C. §3632(d)(4)(B) provides for applicability of time credits. Therein the statute excludes recidivism reduction programs that the prisoner completed (1) prior to the date of enactment of this subchapter, or (ii) during official detention prior to the date that the prisoner's sentence commences under section 3585(a). Id.

Statutory construction principles control the interpretation of statutes. Here, the Congress' inclusion of recidivism programs in 18 U.S.C.(d)(4)(B) only, and he exclusion of "productive activities" necessarily mandates that productive activities be included for purposes of calculation of time credits, prior to the enactment of the subchapter. See Deal v. United States, 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.ED. 2D 44 (noting "fundamental principle of statutory construction (and indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is read") (internal citations omitted); See also Scalia & Garner, Reading Law 167, (2012) cited with approval in Huawai Techs. U.S.A., Inc. v. FCC, 2021 U.S.App. LEXIS 18318 * 22 (5th Cir. 2021) Additionally, the "negative-implication" canon of statutory construction applies to this statutory exclusion of the term productive activities (prison job has heretofore from time inmemoriam been defined as a productive activity for inmates to engage in. (See FSA activities references in BOP publications prior to the FSA. Further, while post-FSA definitions recharacterize prison jobs as productive

49

## END NOTES - 3

programming, the First Step Act, did not materially change the definition of "productive activities" from its pre-First Step Act definition, nor disclaim the definition of "productive activities" that existed pre-First Step Act.) In fact the Fifth Circuit instructs that the "negative-implication" canon is part of the Chevron supra analysis. See Bracken v. Haaland, 944 F.3d 249, 230 (5th Cir. 2021) (Courts are to use "all tools of statutory construction" at Chevron step one).

Additionally, the statute's purpose (FSA, providing for a reduction in the prison population by productive programming and productive activities) supports Maxwell's reading. Arguing additionally and alternatively, between "two competing interpretations" courts must favor the "textually permissible interpretation that furthers rather than obstructs" the statute's purposes. See Scalia & Garner, Reading Law: The Interpretation of Legal Texts §4, at 63 (2012) cited with approval in United States v. Bryant, 996 F.3d 1243, 1256 (11th Cir. 2021)

Next, a review of the statutory language, in the context of statutory construction protocols, reveals that the BOP (FCI-Beaumont-Low) is simply choosing to not follow statutory mandates. See Collings v. Munchin, 938 F.3d 553,569 (5th Cir. 2019) (en banc) ("The Supreme Court instructs that plain meaning comes first: [over agency rules and interpretations] "statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal quotation marks omitted)).

50

## AFFIDAVIT OF WILLIAM MAXWELL

STATE OF TEXAS:
COUNTY OF JEFFERSON:

My name is William Maxwell. I am over the age of 18 years. All the material factual allegations contained herein are within my personal knowledge and are true and correct to the best of my knowledge and belief. I make this declaration under 28 U.S.C. §1746 and under penalties of perjury.

"I was convicted on July 3, 2014 of offenses (white-collar) that are not excluded by the First Step Act. I have been incarcerated continually since that time. I do not have any disciplinary incident reports during my entire time in prison. I have continually been employed either as a cook (No.1 or 2) at FDC Philadelphia and FCI-Beaumont (September 2014-April 2016) or as a law clerk at the law library (April 2016-present). I have worked either 5 or 6 days per week during the entire time. My work schedule and performance schedule reflects above average performance during my entire time in the BOP work cadres. Attached hereto and incorporated herein are the payroll work sheets provided by staff. During my time working in the BOP I was one of two cooks who prepared the entire FCI-Beaumont-Low institution meals (day shift --breakfast and lunch) during the 2015 lockdown due to chicken pox (all other cooks locked down). Since my time at the law library I have assisted 28 inmates to receive sentence reduction or reversals of their convictions based on ineffective assistance of counsel, changes in law, and other legal basis. In addition I have assisted 1000s of inmates in preparation and filing of legal documents related

51

to wills, trusts, family law, civil law, state parole and probation issues, as well as time credit litigation under Barden, Willis and other matters.

I graduated from Baylor University, and Thurgood School of Law. I have further been enrolled at the University of Houston in the Sociology and Law Center (English Legal History and American Legal History with Professor Palmer).The BOP does not have appropriate educational or additional training opportunities for individuals with a doctoral level degrees.

My direct appeal is currently pending before the 3rd Circuit Court of Appeals. The direct appeal in my case has now taken in excess of 7.5 years. My brother who was also convicted in my case has served his entire sentence, has been released to supervised release (10 year sentence) during the pendency of the direct appeal. Both my brother and I were approved by our unit teams for home confinement under the CARES ACT, applying the 18 U.S.C. §§3621(b) factors and 3624(c) as modified by the CARES ACT on or about April 16, 2020. Both my brother, John Maxwell and I, signed our transfer papers on or about April 16, 2020. My brother arrived at home confinement on May 1, 2020 and was released from home confinement to supervised release under the First Step Act on or about January 15, 2022.

After I was approved for transfer to home confinement by my Unit Team in 2020, acting associate warden Cutright, improperly, and without authority, in violation of the §3621(b) factor analysis denied my transfer to home confinement using as a pre-textual basis the percentage of my sentence served.

52

Neither the warden, the Unit Team, or any insitution staff, initially, raised any issue with my transfer based on the §3621(b) factors (they could not because there are none). However, after I began the administrative remedy process, the BOP sought to obstruct, and did obstruct the administrative process, seeking continual delays, failing to meet deadlines, fabricating justifications for their actions. For example, the Warden, after initially advising my counsel, Arkadiy Grinshpun, in May 2020, that the sole basis for his denial of transfer to home confinement was the percentage of my sentence served, fabricated that I did not have a qualifying CDC comordibity factor. The warden, did this in bad faith, as on April 10, 2020, the Warden specifically tendered to me a memorandum that I was at high risk for death or severe illness due to COVID. As further evidence of the bad faith, the Warden postulated that my offense included some measure of violence. That is blatantly false. My case was solely a white collar offense. This is reflected by the PATTERN score which the BOP created which measures recidivism rates and violence rates. In both incidents I have a negative score, far below the lowest score of -0-.

Next, the BOP's regional and central office perpetuated these falshoods. The United States stipulated at my bail hearing, wherein I sought bail during the pendency of my appeal, that I was neither a flight risk or a danger to the community. Further still, at the trial of the matter the Court specifically instructed the jury that no one other that Scarfo and Pelullo were in any way associated with LCN. Further still, my brother who was released to home confinement has the same convictions as I did. The only difference between my brother and myself was

53

length of sentence.

Additionally, the white-collar offenses of Michael Cohen and Paul Manafort are substantively the same or similar as my white-collar offenses. Despite the fact that these two high profile and high economic and status individuals had more than 50% of their sentences to serve, were more than 18 months long, they nevertheless were transferred to home confinement. I have been treated differently for inmates exactly situated as myself (my brother who was located at a different institution, in a different region; and treated differently that inmates who were more socially advantaged than myself, all in violation of §3621(b).

I have repeatedly contacted the warden regarding the First Step Act, the CARES ACT, the statute §3621 and §3624, via email as instructed by Unit Team staff, all to no avail, as staff at FCI-Beaumont-Low substantively do not respond to email (thereby thwarting the administrative remedies (informal settlement)).

I have provided and been approved by the Southern District of Texas, probation department for transfer to home confinement, and in all ways qualify for all the relief sought herein, as more particularly noted in the exhibits attached to the petition and memorandum in support. I have been approved for transfer to home confinement by my Unit Team Staff, who pursuant to BOP policy is the deciding staff member regarding transfers to halfway house and home confinement. The BOP has no good faith basis or lawful justification for denying my transfer to halfway house or home confinement when applying the §3621(b) factors properly."

54

Further affiant sayeth not."

SUBSCRIBED AND SWORN TO BY

William Maxwell
Reg. # 71944-279

## BOP ADMINISTRATIVE REMEDY (in part) [1]

28 C.F.R. §542.10

   (a)  Purpose. The purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement.

   (b)  Scope. This Program applies to all inmates in institutions operated by the Bureau of Prisons, to inmates designated to contract Community Correction Centers (CCCs) under Bureau of Prisons responsibility, and to former inmates for issues that arose during their confinement ... (See Exhibit 21)

28 C.F.R. §542.11 Responsibility

   (a)  The Community Corrections Manager (CCM), Warden, Regional Director, and General Counsel are responsible for the implementation and operation of the Administrative Remedy at the Community Corrections Center (CCC), institution, regional and central office levels, respectively, and shall:

      (1)  Establish procedures for receiving, reviewing, _investigating_, and responding [timely] to Administrative Remedy Requests (Requests) or Appeals (Appeals) submitted by an inmate;

      (2)  Acknowledge receipt of a Request or Appeal by returning a receipt to the inmate; [not done in this case]

---

1. Copies of relevant C.F.R. and/or statutory authority are attached in an appendix.

1

(3) Conduct an investigation into each Request or Appeal; [not done in this case]

(4) Respond to and sign all Requests or Appeals filed at their levels ... [not done in this case]

(b) Inmates have the responsibility to use this Program in good faith and in an honest and straightforward manner.

## ADMINISTRATIVE REMEDY PROCESS

28 C.F.R.§542.13 Informal resolution.
28 C.F.R.§542.14 Initial filing.
28 C.F.R.§542.15 Appeals.
28 C.F.R.§542.17 Resubmission.
28 C.F.R.§542.18 Response Time.

## FIRST STEP ACT TIME CREDITS

28 C.F.R.§523.40 Purpose
28 C.F.R.§523.41 Definitions
28 C.F.R.§523.42 Earning First Step Act Time Credits.
28 C.F.R.§523.43 Loss of FSA Time Credits
28 C.F.R.§523.44 Application of FSA Time Credits.

2

## § 542.13 Informal resolution.

**(a)** Informal Resolution. Except as provided in § 542.13(b), an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy. Each Warden shall establish procedures to allow for the informal resolution of inmate complaints.

**(b)** Exceptions. Inmates in CCCs are not required to attempt informal resolution. An informal resolution attempt is not required prior to submission to the Regional or Central Office as provided for in § 542.14(d) of this part. An informal resolution attempt may be waived in individual cases at the Warden or institution Administrative Remedy Coordinator's discretion when the inmate demonstrates an acceptable reason for bypassing informal resolution.

**HISTORY:** [44 FR 62250, Oct. 29, 1979, as amended at 44 FR 76726, Dec. 27, 1979; 58 FR 58246, Oct. 29, 1993; 61 FR 86, 88, Jan. 2, 1996]

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## § 542.14  Initial filing.

(a) Submission. The deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form (BP-9), is 20 calendar days following the date on which the basis for the Request occurred.

(b) Extension. Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed. In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed.

(c) Form.

(1) The inmate shall obtain the appropriate form from CCC staff or institution staff (ordinarily, the correctional counselor).

(2) The inmate shall place a single complaint or a reasonable number of closely related issues on the form. If the inmate includes on a single form multiple unrelated issues, the submission shall be rejected and returned without response, and the inmate shall be advised to use a separate form for each unrelated issue. For DHO and UDC appeals, each separate incident report number must be appealed on a separate form.

