TRULINCS  71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

------------------------------------------------------------------------------------------------------

FROM: 71944279
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 08/21/2020 07:19:44 AM

To: Warden F. J. Garrido
Inmate Work Assignment: Education

Warden F. J, Garrido:

Re: Fifth Cross Contamination of inmates and preparation for hurricane

I know that there is nothing you can do about the situation as it pertains to this Fifth Cross Contamination.  Two inmates that came in on the last chain have tested positive for COVID and are in quarantine.  There is no question that the remaining inmates on the chain will also, a few days later test positive for COVID.  I recognize that the other inmates are in isolation for a period of days.  I am simply making a record of the situation on or about the date that it happened (chain came in on Wednesday 8-19-2020).  This will be the 5th time this prison has been cross contaminated this summer further demonstrating that the BOP is unable due to its design and operations to maintain social distancing among the inmates during this pandemic. I am assuming that you do not have a decision making role in the transfer of inmates into the institution; but in furtherance thereof, this transfer further refutes the statements of various wardens throughout the United States regarding the cessation of transfers of inmates from other BOP facilities (See litigation at Terminal Island, Lompoc, Elkton, Danbury, Oakdale wherein it was alleged under oath that transfers of inmates between facilities had stopped).  Additionally, two bus loads of inmates have been transferred out of this institution in the past 14 days.

This is being provided to make a record of the activities and conduct of the BOP at this facility that may place inmates (under the CDC guidelines and COVID guidelines) at risk of COVID-19.

Next, to further protect the record, the weather forecasts a hurricane to directly hit this area.  This will be, at least, the fourth hurricane and/or tropical storm to hit this complex in the past 12 years.  In each situation, the institution lost power, and often water.  Without power and water the inmates do not have toilets, showers, and other hygiene necessary for the safe and orderly operation of the institution.  This situation has happened each time a hurricane or tropical storm hits this area (Rita, Harvey, etc...).  Portable toilets are brought in for use by inmates, but only after days where inmates are without toilets, in which the inmates are housed in inhumane conditions.  The inhumane conditions are always rectified after 1-2 weeks.  Given the situation with the pandemic it seems prudent to provide notice ahead of time to the executive staff of the pending situation to allow them to take whatever measures they deem fit to protect the safety and security of the inmates but at the same time to provide humane conditions.  This is further being provided to remove the affirmative defense of "act of god" (etc..) and assertion that the events were unknown to the executive staff ahead of time.  Hopefully, the hurricane will take a different path and the pre-planned safety and security of the inmates will not be impacted,  But as everyone who lives in hurricane country knows, you have to be prepared ahead of time for the hurricane... which is something this institution and complex never seems to be.

Thank you for your attention to these concerns.

Respectfully submitted,

WTM

F    032

TRULINCS  71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

--------------------------------------------------------------------------------

FROM: 71944279
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 08/22/2020 05:38:35 PM

To: Warden F. J. Garrido
Inmate Work Assignment: Education

Warden Garrido:

There appears to be "systemic" attempts to thwart the administrative remedy process.  Large numbers of inmates in this dorm (T-A) are not being either mailed the response from regional office regarding administrative remedies that are pending there, in particular pertaining to the CARES ACT, 18 U.S.C. Section 3621; 18 U.S.C. Section 3582; First Step Act Relief; Second Chance Act Relief; requests to be moved to RRC/home confinement at the end of the inmates sentence.  It happened to me, and to at least 12 other inmates.  Ms. Love is getting me a copy and noting that it was not timely delivered to me and should be commended for follow up on these requests.  I do not know whether the SNAFU occurred at this institution or at Region or at a combination of both, but it seems prudent to make a contemporaneous record of same.

Thank you for your attention to this matter.

Regards,

WTM

CC: OIG

F    033

TRULINCS  71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

----------------------------------------------------------------------------------------------------

FROM: 71944279
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 08/25/2020 05:52:10 PM

To: Warden F. J. Garrido
Inmate Work Assignment: Education

Warden Garrido:

Attached is a cop out sent to the facilities department.  It documents at or about the time of its occurrence that the water coming our of the faucets in Unit T-A is brown.  We have not received any notices, do not drink orders, etc... We are 36 hours prior to the arrival of the hurricane (as projected by the media).  This is to provide notice of this unsafe and hazardous condition at the institution.

Thank you for your attention to this matter.

Regards,

WTM

CC: OIG
-----MAXWELL, WILLIAM on 8/25/2020 5:49 PM wrote:

>

Ladies and Gentleman:

To protect the record and to make a record at or about the time of the incident, please take notice that at or about 5:30 pm on 8.25.2020 the water coming out of our faucets throughout unit T-A is brown.  No notices, do not drink orders, bottles of water, etc.. have been provided.  The hurricane is not expected for 36 hours and the water is now unfit to consume.

Thank you for your attention to this matter.

WTM

F    034

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

----------------------------------------------------------------------------------------------------

FROM: 71944279
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 08/25/2020 07:53:38 AM

To: Warden G. J. Garrido
Inmate Work Assignment: Eduation

Warden Garrido:

I sent a message a few days ago about the on coming hurricane(s). I wanted to advise that the recreation yard has copious amounts of grass clippings that were not raked when cut last... As you know, the design of the prison incorporates the recreation yard a a holding pond to collect rain run off. The prison is designed for the USP over flow in rain to travel through the culverts on this compound and to exit this compound out of the drains on the recreation yard. Those drains consist of a series of pipes that are covered in part by screens to keep inmates from escaping. However, with the copious amount of grass clippings on the recreation yard, those drains are going to quickly be clogged and the entire compound is going to flood. This has the potential for the destruction of large amounts of government property.. and could be rectified with the removal of those clippings from the compound...

Having been at this institution and observed first hand what happens (as far as flooding, loss of water and power for extended periods of time) during hurricanes when the draining system actually functions properly (Harvey, and tropical storms) it is imperative that corrective measure be taken to prevent this destruction of swaths of government property.

I am proving this notice to allow the executive staff to take whatever corrective measures it deems necessary prior to the arrival of hurricane Laura.

Thank you for your attention to this matter.

Respectfully.

WTM

CC: OIL

F    035

TRULINCS  71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

--------------------------------------------------------------------------------------------------

FROM: 71944279
TO: Unit Management BLD 1 LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 08/26/2020 07:19:41 PM

To: Ms. Love
Inmate Work Assignment: Education

Ms. Love

I am trying to get my receipt for Administrative Remedy and the Extension of time for Response (if any) filed by the Regional Office.  I am also trying to get the Regional office response.  Additionally, please get me my Administrative Remedy Generalized Retrieval report (Full Screen Format) and my Administrative Remedy Generalized Retrieval (Single Line Format) report.  My administrative remedy was received by the Regional office via Certified Mail Return Receipt Requested # 70192280000151549354 on July 14, 2020 (but may have been erroneously posted on July 13, 2020 by the Regional Office).

Thank you for your assistance with this matter.

Respectfully submitted.

WTM

F   036

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

--------------------------------------------------------------------------------

FROM: 71944279
TO: Unit Management BLD 1 LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 09/03/2020 03:34:14 PM

To: Ms. Love
Inmate Work Assignment: Education

Ms. Love:

On 8.26.2020 I requested a copy of the Regional Office's response to my BP-10 administrative remedy that was filed by my counsel and delivered to the regional office CMRRR on July 14, 2020. I additionally requested a copy of any extensions requested by the Regional Office to respond to my BP-10. To date I have not received any of the items that I requested in the 8.26.2020 electronic email. I am renewing my request for those items noted in the 8.262020 email. A copy of that email is being resent to you as well as the Warden to document my request.

It has been a policy of the Regional Office to thwart the administrative remedy process by unnecessarily delaying/denying valid requests (it is believed based on the Regional Office nonsensical responses to inmates BP-10 requests and therefore asserted). For example, the Regional Office typically urges that some document is missing from the BP-10, such as a BP-9 or the warden's response to the inmate's BP-9. But the Regional Office does not bother to check the volume of paperwork that it requires to be attached to the BP-10. Often times the document that the Regional Office requests is actually attached to the original filing.

For these reasons it is imperative, as time is of the essence, that I receive the Regional Response or the Regional Office's request for extension of time to file their responses. It has long been my contention that the institution and the Regional Office intentionally and as a matter of policy and practice blocks the administrative remedy process by making it virtually impossible for the inmate to timely comply with the requirements.

Thank you for your prompt attention to this matter.

Respectfully requested,

WTM

CC: OIG and Warden

F  037

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

---------------------------------------------------------------------------------------------

FROM: 71944279
TO: Unit Management BLD 1 LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 09/03/2020 03:36:05 PM

To: Ms. Love
Inmate Work Assignment: Education

Ms. Love

Attached is the prior request for my Administrative Remedy response from the Regional Office requested in my August 26, 2020 and referenced in my September 3, 2020 emails.

Thank you for your attention to this matter.

WTM
-----MAXWELL, WILLIAM on 8/26/2020 7:19 PM wrote:

>

Ms. Love

I am trying to get my receipt for Administrative Remedy and the Extension of time for Response (if any) filed by the Regional Office. I am also trying to get the Regional office response. Additionally, please get me my Administrative Remedy Generalized Retrieval report (Full Screen Format) and my Administrative Remedy Generalized Retrieval (Single Line Format) report. My administrative remedy was received by the Regional office via Certified Mail Return Receipt Requested # 70192280000151549354 on July 14, 2020 (but may have been erroneously posted on July 13, 2020 by the Regional Office).

Thank you for your assistance with this matter.

Respectfully submitted.

WTM

F    038

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

--------------------------------------------------------------------------------------------------------

FROM: 71944279
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 09/03/2020 03:38:04 PM

To: Warden F. J. Garrido
Inmate Work Assignment: Eduation

Warden Garrido:

I have been trying to get the Regional Office response or request for extension of time to file a response to my BP-10.  To date I have not received any response and time is of the essence.  Your assistance in this matter is appreciated.

Respectfully,

WTM
-----MAXWELL, WILLIAM on 9/3/2020 3:36 PM wrote:

>

Ms. Love

Attached is the prior request for my Administrative Remedy response from the Regional Office requested in my August 26, 2020 and referenced in my September 3, 2020 emails.

Thank you for your attention to this matter.

WTM
-----MAXWELL, WILLIAM on 8/26/2020 7:19 PM wrote:

>

Ms. Love

I am trying to get my receipt for Administrative Remedy and the Extension of time for Response (if any) filed by the Regional Office.  I am also trying to get the Regional office response.  Additionally, please get me my Administrative Remedy Generalized Retrieval report (Full Screen Format) and my Administrative Remedy Generalized Retrieval (Single Line Format) report.  My administrative remedy was received by the Regional office via Certified Mail Return Receipt Requested # 70192280000151549354 on July 14, 2020 (but may have been erroneously posted on July 13, 2020 by the Regional Office).

Thank you for your assistance with this matter.

Respectfully submitted.

WTM

F    039

EXHIBIT 13

## Freedman & Grinshpun, PC

*for your business and personal needs*

Gary B. Freedman, Esq., LLM*
Arkadiy Grinshpun, Esq., LLM*

*Admitted PA and NJ Bar

7909 Bustleton Avenue
Philadelphia, PA 19152
215-708-7390
fax 215-708-7391

April 8, 2020

F.J. Garrido, Warden
FCI Beaumont Low
P.O. Box 26025
Beaumont, Texas 77720

RE:    William Maxwell - Reg # 71944-279
       Gary McDuff - Reg # 59934-079

Dear Warden Garrido:

I am writing to you on behalf of my clients, William Maxwell (Reg # 71944-279) and Gary McDuff (Reg # 59934-079), pending release under the Attorney General's prior Directives to the BOP on March 26, 2020 and April 3, 2020, based on the Corona Virus and its deadly effect on the BOP.

As you are aware on March 26, 2020, the Attorney General issued his first public Directive to the BOP regarding the use of home confinement under the statutory authority and discretionary authority of the BOP found in Title 18 U.S.C. Sections 3621 and 3624 and Title 34 U.S.C. Section 60541. Those authorities ultimately led to the passage of the First Step Act in December of 2018. Therein, the Congress allowed for inmates to be placed in home confinement for the last two-thirds of their sentence, provided they met certain specified conditions, at the BOP's discretion. The March 26, 2020 Directive to the BOP ordered the BOP "prioritize" the use of home confinement due to the outbreak of the Corona Virus.

On March 27, 2020, the Congress passed the CARES Act. In the CARES Act Section 12003(b)(2), the Congress allowed for the waiver of restrictions and expansion of the use of home confinement when the Attorney General declares that the pandemic has materially affected the BOP. The time period of the effectiveness of the changes in the statutes authorized by the CARES Act currently runs through May 30, 2020 and can be expanded based on the President's declaration (at this point, extension) of a National Emergency.

F    040                              BP-8-5 (2 of 4)

The Attorney General in the April 3, 2020 Declaration made such a declaration of the pandemic materially affecting the BOP.

On April 3, 2020, the Attorney General issued another Directive to the BOP to expedite the release of inmates over the age of 60 and inmates who have co-morbidity medical issues as described by the CDC. This was largely due to the outbreaks at FCI Oakdale, FCI Elkton, and FCI Danbury, which had resulted in multiple deaths due to the virus and a larger number of cases of COVID-19 and multiple hospitalizations. This April 3, 2020, the Attorney General identified a "new cohort" of inmates who are expected to particularly exposed to the dangers of the COVID-19 virus. The factors that I will list below, were address in the Statutes and in the Attorney General's Directives to the BOP.

Additionally, on April 6, 2020 your institution issued a memorandum to the inmates that their files were being reviewed for release to home confinement based on the CARES ACT and the Attorney General's Directive to the BOP. It is for these issues that I write to you today.

My Client, William Maxwell is over the age of 60 (61 in May). He has had asthma his entire life and is currently being treated by the BOP with a steroid as well as a emergency inhaler. He has previously had skin cancer lesions removed by surgery and the BOP has frozen off several lesions during his time in the BOP.

My Client, Gary McDuff is over the age of 60 (66 this year). He has an extensive history of skin cancer lesions that have been frozen off by the BOP during his time in the BOP.

The statutes and the Attorney General Directives provide for exclusionary factors which would preclude an inmate from consideration for home confinement. My clients have none of these.

Inmates to be released to home confinement may not have life sentences, be sex offenders or violent offenders. Neither of my clients have any of these exclusionary factors.

The statutes and the Attorney General Directives provide for discretionary factors (permissive factors for the BOP to consider in releasing the inmate to serve the balance of their sentence on home confinement, my clients have all -- every single factor in their favor).

Those factors are: Over the Age of 60; Co-morbidity factors (as noted above) as determined by the CDC; lowest possible recidivism scores as determined by PATTERN SCORE (-0-); lowest security rating (my clients are the lowest security ratings -0- points); they have filed a verifiable home release plan (they are being sponsored by Faith Christian Church, which the Church has previously provided required verification; they have no gang affiliation, they have no violence in prison, they have no sexual activity in prison, release would be a cost savings to the BOP, they have been determined by their Unit Manager L. Rivera to qualify for home confinement and he has recommended home confinement; they have filed with Unit Manager L. Rivera a packet of all the information required on the BOP Form A210 pertaining to their release; and finally none of the discretionary factors weigh against them.

F   041   BP-8-5   (3 of 4)

A point of clarification, the 2/3rds requirement previously required under Title 34 U.S.C. Section 60541 is no longer applicable after the Attorney General's latest Directive to the BOP. By way of reference and illustration, William Maxwell's brother is also in the BOP custody. He is housed in Tennessee at Millington Camp. He began his sentence at the same time as William Maxwell and has not reached his 2/3rds release date. Mr. John Maxwell, Jr. has been noted for release and executed is release papers and will be released in the near future and be released to Nashville, Tennessee.

Thank you for your prompt attention to this matter. Please feel free to call me at if you have any questions or concerns.

Sincerely yours,

Arkadiy Grinshpun, Esquire

AG/kab
Via Fax – (409) 626-3410

cc:    Complex Counsel (Tina Hauk, Esq.)
       FCI Beaumont Low
       P.O. Box 26025
       Beaumont, Texas 77720

F    042

BP-8-5 (4 of 4)

EXHIBIT 14



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

P. O. Box 26025
Beaumont, Texas 77720

May 20, 2020

Freedman & Grinshpun, PC
7909 Bustleton Avenue
Philadelphia, Pennsylvania 19152
Attn: Arkadiy Grinshpun, Esq.

