# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| WILLIAM MAXWELL, | § | |
| | § | |
| Petitioner, | § | CIVIL ACTION NO. 1:22-CV-40 |
| | § | |
| v. | § | |
| | § | DISTRICT JUDGE MICHAEL J. TRUNCALE |
| WARDEN, FCI BEAUMONT LOW, | § | MAGISTRATE CHRISTINE L. STETSON |
| | § | |
| Respondent. | § | |

**DECLARATION OF JUSTIN THORNTON**

In accordance with 28 U.S.C. § 1746, I, JUSTIN THORNTON, make the following declaration, under penalty of perjury, pertinent to the above styled and numbered cause:

1.    I have been employed by the United States Department of Justice, Federal Bureau of Prisons ("BOP") since April of 2010. I am currently assigned as the Acting Executive Assistant at the Federal Correctional Complex ("FCC Beaumont"), Beaumont, Texas. As part of my duties as the Acting Executive Assistant, I am the Coordinator for the Administrative Remedy Program and have access to inmate records relating to every step of the administrative remedy program.

2.    I make this declaration in response to the above captioned petition filed by inmate William Maxwell, Federal Register Number 71944-279 ("inmate Maxwell"). The statements I make hereinafter are made on the basis of my review of the official files and records of the BOP, my own personal knowledge, or on the basis of information acquired by me through the performance of my official duties. I am familiar with the BOP computer system, SENTRY, and have access to this system. SENTRY contains inmate information, including tracking information of administrative remedies filed by inmates. While reviewing the matter, I identified the following documents kept in the ordinary course of business as relevant to the issue, and have attached true and correct copies of them to this declaration:

> 1. BOP Program Statement 1330.18, <u>Administrative Remedy Program</u>, pages 1, 4-10
>
> 2. Administrative Remedy Generalized Retrieval for inmate Maxwell, dated May 3, 2022
>
> 3. Administrative Remedy #1048383-F1 request to the Warden (BP-9) and response (includes Informal Resolution Attempt)
>
> 4. Administrative Remedy #1048383-R1 request to the South Central Regional Office (BP-10) and response

1

5.  Administrative Remedy #1048383-A2 request to Central Office (BP-11) and response

3.      The BOP's Administrative Remedy Program is an internal formal three-step grievance procedure by which inmates may complain about various aspects of their confinement.   Prior to beginning the formal appeal process, inmates shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy pursuant to 28 C.F.R. § 542.13(a).   The initial step of the formal Administrative Remedy process is for an inmate to submit a written Administrative Remedy Request form (BP-9) to the Warden's Office within 20 calendar days following the date on which the basis for the Request occurred. *See* 28 C.F.R. § 542.14(a).  If an inmate is not satisfied with the Warden's response, he or she may submit an Appeal on the appropriate form (BP-10) to the Regional Director within 20 calendar days of the date the Warden signed the response. *See* 28 C.F.R. § 542.15(a).  Appeal to the Office of General Counsel via a Central Office Administrative Remedy Appeal form (BP-11) is the final step in the administrative appeal process. *Id.* Appeals must specifically state the reason for appeal.  28 C.F.R. 542.15(b)(1).

4.      Upon receipt of an inmate request or appeal as part of the administrative remedy process, a BOP employee acting as an Administrative Remedy Clerk shall stamp the form with the date it was received, log the form into SENTRY, and write a "Remedy ID" number, as assigned by SENTRY, on the form.  All submissions received by the Administrative Remedy Clerk, whether accepted or rejected, are entered into SENTRY. *See* Attachment 1, a true and correct copy of BOP Program Statement 1330.18, ¶ 13(a).

5.      I have reviewed inmate Maxwell's administrative remedy filings and discovered that on July 13, 2020, inmate Maxwell bypassed submitting a BP-9 to the Warden's Office and submitted an administrative remedy directly to the South Central Region ("SCR"), where it was assigned Remedy ID number 1034426-R1.  The subject of the administrative remedy was "Compassionate Release COVID/Halfway House Placement."  The SCR rejected the administrative remedy and provided instructions to the inmate to first attempt informal resolution and BP-9 at the institution. *See* Attachment 2.

6.      On September 22, 2020, the Warden's office received inmate Maxwell's appeal (BP-9) of his informal resolution attempt (BP-8).   On October 12, 2020, the Warden denied inmate Maxwell's request for home confinement under the CARES Act and listed the individualized factors which the denial for placement was based upon. *See* Attachment 3.

7.      Inmate Maxwell appealed the Warden's response to the SCR.  Inmate Maxwell's appeal (BP-10) was received by the SCR on October 26, 2020.  The SCR responded to inmate Maxwell on December 23, 2020, and affirmed the denial by the Warden's office. *See* Attachment 4.

8.      On March 26, 2021, Central Office received a correctly submitted appeal (BP-11) from inmate Maxwell, appealing the SCR's response regarding his request for home confinement, following an initial rejection on February 18, 2021.  The Central Office responded to inmate Maxwell on May 24, 2021, denying inmate Maxwell's request, and concurring with the responses

2

from the Warden's office and the SCR.  *See* Attachment 5.

9.    The records appear to indicate inmate Maxwell has exhausted his administrative remedies in regards to his request for home confinement placement under the CARES Act.  However, there are no records to indicate inmate Maxwell exhausted, nor ever attempted to exhaust, any of his other claims regarding the First Step Act ("FSA"), including FSA time credits as related to participation in productive activities, preferential housing units, additional phone minutes, expanded commissary, or his transfer to halfway house as a result of successful participation.  *See generally* Attachments 2-5.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed on this _____5ᵀᴴ_____ day of May, 2022.


JUSTIN THORNTON
Acting Executive Assistant
Federal Correctional Complex
Beaumont, Texas

# Attachment 1

 **U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI:          OGC/LIT
NUMBER:    1330.18
DATE:         January 6, 2014

# Administrative Remedy Program

*/s/*
*Approved*:  Charles E. Samuels, Jr.
Director, Federal Bureau of Prisons

1. **PURPOSE AND SCOPE  §542.10**

**a.  Purpose.  The purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement. An inmate may not submit a Request or Appeal on behalf of another inmate.**

Inmates seeking a formal review of issues relating to sexual abuse should use the regulations promulgated by the Department of Justice under the Prison Rape Elimination Act, 42 U.S.C. § 15606, et seq.  These procedures are provided in Section 16 of this Program Statement.

**b.  Scope.  This Program applies to all inmates in institutions operated by the Bureau of Prisons, to inmates designated to contract Community Corrections Centers (CCCs) under Bureau of Prisons responsibility, and to former inmates for issues that arose during their confinement. This Program does not apply to inmates confined in other non-federal facilities.**

The president of a recognized inmate organization may submit a request on behalf of that organization regarding an issue that specifically affects that organization.

**c.  Statutorily-mandated Procedures.  There are statutorily-mandated procedures in place for Tort claims (28 CFR 543, subpart C), Inmate Accident Compensation claims (28 CFR 301), and Freedom of Information Act or Privacy Act requests (28 CFR 513, subpart D).  If an inmate raises an issue in a request or appeal that cannot be resolved through the Administrative Remedy Program, the Bureau will refer the inmate to the appropriate statutorily-mandated procedures.**

**Federal Regulations from 28 CFR are shown in this type.**
Implementing instructions are shown in this type.

SENTRY promptly after delivery to the inmate.  CCMs are responsible for this function for inmates under their supervision.

**b.  Inmates have the responsibility to use this Program in good faith and in an honest and straightforward manner.**

6.  **RESERVED**

7.  **INFORMAL RESOLUTION §542.13**

**a.  Informal Resolution.  Except as provided in §542.13(b), an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy.  Each warden shall establish procedures to allow for the informal resolution of inmate complaints.**

The Warden is responsible for ensuring that effective informal resolution procedures are in place and that good faith attempts at informal resolution are made in an orderly and timely manner by both inmates and staff.  These procedures may not operate to limit inmate access to formal filing of a Request.

**b.  Exceptions.  Inmates in CCCs are not required to attempt informal resolution. An informal resolution attempt is not required prior to submission to the regional or Central Office as provided for in §542.14(d) of this part.  An informal resolution attempt may be waived in individual cases at the Warden or institution Administrative Remedy Coordinator's discretion when the inmate demonstrates an acceptable reason for bypassing informal resolution.**

For example, the Warden may waive informal resolution for Unit Discipline Committee (UDC) appeals, or when informal resolution is deemed inappropriate due to the issue's sensitivity.

Although not mandatory, inmates may attempt informal resolution of DHO decisions. See the Program Statement **Inmate Discipline Program**.

8.  **INITIAL FILING §542.14**

**a.  Submission.  The deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form (BP-9), is 20 calendar days following the date on which the basis for the Request occurred.**

In accord with the settlement in *Washington* v. *Reno*, and for such period of time as this settlement remains in effect, the deadline for completing informal resolution and submitting a formal written Administrative Remedy Request, on the appropriate form (BP-9) (BP-229), for a disputed telephone charge, credit, or telephone service problem for which the inmate requests reimbursement to his/her telephone account, is 120 days from the date of the disputed telephone charge, credit, or telephone service problem.

Administrative Remedy Requests concerning telephone issues that do not involve billing disputes or requests for refunds for telephone service problems (such as Administrative Remedy

Requests concerning telephone privileges, telephone lists, or telephone access) are governed by the 20-day filing deadline.

**b.  Extension.  Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed. In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under §542.19 of this part was delayed.**

Ordinarily, the inmate should submit written verification from staff for any claimed reason for delay.

If an inmate requests an Administrative Remedy form but has not attempted informal resolution, staff should counsel the inmate that informal resolution is ordinarily required.  If the inmate nevertheless refuses to present a request informally, staff should provide the form for a formal Request.  Upon receipt of the inmate's submission, the Coordinator shall accept the Request if, in the Coordinator's discretion, informal resolution was bypassed for valid reasons, or may reject it if there are no valid reasons for bypassing informal resolution.

**c.  Form**

**(1)  The inmate shall obtain the appropriate form from CCC staff or institution staff (ordinarily, the correctional counselor).**

The following forms are appropriate:

- Request for Administrative Remedy, Form BP-9 (BP-229), is appropriate for filing at the institution.
- Regional Administrative Remedy Appeal, Form BP-10 (BP-230), is appropriate for submitting an appeal to the regional office.
- Central Office Administrative Remedy Appeal, Form BP-11 (BP-231), is appropriate for submitting an appeal to the Central Office.

**(2)  The inmate shall place a single complaint or a reasonable number of closely related issues on the form.  If the inmate includes on a single form multiple unrelated issues, the submission shall be rejected and returned without response, and the inmate shall be advised to use a separate form for each unrelated issue.  For DHO and UDC appeals, each separate incident report number must be appealed on a separate form.**

Placing a single issue or closely related issues on a single form facilitates indexing, and promotes efficient, timely and comprehensive attention to the issues raised.

**(3)  The inmate shall complete the form with all requested identifying information and shall state the complaint in the space provided on the form.  If more space is needed, the inmate may use up to one letter-size (8 1/2" by 11") continuation page.**

**The inmate must provide an additional copy of any continuation page.  The inmate must submit one copy of supporting exhibits.  Exhibits will not be returned with the response.  Because copies of exhibits must be filed for any appeal (see § 542.15 (b) (3)), the inmate is encouraged to retain a copy of all exhibits for his or her personal records.**

**(4)  The inmate shall date and sign the Request and submit it to the institution staff member designated to receive such Requests (ordinarily a correctional counselor).  CCC inmates may mail their Requests to the CCM.**

**d.  Exceptions to Initial Filing at Institution**

**(1)  Sensitive Issues.  If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director.  The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution.  If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted.  Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request.  The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission.**

**(2)  DHO Appeals.  DHO appeals shall be submitted initially to the Regional Director for the region where the inmate is currently located.**

See the Program Statement **Inmate Discipline Program**.

**(3)  Control Unit Appeals.  Appeals related to Executive Panel Reviews of Control Unit placement shall be submitted directly to the General Counsel.**

See the Program Statement **Control Unit Programs**.

**(4)  Controlled Housing Status Appeals.  Appeals related to the Regional Director's review of controlled housing status placement may be filed directly with the General Counsel.**

See the Program Statement **Procedures for Handling HIV Positive Inmates Who Pose Danger to Other.**

**9.  APPEALS  § 542.15**

**a.  Submission.  An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP-10) to the appropriate Regional**

**Director within 20 calendar days of the date the Warden signed the response.  An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response.  When the inmate demonstrates a valid reason for delay, these time limits may be extended.  Valid reasons for delay include those situations described in §542.14(b) of this part.  Appeal to the General Counsel is the final administrative appeal.**

These deadlines specify the date of the Appeal's receipt in the regional office or the Central Office.  The deadlines have been made deliberately long to allow sufficient mail time. Inmates should mail their Appeals promptly after receiving a response to ensure timely receipt. Ordinarily, the inmate must submit written verification from institution staff for any reason for delay that cannot be verified through SENTRY.

In many cases, courts require a proper Appeal to the General Counsel before an inmate may pursue the complaint in court.

**b.  Form**

**(1)  Appeals to the Regional Director shall be submitted on the form designed for regional Appeals (BP-10) and accompanied by one complete copy or duplicate original of the institution Request and response.  Appeals to the General Counsel shall be submitted on the form designed for Central Office Appeals (BP-11) and accompanied by one complete copy or duplicate original of the institution and regional filings and their responses.  Appeals shall state specifically the reason for appeal.**

**(2)  An inmate may not raise in an Appeal issues not raised in the lower level filings.  An inmate may not combine Appeals of separate lower level responses (different case numbers) into a single Appeal.**

**(3)  An inmate shall complete the appropriate form with all requested identifying information and shall state the reasons for the Appeal in the space provided on the form.  If more space is needed, the inmate may use up to one letter-size (8 1/2" x 11") continuation page.  The inmate shall provide two additional copies of any continuation page and exhibits with the regional Appeal, and three additional copies with an Appeal to the Central Office (the inmate is also to provide copies of exhibits used at the prior level(s) of appeal).  The inmate shall date and sign the Appeal and mail it to the appropriate Regional Director, if a Regional Appeal, or to the National Inmate Appeals Administrator, Office of General Counsel, if a Central Office Appeal (see 28 CFR part 503 for addresses of the Central Office and Regional Offices).**

c.  **Processing**.  The appropriate regional office to process the Appeal is the regional office for the institution where the inmate is confined at the time of mailing the Appeal, regardless of the institution that responded to the institution filing.

10.  **ASSISTANCE §542.16**

**a.  An inmate may obtain assistance from another inmate or from institution staff in preparing a Request or an Appeal.  An inmate may also obtain assistance from outside sources, such as family members or attorneys.  However, no person may submit a Request or Appeal on the inmate's behalf, and obtaining assistance will not be considered a valid reason for exceeding a time limit for submission unless the delay was caused by staff**.

**b.  Wardens shall ensure that assistance is available for inmates who are illiterate, disabled, or who are not functionally literate in English.  Such assistance includes provision of reasonable accommodation in order for an inmate with a disability to prepare and process a Request or an Appeal.**

For example, Wardens must ensure that staff (ordinarily unit staff) provide assistance in the preparation or submission of an Administrative Remedy or an Appeal upon being contacted by such inmates that they are experiencing a problem.

11.  **RESUBMISSION §542.17**

**a.  Rejections.  The Coordinator at any level (CCM, institution, region, Central Office) may reject and return to the inmate without response a Request or an Appeal that is written by an inmate in a manner that is obscene or abusive, or does not meet any other requirement of this part.**

**b.  Notice.  When a submission is rejected, the inmate shall be provided a written notice, signed by the Administrative Remedy Coordinator, explaining the reason for rejection. If the defect on which the rejection is based is correctable, the notice shall inform the inmate of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal.**

(1)  **Sensitive Submissions**.  Submissions for inmate claims which are too sensitive to be made known at the institution are not to be returned to the inmate.  Only a rejection notice will be provided to the inmate.  However, other rejected submissions ordinarily will be returned to the inmate with the rejection notice.

(2)  **Defects**.  Defects such as failure to sign a submission, failure to submit the required copies of a Request, Appeal, or attachments, or failure to enclose the required single copy of lower level submissions are examples of correctable defects.

Ordinarily, five calendar days from the date of the notice to the inmate is reasonable for resubmission at the institution level; at least 10 calendar days at the CCM or regional offices; and 15 calendar days at the Central Office.

(3)  **Criteria for Rejection**.  When deciding whether to reject a submission, Coordinators, especially at the institution level, should be flexible, keeping in mind that major purposes of this Program are to solve problems and be responsive to issues inmates raise.  Thus, for example, consideration should be given to accepting a Request or Appeal that raises a sensitive or

problematic issue, such as medical treatment, sentence computation, or staff misconduct, even though that submission may be somewhat untimely.

**c.  Appeal of Rejections.  When a Request or Appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection, including a rejection on the basis of an exception as described in §542.14 (d), to the next appeal level.  The Coordinator at that level may affirm the rejection, may direct that the submission be accepted at the lower level (either upon the inmate's resubmission or direct return to that lower level), or may accept the submission for filing.  The inmate shall be informed of the decision by delivery of either a receipt or rejection notice.**

12.  **RESPONSE TIME §542.18**

**If accepted, a Request or Appeal is considered filed on the date it is logged into the Administrative Remedy Index as received.  Once filed, response shall be made by the Warden or CCM within 20 calendar days; by the Regional Director within 30 calendar days; and by the General Counsel within 40 calendar days.  If the Request is determined to be of an emergency nature which threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after filing.  If the time period for response to a Request or Appeal is insufficient to make an appropriate decision, the time for response may be extended once by 20 days at the institution level, 30 days at the regional level, or 20 days at the Central Office level.  Staff shall inform the inmate of this extension in writing.  Staff shall respond in writing to all filed Requests or Appeals.  If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level.**

The date a Request or an Appeal is received in the Administrative Remedy index is entered into SENTRY as the "Date Rcv", and should be the date it is first received and date-stamped in the Administrative Remedy Clerk's office.  Notice of extension ordinarily is made via SENTRY notice.

13.  **REMEDY PROCESSING**

a.  **Receipt**.  Upon receiving a Request or Appeal, the Administrative Remedy Clerk shall stamp the form with the date received, log it into the SENTRY index as received on that date, and write the "Remedy ID" as assigned by SENTRY on the form.  Once a submission is entered into the system, any subsequent submissions or appeals of that case shall be entered into SENTRY using the same Case Number.  The "Case Number" is the purely numerical part of the "Remedy ID" which precedes the hyphen and "Submission ID."

All submissions received by the Clerk, whether accepted or rejected, shall be entered into SENTRY in accordance with the SENTRY Administrative Remedy Technical Reference Manual.

Sensitive issues, when the inmate claims that his or her safety or well-being would be placed in danger if it became known at the institution that the inmate was pursuing the issue, should be

withheld from logging in until answered and/or should be logged into SENTRY with sufficient vagueness as to subject code and abstract to accommodate the inmate's concerns.

A Request should be submitted and logged in at the institution where the inmate is housed at the time the inmate gives the Request to the counselor or other appropriate staff member.  If the event(s) occurred at a previous institution, staff at that previous institution shall provide, promptly upon request, any investigation or other assistance needed by the institution answering the Request.  If an inmate is transferred after giving the Request to a staff member, but before that Request is logged in or answered, the institution where the Request was first given to a staff member remains responsible for logging and responding to that Request.

b.  **Investigation and Response Preparation**.  The Clerk or Coordinator shall assign each filed Request or Appeal for investigation and response preparation.  Matters in which specific staff involvement is alleged may not be investigated by either staff alleged to be involved or by staff under their supervision.  Allegations of physical abuse by staff shall be referred to the Office of Internal Affairs (OIA) in accordance with procedures established for such referrals.  Where appropriate; e.g., when OIA or another agency is assuming primary responsibility for investigating the allegations, the response to the Request or Appeal may be an interim response and need not be delayed pending the outcome of the other investigation.

Requests or Appeals shall be investigated thoroughly, and all relevant information developed in the investigation shall ordinarily be supported by written documents or notes of the investigator's findings.  Notes should be sufficiently detailed to show the name, title, and location of the information provided, the date the information was provided, and a full description of the information provided.  Such documents and notes shall be retained with the case file copy.  When deemed necessary in the investigator's discretion, the investigator may request a written statement from another staff member regarding matters raised in the Request or Appeal.  Requested staff shall provide such statements promptly.  For a disciplinary Appeal, a complete copy of the appealed disciplinary actions record shall be maintained with the Appeal file copy.

c.  **Responses**.  Responses ordinarily shall be on the form designed for that purpose, and shall state the decision reached and the reasons for the decision.  The first sentence or two of a response shall be a brief abstract of the inmate's Request or Appeal, from which the SENTRY abstract should be drawn.  This abstract should be complete, but as brief as possible.  The remainder of the response should answer completely the Request or Appeal, be accurate and factual, and contain no extraneous information.  The response should be written to be released to any inmate and the general public under the Freedom of Information Act (FOIA) and the Privacy Act.  Inmate names shall not be used in responses, and staff and other names may not be used unless absolutely essential.

Program Statements, Operations Memoranda, regulations, and statutes shall be referred to in responses whenever applicable, including section numbers on which the response relies.

d.  **Response Time Limits**. Responses shall be made as required in Section 12 of this Program Statement.

e.  **Index Completion**.  When a response is completed, the Clerk shall update SENTRY in accordance with the SENTRY Administrative Remedy Manual and the instructions in

# Attachment 2

```
 BMACJ            *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      05-03-2022
PAGE 001 OF                                                          08:56:03
      FUNCTION: L-P SCOPE: REG   EQ 71944-279    OUTPUT FORMAT: FULL
-------LIMITED TO SUBMISSIONS WHICH MATCH ALL LIMITATIONS KEYED BELOW----------
DT RCV: FROM _____ THRU _____ DT STS: FROM _____ THRU _____
DT STS: FROM ___ TO ___ DAYS BEFORE "OR" FROM ___ TO ___ DAYS AFTER DT RDU
DT TDU: FROM ___ TO ___ DAYS BEFORE "OR" FROM ___ TO ___ DAYS AFTER DT TRT
STS/REAS: _____ _____ _____ _____ _____ _____ _____ _____ _____ _____
SUBJECTS: ____ ____ ____ ____ ____ ____ ____ ____ ____ ____ ____ ____
EXTENDED: _ REMEDY LEVEL: _ _               RECEIPT: _ _ _ "OR" EXTENSION: _ _ _
RCV  OFC : EQ ____      ____      ____      ____      ____      ____
TRACK:  DEPT: _____ _____ _____ _____ _____ _____
      PERSON: ___        ___       ___       ___       ___       ___
        TYPE: ___        ___       ___       ___       ___       ___
EVNT FACL: EQ ____      ____      ____      ____      ____      ____
RCV FACL.: EQ ____      ____      ____      ____      ____      ____
RCV UN/LC: EQ _____ _____ _____ _____ _____ _____
RCV QTR..: EQ _____ _____ _____ _____ _____ _____
ORIG FACL: EQ ____      ____      ____      ____      ____      ____
ORG UN/LC: EQ _____ _____ _____ _____ _____ _____
ORIG QTR.: EQ _____ _____ _____ _____ _____ _____
```

```
 G0002      MORE PAGES TO FOLLOW . . .
```

```
BMACJ            *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      05-03-2022
PAGE 002 OF       *              FULL SCREEN FORMAT                *      08:56:03


REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                QTR.: T04-059U   RCV OFC: BML
REMEDY ID: 884513-F1      SUB1: 15AM SUB2:      DATE RCV:   12-02-2016
UNT  RCV..:XB           QTR RCV.: X07-033L     FACL RCV: BML
UNT  ORG..:XB           QTR ORG.: X07-033L     FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  1 SCR  2         RESP DUE:  THU  12-22-2016
ABSTRACT.: ALLEGES FRP PMTS ARE INCORRECT
STATUS DT: 12-08-2016  STATUS CODE: CLO STATUS REASON: XPL
INCRPTNO.:           RCT: P EXT:   DATE ENTD: 12-02-2016
REMARKS..:




REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                QTR.: T04-059U   RCV OFC: SCR
REMEDY ID: 884513-R1      SUB1: 15AM SUB2:      DATE RCV:   01-05-2017
UNT  RCV..:XB           QTR RCV.: X07-033L     FACL RCV: BML
UNT  ORG..:XB           QTR ORG.: X07-033L     FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  1 SCR  2         RESP DUE:
ABSTRACT.: ALLEGES FRP PMTS ARE INCORRECT
STATUS DT: 01-05-2017  STATUS CODE: REJ STATUS REASON: CPG ONE RSA OTH
INCRPTNO.:           RCT:   EXT:   DATE ENTD: 01-19-2017
REMARKS..: YOU CAN ONLY HAVE ONE CONTINUATION PAGE PLUS 2 EXTRA
           COPIES (3 COPIE) TOTAL




G0002       MORE PAGES TO FOLLOW . . .
```

```
  BMACJ           *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      05-03-2022
PAGE 003 OF       *              FULL SCREEN FORMAT              *      08:56:03


REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                  QTR.: T04-059U   RCV OFC: SCR
REMEDY ID: 884513-R2     SUB1: 15AM SUB2:       DATE RCV:   02-16-2017
UNT  RCV..:XB            QTR RCV.: X07-033L      FACL RCV: BML
UNT  ORG..:XB            QTR ORG.: X07-033L      FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  1 SCR  2           RESP DUE:  SAT  03-18-2017
ABSTRACT.: ALLEGES FRP PMTS ARE INCORRECT
STATUS DT: 03-07-2017  STATUS CODE: CLD STATUS REASON: DNY
INCRPTNO.:          RCT: P EXT:   DATE ENTD: 03-02-2017
REMARKS..:




REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                  QTR.: T04-059U   RCV OFC: BOP
REMEDY ID: 884513-A1     SUB1: 15AM SUB2:       DATE RCV:   05-01-2017
UNT  RCV..:XB            QTR RCV.: X07-033L      FACL RCV: BML
UNT  ORG..:XB            QTR ORG.: X07-033L      FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  1 SCR  2           RESP DUE:
ABSTRACT.: ALLEGES FRP PMTS ARE INCORRECT
STATUS DT: 05-08-2017  STATUS CODE: REJ STATUS REASON: UTA MEM
INCRPTNO.:          RCT:   EXT:   DATE ENTD: 05-08-2017
REMARKS..: REGIONAL RESPONSE DATED 03-07-2017




  G0002      MORE PAGES TO FOLLOW . . .
```

BMACJ              *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *        05-03-2022
PAGE 004 OF       *              FULL SCREEN FORMAT              *        08:56:03


REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                    QTR.: T04-059U   RCV OFC: BML
REMEDY ID: 972807-F1      SUB1: 21AM SUB2:        DATE RCV:   04-01-2019
UNT  RCV..:XB             QTR RCV.: X08-064U      FACL RCV: BML
UNT  ORG..:XB             QTR ORG.: X08-064U      FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  3 SCR  1            RESP DUE:
ABSTRACT.: IR IS "NON-SENSICAL" AND INCONSISTENT WITH POLICY
STATUS DT: 04-01-2019   STATUS CODE: REJ STATUS REASON: OTH RSF
INCRPTNO.: 3228560   RCT:   EXT:   DATE ENTD: 04-01-2019
REMARKS..: YOU MUST PROVIDE A COPY OF THE IR IN QUESTION



REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                    QTR.: T04-059U   RCV OFC: BML
REMEDY ID: 972807-F2      SUB1: 21AM SUB2:        DATE RCV:   04-01-2019
UNT  RCV..:XB             QTR RCV.: X08-064U      FACL RCV: BML
UNT  ORG..:XB             QTR ORG.: X08-064U      FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  3 SCR  1            RESP DUE:
ABSTRACT.: IR IS "NON-SENSICAL" AND INCONSISTENT WITH POLICY
STATUS DT: 04-15-2019   STATUS CODE: VOD STATUS REASON:
INCRPTNO.:           RCT:   EXT:   DATE ENTD: 04-15-2019
REMARKS..: DATE REC'D NEEDED TO BE UPDATED




G0002       MORE PAGES TO FOLLOW . . .

```
BMACJ              *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      05-03-2022
PAGE 005 OF       *              FULL SCREEN FORMAT              *       08:56:03


REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                QTR.: T04-059U   RCV OFC: BML
REMEDY ID: 972807-F3      SUB1: 21AM SUB2:      DATE RCV:   04-15-2019
UNT  RCV..:XB            QTR RCV.: X08-064U      FACL RCV: BML
UNT  ORG..:XB            QTR ORG.: X08-064U      FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  3 SCR  1          RESP DUE:  SUN  05-05-2019
ABSTRACT.: IR IS "NON-SENSICAL" AND INCONSISTENT WITH POLICY
STATUS DT: 04-24-2019  STATUS CODE: CLD STATUS REASON: DNY
INCRPTNO.: 3228560   RCT: P EXT:   DATE ENTD: 04-15-2019
REMARKS..:




REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                QTR.: T04-059U   RCV OFC: SCR
REMEDY ID: 972807-R1      SUB1: 21AM SUB2:      DATE RCV:   05-20-2019
UNT  RCV..:XB            QTR RCV.: X08-064U      FACL RCV: BML
UNT  ORG..:XB            QTR ORG.: X08-064U      FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  3 SCR  1          RESP DUE:  FRI  07-19-2019
ABSTRACT.: IR IS "NON-SENSICAL" AND INCONSISTENT WITH POLICY
STATUS DT: 07-15-2019  STATUS CODE: CLO STATUS REASON: OTH
INCRPTNO.: 3228560   RCT: P EXT: P DATE ENTD: 05-21-2019
REMARKS..: BACKLOG




G0002      MORE PAGES TO FOLLOW . . .
```

```
BMACJ             *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *        05-03-2022
PAGE 006 OF     *                 FULL SCREEN FORMAT              *      08:56:03


REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                    QTR.: T04-059U   RCV OFC: SCR
REMEDY ID: 1034426-R1     SUB1: 13GM SUB2: 19FM DATE RCV:    07-13-2020
UNT  RCV..:TA           QTR RCV.: T04-057U    FACL RCV: BML
UNT  ORG..:TA           QTR ORG.: T04-057U    FACL ORG: BML
EVT FACL.: BML    ACC LEV:                       RESP DUE:
ABSTRACT.: COMP REL COVID/HALFWAY HOUSE PL 70192280000151549354
STATUS DT: 07-21-2020  STATUS CODE: REJ STATUS REASON: SEN WRL INS INF OTH
INCRPTNO.:           RCT:    EXT:   DATE ENTD: 07-21-2020
REMARKS..: YOU MUST 1ST ATTEMPT INFORMAL RESOLUTION & FILE BP-9
           AT INSTITUTION. IF DISSATISFIED WITH BP-9 RESPONSE,
           YOU MAY THEN SUBMIT BP-10 TO REGIONAL OFFICE.


REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                    QTR.: T04-059U   RCV OFC: BML
REMEDY ID: 1048383-F1     SUB1: 19HM SUB2:      DATE RCV:    09-22-2020
UNT  RCV..:TA           QTR RCV.: T04-057U    FACL RCV: BML
UNT  ORG..:TA           QTR ORG.: T04-057U    FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  1 SCR  1 BOP  2   RESP DUE:  MON  10-12-2020
ABSTRACT.: REQUESTS HOME CONFINEMENT
STATUS DT: 10-02-2020  STATUS CODE: CLD STATUS REASON: DNY
INCRPTNO.:           RCT: N EXT:   DATE ENTD: 09-22-2020
REMARKS..:




G0002      MORE PAGES TO FOLLOW . . .
```

```
BMACJ            *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      05-03-2022
PAGE 007 OF      *            FULL SCREEN FORMAT             *      08:56:03


REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                 QTR.: T04-059U   RCV OFC: SCR
REMEDY ID: 1048383-R1      SUB1: 19HM SUB2:      DATE RCV:   10-26-2020
UNT  RCV..:TA           QTR RCV.: T04-059U    FACL RCV: BML
UNT  ORG..:TA           QTR ORG.: T04-057U    FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  1 SCR  1 BOP  2   RESP DUE:  FRI  12-25-2020
ABSTRACT.: REQUESTS HOME CONFINEMENT
STATUS DT: 12-23-2020  STATUS CODE: CLD STATUS REASON: DNY
INCRPTNO.:            RCT: N EXT: P DATE ENTD: 11-03-2020
REMARKS..: STAFFING




REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA                 QTR.: T04-059U   RCV OFC: BOP
REMEDY ID: 1048383-A1      SUB1: 19HM SUB2:      DATE RCV:   02-03-2021
UNT  RCV..:TA           QTR RCV.: T04-059U    FACL RCV: BML
UNT  ORG..:TA           QTR ORG.: T04-057U    FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  1 SCR  1 BOP  2   RESP DUE:
ABSTRACT.: REQUESTS HOME CONFINEMENT
STATUS DT: 02-18-2021  STATUS CODE: REJ STATUS REASON: RAP RSA
INCRPTNO.:            RCT:   EXT:   DATE ENTD: 02-18-2021
REMARKS..: SEE ATTACHED. ORGANIZE APPEAL ACCORDINGLY.









G0002      MORE PAGES TO FOLLOW . . .
```

```
BMACJ          *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      05-03-2022
PAGE 008 OF 008 *            FULL SCREEN FORMAT              *      08:56:03


REGNO: 71944-279 NAME: MAXWELL, WILLIAM
RSP OF...: BML UNT/LOC/DST: TA            QTR.: T04-059U    RCV OFC: BOP
REMEDY ID: 1048383-A2    SUB1: 19ZM SUB2:      DATE RCV:   03-26-2021
UNT  RCV..:TA          QTR RCV.: T04-059U     FACL RCV: BML
UNT  ORG..:TA          QTR ORG.: T04-057U     FACL ORG: BML
EVT FACL.: BML    ACC LEV:  BML  1 SCR  1 BOP  2   RESP DUE:  TUE  05-25-2021
ABSTRACT.: APPEALS DENIAL OF HOME CONFINEMENT VIA CARES ACT
STATUS DT: 05-24-2021  STATUS CODE: CLD STATUS REASON: DNY
INCRPTNO.:           RCT: N EXT: N DATE ENTD: 04-12-2021
REMARKS..:




            13 REMEDY SUBMISSION(S) SELECTED
G0000        TRANSACTION SUCCESSFULLY COMPLETED
```

# Attachment 3

**FEDERAL CORRECTIONAL COMPLEX (FCC), BEAUMONT, TEXAS
PART B - RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY #1048383-F1**

This is in response to your Request for Administrative Remedy received September 22, 2020, in which you request home confinement based on the CARES Act.

