IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| WILLIAM MAXWELL | § | |
| v. | § | Cause No. 1:22-cv-40 |
| WARDEN, FCI BEAUMONT LOW | § | USDJ: MICHAEL J. TRUNCALE |
| | § | MAG: CHRISTINE L. STETSON |

**MAXWELL'S MOTION TO STRIKE DOC. 8**

TO THE HONORABLE MAGISTRATE STETSON:

William Maxwell files his Motion to Strike Document 8 and for just cause would show unto the Court as follows:

**I. PRELIMINARY STATEMENT**

Maxwell, preliminarily, requests the Court to take judicial notice of the BOP's latest filing regarding the First Step Act (FSA) in the Code of Federal Regulations (CFR) (Fed. Reg./Vol. 87, No. 12/Wednesday, January 19, 2022/pp. 2705-2719)

Maxwell filed the actual rules with his Original Petition (28 CFR §523.40-44) and files the comments and responses along with the preamble along with the rules herewith.

Next, Maxwell requests the Court to take judicial notice of the BOP publications noted and referenced in their CFR filing of January 19, 2022: to include:

* The First Step Act Approved Programs Guide, available on the BOP's website at https://www.bop.gov/inmates/fsa/docs/ 2021_fsa_program_guide.pdf (Program Guide)

Maxwell attaches a relevant excerpt hereto.

1) Maxwell filed his petition for relief under 28 U.S.C. §2241 related to the FSA, title 18 U.S.C. §3621(b) (pertaining

solely to substantive due process); title 18 U.S.C. §§3624(c) and (g) (incorporating 18 U.S.C. 3632(d)); and title 34 U.S.C. §§ 60541(a)(2)(A) and (g). Each of the titles and sections were affected by the FSA. The FSA created and/or modified 18 U.S.C. § 3621(h); 18 U.S.C. §§ 3624 (c)(2) and (g) (which applies FSA earned Time Credits under 18 U.S.C. §3632(d); 34 U.S.C. §60541(a)(2)(A) and (g) which are incorporated into the F.S.A. by 18 U.S.C. § 3632(d)(6).

2)    These particular changes to the housing and pre-release custody of FSA eligible inmates (See Pub. L. 115-391) were made on enactment of the FSA on December 21, 2018.

3)    Maxwell exhausted his administrative remedies. noting with particularity the statutes themselves under which he was seeking relief. (pp. 350-351) [EN1]

4)    In response to Maxwell's §2241 petition the BOP filed Doc. No. 8 which contains dilatory pleas challenging jurisdiction under Fed.R.Civ.P. 12(b)(1); factual and legal sufficiency under Fed.R.Civ.P. 12(b)(6); and alternatively a Motion for Summary Judgment. (pp. 247-261)

5)    Maxwell in his administrative remedies and in his responses to Doc. 8 filed multiple affirmative defenses, to include "admission". (pp.350-351)

6)    During November 2021 through January 2022, the BOP made a series of admissions in public filings. The admissions are found in the CFR, noted supra, and the Office of Inspector General Report, November 15, 2021. (both attached) The OIG report was

-2-

attached to Maxwell's Original Petition. (pp. 199-217) The BOP also made admissions to Maxwell's Counsel in response to Counsel's demand for a written response. (pp. 319-324 -- Counsel's demand) (pp. 340-341 -- Warden's Response)

7) In response to Doc. 8 Maxwell incorporated his affirmative defenses. (See Response to 12(b)(1); Response to 12(b)(6); and Response to Motion for Summary Judgment)

8) Maxwell files this Motion to Strike based on the BOP admissions to which Maxwell asserts his affirmative defense.

## II. BOP ADMISSIONS TO MAXWELL'S COUNSEL

9) Attached to Maxwell's petition (pp. 142-143) and the government's response (pp. 340-341) the government makes the following admission:

"Additional guidance was provided to staff via a May 8, 2020 memorandum regarding this topic. In it, the memorandum states that inmates who have served 50% or more of their sentences or have 18 months or less remaining on their sentence and have served 25% or more of their sentence would be prioritized for consideration for home confinement. Inmate Maxwell does not meet this criteria, as his release date is July 17, 2031" (p. 143) (p. 341) (attached hereto and highlighted for the court)

10) In his response to Maxwell's counsel, Warden Garrido cites no other basis for the denial of Maxwell's release/transfer. Warden Garrido, subsequently, conjured two denials which he asserted to Maxwell, in his denial of Maxwell's administrative

-3-

remedy which were not asserted to Counsel in response to Counsel's express demand for a written response. (p. 324) (Given the factual predicates and legal precepts, please advise me, in writing, the current status of my client's request to be transferred promptly to home confinement) Warden Garrido's false allegations (addressed extensively in Maxwell's responses to Doc. 8) is located on p. 287. ("...nor are you identified as an at-risk inmate per any medical condition by the Health Services Department. Specifically, you were denied on your history of violence...") [EN2] The Warden's false allegations are contrary to the assertions made to Counsel and Maxwell moves to strike the offending statements.

11) As noted in the authority infra, the BOP is bound to the admission made to counsel. Maxwell asserts the affirmative defense of admission and Maxwell objects to the introduction of any evidence or argument to the contrary of this admission. Maxwell requests a ruling on his objection and motion to strike all offending pleadings and/or controverting evidence.

### III. BOP ADMISSIONS MADE IN THE PUBLIC RECORD

**Admissions in the CFR filed January 19, 2022**

12) On January 19, 2022, the BOP filed into the CFR (Fed. Reg./Vol. 87, No. 12/Wednesday, January 19, 2022/2705-2719) its final rule "codif[ying] the Bureau of Prisons' (Bureau or BOP) procedures regarding the earning and application of time credits as authorized by the First Step Act of 2018 (FSA)..."

13) In its CFR filings the BOP makes references to its publications demonstrating and justifying the BOP's FSA activities. These include the admission that prison jobs, assigned

and recommended to FSA eligible low or minimum risk level inmates qualified as productive activities (PAs) that earn FSA Time Credits under 18 U.S.C. §3632(d)(4)(A). See Fed. Reg./Vol. 87, No. 12/Wednesday, January 19, 2022/p. 2710

    \*    "The First Step Act Approved Programs Guide, available on the Bureau's website at https://bop.gov/inmates/fsa/docs /2021_fsa_program_guide.pdf (Program Guide)" See relevant excerpt attached.

    14) In the BOP "responses" to comments made on the proposed rule and in the "preamble" itself the BOP makes the following admissions:

    (a) The BOP admits: the January 19, 2022 filing is the final rule on FSA Time Credits

"Department of Justice
28 CFR Parts 523 and 541
[BOP 1176 P]
RIN 1120-AB76
FSA Time Credits
Agency: Bureau of Prisons, Justice.
Action: Final Rule"

(See p. 2705)

    (b) The BOP admits: the January 19, 2022 filing is the codification of the FSA Time Credits and application thereof.

"This rule codifies the Bureau of Prisons' (Bureau or BOP) procedures regarding the earning and application of time credits as authorized by the First Step Act of 2018 (FSA) hereinafter referred to as 'FSA Time Credits' or 'Time Credits' []

The FSA provides that eligible inmates earn FSA Time Credits toward prerelease custody or early transfer [release] to supervised release for successfully

completing approved Evidence Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) <u>assigned</u> to each inmate based on the inmate's risk and needs assessment." (p. 2705-2706)

(c)    The BOP admits: The January 19, 2022 filing is pursuant to specific statutory authority:

"This rule codifies the Bureau of Prisons (Bureau) procedures regarding First Step Act (FSA) Time Credits, as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of 2018 (Pub.L. 115-391, December 21, 2018, 132 Stat. 5194) (FSA). The FSA provides that an eligible inmate in Bureau custody who successfully participates in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment will [shall][EN3] earn FSA Time Credits (i.e. transfer to a Residential Reentry Center (RRC [halfway house] or home confinement for service of a portion of the inmate's sentence) or transfer to supervised release (i.e. early satisfaction of the inmate's term of imprisonment) under 18 U.S.C.(g)." (p. 2706)

(d)    The BOP admits that the definition of "a day" for purposes of calculating "30 days of successful participation" in 18 U.S.C.(d)(4)(A)(i) and (ii) means any day during which an inmate is enrolled in EBRR programs or PAs."

"The BOP is adopting a simpler FSA Time Credits program award model that will more fully encourage and reward participation in evidence-based recidivism reduction programs and productive activities.

In enacting the FSA, Congress made clear that Time Credits should be broadly applicable to a wide range of activities to maximize their opportunities to reduce recidivism. The proposed definitions [replaced by this final rule] however, would have meant that inmates could do everything asked of them as part of their recommended programming for multiple days (e.g., two hours each day

-6-

for four days), but be credited only for one day of successful participation.

In addition, the proposed definition [replaced by this final rule] would have required Bureau staff to not only track inmate participation in recommended programming, but also break down participation time into individual hours of work, and then aggregate time spent completing other programming. This approach [replaced by this final rule] would have varied the earning of Time Credits by program factors such as intensity, length, and duration that could have been confusing to inmates, burdensome for staff to administer, and inconsistent with the general goal of awarding Time Credits in a consistent manner to inmates who are participating in the full range of programming recommended to them based on the results of their risks and needs assessment.

The final rule adopts a more straightforward and more administratively manageable approach that is consistent with the FSA's goal of promoting successful participation in EBRR programs and PAs. For every thirty-day period that an eligible inmate successfully participates in EBRR programs or PAs recommended based on the inmate's risk and needs assessment, the inmate will [shall] earn ten days of FSA Time Credits. If the inmate is determined to be at a minimum or low risk for recidivating and can maintain that risk level for the most recent two consecutive risk and needs assessments, that inmate may [shall] earn an additional five days of FSA Time Credits per thirty-day period.

[]

...temporary interruptions in participation that are unrelated to an inmate's refusal to participate or other violation of programming requirements, or that are

-7-

authorized by the Bureau, such [as] when a recommended program or activity is unavailable or full will not affect the inmate's ability to earn time credits.(p. 2706-2707)"

(e) The BOP admits: that FSA Time Credits are in addition to rewards and incentives already provided by the BOP. See 18 U.S.C. 3632(d)(6).

"...some courts have held that eligible inmates should be awarded FSA Time Credits in addition to the pre-FSA incentives already offered by the Bureau..." (p. 2708)

(f) The BOP admits: that because it was unable to track inmates participation in FSA Time Credit earning EBRR programs and PAs prior to January 2020, the BOP "will exercise its discretion to award FSA Time Credits to inmates otherwise deemed eligible under the First Step Act by applying the same criteria as applied to inmate participation in authorized EBRR programs and PAs recommended based on a risk and needs assessment after January 2020 to determine the inmate's retroactive Time Credit balance. Eligible inmates will be afforded a presumption of participation for the period between December 21, 2018, and January 14, 2020 and be awarded time credits accordingly." (p. 2708)

(g) The BOP admits: Inmates will earn FSA Time Credits when either EBRR programs or PAs are unavailable for reasons not caused by or subject to an inmate's control. "...inmates will not be penalized if specifically recommended EBRR programs or PAs are unavailable to them or at full enrollment at their facilities." (p. 2711)

[]

"It is important to note, however, that temporary interruptions in participation that are unrelated to an inmate's refusal or other violation of programming requirements, such as the unavailability of a recommended program or activity or its full enrollment,

or interruptions authorized by the Bureau, will not affect the inmate's ability to earn Time credits." (p. 2711)

(h) The BOP admits: FSA Time Credits are earned for successful participation in EBRR programming and PAs on a ongoing basis not solely on completion.

"The Bureau agrees with these comments. As indicated previously, the Bureau is altering and expanding its method for awarding time credits.

The concern of the commentators regarding participation in programming echoes the Bureau's long standing policy of encouraging inmate reentry programming and productive activities throughout each inmate's incarceration, which is consistent with the FSA's goal of attaining maximum recidivism reduction.

[]

Toward that end, the Bureau has developed the simpler model which it now adopts for the FSA Time Credits program. Under this model, each inmate earns Time Credits while participating in recommended EBRR programs and PAs." (p. 2711)

(i) The BOP admits that during the time of Maxwell's administrative remedy (from 2020 until the present) he is continuing to earn FSA Time Credits.

"Time credits for successful participation are awarded at the end of each thirty-day period. By altering the scheme for awarding Time Credits in this manner, the Bureau hopes to increase the amount of FSA Time Credits that may be awarded to the maximum number of eligible inmates."

(j) The BOP admits: Maxwell has liberty interests in his FSA Time Credits.

"The purpose of this rule is to codify the Bureau's procedures regarding the earning and application of time credits as authorized by the FSA. [] <u>Given the liberty</u>

issues implicated by the prompt implementation of this program and this rule, the Bureau is prepared to begin implementation immediately..." (p. 2716) (emphasis added)

(k) The BOP admits that: "an eligible inmate who successfully participates in an EBRR program or PA recommended by staff based on the inmate's risk and needs assessment may [shall] [EN4] earn FSA Time Credits to apply toward <u>prerelease</u> custody or <u>transfer</u> to supervised release.

[]

The Bureau assures commentators that <u>FSA Time Credits will be applied</u> to early transfer to supervised release, as authorized by the FSA in 18 U.S.C.(d)(4)(C) and 18 U.S.C 3624(g)." (p. 2712) (emphasis added)

<u>IV. BOP ADMISSIONS MADE TO THE OFFICE OF INSPECTOR GENERAL</u>

15) On November 15, 2021, the Office of Inspector General filed and published a Management Advisory Memorandum to the BOP on the topic of:

SUBJECT: Impact of the Failure to Conduct Formal Policy Negotiations on the Federal Bureau of Prison's Implementation of the First Step Act and Closure of the Inspector General Recommendations

Maxwell filed a copy of the report with his §2241 Petition (ECF 199-217). Therein the BOP made the following admissions to the OIG that are relevant to this case; they are:

(a) The BOP admits that: there are 60,000 inmates eligible for FSA Time Credits, allowing them to spend time in halfway house, home confinement, or to have their sentences reduced by up to 12 months under the FSA (the BOP has knowingly, willfully, and intentionally failed and refused to provide despite liberty interests of these 60,000 inmates (including Maxwell).

-10-

"...we found that the BOP has not applied such statutorilly earned time credits to any of the approximately 60,000 eligible inmates who may have completed EBRR programs or productive activities.    We are concerned that the delay in applying earned time credits may negatively affect inmates who have earned a reduction in their sentence or earlier placement in the community.

BOP officials told the OIG that the BOP has not applied time credits to inmate's sentences as directed under the law..." (ECF. 204)

(b)   The BOP admits: that it has engaged in unlawful conduct, by failing to timely transfer inmates to community confinement or supervised release under the FSA based on earned FSA Time Credits (earned in addition to other rewards and incentives that existed pre-FSA) because it had not finalized a rule and because it granted it's national union a veto over its requirement to uphold the laws of the United States and directives of Congress.

"BOP Officials told the OIG that the BOP has not applied time credits to inmate sentences as directed under the law because:

(1) a rule that would codify the BOP's procedures for time credits has not been finalized, and

(2)   the BOP must complete policy negotiations on its time credits policy with the national union (No. * in Table A above)"

"The BOP stated that the time credits policy must be negotiated with the national union because it would create changes to conditions of employment, including determinations and application of earned time credits for inmates, for Unit Team Staff working in BOP institutions who are bargaining unit employees." (ECF 204)

(c)    The BOP admits that Unit Team members determine inmate transfers to RRC or home confinement under the FSA earned time credits.

"The BOP stated that the time credits policy must be negotiated with the national union because it would create changes to conditions of employment, including determinations and application of earned time credits for inmates, for Unit Team Staff working in BOP institutions who are bargaining unit employees." (ECF 204)

(d)    The BOP admits: The BOP granted its national union a defacto veto over the statutes of Congress which require the BOP to transfer eligible low or minimum risk and low need inmates into community custody or supervised release.

"BOP officials told the OIG that the BOP has not applied time credits to inmate sentences as directed under the law because:

(2)    the BOP must complete policy negotiations on its time credits policy with the national union...

The BOP stated that the time credits policy must be negotiated with the national union because it would create changes to conditions of employment, including determinations and application of earned time credits for inmates, for Unit Team Staff working in BOP institutions who are bargaining unit employees." (ECF 204)

## APPLICATION

16)    Maxwell asserted the affirmative defense of "admission" during the administrative remedy process. (ECF 350-351) Document 8, filed by the Warden is the first document filed by the BOP. In each of his three responses (Doc. 8 contains three pleas in avoidance) Maxwell reasserted his affirmative defenses. One of those affirmative defenses was "admission."

17)    As discussed in Maxwell's responses to Doc. 8, Agency

-12-

statements in the preamble and responses to comments (documenting the necessity of the Agency rule) are not merely admissions by the Agency, they are afforded <u>Chevron</u> deference. [EN5] see <u>Tribble v. Edison.</u> [EN6] In discussing the gravity given the Dep't of Labor, the Tribble Court, in reliance on <u>United States v. Mead</u>, [EN7] wrote: "As for <u>Mead's</u> second consideration, we do not view the fact that the interpretation appears in a final rule's preamble as disqualifying it from <u>Chevron</u> deference. Edison cites nothing authorative for cabining that doctrine to materials destined for the pages of the Code of Federal Regulations.

Though not a necessary condition, a notice-and-comment rule is virtually assured eligibility for <u>Chevron</u> deference." <u>Tribble</u>, 729 F.3d at 1123 (citing <u>Mead</u>, 533 U.S. at 230-31).

Next, in <u>Mylan Laboratories, Inc. v. Thompson</u>, the D.C. Circuit expressly rejected the argument that minimal deference is owed to F.D.A.'s interpretation of FDCA because it was expressed in letters to the parties and "is not embodied in any regulation, much less a regulation that was subject to notice and comment rulemaking." [EN8]

18) The BOP's admissions in the preamble, responses to comments (January 19, 2022, filing @ 28 CFR 523.40-44), and responses to the Inspector General are not merely statements, they are binding on the BOP, and statements and arguments (or attempted proffered evidence) are inadmissible when properly objected to, and in the face of an affirmative defense. Further statements to counsel are admissions which cannot be avoided by trial counsel's assertions and arguments to the contrary, in the face of objection and affirmative defense.

19) For purposes of notice and objection and motion to strike the offending statements, Maxwell notes the following statements in the BOP pleadings sought to be struck -- along with evidence offered in support thereof. They include:

From (ECF 255) "In addition to not knowing what Petitioner's job is and whether his job qualifies as programming eligible for FSA time credits (which would be addressed in an administrative remedy), there is no case law directly addressing 28 CFR 523.42, stating anything other than "congress did not make the statute retroactive beyond this date." [EN9]

20) First, that statement is nonsensical and obtuse. The BOP has records to show both. Second, Maxwell attached his work history to his affidavit filed in support of the Original Petition. Third, in Maxwell's responses to Doc.8, Maxwell attached his work history, needs history, and his case manager's letter that Maxwell has always been employed as assigned and recommended jobs. (Copies attached) Next, case law is not required to address the plain and unambiguous statute. see 18 U.S.C. 3632(d)(4)(B).

(B)   Availability. A prisoner may not earn time credits under this paragraph for an evidence-based recidivism <u>program</u> that the prisoner successfully <u>completed</u> --

No where is the term or phrase "productive activities" noted in 18 U.S.C. §3632(d)(4)(B). As the basics of statutory construction mandate, and as raised in Maxwell's responses, when "phrases" appear together throughout a statute but are excluded in a single subsection, the statute is interpreted to be that Congress intended it that way. See <u>Park 'N Fly,Inc. v. Dollar Park & Fly, Inc,</u> 469 U.S. 189, 194, 105 S.Ct. 618, 83 L.ED. 582 (1985) (When

-14-

analyzing "statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose"). Another canon of statutory construction provides that "a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." <u>Hamden v. Rumsfeld</u>, 548 U.S. 557, 578, 126 S.Ct. 2749, 165 L.ED. 2d 723 (2006). When applying these precepts to 18 U.S.C. §3632(d)(4)(B) the answer is plain. The combination of EBRR Programming and Productive Activities appear in concert together throughout the FSA. See 18 U.S.C. §§3631(b)(2); §3632(a)(5); §3632(a)(6); §3632(b); §3632(d)(4)(A); §3632(d)(4)(C); §3632(d)(5); §3632(d)(6); §3632(e); §3633(a)(2); §3634(a) -- to note only a few of the dozens and dozens of times EBRR Programming and Productive Activities appear in concert with each other in a subsection -- but not in 18 U.S.C. §3632(d)(4)(B). Productive activities, by the plain reading of the statute are retroactive prior to December 21, 2018.

Fourth, the BOP's admissions noted herein <u>supra</u> preclude this argument. Maxwell objects and moves to strike and requests a ruling thereon.

21) For purposes of notice and objections and motion to strike the offending statements, Maxwell notes the following statements in the BOP's pleadings (Doc. 8) sought to be struck -- along with evidence offered in support thereof. They include:

"In addition to the inability to bring a claim for inmate housing decisions in the habeas context, as it challenges a condition of confinement, it is well settled case law that the placement of inmates serving a lawfully imposed sentence is within

-15-

the discretion of the BOP." (internal citations omitted)

"Federal statutes provide the BOP unfettered authority to decide where to house federal prisoners" and preclude "any approach that puts the judicial branch in charge of designating the place of confinement for a federal prisoner-no matter how well justified on utilitarian grounds." (internal citations omitted)

22) First, that is no longer the law. See Pub. L. 115-391 creating statutorily liberty interests in an inmate's placement in halfway house or home confinement under Wolff and Sandin [EN10].

