# ATTACHMENT 2



DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL

November 15, 2021

Management Advisory Memorandum

To:          Michael Carvajal
             Director
             Federal Bureau of Prisons

From:        Michael E. Horowitz
             Inspector General

Subject:     Impact of the Failure to Conduct Formal Policy Negotiations on the Federal Bureau of
             Prisons' Implementation of the FIRST STEP Act and Closure of Office of the Inspector General
             Recommendations

The purpose of this memorandum is to advise you of critical issues that the Office of the Inspector General (OIG) has identified during its ongoing Review of the Federal Bureau of Prisons' (BOP) Policy Development Process. We believe that the issues we describe below necessitate management's immediate attention to address a 20-month period during which formal policy negotiations have not occurred between the BOP and its national union.[1] The lack of negotiations is the result of the decision by BOP management to decline to meet in person to conduct formal policy negotiations with the national union during the coronavirus disease 2019 (COVID-19) pandemic, and instead to propose remote video meetings, and the decision by the BOP national union to insist on in-person negotiations given that in-person negotiations are provided for in BOP union contracts and its membership has been reporting to work in person throughout the pandemic. The lack of formal negotiations has disrupted aspects of the BOP's implementation of the FIRST STEP Act of 2018 (FSA) and has further delayed policy changes to address OIG recommendations on systemic correctional and safety issues.

The OIG initiated the ongoing BOP policy development review in November 2019 due to significant delays in the resolution of multiple OIG recommendations related to revising or creating BOP policies concerning various correctional and safety issues. Numerous BOP officials expressed concerns to the OIG regarding excessive delays with the BOP's policy development process, and the National Academy of Public Administration released a study finding that the BOP's policy process is lengthy and uncertain, making it

---

[1] For the purposes of this memorandum and our pending Review of the BOP's Policy Development Process, "policy development" includes the process by which the BOP develops and implements, in collaboration with its national union, policies governing BOP programs and operations. Such policies may involve any aspect of BOP programs and operations that affect conditions of employment of the more than 30,000 BOP bargaining unit employees.

1

F 038

difficult for BOP divisions to issue and revise policies in a timely manner.[2] The absence since March 2020 of formal negotiations, including those for issues impacting the FSA, exacerbated these concerns, as detailed below.

In its written response to this memorandum (attached as Appendix 1), the BOP reported that it will be commencing in-person Joint Policy Committee (JPC) meetings with the national union in November 2021 to discuss policies related to the FSA, security and correctional services, and health and safety issues and that it has informed the national union that it intends to resume formal in-person negotiations in December 2021.[3]

Relevant Authorities

Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454
The FIRST STEP Act of 2018, Pub. L. No. 115-391
BOP Ground Rules for National Policy Negotiations, December 5, 2013
BOP and Council of Prison Locals, Master Agreement, July 21, 2014–July 20, 2021 (extended until 2026)

The Issue

Under the BOP's labor contracts, the BOP and its national union can meet in person, 3 days each month, to negotiate policies.[4] Further, the BOP's Ground Rules for National Policy Negotiations state that "no policies will be negotiated over the telephone, on conference calls, or over speakerphones, unless mutually agreed."

In response to the COVID-19 pandemic, on March 13, 2020, the BOP implemented Phase Two of its COVID-19 Action Plan, which, among other things, suspended all official staff travel for 30 days.[5] On August 5, 2020, the BOP issued new travel guidance that suspended "non-essential official staff travel" but permitted essential travel.[6] As of October 25, 2021, this travel guidance was still in place. Since the implementation of Phase Two, BOP management has declined to meet in person with national union staff to conduct formal policy negotiations and has instead proposed conducting virtual policy negotiations. However, the BOP's national union has declined to conduct formal policy negotiations in a remote manner. Relying on labor contractual terms providing for in-person negotiations, the national union has insisted on in-person negotiations and expressed its availability to meet in person. This disagreement has resulted in a lack of formal policy negotiations for a period of 20 months, which at the time of our fieldwork had stalled the development of more than 30 BOP policies, about half of which were created or revised in response to the FSA.

BOP officials have told the OIG that compliance with Title VII of the Civil Service Reform Act of 1978 requires the BOP to negotiate with the national union changes to policy, including BOP policies governing FSA programs, when such changes affect the conditions of employment of bargaining unit employees.[7]

---

[2] National Academy of Public Administration, *Assessment of the Bureau of Prisons' Organizational Alignment with Healthcare Mission* (October 2019), www.oldnapa.primedev.build/uploads/Academy_Studies/BOP_NAPA_Deliverable_1_Final.pdf (accessed November 10, 2021), 36.

