ATTACHMENT 3

U.S. Department of Justice

Office of the Attorney General

# First Step Act
# Annual Report

# April 2022



# Table of Contents

Introduction ........................................................................................................... 1

Executive Summary ............................................................................................... 1

I.    A Summary of the Department's Activities and Efforts in Carrying Out the First Step Act ... 5

II.   An Assessment of Bureau of Prisons' Implementation of the Risk and Needs Assessment System and Compliance with 18 U.S.C. § 3621(h) ........................................ 8

   A.    Implementation and Validation of Risk and Needs Assessment Tools ........................... 8

      1.    Implementation of the Risk Assessment Tool (PATTERN) and Revalidation Efforts .... 8

      2.    Implementation of the Needs Assessment Tool  (SPARC-13) and Revalidation Efforts ........................................................................................18

   B. Implementation of the Risk and Needs Assessment System Through Scoring, Referral to Programs and Ongoing Engagement, and Time Credits ........................25

      1.    PATTERN Risk Assessments .................................................................25

      2.    Time Credits Eligibility by PATTERN Classification ...............................26

      3.    Referral to Programs, Tracking Participation, Ongoing Engagement ........................27

      4.    Time Credits Rule ....................................................................................27

      5.    Good Conduct Time (GCT) Rule/Changes ...........................................29

      6.    FSA Audit Activities ................................................................................30

III.  A Summary and Assessment of the Types and Effectiveness of the Evidence-Based Recidivism Reduction (EBRR) Programs and Productive Activities (PAs) in Prisons Operated by the Bureau of Prisons ...............................................................32

   A.    Approved EBRR Programs and Activities ...............................................32

   B.    FSA Program Participation ......................................................................33

   C.    FSA Program Capacities ..........................................................................35

   D.    FSA Program Evaluations ........................................................................35

   E.    Partnerships with Volunteers ....................................................................36

   F.    BOP's Additional FSA Implementation Activities ....................................39

      1.    BOP Efforts to Assist with Identification ..............................................39

      2.    Transfers Closer to Home ......................................................................40

      3.    Elderly and Terminally Ill Pilot Program ................................................41

      4.    Home Confinement ..................................................................................41

      5.    Drug Treatment ........................................................................................45

6. FSA Staffing Resources ..................................................................................46

7. Retroactive Application of the FSA to Crack-Cocaine Offenders ...............................48

8. Compassionate Release ..................................................................................50

IV. The Rates of Recidivism Among Individuals Who Have Been Released from Federal Prisons..................................................................................................53

Recidivism Data Tables.......................................................................................54

V. The Status of Prison Work Programs at Facilities Operated by the Bureau of Prisons........57

VI. The Operational Policies and Guidance Issued ..................................................60

VII. An Assessment of Progress Made Towards Carrying Out the Purposes of the FSA, Including Any Savings..................................................................................63

VIII. An Assessment of Budgetary Savings ................................................................65

IX. Statistics on Inmates with Dyslexia ..................................................................66

## B. Implementation of the Risk and Needs Assessment System Through Scoring, Referral to Programs and Ongoing Engagement, and Time Credits

As described above, over the past year, the Department has undertaken numerous efforts to improve and automate both the risk assessment tool and the needs assessment tool used by the BOP to carry out the First Step Act, and it is continuing to engage in efforts to revalidate each tool through external expert reviews. At the same time that it has worked to improve the tools, the Department has worked to implement the Risk and Needs Assessment System as mandated by the First Step Act, by ensuring that every inmate has both an initial and periodically updated PATTERN scores, ensuring that every inmate is referred to programs after his or her needs are assessed, and ensuring that every inmate's participation in those programs is systematically tracked so that inmates can earn and apply time credits in accordance with the final Time Credits rule. The Department's implementation of the FSA in these ways may be further understood by a review of various statistical measures described below.

### 1. PATTERN Risk Assessments

The tables below provide an overview of inmate PATTERN risk levels across the BOP population since publication of the last annual Report using the version of the tool (1.2-R) and the cut points currently in effect at the BOP. By approximately May 7, 2022, the BOP will shift to using PATTERN 1.3 and the revised cut points for the general tool set forth above. Below, data is provided that shows simulated PATTERN scores for inmates on both September 26, 2020 (the end of the reporting period for the 2020 annual Report) and January 2022, using PATTERN 1.2-R and the general tool across the entire BOP population, for both males and females. After the BOP shifts to PATTERN 1.3 and the revised cut points, it will release an addendum to this Report or publish information on its website that updates the information below.