(3) The inmate shall complete the form with all requested identifying information and shall state the complaint in the space provided on the form. If more space is needed, the inmate may use up to one letter-size (8 1/2" by 11") continuation page. The inmate must provide an additional copy of any continuation page. The inmate must submit one copy of supporting exhibits. Exhibits will not be returned with the response. Because copies of exhibits must be filed for any appeal (see § 542.15(b)(3)), the inmate is encouraged to retain a copy of all exhibits for his or her personal records.

(4) The inmate shall date and sign the Request and submit it to the institution staff member designated to receive such Requests (ordinarily a correctional counselor). CCC inmates may mail their Requests to the CCM.

(d) Exceptions to Initial Filing at Institution.

(1) Sensitive Issues. If the inmate reasonably believes the issue is sensitive and the

CFR2                                    1                                    4

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution. If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted. Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request. The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission.

**(2)** DHO Appeals. DHO appeals shall be submitted initially to the Regional Director for the region where the inmate is currently located.

**(3)** Control Unit Appeals. Appeals related to Executive Panel Reviews of Control Unit placement shall be submitted directly to the General Counsel.

**(4)** Controlled Housing Status Appeals. Appeals related to the Regional Director's review of controlled housing status placement may be filed directly with the General Counsel.

**(5)** Other requests for formal review of decisions not originating from the Warden. Other than the exceptions listed above, formal administrative remedy requests regarding initial decisions that did not originate with the Warden, or his/her staff, may be initially filed with the Bureau office which made the original decision, and appealed directly to the General Counsel.

**HISTORY:** [44 FR 62250, Oct. 29, 1979; 58 FR 58246, Oct. 29, 1993; 61 FR 86, 88, Jan. 2, 1996; 75 FR 34625, 34626, June 18, 2010]

CFR2                                            2                                            5

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## § 542.15  Appeals.

(a) Submission. An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response. An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response. When the inmate demonstrates a valid reason for delay, these time limits may be extended. Valid reasons for delay include those situations described in § 542.14(b) of this part. Appeal to the General Counsel is the final administrative appeal.

(b) Form.

(1) Appeals to the Regional Director shall be submitted on the form designed for regional Appeals (BP-10) and accompanied by one complete copy or duplicate original of the institution Request and response. Appeals to the General Counsel shall be submitted on the form designed for Central Office Appeals (BP-11) and accompanied by one complete copy or duplicate original of the institution and regional filings and their responses. Appeals shall state specifically the reason for appeal.

(2) An inmate may not raise in an Appeal issues not raised in the lower level filings. An inmate may not combine Appeals of separate lower level responses (different case numbers) into a single Appeal.

(3) An inmate shall complete the appropriate form with all requested identifying information and shall state the reasons for the Appeal in the space provided on the form. If more space is needed, the inmate may use up to one letter-size (8 1/2" x 11") continuation page. The inmate shall provide two additional copies of any continuation page and exhibits with the regional Appeal, and three additional copies with an Appeal to the Central Office (the inmate is also to provide copies of exhibits used at the prior level(s) of appeal). The inmate shall date and sign the Appeal and mail it to the appropriate Regional Director, if a Regional Appeal, or to the National Inmate Appeals Administrator, Office of General Counsel, if a Central Office Appeal (see 28 CFR part 503 for information on locating Bureau addresses).

HISTORY: [44 FR 62250, Oct. 29, 1979; 58 FR 58246, Oct. 29, 1993; 61 FR 86, 89, Jan. 2, 1996; 70 FR 67090, 67091, Nov. 4, 2005, as confirmed at 71 FR 51748, 51749, Aug. 31, 2006]

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## § 542.17  Resubmission.

**(a)** Rejections. The Coordinator at any level (CCM, institution, region, Central Office) may reject and return to the inmate without response a Request or an Appeal that is written by an inmate in a manner that is obscene or abusive, or does not meet any other requirement of this part.

**(b)** Notice. When a submission is rejected, the inmate shall be provided a written notice, signed by the Administrative Remedy Coordinator, explaining the reason for rejection. If the defect on which the rejection is based is correctable, the notice shall inform the inmate of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal.

**(c)** Appeal of Rejections. When a Request or Appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection, including a rejection on the basis of an exception as described in § 542.14(d), to the next appeal level. The Coordinator at that level may affirm the rejection, may direct that the submission be accepted at the lower level (either upon the inmate's resubmission or direct return to that lower level), or may accept the submission for filing. The inmate shall be informed of the decision by delivery of either a receipt or rejection notice.

CFR2                                                  1                                                  7

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## § <u>542.18</u> Response time.

If accepted, a Request or Appeal is considered filed on the date it is logged into the Administrative Remedy Index as received. Once filed, response shall be made by the Warden or CCM within 20 calendar days; by the Regional Director within 30 calendar days; and by the General Counsel within 40 calendar days. If the Request is determined to be of an emergency nature which threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after filing. If the time period for response to a Request or Appeal is insufficient to make an appropriate decision, the time for response may be extended once by 20 days at the institution level, 30 days at the regional level, or 20 days at the Central Office level. Staff shall inform the inmate of this extension in writing. Staff shall respond in writing to all filed Requests or Appeals. If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level.

© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

SUBCHAPTER B -- INMATE ADMISSION, CLASSIFICATION, AND TRANSFER

PART 523 -- COMPUTATION OF SENTENCE

1. The authority citation for 28 CFR part 523 is revised to read as follows:

Authority:  5 U.S.C. 301; 18 U.S.C. 3568 (repealed November 1, 1987, as to offenses committed on or after that date), 3621, 3622, 3624, 3632, 3635, 4001, 4042, 4081, 4082 (repealed in part as to conduct occurring on or after November 1, 1987), 4161-4166 (repealed October 12, 1984, as to offenses committed on or after November 1, 1987), 5006-5024 (repealed October 12, 1984, as to conduct occurring after that date), 5039; 28 U.S.C. 509, 510.

2.  Add a new Subpart E to part 523, entitled "**First Step Act Time Credits**" as follows:

**SUBPART E – FIRST STEP ACT TIME CREDITS**

**Sec.**

**523.40  Purpose.**

**523.41  Definitions.**

**523.42  Earning First Step Act Time Credits.**

**523.43  Loss of FSA Time Credits.**

**523.44  Application of FSA Time Credits.**

**§ 523.40  Purpose.**

(a) The purpose of this subpart is to describe procedures for the earning and application of Time Credits as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of the First Step Act of 2018 (P.L. 115-391, December 21, 2018, 132 Stat 5194) (FSA), hereinafter referred to as "FSA Time Credits" or "Time

9

Credits."

(b) Generally, as defined and described in this subpart, an eligible inmate who successfully participates in Evidence-Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) that are recommended based on the inmate's risk and needs assessment may earn FSA Time Credits to be applied toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g).

**§ 523.41  Definitions.**

(a) **Evidence-Based Recidivism Reduction (EBRR) Program.** An EBRR Program is a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison. EBRR Programs may include, but are not limited to, those involving the following types of activities:

(1) Social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;

(2) Family relationship building, structured parent-child interaction, and parenting skills;

(3) Classes on morals or ethics;

(4) Academic classes;

(5) Cognitive behavioral treatment;

(6) Mentoring;

(7) Substance abuse treatment;

(8) Vocational training;

(9) Faith-based classes or services;

(10) Civic engagement and reintegrative community services;

10

(11)  Inmate work and employment opportunities;

(12)  Victim Impact Classes or other Restorative Justice programs; and

(13)  Trauma counseling and trauma-informed support programs.

(b) **Productive Activity (PA).** A PA is a group or individual activity that allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating.

(c) **Successful participation.**

(1) An eligible inmate must be "successfully participating" in EBRR Programs or PAs to earn FSA Time Credits for those EBRR Programs or PAs.

(2) "Successful participation" requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA.

(3) Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's "successful participation" for the purposes of FSA Time Credit eligibility.

(4) An eligible inmate, as described in paragraph (d) below, will generally not be considered to be "successfully participating" in EBRR Programs or PAs in situations including, but not limited to:

(i) Placement in a Special Housing Unit;

(ii) Designation status outside the institution (e.g., for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);

11

(iii) Temporary transfer to the custody of another federal or non-federal government agency (e.g., on state or federal writ, transfer to state custody for service of sentence, etc.);

(iv) Placement in mental health/psychiatric holds; or

(v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

(5) Opting out.

(i) If an eligible inmate "opts out," or chooses not to participate in any of the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, the inmate's choice must be documented by staff.

(ii) Opting out will not, by itself, be considered a disciplinary violation. However, violation of specific requirements or rules of a particular recommended EBRR Program or PA, including refusal to participate or withdrawal, may be considered a disciplinary violation (see 28 CFR part 523).

(iii) Opting out will result in exclusion from further benefits or privileges allowable under the FSA, until the date the inmate "opts in" (chooses to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, as documented by staff).

(d) **Eligible inmate.**

(1) Eligible to earn FSA Time Credits. An inmate who is *eligible to earn* FSA Time Credits is an "eligible inmate" for the purposes of this subpart. Any inmate sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or any person in the custody of the Bureau, is *eligible to earn* FSA Time Credits, subject to the exception described in paragraph (d)(2) below.

(2) Exception. If the inmate is serving a term of imprisonment for an offense specified in 18 U.S.C. 3632(d)(4)(D), the inmate is not *eligible to earn* FSA Time Credits.

12

**§ 523.42  Earning First Step Act Time Credits.**

(a) <u>When an eligible inmate begins earning FSA Time Credits.</u>  An eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served).

(b) <u>Dates of participation in EBRRs or PAs.</u>

(1) An inmate cannot earn FSA Time Credits for programming or activities in which he or she participated before December 21, 2018, the date of enactment of the First Step Act of 2018.

(2) An eligible inmate, as defined in these regulations, may earn FSA Time Credits for programming and activities in which he or she participated from December 21, 2018, until January 14, 2020.

(3) An eligible inmate, as defined in these regulations, may earn FSA Time Credit if he or she is successfully participating in EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment on or after January 15, 2020.

(c) <u>Amount of FSA Time Credits that may be earned.</u>

(1) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn ten days of FSA Time Credits.

(2) <u>Extra FSA Time Credits for Low/Minimum Recidivism Risk Inmates.</u>  For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn an additional five days of FSA Time Credits if the inmate:

(i) Is determined by the Bureau to be at a minimum or low risk for recidivating; and

13

(ii)  Has maintained a consistent minimum or low risk of recidivism over the most recent two consecutive risk and needs assessments conducted by the Bureau.

### § 523.43  Loss of FSA Time Credits.

(a)  <u>Procedure for loss of FSA Time Credits.</u>  An inmate may lose earned FSA Time Credits for violation of the requirements or rules of an EBRR Program or PA.  The procedures for loss of FSA Time Credits are described in 28 CFR part 541.

(b)  <u>How to Appeal loss of FSA Time Credits.</u>  Inmates may seek review of the loss of earned FSA Time Credits through the Bureau's Administrative Remedy Program (28 CFR part 542).

(c)  <u>Restoration of FSA Time Credits.</u>  An inmate who has lost FSA Time Credits under this regulation may have part or all of the FSA Time Credits restored to him or her, on a case-by-case basis, after clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541) for two consecutive risk and needs assessments conducted by the Bureau.