Re: William Maxwell, Reg. No. 71944-279

Dear Mr. Grinshpun:

I am in receipt of your correspondence dated April 30, 2020, regarding William Maxell. He is currently confined at the Federal Correctional Complex (FCC), Low Security Institution, in Beaumont, Texas. In your letter, you are requesting inmate Maxwell be released to home confinement in connection with the CARES Act and memoranda issued to the Federal Bureau of Prisons by the Attorney General regarding this topic due to the outbreak of COVID-19.

In response to your request, the Bureau of Prisons is utilizing the full scope of its various authorities to ensure that inmates at heightened risk of complications from COVID-19 are identified and housed safely and appropriately given their specific needs and circumstances. This includes modified institution operations; routine staff and inmate medical screening; use of the home confinement authority, where appropriate, based on guidance from the U.S. Attorney General; and use of compassionate release for appropriate inmates who have existing terminal and debilitated medical conditions or who are elderly and nearing the end of their sentence, as provided for in current agency policy.

F   043

BP-9-3- (1 of 4)

The CARES Act authorizes the U.S. Attorney General to expand the cohort of inmates who can be considered for home confinement upon his findings of emergency conditions which are materially affecting the function of the BOP.  On April 3, 2020, the Attorney General made that finding and authorized the Director of the BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and other similarly situated BOP facilities where COVID-19 is materially affecting operations.

Pursuant to the U.S. Attorney's General's direction, the BOP will continue to monitor the situation at all of its facilities, to include FCC Beaumont, and will take swift action to exercise its expanded home confinement authority for any inmate who is found to be at risk for COVID-19 and suitable for home confinement.

Additional guidance was provided to staff via a May 8, 2020 memorandum regarding this topic.  In it, the memorandum stated that inmates who have served 50% or more of their sentence or have 18 months or less remaining on their sentence and have served 25% or more of their sentence would be prioritized for consideration for home confinement.  Inmate Maxwell does not meet this criteria, as his release date is July 17, 2031.

I trust this response adequately addresses your concerns.

Sincerely,

F. J. Garrido
Warden

F    044

BP-9-3-(204)

U.S. Department of Justice
Federal Bureau of Prisons
*Federal Correctional Complex - Low*
P. O. Box 26025
Beaumont, TX 77720-6025

Official Business



N HOUSTON
TX 773
05 JUN '20
PM 6 L

02 1P
0006898331
MAILED FROM ZIP CODE 77720

$ 000.50⁰

JUN 04 2020

Freedman & Grinshpun, PC
7909 Bustleton Avenue
Philadelphia, Pennsylvania 19152
ATTN: Arkadiy Grinshpun, Esq.

19152-330209

EXHIBIT 15

FEDERAL CORRECTIONAL COMPLEX (FCC), BEAUMONT, TEXAS
PART B - RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY #1048383-F1

This is in response to your Request for Administrative Remedy received September 22, 2020, in which you request home confinement based on the CARES Act.

The Bureau of Prisons is utilizing the full scope of its various authorities to ensure that inmates indicated at high risk are of complications from COVID-19 are housed safely and appropriately given their specific needs and circumstances. This includes modified institution operations; routine staff and inmate medical screening; use of the home confinement authority, where appropriate, based on guidance from the U.S. Attorney General; and use of compassionate release for appropriate inmates who have existing terminal and debilitated medical conditions or who are elderly and nearing the end of their sentence, as indicated for in current agency policy.

The CARES Act authorizes the U.S. Attorney General to expand the cohort of inmates who can be considered for home confinement upon his findings of emergency conditions which are materially affecting the function of the BOP. On April 3, 2020, the U.S. Attorney General made that finding and authorized the Director of the BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and other similarly situated BOP facilities where COVID-19 is materially affecting operations.

The U.S. Attorney General issued guidance to the BOP regarding the transfer of inmates to home confinement on March 26, 2020. In assessing whether home confinement should be granted, the BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement and a non-exhaustive list of discretionary factors for priority consideration, including, but not limited to:  no BOP violations within the last year; PATTERN score is minimum; a verifiable re-entry plan; verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his BOP facility; no serious offenses; primary offense is not violent, a sex offense, or terrorism related; no current detainers; and the inmate must have served 50% or more of their sentence or have 18 months or less remaining in their sentence and have served 25% or more of their sentence.

F    046

Information reveals you arrived at FCC Beaumont on August 26, 2015, with a Projected Release Date of July 17, 2031, via Good Conduct Time Release.  You did not meet the criteria to be released on home confinement per the CARES Act, nor are you identified as an at-risk inmate per any medical condition by the Health Services Department.  Specifically, you were denied based on your prior history of violence and with you only completing 36.6% of sentence when you need to complete 50%. There are serious violence (threat of death, bodily injury and kidnapping) during commission of committing offense in your record.

Based on the above information, this response to your Request for Administrative Remedy is denied.

If you are not satisfied with this response, you may appeal to the Regional Director at Bureau of Prisons, South Central Region, South Central Regional Office, 344 Marine Forces Drive, Grand Prairie, Texas, 75051.  Your appeal must be received in the South Central Regional Office within 20 days of the date of this response.

_____          _____
F. J. Garrido, Warden                     Date

F  047

EXHIBIT 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

-vs-                                    CRIMINAL NUMBER:

NICODEMO SCARFO, ET AL,                      11-740

        Defendants.

        Mitchell H. Cohen United States Courthouse
        One John F. Gerry Plaza
        Camden, New Jersey 08101
        June 3, 2014

B E F O R E:        HONORABLE ROBERT B. KUGLER
                    UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

        PAUL J. FISHMAN, UNITED STATES ATTORNEY
        BY: STEVEN J. D'AGUANNO
            HOWARD J. WIENER
            ADAM SMALL
            NORMAN GROSS
        ASSISTANT UNITED STATES ATTORNEYS

        MICHAEL E. RILEY, ESQUIRE
        JEREMY C. GELB, ESQUIRE
        ATTORNEYS FOR NICODEMO SCARFO

        TROY A. ARCHIE, ESQUIRE
        MICHAEL FARRELL, ESQUIRE
        ATTORNEYS FOR SALVATORE PELULLO

        MICHAEL N. HUFF, ESQUIRE
        ATTORNEY FOR WILLIAM MAXWELL

        MARK W. CATANZARO, ESQUIRE
        ATTORNEY FOR JOHN MAXWELL


Certified as true and correct as required by Title 28, U.S.C.,
Section 753
/S/ Theodore Formaroli /S/ Robert Tate /S/ Lisa Marcus

F    048

United States District Court

that offense he was serving a sentence of supervised release from 2006 to early 2008. The nature of that offense is of no concern to you. The evidence of Mr. Scarfo's prior conviction was presented for the limited purposes of explanation why he was serving a sentence of supervised release during the time period that is relevant to the charges in Count 1 regarding the obstruction of justice component of racketeering conspiracy and Count 23 regarding conspiracy to obstruct justice. I will give you thorough instructions regarding the elements of those offenses later on.

The evidence was also presented for the purpose of proving Scarfo's status as a convicted felon, which is relevant to the firearms offenses charged in Counts 24 and 25 in the indictment. I will give you further guidance about the limited relevance of information regarding Scarfo's conviction to those charges later in these instructions.

Once again, and as with all the evidence presented in this case, it is for you to determine whether you believe this evidence about Scarfo's prior conviction, and, if you do believe it, whether you accept it for the purpose offered. You may give it such weight as you feel it deserves, but only for the limited purpose that I described to you.

Nicodemo S. Scarfo is not on trial for committing the offense that was the basis for his prior conviction. You may not consider the fact of the prior conviction as proof that

United States District Court

F    049

Nicodemo S. Scarfo has a bad character or has any propensity to commit crimes. Specifically, you may not use this evidence to conclude that because Scarfo may have been convicted of another offense he must also have committed the acts charged in the indictment in this case.

Remember that the defendants are on trial here only for the charges set forth in the indictment. Do not return a guilt verdict unless the government proves the crimes charged in the indictment beyond a reasonable doubt.

You've heard evidence that Salvatore Pelullo allegedly made a threat against David Roberts that included Pelullo's use of a racial epithet. The evidence of Pelullo's alleged use of that epithet was admitted for a limited purpose, which was whether the allege statement that Pelullo made to David Roberts was intend by Pelullo to be and was interpreted by David Roberts to be an actual threat against David Roberts and his family. You may not consider Salvatore Pelullo's alleged use of that epithet for any other purpose. Moreover, it is up to you to decide whether Pelullo used that racial epithet, and, if he did, whether it is relevant to the limited purpose that I just described.

Other than the limited purpose for which the evidence regarding the allege statement that Salvatore Pelullo made to David Roberts has been admitted into evidence, I instruct you that you may not consider the fact that any defendant used any

*107*

epithets as evidence that they committed any of the crimes charged in this case.  Their use of those epithets is irrelevant to the charges in this case.

You've heard evidence regarding the alleged association between defendant Scarfo and Pelullo and certain organize criminal entities.  In addition, there was evidence kind other defendants that touched upon organize crime, but did not suggest that those defendants were associated with organized crime.

There is no evidence that any defendants other than Scarfo and Pelullo was associated with any organized crime organization.  You should not consider any of the evidence regarding La Cosa Nostra against any defendants other than Scarfo or Pelullo.  Although Count 1 of the indictment alleges that all seven of the defendants were members of the Scarfo-Pelullo Enterprise.  That enterprise, unlike the Lucchese and Philadelphia La Cosa Nostra families, is not alleged to be an organized crime organization as that term is usually understood.

Whether other defendants had any knowledge of Nicodemo S. Scarfo's Salvatore Pelullo's or co-conspirator Scarfo Senior's alleged associations with La Cosa Nostra and the significance of any such knowledge is something for you alone to decide.  But I instruct you that there is nothing illegal about having such knowledge.

F  051

United States District Court

108

Evidence regarding defendant Scarfo's and Pelullo's alleged associations with La Cosa Nostra was presented only for limited purposes. Count 1 of the indictment alleges that defendants Scarfo and Pelullo "made use of, sought to benefit, and benefited from" their associations with La Cosa Nostra and used those associations to further the unlawful goals of the Scarfo-Pelullo Enterprise.

Count 1 of the indictment also alleges that defendants Scarfo and Pelullo established the Scarfo-Pelullo Enterprise and committed the crimes charged in Count 1 so that Scarfo could satisfy his financial obligations to the Lucchese La Cosa Nostra organization. It is up to you to decide whether or not the government proved that either Scarfo or Pelullo made use of sought to benefit or benefited from their association with La Cosa Nostra, and whether either of them used those associations to further the unlawfully goals of the Scarfo-Pelullo Enterprise.

It is also up to you to decide if the government proved that defendants Scarfo and Pelullo established the Scarfo-Pelullo Enterprise and committed the crime charged in Count 1 so that Scarfo could satisfy his financial obligations to the Lucchese La Cosa Nostra organization. If you conclude that the government did not prove any of those allegations, you should not consider the evidence of Scarfo's and Pelullo's association with La Cosa Nostra for any other purpose.

F    053

United States District Court

Evidence regarding the alleged assassination attempt on Nicodemo S. Scarfo was admitted only to explain why he allegedly associated himself with the Lucchese La Cosa Nostra organization and not for any other purpose. It is up to you to determine whether the government proved that Scarfo was a member of the La Cosa Nostra Lucchese criminal organization, and, if so, whether the attempted assassination on him, if you conclude that it occurred, was one of the reasons why he joined that organization. If you conclude that the government failed to prove both of those allegations, you should not consider the evidence of the alleged assassination attempt for any other purpose.

As with all the evidence presented in this case, it is for you to determine whether you believe this evidence about Nicodemo S. Scarfo's and Salvatore Pelullo's alleged association with La Cosa Nostra organizations, and, if you do believe it, whether you accept it for the purposes offered. You may give it such weight as you feel it deserves, but only for the limited purpose that I described to you.

You may not consider the evidence of those alleged associations as proof that defendants Scarfo and Pelullo had a bad character or any propensity to commit crimes. Remember that each defendant, including defendants Scarfo and Pelullo, is on trial here only for the charges in the indictment. Do not return a guilty verdict on any of the charges unless the

F 053

EXHIBIT 17

U.S. Department of Justice

Federal Bureau of Prisons

SENSITIVE - / Regional Administrative Remedy Appeal

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: 

| MAXWELL, WILLIAM | 71944-279 | TA | BML |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

### Part A - REASON FOR APPEAL

I filed for transfer to RRC/home confinement under 18 U.S.C. §3621(b)(1)-(5); 18 U.S.C. §3624 as modified by the CARES Act, section 12003(b)(1)&(2), and for Compassionate Release under 18 U.S.C. §3582. The Unit Team approved my transfer to home confinement on April 12, 2020. I signed my release papers on April 16, 2020. After a series of delays prompted by the AW, and after receipt of a response from the Warden (through Counsel), I filed a formal BP-8 (documents, arguments, and chronology incorporated herein). The Case Manager (Ms. McGowan in our building) instructed us not to file a BP-9, but to send the Warden an electronic "cop-out." All of these steps have been taken and, based on the responses, I am appealing the denial/delay by the Warden of my transfer to home confinement based on all the issues noted herein.

Additionally, since April 10, 2020, when I was designated by the Warden as high risk for serious injury or death (see copy attached to BP-8) from COVID-19, we now have five (5) inmate cases and more than a dozen staff cases of COVID-19. Some inmates are now on on ventilators. Thousands of inmates nationwide in the BOP now have COVID-19 and dozens have died.

[CONTINUED ON BP-10 ATTACHMENT PAGE]

7/1/2020

_____        _____
DATE                            SIGNATURE OF REQUESTER

### Part B - RESPONSE

F    054

_____        _____
DATE                            REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: _____

### Part C - RECEIPT

CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____                    _____
DATE                                       SIGNATURE, RECIPIENT OF REGIONAL APPEAL

## BP-10 ATTACHMENT PAGE

The probation department's approval of my home confinement address is attached, the Warden's denial is attached (sent to Counsel and delivered after June 10, 2020 ... dated May 20, 2020, post-marked June 5, 2020, and delivered on or after June 10, 2020), my e-mails to the Warden (none of which were responded to) are attached along with my BP-8 filing attached.  I am appealing the Warden's denial of my request to be transferred to Home Confinement / Compassionate Release.

7/11/2020

Date                                                        William Maxwell

F    055

## BP-10 ATTACHMENTS

1)  BP-8 plus attachments (including Memos to Warden)

2)  May 26, 2020 - Approval of Release Plan

3)  June 2, 2020 - Correspondence to Warden

4)  June 14, 2020 - Correspondence to Warden

5)  May 20, 2020 - Correspondence from Warden, Post-Marked to Counsel on June 5, 2020, Delivered on June 10, 2020, Mailed to William Maxwell thereafter.

F    056

EXHIBIT 18

U.S. Department of Justice

**Regional Administrative Remedy Appeal**

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: MAXWELL, WILLIAM     71944-279     TA     BEAUMONT (LOW)

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|

**Part A - REASON FOR APPEAL**

I wish to appeal for a <u>second</u> time. The first time, the Warden and staff refused the BP-9. Then they <u>lost</u>, and refused to produce, the response of the Region to the BP-10 (obstructing and delaying the Administrative Remedy process). When I requested the BP-10 response from Region, the Warden replied (not to what was requested--I already have one which was in my paperwork sent to Region the first time--it had been sent to my attorney) as though I had filed a new BP-9. <u>I did not!</u> I asked for the original Regional response. Then, to make themselves look as incompetent as possible, the Warden gave an asinine response. For example, the Warden states I do not have an underlying medical condition. <u>That was stupid.</u> Attached is a copy of the designation of my high risk from COVID-19 given to me <u>by the Warden</u> on April 10, 2020 (six [6] days before I signed my release papers on April 16, 2020). Next he opines that I have a crime of violence. <u>That was stupid.</u> I have a "-10" PATTERN Score because I have no violence. The Government has previously

[CONTINUED ON BP-10 ATTACHMENT PAGE]



_____10-23-2020_____
DATE

_____
SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

OCT 26 2020

BUREAU OF PRISONS
LEGAL DEPARTMENT, SCRO

F    057

_____
DATE

_____
REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE      CASE NUMBER: 104038-R1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|

SUBJECT: _____

_____
DATE

_____
SIGNATURE, RECIPIENT OF REGIONAL APPEAL

## BP-10 ATTACHMENT PAGE

stipulated that I am not a flight risk or danger to the community (at my bail hearing) and the Court previously instructed the jury of same.  Attached is a copy of the transcript that is in my file (I gave it to Unit Manager Rivera).