The Bureau of Prisons is utilizing the full scope of its various authorities to ensure that inmates indicated at high risk are of complications from COVID-19 are housed safely and appropriately given their specific needs and circumstances. This includes modified institution operations; routine staff and inmate medical screening; use of the home confinement authority, where appropriate, based on guidance from the U.S. Attorney General; and use of compassionate release for appropriate inmates who have existing terminal and debilitated medical conditions or who are elderly and nearing the end of their sentence, as indicated for in current agency policy.

The CARES Act authorizes the U.S. Attorney General to expand the cohort of inmates who can be considered for home confinement upon his findings of emergency conditions which are materially affecting the function of the BOP.  On April 3, 2020, the U.S. Attorney General made that finding and authorized the Director of the BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and other similarly situated BOP facilities where COVID-19 is materially affecting operations.

The U.S. Attorney General issued guidance to the BOP regarding the transfer of inmates to home confinement on March 26, 2020. In assessing whether home confinement should be granted, the BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement and a non-exhaustive list of discretionary factors for priority consideration, including, but not limited to:  no BOP violations within the last year; PATTERN score is minimum; a verifiable re-entry plan; verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his BOP facility; no serious offenses; primary offense is not violent, a sex offense, or terrorism related; no current detainers; and the inmate must have served 50% or more of their sentence or have 18 months or less remaining in their sentence and have served 25% or more of their sentence.

Information reveals you arrived at FCC Beaumont on August 26, 2015, with a Projected Release Date of July 17, 2031, via Good Conduct Time Release.  You did not meet the criteria to be released on home confinement per the CARES Act, nor are you identified as an at-risk inmate per any medical condition by the Health Services Department.  Specifically, you were denied based on your prior history of violence and with you only completing 36.6% of sentence when you need to complete 50%. There are serious violence (threat of death, bodily injury and kidnapping) during commission of committing offense in your record.

Based on the above information, this response to your Request for Administrative Remedy is denied.

If you are not satisfied with this response, you may appeal to the Regional Director at Bureau of Prisons, South Central Region, South Central Regional Office, 344 Marine Forces Drive, Grand Prairie, Texas, 75051.  Your appeal must be received in the South Central Regional Office within 20 days of the date of this response.

_____
F. J. Garrido, Warden

Date _____

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | Maxwell, William | 71944-279 | TA | Beaumont LOW |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST**

The BOP has lost my prior BP-8 (copy attached); BP-9 (copy attached); Electronic BP-9 (copy attached); Correspondence from counsel to the Warden, and the Warden's response to counsel. The BOP has additionally lost any response from Region to Maxwell. See Item 1034426-R1, that has never been delivered to Maxwell. For these reasons, and in discussion with Mr. Bevil and Unit Manager Love, yet another copy of the BP-8, BP-9, and attachments thereto are attached. I am appealing based on the exact same reasons noted on June 26, 2020, in my BP-9 (attached).

| 09/15/2020 | |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B– RESPONSE**



RECEIVED

SEP 2 2 2020

WARDEN'S OFFICE
FCC BEAUMONT (LOW)

| DATE | WARDEN OR REGIONAL DIRECTOR |
|---|---|

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE

CASE NUMBER: 1048383-F1

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

| DATE | RECIPIENT'S SIGNATURE (STAFF MEMBER) |
|---|---|

USP LVN

Printed on Recycled Paper

BP–229(13)
APRIL 1982

**U.S. DEPARTMENT OF JUSTICE**

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | MAXWELL, WILLIAM | 71944-279 | TA | BML |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A- INMATE REQUEST**

I want to appeal my BP-8 response (attached) I asked for 3 sets of relief therein and was delayed from being transferred to home confinement, under the CARES Act, §3624(c)(2) expansion provision. Additionally, according to your letter to my counsel, dated May 20, 2020, delivered on or after June 10, 2020, you based your response (erroneously) on Hugh Hurwitz's Memo of April 22, 2020. Be that as it may, you did not address my Compassionate Release request or my transfer to community confinement under the Section 3621(b)(1)-(5) factors, in good faith not addressed a percentage of sentence to serve. These, all in violation of Wedelstedt, Fults, Levine, and Woodall; addressed with particularity in my counsel's letters and my e-mails to you throughout April 2020.

For these reasons, and in furtherance of my administrative remedies, I am appealing my BP-8, adopting the arguments therein seeking home confinement under §3582 and S. Bill 4034 "COVID-19 Safer Detention Act"; and transfer to Community Confinement under §3621(b)(1)-(5)—determined in good faith without consideration of the percentage of sentence served.

6/26/2020
_____
DATE

_____
SIGNATURE OF REQUESTER

**Part B- RESPONSE**

_____
DATE

_____
WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**

CASE NUMBER: _____

CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

BP - 8

Dated: 06/18/2020
With Exhibits

# BP-8 With Exhibits

1  BP-8

2  March 26, 2020  A.G. Directive

3  March 29, 2020  Copout to Unit Manager Rivera

4  March 30, 2020  Release/Transfer to Home Confinement Package

5  April 7, 2020  Expanded request to Unit Mgr. Rivera

6  April 8, 2020  Attorney correspondence to warden

7  April 10, 2020  Designation of William Maxwell as High Risk due to COVID-19

8  April 23, 2020  BOP represented to Wall Street Journal that referred inmates would not be delayed

9  April 24, 2020  Copout to Unit Mgr. Rivera

10  April 29, 2020  Request to Warden Garrido

11  April 30, 2020  Attorney correspondence to Warden Garrido

12  March 30, 2020  Letter of Recommendation

13  April 22, 2020  Hugh Hurwitz Memo

BP–8

BMX 1330.18A
May 8, 2015
Page 6

Attachment A



# DOCUMENTATION OF INFORMAL RESOLUTION ATTEMPT

Bureau of Prisons P1330.18, Administrative Remedy Program, (January 6, 2014), requires, in most cases, that inmates attempt informal resolution of grievances prior to filing a formal-written complaint. This form shall be used to document your efforts towards informally resolving your grievance.

Inmate Name: __William Maxwell__     Reg. No.: __71944-279__     Unit: __TA__

Specific Complaint and Requested Relief: I am requesting to be transferred to home confinement, pursuant to 18 U.S.C. §3621, 3624, and 3582(c)(1)(A)(i).

  1) On March 26, 2020, AG Barr issued his Directive to the BOP.
  2) On March 27, 2020, Congress passed the CARES Act, amending §3621(c) to allow for expanded home confinement.
  3) On March 29, 2020, I sent an electronic cop-out requesting home confinement, to Mr. Rivera.
  4) On March 30, 2020, I filled out a complete release packet, and met with Mr. Rivera. Mr. Rivera was informative and helpeful.
  5) On April 3, 2020, AG Barr issued his second directive expanding home confinement under the CARES Act.
  6) On April 3, 2020, the Warden invited inmates to request home confinement.
  7) On April 7, 2020, I sent an expanded request for home confinement, to Mr. Rivera.
  8) On April 8, 2020, my attorney sent a full request for home confinement to the warden, I executed release of information forms to allow the BOP contact with my counsel.
[ continued on attached page(s) ]

Efforts Made By Inmate To Informally Resolve Grievance (be specific):

See above, and attached page(s).

Counselor's Comments:

ON APRIL 16TH UNIT TEAM COMPLETED A REQUEST FOR HOME CONFINEMENT AND SENT IT TO THE WARDEN FOR APPROVAL. THE CMC DENIED THE REQUEST STATING "THIS INMATE DOES NOT QUALIFY FOR HC UNDER ANY CURRENT CRITERIA, HE IS NOT ELIGIBLE!" AND THE ASSOCIATE WARDEN DENIED THE REQUEST, STATING "DOESN'T MEET THE 50% RULE."

L. JEST/     6/18/2020

Correctional Counselor's Review / Date          Unit Manager's Review / Date

## BP-8 CONTINUATION PAGE

9) On April 9, 2020, BOP spokesman notified the Court in the Court in the Oakdale case that inmates would no longer be held to an arbitrary percentage of their sentence to be served before being transferred to home confinement.

10) On April 10, 2020, Warden Garrido gave me notice that I was "high risk" for severe illness or death due to COVID-19.

11) On April 12, 2020, I was notified I qualified for home confinement.

12) On April 14, 2020, Medical approved my transfer (no medical care in 90 days required).

13) On April 16, 2020, I signed my release papers.

14) I meet all the statutory requirements and discretionary factors to be placed on home confinement, to include no current or past crime of violence, sex offense, or terrorism; no detainers; not illegal alien; pre-release plan (verifiable); below care level IV mental health; no disciplinary shots in my past 12 months or BOP history; I am below -0- on my BRAVO Score; I am below -0- on my PATTERN Score; I have at all times been involved in pre-release programming and productive programming and productive activities as that term is defined under the First Step Act; my transfer to home confinement would save the BOP money; and Government stipulated at my pre-sentencing hearing that I was not a flight risk or a danger to the community.

15) On April 20, 2020, the AW stopped the processing of my paperwork (on information and belief).

16) On April 28, 2020, I sent a request for help with my home confinement to the Warden.

17) On May 4, 2020, my attorney sent a follow letter to the warden on home confinement.

18) The Wedelstedt v. Wiley case precludes the BOP denying my transfer to home confinement based on the amount of time left on my sentence.

19) The Unit Team has done all they can to expedite my home confinement, but I have not been transferred to home confinement.

See attached copies of correspondence and relevant documents.



## Office of the Attorney General
### Washington, D. C. 20530

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:           THE ATTORNEY GENERAL

SUBJECT:        Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic

Thank you for your tremendous service to our nation during the present crisis. The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times. We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe. At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

### I. TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances. I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

Exhibit C

BP-8 - 1(1 of 3)

Memorandum from the Attorney General
Subject: Department of Justice COVID-19 Hoarding and Price Gouging Task Force

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.    PROTECTING THE PUBLIC

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.

BP-8-2(2 of 3)

Memorandum from the Attorney General                                              Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

BP-8-1 (3 of 3)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

------------------------------------------------------------------------------------------------

FROM: 71944279 MAXWELL, WILLIAM
TO: Unit Management BLD 1 LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 03/29/2020 09:41 AM

To: Mr. Rivera
Inmate Work Assignment: Education

Mr. Rivera

Re: Transfer to home confinement pursuant to Attorney General Barr's 3.26.2020 Directive to the BOP

Mr. Rivera,

I am herewith requesting transfer to home confinement under Attorney General Barr's 3.26.2020 Directive to the BOP. I am preparing a memorandum in support of this request addressing all of the statutory and discretionary factors as outlined in the Attorney General's Directive. Included in the memorandum is a detailed home confinement plan, letters of commitment and support, staff letters and other materials for your consideration in conjunction with this request. That memorandum will be delivered to you this week. Thank you for your considerations in this regard.

Respectfully submitted,

William Maxwell

BP 8-2 (1 of 1)

WILLIAM MAXWELL          Reg # 71944-279

Unit Manager L. Rivera
Unit T-A
FCI Beaumont-low
Beaumont, Texas 77720

Re: Inmate William Maxwell's Request for Transfer to Home Confinement pursuant to Attorney General Barr's March 26, 2020 Directive published and directed to the BOP.

Mr. Rivera:

Attached hereto, to accompany my electronic "cop-out" request of March 29, 2020, is a memorandum in support addressing all the statutory and discretionary factors (Including Pre-Release Plan for Reentry) to be considered by you in determining whether to transfer me to home confinement. These include items easily verified along with supporting documentation, letter(s) of support and other materials, to support my request to be transferred to home confinement.

Respectfully submitted,

William Maxwell
Reg # 71944-279

BP-8-3 (1 of 6)

## TABLE OF CONTENTS

1) Home Confinement Worksheet .................................................

2) William Maxwell's CV at the time of entry into the BOP .............

3) William Maxwell's Release Address ........................................

4) Persons to occupy residence with William Maxwell .................

5) Telephone Number of the Residence ....................................

6) William Maxwell's Future Employer ......................................

7) Employer's Address ............................................................

8) Employer's Phone number ..................................................

9) William Maxwell type of work .............................................

10) Inmate's Sentencing District ..............................................

11) Detainers (none) ..............................................................

12) Special Conditions of Release ...........................................

13) Release Plan ..................................................................

BP-8-3 (2 of 6)

WILLIAM MAXWELL

Reg. # 71944-279

D.O.B.        : 5-4-59
Age           : 60, 61 on May 4, 2020.
Co-Morbidity  : Asthma, Skin Cancer

PRIOR WORK HISTORY

William Maxwell, P.C./ William Maxwell, P.L.L.C.    2004-2014
    Lead Counsel, Small litigation firm, specializing in criminal, civil, and
    Administrative law 5-10 employees.  Currently licensed in Texas. Texas
    Bar Number 24028775. (License Suspended pending appeal) Admitted before
    all Texas Courts, United States District Court Southern District of Texas, United
    States District Court Northern District of Texas, United States Court of Appeals
    for the Fifth Circuit.

Gilbert & Maxwell, P.L.L.C.    2000-2004
    Partner in Firm. Small litigation firm, specializing in criminal, civil and Administrative
    law, 10-12 employees

Gilbert Law Firm,  1996-2000
    Associate in law firm. Civil litigation firm

Gilbert & Mestemaker, P.C.   1994-1996
    Paralegal

Mall-Mart,  1989-1994
    Founder and Owner of a small chain of Retail stores in Houston and
    Lake Jackson, Texas

EDUCATION

University of Houston --PB/MA English Legal History, American Legal History
    1999-2000

Thurgood Marshall School of Law -- J.D.  1996-1999 (Graduated Cum Laude)

University of Houston  --PB/MA Sociology 1988-1989

Baylor University, Waco, Texas -- BBA Business Administration Mgt. Finance
    1977-1982              -- BA Radio TV, Film

AWARDS/MEMBERSHIPS

Thurgood Marhall - Awards

Graduated Cum Laude

BP-8-2 (3 of 6)

Amjur, Corpus Juris, Execellencia in Contracts, Criminal Law, Torts, Texas Practice -Constitutional Law, Evidence

Mock Trial team, Moot Court team, Law Review

ASSOCIATIONS

American Trial Lawyers Association, Texas Trial Lawyers Association

LICENSES

FCC-1 Broadcast License, Texas Bar License # 24028775 (Suspended pending appeal) TDL # 24028775 Valid until 5-4-2020 (Extended due to Corona Virus until August 4, 2020)

PUBLICATIONS/SEMINARS PRESENTED

"Workers Compensation Review", "Personal Injury Review" Texas Provider Resource 2001-2004

Presenter for Texas Chiropractic Association for CE credits 2000-2004

PERSONAL

Children: Coral Maxwell Age 14

RP-8-3 (4 of 6)

**RELEASE ADDRESS:**

Faith Christian Center (19 Acre Complex)
3940 Vista Road
Pasadena, Texas 77504
(713) 944-7755 (Main Switch Board)

Complex Living Quarters

**PERSONS TO OCCUPY RESIDENCE**

William Maxwell is joint managing conservator of Coral Carin Maxwell, D.O.B. 10.24 2005. Coral is 14 years of age and has resided exclusively with her mother since July 3, 2014 (date of incarceration). Crystal Maxwell, Coral's mother (both on approved visitor's list) is remarried. Coral will begin, after the Corona Virus clears, to reside, pursuant with the divorce decree with William Maxwell 50% of the time. Coral attends St. Anne's Private School in Houston, Texas.

**WILLIAM MAXWELL'S FUTURE EMPLOYER**

Faith Christian Center has agreed to provide living quarters, food, utilities, and necessary expenses during the Corona Virus pandemic lockdown period (see Correspondence attached). William Maxwell will provide paralegal services, substitute teaching, office assistance and related support to Faith Christian Center (part time), upon the Center's reopening after the pandemic has passed. During the pandemic no costs will be incurred by William Maxwell. After the Center has reopened, William Maxwell work and services to the Center in exchange for support at a rate to exceed minimum wage.

Outside employment. Several members of the church have agreed to consider William Maxwell for employment after a final interview to be conducted post pandemic. William Maxwell will perform education and skills related employment as approved by the supervising agency.

**EMPLOYER'S ADDRESS**

Faith Christian Center
3940 Vista Road
Pasadena, Texas 77504
(713) 944-7755 (main switchboard)

BP-8-3 (5 of 6)

## SENTENCING COURT

William Maxwell was sentenced by the United States District Court of New Jersey, Camden. William Maxwell's direct appeal is pre-filing and pending in the Third Circuit Court of Appeals in Philadelphia, PA.

## DETAINERS

William Maxwell has no detainers nor any criminal history.

## SPECIAL CONDITIONS OF RELEASE

RP-8-3 (6 of 6)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

---------------------------------------------------------------------------------------------

FROM: 71944279 MAXWELL, WILLIAM
TO: Unit Management BLD 1 LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 04/07/2020 12:18 PM

To: Mr. L. Rivera
Inmate Work Assignment: Education

Mr. Rivera:

I wanted to memorialize our conversations in view of the Directive of the AG Barr on April 3, 2020, and the Bulletin Board posting at the institution on Monday April 6, 2020. In particular:

In March 26, 2020, AG Barr issued his first Directive to the BOP for release of inmates to home confinement. There have now been at least two public follow-on Directives to the BOP (one the subject of ACLU Litigation for not being expansive enough) from the AG. Most recently, on April 3, 2020, the AG invoked his authority under Section 12003(b)(2) of the CARES ACT to declare that the Corona Virus was affecting "the operation of the BOP." AG Barr instructed a "new cohort" of inmates (no longer subject to any considerations based on the amount of time remaining on an inmates sentence) who would qualify to be transferred to home confinement based on age and co-morbidity (in my case asthma and Skin Cancer that has been treated by the BOP) and laid out a order and framework to follow to send inmates to home confinement as quickly as possible.

Anticipating such action, I spoke with you and prepared a pre-release packet and request for transfer to home confinement, on March 29, 2020. I prepared a home confinement work sheet that was included in my packet addressing all of the factors to be considered by the BOP in processing my release due to my high risk because of my asthma. The worksheet was based on AG Barr's Directives and the relevant statutory authority for placing inmates on home confinement. Those are found collectively at 18 U.S.C. Section(s) 3621; 3624; 3632; and 34 U.S.C. 60541 and in the BOP policy statements (as modified by the AG's Directives and the CARES ACT).

I additionally electronically requested to be placed on home confinement on March 29, 2020. I additionally prepared a detailed package to include the "home confinement" worksheet and a verifiable pre-release home plan. Those were all tended to you on March 29, 2020. I understand from you that my request was promptly reviewed, and after it was determined that I qualified to be placed on home confinement and after I was approved to be placed on home confinement it was forwarded for processing so that I could be placed on home confinement on or before April 3, 2020.

In support of my application, Faith Christian Center sent you a letter via email and overnight hard copy. The details of the church's sponsorship of my home confinement residence, food, utilities, employment, and agreement to abide by any restrictions placed on me by the BOP or PO while on home confinement.

Both of these (email and hard copy) should by now have been included in my pre-release home confinement application.

In Summary:

I have a detailed home release package, providing for residence, land line phone, food, utilities, employment and supervision in addition to any requirements placed on me by the BOP or Probation Office.

I have none of the exclusionary factors: I am not serving a life sentence, I have no criminal history at all and no history of violence. I have no sex offenses or history of sex offenses.

I qualify under all of the discretionary factors from the statutory authority and the Directives of the Attorney General.

I am 60 years old with co-morbidity factors of asthma and skin cancer;
I have no prior crimes at all;
I have the lowest possible custody classification (security points);
I have no history of violence of sex offenses while in BOP custody;
I have no escape attempts;
Home confinement will save the BOP money;
I have the lowest possible PATTERN SCORE;
I have multiple CDC Risk Factors -- 60 years of age, asthma, skin cancer;
I have no prison violence or gang related activities;

RP-8-4 (1 of 2)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

--------------------------------------------------------------------------------

I have no disciplinary reports at all;
I have a verifiable re-entry plan;
I will be isolated (in my own housing unit) during the Covid-19 period at the Church facility;
I have a life long history of asthma and decades long history of skin cancer for which the BOP has treated me with two modalities (medications) for asthma and have had several cancerous lesions removed from my arms while in the BOP.

IN that I fully qualify in all ways for placement on home confinement, and in memorialization of the actions I have taken, and the actions that you have taken on my behalf, I renew my request to be expedited to home confinement (in accordance with the statutory authority and Directives of the Attorney General) especially in view of my age, asthma, skin cancer, and high risk for disastrous consequences due to the Corona Virus pandemic.

Respectfully submitted;

William Maxwell
Reg # 71944-279

** CARES ACT of March 27, 2020, eliminates any 2/3rds sentence requirement after AG's April 3, 2020 Directive and Declaration.

BP-8-4 (2 of 2)

TRANSMISSION VERIFICATION REPORT

```
TIME  : 04/08/2020 01:46PM
NAME  :
FAX   :
TEL   :
SER.# : U64208K6N305641
```

```
DATE,TIME          04/08  01:45PM
FAX NO./NAME       14096263410
DURATION           00:01:16
PAGE(S)            04
RESULT             OK
MODE               STANDARD
                   ECM
```

## Freedman & Grinshpun, PC

### *for your business and personal needs*

Gary B. Freedman, Esq., LLM*
Arkadiy Grinshpun, Esq., LLM*
*Admitted PA and NJ Bar

7909 Bustleton Avenue
Philadelphia, PA 19152
215-708-7390
fax 215-708-7391

## FACSIMILE TRANSMISSION COVER SHEET

FROM

____ Gary B. Freedman, Esquire

____ Arkadiy Grinshpun, Esquire

____ REPLY NECESSARY

PARALEGAL

__x__ Kim Bullard

____

____ NO REPLY

DATE: __4/8/2020 1:13 PM__

RE: __William Maxwell #71944-279    Gary McDuff #59934-079__

TO: __Warden F.J. Garrido__          FACSIMILE NO: __409-626-3410__

Total number of pages, including cover: __4__

__x__ Original will not follow
____ Original will follow by:

*Regular mail*

13P-8-5 (1 of 4)

## Freedman & Grinshpun, PC

*for your business and personal needs*

Gary B. Freedman, Esq., LLM*
Arkadiy Grinshpun, Esq., LLM*

*Admitted PA and NJ Bar

7909 Bustleton Avenue
Philadelphia, PA 19152
215-708-7390
fax 215-708-7391

April 8, 2020

F.J. Garrido, Warden
FCI Beaumont Low
P.O. Box 26025
Beaumont, Texas 77720

RE:    William Maxwell - Reg # 71944-279
       Gary McDuff - Reg # 59934-079

Dear Warden Garrido:

I am writing to you on behalf of my clients, William Maxwell (Reg # 71944-279) and Gary McDuff (Reg # 59934-079), pending release under the Attorney General's prior Directives to the BOP on March 26, 2020 and April 3, 2020, based on the Corona Virus and its deadly effect on the BOP.

As you are aware on March 26, 2020, the Attorney General issued his first public Directive to the BOP regarding the use of home confinement under the statutory authority and discretionary authority of the BOP found in Title 18 U.S.C. Sections 3621 and 3624 and Title 34 U.S.C. Section 60541. Those authorities ultimately led to the passage of the First Step Act in December of 2018. Therein, the Congress allowed for inmates to be placed in home confinement for the last two-thirds of their sentence, provided they met certain specified conditions, at the BOP's discretion. The March 26, 2020 Directive to the BOP ordered the BOP "prioritize" the use of home confinement due to the outbreak of the Corona Virus.

On March 27, 2020, the Congress passed the CARES Act. In the CARES Act, Section 12003(b)(2), the Congress allowed for the waiver of restrictions and expansion of the use of home confinement when the Attorney General declares that the pandemic has materially affected the BOP. The time period of the effectiveness of the changes in the statutes authorized by the CARES Act currently runs through May 30, 2020 and can be expanded based on the President's declaration (at this point, extension) of a National Emergency.

BP-8-5 (2 of 4)

The Attorney General in the April 3, 2020 Declaration made such a declaration of the pandemic materially affecting the BOP.

On April 3, 2020, the Attorney General issued another Directive to the BOP to expedite the release of inmates over the age of 60 and inmates who have co-morbidity medical issues as described by the CDC. This was largely due to the outbreaks at FCI Oakdale, FCI Elkton, and FCI Danbury, which had resulted in multiple deaths due to the virus and a larger number of cases of COVID-19 and multiple hospitalizations. This April 3, 2020, the Attorney General identified a "new cohort" of inmates who are expected to particularly exposed to the dangers of the COVID-19 virus. The factors that I will list below, were address in the Statutes and in the Attorney General's Directives to the BOP.

Additionally, on April 6, 2020 your institution issued a memorandum to the inmates that their files were being reviewed for release to home confinement based on the CARES ACT and the Attorney General's Directive to the BOP. It is for these issues that I write to you today.

My Client, William Maxwell is over the age of 60 (61 in May). He has had asthma his entire life and is currently being treated by the BOP with a steroid as well as a emergency inhaler. He has previously had skin cancer lesions removed by surgery and the BOP has frozen off several lesions during his time in the BOP.

My Client, Gary McDuff is over the age of 60 (66 this year). He has an extensive history of skin cancer lesions that have been frozen off by the BOP during his time in the BOP.

The statutes and the Attorney General Directives provide for exclusionary factors which would preclude an inmate from consideration for home confinement. My clients have none of these.

Inmates to be released to home confinement may not have life sentences, be sex offenders or violent offenders. Neither of my clients have any of these exclusionary factors.

The statutes and the Attorney General Directives provide for discretionary factors (permissive factors for the BOP to consider in releasing the inmate to serve the balance of their sentence on home confinement, my clients have all -- every single factor in their favor).

Those factors are: Over the Age of 60; Co-morbidity factors (as noted above) as determined by the CDC; lowest possible recidivism scores as determined by PATTERN SCORE (-0-); lowest security rating (my clients are the lowest security ratings -0- points); they have filed a verifiable home release plan (they are being sponsored by Faith Christian Church, which the Church has previously provided required verification; they have no gang affiliation, they have no violence in prison, they have no sexual activity in prison, release would be a cost savings to the BOP, they have been determined by their Unit Manager L. Rivera to qualify for home confinement and he has recommended home confinement; they have filed with Unit Manager L. Rivera a packet of all the information required on the BOP Form A210 pertaining to their release; and finally none of the discretionary factors weigh against them.

BP-8-5  (3 of 4)

A point of clarification, the 2/3rds requirement previously required under Title 34 U.S.C. Section 60541 is no longer applicable after the Attorney General's latest Directive to the BOP. By way of reference and illustration, William Maxwell's brother is also in the BOP custody. He is housed in Tennessee at Millington Camp. He began his sentence at the same time as William Maxwell and has not reached his 2/3rds release date. Mr. John Maxwell. Jr. has been noted for release and executed is release papers and will be released in the near future and be released to Nashville, Tennessee.

Thank you for your prompt attention to this matter. Please feel free to call me at if you have any questions or concerns.

Sincerely yours,

Arkadiy Grinshpun, Esquire

AG/kab
Via Fax – (409) 626-3410

cc:     Complex Counsel (Tina Hauk, Esq.)
        FCI Beaumont Low
        P.O. Box 26025
        Beaumont, Texas 77720

BP-8-5 (4 of 4)



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

P. O.  Box 26035
Beaumont, Texas 77720

April 10, 2020

MEMORANDUM FOR INMATE WILLIAM MAXWELL, REG. NO. 71944-279
(T04-057U)

FROM:         F. J. Garrido, Warden
              Federal Correctional Complex, Beaumont, Texas

SUBJECT:      High Risk Concern

I want to inform you the Centers for Disease Control (CDC) has
designated individuals with certain health conditions to be at
increased risk of experiencing more severe effects of
contracting COVID-19.  Additionally, it has been determined
individuals over the age of 60, are considered to be in the high
risk category.

It has been determined you fall into one of these categories.
Therefore, I am highly encouraging you to be cautious with your
daily interactions with others and take the fullest
precautionary measures available to protect yourself.