Second, this position is contrary to the public filings and statements of the BOP and preclude this argument. Maxwell objects and moves to strike.

Third, these statements are contrary to the context of the FSA. The tenor in the U.S. Senate Committee on the Judiciary correspondence to Attorney General Garland on May 5, 2021, in challenging the originally proposed BOP rule, notes the purpose of the FSA in expanding an inmate's ability to earn time credits for RRC and home confinement. If the FSA means anything, it means that the prior paradigm of BOP discretion is over when it comes low risk and low needs inmates who are not violent and not a danger to the community. (see attached May 5, 2021 correspondence)

23) For purposes of notice and objections and motion to strike the offending statements, Maxwell notes the following statements in the BOP's pleadings sought to be struck along with evidence offered in support thereof. They include:

"As referenced in Weaver, FSA earned Time Credits amount to no more than additional time in prerelease custody or supervised

release." (citations omitted) [EN11] "[Title] 18 U.S.C. §3624(g) indicates the only mandatory tranfers [EN12] under the FSA are to a different form of BOP custody, meaning the mandatory part of the statute does not affect the length of an inmate's confinement." [EN13] "And where the FSA does not affect the length of confinement, the decision of whether to release an inmate early is left to the sole discretion of the Director." (ECF 255)

First, as noted in detail in EN__ supra that statement is categorically false. Second, it expressly violates the admissions of the BOP noted supra (from public filings). To make express representations in the Code of Federal Regulations (Fed. Reg./Vol. 87, No. 12/Wed. Jan. 19, 2022/p. 2712) (The Bureau assures commentators that FSA Time Credits will be applied to early transfer to supervised release, as authorized by the FSA in 18 U.S.C. (d)(4)(C) and 18 U.S.C. 3624(g)) and to take a contrary position opposite thereto in Court only a few months post the representations made to Congress and the Public is unconscionable. Maxwell objects and moves to strike.

24) For purposes of notice and objections and motion to strike the offending statements, Maxwell notes the following statements in BOP pleadings sought to be struck -- along with evidence offered in support thereof. They include:

"Petitioner made his unhappiness with this decision known by exercising his administrative remedies. (See generally Ex. A) And while the Petitioner may have been initially referred by his unit team, the warden made clear the BOP had exercised its discretion and ultimately denied his request for priority release under the CARES Act." [EN14]

25) First, those arguments and statements are false as noted in Maxwell's responses to Doc. 8 filed herein. Second, during the time frame in question, Warden Garrido was not on the compound, he had been augmented to FCI-Oakdale. Through subterfuge and deceit, acting Warden Cutright unlawfully intervened. [EN15] Third, Maxwell was approved (in arguendo) on April 12-16 of 2020. During that time period there was no 50% of sentence being served requirement. (See ECF 286-287 - Warden's false statement denial) compare and contrast with (ECF 340-341 - representation to counsel) ("Additional guidance was provided to staff via a May 8, 2020 memorandum on the topic..." ECF 341) compare and contrast with the sworn affidavit of Acting Warden Juan A. Segovia from April 10, 2020 attached (United States District Court, Western District of Louisiana, Lake Charles Division; <u>Brandon Livas, et al. v. Myers, et al.</u>; Cause No. 20-cv-00422; Honorable Judge Doughtry, Magistrate Kay presiding). [EN16] The statements violate BOP admissions and statements in the public record and Maxwell objects and moves to strike.

26) Maxwell requests rulings on his objections and requests to strike.

## PRAYER

FOR THESE REASONS, Maxwell, based on his affirmative defenses, previously asserted in his administrative remedy and prior filings, and on the BOP's public statements made in court under oath, in public filings (CFR), and in statements to the OIG and to Maxwell's counsel, objects and moves to strike the offending portions of the BOP's pleadings. Maxwell requests such other and additional relief to which he may be entitled.

-18-

Respectfully submitted,

_____

William Maxwell

Reg. 71944-279

FCI-Beaumont-Low

P.O. Box 26020

Beaumont, Texas 77720

Pro' se

## CERTIFICATE OF SERVICE

I hereby certify, under penalties of perjury and pursuant to 28 U.S.C. §1746, that a true and correct copy was served on opposing counsel, Michael W. Lockhart, esq.; AUSA; 550 Fannin St., Ste. 1250; Beaumont, Texas 77701-2237, by placing same in the BOP Legal Mail System, first class postage prepaid, on the __4__ day of August, 2022.

_____        _____
Date                                    William Maxwell

## VERIFICATION

I hereby certify, under penalties of perjury and pursuant to 28 U.S.C. §1746, that the material factual statements herein, are true and correct to the best of my knowledge and belief.

_____        _____
Date                                    William Maxwell

ENDNOTES

EN1) The page numbers generally refer to filed page numbers (ECF "PageID #")

EN2 Maxwell consistently notes the falsehood of the Warde's violence allegation.

EN3) Title 18 U.S.C. §3632(d)(4) does not use the word "will", but rather uses the mandatory "shall" language found throughout the FSA, 112 times.

EN4) Statutes read: "Shall" not "May". See 18 U.S.C. §3632(d)(4)(A); §3632(d)(4)(C); 18 U.S.C. §3624(g)(2)(A)&(B).

EN5) Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.ED. 2D 694 (1984)

EN6) Tribble v. Edison, 729 F.3d 1110, 1122 (9th Cir. 2013) vacated on other grounds, 135 S.Ct. 1823, 191 L.ED.2D 795 (2015)

EN7) United States v. Mead, 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.ED.2D 292 (2001)

EN8) Mylan Lab.'s, Inc. v. Thompson, 389 F.3d 1272, 1279 (D.C. Cir. 2004)(internal citations omitted).

EN9) Maxwell previously addressed this argument in his responses to Doc. 8, the BOP argument uses a false premise and is out of context.

EN10) Wolff v. McDonnel, 418 U.S. 534, 94 S.Ct. 2963, 41 L.ED.2D 935 (1974); Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2243, 132 L.ED.2D. 418 (1995)

EN11) As noted in Maxwell's response to Doc. 8, Weaver is not relevant. First it involves a determination regarding a 18

U.S.C. §3582(c)(1)(A) petition, not a §2241. Second, it was based on alleged EBRR programming completed prior to the F.S.A. enactment on December 21, 2018. Third, there was no allegation that Weaver was engaged in productive activities, nor that the EBRR programming was completed after December 21, 2018.

EN12) Significant here, is the Warden's confession that the FSA uses "mandatory" language which eliminates the Warden's discretion under prevailing law. When the inmate transfers are "mandatory" those transfers are no longer the sole purview of the BOP. (citations omitted)

EN13) Good Time Credits, 18 U.S.C. §3624(b), shorten an inmate's sentence similar to 18 U.S.C. §3624(g)(3), and yet it is uniformly considered to be a protected liberty interest. Further still, the Good Time Credits under 18 U.S.C. §3624(b) are discretionary (i.e. uses "may receive"). See Sandin, supra.

EN14) Significant in the Juan A. Segovia affidavit attached to the BOP's response in Cause No. 20-cv-00422 (attached) is that both FCI-Beaumont-Low and FCI-Oakdale are in the South Central Region of the BOP. Both have the same regional office. At paragraph 21, Juan Segovia, under oath, testifies that: "Acting upon additional guidance from BOP [South Central] Regional Office staff, on the afternoon of April 9, [2020,] the reviewing staff have also expanded the criteria, removing the eighth factor, consideration of whether inmates in low or minimum facilities have served 50% of their sentences." (See attached) This was used to avoid

EN-Page 2

a temporary injunction in the <u>Livas v. Myers</u>, 20-cv-00422; United States District Court, Western District of Louisiana, Lake Charles Division, Honorable Judge Doughty, Magistrate Kay, presiding. And then the BOP promptly reinstated the 50% rule. Maxwell was approved and processed between April 12-16, 2020, and then subsequently denied at a later date. What is most disturbing, is the BOP's cavalier attitude towards the truth in reference to statements made under oath in United States District Courts. Here, the BOP spokesperson, under oath, made a proclamation to the Court and after obtaining the desired result, promptly abandoned it (there are hundreds of inmates whose sentences have been enhanced for perjurious statements must less offensive than the one here).

EN15) See Acting Warden Cutright's denial language on Maxwell's BP-8, at ECF PageID # ___ .

EN16) Attached hereto as Attachment 7

EN-Page 3

ATTACHMENTS

1) 28 CFR §523.40-44 (Fed. Reg./Vol. 87, No. 12/Wed., Jan, 19, 2022.

2) First Step Act Program Guide Excerpt

3) Inspector General Report

4) Warden Garrido Response

5) Senate Judiciary Committee Correspondence (May 5, 2021)

6) Maxwell PATTERN Score, Needs Assessment, Job Report, Case Manager West Memo.

7) Juan A. Segovia Affidavit from Cause No. 20-cv-00422; <u>Brandon Livas, Richard Buswell, et al. v. Rodney Myers, Warden of Oakdale, FCI, et al.</u>; United States District Court, Western District of Louisiana, Lake Charles Division, Honorable Judge Doughty, Magistrate Judge Kay, presiding.

# ATTACHMENT 1

## SCHEDULE OF FEES FOR CONSULAR SERVICES

| Item No. | Fee |
|---|---|
| * | * | * | * | * | * | * |
| **32.** * * * | |
| (e) Certain adoptee applicants for replacement Immigrant Visas as described in 22 CFR 42.71(b)(2) ...................................... | No Fee. |
| (f) Certain immigrant visa applicants previously refused pursuant to Proclamation 9645 or Proclamation 9983, as described in 22 CFR 42.71(b)(3) ................................................................................................................................................... | No Fee. |
| * | * | * | * | * | * | * |
| **34.** * * * | |
| (a) Certain immigrant visa applicants previously refused solely·pursuant to Proclamation 9645 or Proclamation 9983, as described in 22 CFR 42.71(b)(3) .............................................................................................................................. | No Fee. |
| * | * | * | * | * | * | * |

## PART 42—VISAS: DOCUMENTATION OF IMMIGRANTS UNDER THE IMMIGRATION AND NATIONALITY ACT, AS AMENDED

■ 3. The authority citation for part 42 continues to read as follows:

Authority: 8 U.S.C. 1104 and 1182; Pub. L. 105–277, 112 Stat. 2681; Pub. L. 108–449, 118 Stat. 3469; The Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption (done at the Hague, May 29, 1993), S. Treaty Doc. 105–51 (1998), 1870 U.N.T.S. 167 (Reg. No. 31922 (1993)); 42 U.S.C. 14901–14954 (Pub. L. 106–279, 114 Stat. 825); 8 U.S.C. 1101 (Pub. L. 111–287, 124 Stat. 3058); 8 U.S.C. 1154 (Pub. L. 109–162, 119 Stat. 2960); 8 U.S.C. 1201 (Pub. L. 114–70, 129 Stat. 561).

■ 4. Section 42.71 is amended by revising paragraph (b) to read as follows:

### § 42.71  Authority to issue visas; visa fees.

* * * * *

(b) *Immigrant visa fees*—(1) *Payment of fees.* The Secretary of State prescribes a fee for the processing of immigrant visa applications. Except as provided in paragraphs (b)(2) and (3) of this section, an individual registered for immigrant visa processing at a post designated for this purpose by the Deputy Assistant Secretary for Visa Services must pay the fee upon being notified that a visa is expected to become available in the near future, and upon being requested to obtain the supporting documentation needed to apply formally for a visa, in accordance with instructions received with such notification. The fee must be paid before an applicant at a post so designated will receive an appointment to appear and make application before a consular officer. Applicants at a post not yet so designated will pay the fee immediately prior to formal application for a visa. A fee collected for the processing of an immigrant visa application is refundable only if the principal officer of a post or the officer in charge of a consular section

determines that the application was not adjudicated as a result of action by the U.S. Government over which the alien had no control and for which the alien was not responsible, which precluded the applicant from benefitting from the processing, or as provided in paragraph (b)(2) of this section.

(2) *Waiver or refund of fees for replacement immigrant visas for adoptees.* The consular officer shall waive the application processing fee for a replacement immigrant visa or, upon request, refund such a fee where already paid, if the consular officer is satisfied that the alien, the alien's parent(s), or the alien's representative has established that:

(i) The prior immigrant visa was issued on or after March 27, 2013, to an alien who has been lawfully adopted, or who is coming to the United States to be adopted, by a United States citizen;

(ii) The alien was unable to use the original immigrant visa during the period of its validity as a direct result of extraordinary circumstances, including the denial of an exit permit; and

(iii) The inability to use the visa was attributable to factors beyond the control of the adopting parent or parents and of the alien.

(3) *Exemption from fees for immigrant visa applicants·previously refused solely pursuant to Proclamation 9645 or Proclamation 9983.* An immigrant visa applicant shall be exempt from the application processing fee and the affidavit of support review fee, if the applicant was previously denied an immigrant visa on or between December 8, 2017, and January 19, 2020; the sole ground of ineligibility was based on Proclamation 9645 or 9983; and the applicant is applying again for an immigrant visa. This paragraph (b)(3) provides only for a one-time exemption of the applicable fees per applicant.

■ 5. Section 42.74 is amended by revising paragraph (a) to read as follows:

### § 42.74  Issuance of new, replacement, or duplicate visas:

(a) *New immigrant visa for a special immigrant under INA 101(a)(27)(A) and (B).* The consular officer may issue a new immigrant visa to a qualified alien entitled to status under INA 101(a)(27)(A) or (B), provided that:

(1) The alien establishes that the original visa has been lost, mutilated, or has expired; or that the alien will be unable to use it during the period of its validity; and

(2) The alien pays anew the application processing fees prescribed in the Schedule of Fees (22 CFR 22.1); and

(3) The consular officer ascertains whether the original issuing office knows of any reason why a new visa should not be issued.

* * * * *

Kevin E. Bryant,
*Deputy Director, Office of Directives Management, U.S. Department of State.*
[FR Doc. 2022–00829 Filed 1–18–22; 8:45 am]
BILLING CODE 4710–06–P

## DEPARTMENT OF JUSTICE

### Bureau of Prisons

**28 CFR Parts 523 and 541**

[BOP–1176P]

RIN 1120–AB76

### FSA Time Credits

**AGENCY:** Bureau of Prisons, Justice.

**ACTION:** Final rule.

**SUMMARY:** This rule codifies the Bureau of Prisons' (Bureau or BOP) procedures regarding the earning and application of time credits as authorized by the First Step Act of 2018 (FSA), hereinafter referred to as "FSA Time Credits" or "Time Credits." The FSA provides that

eligible inmates earn FSA Time Credits toward prerelease custody or early transfer to supervised release for successfully completing approved Evidence-Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) assigned to each inmate based on the inmate's risk and needs assessment. Inmates eligible to apply Time Credits under the FSA include individuals sentenced under the U.S. Code. As required by the FSA, an inmate cannot earn FSA Time Credits if that inmate is serving a sentence for a disqualifying offense or has a disqualifying prior conviction. However, such inmates may still earn other benefits for successfully completing recidivism reduction programming, such as increased privileges (commissary, visiting, and telephone) for participation in EBRR Programs or PAs, as authorized by the Bureau.

**DATES:** This rule is effective on January 19, 2022.

**FOR FURTHER INFORMATION CONTACT:** Sarah Qureshi, Office of General Counsel, Bureau of Prisons, phone (202) 353-8248.

**SUPPLEMENTARY INFORMATION:** This rule codifies the Bureau of Prisons' (Bureau) procedures regarding First Step Act (FSA) Time Credits, as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of the First Step Act of 2018 (Pub. L. 115–391, December 21, 2018, 132 Stat 5194) (FSA). The FSA provides that an eligible inmate in Bureau custody who successfully participates in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment will earn FSA Time Credits, to be applied toward prerelease custody (i.e., transfer to a Residential Reentry Center (RRC) or home confinement for service of a portion of the inmate's sentence) or transfer to supervised release (i.e., early satisfaction of the inmate's term of imprisonment) under 18 U.S.C. 3624(g).

The proposed rule on this subject was published on November 25, 2020 (85 FR 75268). The public comment period ended on January 25, 2021. The Bureau received over two hundred and fifty responses to the publication of the proposed rule, but cannot generate a definite number of comments, as a significant portion of responses were from inmates in Bureau facilities and their family members requesting that FSA Time Credits be applied to the terms of imprisonment of particular inmates, rather than specific comments or questions regarding the proposed regulations as published.

Staff at Bureau facilities have been instructed to address specific questions regarding application of FSA Time Credits to particular inmates with those individual inmates, and we encourage those with questions regarding particular inmates to address those questions to staff at facilities where those inmates are housed, or to the regional offices with oversight for those facilities. A list of Bureau of Prisons Regional Offices can be found on the Bureau website: *https://www.bop.gov/about/facilities/offices.jsp?o=4.*

The Bureau also received a large number of comments on the proposed regulations which repeated certain common themes and issues. We have therefore consolidated the issues raised into representative excerpts from selected commenters, and address these issues below.

Additionally, on October 18, 2021, the Bureau published a document reopening the comment period of the proposed rulemaking until November 17, 2021, to solicit public comment on the limited issue of whether DC Code offenders in Bureau of Prisons custody are eligible to apply Time Credits under 18 U.S.C. 3632(d)(4), as added by the FSA. 86 FR 57612. We received thirty submissions during the reopened comment period with regard to that issue, which we discuss further below.

*COMMENT: The Bureau's definition of a "day" as one eight-hour-period of a successfully completed EBRR Program or PA is incorrect, unworkable, and/or contrary to congressional intent.*

The FSA provides that "[a] prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. 3632(d)(4)(A)(i). An inmate determined to be at a "minimum or low risk for recidivating" who, "over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. 3632(d)(4)(A)(ii). The statute does not expressly define what constitutes a "day" of successful participation. In the proposed rule, the Bureau defined it as "one eight-hour period of participation in an EBRR Program or PA that an eligible inmate successfully completes."

More than 150 commenters raised concerns with the Bureau's definition. For example, Senator Sheldon Whitehouse (D–RI) and Senator John Cornyn (R–TX) commented as follows:

The proposed rule's definition of a "day" of program participation does not adequately

reward engagement with [EBBR programs] and PAs consistent with the First Step Act. . . . Because BOP programs do not run for eight hours per day, the proposed rule would require individuals to attend an EBBR or PA for several calendar days before they earned a full "day" of time credit. . . It was not our intent as drafters of the legislation that BOP define a "day" in this way. Nor did Congress ever consider it. . . . The proposed rule's narrow definition of a "day" does not adequately incentivize program participation and reduce recidivism as intended by the First Step Act.

Congressman Hakeem Jeffries (D–NY) echoed the Senators' sentiments, stating:

[D]efining a day as eight hours of participation does not appear to be a good faith attempt to honor congressional intent. A day of successful participation is clearly a day on which a prisoner has successfully participated in a program or productive activity. BOP['s] definition of [a] day would dramatically reduce the amount of time credits an individual can earn.

*RESPONSE:* After carefully considering the comments received, the Bureau agrees that a change is warranted. The proposed definition of a day of successful participation was inconsistent with the goals of the FSA and would have been logistically burdensome to calculate and administer. The Bureau is thus adopting a simpler FSA Time Credits program award model that will more fully encourage and reward participation in evidence-based recidivism reduction programs and productive activities.

In enacting the FSA, Congress made clear that Time Credits should be broadly applicable to a wide range of inmates for a broad range of activities to maximize their opportunities to reduce recidivism. The proposed definition, however, would have meant that inmates could successfully do everything asked of them as part of their recommended programming for multiple days (e.g., two hours each day for four days), but be credited for only one day of successful participation.

In addition, the proposed definition would have required Bureau staff to not only track inmate participation in recommended programming, but also break down participation time into individual hours of work, and then aggregate time spent completing certain programming with other time spent completing other programming. This approach would have varied the earning of Time Credits by program factors such as intensity, length, and duration that could have been confusing to inmates, burdensome for staff to administer, and inconsistent with the general goal of awarding Time Credits in a consistent manner to inmates who are participating in the full range of programming

recommended to them based on the results of their risk and needs assessments.

The final rule adopts a more straightforward and more administratively manageable approach that is consistent with the FSA's goal of promoting successful participation in EBRR Programs and PAs. For every thirty-day period that an eligible inmate successfully participates in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, the inmate will earn ten days of FSA Time Credits. If the inmate is determined to be at a minimum or low risk for recidivating and can maintain that risk level for the most recent two consecutive risk and needs assessments, that inmate may earn an additional five days of FSA Time Credits per thirty-day period.

An eligible inmate must successfully participate in programs and activities that the Bureau recommends based on an individualized risk and needs assessment to earn Time Credits. An inmate will not be considered to be successfully participating if that inmate refuses to participate in or otherwise violates conditions, rules, or requirements of EBRR programs or PAs recommended based on the inmate's risk and needs assessment. However, temporary interruptions in participation that are unrelated to an inmate's refusal to participate or other violation of programming requirements, or that are authorized by the Bureau, such when a recommended program or activity is unavailable or at full enrollment, will not affect the inmate's ability to earn Time Credits.

If an eligible inmate refuses to participate in the recommended program or activity, engages in misconduct that results in removal from the program or activity through placement in restrictive housing, or disrupts or fails to follow the conditions, parameters, or rules of the program or activity, accrual of Time Credits is paused until the inmate complies with programming or completes the disciplinary sanction. This methodology is intended to guide inmates back to the appropriate pro-social goals of programming and act as a deterrent for future misconduct, giving inmates a direct incentive to maintain clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541).

By clarifying the method for awarding Time Credits in this manner to ensure it furthers Congressional intent of the statute, the Bureau hopes to increase the amount of FSA Time Credits that may be awarded to eligible inmates.