[3] In its written response, the BOP also stated that, since passage of the FIRST STEP Act in December 2018, it has revised and issued 12 FSA-related policies, 6 of which it told us were issued after March 2020, when formal policy negotiations were ceased.

[4] Article 3 of the BOP's Master Agreement and its Ground Rules for National Policy Negotiations govern the BOP's formal negotiation practices with the national union.

[5] BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Two Action Plan, March 13, 2020, 2. The memorandum stated that any travel exceptions must be approved by the BOP Deputy Director.

[6] BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Nine Action Plan, August 5, 2020, 2.

[7] Generally, according to the BOP's Labor Relations Office Chief, when implementing laws affecting the BOP, the BOP must negotiate changes to the conditions of employment for bargaining unit staff with its national union unless Congress includes explicit terminology to the effect that implementation is notwithstanding any other provision of law. For more information concerning the BOP's collective bargaining obligations under Title VII of the Civil Service Reform Act of 1978, see 5 U.S.C. §§ 7102 and 7106.

F    089

According to the BOP's Office of Labor Relations, failure to do so could be grounds for the filing of an unfair labor practice charge by the national union with the U.S. Federal Labor Relations Authority.

As described below, the BOP's decision to not conduct formal in-person negotiations with the national union has delayed the Department of Justice's (Department, DOJ) ability to move forward with FSA-related policies, as well as policy changes to address OIG recommendations on systemic correctional and safety issues. In response to a draft of this memorandum, the BOP explained that it has declined to meet with the national union in person due to pandemic-related guidance from the Office of Management and Budget (OMB) that was issued in March 2020.[8] However, we note that OMB's memorandum allows mission-critical travel and that the memorandum specifies factors for agencies to consider in determining which travel is mission critical, including whether such travel is required by "statute or contract." As described above, the BOP and the national union have a contract that requires travel for in-person formal policy negotiations unless both parties agree otherwise. Moreover, the imperative of meeting both the FSA's mandates and dozens of additional pending policy matters that concern safety and security issues, as well as the fact that most BOP employees have been working in person throughout the pandemic, further undercuts the BOP's reliance on the OMB guidance as a basis for suspending formal policy negotiations for such a lengthy period. Additionally, as of August 5, 2020, the BOP's own travel guidance allows for essential official travel. Although the BOP travel guidance does not describe what travel is considered essential, for the same reason we believe that travel for negotiation purposes would qualify as mission critical under the OMB memorandum, it should also seemingly be considered essential for BOP purposes.

In its written response to this memorandum, which is attached as Appendix 1, the BOP restated its belief that its decision to decline to meet in person with the national union since March 2020 was consistent with OMB guidance. Additionally, the BOP referenced DOJ's COVID-19 Workforce Safety Plan from February 2021, which provided that "when [in-person] meetings must be held, they shall be limited to fewer than ten individuals." The BOP response went on to state that, since the national union is entitled to 10 representatives at formal negotiations, complying with the DOJ Workplace Safety Plan would have prevented BOP attendance. We note, however, that OMB and DOJ pandemic-related policy memoranda have consistently recognized the need to accommodate mission-critical operational needs during the pandemic. For example, OMB's M-21-25 memorandum, issued on June 10, 2021, stated: "As a reminder, at any time, if there are operational needs related to the completion of agency mission-critical activities, agencies may pursue an exception from select model safety principles set forth by M-21-15, and as amended by Task Force guidance and this memorandum."[9] Indeed, during the course of our review, we learned from the national union that BOP Executive Staff itself had authorized a large meeting in California between BOP officials and union leaders shortly after the DOJ's February 2021 memorandum was issued and that the meeting was attended by at least 15 local union presidents, 15 Wardens, and additional BOP regional office executives and staff. Further, we note that, despite the 10-person rule that it cited, the BOP's response in Appendix 1 stated that it has notified the national union of its intent to resume formal negotiations in December 2021.

FIRST STEP Act Requirements and Impact of the Lack of Negotiation

On December 21, 2018, then President Donald J. Trump signed into law the FSA, which enacted several criminal justice reforms throughout the federal prison system. Among other mandates, the FSA (18 U.S.C. § 3632) required the Attorney General, in consultation with the Independent Review Committee, to develop a

---

[8] OMB Memorandum M-20-14, Updated Federal Travel Guidance in Response to Coronavirus, March 14, 2020, www.chcoc.gov/sites/default/files/M-20-14-travel-guidance-OMB-1_0.pdf (accessed November 10, 2021).