PATTERN Overall Risk Levels, as simulated* on September 26, 2020
(using tool PATTERN 1.2-R)

| Recidivism Risk Level | Frequency | Percent |
|---|---|---|
| Minimum | 21,783 | 15.93 |
| Low | 43,363 | 31.72 |
| Medium | 26,114 | 19.10 |
| High | 45,444 | 33.24 |
| Total | 136,704 | 99.99 |

*Simulated risk levels using the corrected PATTERN 1.2-R tool as released in February 2021.

PATTERN Overall Risk Levels, as assessed on January 29, 2022 (using tool PATTERN 1.2-R)

| Recidivism Risk Level | Frequency | Percent |
|---|---|---|
| Minimum | 18,134 | 13.58 |
| Low | 40,468 | 30.30 |
| Medium | 26,928 | 20.16 |
| High | 48,020 | 35.96 |
| Total | 133,550 | 100 |

25

PATTERN classification levels had been determined but not yet their TC eligibility because the inmates had not yet been in BOP custody for 28 days, as of January 31, 2022.

### 3. Referral to Programs, Tracking Participation, Ongoing Engagement

The Department is committed to offering programming with definable, measurable outcomes that will reduce offender risk and subsequent recidivism as well as address other critical reentry needs. Prior to the passage of the FSA, the BOP offered a wide range of programming to inmates. Under the FSA, the BOP has greatly expanded programs both in the agency's capacity to offer them to a larger number of inmates, and in the variety in the types of programs offered. Along with this growth, the BOP has improved both tracking of inmate participation and program referral processes.

As noted above, inmates complete a series of questionnaires upon arrival to a designated BOP facility as part of the needs assessment process. Within 28 days of arrival, inmates meet with their Unit Management Team to discuss the results of both the risk and needs assessments. This process repeats approximately every six months until the final stages of incarceration, when contact with the unit team increases prior to release.

During the meetings between inmates and their unit team, the BOP updates the PATTERN scores and SPARC-13 findings for the inmates, and staff members recommend specific programs for the individual inmates based on the needs identified. Every need maps onto and is intended to be addressed by one or more recommended programs. Additionally, the unit team works with each inmate to prioritize the order in which the inmate will participate in the programs. While some programs are staged to be offered at particular points in the service of sentence, the inmate may have a pressing need addressed by one particular program that should be prioritized. For example, an inmate with a history of being abused would initially be assigned to, and likely take, a trauma treatment program to alleviate symptoms, which would later help the inmate obtain maximum benefits from a work program. Participation in all programs remains voluntary, and after discussing options with their unit team, inmates sign up to participate in their chosen programs. This process is also an important part of promoting increased self-sufficiency and decision-making abilities that encourages healthy reentry.

As part of FSA implementation in January 2020, the BOP assigned a unique identifier to each program. When an inmate signs up for and successfully participates in or completes a program, the staff delivering the program update and load that information into BOP systems. Information is automated to be shared between the BOP's primary inmate management systems. This integration ensures appropriate monitoring and tracking of inmate participation to better inform BOP staff where operational gaps exist and improvements can be made.

### 4. Time Credits Rule

In recognition of the value of evidence-based recidivism programming, FSA directs that except for those who are deemed ineligible under the Act, inmates shall receive TC for successful completion of EBRR programs and PAs. A "prisoner," as defined by the FSA, "means a person sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons." 18 U.S.C. § 3635(4). The FSA also provides that a prisoner who successfully completes an EBRR program or PA assigned based on the

inmate's risk and needs assessment and is determined to be eligible under the criteria set forth in 18 U.S.C. § 3632 (*see* footnote 36) shall earn TC that may be applied toward prerelease custody (i.e., transfer to a Residential Reentry Center or home confinement for service of a portion of the inmate's sentence) or supervised release (i.e., early satisfaction of the inmate's term of imprisonment).