### § 523.44  Application of FSA Time Credits.

(a)  <u>How Time Credits may be applied.</u>  For any inmate eligible to earn FSA Time Credits under these regulations who is:

(1)  *Sentenced to a term of imprisonment under the U.S. Code*, the Bureau may apply FSA Time Credits toward prerelease custody or supervised release as described in paragraphs (c) and (d) of this section.

(2)  *Subject to a final order of removal under immigration laws as defined in 8 U.S.C. 1101(a)(17) (see 18 U.S.C. 3632(d)(4)(E))*, the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release.

14

(3) *Serving a term of imprisonment pursuant to a conviction for an offense under laws other than the U.S. Code (see Section 105 of the FSA, PUB. L. 115–391, 132 STAT. 5214 (not codified; included as note to 18 U.S.C. 3621))*, the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release. This provision will not bar the application of FSA Time Credits, as authorized by the D.C. Code, for those serving a term of imprisonment for an offense under the D.C. Code.

(b) <u>Consideration for application of FSA Time Credits.</u> Where otherwise permitted by these regulations, the Bureau may apply FSA Time Credits toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g) only if an eligible inmate has:

(1) Earned FSA Time Credits in an amount that is equal to the remainder of the inmate's imposed term of imprisonment;

(2) *Shown through the periodic risk reassessments a demonstrated recidivism risk reduction or maintained a minimum or low recidivism risk, during the term of imprisonment; and*

(3) Had the remainder of his or her imposed term of imprisonment computed under applicable law.

(c) <u>Prerelease custody.</u> The Bureau may apply earned FSA Time Credits toward prerelease custody only when an eligible inmate has, in addition to satisfying the above criteria in paragraph (b):

(1) Maintained a minimum or low recidivism risk through his or her last two risk and needs assessments; or

(2) Had a petition to be transferred to prerelease custody or supervised release approved by the Warden, after the Warden's determination that:

(i) The prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

15

(ii) The prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

(iii) The prisoner is unlikely to recidivate

(d) <u>Transfer to supervised release.</u> The Bureau may apply FSA Time Credits toward early transfer to supervised release under 18 U.S.C. 3624(g) only when an eligible inmate has, in addition to satisfying the above criteria in paragraphs (b) and (c):

(1) An eligible inmate has maintained a minimum or low recidivism risk through his or her last risk and needs assessment;

(2) An eligible inmate has a term of supervised release after imprisonment included as part of his or her sentence as imposed by the sentencing court; and

(3) The application of FSA Time Credits would result in transfer to supervised release no earlier than 12 months before the date that transfer to supervised release would otherwise have occurred.

## SUBCHAPTER C — INSTITUTIONAL MANAGEMENT

## PART 541 — INMATE DISCIPLINE AND SPECIAL HOUSING UNITS

3. The authority citation for part 541 continues to read as follows:

Authority: 5 U.S.C. 301; 18 U.S.C. 3621, 3622, 3624, 4001, 4042, 4081, 4082 (repealed in part as to offenses committed on or after November 1, 1987), 4161-4166 (repealed as to offenses committed on or after November 1, 1987), 5006-5024 (repealed October 12, 1984, as to offenses committed after that date), 5039; 28 U.S.C. 509, 510.

4. Amend 541.3, Table 1 – Prohibited Acts and Available Sanctions, to read as follows:

§ 541.3 Prohibited acts and available sanctions

16

\* \* \* \*

### Table 1 – Prohibited Acts and Available Sanctions

| | | |
|---|---|---|
| \* \* \* \* \* \* | | |
| **AVAILABLE SANCTIONS FOR GREATEST SEVERITY LEVEL PROHIBITED ACTS** | | |
| \* \* \* \* \* \* | | |
| | B.2 | Forfeit up to 41 days of earned FSA Time Credits for each prohibited act committed. |
| \* \* \* \* \* \* | | |
| **AVAILABLE SANCTIONS FOR HIGH SEVERITY LEVEL PROHIBITED ACTS** | | |
| \* \* \* \* \* \* | | |
| | B.2 | Forfeit up to 27 days of earned FSA Time Credits for each prohibited act committed. |
| \* \* \* \* \* \* | | |
| **AVAILABLE SANCTIONS FOR MODERATE SEVERITY LEVEL PROHIBITED ACTS** | | |
| \* \* \* \* \* \* | | |
| | B.2 | Forfeit up to 14 days of earned FSA Time Credits for each prohibited act committed. |
| \* \* \* \* \* \* | | |
| **AVAILABLE SANCTIONS FOR LOW SEVERITY LEVEL PROHIBITED ACTS** | | |
| \* \* \* \* \* \* | | |
| | B.2 | Forfeit up to 7 days of earned FSA Time Credits (only where the inmate is found to have committed a second violation of the same prohibited act within 6 months; forfeit up to 14 days of FSA Time Credits (only where the inmate is found to have committed a third violation of the same prohibited act within 6 months).. |
| \* \* \* \* \* \* | | |

\* \* \* \* \*

5. Amend 541.7, Unit Discipline Committee (UDC) review of the incident report, paragraph (f), as follows:

§ 541.7  Unit Discipline Committee (UDC) review of the incident report.

\* \* \*

(f) Sanctions.  If you committed a prohibited act or prohibited acts, the UDC can impose any of the available sanctions in Tables 1 and 2, except loss of good conduct time credit, FSA Time Credits, disciplinary segregation, or monetary fines.

17

APPENDIX 2

| PROGRAM STATEMENT | TOPIC ADDRESSED |
|---|---|
| 7310.04 | 12/16/98 Community Correction Center Utilization and Transfer Procedures at end of sentence (i.e. incorporting 18 U.S.C. §3624(c)(1)). |
| 5880.28 | 7/19/99 Sentence Computation Manual (CCA of 1984) (Does not address transfers to CCC prior to end of sentence governed by 18 U.S.C. §3624). |
| 5321.08 | 8/10/17 Unit Management Manual (Does not address transfer to CCC under 18 U.S.C. §3621(b) prior to end of sentence which uses 18 U.S.C. §3624) |
| 5160.05 | 1/16/2003 Designation of State Institution for Service to CCC under 18 U.S.C. §3621(b) prior to end of sentence which uses 18 U.S.C. §3624) |
| 5140.35 | 9/12/2001 Transfer of a Prisoner to State Custody Prior to Release from a Federal Sentence (Does not address transfer to CCC under 18 U.S.C. §3621(b) prior to end of sentence which uses 18 U.S.C. §3624). |
| 5100.08 | Sept. 4, 2019 Inmate Security Designation and Custody Classification. (Does not address |

1

| | inmate transfer to CCC prior to end of sentence which uses 18 U.S.C. §3624). |
|---|---|
| 18 U.S.C. §3621(e) | has 26 references in Program Statements all referencing the Residential Drug treatment program |

In short, the BOP has no Policy Statements regarding an inmate's transfer to CCC prior to the end of their sentence under §3624, nor has the BOP crafted any regulations as required by the First Step Act for CCC placement prior to end of sentence.

2

## EXHIBIT LIST NOTATION

EACH OF THE COLLECTED EXHIBITS MAY HAVE BEEN USED AS EXHIBITS DURING THE ADMINISTRATIVE REMEDY PROCESS. FOR CLARITY AND EASE OF USE, THE EXHIBITS HAVE PAGINATED AND THE PAGINATION IS NOTED IN THE EXHIBIT LIST INDEX (HIGHLIGHTED).

## VERIFICATION

I HEREBY CERTIFY THAT EACH OF THE EXHIBITS ARE TRUE AND CORRECT COPIES OF ORIGINALS, THAT THEY WERE MADE AT OR ABOUT THE EXACT TIME INDICATED ON THE EXHIBIT. ALTERNATIVELY, EACH MEMORANDA TO THE WARDEN CONTAINED HEREIN HAS INFORMATION THAT IS WITHIN MY PERSONAL KNOWLEDGE AND IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF. I MAKE THIS CERTIFICATION PURSUANT TO 28 U.S.C. §1746 AND UNDER PENALTIES OF PERJURY.

1-27-2022
_____
DATE

_____
WILLIAM MAXWELL
REG. # 71944-279

## EXHIBIT LIST

1) March 26, 2020 AG Barr's Memo to BOP (F000-F002)

2) March 29, 2020 Maxwell notice to Unit Manager (F003)

3) March 29, 2020 Pre-RElease Plan to Unit Manager (F004-F009)

4) April 7, 2020 2nd Notice to Unit Manager (F010-F011)

5) April 8, 2020 Counsel for Maxwell, Arkadiy Grinshpun,esq. notice to Warden (F012-F015)

6) April 10, 2020 Warden notice to Maxwell of high medical risk due to COVID because of Maxwell's life-long medical condition (Asthma moderate - severe) (F016)

7) April 16, 2020 Maxwell signed his BP-A0210 "Insititional Referral to CCC Placement"(F017-F018)

8) April 30, 2020 Counsel for Maxwell, Arkadiy Grinshpun, esq. second notice to Warden (F019-F024)

9) May 26, 2020 Southern District of Texas Probation Department's approval of Maxwell's transfer to home confinement (F025)

10) Maxwell's PATTERN Score reflecting minimum recidivism and Violence Scores (F026)

11) Correspondence from Maxwell to Warden (F027-F028)

12 Correspondence from Maxwell to Warden (F029-F039)

13) Counsel's correspondence to Warden (F040-F042)

14) Warden's Response to Counsel Grinshpun (F043-F045)

15) Warden's Bad Faith response to BP-9 (F046-F047)

16) Court Transcript - LCN/Violence does not apply to Maxwell (F048-F053)

i

## EXHIBIT LIST – 2

17) Sensitive BP-10 (F054-F056)

18) Second BP-10 (October 22, 2020) (F057-F062)

19) Regional Office Reply (BP-10 reply) December 22, 2020 (F063)

20) Notice of Late Reply by Regional Office January 19, 2021 (F064-F065)

21) BOP Memoranda regarding CARES ACT (F066-F069)

22) Maxwell Bail Hearing Transcript (F079-F079)

23) Paul Manafort/Michael Cohen (high profile) CARES Act transfer to home confinement (F080-F083)

24) Two inmate notices reflecting BOP bad faith (F084-F086)

25) Central Office Denial of Maxwell's BP-11 (F087)

26) Office of Inspector General November 15, 2021 Memo to Bureau of Prisons regarding the BOP's failure to implement the First Step Act (F088-F106)

27) BOP's publication of final rules related to FTC earned time credits (28 C.F.R. §§523.40-44 implementing 18 U.S.C. §3632) and thereby implementing the First Step Act (3 years late) (F107-F109)

ii

EXHIBIT 1



**Office of the Attorney General**

**Washington, D. C. 20530**

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:          THE ATTORNEY GENERAL

SUBJECT:     Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic

Thank you for your tremendous service to our nation during the present crisis. The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times. We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe. At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

I.     **TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH**

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances. I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

Exhibit C

F     000                                                        BP-8 - 1 (1 of 3)

Memorandum from the Attorney General                                           Page 2
Subject: Department of Justice COVID-19 Hoarding and Price Gouging Task Force

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.    PROTECTING THE PUBLIC

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.