Third, the Warden opines that I have not completed fifty percent (50%) of my sentence.  My approval on April 12, 2020, was before my signing my home confinement papers on April 16, 2020, and before the fifty percent (50%) requirement was added, and at the time the BOP representative had made representations to multiple courts that all inmates previously approved (my brother and I signed our papers on the same date--he has been on home confinement since May 1, 2020--same case, same charges, same convictions) would be sent to home confinement.  In fact, the Captain advised that the only reason I had not already been sent to home confinement is because I didn't have a more high profile attorney.  (An express violation of 18 U.S.C. §3621.)

The BOP's responses and delays are in violation of my prior application, approvals by Case Manager, Unit Manager, CMC, SIS, and approval by Probation Department--Southern District of Texas-- and not in compliance with the statute(s) referenced in my original BP-8, attached.

For these reasons, I am appealing a second time, exhausting my Administrative Remedies, and demonstrating obstruction of the Administrative Remedy process.  I hereby appeal again.

See original BP-8 (with exhibits); BP-9 (with exhibits); BP-10 (with exhibits); Second BP-9 (exhibits refused)--all attached.

10-23-2020

Date

William Maxwell

F    058

**U.S. DEPARTMENT OF JUSTICE**

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

---

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | Maxwell, William | 71944–279 | TA | Beaumont LOW |
|-------|------------------|-----------|-----|--------------|
|       | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST**

The BOP has lost my prior BP-8 (copy attached); BP-9 (copy attached); Electronic BP-9 (copy attached); Correspondence from counsel to the Warden, and the Warden's response to counsel. The BOP has additionally lost any response from Region to Maxwell. See Item 1034426-R1, that has never been delivered to Maxwell. For these reasons, and in discussion with Mr. Bevil and Unit Manager Love, yet another copy of the BP-8, BP-9, and attachments thereto are attached. I am appealing based on the exact same reasons noted on June 26, 2020, in my BP-9 (attached).

09/15/2020

_____
DATE

_____
SIGNATURE OF REQUESTER

**Part B– RESPONSE**

RECEIVED

SEP 2 2 2020

F    059

_____
DATE

_____
WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**

CASE NUMBER: 1048383-F1

_____
CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
            LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

SUBJECT: _____

_____
DATE

_____
RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP–229(13)
APRIL 1982

USP LVN

Printed on Recycled Paper

**U.S. DEPARTMENT OF JUSTICE**

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | MAXWELL, WILLIAM | 71944–279 | TA | BML |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST**

   I want to appeal my BP-8 response (attached) I asked for 3 sets of relief therein and was delayed from being transferred to home confinement, under the CARES Act, §3624(c)(2) expansion provision. Additionally, according to your letter to my counsel, dated May 20, 2020, delivered on or after June 10, 2020, you based your response (erroneously) on Hugh Hurwitz's Memo of April 22, 2020. Be that as it may, you did not address my Compassionate Release request or my transfer to community confinement under the Section 3621(b)(1)–(5) factors, in good faith not addressed a percentage of sentence to serve. These, all in violation of Wedelstedt, Fults, Levine, and Woodall; addressed with particularity in my counsel's letters and my e-mails to you throughout April 2020.

   For these reasons, and in furtherance of my administrative remedies, I am appealing my BP-8, adopting the arguments therein seeking home confinement under §3582 and S. Bill 4034 "COVID-19 Safer Detention Act"; and transfer to Community Confinement under §3621(b)(1)–(5)—determined in good faith without consideration of the percentage of sentence served.

| 6/26/2020 | |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B– RESPONSE**

F    060

| | |
|---|---|
| DATE | WARDEN OR REGIONAL DIRECTOR |

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                                   CASE NUMBER: _____

                                                            CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
              LAST NAME, FIRST, MIDDLE INITIAL          REG NO          UNIT          INSTITUTION

BP-8

BMX 1330.18A
May 8, 2015
Page 6

Attachment A

# DOCUMENTATION OF INFORMAL RESOLUTION ATTEMPT

Bureau of Prisons P1330.18, Administrative Remedy Program, (January 6, 2014), requires, in most cases, that inmates attempt informal resolution of grievances prior to filing a formal-written complaint. This form shall be used to document your efforts towards informally resolving your grievance.

Inmate Name: William Maxwell          Reg. No.: 71944-279          Unit: TA

Specific Complaint and Requested Relief: I am requesting to be transferred to home confinement, pursuant to 18 U.S.C. §3621, 3624, and 3582(c)(1)(A)(i).

1) On March 26, 2020, AG Barr issued his Directive to the BOP.

2) On March 27, 2020, Congress passed the CARES Act, amending §3621(c) to allow for expanded home confinement.

3) On March 29, 2020, I sent an electronic cop-out requesting home confinement, to Mr. Rivera.

4) On March 30, 2020, I filled out a complete release packet, and met with Mr. Rivera. Mr. Rivera was informative and helpful.

5) On April 3, 2020, AG Barr issued his second directive expanding home confinement under the CARES Act.

6) On April 3, 2020, the Warden invited inmates to request home confinement.

7) On April 7, 2020, I sent an expanded request for home confinement, to Mr. Rivera.

8) On April 8, 2020, my attorney sent a full request for home confinement to the warden, I executed release of information forms to allow the BOP contact with my counsel.

[continued on attached page(s)]

Efforts Made By Inmate To Informally Resolve Grievance (be specific):

See above, and attached page(s).

F   061

Counselor's Comments:

ON APRIL 16TH UNIT TEAM COMPLETED A REQUEST FOR HOME CONFINEMENT AND SENT IT TO THE WARDEN FOR APPROVAL. THE CMC DENIED THE REQUEST STATING "THIS INMATE DOES NOT QUALIFY FOR HC UNDER ANY CURRENT CRITERIA, HE IS NOT ELIGIBLE!" AND THE ASSOCIATE WARDEN DENIED THE REQUEST STATING "DOESN'T MEET THE 50% RULE."

L. WEST          6/18/2020

Correctional Counselor's Review / Date          Unit Manager's Review / Date

## BP-8 CONTINUATION PAGE

9)  On April 9, 2020, BOP spokesman notified the Court in the Court in the Oakdale case that inmates would no longer be held to an arbitrary percentage of their sentence to be served before being transferred to home confinement.

10)  On April 10, 2020, Warden Garrido gave me notice that I was "high risk" for severe illness or death due to COVID-19.

11)  On April 12, 2020, I was notified I qualified for home confinement.

12)  On April 14, 2020, Medical approved my transfer (no medical care in 90 days required).

13)  On April 16, 2020, I signed my release papers.

14)  I meet all the statutory requirements and discretionary factors to be placed on home confinement, to include no current or past crime of violence, sex offense, or terrorism; no detainers; not illegal alien; pre-release plan (verifiable); below care level IV mental health; no disciplinary shots in my past 12 months or BOP history; I am below -0- on my BRAVO Score; I am below -0- on my PATTERN Score; I have at all times been involved in pre-release programming and productive programming and productive activities as that term is defined under the First Step Act; my transfer to home confinement would save the BOP money; and Government stipulated at my pre-sentencing hearing that I was not a flight risk or a danger to the community.

15)  On April 20, 2020, the AW stopped the processing of my paperwork (on information and belief).

16)  On April 28, 2020, I sent a request for help with my home confinement to the Warden.

17)  On May 4, 2020, my attorney sent a follow letter to the warden on home confinement.

18)  The Wedelstedt v. Wiley case precludes the BOP denying my transfer to home confinement based on the amount of time left on my sentence.

19)  The Unit Team has done all they can to expedite my home confinement, but I have not been transferred to home confinement.

See attached copies of correspondence and relevant documents.

F    062

EXHIBIT 19

Regional Administrative Remedy Appeal No. 1048383-R1
Part B - Response

This is in response to your Regional Administrative Remedy Appeal receipted on October 26, 2020. You are appealing the Warden's response to your request for home confinement placement.

In accordance with the Coronavirus Aid, Relief, and Economic Security (CARES) Act and guidance from the United States Attorney General, the Bureau of Prisons (BOP) has been reviewing inmates who may be considered for home confinement. In determining whether an inmate may be considered for home confinement, the BOP considers the statutory requirements for home confinement and several discretionary criteria. Under these criteria, at a minimum, an inmate must ordinarily: be a low or minimum security inmate; have clear conduct for the past 12 months; have a minimum Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) recidivism risk score; have an adequate and verifiable release plan; have no current conviction or criminal history involving violent offenses, sex offenses, or terrorism-related offenses; have no detainers; be a United States citizen; and have served at least 50% of the inmate's term of imprisonment, or have served at least 25% of the term of imprisonment and have 18 months or less left to serve.

A review of this matter reveals you have not yet served 50% of your term of imprisonment and you have more than 18 months left to serve. Additionally, due to the nature of your offense of conviction, you are not considered a candidate for priority home confinement placement under the CARES Act.

Based on the above information, your appeal is denied.

If you are dissatisfied with this response, you may appeal to the Federal Bureau of Prisons, Office of General Counsel, 320 First Street, N.W., Washington, D.C. 20534. Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

DEC 22 2020

_____
Date

_____
J. Baltazar
Regional Director

F    063

EXHIBIT 20

```
BMLD8           *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      01-07-2021
PAGE 012 OF 012 *           FULL SCREEN FORMAT            *      10:20:52


REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                    QTR.: T04-059U   RCV OFC: SCR
REMEDY ID: 1048383-R1      SUB1: 19HM SUB2:      DATE RCV:   10-26-2020
UNT  RCV..:TA           QTR RCV.: T04-059U     FACL RCV: BML
UNT  ORG..:TA           QTR ORG.: T04-057U     FACL ORG: BML
EVT FACL.: BML     ACC LEV:  BML  1 SCR  1        RESP DUE:  FRI  12-25-2020
ABSTRACT.: REQUESTS HOME CONFINEMENT
STATUS DT: 12-23-2020   STATUS CODE: CLD STATUS REASON:  DNY
INCRPTNO.:          RCT: N EXT: P DATE ENTD: 11-03-2020
REMARKS..: STAFFING
```

*No response was received by this denial date.*

*D. Gtph,  Unit Manager*

```
        11 REMEDY SUBMISSION(S) SELECTED
G0000        TRANSACTION SUCCESSFULLY COMPLETED
```

F   064

EXTENSION OF TIME FOR RESPONSE - ADMINISTRATIVE REMEDY

DATE: JANUARY 7, 2021

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      SOUTH CENTRAL REGIONAL OFFICE

TO  : WILLIAM MAXWELL, 71944-279
      BEAUMONT LOW FCI    UNT: TA      QTR: T04-059U

ADDITIONAL TIME IS NEEDED TO RESPOND TO THE REGIONAL APPEAL
IDENTIFIED BELOW.  WE ARE EXTENDING THE TIME FOR RESPONSE AS PROVIDED
FOR IN THE ADMINISTRATIVE REMEDY PROGRAM STATEMENT.

REMEDY ID      : 1048383-R1
DATE RECEIVED  : OCTOBER 26, 2020
RESPONSE DUE   : DECEMBER 25, 2020
SUBJECT 1      : ELDERLY OFFENDER HOME DETENTION PROGRAM
SUBJECT 2      :

Inmate Maxwell did not receive any response by
December 25, 2020, but his admin remedy was denied on
December 23, 2020.

D. Gledman, Unit Manager

F    065

EXHIBIT 21



U.S. Department of Justice
Memorandum
Federal Bureau of Prisons

---

*Correctional Programs Division*

Central Office
320 First Street, N.W.
Washington, DC 20534

April 22, 2020

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:         Andre Matevousian, Acting Assistant Director
              Correctional Programs Division

              **HUGH HURWITZ** Digitally signed by HUGH HURWITZ
              Date: 2020.04.22 14:17:15 -04'00'
              Hugh J. Hurwitz, Assistant Director
              Reentry Services Division

SUBJECT:      Home Confinement

In an effort to protect the health and safety of staff and inmates during the COVID-19 pandemic, it has become imperative to review at-risk inmates for placement on home confinement. This memorandum provides additional guidance and direction and rescinds the memorandum dated April 3, 2020.

It should be noted that for public safety reasons, in accordance with the March 26, 2020, memorandum from the Attorney General, and to ensure BOP is deploying its limited resources in the most effective manner, the BOP is currently assessing the following factors to ensure inmates are suitable for home confinement:

- reviewing the inmate's institutional discipline history for the last twelve months;
- ensuring the inmate has a verifiable release plan;
- verifying the inmate's primary or prior offense history does not include violence, a sex offense, or terrorism related;
- confirming the inmate does not have a current detainer;
- reviewing the security level of the facility currently housing the inmate, with priority given to inmates residing in Low and Minimum security facilities;
- reviewing the inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment;

F    068

BP-8-12 (1 of 4)

- and reviewing the age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines.

In addition, and in order to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who served a certain portion of their sentences, or who only have a relatively short amount of time remaining on those sentences. While these priority factors are subject to deviation in the BOP's discretion in certain circumstances and are subject to revision as the situation progresses, at this time, the BOP is prioritizing for consideration those inmates who either:

- have served 50% or more of their sentences,
- or have 18 months or less remaining on their sentences and have served 25% or more of their sentences.

Additionally, pregnant inmates should be considered for viability of placement in a community program to include Mothers and Infants Together (MINT) programs and home confinement.

All inmates must be reviewed by the SIS Department at the referring facility to determine if the inmate has engaged in violent or gang-related activity in prison. Additionally, inmates must have maintained clear conduct for the past 12 months to be eligible.

Referrals must be made based on appropriateness for home confinement. Consideration should be given to whether the inmate has demonstrated a verifiable reentry plan that will prevent recidivism and maximize public safety, including verification that the conditions which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility.

All referrals should clearly document the review of the following:

- Unit Team staff will screen each inmate identified to determine if they have a viable release residence and ask questions specific to:
    - o Specific type of release residence (House/Apt/Group home, etc.),
    - o Who will the inmate live with,
    - o Any health concerns of individuals in the residence,
    - o Contact phone numbers should he/she be placed on home confinement,
    - o Transportation plan as to how the inmate will be transferred to the home confinement location.

F    067

BP-8-12 (2004)

All the above information must be clearly documented on the referral for home confinement prior to submission to the RRM Office.

Inmates determined to have a viable release residence will be screened by Health Services and a determination made as to if the inmate requires frequent and on-going medical care within the next 90 days. If frequent and on-going medical care is required, then:

- Health Services staff will coordinate with Naphcare and RRMBs Health Services Specialists to determine if the inmate's medical needs can be met in the community at this time. Naphcare will set up follow-up care prior to the inmate's transfer. An inmate must transfer with AT LEAST 90 days of any prescribed medications.
- If the inmate's medical needs cannot be met in the community at this time, the inmate will remain at the BOP facility.
- If the inmate does not require frequent and on-going medical care, a referral to the community will be processed.
- All the above information must be clearly documented on the referral for home confinement prior to submission to the RRM Office.

Once an inmate is referred for home confinement due to the COVID-19 pandemic, the Case Management Activity (CMA) assignment **CV-COM-REF** should be loaded in SENTRY.

If the Warden determines there is a need to refer an inmate for placement in the community due to risk factors, or as a population management strategy during the pandemic; however, the inmate does not meet the above listed criteria, a packet should be forwarded to the Correctional Programs Division for further review. Packets should be sent to BOP-CPD/Assistant Director from the Warden's general mailbox.

Case Management Coordinators must track all inmates determined to be ineligible for home confinement or the Elderly Offender Pilot Program and enter the appropriate denial code in SENTRY. Reports outlining reason for denial must be reported to BOP-CPD/Unit Management on a weekly basis by Monday at 2:00 p.m. EST.

If an inmate does not currently qualify for home confinement under BOP criteria, they should be reviewed for placement in a

F    068

BP-8-12 (3 of 4)

Residential Reentry Center and for home confinement at a later date, in accordance with applicable laws and BOP policies.

If you have any questions, please contact David Brewer, Acting Senior Deputy Assistant Director, Correctional Programs Division, at (202)353-3638 or Alix McLearen, Senior Deputy Assistant Director, Reentry Services Division, at (202)514-4919.

F    069

BP-8-1) (4 of 4

EXHIBIT 22

1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

       -vs-                  CRIMINAL NUMBER:

WILLIAM M. MAXWELL,

                                 11-740

       Defendant.

    Mitchell H. Cohen United States Courthouse
    One John F. Gerry Plaza
    Camden, New Jersey 08101
    October 1, 2015

B E F O R E:        HONORABLE ROBERT B. KUGLER
                UNITED STATES DISTRICT JUDGE


    A P P E A R A N C E S:

    PAUL J. FISHMAN, UNITED STATES ATTORNEY
    BY:  STEVEN D'AGUANNO
        NORMAN GROSS
    ASSISTANT UNITED STATES ATTORNEYS

    MICHAEL HUFF, ESQUIRE
    ATTORNEY FOR THE DEFENDANT

Certified as true and correct as required by Title 28, U.S.C., Section 753
               /S/ Carl J. Nami

2

(Open court)

THE DEPUTY COURT CLERK:  All rise.