You have been provided a medical face shield for your protection
while interacting with others outside of your living areas.
Additionally, sanitation materials are provided for you to
continuously sanitize your living space.  There are bleach
mixtures and other chemicals being provided.  I highly encourage
you to take advantage of these opportunities to properly
sanitize your cell and living areas on a daily basis.
Additional CDC guidance indicates regular hand washing, and
social distancing will greatly reduce your risk for exposure.

As we continue to implement preventative measures, please be
aware our goal is to protect the inmate population from
exposure.  Due to your high-risk potential, we encourage you to
take all measures to aid us in these efforts.

BP-8-6 (1 of 1)

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/justice-department-clarifies-coronavirus-driven-inmate-releases-11587594242

U.S.

# Confusion Hampers Coronavirus-Driven Inmate Releases

Shifting policy led to some federal prisoners being told they were eligible for home confinement, only to have it revoked



Former New York state Senate Majority Leader Dean Skelos, as he arrived for sentencing in Manhattan in 2018. Mr. Skelos, who has Covid-19, is serving a 51-month prison term.
PHOTO: JUSTIN LANE/EPA-EFE/REX/SHUTTERSTOCK

*By* ⋯⋯⋯⋯⋯⋯ *and* ⋯⋯⋯⋯⋯⋯⋯⋯
Updated April 23, 2020 1:49 pm ET

The Justice Department said Wednesday that federal prison officials could consider inmates for early release even if they haven't yet served half of their sentences, clarifying a shifting policy that has sown confusion across the nation's prisons and courts in recent days.

Dozens of inmates who had been granted early release as part of an effort to stem the spread of the coronavirus were told this week they hadn't served enough time to qualify, according to prisoners and court filings. Inmates, prosecutors and federal judges demanded prison officials explain their rules and criteria for releasing inmates during the pandemic.

A department spokesman said the federal Bureau of Prisons "intends to expeditiously transfer all inmates to home confinement who were previously referred" for it, as long as such transfers

BP-S-7 (1 of 4)

aren't forbidden by law or criteria set forth by Attorney General William Barr. More prisoners are approved for home confinement every day, the spokesman said.

The decision will affect about 200 inmates across the federal prison system, a person familiar with the matter said.

Adding to the uncertainty, though, prison officials on Wednesday also circulated an internal memo indicating that, with some exceptions, they would prioritize early release for those who have served more than 50% of their sentences and those who have 18 months or less left and have served 25% of their terms. The memo, reviewed by The Wall Street Journal, said those guidelines would be "subject to revision as the situation progresses."

Confusion over rules for early release represented the latest challenge for the federal system in its effort to limit the virus's spread behind bars. The bureau said Wednesday that at least 566 inmates and 342 employees had tested positive for Covid-19, the disease caused by the new coronavirus; 24 prisoners and one employee have died.

Mr. Barr directed prison officials last month to begin releasing inmates, prioritizing those who are nonviolent, have shown good conduct behind bars and are particularly at risk for complications of the disease.

The bureau said it has started placing at least 1,440 of the roughly 175,000 prisoners it holds into home confinement, but didn't say how many of those people have actually been released.

The requirement that inmates must have served at least 50% of their sentence wasn't outlined by Mr. Barr. But prison authorities had been using that precondition, according to a filing in a lawsuit over conditions at a prison in Oakdale, La.

Yet the filing also said the bureau had expanded its criteria to include even those who hadn't met that requirement.

Confusion over the 50% cutoff was apparent this week in the case of former New York state Senate majority leader Dean Skelos, whose approved release from federal prison was abruptly thrown into question.

Federal prosecutors said in a filing Friday that the 71-year-old Mr. Skelos—who is about 15 months into a 51-month sentence on federal corruption charges—had Covid-19, and had been approved for release from the Federal Correctional Institution in Otisville, N.Y., to home confinement.

Then in a letter to the court Tuesday, prosecutors said prison officials had told them the bureau "no longer believed Skelos to be eligible for home confinement," because Otisville had been told

5/7/2020

to follow the bureau's previous policy of only considering inmates who had served at least half their sentence.

In their response, lawyers for Mr. Skelos said that after he collapsed on the morning of April 8, Mr. Skelos was taken to the prison's medical facility and held in a solitary cell for 10 days without access to his lawyers, his medications or a change of clothes.

"The rollercoaster of going from a battle with Covid 19 and a dehumanizing quarantine to the tease of a potential furlough to seeing that hope extinguished just a few days later stands as yet another example of unjust punishment for Mr. Skelos and his family," his lawyers wrote.

In another Manhattan case, U.S. District Judge Ronnie Abrams on Tuesday ordered the government to explain its release policy after Lewis Stahl—who is serving a 30-month sentence for tax evasion—was told Monday he would be released to home confinement only to learn, later that day, that the BOP had reversed the approval.

It was unclear Wednesday what would happen to Messrs. Skelos and Stahl.

A policy allowing home confinement only for inmates who have served 50% of their sentence also would have affected, among others, President Trump's former personal lawyer, Michael Cohen. He was told he would be able to serve the rest of his three-year sentence for crimes including campaign-finance violations at home.

A lawyer for Mr. Cohen said the BOP hadn't responded in writing to his application for Mr. Cohen's compassionate release.

Memos from Mr. Barr say inmates should serve a 14-day quarantine, but also gave the BOP discretion to immediately release them to quarantine at home.

Prison quarantines were also posing problems, as in the case of Gerard Scparta, a former New York City police officer who pleaded guilty last year in Manhattan federal court to crimes including tax evasion and Social Security fraud.

Mr. Scparta was serving an 18-month sentence at FCI Butner in North Carolina, which has experienced one of the prison system's worst coronavirus outbreaks. Officials approved Mr. Scparta's release to serve the remainder of his term in home confinement, after a 14-day quarantine in the prison.

BP-8-7 (304)

5/7/2020                    Confusion Hampers Coronavirus-Driven Inmate Releases - WSJ

Mr. Scparta's "quarantine," according to his lawyers, had him confined in proximity to staff and other inmates. And four days into it, prison officials said Mr. Scparta had to restart the 14-day clock after an inmate he was housed with tested positive.

In court filings, prosecutors didn't dispute that he was in contact with other inmates, saying that BOP "is best-equipped to determine whether and how to quarantine the defendant."

In a decision filed Monday, U.S. District Judge Alison Nathan described the BOP's approach as "Kafkaesque," ordering the government to release Mr. Scparta immediately.

Mr. Scparta was released from prison on Monday and is self-quarantining at home in Orange County, N.Y., said his lawyer, Joseph Mure Jr.

Write to Sadie Gurman at sadie.gurman@wsj.com and Rebecca Davis O'Brien at Rebecca.OBrien@wsj.com

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

BP-8-7 (4 of 4)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

---------------------------------------------------------------------------------------------------

FROM: 71944279 MAXWELL, WILLIAM
TO: Unit Management BLD 1 LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 04/24/2020 12:45 PM

To: Unit Manager Rivera
Inmate Work Assignment: Education

Mr. Rivera, below is a letter that I would like to send to the Warden on my home confinement. Because it is hard to read my hand writing I have sent it to you first so that we could discuss it prior to me sending it to the Warden as you are much better informed on the practices and procedures of the BOP regarding these matters. I look forward to discussing it with you.

F. J. Garrido Warden

Re: Home Confinement placement

Warden Garrido:

I need your help and guidance on my home confinement placement. I am in all ways qualified (by your April 23 memo) and have previously signed my release papers on April 16, 2020. However, due to the kerfuffle on April 20, the AW erroneously stopped processing my papers despite my age and CDC co morbidity factors because I have not served 50% of my sentence (Not a totality of the circumstances analysis).

Background

1) After the AG memo on March 26, the CARES Act passed on March 27, I met with Mr. Rivera on March 29 to discuss my placement on home confinement. He was very helpful and knowledgeable regarding the statutory and discretionary authority of the BOP.

2) We discussed the statutory factors, the BOP policy statements, the C.F.R. regulations and the case law, in include the Wedelstedt case (ordering that the denial of home confinement based solely on the amount of time served by the inmate to be unlawful).

3) Based on our discussions I prepared a detailed and verifiable pre-release packet for his consideration. The sponsoring Church sent a supporting letter noting their sponsorship of my home confinement and isolation during the COVID-19 period.

4) On April 7, I submitted a detailed email to Mr. Rivera outlining our discussions.

5) On April 8, my attorney sent a fax to you regarding my home confinement.

6) On April 9, in court filings the BOP identified its home confinement criteria. That substantively matched my April 7 email to Mr. Rivera and your April 23 memo to the BOP population.

7) On April 10, you gave me a directive that I was "high risk" based on the CDC factors for death or serious illness due to the COVID-19 virus.

8) On April 12, I was notified that I qualified for home confinement.

9) On April 16, I signed my release papers.

10) On April 20, my release papers reached the AW who erroneously noted I was not qualified because I had not yet served 50% of my sentence. This is in conflict with your memo of April 23, and the Attorney General's March 26, 2020 directive regarding a totality of the circumstances analysis and my high risk of death or severe illness due to age and CDC co-morbidity factors.

11) On April 23, you issued your second inmate memo detailing the criteria to be considered for inmate placement on home confinement. Your April 23 memo matches substantively my April 7, email to Mr. Rivera noting our discussions and matches the fax from my attorney to you on April 8.

BP-8-8 (1 of 2)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A
-----------------------------------------------------------------------------------------------------

12) In addition to meeting the statutory and discretionary factors, I have been a model prisoner. I was a model pre-trial detainee for almost 3 years. The government stipulated that I was not a flight risk or danger to the community at my pre-sentencing bail hearing. I have a letter of recommendation to Mr. Rivera from my law library supervisor.

13) I have forwarded my prior emails with Mr. Rivera to you to expand upon and elucidate you in our discussions. I have discussed this email with Mr. Rivera and sought his guidance and counsel as well.

14) My brother, John Maxwell, who is housed at Millington camp, TN has been processed and is being transferred to home confinement on May 1. My family advises me that Millington Camp inmates were advised yesterday (April 23, 2020) that all inmates who signed their pre-release papers prior to the abrupt change on April 20 would be processed to home confinement. This information was confirmed by the Wall Street Journal reporting that was based on directives from the BOP and memos from the BOP (reported on April 23, 2020).

15) My asthma, age, weakened immune system make me particularly vulnerable to the COVID-19 virus as you advised me on April 10 under the CDC guidelines.

16) Please help me and correct the error that stopped my paperwork's processing for home confinement. Thank you for your attention and assistance and guidance with this matter.

Respectfully submitted,

William Maxwell
71944-279

BP-8-8 (2of2)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

--------------------------------------------------------------------------------

FROM: 71944279 MAXWELL, WILLIAM
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 04/29/2020 05:16 PM

To: Warden F. J. Garrido
Inmate Work Assignment: Education

Dear Warden Garrido:

I need your help and guidance on my home confinement processing.

I am qualified under all the BOP factors published in your correspondence(s) to the institution on April 6, 23, 24 of 2020. I have signed my release papers. However, it is my understanding that on 20 April 2020 the AW erroneously noted that despite my qualifications to be release to home confinement along with my "high risk" factors, that you identified to me in a 10 April 2020 notice that I was at a high risk of death or severe illness due to the COVID-19, I was not qualified to be transferred to home confinement because I have not completed 50% of my sentence at this time.

Background

1) The AG issued his Directive on 26 March 2020.

2) On 27 March 2020, Congress passed the CARES ACT modifying the home confinement authority of the BOP under 18 U.S.C. Section 3624(c)(2).

3) On 29 March 2020 I sent a request to the Unit Team to be transferred to home confinement.

4) On or about 30 March 2020, I met with Mr. Rivera and discussed the BOP statutory authority under 18 U.S.C. 3621(b)(1)-(5); 3624(c)(2); 34 U.S.C. Section 60541 (discussing the qualifications to transfer to home confinement); the CARES ACT and various BOP policy statements on home confinement. Mr. Rivera was well informed and helpful in his guidance and responsiveness to my questions.

5) I further discussed the Wedelstedt case and its implications on the interpretation of Sections 3621 and 3624. Based on our detailed discussions I prepared a detailed pre-release packet in support of my request for home confinement (including a detailed pre-release plan). The sponsoring church (Faith Christian Center) sent a letter of sponsorship to Mr. Rivera noting their sponsorship (isolated residence, food, utilities, phone line during the lockdown period for COVID-19, along with employment after the isolation period is ended).

6) On 7 April 2020 I submitted a detailed email to Mr. Rivera noting our discussions and the particularities of our discussions.

7) On 8 April 2020 my attorney sent you an email regarding my application for home confinement.

8) On 9 April 2020 the BOP disclosed its criteria for determining who was eligible for home confinement in court filings in the Oakdale case. That further noted that serving 50% of your sentence was not a determinative factor (in keeping with the statutory authority under Sections 3621 and 3624).

9) On 10 April 2020 you gave me a notice of my "high at risk" status under the CDC factors due to my age and co-morbidity factors (asthma and weakened immune system due to my asthma medicine).

10) On 12 April 2020 I was notified by unit team that I was qualified to be submitted for home confinement.

11) On 14 April 2020 medical at Beaumont Low determine that I had no long term medical issues that would need attention in the next 90 days (in response to a medical directive they had received from Central Medical Director).

12) On 16 April 2020 I signed my home confinement papers.

14) On 20 April 2020 AW Cutwright (is my understanding) noted that I did not qualify because I had not completed 50% of my sentence.

BP-8-9 (1 of 2)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A
--------------------------------------------------------------------------------------------------

15) On 22 April 2020 the Associate Director sent out a second memo regarding home confinement (noting that those who had not served 50% were not being given priority consideration at this time)

16) On 22 April 2020 the BOP reversed itself in a statement to the Wall Street Journal and confirmed that those who had executed their release papers would still be considered for home confinement.

17) On 23 and 24 April 2020 you sent memos to the institution noting the factors the BOP was considering for home confinement.

18) I am in all ways qualified to go to home confinement (0 or negative BRAVO Score; 0 or negative PATTERN score; no disciplinary shots at all; no criminal history; no crimes of violence, sex crimes, or terrorism crimes, not an illegal alien, no detainers, verifiable pre-release plan, the government at my post trial bail hearing stipulated that I was not a flight risk or a danger to the community; I have actively programmed the entire time in prison, I have been involved in productive activities the entire time in prison.

19) Dr. Grogan sent Mr. Rivera a letter regarding my employment in education.

20) Based on the First Step Act and the Second Chance Act I have, in all probability between 4-5 years (at my current rate of accumulation and disciplinary history) remaining before I will be transferred to home confinement for the balance of my sentence.

21) My brother, John Maxwell, who entered prison at the exact same time that I was has gone to home confinement (he is at Millington Camp).

22) My case is still pre-appeal (6 years now) as the case was involved in many irregularities including the prosecutor committing suicide, the lead defense lawyer being convicted of crimes (he was under indictment during trial and did not disclose it to anyone), and has been remanded by the 3rd Circuit multiple times. I am still a licensed attorney in Texas (with my license being suspended pending appeal).

23) Due to my asthma, weakened immune system I am particularly susceptible to the COVID-19 as yon notified me on 10 April 2020.

24) Please help me with this matter and clarify my situation to me. I anticipate that my attorney will be following up with you regarding my home confinement as well.

Respectfully submitted,

William Maxwell
71944-279

BP-8-9 (2 of 2)

## Freedman & Grinshpun, PC

*for your business and personal needs*

Gary B. Freedman, Esq., LLM*
Arkadiy Grinshpun, Esq., LLM*

*Admitted PA and NJ Bar

7909 Bustleton Avenue
Philadelphia, PA 19152
215-708-7390
fax 215-708-7391

April 30, 2020

F.J. Garrido, Warden
FCI Beaumont Low
P.O. Box 26025
Beaumont, Texas 77720

RE:    William Maxwell - Reg # 71944-279

Dear Warden Garrido:

I am following-up on my April 8, 2020 correspondence to you regarding my client. (See Copy attached).

In my prior correspondence I noted the March 26, 2020 Attorney General Directive and the April 3, 2020 Attorney General Directive (regarding transferring my clients to home confinement); wherein the Attorney General made the declaration that the COVID-19 pandemic "has materially affected the BOP."

I further addressed the qualifications for my client to be released under the CARES Act which was passed by Congress on March 27, 2020. I noted the Attorney General's Directive that "the BOP was to expedite the release of inmates over the age of 60 **and** inmates who have co-morbidity medical issues as described by the CDC." [My client is over the age of 60 and have co-morbidity factors].

I noted the critical situations that had come to the forefront of the BOP at FCI Oakdale, FCI Elkton, and FCI Danbury. (In the interim Elkton has become the subject of a preliminary injunction and habeas corpus action *see Wiley v. Williams*, in the United States District Court for the Northern District of Ohio, Cause No. 4:20-cv-00794, along with dozens of other outbreaks across the BOP including at Ft. Worth with multiple deaths and hundreds of new COVID-19 cases). Since the date of my last letter/fax, the number of inmate deaths with co-morbidity factors in the BOP has substantively increased (arguably unnecessarily).

I also noted the April 6, 2020 institutional memorandum issued to the inmates regarding the inmate files being reviewed for transfer to home confinement. (It is my understanding that three weeks later no one has left from Beaumont low).

BP-8-10 (1 of 6)

Finally, I discussed my client's qualifications under the Attorney General's Directives and the statutory factors to be considered in order for inmates to be released to home confinement. It has now been three weeks and I wanted to follow-up as I have not heard from you. **Time is of the essence.**

Since the time of my last correspondence the following has transpired:

On the afternoon of April 8, 2020, my client executed "release of information" forms to allow the BOP to communicate with me.

On April 10, 2020, you (Warden F. J. Garrido) issued a notice to my client William Maxwell that the was at "high risk" for serious illness or death from the COVID-19 virus based on the CDC factors and his co-morbidity.

On April 12, 2020 my client was advised that he qualified for processing to be transferred to home confinement.

On April 14, 2020 my client was cleared by Health Services as not requiring any frequent and on-going medical care within the next 90 days.

On April 16, 2020 my client executed (signed) his release papers and home confinement agreements.

On April 20, 2020, AW Cutwright issued a memo/notice, that in her opinion, Maxwell did not qualify for transfer to home confinement because he had not completed 50% of his sentence.

On April 22, 2020 a memo was sent out by the Acting Assistant Director of Correctional Progress Division and the Assistant Director of Reentry Services Division. This memo is discussed more fully below.

On April 22, 2020 there was a public outcry from numerous media outlets regarding the BOP's about face or release of inmates. The BOP representative in response released a statement to the Wall Street Journal that the BOP "intends to expeditiously transfer inmates to home confinement who were previously referred for it." (Published at 7:45 pm 4.22.2020, reporters Rebecca Obrien and Sadie Gurman)

On April 23, 2020 and April 24, 2020 you issued a memo to the institution about the factors being considered by the BOP for inmates to be placed on home confinement (the memo substantively mirrors my fax to you on April 8, 2020., to include the release packet executed by Maxwell give to the unit team and the sponsorship for home confinement by Faith Christian Center).

In particular you noted in your April 23, 2020 institutional memo that:

"The BOP is currently reviewing all inmates to determine which ones meet the criteria, in accordance with the March 26, 2020 memorandum from the Attorney General. In assessing

2 | P a g e

BP-8-10 (2 of 6)

whether home confinement should be granted, the BOP considers the **totality of the circumstances** for each individual inmate, the statutory requirements for home confinement, and is assessing the following non-exclusive list of discretionary factors:

> 1) Review of the inmates conduct in prison, with inmates who have engaged in violent or gang-related activity or who have received a BOP violation within the last 12 months not receiving priority treatment;
> 2) Ensuring the inmate has a verifiable release plan;
> 3) Verification of the inmate's primary or prior offense history does not include violence, a sex offense, or is terrorism related;
> 4) Confirming the inmate does not have a current detainer;
> 5) Review of the security level of the facility currently housing the inmate, with priority given to inmates residing in low and minimum security facilities;
> 6) Review of the inmates score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment;
> 7) Review of the age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines.

The BOP is currently prioritizing for consideration those inmates with at risk factors **and/or** who either

> * Have served 50% or more of their sentences, and
> * Have 18 months or less remaining on their sentences and have served 25% or more of their sentences.

Referrals must be made based on appropriateness for home confinement. Consideration will be given to whether the inmate has demonstrated a verifiable reentry plan which will prevent recidivism and maximize public safety, including verification of the conditions which the inmate would be confined upon release would present a lower risk of contacting COVID-19 than the inmate would face in his or her BOP facility.

All referrals will clearly document the review of the following:

> * Specific type of release residence (House/Apt/Group Home etc...)
> * Who will the inmate live with;
> * Any health concerns of individuals in the residence;
> * Contact numbers should he/she be placed on home confinement;
> * Transpiration plan as to how the inmate will be transferred to the home confinement location.

Inmates determined to have a viable release residence will be screened by Health Serv. and a determination made as to if the inmate requires frequent and on-going medical care within the next 90 days."

The BOP Acting Assistant Director's April 22, 2020 memorandum has all the above noted factors that you included in the institution memorandum but also has the following additional

BP-8-10 (3 of 6)

language... it should be noted however, that the BOP April 22, 2020 memorandum was issued prior to the BOP statement to the Wall Street Journal.

The Additional language in the Assistant Director's 4.22.2020 memo is:

"In an effort to protect the health and safety of the staff and inmates during the COVID-19 pandemic it has become imperative to review **at risk inmates** for placement on home confinement. This memorandum provides additional guidance and directives and rescinds the [BOP] memorandum dated April 3, 2020.

It should be noted that for public safety reasons in accordance with the March 26, 2020 memorandum from the Attorney General, and to ensure BOP is deploying its limited resources in the most effective manner, the BOP is assessing the following factors to ensure inmates are suitable for home confinement" [Followed by the Seven Factors].

"In addition, and in order to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who served a certain portion of their sentences, or who only have a relatively short amount of time remaining on their sentences. While these priority factors are subject to [bold] deviation [end bold] in the BOP's discretion in certain circumstances and are subject to revision as the situation progresses, at this time, the BOP is prioritizing for consideration those inmates who either:

    * Have served 50% of their sentences or
    * Have 18 months or less remaining on their sentences and have served 25% of their sentences."

[The remainder of the April 22, 2020 memo of the Acting Assistant Director of the Correctional Program Division and the Assistant Director of Reentry Services Division is substantively about BOP procedures and processes].

**<u>As previously noted in my April 8, 2020 correspondence my client has had exemplary conduct while incarcerated:</u>**

- He does not have violent conduct in prison, or a prior history of violence, or a current charge for violence;
- He does not have gang related activities;
- He does not have any disciplinary shots in the past 12 months (no sustained shots at all the entire time of incarceration);
- He has a verifiable release plan (Faith Christian Center has forwarded to the Unit Manager correspondence, noting the housing, the isolation, the support, the employment, the financial support required along with an agreement to abide by any BOP or P.O. requirements regarding Maxwell);
- He does not have any sex offense or history of sex offense, neither has any terrorism related charges;
- He does not have any detainers;
- He is located at a low security facility, each with minimum security points;
- He is at or below -0- on his PATTERN scores;
- He is at or below -0- on his BRAVO scores;

4 | P a g e

BP-842 4 of 6

- He is over the age of 60 (61); Maxwell has been identified by you as at "high risk" for death or serious illness from COVID-19 (See your April 10, 2020 warning to Maxwell based on CDC factors);
- He has been sponsored by Faith Christian Center demonstrating a verifiable reentry plan which will prevent recidivism and maximize public safety. He will be housed in single person resident housing at the Church and/or School facilities providing for social distancing during the COVID-19 pandemic. Maxwell is currently housed in a dorm setting at the BOP similar to the FCI Elkton (but smaller cubes than Elkton which has 10' x 15' cubes with three inmates per cube) with the same number of inmates per housing unit (150 per unit).

Pursuant to your memos of April 23, 2020 and April 24, 2020, my client qualifies in all ways to be transferred to home confinement. Further, *Wedelstedt v. Wiley*, 477 F.3d 1160 (10th Cir. 2007) is generally considered to be the bell weather case on inmate transfer to home confinement or halfway house (RRC). In *Wedelstedt* the Court discusses transfer to RRC/home confinement under the the "clear and unambiguous' language of Congress under Section 3621(b) and under the mandatory language of the pre-release custody paradigm of 18 U.S.C. Section 3624(c). The Section 3621(b) factors inform an inmate transfer to home confinement and define the scope of the BOP's discretion in the transfer of inmates. The Section 3624(c) mandate addresses the BOP's affirmative obligation to a prisoner that the last 6 months (or 10%) of their sentence be spent in home confinement. The CARES Act, Section 12003(b)(2) modified the BOP's affirmative mandate to place inmates in home confinement for extended periods due to the death and severe illness that is affecting inmates in the BOP as a result of the COVID-19 virus.

The Court in *Wedelstedt* looked at the interplay between Sections 3621(b) and 3624(c) and observed that three other circuits "interpreted Section 3621(b) to clearly and unambiguously require the BOP to consider the five factors set out in Section 3621(b)(1)-(5) when making placement and transfer decisions..." to home confinement. *Wedelstedt*, 477 F.3d at 1164. As *Chevron USA v. NRDC*, 467 U.S. 837 (1984) made clear deference to an agency is not permitted when Congress has spoken in clear and unambiguous language. In this case, such an arbitrary exclusion (requiring inmates who in all other ways qualify for home confinement) to have served 50% of their sentence (or 25% with 18 months remaining), while meeting all other BOP factors (the BOP tools noted above are used to apply all the Section 3621(b) factors) was invalid because it excludes "an entire class of inmates (those not serving the final 10% of their sentences)" *Wedelstedt*, 477 F.3d at 1164.

In the matter under discussion, the arbitrary time factors (25% of sentence served with 18 months remaining or 50% of the sentence having been served) as published in the April 22, 2020 memo by the Acting Director and referenced in the April 23, 2020 and April 24, 2020 institutional memos notwithstanding, once an inmates meets all other qualifications published by the BOP they are eligible for home confinement regardless of the arbitrary "amount of sentence served." This is confirmed by the Second, Third, Tenth and Eighth Circuits. In fact, all circuits to have considered the issue have adopted this position. See *Levine v. Apker*, 455 F.3d 71,87 (2d Cir. 2006); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 249 (3d Cir. 2005); *Wedelstedt, supra* at 1164; *Fults v. Sanders*, 442 F.3d 1088, 1092 (8th Cir. 2006) (respectively). Each of these circuits noted that setting arbitrary percentages of sentence to be served prior to release of

BP-8-10 (5 of 6)

inmates to home confinement or RRC under Sections 3621(b) [and 3624(c) and necessarily its modifications by the CARES Act Section 12003, (b)(2), because the CARES Act, did not in anyway modify Title 18 U.S.C. Section 3621(b)] Id. (respectively).

The memorandums that you published (and the April 22, 2020 memo from the Acting Assistant Director(s)) to the inmates clearly contemplated the language from these various Circuit cases (presumptively as noted *supra* the BOP would not knowingly violate the law). My client, under the BOP published standards qualifies to be transferred to home confinement and priority is imperative due to his age, high risk co-morbidity factors, and the discretionary factors used by the BOP (to include the statutory language and factors).

My client is in a list provided by regional/central to be inmates with high risk factors for death or serious illness from COVID-19. They were approved by the unit team to be transferred to home confinement. They were cleared of any long-term medical care requirements that would prevent transfer to home confinement.

Given the factual predicates and legal precepts, please advise me, in writing, the current status of my client's request to be transferred promptly to home confinement. Additionally, this request for transfer specifically encompasses Title 18 U.S.C. Sections 3621(b) and 3624(c)(2), the CARES Act. 12003(b)(2). Concurrent herewith a petition for Compassionate Release is being drafted for my client. Please advise whether you are opposed to a petition being filed with the Sentencing Court for release for Compassionate Release. My client has previously tendered requests to the unit team and I have previously tendered a request for information on April 8, 2020 to which I have received no response.

Finally, I understand this is a busy and hectic time for all wardens (given the COVID-19 rapid spread through the BOP with active cases at approximately 50% or more of the institutions), and I, therefore, thank you in advance for your prompt reply these requests.

Sincerely yours,

Arkadiy Grinshpun, Esquire

Via Fax — (409) 626-3410

cc:     Complex Counsel (Tina Hauk, Esq.)
        FCI Beaumont Low
        P.O. Box 26025
        Beaumont, Texas 77720

6 | P a g e

BP-8-10 (6 of 6)



**U.S. Department of Justice**

*Federal Bureau of Prisons*

*Federal Correctional Complex*

P. O. Box 26025
Beaumont, Texas   77720

03-30-2020

To whom it may concern:

My name is Dr. Grogan; I am an Education Specialist, at Beaumont Federal Correctional Complex, Low Institution. I am the Special Learning Needs Teacher, Parenting and Law Library Coordinator for the low institution.

Inmate William Maxwell, Reg. 71944-279 currently has an excellent job performance progress. Any job or task assigned to him receives complete attention for details and correctness. He helps the inmate population properly research and file legal documentation for the courts. In addition, he trains all new inmate workers for the law library.

Inmate Maxwell exhibits great promise and always presents himself in a respectful way.

Any further questions can be directed to (409) 727-8172, Education Department.

Respectively,

Dr. Tiffany R. Grogan
Education Specialist

BP-8-11 (1of1)



U.S. Department of Justice
Memorandum
Federal Bureau of Prisons

*Correctional Programs Division*

*Central Office*
*320 First Street, N.W.*
*Washington, DC 20534*

April 22, 2020

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:            Andre Matevousian, Acting Assistant Director
                 Correctional Programs Division

**HUGH HURWITZ** Digitally signed by HUGH HURWITZ
Date: 2020.04.22 14:17:15 -04'00'

                 Hugh J. Hurwitz, Assistant Director
                 Reentry Services Division

SUBJECT:         Home Confinement

In an effort to protect the health and safety of staff and
inmates during the COVID-19 pandemic, it has become imperative
to review at-risk inmates for placement on home confinement.
This memorandum provides additional guidance and direction and
rescinds the memorandum dated April 3, 2020.

It should be noted that for public safety reasons, in accordance
with the March 26, 2020, memorandum from the Attorney General,
and to ensure BOP is deploying its limited resources in the most
effective manner, the BOP is currently assessing the following
factors to ensure inmates are suitable for home confinement:

- reviewing the inmate's institutional discipline history for
  the last twelve months;
- ensuring the inmate has a verifiable release plan;
- verifying the inmate's primary or prior offense history
  does not include violence, a sex offense, or terrorism
  related;
- confirming the inmate does not have a current detainer;
- reviewing the security level of the facility currently
  housing the inmate, with priority given to inmates residing
  in Low and Minimum security facilities;
- reviewing the inmate's score under PATTERN, with inmates
  who have anything above a minimum score not receiving
  priority treatment;

BP-8-1) (1 of 4)

- and reviewing the age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines.

In addition, and in order to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who served a certain portion of their sentences, or who only have a relatively short amount of time remaining on those sentences. While these priority factors are subject to deviation in the BOP's discretion in certain circumstances and are subject to revision as the situation progresses, at this time, the BOP is prioritizing for consideration those inmates who either:

- have served 50% or more of their sentences,
- or have 18 months or less remaining on their sentences and have served 25% or more of their sentences.

Additionally, pregnant inmates should be considered for viability of placement in a community program to include Mothers and Infants Together (MINT) programs and home confinement.