*COMMENT: FSA Time Credits should be earned for programs successfully completed on or after December 21, 2018, the date of the enactment of the First Step Act, instead of January 15, 2020, as indicated in the proposed rule.*

More than 150 commenters raised this issue, including Senator Sheldon Whitehouse (D–RI) and Senator John Cornyn (R–TX), who wrote:

The Act provides that "[a] prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed . . . prior to the date of enactment of this subchapter." 18 U.S.C. 3632(d)(4)(B). . . . The proposed rule, however, states that an individual may only earn time credits for programs "successfully completed on or after January 15, 2020"—more than a year after the date of enactment. Nor does the proposed rule explain why individuals are not eligible to earn time credits for programs completed between December 21, 2018 and January 15, 2020.

Congressman Hakeem Jeffries (D–NY) also commented on this issue, opining that the regulation's proposed start date for earning time credits of January 15, 2020, "serves no clear purpose and is inconsistent with the text of the First Step Act, which states that credit may not be earned for programs completed prior to the date of enactment of this subchapter, which was December 21, 2018."

*RESPONSE:* As the commenters correctly note, the FSA explicitly states that Time Credits may not be earned for participation in programming prior to the date of the FSA's enactment. The statute is silent, however, as to the specific date on which inmates should begin to earn Time Credits. Instead, the statute expressly contemplates a phased-in approach and sets specific timelines and benchmarks for implementation.[1] This phased-in approach is appropriate and warranted, given that the FSA has been the most impactful congressional action taken concerning the Bureau of Prisons in recent years, requiring major changes to existing systems and processes, the development of new systems, and

changes that apply to approximately 130,000 current inmates.

Under this phased-in approach, the Attorney General was required to develop and release the risk and needs assessment system within 210 days from the date the FSA was signed into law, December 21, 2018. The new risk and needs assessment tool, called the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN), was subsequently released on July 19, 2019, in accordance with the FSA. Additional modifications of PATTERN occurred after feedback was received from external stakeholders and the FSA-established Independent Review Committee.

The FSA required that as part of the implementation period, within 180 days of the risk and needs assessment system's release date, the Bureau would conduct initial risk and needs assessments for the inmate population and begin expanding the EBRR Programs and PAs necessary to effectively implement the system.[2] The Bureau assigned an initial PATTERN risk level to each inmate by the statutory deadline of January 15, 2020. And, notably, the Bureau implemented the FSA's directive at 18 U.S.C. 3621(h)(2)(A), to assign inmates to EBRR Programs or PAs by January 15, 2022 (two years after the date by which the agency completed risk and needs assessments for all inmates) well before that date.

Because the FSA contemplates a phase-in period during which the risk and needs assessment system could be developed, and because the FSA is silent regarding a specific date when eligible inmates must begin earning Time Credits, the Bureau exercised its discretion and adopted the position in the proposed rule that it would be reasonable for the Bureau to begin allowing inmates eligible under the FSA to earn FSA Time Credits *after* the risk and needs assessment and relevant programming were established, *i.e.*, on January 15, 2020, the date on which initial evaluations under the new risk and needs assessment system were completed. However, in light of the comments submitted, the Bureau acknowledges that because the FSA is silent regarding a specific date when eligible inmates must begin earning Time Credits, yet explicitly prohibits the earning of Time Credits for participation prior to the date of enactment, the statute could also be interpreted to allow for eligible inmates to earn Time Credits as of December 21, 2018, the date of enactment of the FSA.

---

[1] *See* 18 U.S.C. 3621(h)(1)(C), referring to the "risk and needs assessment tools necessary to effectively implement the System over time," and sec. 3621(h)(2)(A), requiring that EBRR Programs and PAs be provided "before the date that is 2 years after the date on which the Bureau of Prisons completes a risk and needs assessment for each prisoner. . . ." The Bureau completed risk and needs assessments for every inmate in Bureau custody on January 15, 2020, and, therefore, as indicated by the FSA, had until January 15, 2022, to ensure that EBRR Programs and PAs are provided to eligible inmates in Bureau custody. The Bureau was already providing those programs and activities to eligible inmates well in advance of that date.

[2] *See* 18 U.S.C. 3621(h)(1).

The case law on this issue is mixed, but some courts have concluded that this reading is in fact the better one. With regard to participation in programming completed after the date of the FSA's enactment, but before completion of all inmate risk and needs assessments on January 15, 2020, some courts have held that eligible inmates should be awarded FSA Time Credits in addition to the pre-FSA incentives already offered by the Bureau. Courts in the Districts of New Jersey and Oregon have directed the Bureau to award Time Credits under the FSA for the successful completion of programs and activities occurring before January 15, 2020, but on or after December 21, 2018, the FSA's date of enactment. *See, e.g., Cazares* v. *Hendrix,* 20–cv–2019 (D. Or. Nov. 9, 2021); *Goodman* v. *Ortiz,* 2020 WL 5015613, at \*6 (D.N.J., Aug. 25, 2020) (holding inmates are currently entitled to FSA Time Credits that have been properly earned); *Hare* v. *Ortiz,* 2021 WL 391280, at \*7 (D.N.J. Feb. 4, 2021) (limiting award of Time Credits to those earned for programs completed on or after the date of enactment of the FSA); *Gallo* v. *Ortiz,* Civ. No. 20–16416 (D.N.J., filed Feb. 16, 2021) (District Court required the Bureau to calculate Time Credits based on 2018 date).[3] Awarding Time Credits as of the date of enactment may also be more consistent with the FSA's goals of reducing recidivism through participation in programming and activities, and allowing inmates to work towards early release. From a fairness perspective, the Bureau also acknowledges that an inmate who has been consistently participating in programming, such as working to obtain his or her GED while the FSA was in effect, between December 21, 2018 (the date of the

enactment of the FSA), and January 15, 2020 (the date risk and needs assessments were completed on all Bureau inmates), should be rewarded for that effort.

While the Bureau continues to consider the FSA amenable to the interpretation reflected in the proposed rule, it acknowledges that the statute is ambiguous, and in light of the FSA's purposes and fairness considerations, it exercises its discretion to adopt the reading urged by the majority of commenters. Therefore, the Bureau amends this final rule to allow inmates eligible under the First Step Act to receive retroactive Time Credits for programming and activities they participated in starting on December 21, 2018, the date of the FSA's enactment. In determining how to award FSA Time Credits during the period before all individualized risk and needs assessments had been completed, the Bureau faces administrative challenges. Consistent with the phased-in approach contemplated by the FSA, the Bureau did not have mechanisms in place to methodically track participation in EBRRs and PAs until January 15, 2020, because comprehensive uniform tracking codes did not exist. In addition, it was not until that date that the Bureau had completed individualized risk and needs assessments for every inmate—and thus had a basis to conclude that there was an evidence-based reason to assign a particular program to, or recommend particular activities for, an inmate in order to reduce a particular inmate's risk of recidivism. Thus, in many instances, inmates were participating in programs for reasons other than addressing a criminogenic need.

Due to these administrative difficulties, for inmates participating in programming after the date of the FSA's enactment, but before the date that Bureau had completed all risk and needs assessments (December 18, 2018, to January 14, 2020), it is not feasible for the Bureau to connect individual inmate participation in programming to individualized risk and needs assessments, since the risk and needs assessment tool did not exist until well after the date of the FSA's enactment. Instead, for inmate participation in programming during this period of time, the Bureau will exercise its discretion to award FSA Time Credits to inmates otherwise deemed eligible under the First Step Act by applying the same criteria as that applied to inmate participation in authorized EBRR programs or PAs recommended based on a risk and needs assessment after January 2020 to determine the inmate's

retroactive Time Credit balance. Eligible inmates will be afforded a presumption of participation for the period between December 21, 2018, and January 14, 2020 and be awarded Time Credits accordingly. Inmates will not receive credit for any period in which they were in a special housing unit, in a designation status outside the institution, temporarily transferred to the custody of another Federal or non-Federal government agency, in mental health/psychiatric holds (either court-ordered mental health/psychiatric evaluations or situations in which mental health or psychiatric evaluation or treatment require an inmate to be designated outside or away from the inmate's "home" facility within the Bureau), or for refusing mandatory programming, as further explained below.

*COMMENT: There are no safeguards in the risk and needs assessment system to prevent racial discrimination or racial disparities.*

Several commenters were concerned about the potential for racial and ethnic biases or disparities in the risk and needs assessment tool used by the Bureau of Prisons.

*RESPONSE:* The Department of Justice issued the Risk and Needs Assessment System (RNAS) mandated by the First Step Act, known as PATTERN, on July 19, 2019. *See The First Step Act of 2018: Risk and Needs Assessment,* U.S. DEP'T OF JUSTICE: OFFICE OF THE ATTORNEY GENERAL, *https://www.bop.gov/ inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf* (July 2019). The Department's release of PATTERN was followed by a comment period during which the Department received approximately 200 comments and statements and held two listening sessions. On November 19, 2019, the Attorney General met with the Independent Review Committee (IRC) created by Section 107 of the FSA to discuss proposed changes to PATTERN, as required by 18 U.S.C. 3632.

The Attorney General then announced enhancements to PATTERN in a document entitled *The First Step Act of 2018: Risk and Needs Assessment System—UPDATE, https:// www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf* (January 2020) (2020 Update). In this 2020 Update, and in response to concerns arising from potential racial disparities, the Department instituted several recommended changes to the tool. Later, in 2021, the Department also implemented a more standardized

---

[3] Most courts that have analyzed this issue, however, have found it reasonable for the Bureau to begin awarding Time Credits for successful completion on or after January 15, 2020, as opposed to holding that inmates are entitled to FSA Time Credits for successful completion of EBRR Programs and PAs occurring before that date but on or after December 21, 2018. *See, e.g., Cohen* v. *United States,* No. 20–cv–10833, 2021 WL 1549917, at \*6 (S.D.N.Y. Apr. 20, 2021) ("[T]he statute does not require the BOP to begin awarding ETCs [earned time credits] during the phase-in period."); *Kennedy-Robey* v. *Warden, FCI Pekin,* No. 20–cv–1371 (C.D. Ill. Mar. 2, 2021) (ECF No. 14) ("Not only is the BOP's decision to delay awarding credits permitted under the statute, the BOP has legitimate reasons for desiring to do so."); *Llewlyn* v. *Johns,* No. 5:20-cv-77, 2021 WL 535863 (S.D. Ga. Jan. 5, 2021); *Herring* v. *Joseph,* No. 4:20–CV–249, 2020 WL 3642706, at \*1 (N.D. Fla. July 6, 2020); *Holt* v. *Warden,* 4:20–CV–04064–RAL, (D.S.D. May. 13, 2021; *Fleming* v. *Joseph,* No. 3:20CV5.990–LC–HTC, 2021 WL I66936I (N.D. Fla. Apr. 7, 2021) (report and recommendation). *See also Bowling* v. *Hudgins,* 2020 WL 1917490 (N.D. Va. Apr. 20, 2020); *Allen* v. *Hendrix,* 2020 WL 890396 (E.D. Ark. Feb. 24, 2020).

**2710** Federal Register / Vol. 87, No. 12 / Wednesday, January 19, 2022 / Rules and Regulations

For instance, one commenter indicated that while the requirement to successfully complete a program before earning Time Credits "may make sense for educational classes, certificate-based programs, or fixed length productive activities, it should not apply to prison jobs that would require ongoing accumulation of Time Credits. A prison job is not a 'program to complete,' has no set duration, and its success is based on continued employment and supervisor evaluations."

Another commenter suggested that those "participating in the Residential Drug[] Abuse Program (RDAP), should receive (16) program hours per day, 2 eight-hour program days for 1 proposed day, . . . [because] RDAP participants 'live' in a therapeutic community."

Additionally, Senator Sheldon Whitehouse (D–RI) and Senator John Cornyn (R–TX) commented as follows:

As BOP finalizes and implements its proposed rule, it should ensure that individuals are assigned to categories of programs that meet their needs, rather than specific programs, to allow for maximum participation in credit-earning EBRRs and PAs. . . . Each program at a facility should be appropriately categorized, including faith-based programs. Such flexibility will ensure that individuals can freely choose to participate or not participate in faith-based options. It is also critical to allow for greater program access as BOP expands its offerings, as some programs have limited capacity or may not be offered at particular facilities.

*RESPONSE:* The Bureau agrees with these commenters, and has structured its programs and work assignments to promote participation and flexibility. New funding allotments will enhance the Bureau's course offerings, largely by permitting it to increase capacity through hiring additional staff, and will also serve to bolster the Bureau's resources, thereby improving its ability to carry out the FSA Time Credits program. The Bureau began to enhance programming immediately after the FSA's enactment, using then-current appropriations from FY 2019 not allotted specifically for FSA implementation, and continued to grow its programming offerings with budget allotments as authorized from FY 2020 appropriations.

In *The Attorney General's First Step Act Section 3634 Annual Report,* U.S. DEP'T OF JUSTICE: OFFICE OF THE ATTORNEY GENERAL, *https:// www.bop.gov/inmates/fsa/docs/ 20201221_fsa_section_3634_report.pdf* (December 2020) (2020 Annual Report), the Bureau established a review process to consider externally submitted programs for potential inclusion on the approved EBRR Program/PA list. *Id.* at

17. The Bureau currently engages in partnerships with external organizations to recruit community volunteers to assist with inmate reentry and educational programs. Consistent with the goal of supporting and expanding volunteer activities at all institutions, on June 25, 2019, the Bureau provided guidance to all Wardens about the importance and use of partnerships under the FSA. Specifically, the Assistant Directors for the Office of General Counsel and Reentry Services Divisions issued guidance on collaboration with outside organizations pursuant to the FSA. This memorandum provided information on the FSA's statutory requirements, the Bureau process for establishing partnerships, equitable treatment of similar organizations, and tracking of partnerships.

On September 19, 2019, voluntary partnerships were in place at all 122 Bureau institutions. During FY 2019, 5,939 individuals volunteered 110,489 hours at various institutions. During FY 2020 (as of September 10, 2020), 5,978 volunteers and contractors had provided 157,752 hours at various institutions. The increase in volunteer hours can, in part, be attributed to staff efforts to increase partnerships pre-COVID–19, and changes made to the Bureau volunteer tracking system. *Id.* at 37.

In 2020, the Bureau created unique identifier codes for every Bureau program. These codes allow Bureau to track inmates' program enrollment, participation, and completion. This information can then be compared to needs assessment information and used as a method for assessing capacity. Unfortunately, because of the global pandemic, the Bureau has not been able to program as it would under normal conditions.

The Bureau assesses 12 broad need areas plus dyslexia, and programs are matched to each of these needs. As normal operations resume, the Bureau will be able to accurately track whether inmates sign up for the programs that match their needs, and whether the programs are offered with enough capacity that inmates are able to complete them at the appropriate times during their sentences. While the Bureau's current list of over 70 EBRR Programs and PAs addresses most areas of need, some improvements have been made even during the pandemic. For example, the Bureau created better quality and more standardized materials that provide more consistent program delivery. Additionally, a more intensive program addressing criminal cognition is in development to account for this

highly prevalent need in Bureau facilities. *Id.* at 19–20.

Also, several programs and activities mentioned by the commenters as items that should be included in the list of approved programs are, in fact, already on the list. *The First Step Act Approved Programs Guide,* available on the Bureau's website at *https:// www.bop.gov/inmates/fsa/docs/2021_ fsa_program_guide.pdf* (Programs Guide), contains a program description, institution locations, needs addressed by each program offered, and the department responsible for program delivery (*e.g.,* Education, Psychology).

The Programs Guide indicates that offered programs and activities "will vary based on the needs of the sentenced population" at a given location. This helps to explain, in part, why some programs and activities may not be available at all facilities. However, as the Bureau continues to expand its offerings, the Programs Guide continues to expand, and will be updated annually.

With regard to several programs and activities specifically mentioned by commenters:

*UNICOR:* Employment in Federal Prison Industries (FPI, also known by its trade name, UNICOR) is included in the Programs Guide as an EBRR Program.

*RDAP:* The Residential Drug Abuse Treatment Program (RDAP), is included in the Program Guide as an EBRR Program.

*Online or correspondence college courses:* The Programs Guide includes Post-Secondary Education programming, and explains that "[c]ollege level classes are provided by credentialed instructors from the community who deliver coursework leading to the Associates or Bachelors degree," and that "[s]pecific prerequisites for each program are determined by the school providing the service." *See Programs Guide* at 23. This program, delivered by Education staff or appropriately credentialed contractors, allows for online or correspondence college courses, as authorized and credentialed by the Bureau's Education staff.

*Religious services and programming:* The Programs Guide describes several faith-based programs and activities currently available at all Bureau facilities, including the Threshold Program, a faith-based reentry program (*id.* at 32), and Embracing Interfaith Cooperation, a PA which fosters interfaith dialogue and understanding to counter religious discrimination and extremism (*id.* at 36).

Also, the Bureau's longstanding Life Connections Program (LCP), a

process for inputting scores into the risk and needs system, and the Bureau will continue to ensure that necessary precautions are taken to ensure consistent, objective application for all inmates in accordance with the published schema.

The *2021 Annual Review and Revalidation of the First Step Act Risk Assessment Tool* report confirmed the predictive and dynamic validity of PATTERN, but expressed the concern that differences in race and ethnicity might affect predictions of risk for recidivism. The Justice Department takes seriously its responsibility under the First Step Act to annually "review, validate, and release publicly on the Department of Justice website the risk and needs assessment system," and ". . . to identify any unwarranted disparities, including disparities among similarly classified prisoners of different demographic groups . . ." 18 U.S.C. 3631(b)(4)(E). The Department will continue to meet this mandate, to rigorously evaluate any risk assessment tool, including through the use of outside experts, and to take all steps possible to address and mitigate against racial bias or other disparities.

As part of that compliance, the Department will publish annually (1) for each disqualifying offense, data on how many individuals from each racial and/or ethnic group were ineligible to earn Time Credits; (2) for each disqualifying prior federal conviction, data on how many individuals from each racial and/or ethnic group were ineligible to earn Time Credits; (3) for all other disqualifying prior convictions, data on how many individuals from each racial and/or ethnic group were ineligible to earn Time Credits; (4) data on how many individuals from each racial and/or ethnic group were eligible to earn Time Credits; and (5) how many individuals from each racial and/or ethnic received risk and needs assessment score classifications of "high," "medium," "low," and "minimum" based on their most recent assessment.

*COMMENT: The Bureau does not have the resources to implement the FSA Time Credits program appropriately.*

Several commenters were concerned about the Bureau's ability to implement the FSA Time Credits program. One commenter, for example, stated that "the average course that is offered by BOP is not listed on the list for reentry courses, some of which are college/correspondence courses that inmates have to pay for out of pocket. As for the courses that are listed, they are not even offered at this time because inmates are

the teachers of them, and COVID does not allow inmates to teach them at this time. Many inmates are returning home now, not having had any reentry courses—not to their own fault." Other commenters mentioned long waitlists and other scarcity of resource issues.

*RESPONSE:* The Bureau recognizes the significant impact that the FSA will have on inmate programming, and notes that additional appropriated funding has been directed toward FSA implementation. These additional resources will be used to add to existing programs and meet the FSA's direction that the Bureau encourage and increase inmate programming participation.

Before the enactment of the FSA, the Bureau already offered a wide variety of programs and activities designed to prepare inmates for release, educate them, and provide them with substance abuse disorder and mental health treatment. The Bureau has always endeavored to focus on increasing the breadth and depth of its programming for inmates and build greater capacity for inmate participation in programming, and the FSA provides further statutory support for that mission. To that end, the Bureau has asked, and will continue to ask, Congress to authorize funding and staffing for those purposes, and will endeavor to fill staff positions as necessary to increase and enhance inmate programming.

In *The First Step Act of 2018: Risk and Needs Assessment System— UPDATE,* U.S. DEP'T OF JUSTICE: OFFICE OF THE ATTORNEY GENERAL, *https://www.bop.gov/ inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf* (January 2020) (2020 Update), the Department indicated that it had received feedback expressing concerns about the Bureau's programming capacity. *Id.* at 18. The issue raised by this feedback to the Department is substantially similar to concerns raised by the commenters on the Bureau's proposed rule.

In response to the feedback discussed in this 2020 Update, the Department described the waitlist process for inmate programming, indicating that that process is meant to ensure that inmates are "enrolled in needed courses at the appropriate times in their incarceration," and that "case management and programming staff monitor these lists based on inmate need and release date/plans, to ensure relevant programs are completed in appropriate timeframes." *Id.* The Department also described the ongoing expansion of Federal Prison Industries and the Resolve Program (providing

trauma treatment). However, the Department also noted:

As part of the FSA implementation, the BOP is assigning codes to approved evidence-based recidivism reduction programs and productive activities to enable tracking and monitoring of their capacity and use. BOP will also begin assigning inmates to specific programs to address identified needs, which will allow it to further examine inmate interest and program capacity. Based upon these changes, BOP can expand or contract capacity consistent with the inmate needs and interests.

*Id.* The Department also noted in the 2020 Update that the Bureau had "already begun expanding programs and hiring staff to deliver" further necessary programming, and that although the FSA, issued in 2018, had "not come with appropriated funds in [fiscal year] FY 2019 . . . BOP had taken the initiative to adjust funding within its budget to cover a variety of targeted FSA activities." Further, for FY 2020, approximately $116 million was authorized to allow the Bureau to expand evidence-based reentry programs, capacity for prerelease custody, medication-assisted treatment (MAT) for opioid use disorder nationwide, information technology services for inmates, and evaluation of programs and services. *Id.* at 21–22.