[9] OMB Memorandum M-21-25, Integrating Planning for A Safe Increased Return of Federal Employees and Contractors to Physical Workplaces with Post-Reentry Personnel Policies and Work Environment, June 10, 2021, www.whitehouse.gov/wp-content/uploads/2021/06/M-21-25.pdf (accessed November 10, 2021).

F   090

system to assess the recidivism risk and criminogenic needs of all federal inmates by July 19, 2019. In response to this requirement, the Department developed the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) system.[10] The FSA also set a deadline of January 15, 2020, for the Department to utilize the PATTERN system and other resources to:

- complete an initial risk and needs assessment for each federal inmate,

- begin to assign inmates to appropriate evidence-based recidivism reduction (EBRR) programs based on the initial assessment,

- begin to expand the EBRR programs and productive activities available at BOP facilities and add any new EBRR programs and productive activities necessary to effectively implement the system, and

- begin to implement any other risk and needs assessment tools necessary to effectively implement the recidivism risk assessment system over time.[11]

The FSA also stated that the Department's recidivism risk assessment system "shall provide incentives and rewards for prisoners to participate in and complete [EBRR programs]" and directed that inmates who "successfully complete [EBRR programs] or productive activities, shall earn time credits" toward pre-release custody (i.e., transfer to a Residential Reentry Center or home confinement) or supervised release (i.e., early satisfaction of the inmate's sentence).[12] Under the FSA, the BOP must provide EBRR programs and productive activities to all inmates in its custody no later than January 15, 2022.[13]

During the period of our fieldwork ending in May 2021, we identified 13 FSA-related policies that the BOP has determined require negotiations with the national union. In June and July 2021, as the result of *informal* policy negotiations with the national union, the BOP published 2 of the 13 FSA-related policies we had identified as pending—the First Step Act Needs Assessment and First Step Act Program Incentives.[14]

---

[10] For more information concerning the Department's development and implementation of PATTERN, see Office of the Attorney General (OAG), *The First Step Act of 2018: Risk and Needs Assessment* (July 2019), www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf, and OAG, *The First Step Act of 2018: Risk and Needs Assessment System–UPDATE* (January 2020), www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf (both accessed November 10, 2021).

[11] See 18 U.S.C. § 3621(h)(1) The FSA defines an EBRR program as a group or individual activity that: (1) has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; (2) is designed to help inmates succeed in their communities upon release from prison; and may include (3) social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills. In addition, the FSA defines "productive activity" as a group or individual activity that is designed to allow inmates determined to have a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating. For more information, see 18 U.S.C. § 3635.

[12] 18 U.S.C. §§ 3632(d) and 3632(d)(4).

[13] See 18 U.S.C. § 3621(h)(2). The FSA states that an inmate shall earn 10 days of time credits for every 30 days of successful participation in EBRR programs or productive activities. The law also states that minimum and low risk inmates who, over two consecutive assessments, have not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in EBRR programs or productive activities. For more information, see 18 U.S.C. § 3632(d)(4)(A).

[14] Informal policy negotiations include any type of policy discussions that are not governed by BOP labor contracts. Typically, these discussions include email exchanges or telephone conversations between BOP officials and national union representatives. While neither the BOP nor the national union is obligated to participate in informal policy discussions and may decline to participate without recourse by the other party, informal policy discussions can be an effective way for the BOP to negotiate policies with the national union. In August 2021, the BOP reported to the OIG that since April 2021 it had conducted with its national union several informal policy negotiations that resulted in the issuance of new policies, including FSA-related policies. Though informal policy negotiations can be useful for resolving less complex and divisive policy matters, historically they have served as a supplement to formal policy negotiations. The resumption of formal policy negotiations may be necessary to resolve the policy development issues we discuss throughout this memorandum, many of which have been unresolved for years and may be too complex to address through informal negotiations.

F    091

Accordingly, as of October 2021, 11 of these FSA policies remained pending negotiations, as detailed in Table 1 below.