On November 25, 2020, the BOP published a proposed rule on TC in the Federal Register. The proposed rule would amend 28 C.F.R. part 523 to establish the procedures for the earning, awarding, loss, and restoration of TC. Among other things, that proposed rule established an eight-hour accrual system and proposed that TC would be awarded as of January 25, 2020, the date by which an initial risk and needs assessment was conducted for all inmates. The BOP received approximately 250 comments from the public, including stakeholders and members of Congress. Many of the comments scrutinized the rigidity of the eight-hour accrual method, and encouraged an approach that would instead turn on an inmate's compliance with the requirements of any given program, and thereby result in the greatest number of inmates earning the largest amount of TC. Many comments also argued that TC should be awarded back to the date of enactment of the First Step Act, on December 21, 2018. The Department appreciated the thoughtful responses to the proposed rule.

On October 18, 2021, the BOP published a Notice to reopen the comment period for additional 30 days to request further public comment only on the issue of whether District of Columbia Code offenders in BOP custody are eligible for TC under 18 U.S.C. § 3632(d)(4). The proposed rule clearly excluded D.C. Code offenders from eligibility for TC, and no commenter specifically addressed the exclusion of D.C. Code offenders during the initial comment period. Nevertheless, the BOP recognized that the FSA is ambiguous as to whether D.C. Code offenders are eligible to earn and apply TC, and that commenters during the initial notice-and-comment period may not have fully considered this issue. The new comment period gave the public the opportunity to offer considerations that could help inform BOP's resolution of the legal ambiguity in the FSA. The comment period for the Notice opened on October 18, 2021, and closed on November 17, 2021.

As a result of the feedback received during the public comment period, the BOP made several significant changes to the rule. The final rule eliminates the definition of a day as an 8-hour period, and instead defines a day as a calendar day, allowing eligible inmates to earn 10 to 15 days of time credits for every 30 days of successful participation in EBRR programs and PAs. In addition, subject to BOP's determination of eligibility, inmates will be awarded time credits retroactively to December 21, 2018, the date of enactment of the First Step Act. The rule also explains the circumstances under which an inmate may forfeit time credits, reduces the amount of credits that may be forfeited for any given act, and shortens the period of time over which forfeited credits may be restored. Collectively, these provisions will ensure the broadest possible eligibility and application of time credits.

Concerning D.C. Code offenders, the final rule defers to the D.C. Council, which is considering legislation on a range of criminal justice measures, including legislation that would facilitate re-entry and adjust the length and terms of sentences. While the D.C. Council reaches its decision, D.C. Code offenders in BOP custody remain ineligible to receive time credits. If the D.C. Council

28

declines to act, the BOP will review this matter and determine whether additional rulemaking is warranted.

On January 13, 2022, the Department announced the final rule and the BOP began implementing the Time Credits program. The final rule officially published in the *Federal Register* on January 19, 2022.[37] Implementation began with immediate releases for inmates who, as of the retroactive date of applicability, had earned time credits in an amount that exceeded their days remaining to serve, who were less than 12 months from release, and who had a supervised release term as part of their sentences, such that they could be moved directly to supervised release. As of April 5, 2022, more than 6,100 inmates have been released from Residential Reentry Centers (RRCs), home confinement, and secure facilities. An estimated 3,155 inmates have been placed in an RRC or home confinement and have a projected release method based on earned time credits. Implementation will continue to occur on a rolling basis in the months ahead, as the BOP continues to calculate and apply time credits for all eligible incarcerated individuals in accordance with the published rule and updated PATTERN 1.3.

## 5. Good Conduct Time (GCT) Rule/Changes

Under the FSA, qualifying inmates earn up to 54 days of GCT credit for each year of sentence imposed by the court, instead of for each year of sentence actually served, with GCT credit for the last year of the inmate's imprisonment term to be issued on "the first day of the last year of the term of imprisonment." 18 U.S.C. § 3624(b). As stated in the initial FSA Annual Report, prior to the FSA, qualifying inmates earned up to 54 days of good conduct time (GCT) credit for each year served and, in accordance with the pre-FSA language of 18 U.S.C. § 3624(b), the BOP prorated the amount of GCT credit earned for the final year of sentence served. On July 19, 2019, the BOP began applying the new GCT calculation under the FSA, resulting in immediate release of 3,163 inmates from BOP custody.