F    001                    BP-8-1(2of3)

Memorandum from the Attorney General                                      Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

    The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

    I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

F   002   BP-8-1 (3 of 3)

EXHIBIT 2

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

--------------------------------------------------------------------------------------------------

FROM: 71944279 MAXWELL, WILLIAM
TO: Unit Management BLD 1 LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 03/29/2020 09:41 AM

To: Mr. Rivera
Inmate Work Assignment: Education

Mr. Rivera

Re: Transfer to home confinement pursuant to Attorney General Barr's 3.26.2020 Directive to the BOP

Mr. Rivera,

I am herewith requesting transfer to home confinement under Attorney General Barr's 3.26.2020 Directive to the BOP. I am preparing a memorandum in support of this request addressing all of the statutory and discretionary factors as outlined in the Attorney General's Directive. Included in the memorandum is a detailed home confinement plan, letters of commitment and support, staff letters and other materials for your consideration in conjunction with this request. That memorandum will be delivered to you this week. Thank you for your considerations in this regard.

Respectfully submitted,

William Maxwell

F    003

BP 8-2 (1 of 1)

EXHIBIT 3

WILLIAM MAXWELL

Reg # 71944-279

Unit Manager L. Rivera
Unit T-A
FCI Beaumont-low
Beaumont, Texas 77720

Re: Inmate William Maxwell's Request for Transfer to Home Confinement pursuant to Attorney General Barr's March 26, 2020 Directive published and directed to the BOP.

Mr. Rivera:

Attached hereto, to accompany my electronic "cop-out" request of March 29, 2020, is a memorandum in support addressing all the statutory and discretionary factors (Including Pre-Release Plan for Reentry) to be considered by you in determining whether to transfer me to home confinement.  These include items easily verified along with supporting documentation, letter(s) of support and other materials, to support my request to be transferred to home confinement.

Respectfully submitted,

William Maxwell
Reg # 71944-279

F    004        BP-8-3 (1 of 6)

## TABLE OF CONTENTS

1) Home Confinement Worksheet ...............................................................

2) William Maxwell's CV at the time of entry into the BOP .............

3) William Maxwell's Release Address ......................................

4) Persons to occupy residence with William Maxwell ..................

5) Telephone Number of the Residence ....................................

6) William Maxwell's Future Employer .....................................

7) Employer's Address .........................................................

8) Employer's Phone number ..................................................

9) William Maxwell type of work ..............................................

10) Inmate's Sentencing District ..............................................

11) Detainers (none) ............................................................

12) Special Conditions of Release ............................................

13) Release Plan .................................................................

F    005

BP-8-3 (2 of 6)

WILLIAM MAXWELL

Reg. # 71944-279

D.O.B. : 5-4-59
Age : 60, 61 on May 4, 2020.
Co-Morbidity : Asthma, Skin Cancer

PRIOR WORK HISTORY

William Maxwell, P.C./ William Maxwell, P.L.L.C. 2004-2014
 Lead Counsel, Small litigation firm, specializing in criminal, civil, and Administrative law 5-10 employees. Currently licensed in Texas. Texas Bar Number 24028775. (License Suspended pending appeal) Admitted before all Texas Courts, United States District Court Southern District of Texas, United States District Court Northern District of Texas, United States Court of Appeals for the Fifth Circuit.

Gilbert & Maxwell, P.L.L.C. 2000-2004
 Partner in Firm. Small litigation firm, specializing in criminal, civil and Administrative law, 10-12 employees

Gilbert Law Firm, 1996-2000
 Associate in law firm. Civil litigation firm

Gilbert & Mestemaker, P.C. 1994-1996
 Paralegal

Mall-Mart, 1989-1994
 Founder and Owner of a small chain of Retail stores in Houston and Lake Jackson, Texas

EDUCATION

University of Houston --PB/MA English Legal History, American Legal History
 1999-2000

Thurgood Marshall School of Law -- J.D. 1996-1999 (Graduated Cum Laude)

University of Houston --PB/MA Sociology 1988-1989

Baylor University, Waco, Texas -- BBA Business Administration Mgt. Finance
 1977-1982   -- BA Radio TV, Film

AWARDS/MEMBERSHIPS

Thurgood Marhall - Awards

Graduated Cum Laude

F 006  BP-8-2 (2 of 6)

Amjur, Corpus Juris, Execellencia in Contracts, Criminal Law, Torts, Texas Practice
-Constitutional Law, Evidence

Mock Trial team, Moot Court team, Law Review

ASSOCIATIONS

American Trial Lawyers Association, Texas Trial Lawyers Association

LICENSES

FCC-1 Broadcast License, Texas Bar License # 24028775 (Suspended pending appeal)
TDL # 24028775 Valid until 5-4-2020 (Extended due to Corona Virus until August 4, 2020)

PUBLICATIONS/SEMINARS PRESENTED

"Workers Compensation Review", "Personal Injury Review" Texas Provider Resource 2001-2004

Presenter for Texas Chiropractic Association for CE credits 2000-2004

PERSONAL

Children: Coral Maxwell Age 14

F    007                    RP-8-3 (4 of 6)

RELEASE ADDRESS:

Faith Christian Center (19 Acre Complex)
3940 Vista Road
Pasadena, Texas 77504
(713) 944-7755 (Main Switch Board)

Complex Living Quarters

PERSONS TO OCCUPY RESIDENCE

William Maxwell is joint managing conservator of Coral Carin Maxwell, D.O.B. 10.24 2005. Coral is 14 years of age and has resided exclusively with her mother since July 3, 2014 (date of incarceration). Crystal Maxwell, Coral's mother (both on approved visitor's list) is remarried. Coral will begin, after the Corona Virus clears, to reside, pursuant with the divorce decree with William Maxwell 50% of the time. Coral attends St. Anne's Private School in Houston, Texas.

WILLIAM MAXWELL'S FUTURE EMPLOYER

Faith Christian Center has agreed to provide living quarters, food, utilities, and necessary expenses during the Corona Virus pandemic lockdown period (see Correspondence attached). William Maxwell will provide paralegal services, substitute teaching, office assistance and related support to Faith Christian Center (part time), upon the Center's reopening after the pandemic has passed. During the pandemic no costs will be incurred by William Maxwell. After the Center has reopened, William Maxwell work and services to the Center in exchange for support at a rate to exceed minimum wage.

Outside employment. Several members of the church have agreed to consider William Maxwell for employment after a final interview to be conducted post pandemic. William Maxwell will perform education and skills related employment as approved by the supervising agency.

EMPLOYER'S ADDRESS

Faith Christian Center
3940 Vista Road
Pasadena, Texas 77504
(713) 944-7755 (main switchboard)

F    008                              BP-8-3 (sat 6)

## SENTENCING COURT

William Maxwell was sentenced by the United States District Court of New Jersey, Camden. William Maxwell's direct appeal is pre-filing and pending in the Third Circuit Court of Appeals in Philadelphia, PA.

## DETAINERS

William Maxwell has no detainers nor any criminal history.

## SPECIAL CONDITIONS OF RELEASE

F    009                              BP-8-3 (6 of 6)

EXHIBIT 4

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

------------------------------------------------------------------------------------------------------

FROM: 71944279 MAXWELL, WILLIAM
TO: Unit Management BLD 1 LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 04/07/2020 12:18 PM

To: Mr. L. Rivera
Inmate Work Assignment: Education

Mr. Rivera:

I wanted to memorialize our conversations in view of the Directive of the AG Barr on April 3, 2020, and the Bulletin Board posting at the institution on Monday April 6, 2020. In particular:

In March 26, 2020, AG Barr issued his first Directive to the BOP for release of inmates to home confinement. There have now been at least two public follow-on Directives to the BOP (one the subject of ACLU Litigation for not being expansive enough) from the AG. Most recently, on April 3, 2020, the AG invoked his authority under Section 12003(b)(2) of the CARES ACT to declare that the Corona Virus was affecting "the operation of the BOP." AG Barr instructed a "new cohort" of inmates (no longer subject to any considerations based on the amount of time remaining on an inmates sentence) who would qualify to be transferred to home confinement based on age and co-morbidity (in my case asthma and Skin Cancer that has been treated by the BOP) and laid out a order and framework to follow to send inmates to home confinement as quickly as possible.

Anticipating such action, I spoke with you and prepared a pre-release packet and request for transfer to home confinement, on March 29, 2020. I prepared a home confinement work sheet that was included in my packet addressing all of the factors to be considered by the BOP in processing my release due to my high risk because of my asthma. The worksheet was based on AG Barr's Directives and the relevant statutory authority for placing inmates on home confinement. Those are found collectively at 18 U.S.C. Section(s) 3621; 3624; 3632; and 34 U.S.C. 60541 and in the BOP policy statements (as modified by the AG's Directives and the CARES ACT).

I additionally electronically requested to be placed on home confinement on March 29, 2020. I additionally prepared a detailed package to include the "home confinement" worksheet and a verifiable pre-release home plan. Those were all tended to you on March 29, 2020. I understand from you that my request was promptly reviewed, and after it was determined that I qualified to be placed on home confinement and after I was approved to be placed on home confinement it was forwarded for processing so that I could be placed on home confinement on or before April 3, 2020.

In support of my application, Faith Christian Center sent you a letter via email and overnight hard copy. The details of the church's sponsorship of my home confinement residence, food, utilities, employment, and agreement to abide by any restrictions placed on me by the BOP or PO while on home confinement.

Both of these (email and hard copy) should by now have been included in my pre-release home confinement application.

In Summary:

I have a detailed home release package, providing for residence, land line phone, food, utilities, employment and supervision in addition to any requirements placed on me by the BOP or Probation Office.

I have none of the exclusionary factors: I am not serving a life sentence, I have no criminal history at all and no history of violence. I have no sex offenses or history of sex offenses.

I qualify under all of the discretionary factors from the statutory authority and the Directives of the Attorney General.

I am 60 years old with co-morbidity factors of asthma and skin cancer;
I have no prior crimes at all;
I have the lowest possible custody classification (security points);
I have no history of violence of sex offenses while in BOP custody;
I have no escape attempts;
Home confinement will save the BOP money;
I have the lowest possible PATTERN SCORE;
I have multiple CDC Risk Factors -- 60 years of age, asthma, skin cancer;
I have no prison violence or gang related activities;

F     010     RP-8-4 (1 of 2)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

-------------------------------------------------------------------------------------------------------------------------

I have no disciplinary reports at all;
I have a verifiable re-entry plan;
I will be isolated (in my own housing unit) during the Covid-19 period at the Church facility;
I have a life long history of asthma and decades long history of skin cancer for which the BOP has treated me with two modalities (medications) for asthma and have had several cancerous lesions removed from my arms while in the BOP.

IN that I fully qualify in all ways for placement on home confinement, and in memorialization of the actions I have taken, and the actions that you have taken on my behalf, I renew my request to be expedited to home confinement (in accordance with the statutory authority and Directives of the Attorney General) especially in view of my age, asthma, skin cancer, and high risk for disastrous consequences due to the Corona Virus pandemic.

Respectfully submitted;

William Maxwell
Reg # 71944-279

** CARES ACT of March 27, 2020, eliminates any 2/3rds sentence requirement after AG's April 3, 2020 Directive and Declaration.