THE COURT:  Sit down, everybody.  All right.  Are you going to argue this motion?

MR. GROSS:  I'm going to try, Judge.

THE COURT:  You have a notebook and everything.

MR. GROSS:  You know the Boy Scout modo, Judge.

THE COURT:  All right.  Mr. Huff, are you ready?

MR. HUFF:  Yes.

THE COURT:  All right, this the matter of United States versus William Maxwell.  Start with the appearance of counsel for the government please.

MR. GROSS:  Good morning, Your Honor.  Assistant United States Attorney, Norman Gross.  And with me here at counsel table is Assistant United States Attorney, Steven D'Aguanno.  I see Salhy Alliabad is here also.  So, the government is always happy to have reinforcements.

THE COURT:  Mr. Huff.

MR. HUFF:  Good morning, Your Honor.  Michael Huff on behalf of the petitioner, William Maxwell.

THE COURT:  All right, this is Mr. Huff's motion under Rule 38 (b)(2) for bail pending appeal.  I'll hear you, Mr. Huff.

MR. HUFF:  Thank you, Judge.  Judge I believe procedurally the first thing we're asking for I guess is a

3

stay of sentence followed by the setting of bail and if those motions are denied that the court recommend that Mr. Maxwell essentially be transferred from Texas up to this area so that he can assist counsel in filing his appellate brief.

Your Honor, counsel recognizes that the burden is on the defendant to show by clear and convincing evidence that he is not a flight risk, danger to the community and that there is a -- the appeal will raise substantial questions of law that are likely to result in a reversal or a new trial.

Judge, it does appear and I will address it briefly that the government is not or excuse me not contending that Mr. Maxwell is either a flight risk or a danger. I would, of course, point out to the court, the court is obviously fully aware having tried this case and litigated all the pretrial motions and even was involved in the matter of signing the warrants prior to the indictment being filed, that Mr. Maxwell was free on bail after he was arraigned in Texas and that, of course, at no period, at no point in time did he ever fail to appear in court. In fact, I believe that the court permitted Mr. Maxwell to travel within the entire District of Texas. The Eastern District of Pennsylvania so that he could fly into the Philadelphia Airport as well as meet with me in my office in either Philadelphia or New Jersey. And, of course, he was permitted to be in New Jersey and also Maryland as well where his sister resides. And, of course, as I pointed out, Your

F   072

4

Honor, at no point in time was Mr. Maxwell arrested during the pendency of this case for any reason and obviously always appeared in court when that was required.

Judge, the court knows the substantial pretrial litigation that was conducted in this case as well as objections and motions that were filed even during the trial itself. We raise some of those issues, Judges, in our papers.

Judge, there are some -- much -- very big issues such as the objections that the court heard throughout the trial as well as pretrial with regard to severing the defendants because of Mr. Scarfo's, the allegation that Mr. Scarfo was a member of La Cosa Nostra. That will be, of course, one of the issues that we raised on appeal, Your Honor, and that was, that was testimony that obviously was we would argue very prejudicial, you know, especially as to Mr. Maxwell who never was a member of La Cosa Nostra, never really a what I will call an associate in the terms that he was, you know, under the protection of La Cosa Nostra. He was simply a lawyer in Texas working for First Plus Financial Group. One of the other issues that we raise, Your Honor, is the motion to suppress. The court, as the court may recall, we filed a motion on March the Fourth of 2013 which was document Number 435 in that matter. If you recall, Your Honor, in that motion that we had filed with the court the search warrant gave permission to law enforcement to search the law offices of

5

William Maxwell, specifically his office located in Suite 400, and I believe if Your Honor may recall, we had the placard I believe which listed the offices and it was argued to the court at that time Mr. Maxwell in addition to occupying Suite 400 also had offices in Suite 401, 402, 403, 404 and 405 and obviously we argued that those hard drives that were seized as a result of the search warrant, that the search warrant itself as far as identifying the premise to be searched was overbroad.  Obviously the court denied that motion, but that could be an issue on appeal that if the Third Circuit grants it, substantially or likely change the outcome of the trial and could lead to a reversal or a new trial.  We also raised sufficiency arguments in our papers.  The Government obviously responded to those sufficiency arguments saying that they're not necessarily favored in these types of motions, Your Honor. But again specifically speaking about the gun charges, Your Honor.  If the court recalls, the only evidence that I can recall from the trial about the gun was the telephone call that was made by Mr. John Maxwell as he was allegedly bringing the guns into New Jersey from Texas and a phone call was made to an individual identified as Bill or at least that representation was made to Mr. Pelullo that Mr. John Maxwell had spoken to Bill and Bill said with regard to the helicopters flying overhead, allegedly flying overhead in the van that was following, that Bill said it might be something,

it might be nothing.  We would argue, Your Honor, that that issue has a very substantial likelihood of success on appeal and again could result in either a dismissal of that charge or even perhaps a new trial altogether.  Those are the issues that I would raise, and, of course, rely on my brief for the remainder of the argument, Your Honor.  And, of course, all the issues that have been filed and litigated throughout this trial.  I know the court recalls.

THE COURT:  I've already denied bail pending appeal.  What has changed since then?

MR. HUFF:  For Mr. Maxwell, Your Honor?

THE COURT:  Yeah.

MR. HUFF:  Are you speaking in terms --

THE COURT:  The verdict.

MR. HUFF:  Okay, that's --

THE COURT:  Revoked his bail based on his argument at that time.  Has anything changed?

MR. HUFF:  Well, I guess, yes, Your Honor.  What has changed, I believe that may have been on July the Fourth or July the Third.

THE COURT:  The third.

MR. HUFF:  Yeah, July the Third.  Judge, at that hearing, if you recall, and I reviewed the transcript before today, the Government specifically made arguments with regard to flight risk and danger to the community.  The danger to the

community part was in reliance upon the gun charges that he had been convicted of. And, so, I think what's changed is those arguments made by the Government in order to detain Mr. Maxwell prior to sentencing. They seem to be conceding at this point in that they're not relying specifically on his risk of flight or danger to the community. And, obviously, Your Honor, precautions can be taken by the court to make sure that the risk of flight and danger to the community is minimized by perhaps ordering house arrest pending appeal. Checking in with Pretrial Services and other measures that the court can take to make sure that Mr. Maxwell appears in court and/or turns himself in, for example, if the appeal is denied.

THE COURT: Your argument regarding recommending to the Attorney General that he be incarcerated closer to here so he can have better access to you for purposes of the appeal. Of course it's discretionary with the Attorney General. The Attorney General, she need not follow my recommendation, but it was a year that passed between the date of the conviction and the date of sentencing. What were you unable to speak to Mr. Maxwell about during the course of that period in time in excess of a year about his potential appeal?

MR. HUFF: Well, we, we had obviously that opportunity to do so, Your Honor. I will say as the court also knows many, many of those visits were focused on, I guess you could say post-conviction relief such as the Brady motions

8

that had been filed with the court.  So that a lot of that opportunity during that one year period was not spent, although a portion of it was not spent on discussing appellate issues, but instead were discussing I believe Rule 33 issues especially with regard to the Philadelphia Eastern District case in the Brady motion that had been filed that was really most of the conversations surrounded those issues, Your Honor.

THE COURT:  Well, you're unable to demonstrate to me that you were unable to speak to Mr. William Armstrong during that period of time about his potential appeal?

MR. HUFF:  Mr. Maxwell.

THE COURT:  I'm sorry.  Mr. Maxwell.  I'm sorry.

MR. HUFF:  No.  We obviously had the opportunity to do that, yes, Your Honor.

THE COURT:  All right.  Thank you.

MR. HUFF:  Thank you.

THE COURT:  Mr. Gross, what would you like to say?

MR. GROSS:  Judge, I'll be very brief.  One difference between now and when Your Honor revoked bail following the verdict is that the statute providing presumption for incarceration after sentence -- I'm sorry.  Has a presumption of detention after a sentence of incarceration has been imposed and here it's very likely a sentence of incarceration.  One, I would add it would not be affected even if the Third Circuit, and I'm not conceding

F   077

9

anything here, but even if the Third Circuit concluded that the evidence for the gun charge was insufficient, that wouldn't reduce the sentence at all.

Just very briefly. With respect to the severance and the claim that he was harmed by the, Mr. Maxwell was harmed by the LCN evidence, Your Honor gave a cautionary instruction that the jury should not -- that there was no evidence that Mr. Maxwell was involved in LCN, which the jury likely followed.

With respect to the motion to suppress in addition to the arguments that we put forward as to why there was no unreasonableness in that search. You'll recall that Mr. Maxwell signed a consent for that search. So there were two grounds for which you could deny the motion. And I can't remember -- the motion to suppress, Your Honor, I mean I think there were five hundred pages of briefing on that and extensive oral arguments and I'm quite confident that the Third Circuit is not going to see any reversible error here. So unless if your Honor has any questions.

THE COURT: I don't.

MR. GROSS: Thank you.

THE COURT: Mr. Huff, did you want to respond at all?

MR. HUFF: No, Your Honor.

THE COURT: All right, thank you. I'm going to deny both motions as to the application for a stay and bail pending

10

appeal.  There are no issues that I think that the Third Circuit is going to take up and reverse this court on.  There is the presumption of the revocation of bail because of the lengthy prison sentence that was imposed in this case.  We spent thousands of pages and hundreds of hours arguing the pretrial motions and the post-trial motions and I made my findings.  I made my rulings as explicitly as I could.  As to the issues raised today, I don't see any need for me to revisit those issues.  I think my rulings were correct and Mr. Gross is obviously correct about the gun charge that did cause some discussion at the time the motion was raised because the evidence on that one is a little thin.  But he's correct that even if that's reversed, he would still get the same sentence on the racketeering conviction in the case.

As to a recommendation to the Attorney General, I'm not going to do that because the defendant has had sufficient time with his counsel here in New Jersey to talk about the issues for appeal and I'm confident that they can continue to communicate by phone and by e-mail and regular mail as they firm up their brief on appeal.  So for all those reasons the motions will be denied.  Thank you.

MR. HUFF:  Thank you for your time, Judge.

MR. D'AGUANNO:  Thank you, Judge.

(The matter was then concluded)

EXHIBIT 23

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/justice-department-clarifies-coronavirus-driven-inmate-releases-11587594242

U.S.

# Confusion Hampers Coronavirus-Driven Inmate Releases

Shifting policy led to some federal prisoners being told they were eligible for home confinement, only to have it revoked



Former New York state Senate Majority Leader Dean Skelos, as he arrived for sentencing in Manhattan in 2018. Mr. Skelos, who has Covid-19, is serving a 51-month prison term.
PHOTO: JUSTIN LANE/EPA-EFE/REX/SHUTTERSTOCK

*By* ⋯⋯⋯⋯⋯ *and* ⋯⋯⋯⋯⋯⋯

Updated April 23, 2020 1:49 pm ET

The Justice Department said Wednesday that federal prison officials could consider inmates for early release even if they haven't yet served half of their sentences, clarifying a shifting policy that has sown confusion across the nation's prisons and courts in recent days.

Dozens of inmates who had been granted early release as part of an effort to stem the spread of the coronavirus were told this week they hadn't served enough time to qualify, according to prisoners and court filings. Inmates, prosecutors and federal judges demanded prison officials explain their rules and criteria for releasing inmates during the pandemic.

A department spokesman said the federal Bureau of Prisons "intends to expeditiously transfer all inmates to home confinement who were previously referred" for it, as long as such transfers

F    080

BP-8-7 (1 of 4)

aren't forbidden by law or criteria set forth by Attorney General William Barr. More prisoners are approved for home confinement every day, the spokesman said.

The decision will affect about 200 inmates across the federal prison system, a person familiar with the matter said.

Adding to the uncertainty, though, prison officials on Wednesday also circulated an internal memo indicating that, with some exceptions, they would prioritize early release for those who have served more than 50% of their sentences and those who have 18 months or less left and have served 25% of their terms. The memo, reviewed by The Wall Street Journal, said those guidelines would be "subject to revision as the situation progresses."

Confusion over rules for early release represented the latest challenge for the federal system in its effort to limit the virus's spread behind bars. The bureau said Wednesday that at least 566 inmates and 342 employees had tested positive for Covid-19, the disease caused by the new coronavirus; 24 prisoners and one employee have died.

Mr. Barr directed prison officials last month to begin releasing inmates, prioritizing those who are nonviolent, have shown good conduct behind bars and are particularly at risk for complications of the disease.

The bureau said it has started placing at least 1,440 of the roughly 175,000 prisoners it holds into home confinement, but didn't say how many of those people have actually been released.

The requirement that inmates must have served at least 50% of their sentence wasn't outlined by Mr. Barr. But prison authorities had been using that precondition, according to a filing in a lawsuit over conditions at a prison in Oakdale, La.

Yet the filing also said the bureau had expanded its criteria to include even those who hadn't met that requirement.

Confusion over the 50% cutoff was apparent this week in the case of former New York state Senate majority leader Dean Skelos, whose approved release from federal prison was abruptly thrown into question.

Federal prosecutors said in a filing Friday that the 71-year-old Mr. Skelos—who is about 15 months into a 51-month sentence on federal corruption charges—had Covid-19, and had been approved for release from the Federal Correctional Institution in Otisville, N.Y., to home confinement.

F 081

Then in a letter to the court Tuesday, prosecutors said prison officials had told them the bureau "no longer believed Skelos to be eligible for home confinement," because Otisville had been told

to follow the bureau's previous policy of only considering inmates who had served at least half their sentence.

In their response, lawyers for Mr. Skelos said that after he collapsed on the morning of April 8, Mr. Skelos was taken to the prison's medical facility and held in a solitary cell for 10 days without access to his lawyers, his medications or a change of clothes.

"The rollercoaster of going from a battle with Covid 19 and a dehumanizing quarantine to the tease of a potential furlough to seeing that hope extinguished just a few days later stands as yet another example of unjust punishment for Mr. Skelos and his family," his lawyers wrote.

In another Manhattan case, U.S. District Judge Ronnie Abrams on Tuesday ordered the government to explain its release policy after Lewis Stahl—who is serving a 30-month sentence for tax evasion—was told Monday he would be released to home confinement only to learn, later that day, that the BOP had reversed the approval.

It was unclear Wednesday what would happen to Messrs. Skelos and Stahl.

A policy allowing home confinement only for inmates who have served 50% of their sentence also would have affected, among others, President Trump's former personal lawyer, Michael Cohen. He was told he would be able to serve the rest of his three-year sentence for crimes including campaign-finance violations at home.

A lawyer for Mr. Cohen said the BOP hadn't responded in writing to his application for Mr. Cohen's compassionate release.

Memos from Mr. Barr say inmates should serve a 14-day quarantine, but also gave the BOP discretion to immediately release them to quarantine at home.

Prison quarantines were also posing problems, as in the case of Gerard Scparta, a former New York City police officer who pleaded guilty last year in Manhattan federal court to crimes including tax evasion and Social Security fraud.

F 082

Mr. Scparta was serving an 18-month sentence at FCI Butner in North Carolina, which has experienced one of the prison system's worst coronavirus outbreaks. Officials approved Mr. Scparta's release to serve the remainder of his term in home confinement, after a 14-day quarantine in the prison.

BP-8-7 (304)

Mr. Scparta's "quarantine," according to his lawyers, had him confined in proximity to staff and other inmates. And four days into it, prison officials said Mr. Scparta had to restart the 14-day clock after an inmate he was housed with tested positive.

In court filings, prosecutors didn't dispute that he was in contact with other inmates, saying that BOP "is best-equipped to determine whether and how to quarantine the defendant."

In a decision filed Monday, U.S. District Judge Alison Nathan described the BOP's approach as "Kafkaesque," ordering the government to release Mr. Scparta immediately.

Mr. Scparta was released from prison on Monday and is self-quarantining at home in Orange County, N.Y., said his lawyer, Joseph Mure Jr.

Write to Sadie Gurman at sadie.gurman@wsj.com and Rebecca Davis O'Brien at Rebecca.OBrien@wsj.com

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

F    083

BP-8-7 (4 of 4)

EXHIBIT 24

**FEDERAL CORRECTIONAL COMPLEX (FCC), BEAUMONT, TEXAS**
**PART B - RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY #1054133-F1**


This is in response to your Request for Administrative Remedy received October 28, 2020, in which you request a compassionate release under 18 U.S.C. § 3582(c), or alternatively home confinement in connection with the CARES Act.  Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons.  BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence, Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner. Your request has been evaluated consistent with this general guidance.