All inmates must be reviewed by the SIS Department at the referring facility to determine if the inmate has engaged in violent or gang-related activity in prison. Additionally, inmates must have maintained clear conduct for the past 12 months to be eligible.

Referrals must be made based on appropriateness for home confinement. Consideration should be given to whether the inmate has demonstrated a verifiable reentry plan that will prevent recidivism and maximize public safety, including verification that the conditions which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility.

All referrals should clearly document the review of the following:

- Unit Team staff will screen each inmate identified to determine if they have a viable release residence and ask questions specific to:
  - Specific type of release residence (House/Apt/Group home, etc.),
  - Who will the inmate live with,
  - Any health concerns of individuals in the residence,
  - Contact phone numbers should he/she be placed on home confinement,
  - Transportation plan as to how the inmate will be transferred to the home confinement location.

BP-8-12 (rev)

All the above information must be clearly documented on the referral for home confinement prior to submission to the RRM Office.

Inmates determined to have a viable release residence will be screened by Health Services and a determination made as to if the inmate requires frequent and on-going medical care within the next 90 days. If frequent and on-going medical care is required, then:

- Health Services staff will coordinate with Naphcare and RRMBs Health Services Specialists to determine if the inmate's medical needs can be met in the community at this time. Naphcare will set up follow-up care prior to the inmate's transfer. An inmate must transfer with AT LEAST 90 days of any prescribed medications.
- If the inmate's medical needs cannot be met in the community at this time, the inmate will remain at the BOP facility.
- If the inmate does not require frequent and on-going medical care, a referral to the community will be processed.
- All the above information must be clearly documented on the referral for home confinement prior to submission to the RRM Office.

Once an inmate is referred for home confinement due to the COVID-19 pandemic, the Case Management Activity (CMA) assignment **CV-COM-REF** should be loaded in SENTRY.

If the Warden determines there is a need to refer an inmate for placement in the community due to risk factors, or as a population management strategy during the pandemic; however, the inmate does not meet the above listed criteria, a packet should be forwarded to the Correctional Programs Division for further review. Packets should be sent to BOP-CPD/Assistant Director from the Warden's general mailbox.

Case Management Coordinators must track all inmates determined to be ineligible for home confinement or the Elderly Offender Pilot Program and enter the appropriate denial code in SENTRY. Reports outlining reason for denial must be reported to BOP-CPD/Unit Management on a weekly basis by Monday at 2:00 p.m. EST.

If an inmate does not currently qualify for home confinement under BOP criteria, they should be reviewed for placement in a

BP-8-12 (3 of 4)

Residential Reentry Center and for home confinement at a later date, in accordance with applicable laws and BOP policies.

If you have any questions, please contact David Brewer, Acting Senior Deputy Assistant Director, Correctional Programs Division, at (202)353-3638 or Alix McLearen, Senior Deputy Assistant Director, Reentry Services Division, at (202)514-4919.

BP-8-12 (4of4)

# Attachment 4

Regional Administrative Remedy Appeal No. 1048383-R1
Part B - Response

This is in response to your Regional Administrative Remedy Appeal
receipted on October 26, 2020.  You are appealing the Warden's
response to your request for home confinement placement.

In accordance with the Coronavirus Aid, Relief, and Economic
Security (CARES) Act and guidance from the United States
Attorney General, the Bureau of Prisons (BOP) has been reviewing
inmates who may be considered for home confinement.  In
determining whether an inmate may be considered for home
confinement, the BOP considers the statutory requirements for
home confinement and several discretionary criteria.  Under
these criteria, at a minimum, an inmate must ordinarily:  be a
low or minimum security inmate; have clear conduct for the past
12 months; have a minimum Prisoner Assessment Tool Targeting
Estimated Risk and Needs (PATTERN) recidivism risk score; have
an adequate and verifiable release plan; have no current
conviction or criminal history involving violent offenses, sex
offenses, or terrorism-related offenses; have no detainers; be a
United States citizen; and have served at least 50% of the
inmate's term of imprisonment, or have served at least 25% of
the term of imprisonment and have 18 months or less left to
serve.

A review of this matter reveals you have not yet served 50% of
your term of imprisonment and you have more than 18 months left
to serve. Additionally, due to the nature of your offense of
conviction, you are not considered a candidate for priority home
confinement placement under the CARES Act.

Based on the above information, your appeal is denied.

If you are dissatisfied with this response, you may appeal to
the Federal Bureau of Prisons, Office of General Counsel,
320 First Street, N.W., Washington, D.C. 20534.  Your appeal
must be received in the Office of General Counsel within 30 days
from the date of this response.

DEC 2 2 2020

_____           _____

Date                                J. Baltazar
                                    Regional Director

U.S. Department of Justice

**Regional Administrative Remedy Appeal**

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

| From: | MAXWELL, WILLIAM | 71944-279 | TA | BEAUMONT (LOW) |
|-------|------------------|-----------|-----|----------------|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A - REASON FOR APPEAL**

I wish to appeal for a <u>second</u> time. The First time, the Warden and staff refused the BP-9. Then they <u>lost</u>, and refused to produce, the response of the Region to the BP-10 (obstructing and delaying the Administrative Remedy process). When I requested the BP-10 response from Region, the Warden replied (not to what was requested--I already have one which was in my paperwork sent to Region the first time--it had been sent to my attorney) as though I had filed a new BP-9. <u>I did not!</u> I asked for the original Regional response. Then, to make themselves look as incompetent as possible, the Warden gave an asinine response. For example, the Warden states I do not have an underlying medical condition. <u>That was stupid.</u> Attached is a copy of the designation of my high risk from COVID-19 given to me <u>by the Warden</u> on April 10, 2020 (six [6] days before I signed my release papers on April 16, 2020). Next he opines that I have a crime of violence. <u>That was stupid.</u> I have a "-10" PATTERN Score because I have no violence. The Government has previously

<div align="center">[CONTINUED ON BP-10 ATTACHMENT PAGE]</div>

| 10-23-2020 | | |
|-----------|---|---|
| DATE | | SIGNATURE OF REQUESTER |

**Part B - RESPONSE**

RECEIVED

OCT 2 6 2020

BUREAU OF PRISONS
LEGAL DEPARTMENT, SCRO

| | |
|---|---|
| DATE | REGIONAL DIRECTOR |

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: 1040388-R1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|---|

SUBJECT: _____

| | | |
|---|---|---|
| DATE | | SIGNATURE, RECIPIENT OF REGIONAL APPEAL |

BP-230(13)

## BP-10 ATTACHMENT PAGE

stipulated that I am not a flight risk or danger to the community (at my bail hearing) and the Court previously instructed the jury of same.  Attached is a copy of the transcript that is in my file (I gave it to Unit Manager Rivera).

Third, the Warden opines that I have not completed fifty percent (50%) of my sentence.  My approval on April 12, 2020, was before my signing my home confinement papers on April 16, 2020, and before the fifty percent (50%) requirement was added, and at the time the BOP representative had made representations to multiple courts that all inmates previously approved (my brother and I signed our papers on the same date--he has been on home confinement since May 1, 2020--same case, same charges, same convictions) would be sent to home confinement.  In fact, the Captain advised that the only reason I had not already been sent to home confinement is because I didn't have a more high profile attorney.  (An express violation of 18 U.S.C. §3621.)

The BOP's responses and delays are in violation of my prior application, approvals by Case Manager, Unit Manager, CMC, SIS, and approval by Probation Department--Southern District of Texas-- and not in compliance with the statute(s) referenced in my original BP-8, attached.

For these reasons, I am appealing a second time, exhausting my Administrative Remedies, and demonstrating obstruction of the Administrative Remedy process.  I hereby appeal again.

See original BP-8 (with exhibits); BP-9 (with exhibits); BP-10 (with exhibits); Second BP-9 (exhibits refused)--all attached.

10-23-2020

Date

William Maxwell

SENSITIVE

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: **MAXWELL, WILLIAM**      **71944-279**      **TA**      **BML**

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|

**Part A - REASON FOR APPEAL**

I filed for transfer to RRC/home confinement under 18 U.S.C. §3621(b)(1)-(5); 18 U.S.C. §3624 as modified by the CARES Act, section 12003(b)(1)&(2), and for Compassionate Release under 18 U.S.C. §3582. The Unit Team approved my transfer to home confinement on April 12, 2020. I signed my release papers on April 16, 2020. After a series of delays prompted by the AW, and after receipt of a response from the Warden (through Counsel), I filed a formal BP-8 (documents, arguments, and chronology incorporated herein). The Case Manager (Ms. McGowan in our building) instructed us not to file a BP-9, but to send the Warden an electronic "cop-out." All of these steps have been taken and, based on the responses, I am appealing the denial/delay by the Warden of my transfer to home confinement based on all the issues noted herein.

Additionally, since April 10, 2020, when I was designated by the Warden as <u>high risk</u> for serious injury or death (see copy attached to BP-8) from COVID-19, we now have five (5) inmate cases and more than a dozen staff cases of COVID-19. Some inmates are now on on ventilators. Thousands of inmates nationwide in the BOP now have COVID-19 and dozens have died.

[CONTINUED ON BP-10 ATTACHMENT PAGE]

7/11/2020

| DATE | SIGNATURE OF REQUESTER |
|---|---|

**Part B - RESPONSE**

| DATE | REGIONAL DIRECTOR |
|---|---|

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE      CASE NUMBER: _____

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|

SUBJECT: _____

| DATE | SIGNATURE, RECIPIENT OF REGIONAL APPEAL |
|---|---|

## BP-10 ATTACHMENT PAGE

The probation department's approval of my home confinement address is attached, the Warden's denial is attached (sent to Counsel and delivered after June 10, 2020 ... dated May 20, 2020, post-marked June 5, 2020, and delivered on or after June 10, 2020), my e-mails to the Warden (none of which were responded to) are attached along with my BP-8 filing attached.  I am appealing the Warden's denial of my request to be transferred to Home Confinement / Compassionate Release.

7/1/2020

Date

William Maxwell

**UNITED STATES DISTRICT COURT**

SOUTHERN DISTRICT OF TEXAS
PROBATION OFFICE



| | | |
|---|---|---|
| **BROWNSVILLE**<br>600 E. HARRISON STREET # 103<br>BROWNSVILLE 78520-7122<br>(956) 548-2522 | | **CORPUS CHRISTI**<br>1133 N. SHORELINE STE. 124<br>CORPUS CHRISTI 78401<br>(361) 888-3145 |

BROWNSVILLE
600 E. HARRISON STREET # 103
BROWNSVILLE 78520-7122
(956) 548-2522

HOUSTON
P. O. BOX 61207
HOUSTON 77208
(713) 250-5266

GALVESTON
P. O. BOX 2670
GALVESTON 77553-2670
(409) 766-3733

LAREDO
1300 VICTORIA, SUITE 2111
LAREDO 78040
(956) 726-2255

CORPUS CHRISTI
1133 N. SHORELINE STE. 124
CORPUS CHRISTI 78401
(361) 888-3145

VICTORIA
P. O. BOX 125
VICTORIA 77902-0125
(361) 579-6640

McALLEN
1701 WEST BUSINESS 83, SUITE 729
McALLEN 78501-5159
(956) 618-8035

May 26, 2020

**REPLY TO: HOUSTON**

FCC Beaumont
Attention: Lee West
Email: lwest@bop.gov

Re:   MAXWELL, William
      Reg. No. 71944-279
      SD/TX PACTS# 287618
      <u>Second Pre-Release Investigation</u>

Dear Mr. West,·

We have investigated the release plan submitted by the above noted offender, William Maxwell. Although a home inspection cannot be completed at this time due to COVID19 concerns; the proposed residence, noted below, has been verified telephonically with H. Kevin McDuff. Mr. Maxwell will reside in a motor home parked at the address noted below. The release plan is approved. Please notify our office at the time of the transfer to the RRC and/or direct release, so that re-entry/case planning services can be provided by our office. Should you have questions, I may be reached at 713-250-5153.

Proposed residence: H. Kevin McDuff, 4400 Country Club Dr., Dickinson, Texas 77539, 832-287-8730

Sincerely,

*Elizabeth Martinez*

Elizabeth Martinez
Senior U.S. Probation Officer

Approved:

*Reginald C. Hollins*

Reginald C. Hollins
Supervising U.S. Probation Officer

cc: U.S. Probation, Newark, New Jersey
    njp_NewarkSupervision@njp.uscourts.gov

Page 1 of 1

BP-10-2 (1 of 1)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

---------------------------------------------------------------------------------------------

FROM: 71944279 MAXWELL, WILLIAM
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 06/02/2020 06:44 AM

To: Warden Garrido
Inmate Work Assignment: Education

Warden F.J. Garrido:

Re: United States v. William Maxwell; United States District Court of New Jersey

Warden:

I needed to provide notice, for purposes of protecting the record and for purposes of documenting that I have been unable to effectively participate in the preparation of my appeal.

Background:

In July of 2014 the jury in my case returned a guilty verdict. In July of 2015 I was sentenced. In August of 2015 I was transferred to this facility. In the interim, the lead prosecutor shot himself. The lead defense counsel has been prosecuted for various charges (which he was under indictment at the time he represented us), has been convicted, gone to Federal Prison, served his entire sentence and been released back into the community. This along with dozens and dozens of other issues plague my case. '

For longer than the last two months we have been locked down without effective access to our counsel. Most of our Unit Team Staff have been augmented to other positions throughout the institution as the institution struggles to deal with the COVID-19 pandemic.

I have actively sought transfer to home confinement due to my asthma and my designation as high risk for death or serious illness (by you based on my CDC co-morbidity factors) based on the Attorney General's March 26, 2020 Directive to the BOP along with the Attorney General's April 3, 2020 Directive to the BOP and the CARES Act. I have spoken with counsel and, to date, counsel has contacted you, both by fax and overnight delivery, on April 8, 2020 and April 30, 2020 to demonstrate my eligibility to be transferred to home confinement due to COVID-19.

My Unit Team has done all they can. I have been approved for home confinement. I signed my transfer/release papers on April 16, 2020; I have been cleared by medical; probation has approved my release plan; I have met all the requirements to be transferred to home confinement; and my designated out date was June 15, 2020 (2 and 1/2 months after I began seeking to remain safe from the COVID-19 virus pandemic affecting the BOP). During the time that my home confinement request has been pending more than 3000 inmates and many hundreds of staff in the BOP have contacted the virus. Dozens and dozens have died.

Both myself and counsel have documented the threat to my life and medical well being from the COVID-19. Both Congress and the Attorney General have expressed a desire to place inmates such as myself (especially in light of the fact that I am not finally convicted... my appeal is not final) on home confinement. I have been an exemplary inmate during my entire time in the BOP (and fully expect my case to be reversed). I am still a licensed attorney (with my license being suspended during the time of my appeal).

Both myself (April 7, 2020 and again on or about April 27, 2020) and counsel (April 8, 2020 and April 30, 2020) have provided notice of the you and Institution Counsel of the legal parameters to include the four Circuit cases which have all held that denying an inmate's transfer to home confinement based on a percentage of their sentence served was unlawful. And while I recognize that the Central Office memo (of April 22, 2020) may have noted that no one is being actually denied (rather not "prioritized" for transfer to home confinement) that slight of hand (by Central Office) is not sufficient to protect from the forfeiture of "sovereign immunity" for staff and BOP executives for continuing to participate in an "unlawful act" as the 4 Circuit Court's to address the matter have indicated.

During the past multiple weeks, in violation of the CARES Act, our phones have been turned off. The CARES Act, transformed the "phone privilege" into a right, when it provided for the funding for the phones during the pandemic emergency. Despite this fact and legal right, our phones have been turned off for weeks, not for any conduct for which I was involved but due to an

BP-10-3 (1 of 2)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

--------------------------------------------------------------------------------

(again) unlawful group punishment paradigm denying the administrative remedy process and the Due Process Clause of the United States.

All this being noted, my appellate brief is due to the 3rd Circuit toward the last week of June (27th of June I believe) and I am, by the phones being turned off, being obstructed from contact with my counsel and being denied an opportunity to participate in my own direct appeal. As this will be the subject of litigation going forward (especially due to the fact that I have been approved to be transferred to home confinement on June 15, 2020 .. but have not been placed in quarantine yet) I needed to provide this notice to protect the record. Please save this as it will be requested in the course of litigation.

Thank you for your prompt attention and notice of this ongoing obstruction.

Respectfully,

WTM

BP-10-3 (2 of 2)

TRULINCS 71944279 - MAXWELL, WILLIAM - Unit: BML-T-A

---------------------------------------------------------------------------------------------

FROM: 71944279
TO: Warden LOW
SUBJECT: ***Request to Staff*** MAXWELL, WILLIAM, Reg# 71944279, BML-T-A
DATE: 06/14/2020 03:32:16 PM

To: Warden Garrido
Inmate Work Assignment: Education

Dear Warden:

I needed to document for purposes of protecting the record, that we (Unit TA) have been advised not to submit a BP-8 or BP-9 to the Unit Team by Ms. McGowan (case manager in the building downstairs I believe), regarding our requests to be transferred to home confinement under multiple statutes. We were advised that this instruction was done pursuant to your wishes.

Specifically, 18 U.S.C. Section 3621(b)(1)-(5) which governs transfers to home confinement eligibility in addition to the expansion of 18 U.S.C. Section 3624(c) as modified by the CARES Act Section 12003(b)(1) & (2), and in accordance with the Attorney General's two memorandum of March 26, 2020 and April 3, 2020.

As these instructions are contrary to the Administrative Remedy Paradigm set up by the BOP under the Administrative Procedures Act, it seems prudent that a record be made establishing that the inmates in TA (me in particular) have been advised not to comply with the BP-8 and BP-9 provisions (for cases related to transfer to home confinement).

Or course the warden of an institution is at liberty to modify these provisions, conditioned on no allegations or affirmative defenses are being asserted subsequently that the inmates failed follow the strict procedural exhaustion of administrative remedies that is typically imposed by the 5th Circuit.

By way of clarification, I have provided multiple emails noting my eligibility for home confinement and request for same (April 7, 2020 and April 22, 2020), both under 18 U.S.C. Section 3621(b)(1)-(5) and Section 3624(c).. and have been determined to be eligible for home confinement by my unit team. Additionally, counsel has reached out to you on my behalf on multiple occasions (April 8, 2020; April 30, 2020) regarding same. It should be noted that in those requests I additionally, asked for release under the distinct and separate statutory paradigm 18 U.S.C. 3582 otherwise known as "compassionate release". Collectively these constitute my requests for home confinement under multiple statutory authority and were requested in the alternative.

Since the time of those prior correspondences, my verified release plan and home confinement residence has been approved by the Southern District of Texas Probation Department (On May 26, 2020). I am awaiting my transfer to quarantine prior to transfer to home confinement. Thank you for your assistance with these matters.

Please advise if I misunderstood the instructions Ms. McGowan made regarding inmate applications for home confinement, the use of BP-8, BP-9 and if so under what parameters those should either be used or not used (as it relates to home confinement).

Respectfully submitted,

VTM

BP-10-4 (1 of 1)



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

P. O.  Box 26025
Beaumont, Texas 77720

May 20, 2020

Freedman & Grinshpun, PC
7909 Bustleton Avenue
Philadelphia, Pennsylvania 19152
Attn:  Arkadiy Grinshpun, Esq.

Re:  William Maxwell, Reg. No. 71944-279

Dear Mr. Grinshpun:

I am in receipt of your correspondence dated April 30, 2020, regarding William Maxell. He is currently confined at the Federal Correctional Complex (FCC), Low Security Institution, in Beaumont, Texas. In your letter, you are requesting inmate Maxwell be released to home confinement in connection with the CARES Act and memoranda issued to the Federal Bureau of Prisons by the Attorney General regarding this topic due to the outbreak of COVID-19.

In response to your request, the Bureau of Prisons is utilizing the full scope of its various authorities to ensure that inmates at heightened risk of complications from COVID-19 are identified and housed safely and appropriately given their specific needs and circumstances. This includes modified institution operations; routine staff and inmate medical screening; use of the home confinement authority, where appropriate, based on guidance from the U.S. Attorney General; and use of compassionate release for appropriate inmates who have existing terminal and debilitated medical conditions or who are elderly and nearing the end of their sentence, as provided for in current agency policy.

BP-10-5 (1 of 4)

Grinshpun Letter
May 20, 2020
Page 2

The CARES Act authorizes the U.S. Attorney General to expand the cohort of inmates who can be considered for home confinement upon his findings of emergency conditions which are materially affecting the function of the BOP.  On April 3, 2020, the Attorney General made that finding and authorized the Director of the BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and other similarly situated BOP facilities where COVID-19 is materially affecting operations.

Pursuant to the U.S. Attorney's General's direction, the BOP will continue to monitor the situation at all of its facilities, to include FCC Beaumont, and will take swift action to exercise its expanded home confinement authority for any inmate who is found to be at risk for COVID-19 and suitable for home confinement.

Additional guidance was provided to staff via a May 8, 2020 memorandum regarding this topic.  In it, the memorandum stated that inmates who have served 50% or more of their sentence or have 18 months or less remaining on their sentence and have served 25% or more of their sentence would be prioritized for consideration for home confinement.  Inmate Maxwell does not meet this criteria, as his release date is July 17, 2031.

I trust this response adequately addresses your concerns.

Sincerely,

F. J. Garrido
Warden

BR-10-8 (2 of 4)

U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Complex - Low
P. O. Box 26025
Beaumont, TX 77720-6025

Official Business



N HOUSTON
TX 773
05 JUN '20
PM 6 L

U.S. OFFICIAL MAIL
PENALTY FOR
PRIVATE USE $300

UNITED STATES POSTAGE
PITNEY BOWES
02 1P        $ 000.50⁰
0006898331        JUN 04 2020
MAILED FROM ZIP CODE 77720

Freedman & Grinshpun, PC
7909 Bustleton Avenue
Philadelphia, Pennsylvania 19152
ATTN: Arkadiy Grinshpun, Esq.

19152-330209

**Freedman & Grinshpun, PC**
*for your business and personal needs*

**ARKADIY GRINSHPUN, ESQ.**
Attorney & Counselor at Law, L.L.M. in Taxation

7909 Bustleton Avenue
Philadelphia, PA 19152
(215) 708-7390
fax (215) 708-7891
agrinshpun@fglawpc.com

1874 E. Marlton Pike., Ste. 5
Cherry Hill, NJ 08003
(856) 424-4144
fax (856) 424-7565

Admitted PA and NJ Bar

( Legal Mail )

William Maxwell # 71944-279
FCI Beaumont Low
PO Box 26020
Beaumont, TX 77720

77720-602020

BP-13-5 (4/04)

# Attachment 5

**Administrative Remedy No. 1048383-A2**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal where you disagree with the decision at FCI Beaumont Low to deny your request for home confinement.  You allege the delays in the administrative remedy process represent bad faith and obstruction of justice.  You reassert your prior claims and believe you meet all criteria for home confinement based on the Attorney General's memorandum.  Based on this, you request to be released to home confinement.

The Bureau of Prisons (BOP) is taking extraordinary measures to contain the spread of COVID-19 and to treat any infected inmates.  Additionally, in the BOP's continued effort to protect the health and safety of staff and inmates during the COVID-19 pandemic, inmates are being reviewed for direct placement on home confinement.  In doing so, several factors are assessed and referrals are made based on appropriateness for home confinement.

The Warden and Regional Director adequately addressed your complaint and we concur with the responses provided.  You were reviewed for direct home confinement and deemed ineligible for placement at this time.  You were advised of the reason for this decision and we find you received proper and fair consideration pursuant to the Attorney General's memoranda, and local guidance and direction regarding the COVID-19 pandemic.  You may discuss this matter further with your Unit Team at your next scheduled Program Review.  In addition, we find no evidence of staff malfeasance regarding your administrative remedy request and appeals for this issue.

Accordingly, your appeal is denied.


_____5\24\21_____          _____
Date                         Ian Connors, Administrator
                             National Inmate Appeals

**U.S. Department of Justice**                                    Central Office Administrative Remedy Appeal

Federal Bureau of Prisons

Type or use ball–point pen.  If attachments are needed, submit four copies.  One copy each of the completed BP–DIR–9 and BP–DIR–10, including any attach-ments must be submitted with this appeal.

From: ___William, Maxwell___  ___71944-279___  ___T/A___  ___FCC-BMT-(LOW)___
          LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A—REASON FOR APPEAL** I am adopting all prior arguments made onthe BP-8, BP-9, BP-10, BP-11, previously submitted and attached hereto and incorporated herein. Additionally, and for purposes of making a record prior to court action, with all due respect, the BOP's collective conduct has been a bad faith obstruction of justice. (1) The Warden obstructed justice by advising inmates not to file a BP-8 and BP-9, rather to send requests electronically. (Delay No.1). (2) The Regional office refused to accept my BP-10 noting the warden's refusal to respond to the BP-9. (Delay No.2). (3) On further request for a reply to the original BP-9 (pursuant to Regional Office delay tactics) the warden answers a new BP-9 not the original BP-9. (Delay No.3). (4) The Regional Office did not respond timely. (Delay No.4) (5) The institution did not deliver the Regional response timely. (Delay No.5). (6) The Unit Manager (documents attached) noted that the Region and institution did not timely respond to the BP-10. Nevertheless, Central Office (without reviewing the Unit Manager's notation that the BOP was at fault by not returning the BP-10 timely, thereby presumed denied under the C.F.R. remedy process) returned the BP-11. (Delay N No.6). These all violate BOP policy and rules, and are unconsionable. See continuous page:

___2-4-2021___                                    _____
          DATE                                          SIGNATURE OF REQUESTER

**Part B—RESPONSE**

RECEIVED

MAR 2 6 2021

Administrative Remedy Section
Federal Bureau of Prisons

_____               _____
          DATE                                          GENERAL COUNSEL

FIRST COPY: WASHINGTON FILE COPY               CASE NUMBER: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Part C—RECEIPT**
                                                            CASE NUMBER: _____

Return to: _____
                    LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

SUBJECT: _____

_____               _____               BP-231(13)
          DATE                              SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL               APRIL 1982
USP LVN

William, Maxwell          71944-279          T/A          FCC-BMT-(LOW)
Last Name, First          Reg. No.           Unit         Institution

( continuous page )

For these reasons, and those previously noted and submitted, I am
appealing and exhausting administrative remedies prior to proceeding
in **court.**

3-4-2021

BP-231(13)

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: FEBRUARY 18, 2021



FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CENTRAL OFFICE

TO  : WILLIAM MAXWELL, 71944-279
      BEAUMONT LOW FCI    UNT: TA    QTR: T04-059U
      P.O. BOX 26025
      BEAUMONT, TX 77720

FOR THE REASONS LISTED BELOW, THIS CENTRAL OFFICE APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID        : 1048383-A1      CENTRAL OFFICE APPEAL
DATE RECEIVED    : FEBRUARY 3, 2021
SUBJECT 1        : ELDERLY OFFENDER HOME DETENTION PROGRAM
SUBJECT 2        :
INCIDENT RPT NO:

REJECT REASON 1: YOU DID NOT PROVIDE A COPY OF YOUR   REGIONAL OFFICE
                ADMINISTRATIVE REMEDY APPEAL (BP-10) FORM OR   A COPY
                OF THE (BP-10) RESPONSE FROM THE REGIONAL DIRECTOR.

REJECT REASON 2: YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN
                15 DAYS OF THE DATE OF THIS REJECTION NOTICE.

REMARKS         : SEE ATTACHED. ORGANIZE APPEAL ACCORDINGLY.

EXTENSION OF TIME FOR RESPONSE - ADMINISTRATIVE REMEDY

DATE: JANUARY 7, 2021

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      SOUTH CENTRAL REGIONAL OFFICE

TO  : WILLIAM MAXWELL, 71944-279
      BEAUMONT LOW FCI    UNT: TA      QTR: T04-059U

ADDITIONAL TIME IS NEEDED TO RESPOND TO THE REGIONAL APPEAL
IDENTIFIED BELOW.  WE ARE EXTENDING THE TIME FOR RESPONSE AS PROVIDED
FOR IN THE ADMINISTRATIVE REMEDY PROGRAM STATEMENT.

REMEDY ID       : 1048383-R1
DATE RECEIVED   : OCTOBER 26, 2020
RESPONSE DUE    : DECEMBER 25, 2020
SUBJECT 1       : ELDERLY OFFENDER HOME DETENTION PROGRAM
SUBJECT 2       :

*Inmate Maxwell did not receive any response by December 25, 2020, but his admin remedy was denied on December 23, 2020.*

*D. Gledman, Unit Manager*

**U.S. Department of Justice**

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball–point pen. If attachments are needed, submit four copies. One copy each of the completed BP–DIR–9 and BP–DIR–10, including any attachments must be submitted with this appeal.

| From: | MAXWELL, WILLIAM | 71944–279 | TA | BEAUMONT (LOW) |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL**   I wish to appeal Remedy ID-1048383-R1. On January 7, 2021, the first time Unit Mgr. D. Gladney was available after the holidays (Unit Mgr. Gladney was absent on vacation from December 21 [approximately] until January 5, 2021), I received the two documents attached as Exhibits to this BP-11. They are "Extension for Time for Response-- Administrative Remedy" and "Administrative Remedy Generalized Retrieval". Unit Mgr. Gladney writes (on the documents) "Inmate Maxwell did not receive any response by December 2̶2̶x̶x̶2̶0̶2̶0̶x̶x̶ 25, 2020, but his admin remedy was denied on December 23, 2020." And separately, on the other document, Gladney writes, "No response was received by this date." Both remarks of Unit Mgr. Gladney are on the exhibits, which are dated January 7, 2021, attached hereto. The South Central Office has consistently and unlawfully obstructed the administrative remedy process. As proscribed in 28 C.F.R. §§ 542.10, 542.13(b), 542.14, 542.18, each level of the Administrative Remedy process (BP-8, BP-9, BP-10, BP-11, etc.) has a prescribed time frame within which the BOP must respond to Administrative Remedies. Frivolous basis for denials are not appropriate. Here, the Regional Office (for the second time) has not responded. Due to the COVID-19 pandemic FCI-Beaumont-Low has violated all semblance of the Administrative

[CONTINUED ON BP-11 ATTACHMENT PAGE]

| 1\|15\|2021 | | SIGNATURE OF REQUESTER |
|---|---|---|
| DATE | | |

**Part B—RESPONSE**

RAP
RSD
SEE ATTACHED

FEB 2 2021

| DATE | GENERAL COUNSEL |
|---|---|

ORIGINAL: RETURN TO INMATE            CASE NUMBER: _1048383-A1_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Part C—RECEIPT**                     CASE NUMBER: _____

Return to: _____
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

| DATE | SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL | BP–231(13) APRIL 1982 |
|---|---|---|

USP LVN            Printed on Recycled Paper

BP-11 ATTACHMENT PAGE

Remedy protocols (implicating the Due Process Clause). The FCI-Beaumont-Low administration, during the summer of 2020, refused to accept a BP-9 (Case Mgr. McCowan instructed Unit TA "to send electronic cop-outs to the Warden, not BP-9"); the South Central Regional Office refused to accept the Administrative Remedy appeal (BP-10) without the BP-9 response that the Warden refused to provide, attached. Maxwell filed multiple written requests (electronically) and through outside counsel, and on paper (BOP forms) with the Warden but received no response (to the Administrative Remedy--but Maxwell did receive a response that was belatedly tendered to counsel).  All of these documents were sent to the South Central Regional Office. See attached BP-8 (with attachments); BP-9 (with attachments); multiple BP-10s (with attachments) appended hereto. In a last good faith attempt, Maxwell asked for a copy of the missing BP-9 response prior to Maxwell's second resubmittal to the South Central Regional Office (this farce of an Administrative REmedy taking months). FCI-Beaumont-Low adminstration did not comply. Instead, the Administration issued a new and different (original sent to counsel months previously) BP-9 response that was nonsensical. For example, the Warden opined that Maxwell was not a high risk for COVID-19 (Maxwell is 61 years old with mild to severe Asthma). The Warden (on April 10, 2020) had previously given Maxwell a written warning that Maxwell was high risk of severe illness or death. (That document was provided in my attachments to the BP-8, BP-9, BP-10, but apparently no one bothers to read any of the evidence that we are forced to attach under the Administrative Remedy paradigm.)