Additionally, in the 2020 Update, the Department noted that to facilitate implementation of the FSA, the Bureau had increased staffing at female institutions and enhanced male and female trauma treatment and vocational training offerings. The Bureau also implemented a variety of hiring strategies to address staffing shortfalls, and continues to do so. *Id.* at 24. Therefore, while the Bureau recognizes that resources have been strained, future funding allotments will enhance the Bureau's course offerings and serve to bolster the Bureau's resources, improving its ability to carry out the FSA Time Credits program across all Bureau facilities.

*COMMENT: FSA Time Credits should be awarded for participation in UNICOR, online or correspondence college courses, religious services, more time for RDAP, and other programs and activities.*

Several commenters suggested that the list of EBRR Programs and PAs should be expanded to include participation in, or a greater amount of Time Credits allowable for participation in, UNICOR and prison jobs, online or correspondence courses (including college courses), religious services, the Residential Drug Abuse Treatment Program (RDAP), and a variety of other programs, courses, and activities.

residential, multi-faith-based reentry program open to inmates of all religious traditions and those with no faith affiliation, uses contract partners to provide religious services, while community volunteers serve as mentors to inmate participants. This program is available at six Bureau facilities. *See* 2020 Annual Report, *supra*, at 37–38.

As the Bureau's FSA implementation budget appropriations increase and necessary COVID–19 pandemic-related health and safety restrictions ease, the Bureau will continue its efforts to expand EBRR programming and PA offerings available at Bureau facilities for eligible inmates. Furthermore, as noted above, the Bureau has changed the proposed regulation to a more inclusive model, whereby FSA Time Credits may be earned if an eligible inmate is successfully participating in EBRR Programs and PAs recommended based upon his or her risk and needs assessment. Also, inmates will not be penalized if specifically recommended EBRR Programs or PAs are unavailable to them or at full enrollment at their facilities. As the Bureau continues to evaluate these and other types of programs and activities, the list of EBRR Programs and PAs for which inmates may earn FSA Time Credits will likewise increase.

*COMMENT: FSA Time Credits should be earned for successful participation, not only for successful completion.*

Many commenters opined that FSA Time Credits should be awarded on an ongoing basis, during *participation* in EBRR programming and PAs, instead of after successful *completion* of an EBRR Program or PA. One commenter wrote that

[b]y focusing only on completion, BOP diminishes the value of participation and weakens the incentive structure Congress enacted. Indeed, there are myriad situations where people would successfully participate in an approved program and—through no fault of their own—be prevented from, or delayed in, completing it. Transfers, program resource and staffing limitations, and facility movement restrictions all impact program completion, as do length of sentence, program availability, and waitlists. Individuals have no control over completion if, for example, their facility is locked down, or if programs are indefinitely suspended due to a pandemic. Congress created the earned time credit system to encourage personal responsibility. BOP's all-or-nothing rule that fails to acknowledge participation is inconsistent with this intent. BOP should revise the proposed rule to allow individuals who successfully participate in programming to earn time credits.

*RESPONSE:* The Bureau agrees with these comments. As indicated previously, the Bureau is altering and expanding its method for awarding Time Credits.

The concern of the commenters regarding participation in programming echoes the Bureau's longstanding policy of encouraging inmate reentry programming and productive activities throughout each inmate's incarceration, which is consistent with the FSA's goal of attaining maximum recidivism reduction. The Bureau will continue to emphasize the need for full and successful participation in EBRR programs and PAs, as recommended for each inmate, to achieve the maximum award of FSA Time Credits to the maximum number of eligible inmates.

Toward that end, the Bureau has developed the simpler model which it now adopts for the FSA Time Credits program. Under this model, each eligible inmate earns Time Credits while participating in recommended EBRR Programs and PAs. Time Credits for successful participation are awarded at the end of each thirty-day period. By altering the scheme for awarding Time Credits in this manner, the Bureau hopes to increase the amount of FSA Time Credits that may be awarded to the maximum number of eligible inmates. Inmates must participate in all programs and activities that the Bureau recommends based on an individualized risk and needs assessment to be considered to have successfully participated in recommended EBRR Programs and PAs for purposes of earning Time Credits.

It is important to note, however, that temporary interruptions in participation that are unrelated to an inmate's refusal or other violation of programming requirements, such as the unavailability of a recommended program or activity or its full enrollment, or interruptions authorized by the Bureau, will not affect the inmate's ability to earn Time Credits. An inmate's ability to earn FSA Time Credits will be affected if the inmate refuses to participate in the recommended programming or productive activity, engages in misconduct that results in removal from the program or activity through placement in restrictive housing, or disrupts or fails to follow the conditions, parameters, or rules of the activity. In the event that the inmate is found to have committed any of these violations, accrual of Time Credits is paused until the inmate complies with programming conditions, parameters, or rules, or completes the disciplinary sanction.

For, example, the Bureau may permit an inmate to continue earning FSA Time Credit if programming is briefly interrupted due to an instructor's illness, which results in the instructor canceling class for the day. Another possible example might be a brief interruption caused by an inmate requiring to be absent from programming for a day or two due to illness or medical treatment. In such circumstances, the Bureau may review whether or not the illness or medical treatment is attributable to factors over which the inmate may exercise control (possible drug overdose, injuries sustained while fighting, etc.), whether the conduct is a disciplinary offense, or whether it is excusable behavior and therefore may be authorized. The Bureau will strive to reach an equitable result when calculating time in program participation and circumstances both beyond and within the inmate's control.

Accordingly, unless the inmate formally declines recommended programming addressing his or her unique needs, or is not participating in any activities, the assumption is that the eligible inmates will be earning Time Credits and fully participating in recommended programming. The regulation indicates that accrual of Time Credits may be suspended in certain situations when the inmate is unable to participate in recommended programming, including, but not limited to, situations such as:

• Placement in a Special Housing Unit;

• Designation status outside the institution (*e.g.,* for extended medical placement in a hospital or outside institution, court appearances, an escorted trip, a furlough, etc.);

• Temporary transfer to the custody of another federal or non-federal government agency (e.g., on state or federal writ, transfer to state custody for service of sentence, etc.);

• Placement in mental health/psychiatric holds; or

• "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

Inmates who decline to participate in a recommended voluntary EBRR or PA (*i.e.,* inmates that "opt out") will not be considered to be refusing a program assignment for the purposes of disciplinary prohibited act code violations, but will merely be excluded from benefits or privileges of FSA Time Credit Program participation. For example, declining to take a recommended anger management course will prevent an inmate from earning FSA Time Credits, but will not in itself constitute a disciplinary prohibited act code violation. Inmates that refuse a formal assignment,

however, will also be held responsible for any attendant disciplinary prohibited act code violations, e.g., failing to report to institution work detail.[4]

COMMENT: *FSA Time Credits should be applied to an inmate's transfer to supervised release (to shorten a term of imprisonment).*

Some commenters indicated that they were concerned that Time Credits would not, in fact, be applied to transfer to supervised release at all, but instead might only be applied to prerelease custody, noting that the proposed rule "does not address the procedures for determining whether an individual inmate will have FSA Time Credits applied toward prerelease custody, early transfer to supervised release, a combination of both, or neither; this proposed rule only addresses the procedures for earning, awarding, loss, and restoration of FSA Time Credits."

RESPONSE: As stated, under the FSA, an eligible inmate who successfully participates in an EBRR Program or PA recommended by staff based on the inmate's risk and needs assessment may earn FSA Time Credits to apply toward prerelease custody or transfer to supervised release. Eligible inmates may earn 10 days of Time Credits (and, if maintaining a low or minimum risk status, an additional 5 days of Time Credits) for every 30-day period of successful participation in EBRR Programs or PAs.

However, under the FSA (18 U.S.C. 3624(g)), even if earned, Time Credits may not be applied to prerelease custody until:
- The amount of earned Time Credits is equal to the remainder of the inmate's imposed term of imprisonment;
- The inmate has demonstrated a reduced risk of recidivism or maintained a minimum or low recidivism risk during his or her term of imprisonment;
- The remainder of the inmate's imposed term of imprisonment has been computed under applicable law (e.g., Good Conduct Time Credit under 28 CFR part 523 has been applied, eligibility for early release consideration under Residential Drug Abuse Treatment Program regulations in 28 CFR part 550 has been evaluated, etc.); and
- The inmate has been determined to be at a minimum or low risk of recidivating based on his or her last two assessments, or has had a petition to be

transferred to prerelease custody approved by the warden.

Similar requirements exist under the FSA for application of earned Time Credits to transfer to supervised release. Time Credits may not be applied to transfer to supervised release under 18 U.S.C. 3624(g) unless:
- The amount of earned Time Credits is equal to the remainder of the inmate's imposed term of imprisonment;
- The inmate's sentence includes a period of supervised release to be served after his or her term of imprisonment;
- The inmate's latest risk and needs assessment shows that he or she is at a minimum or low risk of recidivating; and
- The application of Time Credits would not result in starting the period of supervised release more than 12 months before he or she would otherwise be eligible to do so (*i.e.*, any amount of earned Time Credits in excess of 12 months would be applied to prerelease custody).

See Nathan James, U.S. Congressional Research Service, The First Step Act of 2018: An Overview (2019), at 5–6.

The Bureau assures commenters that FSA Time Credits will be applied to early transfer to supervised release, as authorized by the FSA in 18 U.S.C. 3632(d)(4)(C) and 18 U.S.C. 3624(g). See 2020 Annual Report at 39–44. The Bureau intends to adhere to the parameters of the FSA to permit application of Time Credits toward transfer to supervised release pending development of policy, in individual cases as appropriate.

COMMENT: *Earning FSA Time Credits should continue in Residential Reentry Centers and/or while in home confinement.*

Many commenters raised an issue that was articulated by Senator Sheldon Whitehouse (D–RI) and Senator John Cornyn (R–TX) as follows:

The proposed rule also provides that "FSA Time Credits can only be earned while an inmate is in a Bureau facility, and will not be earned if an inmate is in a Residential Reentry Center or on home confinement." The proposed rule does not cite to any authority for this restriction, and this interpretation is not consistent with the goals of the First Step Act.

Allowing individuals to earn time credits while in RRCs is authorized by the First Step Act. The Act provides that "[t]ime credits earned . . . by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release." It defines "prisoner" as "a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons."

Because "[p]re-release inmates at an RRC remain in Federal custody while serving a sentence imposed by a U.S. District Court or DC Superior Court," they are "prisoners" for the purposes of the First Step Act. Nor does the First Step Act distinguish between "prisoners" who are serving their sentence in a BOP institution, in an RRC, or on home confinement in describing the time credit program. By its own terms, the statute allows BOP to award time credits to individuals incarcerated in an RRC toward time in supervised release.

Allowing individuals incarcerated in an RRC to earn time credits by participating in EBRRs would further the purposes of the First Step Act. RRCs offer substance abuse treatment and other programs similar to those offered in BOP institutions. There is no reason to believe that a program offered in an RRC will reduce recidivism any less than one offered to an individual in prison. In fact, such programs may be more effective, as individuals are close to release from custody and can begin putting lessons learned into practice as they transition home. BOP should revise the proposed rule to allow individuals to earn time credits while in an RRC.

Congressman Hakeem Jeffries (D–NY) also stated, "I see no reason to make individuals in Residential Reentry Centers (RRCs) or in home confinement ineligible to earn time credits. . . . Congress could have used a narrower definition or explicitly excluded certain categories of individuals based on where they serve their sentence, but it chose not to do so."

RESPONSE: After carefully considering the comments received, the Bureau agrees that inmates in prerelease custody—whether in a residential reentry center (RRC) or on home confinement—are eligible to earn FSA Time Credits under 18 U.S.C. 3632(d)(4)(A), which they could presumably apply, under 18 U.S.C. 3632(d)(4)(C), toward transfer to supervised release.

The practical effect of allowing eligible inmates to keep earning Time Credits while in prelease custody (RRCs) will likely be limited, however, for several reasons. First, the Bureau intends to transfer eligible inmates who satisfy the criteria in 3624(g) to supervised release to the extent practicable, rather than to prelease custody. The Bureau therefore anticipates that the total population of eligible inmates in RRCs or home confinement will be small.

Second, as a practical matter, programming and services for inmates in RRCs or home confinement will often be provided off-site or by a third-party provider, which makes tracking successful participation more difficult. For example, community-based substance use treatment programs referred to by the Senators in their

---

[4] See 28 CFR 541.3, Table 1—Prohibited Acts and Available Sanctions: Moderate Severity Level Prohibited Acts, code 306: "Refusing to work or to accept a program assignment."

Federal Register / Vol. 87, No. 12 / Wednesday, January 19, 2022 / Rules and Regulations    2713

comments are not provided on-site at RRCs, but rather on an outpatient basis. The Bureau uses a comprehensive inmate information tracking system that is only accessible to Bureau staff. The Bureau's inmate information tracking system is not accessible to RRC staff, and therefore cannot track inmate programming activity when inmates are no longer in the custody of the Bureau of Prisons.

Third, unlike a prison facility, which is a self-contained unit under the Bureau's control and supervision that can provide Bureau-authorized, comparable, and approved programming to all housed inmates, the breadth of programming available at or through different RRCs, or in the communities where an inmate may be place in home confinement, could vary significantly and may not correspond directly to recommendations based on inmates' most recent risk and needs assessments.

Given these variables, the Bureau will work on a case-by-case basis with eligible inmates in RRCs to identify appropriate available programming for them to earn FSA Time Credits, and will determine how to best track participation as part of the Bureau's commitment to ensure the maximum number of FSA Time Credits may be awarded to the maximum number of eligible inmates. The Bureau will issue guidance on this topic to ensure consistency in implementation.

*COMMENT: All inmates should be eligible for FSA Time Credits without exclusions.*

Several commenters recommended that, as a general matter, any inmate willing to participate in the FSA Time Credit program should be eligible for FSA Time Credits. A few individual commenters suggested more specifically that inmates convicted of particular offenses (as described above) should be removed from the category of "ineligible prisoners," as described in 18 U.S.C. 3632(d)(4)(D), and should be permitted to earn FSA Time Credits for application toward prerelease custody or transfer to supervised release.

*RESPONSE:* As noted, 18 U.S.C. 3632(d)(4)(D) describes inmates that are "ineligible to receive time credits" under Subchapter D (the Risk and Needs Assessment System) if serving a term of imprisonment for conviction under any of the provisions listed therein. It is outside the Bureau's authority to alter the exclusions as stated in the FSA. Some commenters suggested that "non-violent" offenses be removed from the ineligibility exclusions, but did not specify which offenses listed might be considered "non-violent" or otherwise define that term. Regardless, the

statutory exclusions may only be amended by Congress.

*Specific offenses:* The FSA enumerates 68 offenses for which inmates who are serving terms of imprisonment are ineligible. Commenters raised several specific offenses. We note that under the FSA's list of 68 enumerated offenses, the following are included as ones for which inmates are ineligible if they are serving a term of imprisonment upon conviction:

- 18 U.S.C. 2250, relating to failure to register as a sex offender (*see* 18 U.S.C. 3632(d)(4)(D)(xxxviii));
- 18 U.S.C. 2251, relating to the sexual exploitation of children (*see* 18 U.S.C. 3632(d)(4)(D)(xxxix));
- 18 U.S.C. 2251A, relating to the selling or buying of children (*see* 18 U.S.C. 3632(d)(4)(D)(xl));
- 18 U.S.C. 2252, relating to certain activities concerning material involving the sexual exploitation of minors (*see* 18 U.S.C. 3632(d)(4)(D)(xli));
- 18 U.S.C. 2252A, relating to certain activities involving material constituting or containing child pornography (*see* 18 U.S.C. 3632(d)(4)(D)(xlii));
- 18 U.S.C. 2260, relating to the production of sexually explicit depictions of a minor for importation into the United States (*see* 18 U.S.C. 3634(d)(4)(D)(xliii)).

*Prior convictions:* As stated in the preamble to the proposed rule, an inmate cannot earn FSA Time Credits if he or she has a disqualifying prior conviction as specified in 18 U.S.C. 3632(d)(4)(D). In the interest of clarifying the statement in the proposed rule, a "disqualifying prior conviction" would render an inmate ineligible to earn Time Credits under 18 U.S.C. 3632(d)(4)(D)(li) if the inmate:

1. Had a *prior conviction* for which he or she served a term of imprisonment of more than 1 year, for a Federal or State offense, by whatever designation and wherever committed, consisting of the following:
- Murder (as described in 18 U.S.C. 1111),
- voluntary manslaughter (as described in 18 U.S.C. 1112),
- assault with intent to commit murder (as described in 18 U.S.C. 113(a)),
- aggravated sexual abuse and sexual abuse (as described in 18 U.S.C. 2241 and 2242),
- abusive sexual contact (as described in 18 U.S.C. 2244(a)(1) and (a)(2)),
- kidnapping (as described in 18 U.S.C. chapter 55),
- carjacking (as described in 18 U.S.C. 2119),
- arson (as described in 18 U.S.C. 844(f)(3), (h), or (i)), or

- terrorism (as described in 18 U.S.C. chapter 113B);

*AND*

2. Is currently serving a term of imprisonment of more than 1 year for an offense described in 18 U.S.C. 3559(c)(2)(F), *i.e.,* a "serious violent felony," which means either—

(i) a Federal or State offense, by whatever designation and wherever committed, consisting of the following:
- Murder (as described in 18 U.S.C. 1111);
- manslaughter other than involuntary manslaughter (as described in 18 U.S.C. 1112);
- assault with intent to commit murder (as described in 18 U.S.C. 113(a));
- assault with intent to commit rape (as described in 18 U.S.C. 3559(c)(2)(A));
- aggravated sexual abuse and sexual abuse (as described in 18 U.S.C. 2241 and 2242);
- abusive sexual contact (as described in 18 U.S.C. 2244(a)(1) and (a)(2));
- kidnapping (as described in 18 U.S.C. 3559(c)(2)(E));
- aircraft piracy (as described in 49 U.S.C. 46502);
- robbery (as described in 18 U.S.C. 2111, 2113, or 2118);
- carjacking (as described in 18 U.S.C. 2119);
- extortion (as described in 18 U.S.C. 3559(c)(2)(C));
- arson (as described in 18 U.S.C. 3559(c)(2)(B));
- firearms use (as described in 18 U.S.C. 3559(c)(2)(D));
- firearms possession (as described in 18 U.S.C. 924(c));
- or attempt, conspiracy, or solicitation to commit any of the above offenses;

*OR*

(ii) any other offense punishable by a maximum term of imprisonment of 10 years or more—
- that has as an element the use, attempted use, or threatened use of physical force against the person of another or
- that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense.

The Bureau is cognizant of the strict categorical analysis required by the Supreme Court in adjudicating whether an offense meets the elements or residual clause of 18 U.S.C. 3559. As such, the Bureau after consultation with the Department of Justice will ensure that its facilities receive updated information as to which federal and state offenses qualify or are the subject

of litigation and that inmate records are updated to ensure maximum participation in credit-earning EBRRs.

*Deportable inmates:* As the FSA also indicates in 18 U.S.C. 3632(d)(4)(E), an inmate who is subject to a final order of removal under immigration laws as defined in 8 U.S.C. 1101(a)(17) may not have FSA Time Credits applied toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g).

Although the Bureau does not have the authority to award FSA Time Credits to inmates who are ineligible under the FSA, such inmates may still earn other benefits for successfully participating in the many other types of programming offered by the Bureau. Inmates ineligible for earning or applying FSA Time Credits may still receive incentives such as increased privileges (commissary, visiting, and telephone) for participation in EBRR Programs.

*COMMENT: Forfeiture penalties for earned Time Credits are too severe.*

Many commenters stated that the proposal to amend the Bureau's regulations on inmate discipline in 28 CFR part 541 to include forfeiture of FSA Time Credits as a disciplinary sanction was too severe. One commenter stated that:

The forfeiture rates would be too harsh on their own, but even more punitive when combined with other negative consequences for violations, including limits on future earning and use of time credits and would be disproportionately severe across all levels of prohibited acts... Moreover, forfeiture of earned time credits is not the only consequence an individual would suffer as the result of a prison infraction. An infraction could also negatively affect an individual's ability to earn and use time credits in the future by raising his risk score. . .

Another commenter stated that

The proposed rule provides that to restore credits from prison rule violations, an individual must first have "[c]lear conduct for at least four consecutive risk and needs assessments.". . .It could take at least 4 years to complete "at least four consecutive risk and needs assessments." Yet BOP provides no justification for requiring clear conduct for this long. Indeed, requiring an individual to remain infraction-free for at least 4 years is inconsistent with PATTERN. Under PATTERN, individuals who are infraction-free for 12 months or more receive no points related to the recency of an infraction. If PATTERN indicates those with infractions older than 12 months are no more risky than those with infractions older than 4 years, it is difficult to understand what justification BOP would have to require "clear conduct" for what could be at least 4 years.

*RESPONSE:* The Bureau agrees with these commenters, and has adjusted the proposed penalties related to FSA Time Credits accordingly. As stated in the proposed rule, FSA Time Credits may be lost through inmate discipline procedures described in 28 CFR part 541 only if an inmate violates the requirements or rules of an EBRR Program or PA. The FSA authorizes the Bureau to develop procedures for the reduction of FSA Time Credits for inmates under these circumstances. *See* 18 U.S.C. 3632(e). Opting out of a program will not result in the forfeiture of credits, unless failure to complete the program itself constitutes an infraction (*e.g.* failing to accept a mandatory work assignment).