## Table 1

### BOP FSA-Related Policies That Need to Be Issued, as of October 29, 2021

| No. | Policy Name | Office of Primary Interest (OPI) | Date OPI First Sent Draft Policy to National Policy Management (NPM) | NPM Notes About Last Policy Step Completed | Date Last Policy Step Completed | Days Since NPM First Received Draft Policy |
|---|---|---|---|---|---|---|
| 1 | Prisoner Transportation Manual | Correctional Programs | 1/7/2019 | 7-day expedited management review | 10/29/2021 | 1,026 |
| 2 | Use of Force and Application of Restraints | Correctional Programs | 1/7/2019 | 7-day expedited management review | 10/29/2021 | 1,026 |
| 3 | Escorted Trips | Correctional Programs | 1/17/2019 | 7-day expedited management review | 10/29/2021 | 1,016 |
| 4 | Pharmacy Services | Health Services | 7/29/2019 | NPM editing to ensure consistency with Medication Assisted Treatment Program: Psychology Services | 7/19/2021 | 823 |
| 5 | First Step Act of 2018–Recidivism Risk Assessment* | Information, Policy, and Public Affairs | 8/30/2019 | Draft provided to union | 2/14/2021 | 791 |
| 6 | Sentence Computation Manual (CCCA of 1984) | Correctional Programs | 9/19/2019 | Draft returned to OPI for further edits | 10/1/2021 | 771 |
| 7 | Medication Assisted Treatment Program: Psychology Services | Reentry Services | 10/18/2019 | NPM editing to ensure consistency with Pharmacy Services | N/A | 742 |
| 8 | First Step Act of 2018–Time Credits | Correctional Programs | 12/6/2019 | Notice to reopen comment period on draft rule to Federal Register (applicability to DC Code Offenders) | 10/18/2021 | 693 |
| 9 | Community Based Programs, Utilization and Transfer Procedures | Reentry Services | 2/27/2020 | Awaiting DOJ CARES Act Decisions | N/A | 610 |
| 10 | Work Programs for Inmates | Federal Prison Industries | Not yet received | Awaiting finalization of draft rules | N/A | N/A |
| 11 | Inmate Work and Performance Pay | Correctional Programs | Not yet received | Evaluating whether FSA Section 605 applies to non-Federal Prison Industry jobs | N/A | N/A |

Note: "N/A" means that the BOP did not provide us with any information under the requested fields, thus indicating that the policy has either (1) not been provided to the NPM or (2) has not completed any policy development steps since receipt by the NPM.

\* In response to a draft of this memorandum, the BOP stated that its system for automating recidivism risk assessments has been completed and it has determined that the First Step Act of 2018–Recidivism Risk Assessment policy (No. 5, above) is no longer needed. Rather, the NPM stated that the Unit Management Manual and Inmate Program Review policies, which will incorporate PATTERN guidance, will be sufficient.

Source: OIG analysis of BOP information

In its written response to this memorandum, the BOP reported that there were seven additional FSA-related policies that are pending negotiations with the national union. These policies include the following: (1) Parenting, Children, and Families, (2) Female Integrated Treatment Program, (3) Management of Inmate

F     092

Veterans, (4) Management of Aging Offenders, (5) Secure Mental Health Units, (6) First Step Act Incentives Procedures Under the Cares Act Covered Period, and (7) Release Orientation Program.

### ·FSA Time Credits

The FSA provides that BOP inmates who "successfully complete [EBRR programs] or productive activities, shall earn time credits."[15] Since January 15, 2020, federal inmates have been able to earn time credits under the FSA (see the text box). However, we found that the BOP has not applied such statutorily earned time credits to any of the approximately 60,000 eligible inmates who may have completed EBRR programs or productive activities.[16] We are concerned that the delay in applying earned time credits may negatively affect inmates who have earned a reduction in their sentence or an earlier placement in the community.

### DOJ Announcement on FSA Time Credits

On January 15, 2020, the Department announced several significant developments concerning its implementation of the FSA. In the Department's press release, then Attorney General William P. Barr declared that, "beginning today, inmates will have even greater incentive to participate in evidence-based programs that prepare them for productive lives after incarceration." Among other developments, the Department announced that, "as of [January] 15, 2020, inmates will be assigned to participate in [EBRR programs and productive activities] based on an initial needs assessment conducted by BOP. Participation and completion of those assigned programs and activities can lead to placement in pre-release custody or a 12-month sentence reduction under the [FSA]."

Source: DOJ press release announcing enhancements to the risk assessment system and FSA updates

BOP officials told the OIG that the BOP has not applied time credits to inmate sentences as directed under the law because:

(1) a rule that would codify the BOP's procedures for time credits has not been finalized, and

(2) the BOP must complete policy negotiations on its time credits policy with the national union (No. 8 in Table 1, above).

The BOP stated that the time credits policy must be negotiated with the national union because it would create changes to conditions of employment, including determinations and application of earned time credits for inmates, for Unit Team staff working in BOP institutions who are bargaining unit employees.