On December 31, 2019, the BOP published in the Federal Register a proposed rule explaining this change to GCT calculation. The proposed rule also presented three alternatives for calculating GCT under the FSA for the "last year of a term of imprisonment," 18 U.S.C. § 3624(b), and explained the BOP's preference for the third alternative, which would award prorated credit for any portion of the final year of the sentence imposed. The BOP explained that this alternative was the most consistent with congressional intent as expressed in the text of the FSA. The BOP also explained that this proration alternative was the most reasonable and logical option that treats all eligible inmates equitably. The BOP received 74 comments, most of which urged adoption of the second alternative, under which the BOP would award a full 54 days of GCT credit for any partial final year of the sentence imposed, regardless of the length of the partial final year. In the proposed rule, the BOP had explained that the second alternative – which treats an inmate with one day remaining in the final year of the imposed sentence identically with another inmate with 365 days remaining in the final year by awarding 54 days of

---

[37] See FSA Time Credits Rule, https://www.federalregister.gov/documents/2022/01/19/2022-00918/fsa-time-credits.

## III.   A Summary and Assessment of the Types and Effectiveness of the Evidence-Based Recidivism Reduction (EBRR) Programs and Productive Activities (PAs) in Prisons Operated by the Bureau of Prisons

### A. Approved EBRR Programs and Activities

The Department is pleased to report that the addition of professional program delivery staff and some specialized new programs have led to expanded programming capacity since the last Report. Additionally, the BOP has established clear procedures for adopting new programming. The BOP's research consultant reviews external proposals for new programming.[40] Proposals for programs by internal BOP staff are submitted to the BOP's Reentry Services Division (RSD) with supporting materials that include, at a minimum, a facilitator's guide, complete curriculum, supporting research, and any handouts that would be provided to inmates. All internal program proposals are evaluated for evidence of recidivism reduction – i.e., whether the program meets or fails to meet the FSA's requirement that an EBRR program "has been shown by empirical evidence to reduce recidivism" or "is likely to be effective in reducing recidivism." 18 U.S.C. § 3635(3). Once the program is reviewed, RSD evaluates whether the program meets or fails to meet the EBRR program criteria. RSD ultimately determines whether a program will be approved as an EBRR program for use within the BOP.

In January 2020, the BOP created the First Step Act Approved Programs Guide (FSA Programs Guide), in accordance with the FSA requirement that the BOP develop a list of programs meeting the statutory definitions of EBRR programs and PAs. The FSA Programs Guide[41] is a collection of the BOP's robust reentry programs designed to ensure that all sentenced inmates have the skills necessary to succeed upon their return to the community. The programs listed in the guide are standardized across institutions, described in the BOP's national policies, implemented with dedicated resources, and reviewed on a regular basis to ensure program fidelity. The initial guide issued in January 2020 was comprised of 70 EBRR programs and PAs. Since the last Report, stakeholders submitted eleven external submissions, of which the BOP approved four new programs: "7 Habits on the Inside"; "Resilience Support"; "Money Smart for Adults;" and "Aleph Institute." The BOP also added an internally proposed program, "Disabilities

---

[40] The external programs were reviewed for evidence demonstrating effectiveness in reducing recidivism and for use by an established framework, particularly in a correctional setting. Using the information from the independent reviews, the BOP assigned a final evidence rating to each proposal based on program design and outcome standards; after which summaries were created to help determine whether and how the proposed program would be used in BOP institutions. Of the five possible ratings, only the programs rated as "Effective" and "Promising" were considered for adoption and inclusion in the First Step Act Approved Programs Guide.

[41] See BOP, First Step Act Approved Programs Guide, https://www.bop.gov/inmates/fsa/docs/fsa_program_guide_2201.pdf

32

Education Program," as well as more PAs. Altogether, the BOP now has more than 83 EBRR programs and PAs in the FSA Program Guide. All approved programs are designed to build upon individual successes and to address one or more of the BOP's thirteen defined needs. The passage of the Time Credits rule in January 2022 expanded the services which qualify as PAs. Only structured EBRR programs and PAs with a facilitator-led curriculum are listed in the FSA Programs Guide. Other activities (e.g., inmate work assignments) may also be recommended by staff to address individual inmate needs as well as qualify for time credits for eligible offenders.