F    011                    BP-8-4 (2 of 2)

EXHIBIT 5

TRANSMISSION VERIFICATION REPORT

```
TIME  : 04/08/2020 01:46PM
NAME  :
FAX   :
TEL   :
SER.# : U64208K6N305641
```

```
DATE,TIME              04/08  01:45PM
FAX NO./NAME           14096263410
DURATION               00:01:16
PAGE(S)                04
RESULT                 OK
MODE                   STANDARD
                       ECM
```

# Freedman & Grinshpun, PC

*for your business and personal needs*

Gary B. Freedman, Esq., LLM*
Arkadiy Grinshpun, Esq., LLM*
*Admitted PA and NJ Bar

7909 Bustleton Avenue
Philadelphia, PA 19152
215-708-7390
fax 215-708-7391

## FACSIMILE TRANSMISSION COVER SHEET

FROM                                          PARALEGAL

___ Gary B. Freedman, Esquire                 _x_ Kim Bullard

___ Arkadiy Grinshpun, Esquire                ___

___ REPLY NECESSARY                           ___ NO REPLY

DATE: __4/8/2020 1:13 PM__

RE: __William Maxwell #71944-279   Gary McDuff #59934-079__

TO: __Warden F.J. Garrido__      FACSIMILE NO: __409-626-3410__

Total number of pages, including cover: ____4____

_x_ Original will not follow
___ Original will follow by:
    ~~Regular mail~~

F   **012**   BP-8-5 (1 of 4)

## Freedman & Grinshpun, PC

*for your business and personal needs*

Gary B. Freedman, Esq., LLM*
Arkadiy Grinshpun, Esq., LLM*

*Admitted PA and NJ Bar

7909 Bustleton Avenue
Philadelphia, PA 19152
215-708-7390
fax 215-708-7391

April 8, 2020

F.J. Garrido, Warden
FCI Beaumont Low
P.O. Box 26025
Beaumont, Texas 77720

RE:  **William Maxwell - Reg # 71944-279**
     **Gary McDuff - Reg # 59934-079**

Dear Warden Garrido:

I am writing to you on behalf of my clients, William Maxwell (Reg # 71944-279) and Gary McDuff (Reg # 59934-079), pending release under the Attorney General's prior Directives to the BOP on March 26, 2020 and April 3, 2020, based on the Corona Virus and its deadly effect on the BOP.

As you are aware on March 26, 2020, the Attorney General issued his first public Directive to the BOP regarding the use of home confinement under the statutory authority and discretionary authority of the BOP found in Title 18 U.S.C. Sections 3621 and 3624 and Title 34 U.S.C. Section 60541. Those authorities ultimately led to the passage of the First Step Act in December of 2018. Therein, the Congress allowed for inmates to be placed in home confinement for the last two-thirds of their sentence, provided they met certain specified conditions, at the BOP's discretion. The March 26, 2020 Directive to the BOP ordered the BOP "prioritize" the use of home confinement due to the outbreak of the Corona Virus.

On March 27, 2020, the Congress passed the CARES Act. In the CARES Act, Section 12003(b)(2), the Congress allowed for the waiver of restrictions and expansion of the use of home confinement when the Attorney General declares that the pandemic has materially affected the BOP. The time period of the effectiveness of the changes in the statutes authorized by the CARES Act currently runs through May 30, 2020 and can be expanded based on the President's declaration (at this point, extension) of a National Emergency.

F   013                              BP-8-5 (2 of 4)

The Attorney General in the April 3, 2020 Declaration made such a declaration of the pandemic materially affecting the BOP.

On April 3, 2020, the Attorney General issued another Directive to the BOP to expedite the release of inmates over the age of 60 and inmates who have co-morbidity medical issues as described by the CDC. This was largely due to the outbreaks at FCI Oakdale, FCI Elkton, and FCI Danbury, which had resulted in multiple deaths due to the virus and a larger number of cases of COVID-19 and multiple hospitalizations. This April 3, 2020, the Attorney General identified a "new cohort" of inmates who are expected to particularly exposed to the dangers of the COVID-19 virus. The factors that I will list below, were address in the Statutes and in the Attorney General's Directives to the BOP.

Additionally, on April 6, 2020 your institution issued a memorandum to the inmates that their files were being reviewed for release to home confinement based on the CARES ACT and the Attorney General's Directive to the BOP. It is for these issues that I write to you today.

My Client, William Maxwell is over the age of 60 (61 in May). He has had asthma his entire life and is currently being treated by the BOP with a steroid as well as a emergency inhaler. He has previously had skin cancer lesions removed by surgery and the BOP has frozen off several lesions during his time in the BOP.

My Client, Gary McDuff is over the age of 60 (66 this year). He has an extensive history of skin cancer lesions that have been frozen off by the BOP during his time in the BOP.

The statutes and the Attorney General Directives provide for exclusionary factors which would preclude an inmate from consideration for home confinement. My clients have none of these.

Inmates to be released to home confinement may not have life sentences, be sex offenders or violent offenders. Neither of my clients have any of these exclusionary factors.

The statutes and the Attorney General Directives provide for discretionary factors (permissive factors for the BOP to consider in releasing the inmate to serve the balance of their sentence on home confinement, my clients have all -- every single factor in their favor).

Those factors are: Over the Age of 60; Co-morbidity factors (as noted above) as determined by the CDC; lowest possible recidivism scores as determined by PATTERN SCORE (-0-); lowest security rating (my clients are the lowest security ratings -0- points); they have filed a verifiable home release plan (they are being sponsored by Faith Christian Church, which the Church has previously provided required verification; they have no gang affiliation, they have no violence in prison, they have no sexual activity in prison, release would be a cost savings to the BOP, they have been determined by their Unit Manager L. Rivera to qualify for home confinement and he has recommended home confinement; they have filed with Unit Manager L. Rivera a packet of all the information required on the BOP Form A210 pertaining to their release; and finally none of the discretionary factors weigh against them.

F   014   BP-8-5   (3 of 4)

A point of clarification, the 2/3rds requirement previously required under Title 34 U.S.C. Section 60541 is no longer applicable after the Attorney General's latest Directive to the BOP. By way of reference and illustration, William Maxwell's brother is also in the BOP custody. He is housed in Tennessee at Millington Camp. He began his sentence at the same time as William Maxwell and has not reached his 2/3rds release date. Mr. John Maxwell. Jr. has been noted for release and executed is release papers and will be released in the near future and be released to Nashville, Tennessee.

Thank you for your prompt attention to this matter. Please feel free to call me at if you have any questions or concerns.

Sincerely yours,

Arkadiy Grinshpun, Esquire

AG/kab
Via Fax – (409) 626-3410

cc:    Complex Counsel (Tina Hauk, Esq.)
       FCI Beaumont Low
       P.O. Box 26025
       Beaumont, Texas 77720

F    015       BP-8-5 (4 of 4)

EXHIBIT 6



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

P. O.  Box 26035
Beaumont, Texas 77720

April 10, 2020

MEMORANDUM FOR INMATE WILLIAM MAXWELL, REG. NO. 71944-279
(T04-057U)

FROM:          F. J. Garrido, Warden
               Federal Correctional Complex, Beaumont, Texas

SUBJECT:       High Risk Concern

I want to inform you the Centers for Disease Control (CDC) has
designated individuals with certain health conditions to be at
increased risk of experiencing more severe effects of
contracting COVID-19.  Additionally, it has been determined
individuals over the age of 60, are considered to be in the high
risk category.

It has been determined you fall into one of these categories.
Therefore, I am highly encouraging you to be cautious with your
daily interactions with others and take the fullest
precautionary measures available to protect yourself.

You have been provided a medical face shield for your protection
while interacting with others outside of your living areas.
Additionally, sanitation materials are provided for you to
continuously sanitize your living space.  There are bleach
mixtures and other chemicals being provided.  I highly encourage
you to take advantage of these opportunities to properly
sanitize your cell and living areas on a daily basis.
Additional CDC guidance indicates regular hand washing, and
social distancing will greatly reduce your risk for exposure.

As we continue to implement preventative measures, please be
aware our goal is to protect the inmate population from
exposure.  Due to your high-risk potential, we encourage you to
take all measures to aid us in these efforts.

F    016

EXHIBIT 7

BP-A0210    **INSTITUTIONAL REFERRAL FOR CCC PLACEMENT** CDFRM
OCT 10

U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

| TO: (Community Corrections Manager)<br><br>Vacant, RRM | FROM: Chief Executive Officer (Name, Title & Date) –<br>Signature certifies approval and CIMS Clearance | |
|---|---|---|
| Inmate Name<br>MAXWELL, WILLIAM | Register Number<br>71944-279 | Date<br>04/16/2020 |
| Unit Manager/Mail ID<br><br>L. RIVERA, EXT 2321 | Institution (Address and Phone Number)<br>BEAUMONT LOW FCI<br>P.O. BOX 26025<br>BEAUMONT, TX 77720<br>(409)727-8172 | |

| 1. Release City Dickinson | | Supervision District Southern District of Texas |
|---|---|---|
| 2. Anticipated Release Date<br>07/17/2031 | Method<br>GCT REL | Verified by (ISM Staff)<br>Pitre, Edward 04-17-2020 |

| 3. Recommended (only one):<br>  a. Range_____, or<br>  b. Date 06/30/2020 | 4. If a presumptive parole case, enter the date the pre-release record review progress report was submitted to the Parole Commission: _____ |
|---|---|

| 5. Statutory Interim Hearing Scheduled?<br>  ☐ Yes  ☐ No  ☐ Waived | 6. Supervised Release<br>  ☑ Yes  ☐ No | Special Parole Term<br>  ☐ Yes  ☑ No |
|---|---|---|

| 7. Aftercare Supervision<br>  ☐ Drug  ☐ Alcohol  ☐ Mental Health  ☐ Other | ☑ N/A |
|---|---|

| 8. CIM Case: ☑ Yes ☐ No | Assignment: Separation |
|---|---|

| As CMC, I have reviewed the Request for Activity Clearance (404) and the SENTRY CIM Clearance and Separatee Data and I recommend the inmate be considered for CCC placement and clearance be granted by the Warden.<br><br>   ☑ Yes  ☐ No   Signature of CMC Moore, Deanne _____<br>Upon signature of the Warden, I will update SENTRY to reflect CCC referral for range/date as listed in item 3 above. | NOTE:<br>The CMC will update SENTRY to reflect specific dates and CCC location code upon notification of acceptance from the CCM. |
|---|---|

| 9. If proposed District of Supervision differs from Sentencing District, has USPO approved?<br>  ☑ Yes  ☐ No | 10. Does inmate have a committed fine?   ☐ Yes   ☑ No<br>If yes, indicate how fine will be paid in item 12. |
|---|---|

11. Additional Information, including status of any detainers or pending charge(s) and whether there is a substance abuse history.

  Inmate Maxwell has no pending charges or detainers.  His Presentence Investigation indicates no substance abuse.  Inmate Maxwell is requesting to reside in the Faith Christian Center Academy.