RIS consideration may be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover.  Your request does not meet this criteria.  Therefore, your request for a compassionate release is denied.

With regard to your request for home confinement, the Bureau of Prisons is utilizing the full scope of its various authorities to ensure that inmates at heightened risk of complications from COVID-19 are identified and housed safely and appropriately given their specific needs and circumstances. This includes modified institution operations; routine staff and inmate medical screening; use of the home confinement authority, where appropriate, based on guidance from the U.S Attorney General; and use of compassionate release for appropriate inmates who have existing terminal and debilitated medical conditions or who are elderly and nearing the end of their sentence, as provided for in current agency policy.

The CARES Act authorizes the U.S. Attorney General to expand the cohort of inmates who can be considered for home confinement upon his findings of emergency conditions which are materially affecting the function of the BOP.  On April 3, 2020, the U.S. Attorney General made that finding and authorized the Director of the BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and other similarly situated BOP facilities where COVID-19 is materially affecting operations.

The U.S. Attorney General issued guidance to the BOP regarding the transfer of inmates to home confinement on March 26, 2020.  The Central Office also listed the following criteria which should be met when reviewing and referring inmates for home confinement:  primary or prior offense history does not include violence, a sex offense, or terrorism related; no detainer; PATTERN risk score is Minimum; reviewing an inmate's institution discipline history for the last 12 months; verifiable release plan; and the inmate must have served at least 50% of their sentence, or have 18 months or less remaining on their sentence and have served 25% or more of their sentence.

F   084

RESPONSE TO INMATE REQUEST TO STAFF
INMATE: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
REGISTER NO: ▮▮▮▮▮▮▮▮▮
INSTITUTION: FCI Beaumont-Low


This is in response to your correspondence addressed to
J. Baltazar, South Central Regional Director, where you requested
an immediate release due to the recently enacted law.

On December 21, 2018, President Trump signed into law the First
Step Act of 2018 ("Act"). The Act does not state "effective
immediately" and does not apply to all inmates. The Federal
Bureau of Prisons is currently reviewing the new law and is
preparing to implement the relevant provisions. Your Unit Team
has reviewed your risk and needs assessment system required by
the Act.

After further review, you do qualify for the First Step Act.
Your Case Manager will review you for 12 months Halfway House
Placement and 6 months of Home Confinement.

Based on the above information, this response to your request is
for your informational purposes only.

_____          ____12/12/19____
F. J. Garrido                             Date
Warden


cc: J. Baltazar, South Central Regional Director


F    085

FEDERAL CORRECTIONAL COMPLEX (FCC), BEAUMONT, TEXAS
PART B - RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY #1020482-F1
PAGE TWO

Information reveals you arrived at FCC Beaumont on September 12, 2019, with a Projected Release Date of January 28, 2024, via Good Conduct Time Release. You do meet the criteria to be released on home confinement per the CARES Act. You case manager will submit you for further consideration by November 10, 2020.

Based on the above information, this response to your Request for Administrative Remedy is for information purposes only.

If you are not satisfied with this response, you may appeal to the Regional Director at Bureau of Prisons, South Central Region, South Central Regional Office, 344 Marine Forces Drive, Grand Prairie, Texas, 75051. Your appeal must be received in the South Central Regional Office within 20 days of the date of this response.

_____          _____
F. J. Garrido, Warden               Date

F    086

EXHIBIT 25

**Administrative Remedy No. 1048383-A2**
**Part B - Response**


This is in response to your Central Office Administrative Remedy Appeal where you disagree with the decision at FCI Beaumont Low to deny your request for home confinement. You allege the delays in the administrative remedy process represent bad faith and obstruction of justice. You reassert your prior claims and believe you meet all criteria for home confinement based on the Attorney General's memorandum. Based on this, you request to be released to home confinement.

The Bureau of Prisons (BOP) is taking extraordinary measures to contain the spread of COVID-19 and to treat any infected inmates. Additionally, in the BOP's continued effort to protect the health and safety of staff and inmates during the COVID-19 pandemic, inmates are being reviewed for direct placement on home confinement. In doing so, several factors are assessed and referrals are made based on appropriateness for home confinement.

The Warden and Regional Director adequately addressed your complaint and we concur with the responses provided. You were reviewed for direct home confinement and deemed ineligible for placement at this time. You were advised of the reason for this decision and we find you received proper and fair consideration pursuant to the Attorney General's memoranda, and local guidance and direction regarding the COVID-19 pandemic. You may discuss this matter further with your Unit Team at your next scheduled Program Review. In addition, we find no evidence of staff malfeasance regarding your administrative remedy request and appeals for this issue.

Accordingly, your appeal is denied.


_____5|24|21_____                          _____
Date                                        Ian Connors, Administrator
                                            National Inmate Appeals

F    087

EXHIBIT 26



DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL

November 15, 2021

Management Advisory Memorandum

To:         Michael Carvajal
            Director
            Federal Bureau of Prisons

From:       Michael E. Horowitz
            Inspector General

Subject:    Impact of the Failure to Conduct Formal Policy Negotiations on the Federal Bureau of
            Prisons' Implementation of the FIRST STEP Act and Closure of Office of the Inspector General
            Recommendations

The purpose of this memorandum is to advise you of critical issues that the Office of the Inspector General (OIG) has identified during its ongoing Review of the Federal Bureau of Prisons' (BOP) Policy Development Process. We believe that the issues we describe below necessitate management's immediate attention to address a 20-month period during which formal policy negotiations have not occurred between the BOP and its national union.[1] The lack of negotiations is the result of the decision by BOP management to decline to meet in person to conduct formal policy negotiations with the national union during the coronavirus disease 2019 (COVID-19) pandemic, and instead to propose remote video meetings, and the decision by the BOP national union to insist on in-person negotiations given that in-person negotiations are provided for in BOP union contracts and its membership has been reporting to work in person throughout the pandemic. The lack of formal negotiations has disrupted aspects of the BOP's implementation of the FIRST STEP Act of 2018 (FSA) and has further delayed policy changes to address OIG recommendations on systemic correctional and safety issues.

The OIG initiated the ongoing BOP policy development review in November 2019 due to significant delays in the resolution of multiple OIG recommendations related to revising or creating BOP policies concerning various correctional and safety issues. Numerous BOP officials expressed concerns to the OIG regarding excessive delays with the BOP's policy development process, and the National Academy of Public Administration released a study finding that the BOP's policy process is lengthy and uncertain, making it

---

[1] For the purposes of this memorandum and our pending Review of the BOP's Policy Development Process, "policy development" includes the process by which the BOP develops and implements, in collaboration with its national union, policies governing BOP programs and operations. Such policies may involve any aspect of BOP programs and operations that affect conditions of employment of the more than 30,000 BOP bargaining unit employees.

F   098

difficult for BOP divisions to issue and revise policies in a timely manner.[2]  The absence since March 2020 of formal negotiations, including those for issues impacting the FSA, exacerbated these concerns, as detailed below.

In its written response to this memorandum (attached as Appendix 1), the BOP reported that it will be commencing in-person Joint Policy Committee (JPC) meetings with the national union in November 2021 to discuss policies related to the FSA, security and correctional services, and health and safety issues and that it has informed the national union that it intends to resume formal in-person negotiations in December 2021.[3]

Relevant Authorities

Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454
The FIRST STEP Act of 2018, Pub. L. No. 115-391
BOP Ground Rules for National Policy Negotiations, December 5, 2013
BOP and Council of Prison Locals, Master Agreement, July 21, 2014–July 20, 2021 (extended until 2026)

The Issue

Under the BOP's labor contracts, the BOP and its national union can meet in person, 3 days each month, to negotiate policies.[4]  Further, the BOP's Ground Rules for National Policy Negotiations state that "no policies will be negotiated over the telephone, on conference calls, or over speakerphones, unless mutually agreed."

In response to the COVID-19 pandemic, on March 13, 2020, the BOP implemented Phase Two of its COVID-19 Action Plan, which, among other things, suspended all official staff travel for 30 days.[5]  On August 5, 2020, the BOP issued new travel guidance that suspended "non-essential official staff travel" but permitted essential travel.[6]  As of October 25, 2021, this travel guidance was still in place.  Since the implementation of Phase Two, BOP management has declined to meet in person with national union staff to conduct formal policy negotiations and has instead proposed conducting virtual policy negotiations.  However, the BOP's national union has declined to conduct formal policy negotiations in a remote manner.  Relying on labor contractual terms providing for in-person negotiations, the national union has insisted on in-person negotiations and expressed its availability to meet in person.  This disagreement has resulted in a lack of formal policy negotiations for a period of 20 months, which at the time of our fieldwork had stalled the development of more than 30 BOP policies, about half of which were created or revised in response to the FSA.

BOP officials have told the OIG that compliance with Title VII of the Civil Service Reform Act of 1978 requires the BOP to negotiate with the national union changes to policy, including BOP policies governing FSA programs, when such changes affect the conditions of employment of bargaining unit employees.[7]

---

[2] National Academy of Public Administration, *Assessment of the Bureau of Prisons' Organizational Alignment with Healthcare Mission* (October 2019), www.oldnapa.primedev.build/uploads/Academy_Studies/BOP_NAPA_Deliverable_1_Final.pdf (accessed November 10, 2021), 36.

[3] In its written response, the BOP also stated that, since passage of the FIRST STEP Act in December 2018, it has revised and issued 12 FSA-related policies, 6 of which it told us were issued after March 2020, when formal policy negotiations were ceased.

[4] Article 3 of the BOP's Master Agreement and its Ground Rules for National Policy Negotiations govern the BOP's formal negotiation practices with the national union.

[5] BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Two Action Plan, March 13, 2020, 2.  The memorandum stated that any travel exceptions must be approved by the BOP Deputy Director.

[6] BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Nine Action Plan, August 5, 2020, 2.

[7] Generally, according to the BOP's Labor Relations Office Chief, when implementing laws affecting the BOP, the BOP must negotiate changes to the conditions of employment for bargaining unit staff with its national union unless Congress includes explicit terminology to the effect that implementation is notwithstanding any other provision of law.  For more information concerning the BOP's collective bargaining obligations under Title VII of the Civil Service Reform Act of 1978, see 5 U.S.C. §§ 7102 and 7106.

F   089

According to the BOP's Office of Labor Relations, failure to do so could be grounds for the filing of an unfair labor practice charge by the national union with the U.S. Federal Labor Relations Authority.

As described below, the BOP's decision to not conduct formal in-person negotiations with the national union has delayed the Department of Justice's (Department, DOJ) ability to move forward with FSA-related policies, as well as policy changes to address OIG recommendations on systemic correctional and safety issues. In response to a draft of this memorandum, the BOP explained that it has declined to meet with the national union in person due to pandemic-related guidance from the Office of Management and Budget (OMB) that was issued in March 2020.[8] However, we note that OMB's memorandum allows mission-critical travel and that the memorandum specifies factors for agencies to consider in determining which travel is mission critical, including whether such travel is required by "statute or contract." As described above, the BOP and the national union have a contract that requires travel for in-person formal policy negotiations unless both parties agree otherwise. Moreover, the imperative of meeting both the FSA's mandates and dozens of additional pending policy matters that concern safety and security issues, as well as the fact that most BOP employees have been working in person throughout the pandemic, further undercuts the BOP's reliance on the OMB guidance as a basis for suspending formal policy negotiations for such a lengthy period. Additionally, as of August 5, 2020, the BOP's own travel guidance allows for essential official travel. Although the BOP travel guidance does not describe what travel is considered essential, for the same reason we believe that travel for negotiation purposes would qualify as mission critical under the OMB memorandum, it should also seemingly be considered essential for BOP purposes.

In its written response to this memorandum, which is attached as Appendix 1, the BOP restated its belief that its decision to decline to meet in person with the national union since March 2020 was consistent with OMB guidance. Additionally, the BOP referenced DOJ's COVID-19 Workforce Safety Plan from February 2021, which provided that "when [in-person] meetings must be held, they shall be limited to fewer than ten individuals." The BOP response went on to state that, since the national union is entitled to 10 representatives at formal negotiations, complying with the DOJ Workplace Safety Plan would have prevented BOP attendance. We note, however, that OMB and DOJ pandemic-related policy memoranda have consistently recognized the need to accommodate mission-critical operational needs during the pandemic. For example, OMB's M-21-25 memorandum, issued on June 10, 2021, stated: "As a reminder, at any time, if there are operational needs related to the completion of agency mission-critical activities, agencies may pursue an exception from select model safety principles set forth by M-21-15, and as amended by Task Force guidance and this memorandum."[9] Indeed, during the course of our review, we learned from the national union that BOP Executive Staff itself had authorized a large meeting in California between BOP officials and union leaders shortly after the DOJ's February 2021 memorandum was issued and that the meeting was attended by at least 15 local union presidents, 15 Wardens, and additional BOP regional office executives and staff. Further, we note that, despite the 10-person rule that it cited, the BOP's response in Appendix 1 stated that it has notified the national union of its intent to resume formal negotiations in December 2021.

FIRST STEP Act Requirements and Impact of the Lack of Negotiation

On December 21, 2018, then President Donald J. Trump signed into law the FSA, which enacted several criminal justice reforms throughout the federal prison system. Among other mandates, the FSA (18 U.S.C. § 3632) required the Attorney General, in consultation with the Independent Review Committee, to develop a

---

[8] OMB Memorandum M-20-14, Updated Federal Travel Guidance in Response to Coronavirus, March 14, 2020, www.chcoc.gov/sites/default/files/M-20-14-travel-guidance-OMB-1_0.pdf (accessed November 10, 2021).

[9] OMB Memorandum M-21-25, Integrating Planning for A Safe Increased Return of Federal Employees and Contractors to Physical Workplaces with Post-Reentry Personnel Policies and Work Environment, June 10, 2021, www.whitehouse.gov/wp-content/uploads/2021/06/M-21-25.pdf (accessed November 10, 2021).

F    090

system to assess the recidivism risk and criminogenic needs of all federal inmates by July 19, 2019. In response to this requirement, the Department developed the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) system.[10] The FSA also set a deadline of January 15, 2020, for the Department to utilize the PATTERN system and other resources to:

- complete an initial risk and needs assessment for each federal inmate,

- begin to assign inmates to appropriate evidence-based recidivism reduction (EBRR) programs based on the initial assessment,

- begin to expand the EBRR programs and productive activities available at BOP facilities and add any new EBRR programs and productive activities necessary to effectively implement the system, and

- begin to implement any other risk and needs assessment tools necessary to effectively implement the recidivism risk assessment system over time.[11]

The FSA also stated that the Department's recidivism risk assessment system "shall provide incentives and rewards for prisoners to participate in and complete [EBRR programs]" and directed that inmates who "successfully complete [EBRR programs] or productive activities, shall earn time credits" toward pre-release custody (i.e., transfer to a Residential Reentry Center or home confinement) or supervised release (i.e., early satisfaction of the inmate's sentence).[12] Under the FSA, the BOP must provide EBRR programs and productive activities to all inmates in its custody no later than January 15, 2022.[13]

During the period of our fieldwork ending in May 2021, we identified 13 FSA-related policies that the BOP has determined require negotiations with the national union. In June and July 2021, as the result of *informal* policy negotiations with the national union, the BOP published 2 of the 13 FSA-related policies we had identified as pending—the First Step Act Needs Assessment and First Step Act Program Incentives.[14]

---

[10] For more information concerning the Department's development and implementation of PATTERN, see Office of the Attorney General (OAG), *The First Step Act of 2018: Risk and Needs Assessment* (July 2019), www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf, and OAG, *The First Step Act of 2018: Risk and Needs Assessment System–UPDATE* (January 2020), www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf (both accessed November 10, 2021).

[11] See 18 U.S.C. § 3621(h)(1). The FSA defines an EBRR program as a group or individual activity that: (1) has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; (2) is designed to help inmates succeed in their communities upon release from prison; and may include (3) social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills. In addition, the FSA defines "productive activity" as a group or individual activity that is designed to allow inmates determined to have a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating. For more information, see 18 U.S.C. § 3635.

[12] 18 U.S.C. §§ 3632(d) and 3632(d)(4).

[13] See 18 U.S.C. § 3621(h)(2). The FSA states that an inmate shall earn 10 days of time credits for every 30 days of successful participation in EBRR programs or productive activities. The law also states that minimum and low risk inmates who, over two consecutive assessments, have not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in EBRR programs or productive activities. For more information, see 18 U.S.C. § 3632(d)(4)(A).