In any event, Maxwell relies on his BP-8, BP-9, BP-10 arguments and counsel's arguments previously made and adopt them herein and attach them hereto. Maxwell expressly objects under the Administrative Procedures Act (APA), to any new arguments being asserted by the BOP, as a basis for denial of RRC/home confinement that was not asserted in the original response to counsel. Maxwell expressly objects to the unknown basis used by the Regional Office to deny my request (refusal to deliver a written denial pursuant to the C.F.R. rules) under the Due Process Clause of the U.S. Constitution. Maxwell expressly objects to the continued unjustified extensions sought by the South Central Regional Office, purposefully thwarting the Administrative Remedy process. Maxwell expressly asserts Waiver (on all grounds not raised originally with counsel). Maxwell expressly asserts admission. The BOP, throughout the process, has made multiple admissions and Maxwell expressly does not waive these BOP admissions.

Maxwell reasserts his rights for substantive due process relief previously raised in his BP-8, BP-9, BP-10, and by counsel. These include relief under 18 U.S.C. §3621; §3624; 34 U.S.C. §60541; and the modifications made thereto under The CARES ACT of 2020 and the First Step Act of 2018 and the Second Chance Act of 2018 (reauthorized and modified by the First Step Act of 2018).  For these reasons I appeal Remedy ID 1048383-R1.

11/15/2021

_____
Date

_____
William Maxwell

BMLD8          *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *          01-07-2021
PAGE 012 OF 012 *              FULL SCREEN FORMAT              *          10:20:52


REGNO: 71944-279 NAME: MAXWELL, WILLIAM

RSP OF...: BML UNT/LOC/DST: TA                    QTR.: T04-059U    RCV OFC: SCR

REMEDY ID: 1048383-R1       SUB1: 19HM SUB2:     DATE RCV:    10-26-2020

UNT  RCV..:TA          QTR RCV.: T04-059U    FACL RCV: BML

UNT  ORG..:TA          QTR ORG.: T04-057U    FACL ORG: BML

EVT FACL.: BML     ACC LEV:  BML  1 SCR  1          RESP DUE:  FRI  12-25-2020

ABSTRACT.: REQUESTS HOME CONFINEMENT

STATUS DT: 12-23-2020   STATUS CODE: CLD STATUS REASON:  DNY

INCRPTNO.:              RCT: N EXT: P DATE ENTD: 11-03-2020

REMARKS..: STAFFING


*No response was received by this denial date.*

*D. Gooby  Unit Manager*


            11 REMEDY SUBMISSION(S) SELECTED
G0000       TRANSACTION SUCCESSFULLY COMPLETED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

-vs-                                        CRIMINAL NUMBER:

NICODEMO SCARFO, ET AL,                          11-740

          Defendants.

Mitchell H. Cohen United States Courthouse
One John F. Gerry Plaza
Camden, New Jersey 08101
June 3, 2014

B E F O R E:          HONORABLE ROBERT B. KUGLER
                 UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

     PAUL J. FISHMAN, UNITED STATES ATTORNEY
     BY: STEVEN J. D'AGUANNO
          HOWARD J. WIENER
          ADAM SMALL
          NORMAN GROSS
     ASSISTANT UNITED STATES ATTORNEYS

     MICHAEL E. RILEY, ESQUIRE
     JEREMY C. GELB, ESQUIRE
     ATTORNEYS FOR NICODEMO SCARFO

     TROY A. ARCHIE, ESQUIRE
     MICHAEL FARRELL, ESQUIRE
     ATTORNEYS FOR SALVATORE PELULLO

     MICHAEL N. HUFF, ESQUIRE
     ATTORNEY FOR WILLIAM MAXWELL

     MARK W. CATANZARO, ESQUIRE
     ATTORNEY FOR JOHN MAXWELL


Certified as true and correct as required by Title 28, U.S.C.,
Section 753
/S/ Theodore Formaroli /S/ Robert Tate /S/ Lisa Marcus

United States District Court

that offense he was serving a sentence of supervised release from 2006 to early 2008. The nature of that offense is of no concern to you. The evidence of Mr. Scarfo's prior conviction was presented for the limited purposes of explanation why he was serving a sentence of supervised release during the time period that is relevant to the charges in Count 1 regarding the obstruction of justice component of racketeering conspiracy and Count 23 regarding conspiracy to obstruct justice. I will give you thorough instructions regarding the elements of those offenses later on.

The evidence was also presented for the purpose of proving Scarfo's status as a convicted felon, which is relevant to the firearms offenses charged in Counts 24 and 25 in the indictment. I will give you further guidance about the limited relevance of information regarding Scarfo's conviction to those charges later in these instructions.

Once again, and as with all the evidence presented in this case, it is for you to determine whether you believe this evidence about Scarfo's prior conviction, and, if you do believe it, whether you accept it for the purpose offered. You may give it such weight as you feel it deserves, but only for the limited purpose that I described to you.

Nicodemo S. Scarfo is not on trial for committing the offense that was the basis for his prior conviction. You may not consider the fact of the prior conviction as proof that

United States District Court

Nicodemo S. Scarfo has a bad character or has any propensity to commit crimes. Specifically, you may not use this evidence to conclude that because Scarfo may have been convicted of another offense he must also have committed the acts charged in the indictment in this case.

Remember that the defendants are on trial here only for the charges set forth in the indictment. Do not return a guilt verdict unless the government proves the crimes charged in the indictment beyond a reasonable doubt.

You've heard evidence that Salvatore Pelullo allegedly made a threat against David Roberts that included Pelullo's use of a racial epithet. The evidence of Pelullo's alleged use of that epithet was admitted for a limited purpose, which was whether the allege statement that Pelullo made to David Roberts was intend by Pelullo to be and was interpreted by David Roberts to be an actual threat against David Roberts and his family. You may not consider Salvatore Pelullo's alleged use of that epithet for any other purpose. Moreover, it is up to you to decide whether Pelullo used that racial epithet, and, if he did, whether it is relevant to the limited purpose that I just described.

Other than the limited purpose for which the evidence regarding the allege statement that Salvatore Pelullo made to David Roberts has been admitted into evidence, I instruct you that you may not consider the fact that any defendant used any

epithets as evidence that they committed any of the crimes charged in this case. Their use of those epithets is irrelevant to the charges in this case.

You've heard evidence regarding the alleged association between defendant Scarfo and Pelullo and certain organize criminal entities. In addition, there was evidence kind other defendants that touched upon organize crime, but did not suggest that those defendants were associated with organized crime.

There is no evidence that any defendants other than Scarfo and Pelullo was associated with any organized crime organization. You should not consider any of the evidence regarding La Cosa Nostra against any defendants other than Scarfo or Pelullo. Although Count 1 of the indictment alleges that all seven of the defendants were members of the Scarfo-Pelullo Enterprise. That enterprise, unlike the Lucchese and Philadelphia La Cosa Nostra families, is not alleged to be an organized crime organization as that term is usually understood.

Whether other defendants had any knowledge of Nicodemo S. Scarfo's Salvatore Pelullo's or co-conspirator Scarfo Senior's alleged associations with La Cosa Nostra and the significance of any such knowledge is something for you alone to decide. But I instruct you that there is nothing illegal about having such knowledge.

Evidence regarding defendant Scarfo's and Pelullo's alleged associations with La Cosa Nostra was presented only for limited purposes. Count 1 of the indictment alleges that defendants Scarfo and Pelullo "made use of, sought to benefit, and benefited from" their associations with La Cosa Nostra and used those associations to further the unlawful goals of the Scarfo-Pelullo Enterprise.

Count 1 of the indictment also alleges that defendants Scarfo and Pelullo established the Scarfo-Pelullo Enterprise and committed the crimes charged in Count 1 so that Scarfo could satisfy his financial obligations to the Lucchese La Cosa Nostra organization. It is up to you to decide whether or not the government proved that either Scarfo or Pelullo made use of sought to benefit or benefited from their association with La Cosa Nostra, and whether either of them used those associations to further the unlawfully goals of the Scarfo-Pelullo Enterprise.

It is also up to you to decide if the government proved that defendants Scarfo and Pelullo established the Scarfo-Pelullo Enterprise and committed the crime charged in Count 1 so that Scarfo could satisfy his financial obligations to the Lucchese La Cosa Nostra organization. If you conclude that the government did not prove any of those allegations, you should not consider the evidence of Scarfo's and Pelullo's association with La Cosa Nostra for any other purpose.

Evidence regarding the alleged assassination attempt on Nicodemo S. Scarfo was admitted only to explain why he allegedly associated himself with the Lucchese La Cosa Nostra organization and not for any other purpose. It is up to you to determine whether the government proved that Scarfo was a member of the La Cosa Nostra Lucchese criminal organization, and, if so, whether the attempted assassination on him, if you conclude that it occurred, was one of the reasons why he joined that organization. If you conclude that the government failed to prove both of those allegations, you should not consider the evidence of the alleged assassination attempt for any other purpose.

As with all the evidence presented in this case, it is for you to determine whether you believe this evidence about Nicodemo S. Scarfo's and Salvatore Pelullo's alleged association with La Cosa Nostra organizations, and, if you do believe it, whether you accept it for the purposes offered. You may give it such weight as you feel it deserves, but only for the limited purpose that I described to you.

You may not consider the evidence of those alleged associations as proof that defendants Scarfo and Pelullo had a bad character or any propensity to commit crimes. Remember that each defendant, including defendants Scarfo and Pelullo, is on trial here only for the charges in the indictment. Do not return a guilty verdict on any of the charges unless the

## MALE PATTERN RISK SCORING

| Register Number: | 71944-279 | Date: | 7/15/2020 |
|---|---|---|---|
| Inmate Name: | MAXWELL, WILLIAM | | |

| MALE RISK ITEM SCORING | CATEGORY | GENERAL SCORE | Enter Score | VIOLENT SCORE | Enter Score |
|---|---|---|---|---|---|
| 1. Current Age    > 60<br>Click on gray dropdown box to select, then click on dropdown arrow | > 60 | 0 | .0 | 0 | 0 |
| | 51-60 | 7 | | 4 | |
| | 41-50 | 14 | | 8 | |
| | 30-40 | 21 | | 12 | |
| | 26-29 | 28 | | 16 | |
| | < 26 | 35 | | 20 | |
| 2. Walsh w/Conviction    No | No | 0 | 0 | 0 | 0 |
| | Yes | 1 | | 0 | |
| 3. Violent Offense (PATTERN)    No | No | 0 | 0 | 0 | 0 |
| | Yes | 5 | | 5 | |
| 4. Criminal History Points    0 - 1 Points | 0 - 1 Points | 0 | 0 | 0 | 0 |
| | 2 - 3 Points | 8 | | 4 | |
| | 4 - 6 Points | 16 | | 8 | |
| | 7 - 9 Points | 24 | | 12 | |
| | 10 - 12 Points | 32 | | 16 | |
| | > 12 Points | 40 | | 20 | |
| 5. History of Escapes    None | None | 0 | 0 | 0 | 0 |
| | > 10 Years Minor | 2 | | 1 | |
| | 5 - 10 Years Minor | 4 | | 2 | |
| | < 5 Years Minor/Any Serious | 6 | | 3 | |
| 6. History of Violence    None | None | 0 | 0 | 0 | 0 |
| | > 10 Years Minor | 1 | | 1 | |
| | > 15 Years Serious | 2 | | 2 | |
| | 5 - 10 Years Minor | 3 | | 3 | |
| | 10 - 15 Years Serious | 4 | | 4 | |
| | < 5 Years Minor | 5 | | 5 | |
| | 5 - 10 Years Serious | 6 | | 6 | |
| | < 5 Years Serious | 7 | | 7 | |
| 7. Education Score    HS Degree / GED | Not Enrolled | 0 | -4 | 0 | -2 |
| | Enrolled in GED | -2 | | -1 | |
| | HS Degree / GED | -4 | | -2 | |
| 8. Drug Program Status    No Need | No DAP Completed | 0 | -9 | 0 | -3 |
| | NRDAP Complete | -3 | | -1 | |
| | RDAP Complete | -6 | | -2 | |
| | No Need | -9 | | -3 | |
| 9. All Incident Reports (120 months)    0 | 0 | 0 | 0 | 0 | 0 |
| | 1 | 1 | | 1 | |
| | 2 | 2 | | 2 | |
| | > 2 | 3 | | 3 | |
| 10. Serious Incident Reports (120 months)    0 | 0 | 0 | 0 | 0 | 0 |
| | 1 | 2 | | 2 | |
| | 2 | 4 | | 4 | |
| | > 2 | 6 | | 6 | |
| 11. Time Since Last Incident Report    12+ months or no incidents | 12+ months or no incidents | 0 | 0 | 0 | 0 |
| | 7-12 months | 2 | | 1 | |
| | 3-6 months | 4 | | 2 | |
| | <3 | 6 | | 3 | |
| 12. Time Since Last Serious Incident Report    12+ months or no incidents | 12+ months or no incidents | 0 | 0 | 0 | 0 |
| | 7-12 months | 1 | | 2 | |
| | 3-6 months | 2 | | 4 | |
| | <3 | 3 | | 6 | |
| 13. FRP Refuse    NO | NO | 0 | 0 | 0 | 0 |
| | YES | 1 | | 1 | |
| 14. Programs Completed    4 - 10 | 0 | 0 | -6 | 0 | -3 |
| | 1 | -2 | | -1 | |
| | 2 - 3 | -4 | | -2 | |
| | 4 - 10 | -6 | | -3 | |
| | > 10 | -8 | | -4 | |
| 15. Work Programs    >1 Program | 0 Programs | 0 | -2 | 0 | -2 |
| | 1 Program | -1 | | -1 | |
| | >1 Program | -2 | | -2 | |

| Total Score (Sum of Columns) | General: | -21 | Violent: | -10 |
|---|---|---|---|---|
| General/Violent Risk Levels | General: | Minimum | Violent: | Minimum |
| OVERALL MALE PATTERN RISK LEVEL | | Minimum | | |

INSTITUTIONAL REFERRAL FOR CCC PLACEMENT CDFRM

BP-A0210
OCT 10
U.S. DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

| TO: (Community Corrections Manager)<br><br>Vacant, RRM | FROM: Chief Executive Officer (Name, Title & Date) –<br>Signature certifies approval and CIMS Clearance |
|---|---|

| Inmate Name<br>MAXWELL, WILLIAM | Register Number<br>71944-279 | Date<br>04/16/2020 |
|---|---|---|

| Unit Manager/Mail ID<br><br>L. RIVERA, EXT 2321 | Institution (Address and Phone Number)<br>BEAUMONT LOW FCI<br>P.O. BOX 26025<br>BEAUMONT, TX 77720<br>(409)727-8172 |
|---|---|

| 1. Release City Dickinson | Supervision Southern District of Texas<br>District |
|---|---|

| 2. Anticipated Release Date<br>07/17/2031 | Method<br>GCT REL | Verified by (ISM Staff)<br>Pitre, Edward 04-17-2020 |
|---|---|---|

| 3. Recommended (only one):<br>a. Range_____, or<br>b. Date 06/30/2020 | 4. If a presumptive parole case, enter the date the pre-release record review progress report was submitted to the Parole Commission: _____ |
|---|---|

| 5. Statutory Interim Hearing<br>Scheduled?<br>☐ Yes  ☐ No  ☐ Waived | 6. Supervised Release<br>☑ Yes  ☐ No | Special Parole Term<br>☐ Yes ☑ No |
|---|---|---|

7. Aftercare Supervision  ☑ N/A
☐ Drug  ☐ Alcohol  ☐ Mental Health  ☐ Other

8. CIM Case: ☑ Yes ☐ No    Assignment: Separation

| As CMC, I have reviewed the Request for Activity Clearance (404) and the SENTRY CIM Clearance and Separatee Data and I recommend the inmate be considered for CCC placement and clearance be granted by the Warden.<br><br>    ☑ Yes   ☐ No   Signature of CMC Moore, Deanne<br>Upon signature of the Warden, I will update SENTRY to reflect CCC referral for range/date as listed in item 3 above. | NOTE:<br>The CMC will update SENTRY to reflect specific dates and CCC location code upon notification of acceptance from the CCM. |
|---|---|

| 9. If proposed District of Supervision differs from Sentencing District, has USPO approved?<br>☑ Yes   ☐ No | 10. Does inmate have a committed fine?  ☐ Yes  ☑ No<br>If yes, indicate how fine will be paid in item 12. |
|---|---|

11. Additional Information, including status of any detainers or pending charge(s) and whether there is a substance abuse history.

   Inmate Maxwell has no pending charges or detainers. His Presentence Investigation indicates no substance abuse. Inmate Maxwell is requesting to reside in the Faith Christian Center Academy.

12.  Specific release preparation/Pre-natal care needs.

Inmate Maxwell is being referred for Home Confinement placement under the provisions contained in the First Step Act (FSA) for placement of eligible elderly offenders and eligible terminally ill offenders. Inmate Maxwell is currently 60 years old, serving a 240 month sentence for Racketeering Conspiracy, Wire Fraud Conspiracy, Money Laundering . His criminal history and inmate disciplinary record reveal no charges or convictions involving violence, escape, or a sexually related offense.
In addition to meeting these requirements of the FSA Elderly Home Confinement, inmate Maxwell also meets the criteria listed in the Attorney General's COVID-19 Pandemic memorandum. As previously noted, inmate Maxwell is 60 years old, and medical staff at FCI Beaumont have determined he is an "at risk" vulnerable inmate. Inmate Maxwell is currently classified as a three point Low Security Level inmate, and has a PATTERN Recidivism score of Minimum. The SIS Department at FCI Beaumont has confirmed that inmate Maxwell has not engaged in any violent or gang related activity, and he has maintained a clear disciplinary record.
If approved for Home Confinement, inmate Maxwell would reside in a motor home at 4400 Country Club Dr., Dickinson, Texas 77539. The telephone contact number is 832-287-8730. It is believed inmate Maxwell will not pose a danger to the community.

| 13.  For MINT Referrals, Date of Delivery: | 14.  (a) For MINT Referrals, Projected Date of Return to Parent Institution: |
| --- | --- |
| | (B) Proposed guardian: |

| TO BE FORWARDED WITH THE REFERRAL FORM | NO. COPIES | TO BE FORWARDED TO THE REGIONAL TSM | NO. COPIES |
| --- | --- | --- | --- |
| BP-S210, Referral Form | 2 | BP-S210, Referral Form | 1 |
| Current Progress Report | 2 | Current Progress Report | 2 |
| Pre-sentence Report/Violation Report | 2 | Treatment Summary and Referral Form | 2 |
| Community Based Program Agreement | 2 | Drug Abuse Treatment Programs Agreement to | |
| BP-339 CIM Case Information Summary | 1 | Participate in Community Transition Programming | 2 |
| (Non-Separation Cases) | 2 | | |
| USPO Acceptance Letter | 2 | | |
| Copy of Latest Notice of Action | 2 | | |
| BP-351 Medical Evaluation for Transfer of | | | |
| Inmates to CCC Type Facility | 2 | | |
| Judgment & Commitment Order | 2 | | |
| Statement of Responsibility | | | |

* If the inmate has a diagnosed, ongoing medical condition, such as diabetes or coronary disease, send any pertinent medical records.

Record Copy - CCM; Copy - Institution File; Copy - USPO Sentencing District; Copy USPO District of Supervision

Prescribed by P7310                This form replaces BP-210 November 1995

PDF

# Exhibit B

226 F.3d 642
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA5 Rule 47 for rules regarding the citation of unpublished opinions.)
United States Court of Appeals,
Fifth Circuit.

Willard THOMASON, Petitioner-Appellant,

v.

Robert GUZIK, Warden Federal Medical Center, Respondent-Appellee.

No. 99-11430.
|
Summary Calendar.
|
July 11, 2000.

Appeal from the United States District Court for the Northern District of Texas, USDC No. 4:99-CV-357-P.

Before SMITH, BARKSDALE, and PARKER, Circuit Judges.

**Opinion**

PER CURIAM: [*]

 **\*1**  Willard Thomason, federal prisoner No. 15433-008, appeals the district court's dismissal of his 28 U.S.C. § 2241 petition for failure to exhaust his administrative remedies with the Bureau of Prisons (BOP). Thomason moves this court for permission to file a traverse out of time, to supplement the record, for a declaratory judgment, and for permission to file a supplemental reply brief. We GRANT the motions to file a traverse and to supplement the record and DENY the motions for a declaratory judgment and permission to file a supplemental reply brief.

Thomason argues that the BOP has wrongfully denied him credit on his federal sentence for time served in the custody of the State of Ohio. A federal prisoner must "exhaust his administrative remedies before seeking habeas relief in federal court under 28 U.S.C. § 2241." *Fuller v. Rich,* 11 F.3d 61, 62 (5th Cir.1994); *see Rourke v. Thompson,* 11 F.3d 47, 49 (5th Cir.1993). Thomason does not dispute that he failed to exhaust his administrative remedies with the BOP prior to seeking § 2241 relief in the district court. *United States v. Wilson,* 503 U.S. 329, 331-35, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992); *see* 28 C.F.R. §§ 542.10-542.18. As he has failed to demonstrate extraordinary circumstances which would warrant a waiver of the exhaustion requirement, we AFFIRM the district court's dismissal of the petition for failure to exhaust administrative remedies. *See Fuller,* 11 F.3d at 62.

AFFIRMED. MOTIONS TO FILE TRAVERSE OUT OF TIME AND TO SUPPLEMENT THE RECORD GRANTED. MOTIONS FOR DECLARATORY JUDGMENT AND TO FILE SUPPLEMENTAL REPLY BRIEF DENIED.

**All Citations**

226 F.3d 642 (Table), 2000 WL 1029081

---

**Footnotes**

[*]      Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**End of Document**                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

580 Fed.Appx. 248
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals,
Fifth Circuit.

Teresa FLORES, Plaintiff–Appellant

v.

Harry LAPPIN, Director, Federal Bureau of
Prisons; T.C. Outlaw, Warden, FCI–Forrest
City; Darrell Perkins, also known as Unknown
Perkins; John Fox, Warden, USP Beaumont;
Unknown Oden, Officer, USP Beaumont; Unknown
Morales, Officer, USP Beaumont; DOES, 2
Unknown Maintenance Officers and 4 John Doe
Correctional Officers, USP Beaumont; United
States Bureau of Prisons, Defendants–Appellees.

No. 13–41058
|
Summary Calendar.
|
Aug. 28, 2014.

**Synopsis**
**Background:** Prisoner brought action under *Bivens* against
the Bureau of Prisons (BOP) and various prison employees,
alleging that he was subjected to unconstitutional conditions
of confinement at federal prison. The United States District
Court for the Eastern District of Texas, Thad Heartfield, J.,
2013 WL 4711663, granted summary judgment in favor of
defendants. Prisoner appealed.

**Holding:** The Court of Appeals held that prisoner failed
to exhaust his available administrative remedies prior to
bringing suit.

Affirmed.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (1)

**[1]     United States**  ⚷  Exhaustion of remedies
Prisoner failed to exhaust his available
administrative remedies, as required to bring
action under *Bivens* against the Bureau of
Prisons (BOP) and various prison employees,
alleging that he was subjected to unconstitutional
conditions of confinement at federal prison,
where prisoner did not file a timely appeal of
warden's decision to BOP's regional director;
even if response to prisoner's administrative
remedy request was delayed, BOP regulations
allowed prisoner to pursue his appeal. Civil
Rights of Institutionalized Persons Act, § 7(a),
🚩 42 U.S.C.A. § 1997e(a); 28 C.F.R. §§
542.14(b), 542.18.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*248**  Teresa Flores, Midland, TX, pro se.

Andrea Lynn Hedrick Parker, Assistant U.S. Attorney, U.S.
Attorney's Office, **\*249** Beaumont, TX, Christopher Lee
Lindsey, Assistant Attorney General, Office of the Attorney
General, Austin, TX, for Defendants–Appellees.

Appeal from the United States District Court for the Eastern
District of Texas, USDC No. 1:08–CV–202.

Before PRADO, OWEN, and GRAVES, Circuit Judges.

**Opinion**

PER CURIAM: [*]

Teresa Flores appeals the district court's grant of summary
judgment for the defendants on the grounds that Hector
Flores, the original plaintiff in this case, [1] failed to exhaust
his administrative remedies in this civil rights action under
🚩 *Bivens v. Six Unknown Named Agents of Fed. Bureau
of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619
(1971). She argues that the district court abused its discretion
in granting summary judgment based on the failure to exhaust

administrative remedies. She contends that Hector Flores was prevented from properly exhausting his administrative remedies because of a delay in the delivery of the warden's response to him until after 20 days had passed.

We review de novo a grant of summary judgment, applying the same standard as the district court. *Nickell v. Beau View of Biloxi, L.L.C.,* 636 F.3d 752, 754 (5th Cir.2011). "The [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a).

Prior to bringing suit, a prisoner must exhaust all available administrative remedies. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). This requirement applies to *Bivens* actions. *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). "[T]he PLRA exhaustion requirement requires proper exhaustion." *Woodford v. Ngo,* 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). That is, "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation and quotation marks omitted). We take "a strict approach" to the exhaustion requirement. *Days v. Johnson,* 322 F.3d 863, 866 (5th Cir.2003), *overruled by implication on other grounds by Jones,* 549 U.S. at 216, 127 S.Ct. 910. Under this strict approach, "mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion"; instead, prisoners must exhaust available remedies properly. *Dillon v. Rogers,* 596 F.3d 260, 268 (5th Cir.2010). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford,* 548 U.S. at 90, 126 S.Ct. 2378. We review the district court's legal rulings concerning exhaustion de novo and its factual findings for clear error. *Dillon,* 596 F.3d at 273.

**\*250** Hector Flores did not file a timely appeal of the warden's decision to the regional director. The warden was given an extension of time to respond to Hector Flores's administrative remedy request until November 24, 2007, but the warden did not respond until December 11, 2007. Hector Flores filed his regional appeal on January 21, 2008, beyond the 20–day period, and his appeal was rejected as untimely.

As the district court correctly noted, even if a response to Hector Flores's administrative remedy request was delayed, the regulations of the Bureau of Prisons provide authority for inmates who do not receive timely responses to administrative remedy submissions to pursue their appeals. "If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R. § 542.18. Hector Flores could have filed his appeal within 20 days of November 24, 2007. He could also have included an explanation for the delay in his appeals to the regional and central office, which he did not do. BOP regulations provide for an extension of filing times if an inmate can demonstrate a valid reason for the delay. *See* 28 C.F.R. § 542.14(b).

Accordingly, the district court did not err by ruling that Hector Flores had not exhausted his administrative remedies. *Dillon,* 596 F.3d at 273.

Teresa Flores argues that failure to exhaust is an affirmative defense and that inmates are not required to specially plead or demonstrate exhaustion in their complaints. The defendants raised the affirmative defense of failure to exhaust in their answer and motion for summary judgment. Teresa Flores also argues that exhaustion should not be required when the original plaintiff was not at fault and exhaustion would be futile because he is now deceased. Teresa Flores does not explain why it would have been futile for Hector Flores to exhaust his administrative remedies before he filed this lawsuit in 2008.

AFFIRMED.

**All Citations**

580 Fed.Appx. 248

## Footnotes

\*      Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1      Hector Flores died in 2009, and Teresa Flores, as his next of kin, was substituted as the proper party.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

555 Fed.Appx. 289
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals,
Fifth Circuit.

James Eli HUFF, II, Plaintiff–Appellant,
v.
Latoina NEAL; Scott Fauver; Unknown Named
Federal Bureau of Prisons Medical Staff; United
States of America, Defendants–Appellees.

No. 12–20762.
|
Jan. 27, 2014.

**Synopsis**
**Background:** Federal prisoner, proceeding pro se, brought
action against prison officials, unnamed prison medical
staff, and the United States, asserting claims pursuant to
🚩 *Bivens* and Federal Tort Claims Act (FTCA). The United
States District Court for the Southern District of Texas
granted summary judgment in defendants' favor, and prisoner
appealed.

**Holdings:** The Court of Appeals held that:

[1] prisoner failed to exhaust administrative remedies before
filing *Bivens* claims;

[2] summary judgment affidavit by prison attorney was
competent summary judgment evidence on issue of
exhaustion;

[3] prisoner was not excused from exhaustion requirement;

[4] discretionary function exception to FTCA applied;

[5] district court did not abuse its discretion by declining to
delay summary judgment for further discovery;

[6] district court did not abuse its discretion by denying
motion to reconsider; and

[7] district court did not abuse its discretion in denying
prisoner's motion for appointment of counsel.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (7)

**[1]    United States** 🔑 Exhaustion of remedies
Federal prisoner, who was attacked by gang
members after being openly called into
lieutenant's office to discuss alleged threats he
reported by gang members, failed to exhaust
his administrative remedies before filing *Bivens*
claims against prison officials, where both
his informal resolution request and formal
administrative remedy request were filed more
than 20 days from date of attack. Civil Rights
of Institutionalized Persons Act, § 7(a), 🚩 42
U.S.C.A. § 1997e(a); 28 C.F.R. §§ 542.13(a),
542.14.

6 Cases that cite this headnote

**[2]    Federal Civil Procedure** 🔑 Sufficiency of
showing
In federal prisoner's *Bivens* action against
prison officials, summary judgment affidavit
by Bureau of Prisons (BOP) attorney, in
which she attested that computer records were
computerized inmate records maintained by
BOP in ordinary course of business, that
her affidavit was based on her own personal
knowledge or information acquired through the
performance of her official duties, and that a
thorough review of the records revealed that
prisoner failed to exhaust his administrative
remedies, was competent summary judgment
evidence. Fed.Rules Civ.Proc.Rule 56(c, e), 28
U.S.C.A.

6 Cases that cite this headnote

**[3]** **United States** Exhaustion of remedies

Federal prisoner, who was attacked by gang members after being openly called into lieutenant's office to discuss alleged threats he reported by gang members, was not excused from exhaustion requirement for his *Bivens* claims against prison officials based on alleged statement by another lieutenant that inmate should wait to file a grievance until captain completed his investigation of incident and generalized fear of retaliation; alleged statement by lieutenant was made within 20-day period after incident for filing formal administrative remedy request and inmate had access to grievance procedure and timeliness standards. Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a); 28 C.F.R. § 542.14(a).

8 Cases that cite this headnote

**[4]** **United States** Prisons

Discretionary function exception to Federal Tort Claims Act (FTCA) applied to failure to protect claim under FTCA by federal prisoner who was attacked by gang members in his housing unit after lieutenant openly called prisoner into her office to discuss alleged threats he reported by gang members; prison officials' placement of gang members in same housing unit as prisoner and their investigation of alleged threats inside the prison involved an element of judgment or choice and was the type of conduct that the discretionary function was designed to shield. 28 U.S.C.A. § 2680(a).