The Bureau's proposed amendments to 28 CFR 541.3, Table 1 (Prohibited Acts and Available Sanctions), were intended to resemble the structure of current sanctions for loss of Good Conduct Time, which allow for forfeiture in escalating amounts depending on the severity level of the prohibited act committed. However, in light of the comments received, the Bureau alters the proposed forfeiture sanctions to more closely mirror the Good Conduct Time forfeiture sanctions, and accordingly decreases the amount of FSA Time Credits forfeiture sanctions for each prohibited act severity level offense by more than half.

Further, upon review, the Bureau agrees with commenters that it is inconsistent with the risk and needs assessment methodology to require clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541) for four consecutive assessments to permit restoration of forfeited Time Credits, and therefore alters the regulation to maintain consistency with the Department of Justice risk and needs assessment methodology—requiring clear conduct for *two* consecutive assessments (one year) as a condition of restoring forfeited Time Credits.

*COMMENT: The FSA should be applicable to DC Code Offenders.*

The Bureau reopened the comment period of the proposed rulemaking from October 18, 2021, until November 17, 2021, to solicit public comment on the limited issue of whether DC Code offenders in Bureau of Prisons custody are eligible to apply Time Credits under 18 U.S.C. 3632(d)(4), as added by the FSA. 86 FR 57612. We received thirty submissions during the reopened comment period. However, of those submissions, only eighteen were comments relating to the limited issue. Twelve submissions related to issues raised during the proposed rule comment period in 2020 or to specific circumstances of particular inmates in Bureau facilities and their eligibility for FSA Time Credits, rather than the limited issue for which the document reopened the comment period. As we stated above with regard to submissions unrelated to the proposed rule, we encourage those with questions regarding particular inmates to address those questions to staff at facilities where those inmates are housed, or to the regional offices with oversight for those facilities.

*RESPONSE:* The October 18, 2021 document indicated that the proposed rule would have expressly excluded from time-credit eligibility any inmate serving a term of imprisonment only for an offense under the laws of the District of Columbia. The FSA, however, is ambiguous as to whether those with convictions under the DC Code are eligible to apply FSA Time Credits through their participation in EBRR programs or PAs.

Some comments pointed to features of the statute's text or history, suggesting that Congress intended DC Code offenders to be eligible to apply FSA Time Credits to their sentences. A comment from the Public Defender Service for the District of Columbia noted that the FSA defines "prisoner" as "a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons." 18 U.S.C. 3635(4). That definition includes DC Code offenders, who the commenter pointed out are in Bureau custody under the National Capital Revitalization and Self Government Improvement Act of 1997, which requires that "any person who has been convicted of a felony offense pursuant to the District of Columbia Code . . . shall be subject to any law or regulation applicable to persons committed for violations of laws of the United States consistent with the sentence imposed." 111 Stat. 251 at 734; Public Law 105–33, Sec. 11021 (the "DC Revitalization Act").

A comment from Senator Cory Booker (D–NJ) noted that other unenacted bills addressing similar subjects that preceded the enactment of the FSA would have defined "prisoner" as a person sentenced for a federal offense. *See* Corrections and Recidivism Reduction Act of 2016, H.R. 759, 114th Cong. 8(4) (as introduced Feb. 5, 2015 sub nom. Recidivism Risk Reduction Act), *https://www.congress.gov/bill/114th-congress/house-bill/759/text/ih* (defining "prisoner" as "a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense"); the Sentencing Reform and Corrections Act

of 2015, S. 2123, 114th Cong. 202(b)(8) (as introduced Oct. 1, 2015), *https:// www.congress.gov/bill/114th-congress/ senate-bill/2123/text/is* (defining "eligible prisoner" as "a prisoner serving a sentence of incarceration for conviction of a Federal offense," with exceptions for medical and security circumstances and sentences under one month).

But there are other statutory features suggesting Congress may not have intended the FSA Time Credit program to alter the time that DC Code offenders spend in Bureau facilities while serving sentences imposed by the District of Columbia. As noted, the DC Revitalization Act commits DC Code offenders to Bureau custody, but provides that these offenders "shall be subject to any law or regulation applicable to" U.S. Code offenders only insofar as those laws or regulations are "consistent with the sentence imposed." (DC Code section 24–101(b).) While this restriction does not appear to bar DC Code offenders from earning FSA Time Credits, it does appear to bar them from applying those credits in a way that would change the duration of their DC-imposed sentences, *i.e.*, by granting them early supervised release. Even given this limitation that currently exists by virtue of the DC Code, it is possible that Congress intended to permit DC Code offenders to use Time Credits to secure an early transfer to prerelease custody, which does not change the sentence's duration. But the fact that at least part of the FSA Time Credit program is inconsistent with the terms on which the DC Code has committed DC Code felons to Bureau custody suggests otherwise.

In addition, Congress took care to preclude violent U.S. Code offenders from using FSA Time Credits to secure an early release from Bureau facilities, specifying a long list of serious Federal crimes in 18 U.S.C. 3632(d)(4)(D), a conviction for which makes a prisoner ineligible to earn Time Credits.[5] Congress's failure to provide an analogous list of serious DC Code offenses could indicate that Congress did not intend DC Code offenders to be eligible to apply Time Credits. Similarly, the FSA states that the Time Credit system does not apply "with respect to offenses committed before November 1, 1987," (*see* Section

102(b)(3) of the FSA), which is the date Federal parole was abolished, but does not contain any like provision for the date DC parole was abolished (2000). If the FSA is construed to afford DC Code offenders in Bureau custody a right to apply Time Credits, Congress's failure to account for the date on which DC parole was abolished would mean that some DC Code offenders could be eligible for both parole and the FSA Time Credit program. Congress could have acted to avoid the overlap of these two programs, and the fact that Congress did not do so could further suggest that Congress did not intend the FSA to make DC Code offenders eligible to apply Time Credits.

Finally, there is a textual basis for concluding that Congress did not intend the FSA to make DC Code offenders eligible to use Time Credits. In Section 105 of the FSA, Congress provided that nothing in the FSA "may be construed to provide authority to place a prisoner in prerelease custody or supervised release who is serving a term of imprisonment pursuant to a conviction for an offense under the laws of one of the 50 States, or of a territory or possession of the United States." 18 U.S.C. 3621 Note. As a comment (from the DC Justice Lab, Democracy Forward Foundation, FAMM, Justice Action Network, National Association of Criminal Defense Lawyers, Washington Lawyers' Committee for Civil Rights, and Urban Affairs) noted, it is unclear whether the District of Columbia is "one of the 50 States," a "territory," or a "possession" of the United States. The Bureau agrees that Section 105 is ambiguous; statutory references to States and territories may or may not be understood to include the District of Columbia, depending on the statutory context. *See, e.g., District of Columbia v. Carter,* 409 U.S. 418, 420 (1973). Particularly in light of the statutory features above, Section 105 could be read to manifest Congress's desire to avoid interference with non-U.S. Code sentences of offenders who end up in Bureau custody.

Overall, there is significant ambiguity about whether and to what extent DC Code offenders are eligible to apply FSA Time Credits under the statute. A construction of the FSA that would allow DC Code offenders to apply Time Credits under federal law would create particular concerns because of the absence of any basis on which to preclude DC Code offenders convicted of violent crimes from then using Time Credits. That result would substantially diverge from the FSA provision that expressly bars federal inmates convicted of any one of a list of 68 categories of enumerated violent offenses (only one

of which includes any DC Code offenses, and only under certain conditions, see 18 U.S.C. 3632(d)(4)(D)(li)) from receiving FSA Time Credits. Although the majority of the comments received during the reopened comment period supported allowing DC Code offenders to earn FSA Time Credits, they largely failed to address the issue of whether violent DC Code offenders should be eligible to apply such credits along with non-violent offenders. A single comment received during the reopened comment period opposed application of the FSA to DC Code offenders in Bureau custody, expressing concern that the rule would "undermine the criminal justice system and allow these violent offenders to re-enter society to only most likely commit these violent crimes again." The lack of additional discussion in the comments regarding this issue is particularly problematic because the overwhelming majority of DC offenders in Bureau custody are serving sentences for violent offenses analogous to the list of offenses that disqualify federal offenders from receiving FSA Time Credits.

The Bureau is also concerned that adopting a reading of the FSA to permit DC Code offenders to leave Bureau facilities before they have served their DC-imposed sentences stands in some tension with other provisions of the DC Code. In other circumstances, where the length of a DC Code offender's sentence would be reduced, there are specific authorities in the DC Code to authorize such actions. For example, the DC Code specifies that offenders sentenced to imprisonment for felonies committed after August 5, 2000, "may receive good time credit toward service of the sentence only as provided in 18 U.S.C. 3624(b)" (DC Code section 24–403.01(d)); that those sentenced to imprisonment after August 5, 2000, "for a nonviolent offense may receive up to a one-year reduction" for completing a substance-abuse-treatment program in accordance with 18 U.S.C. 3621(e)(2) (DC Code section 24–403.01(d–1)(1)); and that certain DC Code offenders who committed their crimes before age 25 have an opportunity to be resentenced to a reduced term (DC Code section 24–403.03). There are no similar provisions to allow DC Code offenders to have sentences reduced by early placement on supervised release under the terms of the FSA.

Many of these considerations implicate the sovereignty of the District of Columbia and its authority over DC Code offenders and could be addressed through local legislation. The Bureau further understands that the DC Council is actively considering whether and

---

[5] *See, e.g.,* 164 Cong. Rec. S7642 (daily ed. Dec. 17, 2018) (statement of Sen. Cornyn) ("There are some who, for example, say that this legislation will put violent criminals and sex offenders back on the streets, which is completely false. . . . This bill will not allow dangerous, violent criminals to be released early. . . . We have disqualified violent offenders . . . .").

under what circumstances DC Code offenders should be eligible for FSA Time Credits as a matter of DC law. The Council has the authority and latitude to incorporate the FSA Time Credit program by reference into the DC Code and specify which DC Code offenders are eligible to apply FSA Time Credits. The DC Council may, for example, develop a list of excluded DC Code offenses that parallels the list of violent federal offenses in 18 U.S.C. 3632(d)(4)(D), or otherwise clarify whether and in what circumstances inmates may apply Time Credits toward pre-release custody and/or supervised release. Should the Council enact legislation that speaks to the issues presented by the FSA's ambiguity, such legislation could significantly inform, or dictate, the relevance of the FSA's time-credit program to DC Code offenders in the Bureau's custody.

In light of these statutory interpretation and policy considerations, and the current deliberations of the DC Council, the Bureau will defer definitively resolving the FSA's ambiguities with respect to DC Code offenders in its custody. The final rule therefore is amended to reflect the possibility that the DC Council will enact legislation regarding the eligibility of such offenders to apply FSA Time Credits. Thus, any inmate in Bureau custody who is sentenced to a term of imprisonment under the Criminal Code of the District of Columbia is, at present, not eligible to apply FSA Time Credits unless the laws of the District of Columbia are amended to authorize the application of such credits. The Bureau may revisit this question through future rulemaking, depending on the outcome of the DC Council's consideration of these issues, and any other relevant developments.

Regulatory Certifications

*Executive Orders 12866 and 13563:* Because this proposed rule may raise novel legal or policy issues arising out of implementation of the First Step Act, the Office of Management and Budget (OMB) has determined that it constitutes a "significant regulatory action" under section 3(f) of Executive Order 12866 and has reviewed it.

The economic impact of this rule is limited to a specific subset of inmates who are eligible to earn and apply FSA Time Credits toward additional prerelease custody or early transfer to supervised release. Under the FSA, FSA Time Credits may be earned by an eligible inmate who is assessed to have a minimum or low risk for recidivating and who has had no increased risk of recidivism over the most recent two

consecutive assessments conducted by the Bureau. Consistent with the FSA, inmates in Bureau custody are assessed under its risk and needs assessment system, which includes both static and dynamic elements.

For example, on August 27, 2020, 131,386 inmates had been assessed under the risk and needs assessment tool and received a risk and needs assessment score. The risk and needs assessment scores for the entire group of 131,386 inmates were: 50,060 classified as high; 25,043 classified as medium; 38,084 classified as low; and 18,199 classified as minimum. Of these inmates, approximately 65,000 would be ineligible to earn FSA Time Credits under the FSA due to the inmate's crime of conviction. This data represents a snapshot of those inmates in Bureau custody as of August 27, 2020.

The Bureau conducted risk and needs assessments for Federal inmates and assigned EBRR Programs by the January 15, 2020, FSA deadline. As of that date, recidivism risk assessment levels of High, Medium, Low, or Minimum were assigned to all sentenced inmates at Bureau designated facilities. The Bureau anticipates that this data will change continually, as inmates in custody earn reductions in risk classification, based on program participation and other dynamic factors, and inmates enter and release from Bureau custody.

The Bureau anticipates that as a result of this rule and the FSA, additional inmates will engage in programming to earn FSA Time Credits. As discussed above, FSA Time Credits may be earned for successful completion of an EBRR Program or PA that is assigned to an inmate based on the inmate's needs assessment. The current list of these programs can be found at *https://www.bop.gov/inmates/fsa/docs/2021_fsa_program_guide.pdf.* These programs are available to all inmates regardless of an inmate's eligibility to earn FSA Time Credits.

The rule may also result in movement of eligible inmates who earn FSA Time Credits from Bureau facilities to prerelease custody in the community (including RRCs and home confinement) earlier in the course of their confinement and for a longer period of time than would have previously occurred. In some cases, this transfer of time from secured confinement to prerelease custody may result in increased costs, depending on the relative costs of the inmate's current facility and the costs associated with housing or supervision in prerelease custody.

The rule may also result in the early transfer of inmates from custody to

supervised release, functionally shortening their term of imprisonment. In such cases, the Bureau would avoid costs that would otherwise have been incurred to confine the affected inmates for that amount of time.

At present, therefore, specific monetary costs or savings for these future actions cannot be calculated. But, consistent with the purpose of the statute, the proposed rule will enhance public safety and reduce the need for future incarceration by providing significant incentives to encourage inmates to participate in evidence-based programs intended to reduce their risk of recidivism and help facilitate their successful reentry back into society after they have served their time.[6]

For these reasons, it is not possible to forecast the actual economic effect of this rule. However, given the mix of cost increases and savings which may result, the overall long-term economic impact is expected to be marginal in either direction.

The purpose of this rule is to codify the Bureau's procedures regarding the earning and application of time credits as authorized by the FSA. Time credits may be applied towards prerelease custody or early transfer to supervised release, and some inmates will be eligible for such custody or release as soon as this rule goes into effect. Delaying implementation for 30 days could therefore deprive at least some inmates of time in the less restrictive environments that Congress has determined are appropriate for eligible inmates. Given the liberty issues implicated by the prompt implementation of this program and this rule, the Bureau is prepared to begin implementation immediately, and the Bureau therefore finds good cause for exempting this rule from the provision of the Administrative Procedure Act (5 U.S.C. 553(d)) which ordinarily requires a delay in effective date. The Bureau notes that neither it nor the affected inmates require a delay to adjust their practices before this rule takes effect. A delay in the effective date of this final rule would be unnecessary and contrary to the public interest.

*Executive Order 13132:* This rule will not have substantial direct effect on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various

---

[6] The costs or cost savings resulting from this rule will not be fully realized for years to come, as increasing numbers of inmates have opportunities to earn FSA Time Credits over their terms of incarceration, are transferred to prerelease custody or supervised release, and reintegrate into the community.

levels of government. Therefore, under Executive Order 13132, we determine that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

*Regulatory Flexibility Act:* The Director of the Bureau of Prisons, under the Regulatory Flexibility Act (5 U.S.C. 605(b)), reviewed this rule and certifies that it will not have a significant economic impact upon a substantial number of small entities for the following reasons: This rule pertains to the correctional management of offenders committed to the custody of the Attorney General or the Director of the Bureau of Prisons, and its economic impact is limited to the Bureau's appropriated funds.

*Unfunded Mandates Reform Act of 1995:* This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Congressional Review Act:* This rule is not a major rule as defined by the Congressional Review Act, 5 U.S.C. 804.

For the foregoing reasons, we issue the regulations regarding the First Step Act Time Credits, proposed on November 25, 2020, with modifications, as set forth below.

List of Subjects in 28 CFR Parts 523 and 541

Prisoners.

Michael D. Carvajal,
*Director, Federal Bureau of Prisons.*

Under rulemaking authority vested in the Attorney General in 5 U.S.C. 301; 28 U.S.C. 509, 510 and delegated to the Director, Bureau of Prisons in 28 CFR 0.96, we amend 28 CFR parts 523 and 541 as follows:

Subchapter B—Inmate Admission, Classification, and Transfer

PART 523—COMPUTATION OF SENTENCE

■ 1. The authority citation for 28 CFR part 523 is revised to read as follows:

Authority: 5 U.S.C. 301; 18 U.S.C. 3568 (repealed November 1, 1987, as to offenses committed on or after that date), 3621, 3622, 3624, 3632, 3635, 4001, 4042, 4081, 4082 (repealed in part as to conduct occurring on or after November 1, 1987), 4161–4166 (repealed October 12, 1984, as to offenses committed on or after November 1, 1987), 5006–5024 (repealed October 12, 1984, as to conduct occurring after that date), 5039; 28 U.S.C. 509, 510.

■ 2. Add subpart E to read as follows:

Subpart E—First Step Act Time Credits

Sec.
523.40  Purpose.
523.41  Definitions.
523.42  Earning First Step Act Time Credits.
523.43  Loss of FSA Time Credits.
523.44  Application of FSA Time Credits.

§ 523.40  Purpose.

(a) The purpose of this subpart is to describe procedures for the earning and application of Time Credits as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of the First Step Act of 2018 (Pub. L. 115–391, December 21, 2018, 132 Stat. 5194) (FSA), hereinafter referred to as "FSA Time Credits" or "Time Credits."

(b) Generally, as defined and described in this subpart, an eligible inmate who successfully participates in Evidence-Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) that are recommended based on the inmate's risk and needs assessment may earn FSA Time Credits to be applied toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g).

§ 523.41  Definitions.

(a) *Evidence-Based Recidivism Reduction (EBRR) Program.* An EBRR Program is a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison. EBRR Programs may include, but are not limited to, those involving the following types of activities:

(1) Social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;

(2) Family relationship building, structured parent-child interaction, and parenting skills;

(3) Classes on morals or ethics;

(4) Academic classes;

(5) Cognitive behavioral treatment;

(6) Mentoring;

(7) Substance abuse treatment;

(8) Vocational training;

(9) Faith-based classes or services;

(10) Civic engagement and reintegrative community services;

(11) Inmate work and employment opportunities;

(12) Victim impact classes or other restorative justice programs; and

(13) Trauma counseling and trauma-informed support programs.

(b) *Productive Activity (PA).* A PA is a group or individual activity that

allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating.

(c) *Successful participation.* (1) An eligible inmate must be "successfully participating" in EBRR Programs or PAs to earn FSA Time Credits for those EBRR Programs or PAs.

(2) "Successful participation" requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA.

(3) Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's "successful participation" for the purposes of FSA Time Credit eligibility.

(4) An eligible inmate, as described in paragraph (d) of this section, will generally not be considered to be "successfully participating" in EBRR Programs or PAs in situations including, but not limited to:

(i) Placement in a Special Housing Unit;

(ii) Designation status outside the institution (*e.g.,* for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);

(iii) Temporary transfer to the custody of another Federal or non-Federal government agency (*e.g.,* on state or Federal writ, transfer to state custody for service of sentence, etc.);

(iv) Placement in mental health/psychiatric holds; or

(v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

(5)(i) If an eligible inmate "opts out," or chooses not to participate in any of the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, the inmate's choice must be documented by staff.

(ii) Opting out will not, by itself, be considered a disciplinary violation. However, violation of specific requirements or rules of a particular recommended EBRR Program or PA, including refusal to participate or withdrawal, may be considered a disciplinary violation (*see* this part).

(iii) Opting out will result in exclusion from further benefits or privileges allowable under the FSA,

until the date the inmate "opts in" (chooses to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, as documented by staff).

(d) *Eligible inmate*—(1) *Eligible to earn FSA Time Credits.* An inmate who is *eligible to earn* FSA Time Credits is an *eligible inmate* for the purposes of this subpart. Any inmate sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or any person in the custody of the Bureau, is *eligible to earn* FSA Time Credits, subject to the exception described in paragraph (d)(2) of this section.

(2) *Exception.* If the inmate is serving a term of imprisonment for an offense specified in 18 U.S.C. 3632(d)(4)(D), the inmate is not *eligible to earn* FSA Time Credits.

### § 523.42   Earning First Step Act Time Credits.

(a) *When an eligible inmate begins earning FSA Time Credits.* An eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served).

(b) *Dates of participation in EBRRs or PAs.* (1) An inmate cannot earn FSA Time Credits for programming or activities in which he or she participated before December 21, 2018, the date of enactment of the First Step Act of 2018.

(2) An eligible inmate, as defined in this subpart, may earn FSA Time Credits for programming and activities in which he or she participated from December 21, 2018, until January 14, 2020.

(3) An eligible inmate, as defined in this subpart, may earn FSA Time Credit if he or she is successfully participating in EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment on or after January 15, 2020.

(c) *Amount of FSA Time Credits that may be earned.* (1) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn ten days of FSA Time Credits.

(2) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn an additional five days of FSA Time Credits if the inmate:

(i) Is determined by the Bureau to be at a minimum or low risk for recidivating; and

(ii) Has maintained a consistent minimum or low risk of recidivism over the most recent two consecutive risk and needs assessments conducted by the Bureau.

### § 523.43   Loss of FSA Time Credits.

(a) *Procedure for loss of FSA Time Credits.* An inmate may lose earned FSA Time Credits for violation of the requirements or rules of an EBRR Program or PA. The procedures for loss of FSA Time Credits are described in 28 CFR part 541.