In December 2020, the Office of the Attorney General (OAG) released its annual report to Congress summarizing the activities and accomplishments of the Department in implementing the FSA.[17] The report acknowledged that the BOP had not applied earned time credits to inmate sentences and stated that the BOP "[did] not believe that anyone ha[d] been negatively impacted...because of the dramatic expansion of inmate community placements in 2020 pursuant to the [Coronavirus Aid, Relief, and Economic Security (CARES)] Act [of 2020]."[18]

---

[15] 18 U.S.C. § 3632(d). However, inmates are ineligible to receive time credits if they are serving a sentence for a conviction under certain provisions of law. For more information, see 18 U.S.C. § 3632(d)(4)(D).

[16] As of March 30, 2021, BOP data indicates that nearly half (60,146 out of 123,186) of all inmates in BOP custody are eligible for time credits if they have completed EBRR programs or productive activities.

[17] See OAG, *The Attorney General's First Step Act Section 3634 Annual Report* (December 2020), www.bop.gov/inmates/fsa/docs/20201221_fsa_section_3634_report.pdf (accessed November 10, 2021).

[18] See OAG, *First Step Act Section 3634 Annual Report*, 40. The report does not mention an August 2020 decision from the U.S. District Court for New Jersey, which ruled in favor of a federal inmate who sued the BOP for failing to apply his earned time credits after he had participated in EBRR programs. After the court-ordered application of 120 days of earned time credits, the inmate was transferred into the community for the duration of his sentence and was subsequently released from BOP custody in January 2021. See *Aryeh Goodman v. David Ortiz, in His Capacity as Warden of Federal Correctional Institution Fort Dix* (Case 1:20-cv-07582-RMB, Aug. 25, 2020), www.casetext.com/case/goodman-v-ortiz (accessed November 10, 2021). In addition, in response to a draft of this memorandum, the BOP reported that the delivery of EBRR programs and productive activities to inmates has been "severely impacted" by the pandemic. As we note above, inmates must participate in EBRR programs and productive activities to earn time credits.

F    093

However, in our review of minimum and low risk inmates in BOP facilities in March 2021 alone, we identified 50 such inmates who do not appear to have benefited from their participation in FSA programming. These 50 inmates had earned, on average, 31 days of time credits and were all projected to be released from BOP custody within the following 6 months. Yet, as of March 27, 2021, none of these inmates had been transferred to community placement despite each of them having completed at least 240 hours of EBRR programs and productive activities. It therefore appears that these inmates have not benefited from their participation in EBRR programs and productive activities due in part to the delay in applying earned time credits.

In August 2021, the BOP told us that the FSA contemplates a phased-in approach to time credit implementation and requires that all inmates be assigned to programming based on their assessments no later than January 15, 2022. As a result, the BOP stated that "implementation of time credits is fully permissible as a phased approach." While we agree that the FSA affords the BOP a 2-year phase-in period to provide all inmates with EBRR programs and productive activities, we also note that the phase-in statute makes no reference to delaying the use of incentives and rewards, including time credits. Instead, the statute states that by January 15, 2020, the BOP "may offer to prisoners who successfully participate in such programs and activities [with] incentives and rewards."[19]

We recognize that the rulemaking process has also delayed the BOP's application of time credits, and BOP officials notified us that a draft rule could soon be finalized.[20] Yet, at the time of our fieldwork, there was still no timetable for when formal union policy negotiations would resume. As noted above, in its written response to this memorandum (attached as Appendix 1), the BOP reported that it will be commencing JPC meetings with the national union in November 2021 to discuss policies and that it intends to resume formal negotiations in December 2021, although we were not provided with a specific date for resumption of formal policy negotiations.[21] Considering that the BOP and the national union were negotiating the time credits policy prior to the suspension of policy negotiations, we are concerned that the lack of formal policy negotiations may further delay the BOP's application of earned time credits to inmates who were eligible to earn them following the Department's January 2020 announcement, as well as its ability to comply with the FSA's upcoming January 2022 deadline for applying earned time credits to inmate sentences, even if a new formal rule is issued. In response to a draft of this memorandum, the BOP stated that it would apply earned time credits to inmate sentences as soon as the draft rule is finalized and prior to completion of negotiations on the time credits policy to comply with the FSA.