Because there is such a wide range of programs addressing all thirteen identified criminogenic needs areas, the BOP has focused on building capacity in existing programs. The agency has achieved expansion in significant part through the addition of full-time program delivery staff (see more information in staffing section below). Efforts to continue increasing programming opportunities for inmates in accordance with the FSA, even during the COVID-19 pandemic, remain a priority for the BOP.

While building capacity in existing programs, the BOP is also developing a number of new programs, as noted above and described below in the next section. To further complement those efforts, the BOP has initiated a new contract action to engage outside expertise to review and evaluate state correctional programs to determine their applicability to BOP. As of March 3, 2022, three contracts have been awarded for the study of specific EBRRs, specifically the BRAVE program, the Anger Management Program, and BOP's Drug Abuse Programs.

## B. FSA Program Participation

The BOP's philosophy and strategy for inmate reentry into the community is based on the premise that reentry preparation begins on the first day of an inmate's incarceration. Inmates are encouraged to begin preparing for reintegration into the community when they arrive at their designated facility to serve their sentence and, through the motivating actions of staff, throughout their confinement. Across institutions, the BOP offers a variety of inmate programs to address criminogenic and reentry needs related to education, employment, substance use, and mental health to assist inmates' successful transition back to the community. Specialized treatment programs are offered for special populations including, but not limited to, sex offenders, women, transgender offenders, aging offenders, and individuals with co-existing disorders. The BOP also provides accommodations to people with disabilities to ensure comparable and fulsome access to FSA programs.

Ensuring and expanding inmate participation in EBRR programs and PAs has been challenging during the COVID-19 pandemic. In March 2020, the BOP modified institution operations to ensure the health and safety of inmates, staff, and community members. The resulting social distancing and virus mitigation measures decreased access to programming. At the end of the reporting period for the last Report, full-service delivery had not resumed at all locations. Nonetheless, even under these conditions, since the last Report, and through January 31, 2022, there were 151,669 completions, and on January 31, 2022, there were 76,399 inmates participating in EBRR programs and PAs. The BOP monitors program participation and has recorded a marked increase in participation over the course of FY 2021.

33

facilities to turn over any inmate identification in their possession to the BOP for inclusion in the inmate central file. This new agreement has been memorialized in an MOU pending USMS signature.

## 2. Transfers Closer to Home

Inmates benefit from maintaining ties with their families and communities during their terms of imprisonment. Incarcerating offenders close to home can help promote that connection. Prior to the passage of the FSA, the BOP sought to place inmates within 500 miles of their release residence, as available and appropriate. The BOP calls those "nearer release transfers." The FSA further refined this effort by requiring nearer release transfers, even if the inmate is already within 500 miles of their release residence if another facility is closer.[45]

From October 1, 2020 to January 31, 2022, the BOP conducted 2,829 Nearer Release Transfers. As of January 29, 2022, 78,132 inmates (68 percent of 115,419 inmates in typical institutions with release residences within the continental United States) were placed within 500 miles of their residence. The following table shows inmate distance within legal residence by institutional security level, as of January 29, 2022.

| Facility Security Level | Within 500 Miles of Legal Residence | Greater Than 500 Miles from Legal Residence | Inmate's Legal Residence Unavailable | Total |
|---|---|---|---|---|
| Administrative | 8,969 | 3,616 | 240 | 12,825 |
| High | 8,629 | 9,781 | 209 | 18,619 |
| Medium | 36,347 | 13,819 | 527 | 50,693 |
| Low | 22,041 | 8,091 | 349 | 30,481 |
| Minimum | 2,146 | 619 | 36 | 2,801 |
| Total | 78,132 (68%) | 35,926 (31%) | 1,361 (1%) | 115,419 |

During the COVID-19 pandemic, the BOP canceled all inmate nearer release transfers to mitigate potential disease transmission. This action involved moving a large number of inmates out of BOP Special Housing Units and into private correctional facilities, and temporarily lowering or setting population caps at all BOP low- and minimum-security facilities in order to decrease COVID-19 exposure incidents in facilities where, due to their physical layout, populations are unable to socially distance. With the advent of additional mitigation strategies including vaccinations, the BOP has resumed nearer release transfers, while continuing efforts to evenly disperse the inmate population across its facilities based on security levels. Additionally, the BOP is still using target population caps at minimum- and low-security facilities to mitigate COVID-19 concerns.