F    017

12.   Specific release preparation/Pre-natal care needs.

Inmate Maxwell is being referred for Home Confinement placement under the provisions contained in the First Step Act (FSA) for placement of eligible elderly offenders and eligible terminally ill offenders. Inmate Maxwell is currently 60 years old, serving a 240 month sentence for Racketeering Conspiracy, Wire Fraud Conspiracy, Money Laundering . His criminal history and inmate disciplinary record reveal no charges or convictions involving violence, escape, or a sexually related offense.
In addition to meeting these requirements of the FSA Elderly Home Confinement, inmate Maxwell also meets the criteria listed in the Attorney General's COVID-19 Pandemic memorandum. As previously noted, inmate Maxwell is 60 years old, and medical staff at FCI Beaumont have determined he is an "at risk" vulnerable inmate. Inmate Maxwell is currently classified as a three point Low Security Level inmate, and has a PATTERN Recidivism score of Minimum. The SIS Department at FCI Beaumont has confirmed that inmate Maxwell has not engaged in any violent or gang related activity, and he has maintained a clear disciplinary record.
If approved for Home Confinement, inmate Maxwell would reside in a motor home at 4400 Country Club Dr., Dickinson, Texas 77539. The telephone contact number is 832-287-8730. It is believed inmate Maxwell will not pose a danger to the community.

| 13.   For MINT Referrals, Date of Delivery: | 14.   (a)  For MINT Referrals, Projected Date of Return to Parent Institution: |
| --- | --- |
| | (B)  Proposed guardian: |

| TO BE FORWARDED WITH THE REFERRAL FORM | NO. COPIES | TO BE FORWARDED TO THE REGIONAL TSM | NO. COPIES |
| --- | --- | --- | --- |
| BP-S210, Referral Form | 2 | BP-S210, Referral Form | 1 |
| Current Progress Report | 2 | Current Progress Report | 2 |
| Pre-sentence Report/Violation Report | 2 | Treatment Summary and Referral Form | 2 |
| Community Based Program Agreement | 2 | Drug Abuse Treatment Programs Agreement to | |
| BP-339 CIM Case Information Summary (Non-Separation Cases) | 1 | Participate in Community Transition Programming | 2 |
| USPO Acceptance Letter | 2 | | |
| Copy of Latest Notice of Action | 2 | | |
| BP-351 Medical Evaluation for Transfer of Inmates to CCC Type Facility | 2 | | |
| Judgment & Commitment Order | 2 | | |
| Statement of Responsibility | 2 | | |

* If the inmate has a diagnosed, ongoing medical condition, such as diabetes or coronary disease, send any pertinent medical records.

Record Copy - CCM; Copy - Institution File; Copy - USPO Sentencing District; Copy USPO District of Supervision

PDF                        Prescribed by P7310                This form replaces BP-210 November 1995

F   018

EXHIBIT 8

## Freedman & Grinshpun, PC

*for your business and personal needs*

Gary B. Freedman, Esq., LLM*
Arkadiy Grinshpun, Esq., LLM*

*Admitted PA and NJ Bar

7909 Bustleton Avenue
Philadelphia, PA 19152
215-708-7390
fax 215-708-7391

April 30, 2020

F.J. Garrido, Warden
FCI Beaumont Low
P.O. Box 26025
Beaumont, Texas 77720

RE:    **William Maxwell - Reg # 71944-279**

Dear Warden Garrido:

I am following-up on my April 8, 2020 correspondence to you regarding my client. (See Copy attached).

In my prior correspondence I noted the March 26, 2020 Attorney General Directive and the April 3, 2020 Attorney General Directive (regarding transferring my clients to home confinement); wherein the Attorney General made the declaration that the COVID-19 pandemic "has materially affected the BOP."

I further addressed the qualifications for my client to be released under the CARES Act which was passed by Congress on March 27, 2020. I noted the Attorney General's Directive that "the BOP was to expedite the release of inmates over the age of 60 **and** inmates who have co-morbidity medical issues as described by the CDC." [My client is over the age of 60 and have co-morbidity factors].

I noted the critical situations that had come to the forefront of the BOP at FCI Oakdale, FCI Elkton, and FCI Danbury. (In the interim Elkton has become the subject of a preliminary injunction and habeas corpus action *see Wiley v. Williams*, in the United States District Court for the Northern District of Ohio, Cause No. 4:20-cv-00794, along with dozens of other outbreaks across the BOP including at Ft. Worth with multiple deaths and hundreds of new COVID-19 cases). Since the date of my last letter/fax, the number of inmate deaths with co-morbidity factors in the BOP has substantively increased (arguably unnecessarily).

I also noted the April 6, 2020 institutional memorandum issued to the inmates regarding the inmate files being reviewed for transfer to home confinement. (It is my understanding that three weeks later no one has left from Beaumont low).

F   019

BP-8-10 (1 of 6)

Finally, I discussed my client's qualifications under the Attorney General's Directives and the statutory factors to be considered in order for inmates to be released to home confinement. It has now been three weeks and I wanted to follow-up as I have not heard from you. **Time is of the essence.**

Since the time of my last correspondence the following has transpired:

On the afternoon of April 8, 2020, my client executed "release of information" forms to allow the BOP to communicate with me.

On April 10, 2020, you (Warden F. J. Garrido) issued a notice to my client William Maxwell that the was at "high risk" for serious illness or death from the COVID-19 virus based on the CDC factors and his co-morbidity.

On April 12, 2020 my client was advised that he qualified for processing to be transferred to home confinement.

On April 14, 2020 my client was cleared by Health Services as not requiring any frequent and on-going medical care within the next 90 days.

On April 16, 2020 my client executed (signed) his release papers and home confinement agreements.

On April 20, 2020, AW Cutwright issued a memo/notice, that in her opinion, Maxwell did not qualify for transfer to home confinement because he had not completed 50% of his sentence.

On April 22, 2020 a memo was sent out by the Acting Assistant Director of Correctional Progress Division and the Assistant Director of Reentry Services Division. This memo is discussed more fully below.

On April 22, 2020 there was a public outcry from numerous media outlets regarding the BOP's about face or release of inmates. The BOP representative in response released a statement to the Wall Street Journal that the BOP "intends to expeditiously transfer inmates to home confinement who were previously referred for it." (Published at 7:45 pm 4.22.2020, reporters Rebecca Obrien and Sadie Gurman)

On April 23, 2020 and April 24, 2020 you issued a memo to the institution about the factors being considered by the BOP for inmates to be placed on home confinement (the memo substantively mirrors my fax to you on April 8, 2020.. to include the release packet executed by Maxwell give to the unit team and the sponsorship for home confinement by Faith Christian Center).

In particular you noted in your April 23, 2020 institutional memo that:

"The BOP is currently reviewing all inmates to determine which ones meet the criteria, in accordance with the March 26, 2020 memorandum from the Attorney General. In assessing

2 | Page

BP-8-10(2 of 6)

whether home confinement should be granted, the BOP considers the **totality of the circumstances** for each individual inmate, the statutory requirements for home confinement, and is assessing the following non-exclusive list of discretionary factors:

> 1) Review of the inmates conduct in prison, with inmates who have engaged in violent or gang-related activity or who have received a BOP violation within the last 12 months not receiving priority treatment;
> 2) Ensuring the inmate has a verifiable release plan;
> 3) Verification of the inmate's primary or prior offense history does not include violence, a sex offense, or is terrorism related;
> 4) Confirming the inmate does not have a current detainer;
> 5) Review of the security level of the facility currently housing the inmate, with priority given to inmates residing in low and minimum security facilities;
> 6) Review of the inmates score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment;
> 7) Review of the age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines.

The BOP is currently prioritizing for consideration those inmates with at risk factors **and/or** who either

> * Have served 50% or more of their sentences, and
> * Have 18 months or less remaining on their sentences and have served 25% or more of their sentences.

Referrals must be made based on appropriateness for home confinement. Consideration will be given to whether the inmate has demonstrated a verifiable reentry plan which will prevent recidivism and maximize public safety, including verification of the conditions which the inmate would be confined upon release would present a lower risk of contacting COVID-19 than the inmate would face in his or her BOP facility.

All referrals will clearly document the review of the following:

> * Specific type of release residence (House/Apt/Group Home etc...)
> * Who will the inmate live with;
> * Any health concerns of individuals in the residence;
> * Contact numbers should he/she be placed on home confinement;
> * Transpiration plan as to how the inmate will be transferred to the home confinement location.

Inmates determined to have a viable release residence will be screened by Health Serv. and a determination made as to if the inmate requires frequent and on-going medical care within the next 90 days."

The BOP Acting Assistant Director's April 22, 2020 memorandum has all the above noted factors that you included in the institution memorandum but also has the following additional

3 | P a g e

BP-8-10 (3 of 6)

language... it should be noted however, that the BOP April 22, 2020 memorandum was issued prior to the BOP statement to the Wall Street Journal.

The Additional language in the Assistant Director's 4.22.2020 memo is:

"In an effort to protect the health and safety of the staff and inmates during the COVID-19 pandemic it has become imperative to review **at risk inmates** for placement on home confinement. This memorandum provides additional guidance and directives and rescinds the [BOP] memorandum dated April 3, 2020.

It should be noted that for public safety reasons in accordance with the March 26, 2020 memorandum from the Attorney General, and to ensure BOP is deploying its limited resources in the most effective manner, the BOP is assessing the following factors to ensure inmates are suitable for home confinement" [Followed by the Seven Factors].

"In addition, and in order to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who served a certain portion of their sentences, or who only have a relatively short amount of time remaining on their sentences. While these priority factors are subject to [bold] deviation [end bold] in the BOP's discretion in certain circumstances and are subject to revision as the situation progresses, at this time, the BOP is prioritizing for consideration those inmates who either:
* Have served 50% of their sentences or
* Have 18 months or less remaining on their sentences and have served 25% of their sentences."

[The remainder of the April 22, 2020 memo of the Acting Assistant Director of the Correctional Program Division and the Assistant Director of Reentry Services Division is substantively about BOP procedures and processes].

**As previously noted in my April 8, 2020 correspondence my client has had exemplary conduct while incarcerated:**

- He does not have violent conduct in prison, or a prior history of violence, or a current charge for violence;
- He does not have gang related activities;
- He does not have any disciplinary shots in the past 12 months (no sustained shots at all the entire time of incarceration);
- He has a verifiable release plan (Faith Christian Center has forwarded to the Unit Manager correspondence, noting the housing, the isolation, the support, the employment, the financial support required along with an agreement to abide by any BOP or P.O. requirements regarding Maxwell);
- He does not have any sex offense or history of sex offense, neither has any terrorism related charges;
- He does not have any detainers;
- He is located at a low security facility, each with minimum security points;
- He is at or below -0- on his PATTERN scores;
- He is at or below -0- on his BRAVO scores;

4 | Page

F    022

BP-S-12 4 of 6

- He is over the age of 60 (61); Maxwell has been identified by you as at "high risk" for death or serious illness from COVID-19 (See your April 10, 2020 warning to Maxwell based on CDC factors);
- He has been sponsored by Faith Christian Center demonstrating a verifiable reentry plan which will prevent recidivism and maximize public safety. He will be housed in single person resident housing at the Church and/or School facilities providing for social distancing during the COVID-19 pandemic. Maxwell is currently housed in a dorm setting at the BOP similar to the FCI Elkton (but smaller cubes than Elkton which has 10' x 15' cubes with three inmates per cube) with the same number of inmates per housing unit (150 per unit).