[14] Informal policy negotiations include any type of policy discussions that are not governed by BOP labor contracts. Typically, these discussions include email exchanges or telephone conversations between BOP officials and national union representatives. While neither the BOP nor the national union is obligated to participate in informal policy discussions and may decline to participate without recourse by the other party, informal policy discussions can be an effective way for the BOP to negotiate policies with the national union. In August 2021, the BOP reported to the OIG that since April 2021 it had conducted with its national union several informal policy negotiations that resulted in the issuance of new policies, including FSA-related policies. Though informal policy negotiations can be useful for resolving less complex and divisive policy matters, historically they have served as a supplement to formal policy negotiations. The resumption of formal policy negotiations may be necessary to resolve the policy development issues we discuss throughout this memorandum, many of which have been unresolved for years and may be too complex to address through informal negotiations.

F    091

Accordingly, as of October 2021, 11 of these FSA policies remained pending negotiations, as detailed in Table 1 below.

## Table 1

### BOP FSA-Related Policies That Need to Be Issued, as of October 29, 2021

| No. | Policy Name | Office of Primary Interest (OPI) | Date OPI First Sent Draft Policy to National Policy Management (NPM) | NPM Notes About Last Policy Step Completed | Date Last Policy Step Completed | Days Since NPM First Received Draft Policy |
|---|---|---|---|---|---|---|
| 1 | Prisoner Transportation Manual | Correctional Programs | 1/7/2019 | 7-day expedited management review | 10/29/2021 | 1,026 |
| 2 | Use of Force and Application of Restraints | Correctional Programs | 1/7/2019 | 7-day expedited management review | 10/29/2021 | 1,026 |
| 3 | Escorted Trips | Correctional Programs | 1/17/2019 | 7-day expedited management review | 10/29/2021 | 1,016 |
| 4 | Pharmacy Services | Health Services | 7/29/2019 | NPM editing to ensure consistency with Medication Assisted Treatment Program: Psychology Services | 7/19/2021 | 823 |
| 5 | First Step Act of 2018–Recidivism Risk Assessment* | Information, Policy, and Public Affairs | 8/30/2019 | Draft provided to union | 2/14/2021 | 791 |
| 6 | Sentence Computation Manual (CCCA of 1984) | Correctional Programs | 9/19/2019 | Draft returned to OPI for further edits | 10/1/2021 | 771 |
| 7 | Medication Assisted Treatment Program: Psychology Services | Reentry Services | 10/18/2019 | NPM editing to ensure consistency with Pharmacy Services | N/A | 742 |
| 8 | First Step Act of 2018–Time Credits | Correctional Programs | 12/6/2019 | Notice to reopen comment period on draft rule to Federal Register (applicability to DC Code Offenders) | 10/18/2021 | 693 |
| 9 | Community Based Programs, Utilization and Transfer Procedures | Reentry Services | 2/27/2020 | Awaiting DOJ CARES Act Decisions | N/A | 610 |
| 10 | Work Programs for Inmates | Federal Prison Industries | Not yet received | Awaiting finalization of draft rules | N/A | N/A |
| 11 | Inmate Work and Performance Pay | Correctional Programs | Not yet received | Evaluating whether FSA Section 605 applies to non-Federal Prison Industry jobs | N/A | N/A |

Note: "N/A" means that the BOP did not provide us with any information under the requested fields, thus indicating that the policy has either (1) not been provided to the NPM or (2) has not completed any policy development steps since receipt by the NPM.

* In response to a draft of this memorandum, the BOP stated that its system for automating recidivism risk assessments has been completed and it has determined that the First Step Act of 2018–Recidivism Risk Assessment policy (No. 5, above) is no longer needed. Rather, the NPM stated that the Unit Management Manual and Inmate Program Review policies, which will incorporate PATTERN guidance, will be sufficient.

Source: OIG analysis of BOP information

In its written response to this memorandum, the BOP reported that there were seven additional FSA-related policies that are pending negotiations with the national union. These policies include the following: (1) Parenting, Children, and Families, (2) Female Integrated Treatment Program, (3) Management of Inmate

F    092

Veterans, (4) Management of Aging Offenders, (5) Secure Mental Health Units, (6) First Step Act Incentives Procedures Under the Cares Act Covered Period, and (7) Release Orientation Program.

FSA Time Credits

The FSA provides that BOP inmates who "successfully complete [EBRR programs] or productive activities, shall earn time credits."[15] Since January 15, 2020, federal inmates have been able to earn time credits under the FSA (see the text box). However, we found that the BOP has not applied such statutorily earned time credits to any of the approximately 60,000 eligible inmates who may have completed EBRR programs or productive activities.[16] We are concerned that the delay in applying earned time credits may negatively affect inmates who have earned a reduction in their sentence or an earlier placement in the community.

**DOJ Announcement on FSA Time Credits**

On January 15, 2020, the Department announced several significant developments concerning its implementation of the FSA. In the Department's press release, then Attorney General William P. Barr declared that, "beginning today, inmates will have even greater incentive to participate in evidence-based programs that prepare them for productive lives after incarceration." Among other developments, the Department announced that, "as of [January] 15, 2020, inmates will be assigned to participate in [EBRR programs and productive activities] based on an initial needs assessment conducted by BOP. Participation and completion of those assigned programs and activities can lead to placement in pre-release custody or a 12-month sentence reduction under the [FSA]."

Source: DOJ press release announcing enhancements to the risk assessment system and FSA updates

BOP officials told the OIG that the BOP has not applied time credits to inmate sentences as directed under the law because:

(1) a rule that would codify the BOP's procedures for time credits has not been finalized, and

(2) the BOP must complete policy negotiations on its time credits policy with the national union (No. 8 in Table 1, above).

The BOP stated that the time credits policy must be negotiated with the national union because it would create changes to conditions of employment, including determinations and application of earned time credits for inmates, for Unit Team staff working in BOP institutions who are bargaining unit employees.

In December 2020, the Office of the Attorney General (OAG) released its annual report to Congress summarizing the activities and accomplishments of the Department in implementing the FSA.[17] The report acknowledged that the BOP had not applied earned time credits to inmate sentences and stated that the BOP "[did] not believe that anyone ha[d] been negatively impacted...because of the dramatic expansion of inmate community placements in 2020 pursuant to the [Coronavirus Aid, Relief, and Economic Security (CARES)] Act [of 2020]."[18]

---

[15] 18 U.S.C. § 3632(d). However, inmates are ineligible to receive time credits if they are serving a sentence for a conviction under certain provisions of law. For more information, see 18 U.S.C. § 3632(d)(4)(D).

[16] As of March 30, 2021, BOP data indicates that nearly half (60,146 out of 123,186) of all inmates in BOP custody are eligible for time credits if they have completed EBRR programs or productive activities.

[17] See OAG, *The Attorney General's First Step Act Section 3634 Annual Report* (December 2020), www.bop.gov/inmates/fsa/docs/20201221_fsa_section_3634_report.pdf (accessed November 10, 2021).

[18] See OAG, *First Step Act Section 3634 Annual Report*, 40. The report does not mention an August 2020 decision from the U.S. District Court for New Jersey, which ruled in favor of a federal inmate who sued the BOP for failing to apply his earned time credits after he had participated in EBRR programs. After the court-ordered application of 120 days of earned time credits, the inmate was transferred into the community for the duration of his sentence and was subsequently released from BOP custody in January 2021. See *Aryeh Goodman v. David Ortiz, in His Capacity as Warden of Federal Correctional Institution Fort Dix* (Case 1:20-cv-07582-RMB, Aug. 25, 2020), www.casetext.com/case/goodman-v-ortiz (accessed November 10, 2021). In addition, in response to a draft of this memorandum, the BOP reported that the delivery of EBRR programs and productive activities to inmates has been "severely impacted" by the pandemic. As we note above, inmates must participate in EBRR programs and productive activities to earn time credits.

F    093

However, in our review of minimum and low risk inmates in BOP facilities in March 2021 alone, we identified 50 such inmates who do not appear to have benefited from their participation in FSA programming. These 50 inmates had earned, on average, 31 days of time credits and were all projected to be released from BOP custody within the following 6 months. Yet, as of March 27, 2021, none of these inmates had been transferred to community placement despite each of them having completed at least 240 hours of EBRR programs and productive activities. It therefore appears that these inmates have not benefited from their participation in EBRR programs and productive activities due in part to the delay in applying earned time credits.

In August 2021, the BOP told us that the FSA contemplates a phased-in approach to time credit implementation and requires that all inmates be assigned to programming based on their assessments no later than January 15, 2022. As a result, the BOP stated that "implementation of time credits is fully permissible as a phased approach." While we agree that the FSA affords the BOP a 2-year phase-in period to provide all inmates with EBRR programs and productive activities, we also note that the phase-in statute makes no reference to delaying the use of incentives and rewards, including time credits. Instead, the statute states that by January 15, 2020, the BOP "may offer to prisoners who successfully participate in such programs and activities [with] incentives and rewards."[19]

We recognize that the rulemaking process has also delayed the BOP's application of time credits, and BOP officials notified us that a draft rule could soon be finalized.[20] Yet, at the time of our fieldwork, there was still no timetable for when formal union policy negotiations would resume. As noted above, in its written response to this memorandum (attached as Appendix 1), the BOP reported that it will be commencing JPC meetings with the national union in November 2021 to discuss policies and that it intends to resume formal negotiations in December 2021, although we were not provided with a specific date for resumption of formal policy negotiations.[21] Considering that the BOP and the national union were negotiating the time credits policy prior to the suspension of policy negotiations, we are concerned that the lack of formal policy negotiations may further delay the BOP's application of earned time credits to inmates who were eligible to earn them following the Department's January 2020 announcement, as well as its ability to comply with the FSA's upcoming January 2022 deadline for applying earned time credits to inmate sentences, even if a new formal rule is issued. In response to a draft of this memorandum, the BOP stated that it would apply earned time credits to inmate sentences as soon as the draft rule is finalized and prior to completion of negotiations on the time credits policy to comply with the FSA.

Finally, on January 15, 2021, the Office of Legal Counsel (OLC) issued a legal opinion that increases the urgency for the BOP to issue a policy regarding earned time credits. The OLC opinion stated that the CARES

---

[19] See 18 U.S.C. §§ 3621(h)(2)–(h)(4). While the *Goodman v. Ortiz* decision referenced in footnote 18 required application of FSA earned time credits, other courts have concluded that the BOP is not obligated to apply earned time credits to inmate sentences before January 15, 2022, the end of the phase-in period. See, for example, *Charles Llewlyn v. Tracy Johns*, Case 5:20-cv-77, Jan. 5, 2021, www.casetext.com/case/llewlyn-v-johns; *Jacqueline D. Kennedy-Robey v. Warden, Federal Correctional Institution Pekin*, Case 20-cv-1371, Mar. 2, 2021 www.casetext.com/case/kennedy-robey-v-warden-fci-pekin; and *Michael D. Cohen v. United States of America, Michael Carvajal, Director of the Federal BOP*, Case 20-cv-10833, Apr. 20, 2021, www.casetext.com/case/cohen-v-united-states-99 (all accessed November 10, 2021). Nevertheless, even in those rulings, the courts have reflected that the BOP has the statutory authority to apply such credits sooner.

[20] The draft rule was published in the Federal Register on November 25, 2020, and was open for public comment until January 25, 2021. In late March 2021, the BOP revised the draft rule to align with the views of the new administration and then submitted it to the Department's Office of Legal Policy (OLP) on May 4, 2021. When OLP finishes its review, the rule will be submitted to the Office of the Deputy Attorney General (ODAG) for review before being submitted to OMB for final review and approval. On September 1, 2021, ODAG officials told us that the draft rule was still under Department review.

[21] In contrast to formal policy negotiations, JPCs allow for BOP officials to jointly revise policies with union representatives as one of its initial policy development steps. During the Obama administration, the JPC structure was used to facilitate a higher volume of published policies than formal policy negotiations.

F    094

Act authorized the BOP Director to expand the use of home confinement only during the Act's covered emergency period (i.e., for the duration of the period during which the Attorney General finds that the emergency conditions of the pandemic materially affect the BOP's functioning).[22] According to the OLC opinion, should that period end or should the Attorney General revoke this finding, the BOP would be required to recall inmates placed in home confinement to correctional facilities unless they are otherwise eligible for home confinement under 18 U.S.C. § 3624(c)(2).[23] As of July 29, 2021, the BOP had 7,315 inmates in home confinement and approximately 2,754 of those inmates would not be eligible for home confinement under 18 U.S.C. § 3624(c)(2).[24] Thus, if the covered emergency period were to end without any Department action to address the conclusions of the OLC opinion, these inmates would be returned to BOP institutions, without any consideration of whether time credits earned before pre-release custody placement would make them eligible to remain in home confinement, in part because the BOP has not finalized a policy to administer earned time credits.[25]

Additional Incentives and Rewards

At the time our fieldwork ended, in May 2021, we also found that, contrary to the FSA, the BOP had not used any incentives and rewards for inmates who participated in and completed EBRR programs because the First Step Act Program Incentives policy had not been finalized. The FSA requires the BOP to use incentives and rewards for inmates to participate in EBRR programs, including the following:

- additional phone privileges and, if available, video conferencing privileges of up to 30 minutes a day and up to 510 minutes a month;

- additional time for visitation at the prison, as determined by the Warden of the prison;

- transfer to a facility closer to the inmate's release residence, subject to the availability of bed space, the inmate's security designation, and the recommendation from the Warden of the facility at which the inmate is incarcerated at the time of making the request; and

- additional incentives and rewards, as determined by the BOP, to include not fewer than two of the following: (1) increased commissary spending limits and product offerings, (2) greater email access, and (3) consideration for transfer to preferred housing units.[26]

---

[22] See DOJ OLC, Home Confinement of Federal Prisoners After the COVID-19 Emergency, January 15, 2021, www.justice.gov/olc/file/1355886/download (accessed November 10, 2021), 1.

[23] 18 U.S.C. § 3624(c)(2) authorizes the BOP to place an inmate in home confinement for the shorter of 10 percent of the term of imprisonment of that inmate or 6 months.

In July 2021, news organizations reported that the Biden administration concurred with OLC's opinion that certain inmates must be returned to their institutions once the official pandemic state of emergency ends. See The New York Times, "Biden Legal Team Decides Inmates Must Return to Prison After Covid Emergency," July 19, 2021, www.nytimes.com/2021/07/19/us/politics/biden-prisoners-covid.html (accessed November 10, 2021).

[24] In discussions with BOP officials about this memorandum, the BOP stated that it refers inmates to pre-release custody within 18 months of their projected release date, which the BOP said made it unlikely that an inmate with less than 18 months remaining in his or her sentence would be returned to custody. However, upon further OIG inquiry, the BOP was unable to provide a more detailed explanation of what would happen to the approximately 2,754 inmates placed in home confinement who could not remain in home confinement under 18 U.S.C. § 3624(c)(2) upon conclusion of the emergency period.

[25] During recent congressional testimony, Attorney General Merrick Garland stated that the Department was reviewing the OLC opinion and its authorities to see if it can keep these inmates in home confinement once the covered emergency period ends. Merrick Garland, U.S. Attorney General, before the Committee on the Judiciary, U.S. Senate, concerning "Oversight of the Department of Justice" (October 27, 2021), www.judiciary.senate.gov/meetings/10/20/2021/oversight-of-the-department-of-justice (accessed November 10, 2021).

[26] 18 U.S.C. § 3632(d).

8

F 095

With publication of the First Step Act Program Incentives policy on July 14, 2021, the BOP reported that, with the exception of FSA time credits, institution staff are now authorized to offer incentives and rewards. However, the BOP has not provided the OIG with any documentation demonstrating that institution staff have started to use incentives and rewards to encourage inmate participation in EBRR programs and productive activities as called for under the FSA. In August 2021, the BOP reported that it is working to develop an automated program that will track the use of incentives and rewards.

Closure of OIG Recommendations

In addition to meeting its FSA obligations, the BOP has an ongoing duty to honor its commitment to implement corrective actions in response to recommendations in seven OIG reports that have found serious deficiencies in BOP programs and policies.[27] While the BOP has historically faced longstanding challenges updating its policies to timely resolve such matters, we are concerned that the lack of formal negotiations for 20 months has unnecessarily exacerbated these challenges and significantly delayed needed actions.[28] We are particularly concerned with the BOP's lack of progress in implementing 27 policy-related recommendations that the OIG has made in seven reports since 2015. Those 27 recommendations have remained open for an average of 3 years. See Table 2 below for more information.