13 Cases that cite this headnote

**[5]** **Federal Civil Procedure** Time for consideration of motion

District court did not abuse its discretion by declining to delay summary judgment for further discovery on jurisdictional issues that were intertwined with federal prisoner's failure to protect claim under the Federal Tort Claims Act

(FTCA), absent allegations that what prisoner hoped to discover would show that the district court's determination on the jurisdictional issue was erroneous. 28 U.S.C.A. §§ 1346, 2671 et seq.; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

2 Cases that cite this headnote

**[6]** **Federal Civil Procedure** Grounds and objections

District court did not abuse its discretion in denying federal prisoner's motion to reconsider dismissal of his failure to protect claim under the Federal Tort Claims Act (FTCA) against prison officials and the United States, where prisoner failed to provide grounds for relief from judgment. 28 U.S.C.A. §§ 1346, 2671 et seq.

**[7]** **Federal Civil Procedure** Appointment of counsel

District court did not abuse its discretion in denying federal prisoner's motion for appointment of counsel in his action against prison officials and the United States, asserting claims pursuant to *Bivens* and Federal Tort Claims Act (FTCA), where prisoner filed thorough pleadings and responses to motions that adequately addressed the complexities of the case. 28 U.S.C.A. §§ 1346, 2671 et seq.

**Attorneys and Law Firms**

**\*290** James Eli Huff, II, Big Spring, TX, pro se.

Fred Turner Hinrichs, Assistant U.S. Attorney, U.S. Attorney's Office, Houston, TX, for Defendants–Appellees.

Appeal from the United States District Court for the Southern District of Texas, USDC No. 4:09–CV–2000.

Before JONES, ELROD, and HAYNES, Circuit Judges.

**Opinion**

***291**  PER CURIAM: [*]

James Eli Huff, II, a federal prisoner proceeding *pro se,* filed suit against Latoina Neal, Scott Fauver, unknown medical staff at the federal Bureau of Prisons ("BOP"), and the United States of America (collectively, the "defendants"), asserting claims pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and the Federal Tort Claims Act ("FTCA"). The district court granted summary judgment to the defendants on the *Bivens* claims and dismissed the FTCA claims. Because Huff failed to exhaust his administrative remedies with respect to the *Bivens* claims and because the defendants' actions underlying the FTCA claims fell within the discretionary function exception, we AFFIRM.

I.

Huff was incarcerated at the Federal Correctional Institution in Big Spring, Texas. [1]  On July 6, 2007, Huff informed Corrections Officer John Skidmore that a violent prison gang, the Hermanos Pistoleros Latinos ("Pistoleros"), had threatened several inmates over mealtime seating arrangements. The next day, in investigating this claim, Lieutenant Neal openly called Huff into her office; after he left, she called three Pistoleros into her office. According to Huff, Lieutenant Neal's "open investigation procedure" portrayed Huff as a snitch. Huff then reported to Officer Skidmore that he had been threatened by a Pistoleros member for being a snitch. On July 10, 2007, Captain Fauver approved the placement of two Pistoleros gang members into Huff's unit. Two days later, on July 12, 2007, three Pistoleros gang members entered Huff's cell and, while yelling "pinche ratto," violently attacked him. Huff was placed in the Special Housing Unit ("SHU") following the attack. Medical personnel noted that Huff had an injured nose; multiple abrasions and bruises on his forehead, neck, arms, torso, legs and bottoms of his feet; footprints on his back; a brain stem concussion that caused vision impairment, headaches, and dizziness; and psychological injuries.

On July 20, 2007, Huff was released from the SHU. At that time, according to Huff, he "wanted to file a formal complaint against [Lieutenant] Neal but feared more retaliation. [Lieutenant] Jackson inform[ed] Huff that Captain Fauver is investigating the incident and to just wait for his determination." Lieutenant Jackson again informed Huff that the investigation was ongoing on August 3, 2007.

Huff filed an informal complaint (form BP–8) with Captain Fauver on August 20, 2007, stating "his reluctance to file a complaint fearing more retaliation, and complaining about [Lieutenant] Neal's conduct portraying Huff as a snitch." On November 13, 2007, Huff filed a formal complaint (form BP–9).

On June 25, 2009, Huff filed a lawsuit against the defendants in their individual and official capacities, bringing claims under *Bivens* and the FTCA. Huff alleged that the defendants retaliated against him and failed to protect his safety. The defendants moved for summary judgment on the *Bivens* claims brought against them in their individual capacities, arguing that  ***292**  Huff had failed to exhaust his administrative remedies. Huff contended that he had properly exhausted his remedies and, in the alternative, that the exhaustion requirement should be excused. The district court granted the motion on failure-to-exhaust grounds. [2]  The defendants later filed a motion to dismiss the FTCA claims pursuant to Federal Rule of Civil Procedure 12(b)(1), which the district court also granted, concluding that the defendants' alleged actions fell within the discretionary function exception and that therefore subject matter jurisdiction was lacking. [3]  The district court denied Huff's motion for reconsideration. Huff timely appealed.

II.

A.

Huff challenges the district court's grant of summary judgment in favor of the defendants on his *Bivens* claims. We review a summary judgment *de novo.* *Dillon v. Rogers,* 596 F.3d 260, 266 (5th Cir.2010). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). If the moving party bears his burden of showing that no genuine issue exists, the burden then shifts to the nonmoving party to produce evidence or set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.*

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   3

*v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We view the evidence and draw inferences therefrom in the light most favorable to the non-moving party. *Mississippi River,* 730 F.3d at 488.

B.

 **[1]**    Huff was required to exhaust administrative remedies for his *Bivens* claims. Huff argues that he properly exhausted administrative remedies because he timely initiated the BOP's administrative process when he notified BOP staff of the imminent threats of assault by gang members. Huff contends that there is no genuine issue of material fact as to whether the defendants had subjective knowledge that he faced serious harm. In support of his position, Huff relies on *Smith v. Brenoettsy,* in which we stated that "all that we (and the Supreme Court) have required is that the official ... be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." 158 F.3d 908, 912 (5th Cir.1998) (internal quotation marks omitted) (citing *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Huff's reliance on *Farmer* is misplaced. Under the Prison Litigation Reform Act ("PLRA"), an inmate must exhaust available administrative remedies offered by the agency before bringing a civil rights claim against officials in their individual capacities. 42 U.S.C. § 1997e(a) (as amended 1996); *Woodford v. Ngo,* 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ("[T]he PLRA exhaustion requirement requires proper exhaustion."). In *Porter v. Nussle,* the Supreme Court announced that the "PLRA's exhaustion **\*293** requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The defendants in an inmate's lawsuit "must establish beyond peradventure all of the essential elements of the defense of exhaustion to warrant summary judgment in their favor." *Dillon,* 596 F.3d at 266 (citation omitted).

The BOP has a four-step process for resolving grievances by inmates. First, an inmate must attempt to informally resolve the issue with the staff. 28 C.F.R. § 542.13(a). The Inmate Handbook for the facility in which Huff was incarcerated

instructs that an inmate must attempt informal resolution by filing a form BP–8. Second, if informal resolution is unsuccessful, the inmate must submit a formal written Administrative Remedy Request (form BP–9) to the warden within twenty days after the date on which the basis for the request occurred. 28 C.F.R. § 542.14. Third, if the inmate is not satisfied with the warden's response, he may submit an appeal (form BP–10) to the Regional Director within twenty days of the date of the warden's response. 28 C.F.R. § 542.15. Fourth, if the inmate is not satisfied with the Regional Director's response, the inmate may submit an appeal (form BP–11) to the General Counsel within thirty days of the Regional Director's response. 28 C.F.R. § 542.15. An inmate has not exhausted his administrative remedies until his claim has been denied at all levels.

The defendants' summary judgment evidence consisted of an affidavit from Jennifer Hansen, the Senior Attorney–Advisor for the BOP, and authenticated computerized records. In her affidavit, Hansen outlined the procedures set forth above and attested, in pertinent part, to the following. The BOP does not retain copies of rejected administrative requests but instead returns them to the inmate. A review of BOP computerized administrative remedy records revealed that Huff failed to exhaust administrative remedies relative to the July 12, 2007, incident and the related issues he raised in his complaint. Because Huff's claims involved allegations of staff misconduct, he should have filed his request for an administrative remedy at the institution level via a BP–9 within twenty days of the incident. Huff attempted to file a BP–9 regarding the July 12, 2007, incident on November 13, 2007. That request was rejected on November 27, 2007, as untimely because it was not filed within twenty days of the incident.

In response to the defendants' motion for summary judgment, Huff asserted, among other things, that he reasonably relied on Lieutenant Jackson's statements that Captain Fauver was investigating the incident and that Huff should wait until Captain Fauver's report was issued to proceed with a complaint. Huff submitted an affidavit in which he attested that he exhausted his administrative remedies to the fullest extent permitted by "BOP Program Statement 1330.16" and that the defendants failed to respond to his BP–8 request for an informal resolution. Huff attached a verified "Administrative Remedy Compendium," asserting that: Lieutenant Jackson and BOP staff told Huff on August 17, 2007, that Captain Fauver's investigation was ongoing; on August 20, 2007, Huff filed a BP–8 to the attention of Captain Fauver, stating that he

was reluctant to file a complaint because he feared retaliation; Huff was transferred on October 23, 2007, to a facility in Arkansas; on November 13, 2007, Huff filed a BP–9, stating that he had not received a response to his BP–8. Huff also attached, among other **\*294** things, copies of his August 20, 2007, and November 13, 2007, filings.

The district court determined that there was no genuine issue of material fact as to whether Huff had exhausted his administrative remedies. The district court explained that "the only evidence Huff cited was his own declaration containing conclusory statements that he exhausted administrative remedies, that the BOP did not comply with its own regulations," and that it delayed its response to his request for informal resolution. The district court also concluded that Huff was not excused from the exhaustion requirement.

 **[2]**    Huff argues that his evidence shows that he properly exhausted because he began informal resolution on August 20, 2007, was transferred to a facility in Arkansas on October 23, 2007, and filed a BP–9 on November 13, 2007, as soon as he received his property. He also contends that, under the "Best Evidence Rule," the defendants' computer-generated spread sheets of his alleged remedy filings is not competent summary judgment evidence of whether he attempted to exhaust administrative remedies. Federal Rule of Civil Procedure 56 sets out the standards for summary judgment and generally requires that evidence be sworn, certified, or verified material for a court to consider it. Rule 56(c), (e); *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir.1987). Hansen attested that the computer records were "computerized inmate records maintained by the BOP in the ordinary course of business" and that her affidavit was based on her own personal knowledge or information acquired through the performance of her official duties. Hansen swore that "[a] thorough review of BOP computerized administrative remedy records revealed that [Huff] ha[d] failed to exhaust his administrative remedies with respect to the issues raised in his Complaint." Therefore, we agree with the district court that the defendants put forth competent summary judgment evidence.

Under 28 C.F.R. § 542.14(a), Huff was required to file both the informal resolution request and the formal administrative remedy request within twenty days of the complained of incident. As noted above, the incident occurred on July 12, 2007. Huff argues that he began the informal resolution request on August 20, 2007. Huff's own evidence establishes that both his purported August 20, 2007, informal resolution

request and November 13, 2007, BP–9 were submitted more than twenty days after the incident. Huff's unsupported allegations that he did exhaust his remedies are insufficient to defeat the motion for summary judgment. As the district court reasoned, conclusory allegations supported by conclusory affidavits are insufficient to require a trial. *See Shaffer v. Williams,* 794 F.2d 1030, 1033 (5th Cir.1986). Therefore, Huff fails to raise a genuine issue of material fact as to whether he properly exhausted administrative remedies.

 **[3]**    Huff argues, in the alternative, that he should be excused from the exhaustion requirement because Lieutenant Jackson told him that he should wait until Captain Fauver completed his investigation to file a grievance. Huff also argues that he should be excused because his fear of retaliation rendered his administrative remedies unavailable. We have held that "the exhaustion requirement 'may be subject to certain defenses such as waiver, estoppel, or equitable tolling.' " *Days v. Johnson,* 322 F.3d 863, 866 (5th Cir.2003) (quoting *Wendell v. Asher,* 162 F.3d 887, 890 (5th Cir.1998)), *overruled by implication on other grounds by Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). We have recognized, as a basis for **\*295** excuse, circumstances where administrative remedies are inadequate because prison officials have ignored or interfered with a inmate's pursuit of an administrative remedy. *Holloway v. Gunnell,* 685 F.2d 150, 154 (5th Cir.1982). An inmate may be excused from the exhaustion requirement if the inmate can demonstrate that he relied on an officer's statement and that such reliance effectively rendered his administrative remedies unavailable. *Dillon,* 596 F.3d at 268. However, "[a]n administrative remedy does not become unavailable simply because a prisoner has not timely or properly filed a grievance and is consequently later barred from seeking further administrative relief." *Id.* at 267 n. 1 (citing *Woodford,* 548 U.S. at 83–84, 126 S.Ct. 2378).

The district court relied on *Johnson v. Ford,* 261 Fed.Appx. 752 (5th Cir.2008) (unpublished), in rejecting Huff's argument that he was excused from the exhaustion requirement. In *Johnson,* as here, an inmate argued that he should be excused from exhaustion because he was advised to proceed through informal resolution and was advised by the warden that the matter was being investigated. 261 Fed.Appx. at 757. We were not persuaded: "[The

inmate's] argument that he relied on the Warden's order of an investigation ... does not serve to excuse his untimely filing of his grievance in the face of a clear ... deadline to file a formal grievance." *Id.* at 757.

Similarly, the evidence here demonstrates that the applicable grievance procedure, including the relevant deadlines, was available to Huff. [4] Huff's knowledge of the grievance procedure generally is evinced by his filing of a BP–8, the first step of the procedure, in August 2007 and his awareness of the BOP Program Statement, which provides the timeliness standards for the procedure. *See, e.g., Alexander v. Tippah Cnty.,* 351 F.3d 626, 630 (5th Cir.2003) (remedies were available because inmate had knowledge of grievance procedures); *Ferrington v. La. Dep't of Corrs.,* 315 F.3d 529, 532 (5th Cir.2002) (remedies were available because the inmate "was well aware of the general procedural requirements described in the inmate handbook"). Moreover, Huff has not alleged that BOP officials provided him with contrary deadlines. Instead, Huff asserts in his affidavits that Lieutenant Jackson told him to delay filing a BP–9 until after Captain Fauver's investigation concluded. [5] But Huff points to only one such statement that was made within twenty days following the incident (i.e., on July 20, 2007). Huff's assertion regarding Lieutenant Jackson's statement, which is merely a reiteration of an allegation in his complaint, is insufficient to raise a fact issue regarding whether BOP officials' actions rendered his remedies unavailable, given Huff's knowledge of the grievance procedures. **\*296** [6] Huff also sets forth a generalized fear of retaliation but does not allege any specific acts or threats of retaliation by any specific officers. *See Brown v. Civigenics,* 439 Fed.Appx. 370, 371 (5th Cir.2011) (unpublished) (concluding that a generalized fear of retaliation does not amount to an excuse in light of the Fifth Circuit's "strict approach to the exhaustion requirement"). The district court was also correct to conclude that this conclusory assertion regarding the fear of retaliation was insufficient, without more, to require a trial on the *Bivens* claims. Viewing the record in the light most favorable to Huff, there is no genuine issue of material fact as to whether Huff was excused from the exhaustion requirement.

Huff argues a number of other reasons as to why he should be excused from the exhaustion requirement, but each is unavailing. Huff contends that the exhaustion requirement should be excused because the prison failed to adhere to its own policy requiring the Remedy Coordinator to be flexible

and accept untimely informal resolution requests. However, the facility's policy did not require prison officials to accept an untimely submission, only that "consideration should be given." Huff also argues that administrative remedies were rendered unavailable because his injuries prevented him from filing a timely request. We have held that an inmate's "personal inability" may render a grievance system "unavailable" for purposes of the exhaustion requirement. *Days,* 322 F.3d at 867. Although Huff alleges in his complaint, more definite statement, and compendium that he sustained injuries as a result of the Pistoleros' attack, his summary judgment evidence went only to the nature of his injuries and did not demonstrate that his injuries prevented him from properly exhausting administrative remedies. These conclusory allegations cannot satisfy Huff's summary judgment burden.

## III.

### A.

Huff also challenges the dismissal of his failure to protect claim under the FTCA. We review *de novo* a district court's dismissal under Rule 12(b)(1). *In re Supreme Beef Processors, Inc.,* 468 F.3d 248, 251 (5th Cir.2006). Under Rule 12(b)(1), a case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir.1998). Courts may dismiss for lack of subject matter jurisdiction based on: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint, supplemented by undisputed facts, plus the court's resolution of disputed facts. *Clark v. Tarrant County,* 798 F.2d 736, 741 (5th Cir.1986). When subject matter jurisdiction is challenged, the plaintiff has the burden of demonstrating that subject matter jurisdiction exists. *Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir.1981).

### B.

As the sovereign, the United States is immune from suit, except to the extent that it has waived its immunity and has

consented to be sued. *F.D.I.C. v. Meyer,* 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The FTCA acts as a limited **\*297** waiver of sovereign immunity allowing the United States to be sued for "injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b); *see United States v. Muniz,* 374 U.S. 150, 151, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (confirming the right of a federal prisoner to sue under the FTCA for injuries received during incarceration). Courts strictly construe waivers of sovereign immunity and resolve all ambiguities in favor of the sovereign. *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). Under the discretionary function exception, the waiver of immunity does not apply to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see Guile v. United States,* 422 F.3d 221, 229 (5th Cir.2005). Huff has the burden of proving subject matter jurisdiction by alleging a claim that was facially outside the discretionary function exception. *See St. Tammany Parish ex rel. Davis v. Fed. Emergency Mgmt. Agency,* 556 F.3d 307, 315 (5th Cir.2009).

To determine whether the discretionary function exception applies, we conduct a two-pronged inquiry. *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.,* 713 F.3d 807, 810 (5th Cir.2013). We ask first whether the challenged act "involv[ed] an element of judgment or choice." *Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267 (internal quotation marks and citation omitted). If so, we ask next "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 322–23, 111 S.Ct. 1267 (internal quotation marks and citation omitted). The exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 323, 111 S.Ct. 1267 (internal quotation marks and citation omitted).

The district court applied the *Gaubert* test and concluded that the discretionary function exception applied because the BOP exercises "significant judgment in fulfilling its statutory

obligation to provide for the safekeeping" of inmates and that the discretionary safekeeping of inmates was the type of action for which the FTCA was designed to shield the government from liability. [7]

**[4]** Huff complains that Lieutenant Neal's "open investigation procedure" portrayed him as a snitch and that Captain Fauver disregarded his health and safety by placing two Pistoleros into his housing unit. Huff contends that the district court erred when it applied the discretionary function exception because, under 18 U.S.C. § 4042(a), the BOP shall "provide suitable quarters and provide for the safekeeping, care, and subsistence" of those in its charge, the defendants' obligation to protect him from harm was statutory, rather than discretionary. Citing *Castro v. United States,* 560 F.3d 381 (5th Cir.2009), *vacated, Castro v. United States,* 608 F.3d 266 (5th Cir.2010) (*en banc* ), Huff argues that the defendants did not possess the discretion to violate his Eighth Amendment right against cruel and unusual punishment. Huff's reliance on *Castro* **\*298** is misplaced because that case has since been overturned by the *en banc* court. *Castro,* 608 F.3d 266. Huff provides little analysis of this argument and does not cite any case besides the overturned opinion in *Castro.* Though *pro se* litigants' briefs are liberally construed, *pro se* litigants must still brief the issues. *Grant v. Cuellar,* 59 F.3d 523, 524 (5th Cir.1995). Therefore, Huff has waived the issue by failing to brief it adequately. *United States v. Scroggins,* 599 F.3d 433, 446 (5th Cir.2010) ( "A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it." (citations omitted)).

The discretionary function exception "does not apply if 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.' " *Buchanan v. United States,* 915 F.2d 969, 971 (5th Cir.1990) (quoting *Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). Although § 4042 mandates that the BOP ensure the safekeeping of inmates, the Supreme Court has observed that a prison's internal security is normally left to the discretion of prison administrators. *Whitley v. Albers,* 475 U.S. 312, 321–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ("Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks

omitted)). In addition, we have stated that the BOP must "provide for the safekeeping, care, and subsistence of all federal prisoners, but [ 🚩 § 4042(a) ] does not indicate the manner in which the duty must be fulfilled." 🚩 *Spotts v. United States,* 613 F.3d 559, 567 (5th Cir.2010). In other words, because 🚩 § 4042 does not prescribe a specific course of action, the BOP has discretion to decide how best to fulfill its duty. [8]

Because the duty to maintain safekeeping of inmates is a discretionary one, we now turn to the two-pronged inquiry for the discretionary function exception. The placement of Pistoleros in a particular unit of the prison and the investigation of alleged threats inside the prison "involv[ed] an element of judgment or choice," thereby satisfying the first prong. 🚩 *Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267. Indeed, the placement of any inmates on any occasion, as well as the investigation of any internal issue at any time, inherently requires that prison officials exercise their discretion to make a choice regarding the proper course of action in furtherance of safekeeping. Moreover, this is the type of conduct that the discretionary function was designed to shield because "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." 🚩 *Buchanan,* 915 F.2d at 971 (internal quotation marks omitted). Public policy demands that these decisions be made by prison officials, not judges. Therefore, the BOP officials' actions in this case fell within the discretionary function exception. [9] **\*299** Our conclusion comports with a recent unpublished opinion in which we held that "decisions regarding the transfers and classifications of prisoners generally fall within the discretionary function exception." 🚩 *Patel v. United States,* 398 Fed.Appx. 22, 29 (5th Cir.2010) (unpublished).

 **[5]**    Huff raises a series of other issues that are meritless. He argues that the district court erred when it denied his motion for leave to amend his complaint after the defendants filed their motion to dismiss his FTCA claims. Futility of amendment is a permissible basis for denial of a motion to amend. 🚩 *Wright v. Allstate Ins. Co.,* 415 F.3d 384, 391 (5th Cir.2005). Because the court lacks subject matter jurisdiction over Huff's FTCA claims, amendment to his complaint would have been futile. Likewise, Huff argues that the district court erred when it denied an opportunity for discovery on the jurisdictional issues that were intertwined with his FTCA

claims. A district court's decision to delay summary judgment for further discovery is reviewed for an abuse of discretion. *Raby v. Livingston,* 600 F.3d 552, 561 (5th Cir.2010). Huff has not indicated how any fact he hopes to discover would show that the district court's determination on the jurisdiction issue was erroneous. We have stated that a nonmovant "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Id.* Therefore, the district court's denial of Huff's motion for an evidentiary hearing was not erroneous.

 **[6]**    In addition, Huff argues that his due process rights were violated when the district court denied his motion to reconsider the dismissal of his FTCA claims and his motion to amend. "We review the district court's denial of a motion for reconsideration under an abuse of discretion standard." *Ramon v. Casellas,* 165 F.3d 23, \*1 (5th Cir.1998) (unpublished). Huff has not provided grounds for relief from the judgment. The district court therefore did not abuse its discretion.

 **[7]**    Finally, Huff argues that he district court abused its discretion when it denied his motion for the appointment of counsel without an analysis of the relevant factors. Huff had no automatic right to counsel and the district court was required to appoint counsel only if the case presented exceptional circumstances. 🚩 *Ulmer v. Chancellor,* 691 F.2d 209, 212 (5th Cir.1982). Although there is no comprehensive definition of exceptional circumstances is practical, we have stated that a number of factors should be considered in ruling on requests for appointed counsel. These include: (1) the type and complexity of the case; (2) whether the indigent is capable of adequately presenting his case; (3) whether the indigent is in a position to investigate adequately the case; and (4) whether the evidence will consist in large part of conflicting testimony so as to require skill in the presentation of evidence and in cross-examination. 🚩 *Id.* at 213. Huff filed thorough pleadings and responses to the defendants' motions that adequately addressed the complexities of the case. Therefore, the district court did not abuse its discretion in denying Huff's motion for the appointment of counsel.

We AFFIRM.

**All Citations**

555 Fed.Appx. 289

## Footnotes

| | |
|---|---|
| * | Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4. |
| 1 | We present the facts, as we must, in the light most favorable to Huff. *See Gulf and Miss. River Transp. Co., Ltd. v. BP Oil Pipeline Co.,* 730 F.3d 484, 488 (5th Cir.2013). |
| 2 | The district court dismissed Huff's *Bivens* claims against the defendants in their official capacities based on sovereign immunity. Huff explicitly waives any challenge to the dismissal of his *Bivens* claims against the defendants in their official capacities. |
| 3 | The district court also dismissed the FTCA claims pursuant to Rule 12(b)(6). Because we ultimately conclude that the district court was correct in dismissing the claims for lack of jurisdiction, we do not reach the failure-to-state-a-claim issue. |
| 4 | Huff also argues that he was under the impression that BOP policy required him to wait twenty days from the answer to his informal remedy request to file a formal grievance. In fact, however, the BP–9 was required to be filed within twenty days of the incident. *See* 28 C.F.R. § 542.14. The only evidence in the record that Huff was actually confused about the administrative procedures is an Inmate Request to Staff in which Huff asked when a BP–9 needed to be filed. But this request was submitted in 2010, not in 2007, when the events at issue took place. This 2010 Inmate Request cannot be used to demonstrate Huff's confusion over the administrative procedures in 2007. |
| 5 | To the extent that Huff also argues, based on Lieutenant Jackson's statement, that promissory and equitable estoppel should excuse his untimely exhaustion, we consider this to be subsumed by the broader excuse-from-exhaustion argument, which we ultimately reject. |
| 6 | Relying on *Dillon,* 596 F.3d 260, Huff argues that his remedies were unavailable. However, in *Dillon,* there was a lack of evidence as to what the inmate knew or "could have discovered" about the relevant deadlines. *Id.* at 269. Here, by contrast, the record reflects that Huff could have discovered when a BP–9 was due. |
| 7 | Huff argues that the district court erred by considering the jurisdictional question *sua sponte.* We disagree. The district court was obliged to undertake an analysis of the applicability of the discretionary function exception and dismiss this action for lack of subject matter jurisdiction under Rule 12(b)(1). |
| 8 | Huff argues that BOP policy provides specific courses of actions that BOP employees must follow in order to fulfill their duty under § 4042(a), but he has not pointed to a rule, regulation, or policy statement showing that the defendants lacked discretion in handling his placement. The BOP has discretion within the bounds of § 4042. |
| 9 | Regardless of whether Huff purports to rely on a negligence theory or intentional-tort theory, the conduct underlying Huff's FTCA claims falls within the discretionary function exception. The exception does not depend on the inmate-plaintiff's theory. *See Patel,* 398 Fed.Appx. at 29 (citing *Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267) (applying discretionary function exception to bar plaintiff's claim that BOP officials acted "either negligently or deliberately" in transferring plaintiff to facility without capacity to treat plaintiff's medical conditions). |

**End of Document**      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 350719
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

UNITED STATES of America, Plaintiff,

v.

Clarence WEAVER, Defendants.

Case No. 18-20364
|
Signed 02/04/2022

**Attorneys and Law Firms**

John N. O'Brien, II, U.S. Attorney, U.S. Attorney's Office, Detroit, MI, for Plaintiff.

Federal Defender, Public Defender, Federal Defender Office, Detroit, MI, James W. Amberg, Amberg and Amberg, Royal Oak, MI, for Defendants.

**ORDER DENYING MOTION
FOR SENTENCE REDUCTION
(COMPASSIONATE RELEASE) [ECF No. 161]**

Victoria A. Roberts, United States District Judge

**I. Introduction**

**\*1** Clarence Weaver moves for sentence reduction under 18 U.S.C. § 3582(c)(1)(A), and alternatively, for home confinement under 18 U.S.C § 3624(c)(2). As "extraordinary and compelling" circumstances, Weaver relies on the COVID-19 pandemic, prison conditions, his rehabilitation, and his underlying medical conditions: diabetes, obesity, hyperlipidemia, and gastroesophageal reflux.

Based on these circumstances and the 18 U.S.C. § 3553(a) applicable factors, the Court **DENIES** Weaver's motion for compassionate release.

**II. Discussion**

Upon a defendant's motion, the Court may modify his sentence if: (1) he fully exhausts all administrative remedies; (2) he shows "extraordinary and compelling reasons to

warrant such a reduction [or release]"; and (3) the factors in 18 U.S.C. § 3553(a) support the reduction or release. *See* 18 U.S.C. § 3582(c)(1)(A)(i); *United States v. Hampton*, 985 F.3d 530, 531 (6th Cir. 2021).

The statute also states that the Court shall determine whether a "reduction was consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(ii). However, the Sixth Circuit held that the Sentencing Commission's policy statements on reduction of a term of imprisonment does not apply to motions for compassionate release filed directly by inmates, and the Court need not follow them. *United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021).

Weaver fully exhausted remedies, but he cannot show that extraordinary and compelling circumstances warrant release, or that the § 3553 factors favor a sentence reduction.

**A. Medical Conditions and COVID-19**

The Court sentenced Weaver to 72 months following his 2018 convictions for conspiracy and possession with intent to distribute methamphetamine.

He has underlying health conditions that place him at increased risk of severe illness due to COVID-19, yet Weaver declined to get vaccinated. Weaver also says that the environment at the prison where he is housed - Allenwood Low FCI - makes it "impossible" to social distance and self-care.

Weaver's access to the COVID-19 vaccine mitigates any extraordinary and compelling medical reasons for release. *See United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) ("[If a prisoner] has access to the COVID-19 vaccine, [incarceration during the COVID-19 pandemic] does not present an extraordinary and compelling reason warranting a sentence reduction").

Several district courts in the Sixth Circuit have declined to find extraordinary and compelling circumstances when a defendant had medical conditions that might otherwise compel release, but he declined the vaccine. *See, e.g., United States v. Cotton,* No. 18-20315, 2021 WL 1601403 (E.D. Mich. Apr. 23, 2021); *United States v. Goston,* No. 15-20694,

2021 WL 872215 (E.D. Mich. Mar. 9, 2021); *United States v. Wilson*, 2021 WL 3417917, at \*3 n.13 (E.D. Mich. Aug. 5, 2021). And the Sixth Circuit recently held that, even if defendant has underlying health conditions, "If an inmate does not present a compelling reason justifying the failure to be vaccinated despite access to the vaccine, a district court would abuse its discretion by granting a motion seeking a sentence reduction under § 3582(c)(1)(A)(i) on the grounds that COVID-19 constitutes an extraordinary and compelling justification." *Lemons*, 15 F.4th at 751.

**\*2** Weaver has access to the vaccine and presents no compelling circumstances justifying failure to be vaccinated.

### B. Prison Conditions

Weaver cites to limited access to recreation, the size of his living space, the condition of prison bathrooms and showers as extraordinary and compelling circumstances. [ECF. No. 161, PageID.1221]. These limitations, while burdensome and disappointing to Weaver, are not sufficient to warrant a sentence reduction or early release.