(b) *How to appeal loss of FSA Time Credits.* Inmates may seek review of the loss of earned FSA Time Credits through the Bureau's Administrative Remedy Program (28 CFR part 542).

(c) *Restoration of FSA Time Credits.* An inmate who has lost FSA Time Credits under this subpart may have part or all of the FSA Time Credits restored to him or her, on a case-by-case basis, after clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541) for two consecutive risk and needs assessments conducted by the Bureau.

### § 523.44   Application of FSA Time Credits.

(a) *How Time Credits may be applied.* For any inmate eligible to earn FSA Time Credits under this subpart who is:

(1) Sentenced to a term of imprisonment under the U.S. Code, the Bureau may apply FSA Time Credits toward prerelease custody or supervised release as described in paragraphs (c) and (d) of this section.

(2) Subject to a final order of removal under immigration laws as defined in 8 U.S.C. 1101(a)(17) (*see* 18 U.S.C. 3632(d)(4)(E)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release.

(3) Serving a term of imprisonment pursuant to a conviction for an offense under laws other than the U.S. Code (see Section 105 of the FSA, Pub. L. 115–391, 132 Stat. 5214 (not codified; included as note to 18 U.S.C. 3621)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release. This paragraph (a)(3) will not bar the application of FSA Time Credits, as authorized by the DC Code, for those serving a term of imprisonment for an offense under the DC Code.

(b) *Consideration for application of FSA Time Credits.* Where otherwise permitted by this subpart, the Bureau may apply FSA Time Credits toward prerelease custody or early transfer to

supervised release under 18 U.S.C. 3624(g) only if an eligible inmate has:

(1) Earned FSA Time Credits in an amount that is equal to the remainder of the inmate's imposed term of imprisonment;

(2) Shown through the periodic risk reassessments a demonstrated recidivism risk reduction or maintained a minimum or low recidivism risk, during the term of imprisonment; and

(3) Had the remainder of his or her imposed term of imprisonment computed under applicable law.

(c) *Prerelease custody.* The Bureau may apply earned FSA Time Credits toward prerelease custody only when an eligible inmate has, in addition to satisfying the criteria in paragraph (b) of this section:

(1) Maintained a minimum or low recidivism risk through his or her last two risk and needs assessments; or

(2) Had a petition to be transferred to prerelease custody or supervised release approved by the Warden, after the Warden's determination that:

(i) The prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

(ii) The prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

(iii) The prisoner is unlikely to recidivate.

(d) *Transfer to supervised release.* The Bureau may apply FSA Time Credits toward early transfer to supervised release under 18 U.S.C. 3624(g) only when an eligible inmate has, in addition to satisfying the criteria in paragraphs (b) and (c) of this section:

(1) An eligible inmate has maintained a minimum or low recidivism risk through his or her last risk and needs assessment;

(2) An eligible inmate has a term of supervised release after imprisonment included as part of his or her sentence as imposed by the sentencing court; and

(3) The application of FSA Time Credits would result in transfer to supervised release no earlier than 12 months before the date that transfer to supervised release would otherwise have occurred.

Subchapter C—Institutional Management

## PART 541—INMATE DISCIPLINE AND SPECIAL HOUSING UNITS

■ 3. The authority citation for part 541 continues to read as follows:

Authority: 5 U.S.C. 301; 18 U.S.C. 3621, 3622, 3624, 4001, 4042, 4081, 4082 (Repealed in part as to offenses committed on or after November 1, 1987), 4161–4166 (Repealed as

to offenses committed on or after November 1, 1987), 5006–5024 (Repealed October 12, 1984 as to offenses committed after that date), 5039; 28 U.S.C. 509, 510.

■ 4. Amend § 541.3 in paragraph (b), Table 1, by:

■ a. Under the heading "Available Sanctions for Greatest Severity Level Prohibited Acts", adding the entry B.2 in alphanumeric order;

■ b. Under the heading "Available Sanctions for High Severity Level Prohibited Acts", adding the entry B.2 in alphanumeric order;

■ c. Under the heading "Available Sanctions for Moderate Severity Level Prohibited Acts", adding the entry B.2 in alphanumeric order; and

■ d. Under the heading "Available Sanctions for Low Severity Level Prohibited Acts", adding the entry B.2 in alphanumeric order.

The additions read as follows:

§ 541.3   Prohibited acts and available sanctions.

\*    \*    \*    \*    \*

(b) \* \* \*

### TABLE 1—PROHIBITED ACTS AND AVAILABLE SANCTIONS

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

**Available Sanctions for Greatest Severity Level Prohibited Acts**

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

B.2 ........................... Forfeit up to 41 days of earned First Step Act (FSA) Time Credits (*see* 28 CFR part 523, subpart E) for each prohibited act committed.

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

**Available Sanctions for High Severity Level Prohibited Acts**

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

B.2 ........................... Forfeit up to 27 days of earned FSA Time Credits for each prohibited act committed.

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

**Available Sanctions for Moderate Severity Level Prohibited Acts**

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

B.2 ........................... Forfeit up to 14 days of earned FSA Time Credits for each prohibited act committed.

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

**Available Sanctions for Low Severity Level Prohibited Acts**

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

B.2 ........................... Forfeit up to 7 days of earned FSA Time Credits (only where the inmate is found to have committed a second violation of the same prohibited act within 6 months; forfeit up to 14 days of FSA Time Credits (only where the inmate is found to have committed a third violation of the same prohibited act within 6 months).

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

\*    \*    \*    \*    \*

■ 5. Amend § 541.7 by revising paragraph (f) to read as follows:

§ 541.7   Unit Discipline Committee (UDC) review of the incident report.

\*    \*    \*    \*    \*

(f) *Sanctions.* If you committed a prohibited act or prohibited acts, the UDC can impose any of the available sanctions in Tables 1 and 2 of § 541.3, except loss of good conduct time credit, FSA Time Credits, disciplinary segregation, or monetary fines.

[FR Doc. 2022–00918 Filed 1–14–22; 4:15 pm]

BILLING CODE P

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–R05–OAR–2021–0535; FRL–9444–02–R5]

### Air Plan Approval; Wisconsin; Wisconsin Nonattainment New Source Review Certification for the 2015 Ozone NAAQS

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is approving, as a State Implementation Plan (SIP) revision, Wisconsin's certification that its SIP satisfies the nonattainment new source review (NNSR) requirements of the Clean Air Act (CAA) for the 2015 ozone National Ambient Air Quality Standard (NAAQS).

**DATES:** This direct final rule will be effective March 21, 2022, unless EPA receives adverse comments by February 18, 2022. If adverse comments are received, EPA will publish a timely withdrawal of the direct final rule in the Federal Register informing the public that the rule will not take effect.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2021–0535 at *http://www.regulations.gov* or via email to *damico.genevieve@epa.gov.* For comments submitted at *Regulations.gov*, follow the online instructions for submitting comments. Once submitted,

# ATTACHMENT 2

U.S. Department of Justice
Federal Bureau of Prisons
Washington, DC

**Reentry Services Division** January 2022

# First Step Act
# Approved Programs Guide



The Federal Bureau of Prisons (Bureau) protects public safety by ensuring federal inmates receive relevant and meaningful reentry programming to support their return to the community as law-abiding citizens. Reentry efforts increase opportunities, reduce recidivism, promote public safety, and reduce institution misconduct. To this end, the Bureau is committed to provide a robust menu of programs to address thirteen need areas for a diverse inmate population, located in 122 institutions of varying security levels across the nation.

E  246

# STRUCTURED, CURRICULUM-BASED PRODUCTIVE ACTIVITIES

Productive Activities (PA) include a wide range of activities including work assignments, community service, inmate led-classes, and other unstructured but valuable ways to spend time. This guide only provides information about structured, curriculum-based PAs.

| Productive Activities & Descriptions | Hours | Location(s) | Need(s) Addressed | Program Delivery |
|---|---|---|---|---|
| **A Healthier Me**<br><br>The Healthier Me Program is designed to help incarcerated women build healthy lifestyles by considering what a healthy life means to them and practicing skills for stress management, healthy relationships, physical activity, and mindful eating. | 10 | All female sites | Recreation/Leisure/Fitness | Recreation<br><br>Special Population Program Coordinator<br><br>Unit Team |
| **A Matter of Balance**<br><br>Falling, or fear of falling, can negatively impact older adults by causing them to refrain from enjoyable or therapeutic activities. This program helps to build self-efficacy related to strength and mobility by decreasing fall-related fears. It teaches older inmates to problem-solve and improve their self-esteem. | 16 | All institutions | Recreation/Leisure/Fitness | Health Services<br><br>Recreation |
| **AARP Foundation Finances 50+**<br><br>This program provides financial education and counseling for vulnerable households, particularly adults age 50+. Older adults face unique challenges in financial planning and weak job prospects. This program will assist the older adult in financial goal setting that translates into positive financial behaviors. | 5 | All institutions | Finance/Poverty | Unit Team<br><br>Volunteers |
| **Access**<br><br>This program is designed for incarcerated women who are survivors of domestic violence. It assists women in identifying suitable career options to be economically independent upon reentry. An interactive computer component (which can be printed and used in class) is used to explore career options. Participants also complete testing to determine what career field is best for them. | 10 | All female sites | Cognitions<br>Mental Health<br>Trauma | Special Population Program Coordinator |

MAXWELL, WILLIAM 71944279

ATTACHMENT 3



DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL

November 15, 2021

Management Advisory Memorandum

To:             Michael Carvajal
                Director
                Federal Bureau of Prisons

From:           Michael E. Horowitz
                Inspector General


Subject:        Impact of the Failure to Conduct Formal Policy Negotiations on the Federal Bureau of
                Prisons' Implementation of the FIRST STEP Act and Closure of Office of the Inspector General
                Recommendations

The purpose of this memorandum is to advise you of critical issues that the Office of the Inspector General
(OIG) has identified during its ongoing Review of the Federal Bureau of Prisons' (BOP) Policy Development
Process. We believe that the issues we describe below necessitate management's immediate attention to
address a 20-month period during which formal policy negotiations have not occurred between the BOP
and its national union.[1] The lack of negotiations is the result of the decision by BOP management to decline
to meet in person to conduct formal policy negotiations with the national union during the coronavirus
disease 2019 (COVID-19) pandemic, and instead to propose remote video meetings, and the decision by the
BOP national union to insist on in-person negotiations given that in-person negotiations are provided for in
BOP union contracts and its membership has been reporting to work in person throughout the pandemic.
The lack of formal negotiations has disrupted aspects of the BOP's implementation of the FIRST STEP Act of
2018 (FSA) and has further delayed policy changes to address OIG recommendations on systemic
correctional and safety issues.

The OIG initiated the ongoing BOP policy development review in November 2019 due to significant delays in
the resolution of multiple OIG recommendations related to revising or creating BOP policies concerning
various correctional and safety issues. Numerous BOP officials expressed concerns to the OIG regarding
excessive delays with the BOP's policy development process, and the National Academy of Public
Administration released a study finding that the BOP's policy process is lengthy and uncertain, making it

---

[1] For the purposes of this memorandum and our pending Review of the BOP's Policy Development Process, "policy development"
includes the process by which the BOP develops and implements, in collaboration with its national union, policies governing BOP
programs and operations. Such policies may involve any aspect of BOP programs and operations that affect conditions of employment
of the more than 30,000 BOP bargaining unit employees.

1

F   `≈&

difficult for BOP divisions to issue and revise policies in a timely manner.[2] The absence since March 2020 of formal negotiations, including those for issues impacting the FSA, exacerbated these concerns, as detailed below.

In its written response to this memorandum (attached as Appendix 1), the BOP reported that it will be commencing in-person Joint Policy Committee (JPC) meetings with the national union in November 2021 to discuss policies related to the FSA, security and correctional services, and health and safety issues and that it has informed the national union that it intends to resume formal in-person negotiations in December 2021.[3]

## Relevant Authorities

Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454
The FIRST STEP Act of 2018, Pub. L. No. 115-391
BOP Ground Rules for National Policy Negotiations, December 5, 2013
BOP and Council of Prison Locals, Master Agreement, July 21, 2014–July 20, 2021 (extended until 2026)

## The Issue

Under the BOP's labor contracts, the BOP and its national union can meet in person, 3 days each month, to negotiate policies.[4] Further, the BOP's Ground Rules for National Policy Negotiations state that "no policies will be negotiated over the telephone, on conference calls, or over speakerphones, unless mutually agreed."

In response to the COVID-19 pandemic, on March 13, 2020, the BOP implemented Phase Two of its COVID-19 Action Plan, which, among other things, suspended all official staff travel for 30 days.[5] On August 5, 2020, the BOP issued new travel guidance that suspended "non-essential official staff travel" but permitted essential travel.[6] As of October 25, 2021, this travel guidance was still in place. Since the implementation of Phase Two, BOP management has declined to meet in person with national union staff to conduct formal policy negotiations and has instead proposed conducting virtual policy negotiations. However, the BOP's national union has declined to conduct formal policy negotiations in a remote manner. Relying on labor contractual terms providing for in-person negotiations, the national union has insisted on in-person negotiations and expressed its availability to meet in person. This disagreement has resulted in a lack of formal policy negotiations for a period of 20 months, which at the time of our fieldwork had stalled the development of more than 30 BOP policies, about half of which were created or revised in response to the FSA.

BOP officials have told the OIG that compliance with Title VII of the Civil Service Reform Act of 1978 requires the BOP to negotiate with the national union changes to policy, including BOP policies governing FSA programs, when such changes affect the conditions of employment of bargaining unit employees.[7]

---

[2] National Academy of Public Administration, *Assessment of the Bureau of Prisons' Organizational Alignment with Healthcare Mission* (October 2019), www.oldnapa.primedev.build/uploads/Academy_Studies/BOP_NAPA_Deliverable_1_Final.pdf (accessed November 10, 2021), 36.

[3] In its written response, the BOP also stated that, since passage of the FIRST STEP Act in December 2018, it has revised and issued 12 FSA-related policies, 6 of which it told us were issued after March 2020, when formal policy negotiations were ceased.

[4] Article 3 of the BOP's Master Agreement and its Ground Rules for National Policy Negotiations govern the BOP's formal negotiation practices with the national union.

[5] BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Two Action Plan, March 13, 2020, 2. The memorandum stated that any travel exceptions must be approved by the BOP Deputy Director.

[6] BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Nine Action Plan, August 5, 2020, 2.

[7] Generally, according to the BOP's Labor Relations Office Chief, when implementing laws affecting the BOP, the BOP must negotiate changes to the conditions of employment for bargaining unit staff with its national union unless Congress includes explicit terminology to the effect that implementation is notwithstanding any other provision of law. For more information concerning the BOP's collective bargaining obligations under Title VII of the Civil Service Reform Act of 1978, see 5 U.S.C. §§ 7102 and 7106.

F   089

According to the BOP's Office of Labor Relations, failure to do so could be grounds for the filing of an unfair labor practice charge by the national union with the U.S. Federal Labor Relations Authority.

As described below, the BOP's decision to not conduct formal in-person negotiations with the national union has delayed the Department of Justice's (Department, DOJ) ability to move forward with FSA-related policies, as well as policy changes to address OIG recommendations on systemic correctional and safety issues. In response to a draft of this memorandum, the BOP explained that it has declined to meet with the national union in person due to pandemic-related guidance from the Office of Management and Budget (OMB) that was issued in March 2020.[8] However, we note that OMB's memorandum allows mission-critical travel and that the memorandum specifies factors for agencies to consider in determining which travel is mission critical, including whether such travel is required by "statute or contract." As described above, the BOP and the national union have a contract that requires travel for in-person formal policy negotiations unless both parties agree otherwise. Moreover, the imperative of meeting both the FSA's mandates and dozens of additional pending policy matters that concern safety and security issues, as well as the fact that most BOP employees have been working in person throughout the pandemic, further undercuts the BOP's reliance on the OMB guidance as a basis for suspending formal policy negotiations for such a lengthy period. Additionally, as of August 5, 2020, the BOP's own travel guidance allows for essential official travel. Although the BOP travel guidance does not describe what travel is considered essential, for the same reason we believe that travel for negotiation purposes would qualify as mission critical under the OMB memorandum, it should also seemingly be considered essential for BOP purposes.

In its written response to this memorandum, which is attached as Appendix 1, the BOP restated its belief that its decision to decline to meet in person with the national union since March 2020 was consistent with OMB guidance. Additionally, the BOP referenced DOJ's COVID-19 Workforce Safety Plan from February 2021, which provided that "when [in-person] meetings must be held, they shall be limited to fewer than ten individuals." The BOP response went on to state that, since the national union is entitled to 10 representatives at formal negotiations, complying with the DOJ Workplace Safety Plan would have prevented BOP attendance. We note, however, that OMB and DOJ pandemic-related policy memoranda have consistently recognized the need to accommodate mission-critical operational needs during the pandemic. For example, OMB's M-21-25 memorandum, issued on June 10, 2021, stated: "As a reminder, at any time, if there are operational needs related to the completion of agency mission-critical activities, agencies may pursue an exception from select model safety principles set forth by M-21-15, and as amended by Task Force guidance and this memorandum."[9] Indeed, during the course of our review, we learned from the national union that BOP Executive Staff itself had authorized a large meeting in California between BOP officials and union leaders shortly after the DOJ's February 2021 memorandum was issued and that the meeting was attended by at least 15 local union presidents, 15 Wardens, and additional BOP regional office executives and staff. Further, we note that, despite the 10-person rule that it cited, the BOP's response in Appendix 1 stated that it has notified the national union of its intent to resume formal negotiations in December 2021.

FIRST STEP Act Requirements and Impact of the Lack of Negotiation

On December 21, 2018, then President Donald J. Trump signed into law the FSA, which enacted several criminal justice reforms throughout the federal prison system. Among other mandates, the FSA (18 U.S.C. § 3632) required the Attorney General, in consultation with the Independent Review Committee, to develop a

---

[8] OMB Memorandum M-20-14, Updated Federal Travel Guidance in Response to Coronavirus, March 14, 2020, www.chcoc.gov/sites/default/files/M-20-14-travel-guidance-OMB-1_0.pdf (accessed November 10, 2021).

[9] OMB Memorandum M-21-25, Integrating Planning for A Safe Increased Return of Federal Employees and Contractors to Physical Workplaces with Post-Reentry Personnel Policies and Work Environment, June 10, 2021, www.whitehouse.gov/wp-content/uploads/2021/06/M-21-25.pdf (accessed November 10, 2021).

F   090

system to assess the recidivism risk and criminogenic needs of all federal inmates by July 19, 2019. In response to this requirement, the Department developed the *Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN)* system.[10] The FSA also set a deadline of January 15, 2020, for the Department to utilize the PATTERN system and other resources to:

- complete an initial risk and needs assessment for each federal inmate,

- begin to assign inmates to appropriate evidence-based recidivism reduction (EBRR) programs based on the initial assessment,

- begin to expand the EBRR programs and productive activities available at BOP facilities and add any new EBRR programs and productive activities necessary to effectively implement the system, and

- begin to implement any other risk and needs assessment tools necessary to effectively implement the recidivism risk assessment system over time.[11]

The FSA also stated that the Department's recidivism risk assessment system "shall provide incentives and rewards for prisoners to participate in and complete [EBRR programs]" and directed that inmates who "successfully complete [EBRR programs] or productive activities, shall earn time credits" toward pre-release custody (i.e., transfer to a Residential Reentry Center or home confinement) or supervised release (i.e., early satisfaction of the inmate's sentence).[12] Under the FSA, the BOP must provide EBRR programs and productive activities to all inmates in its custody no later than January 15, 2022.[13]

During the period of our fieldwork ending in May 2021, we identified 13 FSA-related policies that the BOP has determined require negotiations with the national union. In June and July 2021, as the result of *informal* policy negotiations with the national union, the BOP published 2 of the 13 FSA-related policies we had identified as pending—the First Step Act Needs Assessment and First Step Act Program Incentives.[14]

---

[10] For more information concerning the Department's development and implementation of PATTERN, see Office of the Attorney General (OAG), *The First Step Act of 2018: Risk and Needs Assessment* (July 2019), www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf, and OAG, *The First Step Act of 2018: Risk and Needs Assessment System–UPDATE* (January 2020), www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf (both accessed November 10, 2021).

[11] See 18 U.S.C. § 3621(h)(1) The FSA defines an EBRR program as a group or individual activity that:  (1) has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; (2) is designed to help inmates succeed in their communities upon release from prison; and may include (3) social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills.  In addition, the FSA defines "productive activity" as a group or individual activity that is designed to allow inmates determined to have a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating. For more information, see 18 U.S.C. § 3635.

[12] 18 U.S.C. §§ 3632(d) and 3632(d)(4).

[13] See 18 U.S.C. § 3621(h)(2). The FSA states that an inmate shall earn 10 days of time credits for every 30 days of successful participation in EBRR programs or productive activities.  The law also states that minimum and low risk inmates who, over two consecutive assessments, have not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in EBRR programs or productive activities.  For more information, see 18 U.S.C. § 3632(d)(4)(A).

[14] Informal policy negotiations include any type of policy discussions that are not governed by BOP labor contracts.  Typically, these discussions include email exchanges or telephone conversations between BOP officials and national union representatives. While neither the BOP nor the national union is obligated to participate in informal policy discussions and may decline to participate without recourse by the other party, informal policy discussions can be an effective way for the BOP to negotiate policies with the national union. In August 2021, the BOP reported to the OIG that since April 2021 it had conducted with its national union several informal policy negotiations that resulted in the issuance of new policies, including FSA-related policies.  Though informal policy negotiations can be useful for resolving less complex and divisive policy matters, historically they have served as a supplement to formal policy negotiations. The resumption of formal policy negotiations may be necessary to resolve the policy development issues we discuss throughout this memorandum, many of which have been unresolved for years and may be too complex to address through informal negotiations.