Finally, on January 15, 2021, the Office of Legal Counsel (OLC) issued a legal opinion that increases the urgency for the BOP to issue a policy regarding earned time credits. The OLC opinion stated that the CARES

---

[19] See 18 U.S.C. §§ 3621(h)(2)–(h)(4). While the *Goodman v. Ortiz* decision referenced in footnote 18 required application of FSA earned time credits, other courts have concluded that the BOP is not obligated to apply earned time credits to inmate sentences before January 15, 2022, the end of the phase-in period. See, for example, *Charles Llewlyn v. Tracy Johns*, Case 5:20-cv-77, Jan. 5, 2021, www.casetext.com/case/llewlyn-v-johns; *Jacqueline D. Kennedy-Robey v. Warden, Federal Correctional Institution Pekin*, Case 20-cv-1371, Mar. 2, 2021 www.casetext.com/case/kennedy-robey-v-warden-fci-pekin; and *Michael D. Cohen v. United States of America, Michael Carvajal, Director of the Federal BOP*, Case 20-cv-10833, Apr. 20, 2021, www.casetext.com/case/cohen-v-united-states-99 (all accessed November 10, 2021). Nevertheless, even in those rulings, the courts have reflected that the BOP has the statutory authority to apply such credits sooner.

[20] The draft rule was published in the Federal Register on November 25, 2020, and was open for public comment until January 25, 2021. In late March 2021, the BOP revised the draft rule to align with the views of the new administration and then submitted it to the Department's Office of Legal Policy (OLP) on May 4, 2021. When OLP finishes its review, the rule will be submitted to the Office of the Deputy Attorney General (ODAG) for review before being submitted to OMB for final review and approval. On September 1, 2021, ODAG officials told us that the draft rule was still under Department review.

[21] In contrast to formal policy negotiations, JPCs allow for BOP officials to jointly revise policies with union representatives as one of its initial policy development steps. During the Obama administration, the JPC structure was used to facilitate a higher volume of published policies than formal policy negotiations.

F    094

Act authorized the BOP Director to expand the use of home confinement only during the Act's covered emergency period (i.e., for the duration of the period during which the Attorney General finds that the emergency conditions of the pandemic materially affect the BOP's functioning).[22]  According to the OLC opinion, should that period end or should the Attorney General revoke this finding, the BOP would be required to recall inmates placed in home confinement to correctional facilities unless they are otherwise eligible for home confinement under 18 U.S.C. § 3624(c)(2).[23]  As of July 29, 2021, the BOP had 7,315 inmates in home confinement and approximately 2,754 of those inmates would not be eligible for home confinement under 18 U.S.C. § 3624(c)(2).[24]  Thus, if the covered emergency period were to end without any Department action to address the conclusions of the OLC opinion, these inmates would be returned to BOP institutions, without any consideration of whether time credits earned before pre-release custody placement would make them eligible to remain in home confinement, in part because the BOP has not finalized a policy to administer earned time credits.[25]

Additional Incentives and Rewards

At the time our fieldwork ended, in May 2021, we also found that, contrary to the FSA, the BOP had not used any incentives and rewards for inmates who participated in and completed EBRR programs because the First Step Act Program Incentives policy had not been finalized.  The FSA requires the BOP to use incentives and rewards for inmates to participate in EBRR programs, including the following:

- additional phone privileges and, if available, video conferencing privileges of up to 30 minutes a day and up to 510 minutes a month;

- additional time for visitation at the prison, as determined by the Warden of the prison;

- transfer to a facility closer to the inmate's release residence, subject to the availability of bed space, the inmate's security designation, and the recommendation from the Warden of the facility at which the inmate is incarcerated at the time of making the request; and

- additional incentives and rewards, as determined by the BOP, to include not fewer than two of the following:  (1) increased commissary spending limits and product offerings, (2) greater email access, and (3) consideration for transfer to preferred housing units.[26]

---

[22]  See DOJ OLC, Home Confinement of Federal Prisoners After the COVID-19 Emergency, January 15, 2021, www.justice.gov/olc/file/ 1355886/download (accessed November 10, 2021), 1.

[23]  18 U.S.C. § 3624(c)(2) authorizes the BOP to place an inmate in home confinement for the shorter of 10 percent of the term of imprisonment of that inmate or 6 months.

In July 2021, news organizations reported that the Biden administration concurred with OLC's opinion that certain inmates must be returned to their institutions once the official pandemic state of emergency ends.  See The New York Times, "Biden Legal Team Decides Inmates Must Return to Prison After Covid Emergency," July 19, 2021, www.nytimes.com/2021/07/19/us/politics/biden-prisoners-covid.html (accessed November 10, 2021).