---

[45] The BOP considers a variety of factors in designating inmates to specific institutions, including the inmate's security designation, programmatic needs, mental and medical health needs, faith-based needs, and recommendations of the sentencing court. The BOP's decision-making as to designations is not judicially reviewable. *See* 18 U.S.C. § 3621(b).

40

### 3. Elderly and Terminally Ill Pilot Program

The BOP has continued to implement this Second Chance Act program to release to home confinement eligible elderly and terminally ill offenders. Section 603(a) of the FSA reauthorized and modified the Pilot Program for Eligible Elderly Offenders and Terminally Ill Offenders conducted under the Second Chance Act, 34 U.S.C. § 60541. Section 603(a) allows offenders who are over 60 years of age, have served two-thirds of their sentence, are not convicted of a crime of violence, and do not have a history of escape to be placed on home confinement for the remaining portion of their sentence. To meet this standard, the BOP instituted a process in which each institution case manager conducted an initial caseload review for inmates who were 60 years of age or older and met the established criteria. Once inmates were determined to be eligible, they were submitted for placement on home confinement. Case managers are continuing to review their caseload and identify inmates for home confinement once they meet the criteria. Eligible inmates are then processed by Residential Reentry Management staff and, if approved, moved to their home communities on the appropriate date. On October 1, 2020, the time period immediately after the prior Report was published, there were 512 inmates participating in this pilot program. The population fluctuates daily as individuals are released into home confinement or complete their sentences. As of January 29, 2022, there were 191 inmates participating. The BOP has placed approximately 1,179 inmates in this program since April 2019.

### 4. Home Confinement

The BOP is committed to placing inmates in the community commensurate with their needs. Since the last Report, the BOP has dramatically increased home confinement utilization by more than ten-fold. The population thus grew from approximately 3,000 inmates on home confinement at any given time before the COVID-19 pandemic to more than 31,500 inmates, as of January 29, 2022. Increased placements on home confinement have primarily been due to pandemic-related releases under the CARES Act. Specifically, from October 2020 through January 2022, the BOP transferred 4,352 inmates to home confinement pursuant to CARES Act authority, which along with the increased authority given to the BOP by the FSA, has led to inmates being placed in home confinement for longer durations.

ATTACHMENT 4

U.S. Department of Justice
Federal Bureau of Prisons
Washington, DC

## Reentry Services Division

## January 2022

# First Step Act
# Approved Programs Guide



The Federal Bureau of Prisons (Bureau) protects public safety by ensuring federal inmates receive relevant and meaningful reentry programming to support their return to the community as law-abiding citizens. Reentry efforts increase opportunities, reduce recidivism, promote public safety, and reduce institution misconduct. To this end, the Bureau is committed to provide a robust menu of programs to address thirteen need areas for a diverse inmate population, located in 122 institutions of varying security levels across the nation.

E 246

January 2022

# STRUCTURED, CURRICULUM-BASED PRODUCTIVE ACTIVITIES

Productive Activities (PA) include a wide range of activities including work assignments, community service, inmate led-classes, and other unstructured but valuable ways to spend time. This guide only provides information about structured, curriculum-based PAs.