Pursuant to your memos of April 23, 2020 and April 24, 2020, my client qualifies in all ways to be transferred to home confinement. Further, *Wedelstedt v. Wiley*, 477 F.3d 1160 (10th Cir. 2007) is generally considered to be the bell weather case on inmate transfer to home confinement or halfway house (RRC). In *Wedelstedt* the Court discusses transfer to RRC/home confinement under the the "clear and unambiguous' language of Congress under Section 3621(b) and under the mandatory language of the pre-release custody paradigm of 18 U.S.C. Section 3624(c). The Section 3621(b) factors inform an inmate transfer to home confinement and define the scope of the BOP's discretion in the transfer of inmates. The Section 3624(c) mandate addresses the BOP's affirmative obligation to a prisoner that the last 6 months (or 10%) of their sentence be spent in home confinement. The CARES Act, Section 12003(b)(2) modified the BOP's affirmative mandate to place inmates in home confinement for extended periods due to the death and severe illness that is affecting inmates in the BOP as a result of the COVID-19 virus.

The Court in *Wedelstedt* looked at the interplay between Sections 3621(b) and 3624(c) and observed that three other circuits "interpreted Section 3621(b) to clearly and unambiguously require the BOP to consider the five factors set out in Section 3621(b)(1)-(5) when making placement and transfer decisions..." to home confinement. *Wedelstedt*, 477 F.3d at 1164. As *Chevron USA v. NRDC*, 467 U.S. 837 (1984) made clear deference to an agency is not permitted when Congress has spoken in clear and unambiguous language. In this case, such an arbitrary exclusion (requiring inmates who in all other ways qualify for home confinement) to have served 50% of their sentence (or 25% with 18 months remaining), while meeting all other BOP factors (the BOP tools noted above are used to apply all the Section 3621(b) factors) was invalid because it excludes "an entire class of inmates (those not serving the final 10% of their sentences)" *Wedelstedt*, 477 F.3d at 1164.

In the matter under discussion, the arbitrary time factors (25% of sentence served with 18 months remaining or 50% of the sentence having been served) as published in the April 22, 2020 memo by the Acting Director and referenced in the April 23, 2020 and April 24, 2020 institutional memos notwithstanding, once an inmates meets all other qualifications published by the BOP they are eligible for home confinement regardless of the arbitrary "amount of sentence served." This is confirmed by the Second, Third, Tenth and Eighth Circuits. In fact, all circuits to have considered the issue have adopted this position. See *Levine v. Apker*, 455 F.3d 71, 87 (2d Cir. 2006); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 249 (3d Cir. 2005); *Wedelstedt, supra* at 1164; *Fults v. Sanders*, 442 F.3d 1088, 1092 (8th Cir. 2006) (respectively). Each of these circuits noted that setting arbitrary percentages of sentence to be served prior to release of

5 | Page

BP-8-10 (5 of 6)

F    023

inmates to home confinement or RRC under Sections 3621(b) [and 3624(c) and necessarily its modifications by the CARES Act Section 12003, (b)(2), because the CARES Act, did not in anyway modify Title 18 U.S.C. Section 3621(b)] Id. (respectively).

The memorandums that you published (and the April 22, 2020 memo from the Acting Assistant Director(s)) to the inmates clearly contemplated the language from these various Circuit cases (presumptively as noted *supra* the BOP would not knowingly violate the law). My client, under the BOP published standards qualifies to be transferred to home confinement and priority is imperative due to his age, high risk co-morbidity factors, and the discretionary factors used by the BOP (to include the statutory language and factors).

My client is in a list provided by regional/central to be inmates with high risk factors for death or serious illness from COVID-19. They were approved by the unit team to be transferred to home confinement. They were cleared of any long-term medical care requirements that would prevent transfer to home confinement.

Given the factual predicates and legal precepts, please advise me, in writing, the current status of my client's request to be transferred promptly to home confinement. Additionally, this request for transfer specifically encompasses Title 18 U.S.C. Sections 3621(b) and 3624(c)(2), the CARES Act. 12003(b)(2). Concurrent herewith a petition for Compassionate Release is being drafted for my client. Please advise whether you are opposed to a petition being filed with the Sentencing Court for release for Compassionate Release. My client has previously tendered requests to the unit team and I have previously tendered a request for information on April 8, 2020 to which I have received no response.

Finally, I understand this is a busy and hectic time for all wardens (given the COVID-19 rapid spread through the BOP with active cases at approximately 50% or more of the institutions), and I, therefore, thank you in advance for your prompt reply these requests.

Sincerely yours,

Arkadiy Grinshpun, Esquire

Via Fax – (409) 626-3410

cc:    Complex Counsel (Tina Hauk, Esq.)
       FCI Beaumont Low
       P.O. Box 26025
       Beaumont, Texas 77720

6 | Page

F    024

BP-8-10 (6 of 6)

EXHIBIT 9

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## PROBATION OFFICE

**BROWNSVILLE**
600 E. HARRISON STREET # 103
BROWNSVILLE 78520-7122
(956) 548-2522

**HOUSTON**
P. O. BOX 61207
HOUSTON 77208
(713) 250-5266

**GALVESTON**
P. O. BOX 2670
GALVESTON 77553-2670
(409) 766-3733

**LAREDO**
1300 VICTORIA, SUITE 2111
LAREDO 78040
(956) 726-2255

**CORPUS CHRISTI**
1133 N. SHORELINE STE. 124
CORPUS CHRISTI 78401
(361) 888-3145

**VICTORIA**
P. O. BOX 125
VICTORIA 77902-0125
(361) 579-6640

**McALLEN**
1701 WEST BUSINESS 83, SUITE 729
McALLEN 78501-5159
(956) 618-8035



May 26, 2020

**REPLY TO: HOUSTON**

FCC Beaumont
Attention: Lee West
Email: lwest@bop.gov

Re:    MAXWELL, William
       Reg. No. 71944-279
       SD/TX PACTS# 287618
       <u>Second Pre-Release Investigation</u>

Dear Mr. West,

We have investigated the release plan submitted by the above noted offender, William Maxwell. Although a home inspection cannot be completed at this time due to COVID19 concerns; the proposed residence, noted below, has been verified telephonically with H. Kevin McDuff. Mr. Maxwell will reside in a motor home parked at the address noted below. The release plan is approved. Please notify our office at the time of the transfer to the RRC and/or direct release, so that re-entry/case planning services can be provided by our office. Should you have questions, I may be reached at 713-250-5153.

Proposed residence: H. Kevin McDuff, 4400 Country Club Dr., Dickinson, Texas 77539, 832-287-8730

Sincerely,

*Elizabeth Martinez*

Elizabeth Martinez
Senior U.S. Probation Officer

Approved:

*Reginald C. Hollins*

Reginald C. Hollins
Supervising U.S. Probation Officer

cc: U.S. Probation, Newark, New Jersey
    njp_NewarkSupervision@njp.uscourts.gov

Page 1 of 1

F   025    BP-9-1

EXHIBIT 10

# MALE PATTERN RISK SCORING

| Register Number: | 71944-279 | Date: | 7/15/2020 |
|---|---|---|---|
| Inmate Name: | MAXWELL, WILLIAM | | |

| MALE RISK ITEM SCORING | CATEGORY | GENERAL SCORE | Enter Score | VIOLENT SCORE | Enter Score |
|---|---|---|---|---|---|
| **1. Current Age** <br> > 60 <br> Click on gray dropdown box to select, then click on dropdown arrow | > 60 | 0 | | 0 | |
| | 51-60 | 7 | | 4 | |
| | 41-50 | 14 | 0 | 8 | 0 |
| | 30-40 | 21 | | 12 | |
| | 26-29 | 28 | | 16 | |
| | < 26 | 35 | | 20 | |
| **2. Walsh w/Conviction** <br> No | No | 0 | 0 | 0 | 0 |
| | Yes | 1 | | 0 | |
| **3. Violent Offense (PATTERN)** <br> No | No | 0 | 0 | 0 | 0 |
| | Yes | 5 | | 5 | |
| **4. Criminal History Points** <br> 0 - 1 Points | 0 - 1 Points | 0 | | 0 | |
| | 2 - 3 Points | 8 | | 4 | |
| | 4 - 6 Points | 16 | 0 | 8 | 0 |
| | 7 - 9 Points | 24 | | 12 | |
| | 10 - 12 Points | 32 | | 16 | |
| | > 12 Points | 40 | | 20 | |
| **5. History of Escapes** <br> None | None | 0 | | 0 | |
| | > 10 Years Minor | 2 | 0 | 1 | 0 |
| | 5 - 10 Years Minor | 4 | | 2 | |
| | < 5 Years Minor/Any Serious | 6 | | 3 | |
| **6. History of Violence** <br> None | None | 0 | | 0 | |
| | > 10 Years Minor | 1 | | 1 | |
| | > 15 Years Serious | 2 | | 2 | |
| | 5 - 10 Years Minor | 3 | 0 | 3 | 0 |
| | 10 - 15 Years Serious | 4 | | 4 | |
| | < 5 Years Minor | 5 | | 5 | |
| | 5 - 10 Years Serious | 6 | | 6 | |
| | < 5 Years Serious | 7 | | 7 | |
| **7. Education Score** <br> HS Degree / GED | Not Enrolled | 0 | | 0 | |
| | Enrolled in GED | -2 | -4 | -1 | -2 |
| | HS Degree / GED | -4 | | -2 | |
| **8. Drug Program Status** <br> No Need | No DAP Completed | 0 | | 0 | |
| | NRDAP Complete | -3 | -9 | -1 | -3 |
| | RDAP Complete | -6 | | -2 | |
| | No Need | -9 | | -3 | |
| **9. All Incident Reports (120 months)** <br> 0 | 0 | 0 | | 0 | |
| | 1 | 1 | 0 | 1 | 0 |
| | 2 | 2 | | 2 | |
| | > 2 | 3 | | 3 | |
| **10. Serious Incident Reports (120 months)** <br> 0 | 0 | 0 | | 0 | |
| | 1 | 2 | 0 | 2 | 0 |
| | 2 | 4 | | 4 | |
| | > 2 | 6 | | 6 | |
| **11. Time Since Last Incident Report** <br> 12+ months or no incidents | 12+ months or no incidents | 0 | | 0 | |
| | 7-12 months | 2 | 0 | 1 | 0 |
| | 3-6 months | 4 | | 2 | |
| | <3 | 6 | | 3 | |
| **12. Time Since Last Serious Incident Report** <br> 12+ months or no incidents | 12+ months or no incidents | 0 | | 0 | |
| | 7-12 months | 1 | 0 | 2 | 0 |
| | 3-6 months | 2 | | 4 | |
| | <3 | 3 | | 6 | |
| **13. FRP Refuse** <br> NO | NO | 0 | 0 | 0 | 0 |
| | YES | 1 | | 1 | |
| **14. Programs Completed** <br> 4 - 10 | 0 | 0 | | 0 | |
| | 1 | -2 | | -1 | |
| | 2 - 3 | -4 | -6 | -2 | -3 |
| | 4 - 10 | -6 | | -3 | |
| | > 10 | -8 | | -4 | |
| **15. Work Programs** <br> >1 Program | 0 Programs | 0 | | 0 | |
| | 1 Program | -1 | -2 | -1 | -2 |
| | >1 Program | -2 | | -2 | |
| **Total Score (Sum of Columns)** | | General: | **-21** | Violent: | **-10** |
| **General/Violent Risk Levels** | | General: | Minimum | Violent: | Minimum |
| **OVERALL MALE PATTERN RISK LEVEL** | 026 | | **Minimum** | | |

EXHIBIT 11

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

---------------------------------------------------------------------------------------------------

FROM: 71944279 MAXWELL, WILLIAM
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 06/02/2020 06:44 AM

To: Warden Garrido
Inmate Work Assignment: Education

Warden F.J. Garrido:

Re: United States v. William Maxwell; United States District Court of New Jersey

Warden:

I needed to provide notice, for purposes of protecting the record and for purposes of documenting that I have been unable to effectively participate in the preparation of my appeal.