### Table 2

### Open OIG Policy Recommendations to the BOP, as of November 3, 2021

| OIG Review | No. of Open Policy Recs | No. of Months Recs Open |
|---|---|---|
| The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (May 2015) | 3 | 78 |
| The Federal Bureau of Prisons' Contraband Interdiction Efforts (June 2016) | 4 | 64 |
| The Federal Bureau of Prisons' Release Preparation Program (August 2016) | 2 | 62 |

---

[27] For instance, the OIG's June 2016 report examining the smuggling of contraband into BOP institutions found significant deficiencies in the BOP's ability to interdict contraband introductions, thus compromising the safety and security of staff, visitors, and inmates. Four of the recommendations the OIG made concerned needed revisions to the BOP's policy on searching staff and their belongings to better deter staff contraband introductions: (1) develop uniform criteria for conducting random pat searches of staff, (2) define the quantity of tobacco staff may bring into institutions for personal use, (3) restrict the size and content of personal property staff may bring into institutions, and (4) establish guidelines for documenting and confiscating items discovered during staff screening. See DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts*, Evaluation and Inspections (E&I) Report 16-05 (June 2016), www.oig.justice.gov/reports/review-federal-bureau-prisons-contraband-interdiction-efforts.

Also, in July 2017 the OIG issued a report assessing the BOP's use of restrictive housing for inmates with mental illness, which found that BOP policies did not adequately address the confinement of inmates with mental illness in restrictive housing. As a result, inmates, including those with mental illness, could spend years and even decades in restrictive housing. The OIG issued four policy-related recommendations to the BOP to address the report's findings, including that the BOP establish in policy the circumstances that warrant the placement of inmates in single-cell confinement while maintaining institutional and inmate safety and security and ensuring appropriate, meaningful human contact and out-of-cell opportunities to mitigate mental health concerns. See DOJ OIG, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, E&I Report 17-05 (July 2017), www.oig.justice.gov/ reports/review-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness.

[28] While the BOP's policy challenges have worsened since 2017, this issue has periodically emerged over the past 2 decades. For instance, a September 2010 DOJ OIG audit reported a backlog of 50 policies awaiting national union negotiations and resulting in an "inordinate amount of time" for the BOP to implement policy changes requiring negotiations. Additionally, the report notes that, while the BOP drafted revisions to its furlough policy in 2003, the policy was still awaiting negotiations with its national union in 2010, over 7 years later. In response, the OIG recommended that the BOP develop a more effective mechanism for coordinating with its national union on required policy changes. DOJ OIG, *Audit of the Federal Bureau of Prisons' Furlough Program*, Audit Report 10-44 (September 2010), www.oig.justice.gov/ reports/audit-federal-bureau-prisons-furlough-program.

F    096

## Table 2 (Continued)

| | | |
|---|---|---|
| *The Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness* (July 2017) | 4 | 52 |
| *Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates* (September 2019) | 4 | 25 |
| *The Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization* (March 2020) | 4 | 19 |
| *The Federal Bureau of Prisons' Perimeter Security Strategy and Efforts Related to the Contract Awarded to DeTekion Security Systems, Incorporated, to Update the Lethal/Non-Lethal Fence at Nine United States Penitentiaries* (September 2020) | 6 | 13 |
| **Total Open Recommendations Awaiting BOP Policy Finalization** | **27** | **36 (avg.)** |

Source: OIG analysis of BOP status reports on open recommendations

## Conclusion

The OIG has determined that aspects of the BOP's implementation of the FSA have been delayed in part because the BOP has not conducted any formal policy negotiations with its national union in 20 months. The suspension of formal policy negotiations has also exacerbated yearslong delays in the BOP's implementation of 27 policy-related OIG recommendations that address important correctional issues.

## Recommendations

The OIG recommends that the BOP take the following actions to address the concerns identified in this memorandum:

1. Develop and implement a plan to immediately resume in-person policy negotiations with the national union.

2. Describe how the BOP will prioritize all policies pending negotiation with the national union, including those related to the FIRST STEP Act, and effectively reduce the backlog of policies slated to be negotiated.

Please advise the OIG within 30 days of the date of this memorandum on the actions the BOP has taken to address this issue. If you have any questions or would like to discuss this information and our concerns, please contact me at (202) 514-3435 or René Rocque Lee, Assistant Inspector General for Evaluation and Inspections, at (202) 616-4620.

cc:     Tamarra Matthews-Johnson
        Counsel to the Attorney General, Office of the Attorney General

        Bradley Weinsheimer
        Associate Deputy Attorney General, Office of the Deputy Attorney General

        Eric Nguyen
        Senior Counsel to the Deputy Attorney General, Office of the Deputy Attorney General

        Gene Beasley
        Deputy Director, Federal Bureau of Prisons

        Zachary J. Kelton
        Associate Director and Chief of Staff, Federal Bureau of Prisons

F    097

Louis Milusnic
Assistant Director, Program Review Division, Federal Bureau of Prisons

Angela Owens
Senior Deputy Assistant Director, Program Review Division, Federal Bureau of Prisons

Christopher Rivers
Administrator, External Auditing Branch, Program Review Division, Federal Bureau of Prisons

Laura Fesler
Chief, External Audits, Planning and Analysis Section, External Auditing Branch, Program Review Division, Federal Bureau of Prisons

Louise M. Duhamel, Ph.D.
Assistant Director, Internal Review and Evaluation Office, Justice Management Division

F    098

## Appendix 1: The BOP's Response



U.S. Department of Justice

Federal Bureau of Prisons

---

*Office of the Director*                                          *Washington, D.C. 20534*

November 3, 2021

MEMORANDUM FOR RENE ROCQUE LEE
                ASSISTANT INSPECTOR GENERAL
                EVALUATION AND INSPECTIONS

FROM:          M.D. Carvajal
               Director

SUBJECT:       Response to the Office of Inspector General's (OIG)
               Formal Draft of a Management Advisory Memorandum:
               Impact of the Failure to Conduct Formal Policy
               Negotiations on the Federal Bureau of Prisons'
               Implementation of the First Step Act and Closure of
               OIG Recommendations (A-2020-003-A)

The Bureau of Prisons (BOP) appreciates the opportunity to
provide a formal response to the Office of the Inspector
General's above-referenced Management Advisory Memorandum. The
BOP has completed our review of the Memorandum and provides our
comments with regard to both recommendations:

The BOP reiterates that our decision-making regarding meeting
virtually with the Union to conduct policy negotiations during
the COVID-19 pandemic was consistent with directives from the
both the CDC and OMB to not only mitigate disease transmission
but to prevent infection. In addition to CDC and OMB guidance,
on February 16, 2021, the Department of Justice (DOJ) issued its
*2021 DOJ COVID-19 Workforce Safety Plan* which stated only
*"mission-critical travel in support of Primary Mission Essential
Functions or Mission Essential Functions is permissible."*
Further, the *Plan* also states that *"[I]n-person meetings should
be avoided wherever possible . . . and when they must be held,
they shall be limited to fewer than ten individuals . . ."*
Because BOP's policy ground rules permit the Union ten
representatives, this Department guidance would have resulted in

12

F    099

BOP having no representatives present for any negotiations, which is not acceptable or rational.

Further, BOP rejects the statement on page 3 that places institution staff in the same position as Central Office staff with respect to restrictions during the COVID-19 pandemic. The CDC has identified institution staff as "critical infrastructure staff" who ensure that essential functions and operations continue through the pandemic, and who report to work every day during the pandemic to ensure the orderly and safe operations of our prisons. Central Office staff who are responsible for national policy development as well as negotiation and implementation are in an office setting, and thus fell under DOJ's ongoing "maximum telework posture" as well as the parameters established in the *2021 DOJ COVID-19 Workforce Safety Plan*. DOJ travel parameters, as stated in the *Plan*, also apply to BOP travel. BOP is required to follow both OMB guidance, which is referenced in the Memorandum, and Departmental guidance, which is not referenced.

Despite the lack of formal negotiations, the BOP has issued FSA-related policies since the passage of the legislation through the use of in-person informal negotiation. Since the passage of the FSA in December 2018, the BOP has revised and issued 12 policies to implement the FSA's requirements. In other instances, FSA implementation was effectuated using the issuance of guidance memoranda to institutions or other guidance documents. A description of the BOP's FSA implementation during 2020 is contained in "The Attorney General's First Step Act Section 3634 Annual Report (December 2020)".[1] In sum, the BOP developed a new Risk & Needs Assessment System (RNAS), implemented the RNAS including the use of new tracking codes for program participation, screened inmates and assigned programming, expanded BOP programs and implemented new ones, and expanded the use of home confinement. As well, BOP continued to perform existing activities further refined by the FSA, most notably processing compassionate release requests, processing requests for the elderly offender home confinement pilot, the award of good conduct time, the delivery of Medication Assisted Treatment, and the transfers of inmates closer to home.

BOP disagrees with OIG's characterization of the agency's delayed implementation of FSA requirements. Although the COVID-19 pandemic has created unprecedented challenges for the federal government, BOP has taken significant steps in implementing the FSA's requirements, consistent with the FSA's phased approach,

---

[1] See https://www.bop.gov/inmates/fsa/docs/20201221_fsa_section_3634_report.pdf

F 100

and has complied with all mandatory statutory guidelines to-date.

Recommendations

**Recommendation One:** Develop and implement a plan to immediately resume in-person policy negotiations with the national union.

**BOP's Response:** The BOP will implement this recommendation only in accordance with CDC guidance and best practices to ensure the health and safety of all persons involved. The BOP has already made substantial progress in developing and implementing a thoughtful plan to implement policy negotiations in a responsible manner. Although formal negotiations pursuant to Article 3 of the Master Agreement have not yet resumed, on September 29, 2021, the BOP and Council of Prison Locals (Union) entered into an agreement to negotiate policies during Joint Policy Committee (JPC) meetings. JPCs are an alternative to formal negotiations described in Article 3 and are conducted in person by representatives of both management and the Union. During the week of November 15, 2021, the parties are expected to conduct three JPCs concerning multiple policies related to the First Step Act, Security/Correctional Services, and Health/Safety. In addition, representatives of both management and the Union are scheduled to meet, in person, during the week of November 1, 2021, to discuss implementation of the mandatory COVID-19 vaccination requirement. Finally, the agency has also notified the Union of its intent to resume formal negotiations alongside JPCs starting in December 2021.

**Recommendation Two:** Describe how the BOP will prioritize all policies pending negotiation with the national union, including those related to the FSA, and effectively reduce the backlog of policies slated to be negotiated.

**BOP's Response:** BOP Management has and will continue to prioritize FSA-related policies. In order to implement the Act successfully, the following FSA-related policies and guidance have been issued:

* Policy regarding Compassionate Release (Reduction in Sentence) [PS 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), published 1.17.2019]

* Policy guidance to enable BOP employees to carry and store personal weapons under 18 U.S.C. § 4050. [PS 5575.01, CN-1, Staff Personal Weapons Storage, published 1.18.2019]

F   101

- BOP and USMS policies comply with the Act's requirements that prohibit certain room confinement for juvenile offenders. The BOP does not house juveniles in its facilities. [PS 5216.06, Juvenile Delinquents, updated to reflect FSA language, published 4.26.2019]

- Guidance to Wardens about entering into partnerships with nonprofits and other private organizations, including faith-based, art, and community-based organizations; institutions of higher education; private vocational training entities; and industry-sponsored organizations. These partnerships will enable the BOP to expand the opportunities for evidence-based recidivism reduction programs and productive activities. [OGC memorandum 6.25.2019]

- Policy guidance regarding release preparation and assisting inmates with obtaining identification. [PS 5325.07, Release Preparation Program, published 8.15.2019]

- Guidance on inmate security designation documenting changes in the law with regard to placing offenders within 500 driving miles of their release residence, as well as processing nearer release transfers, where appropriate. [PS 5100.08, Inmate Security Designation and Custody Classification, published 9.4.2019]

- Procedures implementing the dyslexia-screening requirement, which will enable the BOP to identify those offenders within the BOP inmate population who have this learning disorder. The BOP also developed specific tracking codes for dyslexia to ensure that required reporting can occur. [PS 5200.06, Management of Inmates with Disabilities, published 11.22.2019]

- Through its policies and contracts, the BOP continues to provide sanitary products and ensures they are available and accessible to female offenders under 18 U.S.C. § 3621(h). [OM 003-2019, Provision of Feminine Hygiene Products, published 7.29.2020]

- Policy on Medication Assisted Treatment (MAT). [PS 1610.01, Naloxone Procedures and Protocol for Reversal of Opioid Overdose, published 12.17.2020]

15

F    102

- Policy for the Elderly Offender Home Confinement Pilot. [OM 001-2019, Home Confinement under the First Step Act, published 5.3.2021]

- Policy on federal prison facilities housing female inmates regarding the Act's requirements prohibiting the use of restraints on pregnant inmates absent extreme circumstances. (The BOP has prohibited this conduct since August 2014.)  In concert, the U.S. Marshals Service (USMS) issued similar updated procedures and forms for USMS and its contracted private detention facilities. [PS 5200.07, Female Offender Manual, published 5.13.2021]

- Policy on First Step Act Needs Assessments [PS 5400.01, First Step Act Needs Assessments, published 6.28.2021]

- Policy on First Step Act Program Incentives [PS 5220.01, First Step Act Program Incentives, published 7.15.2021]

- Specialized and comprehensive de-escalation training was provided to BOP employees and officers in accordance with Section 606 of the Act (including mental health awareness training regarding inmates with psychiatric disorders), and more than 31,000 BOP employees have already received the updated training.

The following FSA-related policies and guidance are awaiting negotiation with the BOP's National Union:

- Parenting, Children, and Families

- Female Integrated Treatment Program

- Management of Inmate Veterans

- Management of Aging Offenders

- Secure Mental Health Units

- First Step Act Incentives Procedures Under the Cares Act Covered Period

- Release Orientation Program

It should be noted that while these policies may be awaiting finalization, they are not hampering or impeding the BOP's efforts to implement FSA programs and services as such guidance is provided via BOP operational memos.  Policies, however, are desired as they permanently memorialize program guidance and directives for BOP staff, inmates and stakeholders.

F   103

The following FSA-related policies and guidance are awaiting Rules action:

- First Step Act Time Credits

- Work Programs for Inmates, FPI (deferred compensation)

Once regulations are published, the implementing policy will be negotiated accordingly.  BOP reiterates that while these policies may be awaiting finalization, they are not hampering or impeding efforts to implement FSA programs and services.  With regard to FSA Time Credits, the Correctional Programs Division is monitoring the accrual of time credits such that inmates are reviewed twenty-four months in advance of their release as to their time credit accrual to ensure that such time is considered for purposes of their pre-release confinement date.

Page 6 of 6

17

F  104

# Appendix 2: OIG Analysis and Summary of Necessary Actions

The OIG provided a draft of this Management Advisory Memorandum to the BOP, and the BOP provided a formal response, which is in Appendix 1. The BOP stated in its response that it generally agreed with the OIG's recommendations but contended that its decision to suspend in-person policy negotiations complied with guidance from the Department, the Centers for Disease Control and Prevention (CDC), and the Office of Management and Budget (OMB), and that only institution staff are considered "critical infrastructure staff," noting that it must follow both OMB and Departmental guidance. The BOP disagreed that FIRST STEP Act (FSA) implementation has been delayed, stating that it has revised and issued 12 policies since passage of the FSA, issued FSA implementation guidance, continued performing existing activities further refined by the FSA, and complied with all mandatory statutory guidelines.

In response to this memorandum, the BOP reported that it will be commencing Joint Policy Committee (JPC) meetings with the national union in November 2021 to discuss policies and that it has notified the national union of its intent to resume formal negotiations in December 2021. Below, we provide a summary of the actions necessary to close the recommendations.

**Recommendation 1:** Develop and implement a plan to immediately resume in-person policy negotiations with the national union.

**Status:** Resolved.

**BOP Response:** The BOP reported that it recently entered into an agreement with the national union to establish JPC meetings, which will provide a forum for in-person policy negotiations between the BOP and the national union. The BOP stated that three JPC meetings are scheduled to occur during the week of November 15, 2021, and policies related to the FSA, security and correctional services, and health and safety will be discussed. In addition, the BOP stated that management officials and union representatives were scheduled to meet, in person, during the week of November 1, 2021, to discuss implementation of the mandatory COVID-19 vaccination requirement. Finally, the BOP indicated that it has notified the national union of its intent to resume formal negotiations alongside JPC meetings starting in December 2021.

**OIG Analysis:** Given the BOP's representation that it has JPC meetings scheduled this month with the national union and informed the national union of its willingness to resume formal negotiations in December, the BOP's planned actions are responsive to this recommendation. The OIG requests that within 30 days of the issuance of this memorandum the BOP provide documentation evidencing the resumption of in-person policy negotiations with the national union.