### C. REHABILITATION

Weaver says that he worked approximately 200 hours since he began his incarceration on these charges at FCI Milan in May 2018. He says that because of COVID, he did not receive time reduction credits under the First Step Act (FSA) because he completed these hours before he was transferred to Allenwood Low FCI, "where he is now serving his sentence." [ECF No. 165, PageID.1452].

Under recent FSA amendments, inmates eligible under the FSA can receive retroactive time credit (towards prerelease custody) from the Bureau of Prisons (BOP) for evidence-based recidivism reduction programs they participated in from "December 21, 2018, until January 14, 2020." 28 C.F.R § 523.42(b) (1-2).

Congress did not make the statute retroactive beyond this date. More importantly, the code of federal regulation that Weaver relies on pertains to internal operations and decisions by the BOP and not to decisions the Court makes in conjunction with motions for sentence reduction. *See United States v. Moore*, No. 2:93-CR-310-ID, 2009 WL 2970464, at \*2 (M.D. Ala. Sept. 11, 2009) ("As a general matter, it is plain from the statute that the Attorney General is charged with administration of this pilot program, and the Court is not inclined to interfere with his authority in that regard.")

Even if the Court was compelled to take this regulation into account, incarcerated persons cannot show that extraordinary and compelling circumstances warrant release solely based on a nonretroactive change in the law. *United States v. Wills*, 997 F.3d 685, 688 (6th Cir. 2021).

Finally, even if Weaver worked hours between December 21, 2018 and January 14, 2020 for which the BOP did not give him credit towards prerelease custody, the Court lacks authority under the FSA to compel the BOP to award Weaver those credits. The exclusive authority to determine a prisoner's place of incarceration—including home confinement—rests with the BOP, not with the sentencing court. 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment ..."). Such a decision "is not reviewable by any court." 18 U.S.C. § 3621(b)(5). *See also Miller v. United States*, No. 16-20222-1, 453 F.Supp.3d 1062, 1064–65, (E.D. Mich. Apr. 9, 2020); *United States v. Mitchell*, 472 F. Supp. 3d 403, 409 (E.D. Mich. 2020); *United States v. Doshi*, No. 13-cr-20349, 2020 WL 1527186, at \*1 (E.D. Mich. Mar. 31, 2020).

Nonetheless, the Court may consider the hours that Weaver worked along with his other significant efforts toward rehabilitation.

There is no dispute that the BOP classifies Weaver's risk of reoffending as "low" under the FSA's recidivism risk assessment tool. [ECF No. 161, PageID.1245]. He has completed more than 50% of his sentence and is enrolled in several adult education courses. Weaver has prison work experience and has participated in residential and non-residential drug programs. [ECF. No. 165, PageID.1452]. Since sentencing, he has incurred no prison discipline. He does have a release plan that details where he will live, his means of support and transportation, and how he will get medical care. [ECF No. 161, PageID.1247]. Weaver desires to be physically present with his longtime partner and children. He says he will lead a better life upon release.

Case 1:22-cv-00040-MJT-CLS   Document 8-1   Filed 05/17/22   Page 116 of 143 PageID #:  378

**\*3**  However, a prisoner's rehabilitation, without more, is not an extraordinary and compelling circumstance warranting sentence reduction. *United States v. Lemons*, 15 F.4th 747 (6th Cir. 2021).

Weaver's circumstances are not sufficiently extraordinary and compelling – either individually or collectively – to support a sentence reduction.

### D. § 3553 Factors

Even if Weaver's circumstances were extraordinary and compelling, the § 3553 factors do not favor release.

Weaver's offense is serious; he engaged in a conspiracy to distribute dangerous drugs. He also has an extensive criminal history – five drug crimes. One of those crimes occurred while he was on parole. He has a conviction for a violent felony. He does not dispute that, during his incarceration in the state correctional system, he received nine misconduct violations.

The Court believes that the sentence it imposed serves the § 3553 factors: it accounts for Weaver's history and circumstances. It reflects the seriousness of Weaver's offenses, promotes respect for the law, provides just punishment, and affords adequate deterrence.

### E. Conclusion

The grounds Weaver offers in support of a sentence reduction do not amount to extraordinary and compelling circumstances and they do not support a sentence reduction. Weaver also fails to show that the § 3553(a) factors support a reduction.

The Court **DENIES** Weaver's motion for sentence reduction.

**IT IS ORDERED.**

**All Citations**

Slip Copy, 2022 WL 350719

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

310 Fed.Appx. 678
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See Fed.
Rule of Appellate Procedure 32.1 generally governing
citation of judicial decisions issued on or after Jan.
1, 2007. See also Fifth Circuit Rules 28.7, 47.5.3,
47.5.4. (Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Fernando SPENCER, Petitioner–Appellant
v.
Warden M. Thomas BRAGG, Respondent–Appellee.

No. 07–51452
|
Conference Calendar.
|
Feb. 18, 2009.

**Synopsis**

**Background:** Federal prisoner brought habeas petition related to alleged exposure to asbestos, lack of proper medical treatment, retaliation, and loss of legal notes. The United States District Court for the Western District of Texas, Kathleen Cardone, J., 2007 WL 4115295, dismissed the petition. Prisoner appealed.

**Holding:** The Court of Appeals held that habeas petition was not proper method for federal prisoner to challenge the conditions of his confinement.

Denied.

**Procedural Posture(s):** On Appeal.

West Headnotes (1)

**[1]**    **Civil Rights** 🔑 Criminal Law Enforcement; Prisons

**Habeas Corpus** 🔑 Prisons; Conditions, Discipline, Transfer, Etc

**Habeas Corpus** 🔑 Limitations and Conditions;  Treatment and Discipline

Habeas petition was not proper method for federal prisoner to challenge the conditions of his confinement, since such claims should be raised in civil rights action; prisoner's claims related to alleged exposure to asbestos, lack of proper medical treatment, retaliation, and the loss of legal notes. 🚩 28 U.S.C.A. § 2241.

89 Cases that cite this headnote

**Attorneys and Law Firms**

**\*679**  Fernando Spencer, Anthony, NM, pro se.

Eduardo R. Castillo, U.S. Attorney's Office, Western District of Texas, El Paso, TX, for Respondent–Appellee.

Appeal from the United States District Court for the Western District of Texas, USDC No. 3:07–CV–160.

Before HIGGINBOTHAM, DENNIS, and PRADO, Circuit Judges.

**Opinion**

PER CURIAM: [*]

**\*\*1**   Fernando Spencer, federal prisoner # 10714–180, appeals the district court's dismissal of his 🚩 28 U.S.C. § 2241 petition without prejudice for lack of jurisdiction. The district court held that Spencer's claims, which relate to his alleged exposure to asbestos, lack of proper medical treatment, retaliation, and the loss of legal notes, related to the conditions of his confinement. Because success on these claims would not result in Spencer's accelerated release from prison, the district court held that they were not cognizable under 🚩 § 2241.

Spencer argues that his application is proper under 🚩 § 2241 because he is challenging the execution of his sentence and he seeks accelerated release from prison. He contends that the loss of his legal notes negatively impacted his 28 U.S.C. § 2255 proceeding, which he asserts could have resulted in his release from prison. Therefore, he argues that accelerated release is appropriate relief in this proceeding.

Case 1:22-cv-00040-MJT-CLS   Document 8-1   Filed 05/17/22   Page 118 of 143 PageID #: 380

Where "a prisoner challenges an unconstitutional condition of confinement or prison procedure that affects the timing of his release from custody," the proper vehicle is a civil rights action if a determination in the prisoner's favor will not automatically result in his accelerated release. *Carson v. Johnson,* 112 F.3d 818, 820–21 (5th Cir.1997). Even if Spencer could prove the claims he seeks to present, he has not shown a legal basis for obtaining accelerated release.

Accordingly, we AFFIRM the district court's judgment dismissing the § 2241 petition without prejudice for lack of jurisdiction.

Spencer's motion for release pending appeal is DENIED.

**All Citations**

310 Fed.Appx. 678, 2009 WL 405864

## Footnotes

\*      Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

526 F.Supp.2d 606
United States District Court,
N.D. Texas,
Fort Worth Division.

Courtney M. TISCHENDORF, Petitioner,

v.

Ginny VAN BUREN, Warden,
FMC–Carswell, Respondent.

No. 4:07–CV–273–A.
|
Dec. 5, 2007.

**Synopsis**
**Background:** Petitioner, a federal prisoner, sought federal habeas relief, moving for an order directing the Bureau of Prisons (BOP) to consider in good faith the placement of petitioner in a Community Correction Center (CCC) at least 180 days prior to the end of her sentence.

**Holdings:** The District Court, John McBryde, J., held on matters of first impression that:

[1] BOP had authority to categorically limit release to CCC, and

[2] categorical limitation was a valid application of governing statutes.

Petition denied.

West Headnotes (10)

**[1]    Habeas Corpus**  ⚷  Place of confinement; transfer

Federal prisoner's request for an order directing the Bureau of Prisons (BOP) to consider in good faith her placement in a Community Correction Center (CCC) at least 180 days prior to the end of her sentence challenged the execution of her sentence, and was therefore governed by habeas corpus statute. 🚩 28 U.S.C.A. § 2241.

4 Cases that cite this headnote

**[2]    Federal Courts**  ⚷  Ripeness; Prematurity

Ripeness is a constitutional prerequisite to the exercise of Article III jurisdiction. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[3]    Habeas Corpus**  ⚷  Administrative remedies, and review thereof

As a general rule, a prisoner seeking habeas relief under must first exhaust administrative remedies. 🚩 28 U.S.C.A. § 2241.

**[4]    Habeas Corpus**  ⚷  Administrative remedies, and review thereof

To be excused from exhaustion requirement for habeas review, petitioner must demonstrate either that the administrative remedies are unavailable or inappropriate to the relief sought or that to pursue the existing administrative remedies would be patently futile. 🚩 28 U.S.C.A. § 2241.

**[5]    Habeas Corpus**  ⚷  Prisons; conditions, discipline, transfer, etc

Any attempt by habeas petitioner to seek relief through administrative remedies for her request to be placed in Community Correction Center (CCC) would have been patently futile, thus excusing petitioner from exhaustion requirement for habeas review, where petitioner challenged Bureau of Prison (BOP) regulations which categorically denied consideration for community confinement before a certain point in time. 🚩 28 U.S.C.A. § 2241; 🚩 28 C.F.R. § 570.21.

2 Cases that cite this headnote

**[6]    Prisons**  ⚷  Conditional release; community placement

Federal Bureau of Prisons (BOP) had the authority, under statute requiring that prisons decide, on a case by case basis, the placement of prisoners, and under statute governing pre-release custody of a prisoner, to categorically limit Community Correction Centers (CCC) for use as pre-release custody facilities, with some exceptions, and to predetermine that a CCC was generally not a suitable facility to be considered for initial placement or transfer. 🚩 18 U.S.C.A. §§ 3621(b), 🚩 3624(c); 🚩 28 C.F.R. § 570.20.

5 Cases that cite this headnote

[7]    **Statutes** 🗝 General and specific statutes

In statutory interpretation, specific statutory provisions govern over more general provisions.

[8]    **Statutes** 🗝 Superfluousness

In statutory interpretation, courts have a duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section.

[9]    **Statutes** 🗝 Superfluousness

In statutory interpretation, courts should be reluctant to treat statutory terms as surplusage.

[10]   **Prisons** 🗝 Conditional release; community placement

Even if Congressional intent were not facially apparent, federal Bureau of Prison (BOP) regulations designating inmates to community confinement only as part of pre-release program, and only during last 10 percent of sentence not to exceed six months, was a permissible, and thus valid, application of general statute requiring that BOP decide, on a case by case basis, where to place or transfer prisoners, when read to gather with more specific statute governing prisoners' pre-release custody; more specific provision expressly restricted the broad grant of general authority conferred upon BOP under more general statute governing placement.

🚩 18 U.S.C.A. §§ 3621(b), 🚩 3624(c); 🚩 28 C.F.R. § 570.20.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*607** Mark McAdoo, Law Offices of Mark A. McAdoo, Arlington, TX, for Petitioner.

**\*608** Donna K. Webb, U.S. Attorney's Office, Fort Worth, TX, for Respondent.

*MEMORANDUM OPINION* and *ORDER*

JOHN McBRYDE, District Judge.

Came on for consideration the above-captioned action wherein Courtney M. Tischendorf is petitioner and Ginny Van Buren, Warden, FMC–Carswell, is respondent. This is a petition for writ of habeas corpus in which petitioner, a federal prisoner, seeks relief under 🚩 28 U.S.C. § 2241.

I.

*Background*

On February 27, 2006, petitioner was sentenced to a 33–month term of imprisonment followed by a four-year term of supervised release for violating 18 U.S.C. § 656. She is currently serving this sentence at a Satellite Camp at FMC–Carswell, Fort Worth, Texas. Petitioner is expected to complete her prison sentence on September 23, 2008, because of good conduct time release. The Bureau of Prisons ("BOP") has projected June 29, 2008, as the date on which it will consider petitioner for placement in a Community Correction Center ("CCC"). Plaintiff moves pursuant to 🚩 28 U.S.C. § 2241 for an order directing the BOP to consider in good faith the placement of petitioner in a CCC at least 180 days prior to the end of her sentence of imprisonment.

II.

*Applicable Statutes and Regulations*

BOP has the authority to designate confinement facilities and determine pre-release custody placements for federal prisoners. This authority, granted to BOP by Congress, is found in two statutes, 18 U.S.C. §§ 3621(b) and 3624(c). Section 3621(b) states:

> (b) Place of imprisonment.—The Bureau of Prisons shall designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering—
>
> (1) the resources of the facility contemplated;
>
> (2) the nature and circumstances of the offense;
>
> (3) the history and characteristics of the prisoner;
>
> (4) any statement by the court that imposed the sentence —
>
> (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
>
> (B) recommending a type of penal or corrections facility as appropriate; and
>
> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.
>
> In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correction facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse.

18 U.S.C.A. § 3621(b) (West 2000). Section 3624(c) states:

> *609 (c) Pre-release custody.—The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody.

18 U.S.C.A. § 3624(c) (West 2000).

The applicable BOP regulations implementing these statutes became effective February 14, 2005, and are codified at Community Programs, 28 C.F.R. §§ 570.20 and 570.21 (2006) (collectively, "BOP Regulations"). Section 570.20 states:

> (a) This subpart provides the Bureau of Prisons' (Bureau) categorical exercise of discretion for designating inmates to community confinement. The bureau designates inmates to community confinement only as part of pre-release custody and programming which will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community.
>
> (b) As discussed in this subpart, the term "community confinement" includes Community Corrections Center (CCC) (also known as "halfway houses") and home confinement.

Section 570.21 provides:

> (a) The Bureau will designate inmates to community confinement only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months.

(b) We may exceed these time-frames only when specific Bureau programs allow greater periods of community confinement, as provided by separate statutory authority (for example, residential substance abuse treatment program ( 18 U.S.C. 3621(e)(2)(A)), or shock incarceration program (18 U.S.C. 4046(c))).

### III.

*Analysis*

A. *Jurisdiction*

1.  *Section 2241*
 **[1]**    Respondent contends that petitioner does not have a right to bring this action pursuant to  28 U.S.C. § 2241. The better-reasoned circuit decisions have held to the contrary. In *Warren v. Miles,* 230 F.3d 688 (5th Cir.2000), the issue before the court was the consideration of a federal prisoner for early release. The Fifth Circuit held that  § 2241 "is the proper habeas remedy for challenging the execution of a sentence."

*Id.* at 694; *see also*  *Leggett v. Fleming,* 380 F.3d 232, 234 (5th Cir.2004) (considering time credit issues), *United States v. Cleto,* 956 F.2d 83, 84 (5th Cir.1992) (same). While the Fifth Circuit has not specifically addressed what vehicle should be used by a federal prisoner to challenge where a federal sentence should be served for purposes of pre-release custody, at least two circuits have held that a  § 2241 action is proper. *See*  *Levine v. Apker,* 455 F.3d 71, 77–78 (2d Cir.2006);  *Woodall v. Federal Bureau of Prisons,* 432 F.3d 235, 242–44 (3d Cir.2005). The court agrees with those holdings. The court concludes that petitioner is challenging the "execution" of her sentence and thus, her petition filed pursuant to  § 2241 is the proper vehicle in which to seek relief.

 ***610*** 2. *Ripeness*
 **[2]**    "Article III of the Constitution confines federal courts to the decision of 'cases' and 'controversies.' A case or controversy must be ripe for decision, meaning that it must not be premature or speculative. That is, ripeness is a constitutional prerequisite to the exercise of jurisdiction."

 *Shields v. Norton,* 289 F.3d 832, 834–35 (5th Cir.2002) (footnote omitted) (citing  *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

Here, respondent argues that petitioner's claim is not ripe for review because BOP staff does not need to consider her for placement in a halfway house until eleven to thirteen months prior to her scheduled release date, which is in September of 2008. Petitioner argues that if the court were to grant her petition then she could be considered for halfway house placement as early as March of 2008. Even assuming petitioner's scheduled release date remains in September of 2008, that date is less than eleven months from now, and, thus, respondent's ripeness argument is moot.

B. *Exhaustion of Administrative Remedies*
 **[3]**    **[4]**    As a general rule. a prisoner seeking habeas relief under  § 2241 must first exhaust administrative remedies. *See*  *Fuller v. Rich,* 11 F.3d 61, 62 (5th Cir.1994). To be excused from this exhaustion requirement, the prisoner must demonstrate either that the administrative remedies are unavailable or inappropriate to the relief sought or that to pursue the existing administrative remedies would be patently futile.  *Id.*

 **[5]**    Here, petitioner challenges BOP Regulations which categorically deny consideration for community confinement before a certain point in time. Accordingly, the court concludes that any further attempt by petitioner to seek relief through administrative remedies would be patently futile. Therefore, petitioner is excused from the exhaustion requirement.  *Id.; see Bell v. Wiley,* 481 F.Supp.2d 1168, 1172 (D.Colo.2007) (holding that administrative relief for a challenge to  28 C.F.R. § 570.21 is not possible because BOP has predetermined the issue).

C. *BOP Regulations*
The issue before the court is whether BOP Regulations, which are challenged by petitioner, are a valid interpretation of  18 U.S.C. §§ 3621(b) and  3624(c). The Fifth Circuit has not decided this issue but four other circuit courts, as well as two judges of this court, have held that the BOP Regulations are contrary to Congress' clear and unambiguous intent under  § 3621(b) and, thus, invalid.  *Levine,* 455

F.3d 71; Woodall, 432 F.3d 235; Fults v. Sanders, 442 F.3d 1088 (8th Cir.2006); Wedelstedt v. Wiley, 477 F.3d 1160 (10th Cir.2007); Mihailovich v. Berkebile, No. 3:06–CV–16–3–N, 2007 WL 942091 (N.D.Tex. March 28, 2007); Briggs v. Van Buren, No. 4:06–CV–800–Y, 2007 WL 3019238 (N.D.Tex. Oct.16, 2007). The court disagrees with those holdings. In the court's view, those holdings have resulted from an improper focus on § 3621(b) without consideration being given to the broader imprisonment-pre-release scheme contemplated by §§ 3621(b) and 3624(c) combined.

A federal district court's review of an agency's interpretation of a statute is governed by Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In Chevron, the United States Supreme Court stated that

> [w]hen a court reviews an agency's construction of the statute which [the agency] administers, [the court] is confronted **\*611** with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Id. at 842–43, 104 S.Ct. 2778 (footnotes omitted).

Here, respondent argues that in promulgating §§ 3621(b) and 3624(c) Congress was silent on the issue of whether BOP could make a categorical designation that CCCs are only for prisoners in pre-release custody, with the exception of certain statutory designations. Respondent maintains that the issue presented in this case is akin to that decided by the Supreme Court in Lopez v. Davis, 531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001), in which the Court held that BOP's categorical exercise of discretion was a permissible interpretation of § 3621(e)(2)(B). Id. at 242, 121 S.Ct. 714. Specifically, in Lopez, the Court upheld the BOP interpretation that categorically excluded prisoners from eligibility for early release for successful completion of the substance abuse treatment program if those prisoners were convicted of an offense using a firearm. Id. at 244, 121 S.Ct. 714. In doing so, the court, applying Chevron, concluded that, although Congress was silent on the issue, the BOP regulation was a permissible interpretation of § 3621(e)(2)(B). Id. at 244, 121 S.Ct. 714.

In its response to the petition, respondent relies on the following language from Lopez: " 'even if a statutory scheme requires individualized determinations ... the decision maker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.' " Resp. 16 (quoting Lopez, 531 U.S. at 243–44, 121 S.Ct. 714). Respondent contends that the analysis in Lopez is applicable to the instant action because, just as in § 3621(e)(2), Congress granted BOP wide discretion under §§ 3621(b) and 3624(c), including the authority to limit community confinement designations to prisoners in pre-release status, and in both instances did not prohibit such discretion from being exercised categorically.

Petitioner contends that a proper application of Chevron to the statute leads to the conclusion that Congress clearly and unambiguously intended that BOP be required to make on individualized case-by-case assessment in deciding whether a prisoner should be designated for CCC placement. The

argument petitioner makes is best summed up by the Tenth Circuit's reasoning in *Wedelstedt* that:

> The BOP regulations contradict Congress' clear intent that all inmate placement and transfer decisions be made individually and with regard to the five factors enumerated in 18 U.S.C. § 3621(b). The regulations at issue supplant the five factors and, therefore, are invalid.

477 F.3d at 1162. Petitioner urges the court to adopt this reasoning and conclude that BOP's Regulations are not a permissible interpretation of § 3621(b) and, therefore, are invalid.

 **[6]**    The court declines petitioner's invitation to adopt the reasoning expressed in *Wedelstedt.* The court views the issue in a **\*612**  different way. The question is not whether BOP has the authority to disregard the factors set out in § 3621(b) by categorically designating individuals, rather, the issue is whether BOP is authorized to categorically designate a type of facility for only pre-release purposes. The court finds persuasive the reasoning of the dissent in *Levine:*

> I construe the [BOP Regulations] as a permissible categorical rejection of CCCs as appropriate and suitable facilities for § 3621(b) designations generally, with a limited exception only for those circumstances where Congress has identified statutory considerations....

. . . . .

> The rule does not eliminate § 3621(b) factors from any placement consideration: rather, it eliminates a particular type of facility-CCCs-from among those to which a prisoner can be designated when only the five § 3621(b) factors inform the BOP's placement decision.

. . . . .

In light of the statutory scheme, the BOP might well conclude that (1) it does not generally consider CCCs appropriate and suitable facilities for the service of incarceratory sentences; nevertheless (2) these facilities, which are, after all, designed to promote community reentry, can usefully serve the § 3624(c) mandate.

455 F.3d at 88–89 (Raggi, J., dissenting). The court agrees that BOP's decision categorically to limit CCCs for use as pre-release custody facilities, with some exceptions, is in no way contrary to congressional intent. The fact that BOP has predetermined that a CCC is generally not a suitable facility to be considered for initial placement or transfer does not mean that BOP's decisions regarding placement and transfer are any less individual. Congress' intent evidenced by §§ 3621(b) and 3624(c) to give BOP broad discretion regarding the designation of a facility only for pre-release purposes is clear. The court agrees with the following observations of the concurring judge in *Goldings v. Winn,* 383 F.3d 17 (1st Cir.2004):

> Even if the statutory criteria for making assignments and transfers could be read to guarantee some sort of individualized treatment, it is apparent to me that BOP would still have the authority to make a categorical rule excluding some or all CCC placements, except as required for end of sentence placements governed by § 3624(c).

*Id.* at 33 (Howard, J., concurring).

 **[7]**    **[8]**    **[9]**    Moreover, even if Congress' intent on this issue was not facially apparent from the statute, BOP's interpretation of §§ 3621(b) and 3624(c), as expressed in the BOP Regulations, is permissible. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778 (stating that if the court determines that the statute is silent or ambiguous on the specific issue, "the question is whether the agency's answer is based on a permissible construction of the statute"). Two

canons of statutory construction are helpful in reading § 3621(b), a general provision, in light of § 3624(c), a more specific provision. *See* *Elwood v. Jeter,* 386 F.3d 842, 847–48 (8th Cir.2004) (Riley, J., dissenting). One mandates that specific statutory provisions govern over more general provisions. *Varity Corp. v. Howe,* 516 U.S. 489, 511, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). The other is that courts have a "duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section". *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (internal quotation marks omitted). In other words, courts should be "reluctant to treat statutory terms as surplusage." *Babbitt v. Sweet Home Chapter of Communities for Great Ore.,* 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).

**\*613  [10]**    Congress articulated in § 3621(b) a general rule that BOP must follow in deciding, on a case by case basis, where to place or transfer prisoners. Section 3624(c) is a more specific statute governing prisoners' pre-release custody—a specific part of a prisoner's sentence that can consist of the last ten percent of the sentence, not to exceed six months. Reading the sections together, "[t]he specific ten percent/six month limitations contained in section 3624(c) expressly restrict BOP's broad grant of general authority and discretion conferred under § 3621(b)." *Elwood,* 386 F.3d at 848 (Riley, J., dissenting). This reading insures that words in the statute are not rendered meaningless and "specifically gives life to section 3624's limitations on placements in transitional facilities at the end of an inmate's term," *id.;* and "[s]uch an interpretation further complies with the canon, the specific governs the general." *Id.* (internal quotation marks omitted). Accordingly, the court concludes that the BOP Regulations are a permissible, and thus valid, application of §§ 3621(b) and 3624(c).

If the statutory interpretation urged by petitioner, with the support of several court decisions, were to be adopted, § 3624(c) would be rendered virtually meaningless. The "a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served" would be written out of § 3624(c) by such a statutory interpretation, because,

under that interpretation, every prisoner would be entitled to be considered at any point in the service of his sentence for placement in a pre-release custody facility. As the dissent put it in *Elwood:*

> By reading the two [ §§ 3621(b) and 3624(c) ] together to permit the BOP to begin to transition inmates at any time during their imprisonment, the majority eviscerates both the specific limitations set forth in section 3624(c) and Congress's express intention to limit the amount of time permitted for CCC placement at the conclusion of an inmate's term.

*Id.*

Whether viewed as being authorized facially by the statute or by a permissible reading of the statute, the BOP had the authority under §§ 3621(b) and 3624(c) to adopt the regulation that designates "inmates to community confinement only as part of pre-release custody and programming which will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community," 28 C.F.R. § 570.20, and to "designate inmates to community confinement only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months," *id* § 570.21.

IV.

*ORDER*

For the reasons discussed above,

The court ORDERS that the petition be, and is hereby, denied.

**All Citations**

526 F.Supp.2d 606

---

**End of Document**                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3047471
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

UNITED STATES, Plaintiff,
v.
Lee OROZCO, Defendant.

Case No. 3:15-CR-00038-RCJ-WGC
|
Signed 06/08/2020

**Attorneys and Law Firms**

Megan Rachow, U.S. Attorney's Office, Reno, NV, for Plaintiff.

## ORDER

[ROBERT C. JONES](), United States District Judge

 **\*1** Defendant requests this Court recommend to the Bureau of Prisons (BOP) that he spend the remainder of his sentence in home confinement because of COVID-19. Because he has neither shown a likelihood of contracting the disease while incarcerated nor that the disease would make him severely ill, the Court denies the motion.

## FACTUAL BACKGROUND

Defendant is thirty-one years old and lacks any serious health problems. (Presentence Rep. at 2, 13.) He is currently serving a thirty-three-month sentence for violating [18 U.S.C. §§ 922(g)(1)](), [924(a)(2)](). (ECF No. 35.) Defendant has been previously convicted for a number of nonviolent crimes (both felony and misdemeanor), including theft, driving under the influence, and other drug-related offenses. (Presentence Rep. at 5–10.)

Defendant is incarcerated in FCI Sheridan with a projected release date of September 7, 2020. *Find an inmate*, https://www.bop.gov/inmateloc/ (last visited on June 2, 2020). FCI Sheridan does not appear to have any confirmed active cases of COVID-19. *COVID-19 Coronavirus: COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited June 2,

2020) (failing to list FCI Sheridan as a facility affected by COVID-19).

## LEGAL STANDARD

The BOP has discretion to designate the facility in which a prisoner serves his sentence. [18 U.S.C. § 3621(b)](). In making this determination, the BOP must consider five factors, one of which is "any statement by the court that imposed the sentence ... recommending a type of penal or correctional facility as appropriate." [*Id.* § 3621(b)](). The BOP may allow a prisoner to serve the last 10% or six months of his sentence, whichever is less, in home confinement and "shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph." [18 U.S.C. § 3624(c)(2)]().

Combining these statutes, courts have held that they may recommend that the BOP allow an eligible defendant to serve his sentence in home confinement. *See, e.g., [United States v. Miranda](), No. 3:16-CR-00250-GPC, 2017 WL 3219941, at \*3 (S.D. Cal. July 28, 2017)* (recommending home confinement). [1] A court may make such recommendations at any time. *See [United States v. Ceballos](), 671 F.3d 852, 856 n.2 (9th Cir. 2011).*

## ANALYSIS

 **\*2** Even though the Government does not oppose the motion, the Court declines to recommend the BOP allow Defendant to spend the rest of his prison sentence in home confinement. Assuming, *arguendo*, that the BOP must consider the Court's recommendation and that Defendant is eligible to serve the remainder of his sentence in such a manner, the Court finds the basis for his request inadequate. He only bases this request on the ongoing pandemic of COVID-19, but he is not at risk of becoming severely ill from COVID-19. *See Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness*, Ctr. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 2, 2020). He further fails to show that he is more

2020 WL 3047471

likely to get the disease, while incarcerated because it appears that COVID-19 has not even reached his facility.

In declining to make this recommendation, the Court is also not recommending against home confinement—rather, the Court is merely recognizing the fact that the BOP, not this Court, is in the best position to make this determination. The statute identifies three elements to consider in determining whether to place an inmate in home confinement: home confinement is practicable, the inmate qualifies as "lower risk level[ ]," and the inmate has "lower needs." The information required to make this determination, in this case, is not available to the Court.

## CONCLUSION

IT IS HEREBY ORDERED that Defendant's Motion for Judicial Recommendation for Transfer to Home Confinement (ECF No. 38) is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 3047471

## Footnotes

1    The proposition that the BOP must consider such a recommendation is dubious. While Congress ordered the BOP to consider court recommendations about the most appropriate "penal or correctional facility" in § 3621(b), it failed to include "home confinement" in this provision. Rather, a separate statute, § 3624(c)(2), governs the BOP's authority to place an inmate in home confinement, which does not include such a mandate. Indeed, a court's recommendation of home confinement seems pointless as § 3624(c)(2)—unlike the BOP's discretion in choosing a correctional facility under § 3621(b)—mandates, "to the extent practicable," home confinement for "prisoners with lower risk levels and lower needs ... for the maximum amount of time permitted under this paragraph." *See United States v. Phelps*, No. 2:13-CR-83-JCM-CWH, 2019 WL 2291454, at *2 (D. Nev. May 29, 2019) ("[T]he plain language of [§ 3624(c)(1)] directs the BOP, not the court, to ensure that eligible prisoners are afforded home confinement relief....").

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6621681

2012 WL 6621681
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

Michael T. TOOLE, Petitioner,
v.
J.E. KRUEGER, Warden, Respondent.

No. 12–CV–2445 (PJS/TNL).
|
Dec. 19, 2012.

**Attorneys and Law Firms**

Michael T. Toole, pro se.