4

F    091

Accordingly, as of October 2021, 11 of these FSA policies remained pending negotiations, as detailed in Table 1 below.

## Table 1

### BOP FSA-Related Policies That Need to Be Issued, as of October 29, 2021

| No. | Policy Name | Office of Primary Interest (OPI) | Date OPI First Sent Draft Policy to National Policy Management (NPM) | NPM Notes About Last Policy Step Completed | Date Last Policy Step Completed | Days Since NPM First Received Draft Policy |
|---|---|---|---|---|---|---|
| 1 | Prisoner Transportation Manual | Correctional Programs | 1/7/2019 | 7-day expedited management review | 10/29/2021 | 1,026 |
| 2 | Use of Force and Application of Restraints | Correctional Programs | 1/7/2019 | 7-day expedited management review | 10/29/2021 | 1,026 |
| 3 | Escorted Trips | Correctional Programs | 1/17/2019 | 7-day expedited management review | 10/29/2021 | 1,016 |
| 4 | Pharmacy Services | Health Services | 7/29/2019 | NPM editing to ensure consistency with Medication Assisted Treatment Program: Psychology Services | 7/19/2021 | 823 |
| 5 | First Step Act of 2018–Recidivism Risk Assessment* | Information, Policy, and Public Affairs | 8/30/2019 | Draft provided to union | 2/14/2021 | 791 |
| 6 | Sentence Computation Manual (CCCA of 1984) | Correctional Programs | 9/19/2019 | Draft returned to OPI for further edits | 10/1/2021 | 771 |
| 7 | Medication Assisted Treatment Program: Psychology Services | Reentry Services | 10/18/2019 | NPM editing to ensure consistency with Pharmacy Services | N/A | 742 |
| 8 | First Step Act of 2018–Time Credits | Correctional Programs | 12/6/2019 | Notice to reopen comment period on draft rule to Federal Register (applicability to DC Code Offenders) | 10/18/2021 | 693 |
| 9 | Community Based Programs, Utilization and Transfer Procedures | Reentry Services | 2/27/2020 | Awaiting DOJ CARES Act Decisions | N/A | 610 |
| 10 | Work Programs for Inmates | Federal Prison Industries | Not yet received | Awaiting finalization of draft rules | N/A | N/A |
| 11 | Inmate Work and Performance Pay | Correctional Programs | Not yet received | Evaluating whether FSA Section 605 applies to non-Federal Prison Industry Jobs | N/A | N/A |

Note: "N/A" means that the BOP did not provide us with any information under the requested fields, thus indicating that the policy has either (1) not been provided to the NPM or (2) has not completed any policy development steps since receipt by the NPM.

\* In response to a draft of this memorandum, the BOP stated that its system for automating recidivism risk assessments has been completed and it has determined that the First Step Act of 2018–Recidivism Risk Assessment policy (No. 5, above) is no longer needed. Rather, the NPM stated that the Unit Management Manual and Inmate Program Review policies, which will incorporate PATTERN guidance, will be sufficient.

Source: OIG analysis of BOP information

In its written response to this memorandum, the BOP reported that there were seven additional FSA-related policies that are pending negotiations with the national union. These policies include the following: (1) Parenting, Children, and Families, (2) Female Integrated Treatment Program, (3) Management of Inmate

F    092

Veterans, (4) Management of Aging Offenders, (5) Secure Mental Health Units, (6) First Step Act Incentives Procedures Under the Cares Act Covered Period, and (7) Release Orientation Program.

### FSA Time Credits

The FSA provides that BOP inmates who "successfully complete [EBRR programs] or productive activities, shall earn time credits."[15] Since January 15, 2020, federal inmates have been able to earn time credits under the FSA (see the text box). However, we found that the BOP has not applied such statutorily earned time credits to any of the approximately 60,000 eligible inmates who may have completed EBRR programs or productive activities.[16] We are concerned that the delay in applying earned time credits may negatively affect inmates who have earned a reduction in their sentence or an earlier placement in the community.

> **DOJ Announcement on FSA Time Credits**
>
> On January 15, 2020, the Department announced several significant developments concerning its implementation of the FSA. In the Department's press release, then Attorney General William P. Barr declared that, "beginning today, inmates will have even greater incentive to participate in evidence-based programs that prepare them for productive lives after incarceration." Among other developments, the Department announced that, "as of [January] 15, 2020, inmates will be assigned to participate in [EBRR programs and productive activities] based on an initial needs assessment conducted by BOP. Participation and completion of those assigned programs and activities can lead to placement in pre-release custody or a 12-month sentence reduction under the [FSA]."
>
> Source: DOJ press release announcing enhancements to the risk assessment system and FSA updates

BOP officials told the OIG that the BOP has not applied time credits to inmate sentences as directed under the law because:

(1) a rule that would codify the BOP's procedures for time credits has not been finalized, and

(2) the BOP must complete policy negotiations on its time credits policy with the national union (No. 8 in Table 1, above).

The BOP stated that the time credits policy must be negotiated with the national union because it would create changes to conditions of employment, including determinations and application of earned time credits for inmates, for Unit Team staff working in BOP institutions who are bargaining unit employees.

In December 2020, the Office of the Attorney General (OAG) released its annual report to Congress summarizing the activities and accomplishments of the Department in implementing the FSA.[17] The report acknowledged that the BOP had not applied earned time credits to inmate sentences and stated that the BOP "[did] not believe that anyone ha[d] been negatively impacted...because of the dramatic expansion of inmate community placements in 2020 pursuant to the [Coronavirus Aid, Relief, and Economic Security (CARES)] Act [of 2020]."[18]

---

[15] 18 U.S.C. § 3632(d). However, inmates are ineligible to receive time credits if they are serving a sentence for a conviction under certain provisions of law. For more information, see 18 U.S.C. § 3632(d)(4)(D).

[16] As of March 30, 2021, BOP data indicates that nearly half (60,146 out of 123,186) of all inmates in BOP custody are eligible for time credits if they have completed EBRR programs or productive activities.

[17] See OAG, *The Attorney General's First Step Act Section 3634 Annual Report* (December 2020), www.bop.gov/inmates/fsa/docs/20201221_fsa_section_3634_report.pdf (accessed November 10, 2021).

[18] See OAG, *First Step Act Section 3634 Annual Report*, 40. The report does not mention an August 2020 decision from the U.S. District Court for New Jersey, which ruled in favor of a federal inmate who sued the BOP for failing to apply his earned time credits after he had participated in EBRR programs. After the court-ordered application of 120 days of earned time credits, the inmate was transferred into the community for the duration of his sentence and was subsequently released from BOP custody in January 2021. See *Aryeh Goodman v. David Ortiz, in His Capacity as Warden of Federal Correctional Institution Fort Dix* (Case 1:20-cv-07582-RMB, Aug. 25, 2020), www.casetext.com/case/goodman-v-ortiz (accessed November 10, 2021). In addition, in response to a draft of this memorandum, the BOP reported that the delivery of EBRR programs and productive activities to inmates has been "severely impacted" by the pandemic. As we note above, inmates must participate in EBRR programs and productive activities to earn time credits.

F   093

However, in our review of minimum and low risk inmates in BOP facilities in March 2021 alone, we identified 50 such inmates who do not appear to have benefited from their participation in FSA programming. These 50 inmates had earned, on average, 31 days of time credits and were all projected to be released from BOP custody within the following 6 months. Yet, as of March 27, 2021, none of these inmates had been transferred to community placement despite each of them having completed at least 240 hours of EBRR programs and productive activities. It therefore appears that these inmates have not benefited from their participation in EBRR programs and productive activities due in part to the delay in applying earned time credits.

In August 2021, the BOP told us that the FSA contemplates a phased-in approach to time credit implementation and requires that all inmates be assigned to programming based on their assessments no later than January 15, 2022. As a result, the BOP stated that "implementation of time credits is fully permissible as a phased approach." While we agree that the FSA affords the BOP a 2-year phase-in period to provide all inmates with EBRR programs and productive activities, we also note that the phase-in statute makes no reference to delaying the use of incentives and rewards, including time credits. Instead, the statute states that by January 15, 2020, the BOP "may offer to prisoners who successfully participate in such programs and activities [with] incentives and rewards."[19]

We recognize that the rulemaking process has also delayed the BOP's application of time credits, and BOP officials notified us that a draft rule could soon be finalized.[20] Yet, at the time of our fieldwork, there was still no timetable for when formal union policy negotiations would resume. As noted above, in its written response to this memorandum (attached as Appendix 1), the BOP reported that it will be commencing JPC meetings with the national union in November 2021 to discuss policies and that it intends to resume formal negotiations in December 2021, although we were not provided with a specific date for resumption of formal policy negotiations.[21] Considering that the BOP and the national union were negotiating the time credits policy prior to the suspension of policy negotiations, we are concerned that the lack of formal policy negotiations may further delay the BOP's application of earned time credits to inmates who were eligible to earn them following the Department's January 2020 announcement, as well as its ability to comply with the FSA's upcoming January 2022 deadline for applying earned time credits to inmate sentences, even if a new formal rule is issued. In response to a draft of this memorandum, the BOP stated that it would apply earned time credits to inmate sentences as soon as the draft rule is finalized and prior to completion of negotiations on the time credits policy to comply with the FSA.

Finally, on January 15, 2021, the Office of Legal Counsel (OLC) issued a legal opinion that increases the urgency for the BOP to issue a policy regarding earned time credits. The OLC opinion stated that the CARES

---

[19] See 18 U.S.C. §§ 3621(h)(2)–(h)(4). While the Goodman v. Ortiz decision referenced in footnote 18 required application of FSA earned time credits, other courts have concluded that the BOP is not obligated to apply earned time credits to inmate sentences before January 15, 2022, the end of the phase-in period. See, for example, Charles Llewlyn v. Tracy Johns, Case 5:20-cv-77, Jan. 5, 2021, www.casetext.com/case/llewlyn-v-johns; Jacqueline D. Kennedy-Robey v. Warden, Federal Correctional Institution Pekin, Case 20-cv-1371, Mar. 2, 2021 www.casetext.com/case/kennedy-robey-v-warden-fci-pekin; and Michael D. Cohen v. United States of America, Michael Carvajal, Director of the Federal BOP, Case 20-cv-10833, Apr. 20, 2021, www.casetext.com/case/cohen-v-united-states-99 (all accessed November 10, 2021). Nevertheless, even in those rulings, the courts have reflected that the BOP has the statutory authority to apply such credits sooner.

[20] The draft rule was published in the Federal Register on November 25, 2020, and was open for public comment until January 25, 2021. In late March 2021, the BOP revised the draft rule to align with the views of the new administration and then submitted it to the Department's Office of Legal Policy (OLP) on May 4, 2021. When OLP finishes its review, the rule will be submitted to the Office of the Deputy Attorney General (ODAG) for review before being submitted to OMB for final review and approval. On September 1, 2021, ODAG officials told us that the draft rule was still under Department review.

[21] In contrast to formal policy negotiations, JPCs allow for BOP officials to jointly revise policies with union representatives as one of its initial policy development steps. During the Obama administration, the JPC structure was used to facilitate a higher volume of published policies than formal policy negotiations.

F    094

Act authorized the BOP Director to expand the use of home confinement only during the Act's covered emergency period (i.e., for the duration of the period during which the Attorney General finds that the emergency conditions of the pandemic materially affect the BOP's functioning).[22] According to the OLC opinion, should that period end or should the Attorney General revoke this finding, the BOP would be required to recall inmates placed in home confinement to correctional facilities unless they are otherwise eligible for home confinement under 18 U.S.C. § 3624(c)(2).[23] As of July 29, 2021, the BOP had 7,315 inmates in home confinement and approximately 2,754 of those inmates would not be eligible for home confinement under 18 U.S.C. § 3624(c)(2).[24] Thus, if the covered emergency period were to end without any Department action to address the conclusions of the OLC opinion, these inmates would be returned to BOP institutions, without any consideration of whether time credits earned before pre-release custody placement would make them eligible to remain in home confinement, in part because the BOP has not finalized a policy to administer earned time credits.[25]

Additional Incentives and Rewards

At the time our fieldwork ended, in May 2021, we also found that, contrary to the FSA, the BOP had not used any incentives and rewards for inmates who participated in and completed EBRR programs because the First Step Act Program Incentives policy had not been finalized. The FSA requires the BOP to use incentives and rewards for inmates to participate in EBRR programs, including the following:

- additional phone privileges and, if available, video conferencing privileges of up to 30 minutes a day and up to 510 minutes a month;

- additional time for visitation at the prison, as determined by the Warden of the prison;

- transfer to a facility closer to the inmate's release residence, subject to the availability of bed space, the inmate's security designation, and the recommendation from the Warden of the facility at which the inmate is incarcerated at the time of making the request; and

- additional incentives and rewards, as determined by the BOP, to include not fewer than two of the following: (1) increased commissary spending limits and product offerings, (2) greater email access, and (3) consideration for transfer to preferred housing units.[26]

---

[22] See DOJ OLC, Home Confinement of Federal Prisoners After the COVID-19 Emergency, January 15, 2021, www.justice.gov/olc/file/1355886/download (accessed November 10, 2021), 1.

[23] 18 U.S.C. § 3624(c)(2) authorizes the BOP to place an inmate in home confinement for the shorter of 10 percent of the term of imprisonment of that inmate or 6 months.

In July 2021, news organizations reported that the Biden administration concurred with OLC's opinion that certain inmates must be returned to their institutions once the official pandemic state of emergency ends. See The New York Times, "Biden Legal Team Decides Inmates Must Return to Prison After Covid Emergency," July 19, 2021, www.nytimes.com/2021/07/19/us/politics/biden-prisoners-covid.html (accessed November 10, 2021).

[24] In discussions with BOP officials about this memorandum, the BOP stated that it refers inmates to pre-release custody within 18 months of their projected release date, which the BOP said made it unlikely that an inmate with less than 18 months remaining in his or her sentence would be returned to custody. However, upon further OIG inquiry, the BOP was unable to provide a more detailed explanation of what would happen to the approximately 2,754 inmates placed in home confinement who could not remain in home confinement under 18 U.S.C. § 3624(c)(2) upon conclusion of the emergency period.

[25] During recent congressional testimony, Attorney General Merrick Garland stated that the Department was reviewing the OLC opinion and its authorities to see if it can keep these inmates in home confinement once the covered emergency period ends. Merrick Garland, U.S. Attorney General, before the Committee on the Judiciary, U.S. Senate, concerning "Oversight of the Department of Justice" (October 27, 2021), www.judiciary.senate.gov/meetings/10/20/2021/oversight-of-the-department-of-justice (accessed November 10, 2021).

[26] 18 U.S.C. § 3632(d).

F   095

ATTACHMENT 4

Case 1:22-cv-00040-MJT-CLS    Document 18    Filed 08/08/22    Page 53 of 71 PageID #:
Case 1:22-cv-00040-MJT-CLS    Document 8-1    Filed 05/17/22    Page 78 of 143 PageID #:  340
823



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

P. O.   Box 26025
Beaumont, Texas 77720

May 20, 2020

Freedman & Grinshpun, PC
7909 Bustleton Avenue
Philadelphia, Pennsylvania 19152
Attn:  Arkadiy Grinshpun, Esq.

Re:  William Maxwell, Reg. No. 71944-279

Dear Mr. Grinshpun:

I am in receipt of your correspondence dated April 30, 2020,
regarding William Maxell.  He is currently confined at the
Federal Correctional Complex (FCC), Low Security Institution, in
Beaumont, Texas.  In your letter, you are requesting inmate
Maxwell be released to home confinement in connection with the
CARES Act and memoranda issued to the Federal Bureau of Prisons
by the Attorney General regarding this topic due to the outbreak
of COVID-19.

In response to your request, the Bureau of Prisons is utilizing
the full scope of its various authorities to ensure that inmates
at heightened risk of complications from COVID-19 are identified
and housed safely and appropriately given their specific needs
and circumstances. This includes modified institution
operations; routine staff and inmate medical screening; use of
the home confinement authority, where appropriate, based on
guidance from the U.S. Attorney General; and use of
compassionate release for appropriate inmates who have existing
terminal and debilitated medical conditions or who are elderly
and nearing the end of their sentence, as provided for in
current agency policy.

BP-10-5 (1 of 4)

Case 1:22-cv-00040-MJT-CLS     Document 8-1     Filed 05/17/22     Page 79 of 143 PageID #:  341

Grinshpun Letter
May 20, 2020
Page 2

The CARES Act authorizes the U.S. Attorney General to expand the cohort of inmates who can be considered for home confinement upon his findings of emergency conditions which are materially affecting the function of the BOP.  On April 3, 2020, the Attorney General made that finding and authorized the Director of the BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and other similarly situated BOP facilities where COVID-19 is materially affecting operations.

Pursuant to the U.S. Attorney's General's direction, the BOP will continue to monitor the situation at all of its facilities, to include FCC Beaumont, and will take swift action to exercise its expanded home confinement authority for any inmate who is found to be at risk for COVID-19 and suitable for home confinement.

Additional guidance was provided to staff via a May 8, 2020 memorandum regarding this topic.  In it, the memorandum stated that inmates who have served 50% or more of their sentence or have 18 months or less remaining on their sentence and have served 25% or more of their sentence would be prioritized for consideration for home confinement.  Inmate Maxwell does not meet this criteria, as his release date is July 17, 2031.

I trust this response adequately addresses your concerns.

Sincerely,

F. J. Garrido
Warden

BP-10-8 (2 of 4)

ATTACHMENT 5

RICHARD J. DURBIN, ILLINOIS, CHAIR

PATRICK J. LEAHY, VERMONT
DIANNE FEINSTEIN, CALIFORNIA
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII
CORY A. BOOKER, NEW JERSEY
ALEX PADILLA, CALIFORNIA
JON OSSOFF, GEORGIA

CHARLES E. GRASSLEY, IOWA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
BEN SASSE, NEBRASKA
JOSHUA D. HAWLEY, MISSOURI
TOM COTTON, ARKANSAS
JOHN KENNEDY, LOUISIANA
THOM TILLIS, NORTH CAROLINA
MARSHA BLACKBURN, TENNESSEE

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510-6275

May 5, 2021

The Honorable Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Attorney General Garland:

We respectfully request that you direct the Bureau of Prisons (BOP) to expeditiously revise the proposed rule published on November 25, 2020, regarding earned time credits authorized by the First Step Act of 2018 (FSA). As proposed, the rule severely limits the incentive structure designed to increase program participation and would undercut the effectiveness of the FSA. We ask that you reevaluate and amend the rule consistent with the statute's goals of incentivizing and increasing program participation to reduce recidivism.

The proposed rule undermines the FSA's incentive structure in several respects. First, by defining a day as eight hours of programming the rule greatly restricts the ability to earn credits. Under the FSA, eligible inmates "shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming [EBRR] or productive activities [PAs]." While not statutorily defined, the plain meaning of a day of participation is every calendar day during which a person successfully participates in an EBRR or PA, with the length of participation determined by the program. Instead, the proposed rule defines a day as "one eight-hour period" of a completed EBRR or PA. Using this definition, an inmate who participates in a program one hour a day for eight days would earn just one "day" of participation under the FSA. Given the limited programs offered and the duration and frequency of programs, earning enough time credits to meaningfully reduce prison time would be nearly impossible under this definition.

Second, the proposed rule allows credits to be earned only for programs that were assigned and completed after January 15, 2020, more than two years after the FSA's date of enactment. The FSA does not require BOP to limit earned time credits to completion of *assigned* programming. BOP's inclusion of this limitation in the proposed rule is particularly troublesome because BOP has not developed an effective needs assessment, as required by the FSA. Under the proposed rule, inmates would not be rewarded for self-identifying needs and voluntarily participating in programming. The proposed rule also, without authority or explanation, prohibits credits for programs completed before January 15, 2020, when the FSA allows for credits based on all programming completed after the statute's enactment on December 21, 2018.

Third, the FSA directs that all eligible federal prisoners in BOP custody shall earn credits for program participation, but the proposed rule would exclude prisoners in residential reentry centers (RRCs) or home detention. Because prisoners in RRCs and home detention are in BOP custody, the rule is contrary to the FSA. In fact, the FSA specifically anticipated that prisoners on home detention would continue to participate in programming by listing program participation as one of a few authorized reasons prisoners may leave home while on detention.

Finally, we are concerned that the proposed rule's penalties are unduly harsh. The rule proposes that inmates may lose earned time credits "for violations of prison rules, or requirements and/or rules of an [EBRR or PA]," applying the same procedures used for loss of good time credits. Especially when combined with the time required to earn credits under the proposed rule, the penalty for violations would be too severe. For example, one unexcused absence from a work assignment could result in the loss of 30 days of earned credits, although earning those credits would require completing 720 hours of programming. The rule also imposes penalties for violations of program requirements, rather than just violations of "prison rules or [EBRR or PA] rules," as the FSA requires, suggesting that failure to fulfill the requirements of a program not only could result not only in a failure to earn time credits for participation, but also the loss of credits previously earned.

While losing hard-earned credits would be easy, the rule makes restoring credits too difficult. The FSA simply requires "a procedure to restore time credits that a prisoner lost as a result of a rule violation, based on the prisoner's individual progress." However, the proposed rule would only allow for restoration after "clear conduct for at least four consecutive risk and needs assessments." These assessments may only be completed annually, so it could take a prisoner at least four years to restore lost credits, longer than the average sentence.