[24]  In discussions with BOP officials about this memorandum, the BOP stated that it refers inmates to pre-release custody within 18 months of their projected release date, which the BOP said made it unlikely that an inmate with less than 18 months remaining in his or her sentence would be returned to custody.  However, upon further OIG inquiry, the BOP was unable to provide a more detailed explanation of what would happen to the approximately 2,754 inmates placed in home confinement who could not remain in home confinement under 18 U.S.C. § 3624(c)(2) upon conclusion of the emergency period.

[25]  During recent congressional testimony, Attorney General Merrick Garland stated that the Department was reviewing the OLC opinion and its authorities to see if it can keep these inmates in home confinement once the covered emergency period ends.  Merrick Garland, U.S. Attorney General, before the Committee on the Judiciary, U.S. Senate, concerning "Oversight of the Department of Justice" (October 27, 2021), www.judiciary.senate.gov/meetings/10/20/2021/oversight-of-the-department-of-justice (accessed November 10, 2021).

[26]  18 U.S.C. § 3632(d).

F   005

With publication of the First Step Act Program Incentives policy on July 14, 2021, the BOP reported that, with the exception of FSA time credits, institution staff are now authorized to offer incentives and rewards. However, the BOP has not provided the OIG with any documentation demonstrating that institution staff have started to use incentives and rewards to encourage inmate participation in EBRR programs and productive activities as called for under the FSA. In August 2021, the BOP reported that it is working to develop an automated program that will track the use of incentives and rewards.

### Closure of OIG Recommendations

In addition to meeting its FSA obligations, the BOP has an ongoing duty to honor its commitment to implement corrective actions in response to recommendations in seven OIG reports that have found serious deficiencies in BOP programs and policies.[27] While the BOP has historically faced longstanding challenges updating its policies to timely resolve such matters, we are concerned that the lack of formal negotiations for 20 months has unnecessarily exacerbated these challenges and significantly delayed needed actions.[28] We are particularly concerned with the BOP's lack of progress in implementing 27 policy-related recommendations that the OIG has made in seven reports since 2015. Those 27 recommendations have remained open for an average of 3 years. See Table 2 below for more information.

### Table 2

### Open OIG Policy Recommendations to the BOP, as of November 3, 2021

| OIG Review | No. of Open Policy Recs | No. of Months Recs Open |
|---|---|---|
| *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015) | 3 | 78 |
| *The Federal Bureau of Prisons' Contraband Interdiction Efforts* (June 2016) | 4 | 64 |
| *The Federal Bureau of Prisons' Release Preparation Program* (August 2016) | 2 | 62 |

---

[27] For instance, the OIG's June 2016 report examining the smuggling of contraband into BOP institutions found significant deficiencies in the BOP's ability to interdict contraband introductions, thus compromising the safety and security of staff, visitors, and inmates. Four of the recommendations the OIG made concerned needed revisions to the BOP's policy on searching staff and their belongings to better deter staff contraband introductions: (1) develop uniform criteria for conducting random pat searches of staff, (2) define the quantity of tobacco staff may bring into institutions for personal use, (3) restrict the size and content of personal property staff may bring into institutions, and (4) establish guidelines for documenting and confiscating items discovered during staff screening. See DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts*, Evaluation and Inspections (E&I) Report 16-05 (June 2016), www.oig.justice.gov/reports/review-federal-bureau-prisons-contraband-interdiction-efforts.

Also, in July 2017 the OIG issued a report assessing the BOP's use of restrictive housing for inmates with mental illness, which found that BOP policies did not adequately address the confinement of inmates with mental illness in restrictive housing. As a result, inmates, including those with mental illness, could spend years and even decades in restrictive housing. The OIG issued four policy-related recommendations to the BOP to address the report's findings, including that the BOP establish in policy the circumstances that warrant the placement of inmates in single-cell confinement while maintaining institutional and inmate safety and security and ensuring appropriate, meaningful human contact and out-of-cell opportunities to mitigate mental health concerns. See DOJ OIG, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, E&I Report 17-05 (July 2017), www.oig.justice.gov/reports/review-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness.

[28] While the BOP's policy challenges have worsened since 2017, this issue has periodically emerged over the past 2 decades. For instance, a September 2010 DOJ OIG audit reported a backlog of 50 policies awaiting national union negotiations and resulting in an "inordinate amount of time" for the BOP to implement policy changes requiring negotiations. Additionally, the report notes that, while the BOP drafted revisions to its furlough policy in 2003, the policy was still awaiting negotiations with its national union in 2010, over 7 years later. In response, the OIG recommended that the BOP develop a more effective mechanism for coordinating with its national union on required policy changes. DOJ OIG, *Audit of the Federal Bureau of Prisons' Furlough Program*, Audit Report 10-44 (September 2010), www.oig.justice.gov/reports/audit-federal-bureau-prisons-furlough-program.