| Productive Activities & Descriptions | Hours | Location(s) | Need(s) Addressed | Program Delivery |
|---|---|---|---|---|
| **A Healthier Me**<br><br>The Healthier Me Program is designed to help incarcerated women build healthy lifestyles by considering what a healthy life means to them and practicing skills for stress management, healthy relationships, physical activity, and mindful eating. | 10 | All female sites | Recreation/Leisure/Fitness | Recreation<br><br>Special Population Program Coordinator<br><br>Unit Team |
| **A Matter of Balance**<br><br>Falling, or fear of falling, can negatively impact older adults by causing them to refrain from enjoyable or therapeutic activities. This program helps to build self-efficacy related to strength and mobility by decreasing fall-related fears. It teaches older inmates to problem-solve and improve their self-esteem. | 16 | All institutions | Recreation/Leisure/Fitness | Health Services<br><br>Recreation |
| **AARP Foundation Finances 50+**<br><br>This program provides financial education and counseling for vulnerable households, particularly adults age 50+. Older adults face unique challenges in financial planning and weak job prospects. This program will assist the older adult in financial goal setting that translates into positive financial behaviors. | 5 | All institutions | Finance/Poverty | Unit Team<br><br>Volunteers |
| **Access**<br><br>This program is designed for incarcerated women who are survivors of domestic violence. It assists women in identifying suitable career options to be economically independent upon reentry. An interactive computer component (which can be printed and used in class) is used to explore career options. Participants also complete testing to determine what career field is best for them. | 10 | All female sites | Cognitions<br>Mental Health<br>Trauma | Special Population Program Coordinator |

E    247

ATTACHMENT 5

State of Tennessee:

County of _W i l s o n_ :

Before me, the undersigned Notary personally appeared John Maxwell, Jr. a person known to me by sight/ID (Circle one), who after I administered an oath, testified on that oath, that the factual statements made herein are within his personal knowledge and are true and correct and subject to penalties of perjury under 28 U.S.C. Section 1746.

John Maxwell further testified as follows:

"My name is John Maxwell, Jr. I am over the age of 18 years of age. I am in all ways competent to make this affidavit. I have personal knowledge of all the facts herein and they are true and correct. I along with my brother, William Maxwell, Register No. 71944-279, were charged in Cause No. 11:740-RBK, United States v. Scarfo, et al; In the District of New Jersey, Honorable Judge Kugler presiding.  Both my brother and I were charged in the same counts. Both my brother and I went to trial. Trial lasted from jury selection in October of 2013 until verdict on July 3, 2014.  Both of us were out on either signature or small bonds for almost three years prior to verdict.  Both my brother and I have the same parents and upbringing and the same family situation growing up.  Both my brother and I have the same court statements or reasons and recommendations from sentencing (with the exception of the recommendation for drug counseling for myself). I am 8 years older than my brother. William suffers and has had moderate to severe asthma all his life.  He has been treated for asthma all his life.

'In April of 2020 I signed my BOP papers, the same as my brother, to transfer to home confinement. On May 1, 2020 I was transferred to home confinement.  In January of 2022, I was placed on supervised release, having been credited with 1 year under the First Step Act.  I remain on supervised release today. The sole difference in my case and my brother's case is that I received a 120 month sentence and he received a 240 month sentence.  All other items, counts, charges, convictions are the same to the best of my knowledge and belief.  We were tried together and attended court together.  Both were out on signature bond and/or small cash bond for almost three years pre-trial.  Neither had any infractions while on pre-trial release.

I was housed by the BOP at FCI-Millington Camp and transferred from there to home confinement on May 1, 2020.

At my brother's multiple pre-trial and post-trial bail hearings the government stipulated to him not being a flight risk or a danger to the community.

Our direct appeal did not get submitted until post oral-argument on July 6, 2021. Oral argument was 2 hours long.

Having reviewed the 18 U.S.C. Section 3621(b)(1)-(5) factors, both myself and my brother have substantively the identical factors and findings by the court and probation department, the same convictions, and the same loss amount.  I actually had 44 points under the U.S.S.G and my brother had 43 points under the U.S.S.G.  I was C.E.O. of a public company and my brother was special counsel for the public company.

The government stipulated multiple times during trial and the court instructed the jury multiple times during trial that no one other than Nick Scarfo and Salvatore Pelullo were alleged to be tied to La Cosa Nostra ("LCN").

Further Affiant Sayeth not.

_June 3, 2022_

**DATE**

John Maxwell, Jr.

Reg. # 43685-177

Notary STAMP

My Commission Expires Aug. 19, 2025

SUBSCRIBED AND SWORN TO

BEFORE ME THE UNDERSIGNED

ME THE UNDERSIGNED NOTARY

Tiffany Wilson

Printed Name