Background:

In July of 2014 the jury in my case returned a guilty verdict. In July of 2015 I was sentenced. In August of 2015 I was transferred to this facility. In the interim, the lead prosecutor shot himself. The lead defense counsel has been prosecuted for various charges (which he was under indictment at the time he represented us), has been convicted, gone to Federal Prison, served his entire sentence and been released back into the community. This along with dozens and dozens of other issues plague my case.

For longer than the last two months we have been locked down without effective access to our counsel. Most of our Unit Team Staff have been augmented to other positions throughout the institution as the institution struggles to deal with the COVID-19 pandemic.

I have actively sought transfer to home confinement due to my asthma and my designation as high risk for death or serious illness (by you based on my CDC co-morbidity factors) based on the Attorney General's March 26, 2020 Directive to the BOP along with the Attorney General's April 3, 2020 Directive to the BOP and the CARES Act. I have spoken with counsel and, to date, counsel has contacted you, both by fax and overnight delivery, on April 8, 2020 and April 30, 2020 to demonstrate my eligibility to be transferred to home confinement due to COVID-19.

My Unit Team has done all they can. I have been approved for home confinement. I signed my transfer/release papers on April 16, 2020; I have been cleared by medical; probation has approved my release plan; I have met all the requirements to be transferred to home confinement; and my designated out date was June 15, 2020 (2 and 1/2 months after I began seeking to remain safe from the COVID-19 virus pandemic affecting the BOP). During the time that my home confinement request has been pending more than 3000 inmates and many hundreds of staff in the BOP have contacted the virus. Dozens and dozens have died.

Both myself and counsel have documented the threat to my life and medical well being from the COVID-19. Both Congress and the Attorney General have expressed a desire to place inmates such as myself (especially in light of the fact that I am not finally convicted... my appeal is not final) on home confinement. I have been an exemplary inmate during my entire time in the BOP (and fully expect my case to be reversed). I am still a licensed attorney (with my license being suspended during the time of my appeal).

Both myself (April 7, 2020 and again on or about April 27, 2020) and counsel (April 8, 2020 and April 30, 2020) have provided notice of the you and Institution Counsel of the legal parameters to include the four Circuit cases which have all held that denying an inmate's transfer to home confinement based on a percentage of their sentence served was unlawful. And while I recognize that the Central Office memo (of April 22, 2020) may have noted that no one is being actually denied (rather not "prioritized" for transfer to home confinement) that slight of hand (by Central Office) is not sufficient to protect from the forfeiture of "sovereign immunity" for staff and BOP executives for continuing to participate in an "unlawful act" as the 4 Circuit Court's to address the matter have indicated.

During the past multiple weeks, in violation of the CARES Act, our phones have been turned off. The CARES Act, transformed the "phone privilege" into a right, when it provided for the funding for the phones during the pandemic emergency. Despite this fact and legal right, our phones have been turned off for weeks, not for any conduct for which I was involved but due to an

F    027        BP-9-2-(1 of 2)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A
----------------------------------------------------------------------------------------------------

(again) unlawful group punishment paradigm denying the administrative remedy process and the Due Process Clause of the United States.

All this being noted, my appellate brief is due to the 3rd Circuit toward the last week of June (27th of June I believe) and I am, by the phones being turned off, being obstructed from contact with my counsel and being denied an opportunity to participate in my own direct appeal. As this will be the subject of litigation going forward (especially due to the fact that I have been approved to be transferred to home confinement on June 15, 2020 .. but have not been placed in quarantine yet) I needed to provide this notice to protect the record. Please save this as it will be requested in the course of litigation.

Thank you for your prompt attention and notice of this ongoing obstruction.

Respectfully,

WTM

F   028

RP-9-2-(202)

EXHIBIT 12

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

-------------------------------------------------------------------------------------------------------

FROM: 71944279 MAXWELL, WILLIAM
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 04/29/2020 05:16 PM

To: Warden F. J. Garrido
Inmate Work Assignment: Education

Dear Warden Garrido:

I need your help and guidance on my home confinement processing.

I am qualified under all the BOP factors published in your correspondence(s) to the institution on April 6, 23, 24 of 2020. I have signed my release papers. However, it is my understanding that on 20 April 2020 the AW erroneously noted that despite my qualifications to be release to home confinement along with my "high risk" factors, that you identified to me in a 10 April 2020 notice that I was at a high risk of death or severe illness due to the COVID-19, I was not qualified to be transferred to home confinement because I have not completed 50% of my sentence at this time.

Background

1) The AG issued his Directive on 26 March 2020.

2) On 27 March 2020, Congress passed the CARES ACT modifying the home confinement authority of the BOP under 18 U.S.C. Section 3624(c)(2).

3) On 29 March 2020 I sent a request to the Unit Team to be transferred to home confinement.

4) On or about 30 March 2020, I met with Mr. Rivera and discussed the BOP statutory authority under 18 U.S.C. 3621(b)(1)-(5); 3624(c)(2); 34 U.S.C. Section 60541 (discussing the qualifications to transfer to home confinement); the CARES ACT and various BOP policy statements on home confinement. Mr. Rivera was well informed and helpful in his guidance and responsiveness to my questions.

5) I further discussed the Wedelstedt case and its implications on the interpretation of Sections 3621 and 3624. Based on our detailed discussions I prepared a detailed pre-release packet in support of my request for home confinement (including a detailed pre-release plan). The sponsoring church (Faith Christian Center) sent a letter of sponsorship to Mr. Rivera noting their sponsorship (isolated residence, food, utilities, phone line during the lockdown period for COVID-19, along with employment after the isolation period is ended).

6) On 7 April 2020 I submitted a detailed email to Mr. Rivera noting our discussions and the particularities of our discussions.

7) On 8 April 2020 my attorney sent you an email regarding my application for home confinement.

8) On 9 April 2020 the BOP disclosed its criteria for determining who was eligible for home confinement in court filings in the Oakdale case. That further noted that serving 50% of your sentence was not a determinative factor (in keeping with the statutory authority under Sections 3621 and 3624).

9) On 10 April 2020 you gave me a notice of my "high at risk" status under the CDC factors due to my age and co-morbidity factors (asthma and weakened immune system due to my asthma medicine).

10) On 12 April 2020 I was notified by unit team that I was qualified to be submitted for home confinement.

11) On 14 April 2020 medical at Beaumont Low determine that I had no long term medical issues that would need attention in the next 90 days (in response to a medical directive they had received from Central Medical Director).

12) On 16 April 2020 I signed my home confinement papers.

14) On 20 April 2020 AW Cutwright (is my understanding) noted that I did not qualify because I had not completed 50% of my sentence.

F     029                    BP-8-9 (1 of 2)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

-----------------------------------------------------------------------------------------------

15) On 22 April 2020 the Associate Director sent out a second memo regarding home confinement (noting that those who had not served 50% were not being given priority consideration at this time)

16) On 22 April 2020 the BOP reversed itself in a statement to the Wall Street Journal and confirmed that those who had executed their release papers would still be considered for home confinement.

17) On 23 and 24 April 2020 you sent memos to the institution noting the factors the BOP was considering for home confinement.

18) I am in all ways qualified to go to home confinement (0 or negative BRAVO Score; 0 or negative PATTERN score; no disciplinary shots at all; no criminal history; no crimes of violence, sex crimes, or terrorism crimes, not an illegal alien, no detainers, verifiable pre-release plan, the government at my post trial bail hearing stipulated that I was not a flight risk or a danger to the community; I have actively programmed the entire time in prison, I have been involved in productive activities the entire time in prison.

19) Dr. Grogan sent Mr. Rivera a letter regarding my employment in education.

20) Based on the First Step Act and the Second Chance Act I have, in all probability between 4-5 years (at my current rate of accumulation and disciplinary history) remaining before I will be transferred to home confinement for the balance of my sentence.

21) My brother, John Maxwell, who entered prison at the exact same time that I was has gone to home confinement (he is at Millington Camp).

22) My case is still pre-appeal (6 years now) as the case was involved in many irregularities including the prosecutor committing suicide, the lead defense lawyer being convicted of crimes (he was under indictment during trial and did not disclose it to anyone), and has been remanded by the 3rd Circuit multiple times. I am still a licensed attorney in Texas (with my license being suspended pending appeal).

23) Due to my asthma, weakened immune system I am particularly susceptible to the COVID-19 as you notified me on 10 April 2020.

24) Please help me with this matter and clarify my situation to me. I anticipate that my attorney will be following up with you regarding my home confinement as well.

Respectfully submitted,

William Maxwell
71944-279

F    030                                    BP-8-9 (2 of 2)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

--------------------------------------------------------------------------------

FROM: 71944279
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 06/14/2020 03:32:16 PM

To: Warden Garrido
Inmate Work Assignment: Education

Dear Warden:

I needed to document for purposes of protecting the record, that we (Unit TA) have been advised not to submit a BP-8 or BP-9 to the Unit Team by Ms. McGowan (case manager in the building downstairs I believe), regarding our requests to be transferred to home confinement under multiple statutes. We were advised that this instruction was done pursuant to your wishes.

Specifically, 18 U.S.C. Section 3621(b)(1)-(5) which governs transfers to home confinement eligibility in addition to the expansion of 18 U.S.C. Section 3624(c) as modified by the CARES Act Section 12003(b)(1) & (2), and in accordance with the Attorney General's two memorandum of March 26, 2020 and April 3, 2020.

As these instructions are contrary to the Administrative Remedy Paradigm set up by the BOP under the Administrative Procedures Act, it seems prudent that a record be made establishing that the inmates in TA (me in particular) have been advised not to comply with the BP-8 and BP-9 provisions (for cases related to transfer to home confinement).

Or course the warden of an institution is at liberty to modify these provisions, conditioned on no allegations or affirmative defenses are being asserted subsequently that the inmates failed follow the strict procedural exhaustion of administrative remedies that is typically imposed by the 5th Circuit.

By way of clarification, I have provided multiple emails noting my eligibility for home confinement and request for same (April 7, 2020 and April 22, 2020), both under 18 U.S.C. Section 3621(b)(1)-(5) and Section 3624(c).. and have been determined to be eligible for home confinement by my unit team. Additionally, counsel has reached out to you on my behalf on multiple occasions (April 8, 2020; April 30, 2020) regarding same. It should be noted that in those requests I additionally, asked for release under the distinct and separate statutory paradigm 18 U.S.C. 3582 otherwise known as "compassionate release". Collectively these constitute my requests for home confinement under multiple statutory authority and were requested in the alternative.

Since the time of those prior correspondences, my verified release plan and home confinement residence has been approved by the Southern District of Texas Probation Department (On May 26, 2020). I am awaiting my transfer to quarantine prior to transfer to home confinement. Thank you for your assistance with these matters.

Please advise if I misunderstood the instructions Ms. McGowan made regarding inmate applications for home confinement, the use of BP-8, BP-9 and if so under what parameters those should either be used or not used (as it relates to home confinement).

Respectfully submitted,

WTM

F   031