**Recommendation 2:** Describe how the BOP will prioritize all policies pending negotiation with the national union, including those related to the FIRST STEP Act, and effectively reduce the backlog of policies slated to be negotiated.

**Status:** Resolved.

**BOP Response:** The BOP stated that it has and will continue to prioritize all policies related to the FSA and has issued numerous policies and guidance implementing critical aspects of the FSA and provided de-escalation training to BOP staff. The BOP also contended that the failure to finalize these policies has not hampered or impeded the BOP's efforts to implement FSA programs and services, as such guidance is provided to staff through BOP operational memoranda. However, the BOP recognized that policies are desired over memoranda as they permanently memorialize program guidance and directives for BOP staff, inmates, and stakeholders. In addition, the BOP stated that two additional policies, the First Step Act of 2018–Time Credits policy and the Work Programs for Inmates policy, are awaiting rules action that, once

F    105

finalized, will be negotiated with the national union. The BOP reiterated that, while these policies may be awaiting finalization, they are not hampering or impeding efforts to implement FSA programs and services. For instance, the BOP stated that, with respect to time credits, the Correctional Programs Division monitors the accrual of time credits for inmates who are within 2 years of their projected release date to ensure that such time is considered for purposes of their pre-release confinement date.

**OIG Analysis:** The BOP's representation that it continues to prioritize policies pending negotiation with the national union is responsive to this recommendation. We note, however, that the BOP details neither how it is prioritizing policy negotiations nor how it will effectively reduce the backlog of policies requiring negotiation. Separately, the OIG does not agree that the suspension of policy negotiations has had no material impact on the BOP's implementation of the FSA. As we discuss in this memorandum, the BOP told us that it did not start offering incentives and rewards to inmates to encourage participation in evidence-based recidivism reduction programs until the First Step Act Program Incentives policy was published in July 2021, about 18 months after it had the statutory authority to do so. Further, while the Correctional Services Division may be monitoring the accrual of time credits for inmates who are within 2 years of their projected release date, the BOP has not yet applied time credits to inmate sentences. The lack of formal negotiations has also significantly delayed the BOP's implementation of corrective actions in response to seven OIG reports issued since 2015 that have identified serious deficiencies in BOP programs and policies.

The OIG requests that, within 30 days of the issuance of this memorandum, the BOP provide documentation listing all policies, including but not limited to those related to the FSA, that are pending negotiations with the national union and describe how it will effectively reduce the backlog of all policies slated to be negotiated.

F    106

EXHIBIT 27

levels of government. Therefore, under Executive Order 13132, we determine that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

*Regulatory Flexibility Act:* The Director of the Bureau of Prisons, under the Regulatory Flexibility Act (5 U.S.C. 605(b)), reviewed this rule and certifies that it will not have a significant economic impact upon a substantial number of small entities for the following reasons: This rule pertains to the correctional management of offenders committed to the custody of the Attorney General or the Director of the Bureau of Prisons, and its economic impact is limited to the Bureau's appropriated funds.

*Unfunded Mandates Reform Act of 1995:* This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Congressional Review Act:* This rule is not a major rule as defined by the Congressional Review Act, 5 U.S.C. 804.

For the foregoing reasons, we issue the regulations regarding the First Step Act Time Credits, proposed on November 25, 2020, with modifications, as set forth below.

**List of Subjects in 28 CFR Parts 523 and 541**

Prisoners.

**Michael D. Carvajal,**

*Director, Federal Bureau of Prisons.*

Under rulemaking authority vested in the Attorney General in 5 U.S.C. 301; 28 U.S.C. 509, 510 and delegated to the Director, Bureau of Prisons in 28 CFR 0.96, we amend 28 CFR parts 523 and 541 as follows:

**Subchapter B—Inmate Admission, Classification, and Transfer**

**PART 523—COMPUTATION OF SENTENCE**

■ 1. The authority citation for 28 CFR part 523 is revised to read as follows:

**Authority:** 5 U.S.C. 301; 18 U.S.C. 3568 (repealed November 1, 1987, as to offenses committed on or after that date), 3621, 3622, 3624, 3632, 3635, 4001, 4042, 4081, 4082 (repealed in part as to conduct occurring on or after November 1, 1987), 4161–4166 (repealed October 12, 1984, as to offenses committed on or after November 1, 1987), 5006–5024 (repealed October 12, 1984, as to conduct occurring after that date), 5039; 28 U.S.C. 509, 510.

■ 2. Add subpart E to read as follows:

**Subpart E—First Step Act Time Credits**

Sec.
523.40  Purpose.
523.41  Definitions.
523.42  Earning First Step Act Time Credits.
523.43  Loss of FSA Time Credits.
523.44  Application of FSA Time Credits.

**§ 523.40  Purpose.**

(a) The purpose of this subpart is to describe procedures for the earning and application of Time Credits as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of the First Step Act of 2018 (Pub. L. 115–391, December 21, 2018, 132 Stat. 5194) (FSA), hereinafter referred to as "FSA Time Credits" or "Time Credits."

(b) Generally, as defined and described in this subpart, an eligible inmate who successfully participates in Evidence-Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) that are recommended based on the inmate's risk and needs assessment may earn FSA Time Credits to be applied toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g).

**§ 523.41  Definitions.**

(a) *Evidence-Based Recidivism Reduction (EBRR) Program.* An EBRR Program is a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison. EBRR Programs may include, but are not limited to, those involving the following types of activities:

(1) Social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;

(2) Family relationship building, structured parent-child interaction, and parenting skills;

(3) Classes on morals or ethics;

(4) Academic classes;

(5) Cognitive behavioral treatment;

(6) Mentoring;

(7) Substance abuse treatment;

(8) Vocational training;

(9) Faith-based classes or services;

(10) Civic engagement and reintegrative community services;

(11) Inmate work and employment opportunities;

(12) Victim impact classes or other restorative justice programs; and

(13) Trauma counseling and trauma-informed support programs.

(b) *Productive Activity (PA).* A PA is a group or individual activity that

allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating.

(c) *Successful participation.* (1) An eligible inmate must be "successfully participating" in EBRR Programs or PAs to earn FSA Time Credits for those EBRR Programs or PAs.

(2) "Successful participation" requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA.

(3) Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's "successful participation" for the purposes of FSA Time Credit eligibility.

(4) An eligible inmate, as described in paragraph (d) of this section, will generally not be considered to be "successfully participating" in EBRR Programs or PAs in situations including, but not limited to:

(i) Placement in a Special Housing Unit;

(ii) Designation status outside the institution (*e.g.,* for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);

(iii) Temporary transfer to the custody of another Federal or non-Federal government agency (*e.g.,* on state or Federal writ, transfer to state custody for service of sentence, etc.);

(iv) Placement in mental health/psychiatric holds; or

(v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

(5)(i) If an eligible inmate "opts out," or chooses not to participate in any of the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, the inmate's choice must be documented by staff.

(ii) Opting out will not, by itself, be considered a disciplinary violation. However, violation of specific requirements or rules of a particular recommended EBRR Program or PA, including refusal to participate or withdrawal, may be considered a disciplinary violation (*see* this part).

(iii) Opting out will result in exclusion from further benefits or privileges allowable under the FSA,

GAHARAN, JAMES 2107803

F  10

until the date the inmate "opts in" (chooses to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, as documented by staff).

(d) *Eligible inmate*—(1) *Eligible to earn FSA Time Credits.* An inmate who is *eligible to earn* FSA Time Credits is an *eligible inmate* for the purposes of this subpart. Any inmate sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or any person in the custody of the Bureau, is *eligible to earn* FSA Time Credits, subject to the exception described in paragraph (d)(2) of this section.

(2) *Exception.* If the inmate is serving a term of imprisonment for an offense specified in 18 U.S.C. 3632(d)(4)(D), the inmate is not *eligible to earn* FSA Time Credits.

### § 523.42    Earning First Step Act Time Credits.

(a) *When an eligible inmate begins earning FSA Time Credits.* An eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served).

(b) *Dates of participation in EBRRs or PAs.* (1) An inmate cannot earn FSA Time Credits for programming or activities in which he or she participated before December 21, 2018, the date of enactment of the First Step Act of 2018.

(2) An eligible inmate, as defined in this subpart, may earn FSA Time Credits for programming and activities in which he or she participated from December 21, 2018, until January 14, 2020.

(3) An eligible inmate, as defined in this subpart, may earn FSA Time Credit if he or she is successfully participating in EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment on or after January 15, 2020.

(c) *Amount of FSA Time Credits that may be earned.* (1) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn ten days of FSA Time Credits.

(2) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn an additional five days of FSA Time Credits if the inmate:

(i) Is determined by the Bureau to be at a minimum or low risk for recidivating; and

(ii) Has maintained a consistent minimum or low risk of recidivism over the most recent two consecutive risk and needs assessments conducted by the Bureau.

### § 523.43    Loss of FSA Time Credits.

(a) *Procedure for loss of FSA Time Credits.* An inmate may lose earned FSA Time Credits for violation of the requirements or rules of an EBRR Program or PA. The procedures for loss of FSA Time Credits are described in 28 CFR part 541.

(b) *How to appeal loss of FSA Time Credits.* Inmates may seek review of the loss of earned FSA Time Credits through the Bureau's Administrative Remedy Program (28 CFR part 542).

(c) *Restoration of FSA Time Credits.* An inmate who has lost FSA Time Credits under this subpart may have part or all of the FSA Time Credits restored to him or her, on a case-by-case basis, after clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541) for two consecutive risk and needs assessments conducted by the Bureau.

### § 523.44    Application of FSA Time Credits.

(a) *How Time Credits may be applied.* For any inmate eligible to earn FSA Time Credits under this subpart who is:

(1) Sentenced to a term of imprisonment under the U.S. Code, the Bureau may apply FSA Time Credits toward prerelease custody or supervised release as described in paragraphs (c) and (d) of this section.

(2) Subject to a final order of removal under immigration laws as defined in 8 U.S.C. 1101(a)(17) (*see* 18 U.S.C. 3632(d)(4)(E)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release.

(3) Serving a term of imprisonment pursuant to a conviction for an offense under laws other than the U.S. Code (see Section 105 of the FSA, Pub. L. 115–391, 132 Stat. 5214 (not codified; included as note to 18 U.S.C. 3621)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release. This paragraph (a)(3) will not bar the application of FSA Time Credits, as authorized by the DC Code, for those serving a term of imprisonment for an offense under the DC Code.

(b) *Consideration for application of FSA Time Credits.* Where otherwise permitted by this subpart, the Bureau may apply FSA Time Credits toward prerelease custody or early transfer to

supervised release under 18 U.S.C. 3624(g) only if an eligible inmate has:

(1) Earned FSA Time Credits in an amount that is equal to the remainder of the inmate's imposed term of imprisonment;

(2) Shown through the periodic risk reassessments a demonstrated recidivism risk reduction or maintained a minimum or low recidivism risk, during the term of imprisonment; and

(3) Had the remainder of his or her imposed term of imprisonment computed under applicable law.

(c) *Prerelease custody.* The Bureau may apply earned FSA Time Credits toward prerelease custody only when an eligible inmate has, in addition to satisfying the criteria in paragraph (b) of this section:

(1) Maintained a minimum or low recidivism risk through his or her last two risk and needs assessments; or

(2) Had a petition to be transferred to prerelease custody or supervised release approved by the Warden, after the Warden's determination that:

(i) The prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

(ii) The prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

(iii) The prisoner is unlikely to recidivate.

(d) *Transfer to supervised release.* The Bureau may apply FSA Time Credits toward early transfer to supervised release under 18 U.S.C. 3624(g) only when an eligible inmate has, in addition to satisfying the criteria in paragraphs (b) and (c) of this section:

(1) An eligible inmate has maintained a minimum or low recidivism risk through his or her last risk and needs assessment;

(2) An eligible inmate has a term of supervised release after imprisonment included as part of his or her sentence as imposed by the sentencing court; and

(3) The application of FSA Time Credits would result in transfer to supervised release no earlier than 12 months before the date that transfer to supervised release would otherwise have occurred.

#### Subchapter C—Institutional Management

### PART 541—INMATE DISCIPLINE AND SPECIAL HOUSING UNITS

■ 3. The authority citation for part 541 continues to read as follows:

**Authority:** 5 U.S.C. 301; 18 U.S.C. 3621, 3622, 3624, 4001, 4042, 4081, 4082 (Repealed in part as to offenses committed on or after November 1, 1987), 4161–4166 (Repealed as

GAHARAN, JAMES 21078035

to offenses committed on or after November 1, 1987), 5006–5024 (Repealed October 12, 1984 as to offenses committed after that date), 5039; 28 U.S.C. 509, 510.

■ 4. Amend § 541.3 in paragraph (b), Table 1, by:

■ a. Under the heading "Available Sanctions for Greatest Severity Level Prohibited Acts", adding the entry B.2 in alphanumeric order;

■ b. Under the heading "Available Sanctions for High Severity Level Prohibited Acts", adding the entry B.2 in alphanumeric order;

■ c. Under the heading "Available Sanctions for Moderate Severity Level Prohibited Acts", adding the entry B.2 in alphanumeric order; and

■ d. Under the heading "Available Sanctions for Low Severity Level Prohibited Acts", adding the entry B.2 in alphanumeric order.

The additions read as follows:

### § 541.3 Prohibited acts and available sanctions.

\*   \*   \*   \*   \*

(b) \* \* \*

## TABLE 1—PROHIBITED ACTS AND AVAILABLE SANCTIONS

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |
| **Available Sanctions for Greatest Severity Level Prohibited Acts** | | | | | | |
| \* | \* | \* | \* | \* | \* | \* |
| B.2 .......................... Forfeit up to 41 days of earned First Step Act (FSA) Time Credits (*see* 28 CFR part 523, subpart E) for each prohibited act committed. | | | | | | |
| \* | \* | \* | \* | \* | \* | \* |
| **Available Sanctions for High Severity Level Prohibited Acts** | | | | | | |
| \* | \* | \* | \* | \* | \* | \* |
| B.2 .......................... Forfeit up to 27 days of earned FSA Time Credits for each prohibited act committed. | | | | | | |
| \* | \* | \* | \* | \* | \* | \* |
| **Available Sanctions for Moderate Severity Level Prohibited Acts** | | | | | | |
| \* | \* | \* | \* | \* | \* | \* |
| B.2 .......................... Forfeit up to 14 days of earned FSA Time Credits for each prohibited act committed. | | | | | | |
| \* | \* | \* | \* | \* | \* | \* |
| **Available Sanctions for Low Severity Level Prohibited Acts** | | | | | | |
| \* | \* | \* | \* | \* | \* | \* |
| B.2 .......................... Forfeit up to 7 days of earned FSA Time Credits (only where the inmate is found to have committed a second violation of the same prohibited act within 6 months; forfeit up to 14 days of FSA Time Credits (only where the inmate is found to have committed a third violation of the same prohibited act within 6 months). | | | | | | |
| \* | \* | \* | \* | \* | \* | \* |

\*   \*   \*   \*   \*

■ 5. Amend § 541.7 by revising paragraph (f) to read as follows:

### § 541.7 Unit Discipline Committee (UDC) review of the incident report.

\*   \*   \*   \*   \*

(f) *Sanctions.* If you committed a prohibited act or prohibited acts, the UDC can impose any of the available sanctions in Tables 1 and 2 of § 541.3, except loss of good conduct time credit, FSA Time Credits, disciplinary segregation, or monetary fines.

[FR Doc. 2022–00918 Filed 1–14–22; 4:15 pm]

**BILLING CODE P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–R05–OAR–2021–0535; FRL–9444–02–R5]

### Air Plan Approval; Wisconsin; Wisconsin Nonattainment New Source Review Certification for the 2015 Ozone NAAQS

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is approving, as a State Implementation Plan (SIP) revision, Wisconsin's certification that its SIP satisfies the nonattainment new source review (NNSR) requirements of the Clean Air Act (CAA) for the 2015 ozone National Ambient Air Quality Standard (NAAQS).

**DATES:** This direct final rule will be effective March 21, 2022, unless EPA receives adverse comments by February 18, 2022. If adverse comments are received, EPA will publish a timely withdrawal of the direct final rule in the **Federal Register** informing the public that the rule will not take effect.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2021–0535 at *http://www.regulations.gov* or via email to *damico.genevieve@epa.gov.* For comments submitted at *Regulations.gov,* follow the online instructions for submitting comments. Once submitted,

GAHARAN, JAMES 21078035