D. Gerald Wilhelm, United States Attorney's Office, for respondent.

ORDER

PATRICK J. SCHILTZ, District Judge.

 **\*1** This matter is before the Court on the objection of petitioner Michael Toole to the November 26, 2012 Report and Recommendation ("R & R") of Magistrate Judge Tony N. Leung. Judge Leung recommends that Toole's petition for a writ of habeas corpus under 28 U.S.C. § 2241 be denied. The Court has conducted a de novo review. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). Based on that review, the Court sustains Toole's objection and grants his § 2241 petition.

Toole, a former state-court judge, is serving a 30–month sentence in the Federal Prison Camp in Duluth, Minnesota. On September 27, 2012, Toole completed the first of three components of the Residential Drug Abuse Program ("RDAP"). [1] Toole contends that, as a result, the Bureau of Prisons ("BOP") has the *authority* (although, he concedes, not the *obligation* ) to immediately place him in a home-confinement program. Toole contends that this authority derives from 18 U.S.C § 3621(e)(2)(A), which states, in pertinent part: "Any prisoner who, in the judgment of the Director of the Bureau of Prisons, has successfully completed a program of residential substance abuse treatment provided under paragraph (1) of this subsection, shall remain in the custody of the Bureau under such conditions as the Bureau deems appropriate."

Respondent disagrees. According to respondent, the only authority under which the BOP can designate an inmate to home confinement is found in 18 U.S.C. § 3624(c), which governs prerelease custody determinations during the last 12 months of an inmate's incarceration. Under Section 3624(c)(2), the BOP may place an inmate in home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months"—which, in Toole's case, would mean that he is not eligible for home confinement until the end of December.

Because Toole contends that he has been eligible for home confinement since September 27, 2012, and because Toole is scheduled to be placed in home confinement on January 2, 2013, ECF No. 20 at 1, Toole seeks an expedited decision on his petition. Doing its best to work through this complicated issue in the short amount of time available to it, the Court holds that Toole is correct: Under § 3621(e)(2)(A), the BOP has had the authority to place Toole in home confinement since September 27, 2012, when Toole completed the first component of the RDAP.

Toole's petition essentially presents three questions: First, has Toole "successfully completed a program of residential substance abuse treatment" for purposes of § 3621(e)(2)(A)? Second, does § 3621(e)(2)(A) give the BOP the authority to place an inmate who has completed such a program in home confinement? And finally, if the BOP has the authority to place such an inmate in home confinement under § 3621(e)(2)(A), do the time limits in § 3624(c)(2) limit that authority?

The Court begins with the last question, which is the easiest to answer. Toole is correct that the time limits in § 3624(c)(2) do not limit whatever authority the BOP has under § 3621(e)(2)(A) to place an inmate in home confinement. The statute itself makes this clear. Section 3624(c)(4) expressly states that "[n]othing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621." Moreover, even before § 3624(c) was amended to include this language, the Eighth Circuit had rejected an argument that § 3624(c) limited the

BOP's authority under a different subsection of 🚩 § 3621. 🚩 *Elwood v. Jeter,* 386 F.3d 842, 846–47 (8th Cir.2004). In so holding, the Eighth Circuit implicitly rejected the argument (relied on by the dissent in *Elwood,* and by Judge Leung in the R & R) that the specific provisions of 🚩 § 3624(c) should govern over the more general provisions of 🚩 § 3621 and that the petitioner's position rendered 🚩 § 3624(c) mere surplusage. *See* 🚩 *id.* at 847–48 (Riley, J. dissenting). If the BOP has the authority under 🚩 § 3621(e)(2)(A) to place Toole in home confinement, then both 🚩 § 3624(c)(4) and *Elwood* make clear that nothing in 🚩 § 3624(c) limits that authority.

**\*2** As noted, determining whether 🚩 § 3621(e)(2)(A) in fact gives the BOP the authority to place Toole in home confinement involves two questions: (1) Whether Toole has "successfully completed a program of residential substance abuse" within the meaning of that provision and, if so, (2) whether that provision gives the BOP the authority to place Toole in home confinement.

Respondent notes—in passing, and in the "Background" section of his brief—that "[s]uccessful completion of [the] RDAP requires an inmate to successfully complete all three components." *See* 28 C.F.R. § 550.53(a) ("[t]o successfully complete the RDAP, inmates must complete each of the following [three] components"). But nowhere in his brief does respondent explicitly argue that Toole has not completed a "program of residential substance abuse treatment" for purposes of 🚩 § 3621(e)(2)(A). In particular, nowhere in his brief does respondent dispute Toole's careful and detailed argument that the first, "unit-based" component of the RDAP —a component that lasts a minimum of six months and that takes place in a treatment unit set apart from the general prison population, *see* 28 C.F.R. § 550.53(a)(1)—meets the definition of "residential substance abuse treatment" in 🚩 § 3621(e)(5)(A). *See* 18 U.S.C. § 3 621(e)(5)(A) (defining "residential substance abuse treatment" as "a course of individual and group activities and treatment, lasting at least 6 months, in residential treatment facilities set apart from the general prison population"). Notably, the R & R indicated that completing the unit-based component triggers 🚩 § 3621(e)(2)(A), *see* R & R at 15 (" 🚩 Section 3621(e)(2)(A) provides

that a prisoner who has completed the unit component of the RDAP 'shall remain in the custody of the [BOP] under such conditions as the [BOP] deems appropriate.' "), and respondent did not object in any way to this assertion.

Given the importance of this issue to Toole's petition, the Court considers respondent's failure to argue explicitly that Toole has not successfully completed a "program of residential substance abuse treatment" within the meaning of 🚩 § 3621(e)(2)(A)—combined with respondent's failure to object to Judge Leung's indication that the unit-based component satisfies the requirements of 🚩 § 3621(e)(2) (A)—to be a concession that Toole has "successfully completed a program of residential substance abuse treatment" for purposes of 🚩 § 3621(e)(2)(A). The Court also notes that respondent explicitly conceded that the third component of the RDAP can be completed by the inmate while in home confinement. ECF No. 8 at 9. This is necessarily a concession that, *if* 🚩 § 3621(e)(2)(A) gives the BOP authority to place an inmate in home confinement after the inmate has "successfully completed a program of residential substance abuse treatment," that authority can be exercised before the inmate completes the third component of the RDAP.[2] The only remaining question, then, is whether 🚩 § 3621(e)(2)(A) gives the BOP authority to place an inmate in home confinement after the inmate has "successfully completed a program of residential substance abuse treatment."

**\*3** The BOP's general custodial authority over inmates is set forth in 🚩 §§ 3621(a) and 🚩 (b). 🚩 Section 3621(a) commits a person who has been sentenced to a term of imprisonment to the "custody" of the BOP "until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of 🚩 section 3624." 🚩 Section 3621(b), in turn, authorizes the BOP to designate "any available penal or correctional facility" as the place of the inmate's imprisonment. There is authority for the proposition that a "penal or correctional facility" includes a community corrections center. *See* 🚩 *Goldings v. Winn,* 383 F.3d 17, 25–28 (1st Cir.2004).[3] Respondent argues, however, that a "penal or correctional facility" does not include home confinement. *See Monigold v. Berkebile,* No. 07–CV–0750, 2008 WL 623350, at \*8 (N.D.Tex. Mar. 5, 2008) ("Because home confinement does not equate to a penal or correctional

facility, § 3621(b) does not permit the BOP to designate an inmate's home as his place of imprisonment.").

It may be true that an inmate's home is not a "penal or correctional facility" within the meaning of § 3621(b). But Toole is not relying on § 3621(b). Instead, Toole is relying on § 3621(e)(2)(A), which does not require that the inmate be confined in a "penal or correctional facility." Section 3621(e)(2)(A) requires only that the BOP keep the inmate in "*custody* ... under such conditions as the Bureau deems appropriate." The Court concludes that this provision authorizes home confinement, for two reasons:

*First,* both the Supreme Court and the Eighth Circuit have recognized that the question of whether an inmate is in "custody" turns not on the inmate's location—that is, on whether he is confined to a particular facility—but instead on whether the inmate is subject to the BOP's control. In *Reno v. Koray,* 515 U.S. 50, 62–63 (1995), the Supreme Court explained, albeit in a different context, that whether a defendant is in "official detention" for purposes of granting credit for prior custody depends on whether the defendant is in the BOP's custody. In so holding, the Court recognized that the place of confinement does not define whether an inmate is in the BOP's custody; rather, the relevant question is whether the inmate is subject to the BOP's control. *Id.* at 63 ("Unlike defendants 'released' on bail, defendants who are 'detained' or 'sentenced' *always remain subject to the control of the Bureau.* This is an important distinction, as the identity of the custodian has both legal and practical significance. A defendant who is 'released' is not in BOP's custody ...." (citation omitted)); *see also Moreland v. United States,* 968 F.2d 655, 659 n. 8 (8th Cir.1992) ("There exists a strong presumption that 'custody' refers to the legal authority of the custodian.... The physical conditions to which federal inmates are subjected vary widely.... The only common link among all those settings is that the inmates are always subject to the authority of the Attorney General." (citation and quotations omitted)); *Goldings,* 383 F.3d at 25 (noting that *Koray* "recogniz[ed] that the relevant criteria for determining whether a court-imposed period of pre-trial detention in a CCC or other facility may be credited against a term of imprisonment is not the type or place of confinement but whether the defendant is in BOP custody"). These precedents suggest that an inmate who is confined to

his home is still in the BOP's "custody" so long as the inmate remains subject to the control of the BOP.

**\*4** *Second,* the BOP interprets a provision that is substantively identical to § 3621(e)(2)(A)—18 U.S.C. § 4046(c)—to give it authority to place qualified inmates in home confinement notwithstanding the time limitations in § 3624(c). *See* BOP Program Statement 7320.01 (Sept. 6, 1995). [4] So far as the Court can tell, the BOP's understanding of § 4046(c) is well-established and uncontroversial. *See United States v. Pipitone,* 67 F.3d 34, 36 (2d Cir.1995) (noting that, in exchange for completing a shock-incarceration program under § 4046(b), a defendant may be considered for home confinement under § 4046(c)); U.S.S.G. § 5F1.7 cmt. (noting that, in return for completing a shock-incarceration program, "the defendant is eligible to serve the remainder of his term of imprisonment in a graduated release program comprised of community corrections center and home confinement phases"). If § 4046(c) permits the BOP to place an inmate in home confinement, then § 3621(e)(2)(A)—which, for all relevant purposes, is *identical* to § 4046(c)—must likewise grant the BOP such authority. This interpretation is consistent with the implicit definition of "custody" recognized by the Supreme Court and the Eighth Circuit, under which it is the BOP's control over the inmate, rather than the place of the inmate's confinement, that defines whether an inmate is in BOP custody.

The Court therefore concludes that placing an inmate in home confinement is consistent with the requirement in § 3621(e)(2)(A) that an inmate who has successfully completed a program of residential substance abuse treatment "remain in the custody of the Bureau under such conditions as the Bureau deems appropriate." Having concluded (1) that Toole has "successfully completed a program of residential substance abuse treatment" within the meaning of § 3621(e)(2)(A); (2) that § 3621(e)(2)(A) gives the BOP the authority to place an inmate in Toole's position in home confinement; and (3) that § 3624(c)(2) does not limit the BOP's authority to place an inmate in Toole's position in home confinement, the Court will grant Toole's petition and order the BOP to consider whether to place Toole in immediate home confinement.

ORDER

Based on all of the files, records, and proceedings herein, the Court SUSTAINS petitioner's objection [Docket No. 17] and DECLINES TO ADOPT the R & R [Docket No. 15]. IT IS HEREBY ORDERED THAT:

1. Petitioner's 28 U.S.C. § 2241 petition for writ of habeas corpus [Docket No. 1] is GRANTED.

2. Respondent is ORDERED to consider whether to place petitioner in immediate home confinement, using the same criteria that respondent would normally use to make such a determination under 18 U.S.C. § 3624(c)(2).

3. Petitioner's motion for an emergency or expedited hearing [ECF No. 2] is DENIED AS MOOT.

LET JUDGMENT BE ENTERED ACCORDINGLY.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6621681

---

**Footnotes**

1     The other two components consist of (1) follow-up services, in which an inmate must participate "[i]f time allows" before transfer to a community-based program, and (2) the "transitional drug abuse treatment" (or "TDAT") component, which takes place after transfer to community confinement. 28 C.F.R. § 550.53(a).

2     The second component of the RDAP—which appears to be designed to help inmates transition back to the general prison population—must be completed only "[i]f time allows between completion of the unit-based component of the RDAP and transfer to a communitybased program...." 28 C.F.R. § 550.53(a)(2). Toole asserts—and respondent does not dispute—that "time" does not "allow[ ]" him to complete the second component of the RDAP.

3     In *Elwood,* the government conceded that a community corrections center is a "penal or correctional facility," and the Eighth Circuit assumed that was true for purposes of its analysis. *Elwood,* 386 F.3d at 846; *see also Miller v. Whitehead,* 527 F.3d 752, 755 n. 3 (8th Cir.2008).

4     The reference to this exception in Program Statement 7320.01 could be read to address the BOP's authority to place inmates in community corrections facilities rather than its authority to place inmates in home confinement. Program Statement 7320.01 is entitled "Home Confinement," however, and its "purpose and scope" is to "establish policy and procedures for referral and placement of pre-release inmates in Community Corrections home confinement programs." The Court therefore interprets it to address only the BOP's home-confinement authority.

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

421 Fed.Appx. 215
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on
or after Jan. 1, 2007. See also Third Circuit LAR,
App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

Duane GUESS, Appellant

v.

Warden Robert WERLINGER; U.S. Department
of Justice; Federal Bureau of Prisons.

No. 10–3500.
|
Submitted Pursuant to Third Circuit
LAR 34.1(a) March 9, 2011.
|
Opinion filed: April 5, 2011.

**Synopsis**
**Background:** Federal prison inmate filed § 2241 habeas
petition to compel Bureau of Prisons to conduct his prerelease
custody review. The United States District Court for the
Western District of Pennsylvania, Kim R. Gibson, J.,
dismissed petition. Inmate appealed.

**Holdings:** The Court of Appeals held that:

[1] inmate was not required to exhaust administrative
remedies prior to challenging Bureau's policy to conduct
prerelease custody review at 17 to 19 months before inmate's
projected release date, and

[2] inmate was not entitled to habeas relief compelling Bureau
to conduct review.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (2)

[1]    **Habeas Corpus** 👈 Prisons; conditions,
       discipline, transfer, etc
       Federal prison inmate was not required
       to exhaust administrative remedies prior to
       bringing § 2241 habeas proceeding challenging
       Bureau of Prisons' policy to conduct prerelease
       custody hearing at 17 to 19 months before
       inmate's projected release date; inmate's
       challenge implicated execution of sentence
       by alleging that policy foreclosed prerelease
       custodial placement in full amount of time
       available under law. 🚩 28 U.S.C.A. § 2241;
       18 U.S.C.A. § 3624(c)(1).

       3 Cases that cite this headnote

[2]    **Habeas Corpus** 👈 Nature and Place of
       Confinement
       **Prisons** 👈 Time for proceedings; prior notice
       and hearing

       Federal prison inmate was not entitled to 🚩 §
       2241 habeas relief compelling Bureau of Prisons
       to conduct prerelease custody hearing prior to 17
       to 19 months before inmate's projected release;
       Bureau's policy of conducting hearing at 17
       to 19 months prior to date did not foreclose
       availability of 12-month maximum period in
       prerelease custody. 18 U.S.C.A. §§ 3621(b),
       3624(c)(1, 2); 🚩 28 U.S.C.A. § 2241.

       5 Cases that cite this headnote

 *216 On Appeal from the United States District Court for
the Western District of Pennsylvania (D.C. Civil Action No.
10–cv–00182), District Judge: Honorable Kim R. Gibson.

**Attorneys and Law Firms**

Duane Guess, Loretto, PA, pro se.

Laura S. Irwin, Esq., Kelly R. Labby, Esq., Office of the United States Attorney, Pittsburgh, PA, for Appellees.

Before: FUENTES, GREENAWAY, JR. and ROTH, Circuit Judges.

OPINION

PER CURIAM.

**\*\*1** Duane Guess filed a habeas petition pursuant to 🚩 28 U.S.C. § 2241 in District Court. Serving a sentence of 240 months, he stated that his projected release date is in August 2012 and that he expected to be reviewed for prerelease custody options at approximately 17 to 19 months before his projected release date. He requested that the Bureau of Prisons ("BOP") conduct his individualized review under 🏴 18 U.S.C. § 3621 immediately so that he could be afforded 18 months in the prerelease custodial arrangements described in 🏴 18 U.S.C. § 3624. He also asked the BOP be directed to show cause why the writ should not be granted.

A Magistrate Judge screened the petition and recommended that it be dismissed as meritless and for failure to exhaust administrative remedies. More specifically, the Magistrate Judge noted that the District Court does not issue writs to have the BOP justify why it had not conducted Guess's review sooner. The Magistrate Judge also stated that to the extent Guess wanted the District Court to grant him 18 months in a halfway house or home confinement, he had not exhausted his administrative remedies as to that claim. The Magistrate Judge noted that Guess had completed only the first stage of the administrative review process before filing suit.

Guess filed objections. He again requested an immediate prerelease review by the BOP. He also conceded that he had not exhausted his administrative remedies. He argued that his claim should be heard nonetheless because exhaustion would be futile given that he was challenging the validity of the BOP's regulation not its application. Expanding on his argument, Guess contended that the BOP's policy of refusing to conduct a prelease evaluation before 17 to 19 months before a projected release date is invalid and violates 🏴 18 U.S.C. §§ 3621(b) & 🏴 3624(c). He also stated that the BOP's decision to wait to hold his hearing was invalid as to him

and contrary to the individualized determinations intended by statute.

The District Court denied Guess's objections, specifically rejecting his argument that he should be excused from exhausting his administrative remedies. The District Court also noted that Guess had offered nothing to suggest that the BOP has abused or will abuse its discretion in determining his prerelease custody placement. The District Court then adopted the Magistrate **\*217** Judge's report and recommendation as its opinion. Guess appeals.

In his brief, Guess challenges the validity of the BOP's policy of waiting until 17 to 19 months before a prisoner's release to conduct the hearing on prerelease custody. He claims that he is not challenging the application of the regulations, but he also contends that the BOP erred in denying his request for a review before 17 to 19 months and asks us to order the BOP to conduct an immediate review in his case. In response to the Government's contention that Guess's petition was properly dismissed for failure to exhaust, Guess states that he succeeded in exhausting his administrative remedies after the District Court ruled. In addition to pursuing the exhaustion argument, the Government states that Guess's petition lacked merit.

**\*\*2** We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. Our review of the District Court's legal conclusions is plenary. *See* 🚩 *Rios v. Wiley,* 201 F.3d 257, 262 (3d Cir.2000).

**[1]** We conclude that, in part, Guess challenged and continues to challenge the validity of the BOP policy that sets the prerelease custody hearing at 17 to 19 months before the projected release date. He presents a challenge that sounds in habeas under 🚩 § 2241 because he alleges that the time of the hearing forecloses a prerelease custodial placement of 18 months, the amount of time that he says is available under law. That is, Guess's challenge implicates the execution of his sentence. *See* 🏴⚠️ *Woodall v. Fed. Bureau of Prisons,* 432 F.3d 235, 243 (3d Cir.2005).

**[2]** To the extent that Guess contested the validity of the BOP's policy, he did not need to exhaust his administrative remedies. *See* 🏴⚠️ *Woodall,* 432 F.3d at 239 n. 2. However, the District Court did not err in concluding the claim lacks merit. Guess's claim fails because it proceeds from a misunderstanding of 🏴 18 U.S.C. § 3624. The statute

provides up to 12 months in the prerelease custodial arrangements it describes. *See* Krueger v. Martinez, 665 F.Supp.2d 477, 480 (M.D.Pa.2009). More specifically, the statute provides generally for the following prerelease custody:

> The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

18 U.S.C. § 3624(c)(1). The authority for prerelease custody found in subsection (c) includes the authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." *See* id. at § 3624(c)(2). The 6 months of home confinement is not additional to the 12 months of prerelease custody.

We also reject Guess's contention that the scheduling of the prerelease hearing at 17 to 19 months before a projected release date runs afoul of 18 U.S.C. § 3621(b). In this provision, section 3621 sets forth the factors that the BOP must consider when exercising its discretion in determining prerelease custody under § 3624(c). *See* Woodall, 432 F.3d at 251. As Guess states, the determination must be individualized for each prisoner. *See* id. at 248. However, because the 18 month period that Guess describes is not available under § 3624(c), a hearing at 17 to 19 months before a projected release date does not fail to take into account individual circumstances (such as the circumstances he describes, a supposed entitlement to 18 months of prerelease custody).

Guess also filed his habeas petition to take issue with how the policy was applied **\*218** to him. He appears to seek a hearing in advance of 17 to 19 months before the end of his sentence or even release into one of the prerelease custodial options at 18 months before his projected release date. To some extent, the passage of time has made his claims moot: we are within 18 months of his projected release date. To the extent they are not moot, he is not entitled to relief on them anyway because he did not exhaust his administrative remedies. He conceded as much in the District Court. Although he filed a document on appeal in which he asserted that he took additional steps to exhaust his administrative remedies after the District Court ruled, he did not exhaust his claims before he filed his petition. In any event, under the circumstances at issue, the BOP's policy does not violate 18 U.S.C. § 3621(b) or § 3624(c), as we explained above.

**\*\*3**  For the reasons given, we will affirm the District Court's judgment.

### All Citations

421 Fed.Appx. 215, 2011 WL 1241531

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.



# Office of the Attorney General
## Washington, D. C. 20530

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:            THE ATTORNEY GENERAL

SUBJECT:         <u>Increasing Use of Home Confinement at Institutions Most Affected by COVID-19</u>

 The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

 Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

 As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

I.  <u>**IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**</u>

Memorandum from the Attorney General

Page 2

Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.    **PROTECTING THE PUBLIC**

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                                    Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.  Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case.  Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

844 Fed.Appx. 753 (Mem)
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

Rafael Daniel DE LA CRUZ
JIMENEZ, Plaintiff-Appellant,

v.

UNITED STATES of America; Michael Carvajal,
Individually and official Capacity; Rodney Myers,
Individually and official Capacity; Mark Swafford,
Individually and official Capacity, Defendants-Appellees.

No. 20-30440
|
FILED April 19, 2021

Appeal from the United States District Court for the Western District of Louisiana, USDC No. 2:20-CV-626

**Attorneys and Law Firms**

Rafael Daniel De La Cruz Jimenez, Pro Se

Before Dennis, Southwick, and, Engelhardt, Circuit Judges.

**Opinion**

Per Curiam: [*]

 **\*754**  Citing concerns over the COVID-19 pandemic, federal inmate Rafael Daniel De La Cruz Jimenez petitioned the district court for an injunction compelling the respondents, Bureau of Prisons officials, to release him to home confinement under the provisions of the CARES Act of 2020 and the Attorney General's accompanying memoranda, arguing that the CARES Act created a contractual and due process right to release for qualifying inmates. The district court denied relief, finding that De La Cruz Jimenez had failed to state a claim for relief. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). In conjunction with his appeal of that ruling, De La Cruz Jimenez moves this court for leave to proceed in forma pauperis (IFP), challenging the district court's determination

that his appeal is not taken in good faith. *See* *Baugh v. Taylor*, 117 F.3d 197, 202 (5th Cir. 1997).

De La Cruz Jimenez fails to present a nonfrivolous argument that the district court abused its discretion by denying an injunction. *See* *Aransas Project v. Shaw*, 775 F.3d 641, 663 (5th Cir. 2014); *Howard v. King*, 707 F.2d 215, 220 (5th Cir. 1983). He cites no legal authority, nor are we aware of any, holding that the CARES Act created an actionable right to release even for qualifying inmates or a corresponding duty of the respondents to release him. Therefore, De La Cruz Jimenez failed to state a claim on which relief may be granted and, as such, could not arguably meet the standard for granting an injunction. *See* *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 533 (5th Cir. 2016); *Harris Cty., Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 312 (5th Cir. 1999); § 1915(e)(2)(B)(ii).

In light of the above, the district court did not abuse its discretion by denying IFP status. *See* *Carson v. Polley*, 689 F.2d 562, 586 (5th Cir. 1982). Accordingly, the motion to proceed IFP on appeal is DENIED. Furthermore, because the merits of De La Cruz Jimenez's appeal are so intertwined with the IFP certification decision as to constitute the same issue, the appeal is DISMISSED AS FRIVOLOUS. *See* *Baugh*, 117 F.3d at 202 & n.24; 5TH CIR. R. 42.2.

The dismissal of De La Cruz Jimenez's civil action for failure to state a claim and the dismissal of the instant appeal as frivolous both count as strikes against him under 28 U.S.C. § 1915(g). *See* *Coleman v. Tollefson*, 575 U.S. 532, 135 S. Ct. 1759, 1761-64, 191 L.Ed.2d 803 (2015); *Adepegba v. Hammons*, 103 F.3d 383, 387 (5th Cir. 1996). De La Cruz Jimenez is accordingly WARNED that if he accumulates three strikes, he will not be able to proceed IFP in any civil action or appeal filed while he is incarcerated or detained in any facility unless he is under imminent danger of serious physical injury. *See* § 1915(g).

IFP MOTION DENIED; APPEAL DISMISSED; SANCTIONS WARNING ISSUED.

**All Citations**

844 Fed.Appx. 753 (Mem)

De La Cruz Jimenez v. United States, 844 Fed.Appx. 753 (2021)

## Footnotes

\*       Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

---

**End of Document**                                  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   2

835 Fed.Appx. 790 (Mem)
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Manuel LANG, III, Defendant-Appellant.

No. 20-10420
|
FILED February 10, 2021

Appeal from the United States District Court for the Northern District of Texas, USDC No. 1:15-CR-92-2

**Attorneys and Law Firms**

Amanda R. Burch, Assistant U.S. Attorney, U.S. Attorney's Office, Northern District of Texas, Lubbock, TX, Leigha Amy Simonton, Assistant U.S. Attorney, U.S. Attorney's Office, Northern District of Texas, Dallas, TX, for Plaintiff-Appellee

Manuel Lang, III, Pro Se

Before Davis, Southwick, and Costa, Circuit Judges.

**Opinion**

Per Curiam:[*]

 **\*791**  Manuel Lang, III, federal prisoner # 66137-380, appeals the district court's denial of his motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A). Lang requested a compassionate-release sentence reduction based upon the COVID-19 pandemic and his underlying medical conditions. Because Lang failed to exhaust his administrative remedies prior to filing his motion, we AFFIRM.[1]

In 2016, Lang pleaded guilty to a drug offense and was sentenced to 96 months in prison. On April 13, 2020, Lang submitted a motion requesting a compassionate-release sentence reduction under § 3582(c)(1)(A) and home confinement under the Coronavirus Aid, Relief, and Economic Security (CARES) Act.[2] Lang stated that he

suffers from various health ailments, making him high risk for contracting COVID-19 and developing a debilitating illness from it. On April 18, 2020, the district court denied Lang's motion based on Lang's failure to describe "the conditions of his present housing at FMC-Fort Worth or how those conditions might justify any change to the service of his sentence." Lang timely filed a notice of appeal.[3]

On appeal, Lang argues that the district court abused its discretion and erred in denying his motion for a compassionate-release sentence reduction under § 3582(c)(1)(A)(i) because it failed to consider his medical conditions which put him at high risk of contracting, and becoming seriously ill from, COVID-19.[4] He asserts that his medical conditions combined with the COVID-19 pandemic constitute "extraordinary and compelling reasons," as contemplated by § 3582(c)(1)(A)(i), qualifying him for a compassionate-release sentence reduction.[5]  **\*792** He contends that he exhausted his administrative remedies because he sent an inmate request for compassionate release to the appropriate prison authority on April 18, 2020, and he did not receive a response within 30 days.

" '[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances."[6] One such exception is § 3582(c)(1)(A)(i), the provision that Lang relies on here, which allows a district court to reduce a defendant's sentence if, after considering any relevant 18 U.S.C. § 3553(a) sentencing factors, it finds that "extraordinary and compelling reasons warrant such a reduction" and "a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[7] We review the denial of a § 3582(c)(1)(A)(i) motion for an abuse of discretion.[8]

A § 3582(c)(1)(A) compassionate-release motion may be filed either by the Director of the Bureau of Prisons or by a defendant after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[9] This Court recently held in a case involving a motion for compassionate release based on the COVID-19 pandemic that this pre-

filing administrative exhaustion requirement, although not jurisdictional, is mandatory. [10]

As stated above, with respect to exhaustion, Lang asserts that he submitted a written inmate request to the appropriate prison authority on April 18, 2020, and that he did not receive a response within 30 days. But the record shows that on April 13, 2020, before Lang ever made his request to prison officials, Lang submitted his motion for compassionate release for mailing to the district court, which was marked as filed on April 16, 2020. Thus, Lang had not begun the mandatory administrative exhaustion process required by § 3582(c)(1)(A)(i), let alone completed it, before he filed his motion for compassionate release in federal court.

Based on the foregoing, because Lang failed to exhaust his administrative remedies before filing his motion for a compassionate-release sentence reduction in federal court, the district court's judgment is AFFIRMED. [11]

**All Citations**

835 Fed.Appx. 790 (Mem)

## Footnotes

| | |
|---|---|
| * | Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4. |
| 1 | *United States v. Chacon*, 742 F.3d 219, 220 (5th Cir. 2014) (noting that this Court may affirm on any basis supported by the record). |
| 2 | Lang indicated that on April 13, 2020, he signed and submitted his motion to prison authorities to be mailed to the district court. The motion was received and marked as "filed" by the district court on April 16, 2020. |
| 3 | Lang subsequently filed in the district court a motion to expedite his appeal and an amended motion to expedite his appeal. Construing those motions as additional motions for compassionate release under § 3582(c)(1)(A), the district court denied those motions on May 20, 2020, based on Lang's failure to exhaust his administrative remedies as required by § 3582(c)(1)(A). Lang, however, did not appeal the district court's May 20, 2020, order. Thus, our appellate jurisdiction is limited to review of the district court's April 20, 2020, order. *See* *Fiess v. State Farm Lloyds*, 392 F.3d 802, 806–07 (5th Cir. 2004) (holding that this Court lacks appellate jurisdiction to review a ruling without an effective notice of appeal of that ruling). |
| 4 | Lang has informed this Court that he tested positive for COVID-19 on September 21, 2020. |
| 5 | Although Lang contends he meets the criteria for release to home confinement under the CARES Act, the plain language of the CARES Act does not grant a federal court the authority to make home confinement determinations. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134, § 12003 Stat. 281, 516 (2020). Rather, it authorizes prison authorities to lengthen the maximum amount of time to place a prisoner in home confinement under 18 U.S.C. § 3624(c)(2), which applies to "prerelease custody" and not to compassionate-release sentence reductions under § 3582(c)(1)(A). |
| 6 | *Dillon v. United States*, 560 U.S. 817, 824, 130 S.Ct. 2683, 177 L.Ed.2d 271 (2010) (quoting § 3582(b)). |
| 7 | § 3582(c)(1)(A)(i). |
| 8 | *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020). |
| 9 | § 3582(c)(1)(A). |
| 10 | *United States v. Franco*, 973 F.3d 465, 467–68 (5th Cir. 2020). |
| 11 | *See* *id.* |

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.