For these reasons, we ask that you direct BOP to expeditiously revise the proposed rule consistent with the comments above. Establishing robust programming and a fair system to earn time credits is critical to meeting the FSA's goal of reducing recidivism.

Thank you for your time and consideration. We look forward to your prompt response.

Sincerely,

Richard J. Durbin
Chair
U.S. Senate Committee on the Judiciary

Charles E. Grassley
Ranking Member
U.S. Senate Committee on the Judiciary

ATTACHMENT 6

U.S. Department of Justice

Federal Bureau of Prisons

*Federal Correctional Complex*

---

P.O. Box 26035
Beaumont, Texas 77720

June 30, 2022

Inmate Maxwell, William, Reg. No. 71944-279, is currently assigned as an education library clerk in the education department and has been during his entire time of incarceration.

L. WEST

CASE MANAGER



## Individualized Needs Plan - Program Review    (Inmate Copy)

SEQUENCE: 01720812

Dept. of Justice / Federal Bureau of Prisons

Team Date: 01-13-2022

Plan is for inmate: MAXWELL, WILLIAM  71944-279

| | | | |
|---|---|---|---|
| Facility: | BML  BEAUMONT LOW FCI | Proj. Rel. Date: | 07-17-2031 |
| Name: | MAXWELL, WILLIAM | Proj. Rel. Mthd: | GCT REL |
| Register No.: | **71944-279** | DNA Status: | PHL06380 / 07-03-2014 |
| Age: | 62 | | |
| Date of Birth: | ███-1959 | | |

### Detainers

| Detaining Agency | Remarks |
|---|---|

*NO DETAINER*

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BML | EDUC | EDUCATION | 04-23-2016 |
| BML | GROUP 4 | QUARANTINE GROUP 4 | 07-02-2020 |

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BML | ESL HAS | ENGLISH PROFICIENT | 09-03-2015 |
| BML | GED HAS | COMPLETED GED OR HS DIPLOMA | 12-09-2014 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| BML | C | EMPLOYMENT SKILLS RPP#2 | 01-15-2020 | 01-15-2020 |
| BML | C | BUSINESS COMMUN. ACE RPP#6 | 10-16-2019 | 12-18-2019 |
| BML | C | BUSINESS WRITING RPP#6 | 07-17-2019 | 09-18-2019 |
| BML | C | REAL ESTATE FOR PROFIT RPP#6 | 07-16-2019 | 09-17-2019 |
| BML | C | ACE PRODUCT DEVELOP RPP#6 | 07-15-2019 | 09-16-2019 |
| BML | C | MONEY SMART, RPP#3 | 04-10-2018 | 06-14-2018 |
| BML | C | TICKET TO THE FUTURE, RPP#2 | 05-09-2018 | 05-30-2018 |
| BML | C | JOB FAIR INFORMATION RPP#2 | 05-30-2018 | 05-30-2018 |
| BML | C | EMPLOYMENT SKILLS RPP#2 | 04-18-2018 | 04-18-2018 |
| BML | C | JOB INTERVIEWING, RPP CT2 | 04-25-2018 | 05-02-2018 |
| BML | C | FIVE SECRETS FINDING JOB RPP#2 | 01-18-2018 | 03-08-2018 |
| BML | C | JOB SUCCESS CLASS, RPP#2 | 01-12-2018 | 03-16-2018 |
| BML | C | EMPLOY OPPORTUNITY, RPP#2 | 01-08-2018 | 03-14-2018 |
| BML | C | RECREATION CALLIGRAPHY RPP#6 | 07-26-2017 | 10-04-2017 |
| BML | C | PARENTING-2  RPP#6 | 12-02-2016 | 02-10-2017 |
| BML | C | PARENTING RPP#6 | 10-07-2016 | 11-18-2016 |
| BML | C | EMPLOY OPPORTUNITY, RPP#2 | 01-11-2016 | 03-14-2016 |
| BML | C | MANAGE CAREER SHU PROGRAM | 12-01-2015 | 12-30-2015 |
| BML | C | RPP CORE 1 - HEALTH | 09-06-2015 | 09-06-2015 |

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 08-31-2015 |
| CARE2 | STABLE, CHRONIC CARE | 07-16-2020 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| C19-RCVRD | COVID-19 RECOVERED | 07-27-2020 |
| LOWER BUNK | LOWER BUNK REQUIRED | 04-07-2021 |
| OTHER | OTHER MEDICAL RESTRICTION | 04-07-2021 |
| PAPER | LEGACY PAPER MEDICAL RECORD | 04-07-2020 |
| REG DUTY | NO MEDICAL RESTR–REGULAR DUTY | 07-10-2014 |
| YES F/S | CLEARED FOR FOOD SERVICE | 08-26-2015 |



## Individualized Needs Plan - Program Review    (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: MAXWELL, WILLIAM  71944-279

SEQUENCE: 01720812

Team Date: 01-13-2022

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DAP NO INT | DRUG ABUSE PROGRAM NO INTEREST | 02-13-2019 |
| ED NONE | DRUG EDUCATION NONE | 09-08-2015 |

### FRP Payment Plan

Most Recent Payment Plan

**FRP Assignment:**    PART    FINANC RESP-PARTICIPATES    Start: 07-31-2019

**Inmate Decision:**   AGREED    $40.00                    Frequency: QUARTERLY

**Payments past 6 months:**    $80.00        Obligation Balance: $14,180,598.00

### Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $2,200.00 | $1,739.63 | IMMEDIATE | EXPIRED |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 2 | REST FV | $14,180,798.00 | $14,180,598.00 | IMMEDIATE | AGREED |

| Adjustments: | Date Added | Facl | Adjust Type | Reason | Amount |
|---|---|---|---|---|---|
| | 12-14-2021 | BML | PAYMENT | INSIDE PMT | $40.00 |
| | 09-08-2021 | BML | PAYMENT | INSIDE PMT | $40.00 |

### FRP Deposits

Trust Fund Deposits - Past 6 months:    $ N/A        Payments commensurate ?   N/A

New Payment Plan:    ** No data **

### Current FSA Assignments

| Assignment | Description | Start |
|---|---|---|
| FTC ELIG | FTC-ELIGIBLE - REVIEWED | 12-10-2019 |
| N-ANGER N | NEED - ANGER/HOSTILITY NO | 01-10-2022 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 01-10-2022 |
| N-COGNTV N | NEED - COGNITIONS NO | 01-10-2022 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-28-2021 |
| N-EDUC N | NEED - EDUCATION NO | 01-10-2022 |
| N-FIN PV N | NEED - FINANCE/POVERTY NO | 01-10-2022 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 01-10-2022 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 01-10-2022 |
| N-MEDICL Y | NEED - MEDICAL YES | 01-10-2022 |
| N-RLF Y | NEED - REC/LEISURE/FITNESS YES | 01-10-2022 |
| N-SUB AB N | NEED - SUBSTANCE ABUSE NO | 01-10-2022 |
| N-TRAUMA N | NEED - TRAUMA NO | 01-10-2022 |
| N-WORK N | NEED - WORK NO | 01-10-2022 |
| R-MIN | MINIMUM RISK RECIDIVISM LEVEL | 01-10-2022 |

### Progress since last review

Progress:  Good; Inmate has continually participated in the recommended academic programs.  He completed his GED and has strived to enhance his education beyond incarceration.

### Next Program Review Goals

Unit Team recommends you enroll in an ACE, VT, or Parenting  class which can assist you with skills that can be used upon release and complete the course, showing at least 70% mastery of the course objectives.  Complete by your next review.

### Long Term Goals

Obtain institutional employment which will provide you with transferable skills.

### RRC/HC Placement

FSA Recidivism Risk Assessment (PATTERN 01.02.01)
Register Number:71944-279, Last Name:MAXWELL

**U.S. DEPARTMENT OF JUSTICE**                              **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number: 71944-279 | Risk Level Inmate....: R-MIN |
| Inmate Name |   General Level......: R-MIN (-19) |
|   Last.........: MAXWELL |   Violent Level......: R-MIN (-8) |
|   First........: WILLIAM | Security Level Inmate: LOW |
|   Middle.......: | Security Level Facl..: LOW |
|   Suffix.......: | Responsible Facility.: BML |
| Gender........: MALE | Start Incarceration..: 07/30/2015 |

PATTERN Worksheet Summary

| Item | - Value | - General Score | - Violent Score |
|---|---|---|---|
| Current Age | 62 | 0 | 0 |
| Walsh w/Conviction | FALSE | 0 | 0 |
| Violent Offense (PATTERN) | FALSE | 0 | 0 |
| Criminal History Points | 0 | 0 | 0 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 0 | 0 | 0 |
| Education Score | HighSchoolDegreeOrGED | -4 | -2 |
| Drug Program Status | NoNeed | -9 | -3 |
| All Incident Reports (120 Months) | 0 | 0 | 0 |
| Serious Incident Reports (120 Months) | 0 | 0 | 0 |
| Time Since Last Incident Report | N/A | 0 | 0 |
| Time Since Last Serious Incident Report | N/A | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 7 | -6 | -3 |
| Work Programs | 0 | 0 | 0 |
| | | Total -19 | -8 |



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

*P.O. Box 26035*
*Beaumont, Texas 77720*

June 30, 2022

Inmate Maxwell, William, Reg. No. 71944-279, is currently assigned as an education library clerk in the education department and has been during his entire time of incarceration.

L. WEST

CASE MANAGER

```
BMLBR  531.01 *                  INMATE HISTORY              *      02-15-2022
PAGE 001 OF 001 *                  WRK DETAIL                *      14:45:37

REG NO..: 71944-279 NAME....: MAXWELL, WILLIAM
CATEGORY: WRK      FUNCTION: PRT           FORMAT:

FCL     ASSIGNMENT DESCRIPTION                  START DATE/TIME STOP  DATE/TIME
BML     EDUC       EDUCATION                    04-23-2016 0001 CURRENT
BML     GROUP 4    QUARANTINE GROUP 4           07-02-2020 1459 CURRENT
BML     KITCHEN AM KITCHEN AM SHIFT             01-07-2016 0001 04-23-2016 0001
BML     UNASSG     UNASSIGNED                   01-03-2016 1749 01-07-2016 0001
BML     ADM DET    ADMIN DET SHU                12-11-2015 1547 01-03-2016 1749
BML     KITCHEN AM KITCHEN AM SHIFT             09-30-2015 0001 12-11-2015 1547
BML     A&O CMPLT  COMPLETED INSTITUTION A&O    09-17-2015 1303 09-30-2015 0001
BML     PRE-A&O    PRE-ADMISSION & ORIENTATION  08-26-2015 1543 09-17-2015 1303
PHL     AM COOK    AM COOK FOOD SERVICE         11-10-2014 0807 08-24-2015 0731
PHL     SANITATION SANITATION FOOD SERVICE      10-09-2014 0818 11-10-2014 0807
PHL     FOOD SVC   FOOD SERVICE INMATES WAITING 10-09-2014 0738 10-09-2014 0818
PHL     4S UNASSG  4S UNASSIGNED INMATE         07-03-2014 1732 10-09-2014 0738
PHL     7N UNASSG  7N UNASSIGNED INMATE         07-03-2014 1715 07-03-2014 1732
HOU     UNASSG     UNASSIGNED                   11-01-2011 1216 11-02-2011 0718




G0000          TRANSACTION SUCCESSFULLY COMPLETED
```

# ATTACHMENT 7

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

BRANDON LIVAS, RICHARD BUSWELL,      )
DEWAYNE CORBETT, JOHNNY SMITH,       )
CARLOS LORENZO MARTIN and            )    CIVIL ACTION NO. 20-cv-00422
GAINES ANDREWS, on behalf of         )
themselves and those similarly situated  )
                                     )
                                     )    JUDGE DOUGHTY
VERSUS                               )
                                     )
RODNEY MYERS, Warden of Oakdale      )    MAGISTRATE JUDGE KAY
Federal Correctional Institutions; and   )
MICHAEL CARVAJAL, Federal Bureau of  )
Prisons Director, in their official capacities  )
                                     )

*20-cv-00422*

*See paragraphs 19, 4, 21*

## DECLARATION OF JUAN A. SEGOVIA

In accordance with 28 U.S.C. § 1746, I, JUAN A. SEGOVIA, make the following declaration, under penalty of perjury, pertinent to the above styled and numbered cause.

1.      I have been employed by the United States Department of Justice, Federal Bureau of Prisons (BOP) since 1991. I am currently an Associate Warden at the Federal Medical Center, in Fort Worth, Texas. From December 2018 through February 2020, I was an Associate Warden at the Federal Correctional Complex in Oakdale, Louisiana (FCC Oakdale). As of April 5, 2020, I have temporarily reported back to FCC Oakdale to assist with the COVID-19 emergency. The statements I make hereinafter are made on the basis of my review of the official files and records of the BOP, my own personal knowledge, or on the basis of information acquired by me through the performance of my official duties.

2.      FCC Oakdale is a complex of separate BOP men's prison facilities. The complex includes FCI Oakdale I and FCI Oakdale II, both low security facilities; and the Satellite Prison Camp (the "Camp"), a minimum security facility. The complex is run by a Complex Warden, who has ultimate authority over all of the facilities.

3.      The BOP's response to the COVID-19 emergency at FCC Oakdale has been swift and now appears to be proving effective. In the two weeks immediately following FCC Oakdale's first positive COVID-19 test, new potential COVID-19 cases were being identified and isolated daily, often with multiple cases each day. Following the implementation of the control measures described below, the last new isolation cases were identified on April 2, 2020 and April 7, 2020. A decline from multiple daily new cases to two new cases in over a week is a positive sign.

E    048

GOVERNMENT
EXHIBIT

1

17.    Transfers to Residential Re-Entry Centers (RRC) or Home Confinement: While BOP is not itself empowered to modify an inmate's sentence, Congress has provided the Attorney General and Bureau of Prisons with wide discretion in determining where to confine inmates. *See* 18 U.S.C. § 3621. Both placement in a RRC (also called a halfway house) and home confinement are forms of confinement, not actual releases from custody. *See* 18 U.S.C. § 3624(c). Placement in a halfway house and/or home confinement is discretionary. *See* 18 U.S.C. § 3621(c) ("Such conditions *may* include a community correctional facility" and "[t]he authority under this subsection *may* be used to place a prisoner in home confinement.") (emphasis added). While providing a framework of factors to consider inmate placement, Congress also affirmed the breadth of the agency's discretion in such matters, noting that even sentencing court orders regarding inmate placement in a community correction facility "shall have no binding effect," and that "a designation of a place of imprisonment under this subsection is not reviewable by any court." 18 U.S.C. § 3621(b)(5).

18.    While RRC or halfway house placement is considered a beneficial pre-release custody option for appropriate inmates, it requires both significant pre-arrangement and available RRC space before it may allow an inmate to be removed from prison. Pursuant to a March 26, 2020 memorandum from the Attorney General, BOP has prioritized the consideration of home confinement, which has the potential to remove someone from the prison population faster, as a response to the COVID-19 pandemic. Inmates at FCC Oakdale were considered for home confinement under the terms of this memo. Three were thought likely to be approved and were transferred to quarantine in the special housing unit, pending final determination. As the Court is already aware, one of these three were later determined to be ineligible due to a history of sex crimes, one is waiting out his quarantine pending transfer, and one is being re-reviewed based on updated guidance discussed in paragraph 21, below.

19.    Previously, BOP was limited in its authority to allow home confinement the "shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. § 3624. The recently passed Coronavirus Aid, Relief, and Economic Security Act (CARES Act) authorizes the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his findings of emergency conditions which are materially affecting the function of the BOP. On April 3, 2020, the Attorney General made that finding and authorized the Director of the BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale and other BOP facilities where COVID-19 is materially affecting operations. Guidance on implementation of this was previously provided by BOP Central Office, recommending initial review for placement in home confinement of inmates who meet the following nine criteria: 1) Primary Offense is not violent; 2) Primary Offense is not sex offense; 3) Primary Offense is not terrorism; 4) No detainer; 5) Mental Health Care Level is less than IV; 6) PATTERN (BOP's new risk and needs assessment tool) score is MIN; 7) BRAVO (BOP's existing risk evaluation tool) score is LOW or MIN; 8) Completed at least 50% of their sentence; and 9) No Incident Reports in the past 12 months.

20.    ' Based on this initial set of nine criteria, late on April 6, 2020, BOP's Office of Research and Evaluation identified 4,013 inmates nationwide to be the first cohort reviewed under the extended home confinement timeframe. Of these 4,013 inmates, 58 are currently housed at FCC Oakdale. This review would ordinarily be done by case management staff at FCC Oakdale.

5

E    049

However, circumstances made this a challenge, with a leader in this department being out under quarantine, and other staff having to perform ancillary custody functions to ensure basic needs, orderly operations, safety, and security are provided to FCC Oakdale inmates. On April 8, 2020, I began marshalling resources pulling from temporary staff with experience in case management, seeking remote assistance from other facilities, and freeing up FCC Oakdale's existing case management staff by transferring their emergent custody responsibilities to other temporary staff. We focused on the Camp and FCI Oakdale I inmates, because of COVID-19 cases from those facilities. We have since reviewed vast majority of the 58 originally-listed priority inmates. Six of these have been determined to be potentially eligible and they have already been placed in special housing or will be placed there shortly, allowing them to begin the 14-day pre-transfer quarantine. Of those reviewed, the most common reasons for ineligibility appear to be history of previous violence or sex offenses.

21.    Acting upon additional guidance from BOP Regional Office Staff, on the afternoon of April 9th, the reviewing staff have also expanded the criteria, removing the eighth factor, consideration of whether inmates in low or minimum facilities have served 50% of their sentence. Accordingly, staff reviewed an additional 90 inmates for home confinement eligibility and dozens more are pending review. So far, 15 additional inmates have been determined to be potentially eligible for home confinement, and are being prepared for pre-transfer quarantine.

22.    The primary factors being used to prioritize consideration by BOP staff, including prison disciplinary history, PATTERN score, violence or sex crime history, and classification level, come directly from the Attorney General's March 26th Memorandum. In his April 3rd Memorandum, the Attorney General reiterated that BOP's expanded consideration of inmates for home confinement should continue to be guided by those factors. I have checked BOP records for each of the named petitioners in this matter to determine whether they are likely to be reviewed for consideration under the Attorney General's expansion of home confinement eligibility. Individual Petitioners Livas, Martin, Andrews, and Corbett have PATTERN risk recidivism scores above minimum, removing them from priority consideration. Petitioner Smith is ineligible due to his current offenses, involving the production and possession of child pornography. Finally, based on the new April 9th expanded criteria, Petitioner Buswell appears to be eligible and will be given priority review for home confinement.

23.    Staff continue to receive additional guidance on this matter and the number of inmates being given priority consideration is expanding daily. Once we complete review of the list of FCC Oakdale inmates designated for priority consideration by the Attorney General's memorandum and subsequently received guidance, I have been informed that the institution may consider expanding the criteria for review. I anticipate coordinating with medical staff at FCC Oakdale to continue additional reviews for inmates with the highest COVID-19 medical risk, per CDC guidelines, who might not have met the previous criteria.

24.    Non-Transfer Furlough: Placement in RRC or home confinement, once approved, still requires a number of factors to be satisfied prior to implementation. For example, the release plan needs to be evaluated by the appropriate United States Probation Office. In order to facilitate faster removal of approved inmates from the prison facility, BOP has provided its Wardens with additional guidance allowing the use of non-transfer furloughs up to 30 days in length in specific

6

E   050

circumstances.    As inmates are approved for home confinement through the above-described review process, they may also be considered for such a furlough if they meet the criteria. Furloughs are also currently being evaluated for inmates with previously approved RRC placements.

25.    Keeping our duties to both the general public and to care for those ordered into our custody in mind, BOP staff currently working at FCC Oakdale, and throughout the region, are working very hard to protect all from the effects of the current pandemic. In addition to the specific COVID-19 remediation measures outlined above, BOP is continually working to reduce population at affected facilities. Within the discretion provided to the agency by Congress, BOP staff continue to identify, evaluate, and place appropriately-situated inmates in halfway house or home confinement, removing them from prison facilities. We also continue to work with sentencing courts on sentence reductions and compassionate release motions, as appropriate.

I declare under that the foregoing is true and correct to the best of my knowledge and belief. Executed on April 10, 2020, at Oakdale, Louisiana.

_____
JUAN A. SEGOVIA
Associate Warden

7

E 051

United States District Clerk
Eastern District of Texas
104 N. Third Street
Lufkin, TX 75901

Re:   William Maxwell v. Warden, FCI Beaumont Low, Cause No. 1:22-CV-40, Honorable Michael J. Truncale, Christine L. Stetson, presiding.

Ladies and Gentlemen:

Enclosed herewith is Maxwell's Motion to Strike Doc. 8.  Please file in your usual manner.  Please file-mark and return the cover copy in the enclosed postage-paid, self-addressed, stamped envelope.

Thank you for your courtesies in this regard.

Regards,

William Maxwell
Reg. No. 71944-279
FCI-Beaumont-Low
P.O. Box 26020
Beaumont, TX 77720

William Maxwell
Reg. 71944-279
FCI-Beaumont-Low
P.O. Box 26020
Beaumont, Tx 77720





CLERK U.S. DISTRICT COURT
RECEIVED
AUG 0 8 2022
EASTERN DIST. OF TEXAS
BEAUMONT, TEXAS

United States District Clerk
300 Willow, Room 104
Beaumont, Tx 77701

LEGAL
MAIL