F    096

## Table 2 (Continued)

| | | |
|---|---|---|
| *The Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness* (July 2017) | 4 | 52 |
| *Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates* (September 2019) | 4 | 25 |
| *The Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization* (March 2020) | 4 | 19 |
| *The Federal Bureau of Prisons' Perimeter Security Strategy and Efforts Related to the Contract Awarded to DeTekion Security Systems, Incorporated, to Update the Lethal/Non-Lethal Fence at Nine United States Penitentiaries* (September 2020) | 6 | 13 |
| **Total Open Recommendations Awaiting BOP Policy Finalization** | 27 | 36 (avg.) |

Source: OIG analysis of BOP status reports on open recommendations

## Conclusion

The OIG has determined that aspects of the BOP's implementation of the FSA have been delayed in part because the BOP has not conducted any formal policy negotiations with its national union in 20 months. The suspension of formal policy negotiations has also exacerbated yearslong delays in the BOP's implementation of 27 policy-related OIG recommendations that address important correctional issues.

## Recommendations

The OIG recommends that the BOP take the following actions to address the concerns identified in this memorandum:

1. Develop and implement a plan to immediately resume in-person policy negotiations with the national union.

2. Describe how the BOP will prioritize all policies pending negotiation with the national union, including those related to the FIRST STEP Act, and effectively reduce the backlog of policies slated to be negotiated.

Please advise the OIG within 30 days of the date of this memorandum on the actions the BOP has taken to address this issue. If you have any questions or would like to discuss this information and our concerns, please contact me at (202) 514-3435 or René Rocque Lee, Assistant Inspector General for Evaluation and Inspections, at (202) 616-4620.

cc:    Tamarra Matthews-Johnson
       Counsel to the Attorney General, Office of the Attorney General

       Bradley Weinsheimer
       Associate Deputy Attorney General, Office of the Deputy Attorney General

       Eric Nguyen
       Senior Counsel to the Deputy Attorney General, Office of the Deputy Attorney General

       Gene Beasley
       Deputy Director, Federal Bureau of Prisons

       Zachary J. Kelton
       Associate Director and Chief of Staff, Federal Bureau of Prisons

10

F  097

Louis Milusnic
Assistant Director, Program Review Division, Federal Bureau of Prisons

Angela Owens
Senior Deputy Assistant Director, Program Review Division, Federal Bureau of Prisons

Christopher Rivers
Administrator, External Auditing Branch, Program Review Division, Federal Bureau of Prisons

Laura Fesler
Chief, External Audits, Planning and Analysis Section, External Auditing Branch, Program Review Division, Federal Bureau of Prisons

Louise M. Duhamel, Ph.D.
Assistant Director, Internal Review and Evaluation Office, Justice Management Division

F  098

# Appendix 1: The BOP's Response



U.S. Department of Justice

Federal Bureau of Prisons

_Office of the Director_

Washington, D.C. 20534

November 3, 2021

MEMORANDUM FOR RENE ROCQUE LEE
                ASSISTANT INSPECTOR GENERAL
                EVALUATION AND INSPECTIONS

FROM:           M.D. Carvajal
                Director

SUBJECT:        Response to the Office of Inspector General's (OIG)
                Formal Draft of a Management Advisory Memorandum:
                Impact of the Failure to Conduct Formal Policy
                Negotiations on the Federal Bureau of Prisons'
                Implementation of the First Step Act and Closure of
                OIG Recommendations (A-2020-003-A)

The Bureau of Prisons (BOP) appreciates the opportunity to provide a formal response to the Office of the Inspector General's above-referenced Management Advisory Memorandum. The BOP has completed our review of the Memorandum and provides our comments with regard to both recommendations:

The BOP reiterates that our decision-making regarding meeting virtually with the Union to conduct policy negotiations during the COVID-19 pandemic was consistent with directives from the both the CDC and OMB to not only mitigate disease transmission but to prevent infection. In addition to CDC and OMB guidance, on February 16, 2021, the Department of Justice (DOJ) issued its _2021 DOJ COVID-19 Workforce Safety Plan_ which stated only "_mission-critical travel in support of Primary Mission Essential Functions or Mission Essential Functions is permissible._" Further, the _Plan_ also states that "_[I]n-person meetings should be avoided wherever possible . . . and when they must be held, they shall be limited to fewer than ten individuals . . ._" Because BOP's policy ground rules permit the Union ten representatives, this Department guidance would have resulted in

F   099