ATTACHMENT 6

## AFFIDAVIT OF WILLIAM MAXWELL

STATE OF TEXAS

COUNTY OF JEFFERSON

The following declaration and affidavit is made on first-hand knowledge, review of documents attached in support of the declaration, review of the Warden's documents attached in support of Justin Thornton's affidavit, review of various public filings of the Bureau of Prisons, review of memoranda sent to inmates by the Bureau of Prisons (published on the Inmate Bulletin Board at FCI-Beaumont-Low and published on the BOP's website), review of emails tendered to the BOP, review of Warden Garrido's response to Counsel (Arkadiy Grinshpun, esq.), memoranda published by Attorney General Barr, multiple declarations of BOP personnel (published in their official capacity), review of the case law, and based on my education, training and expertise. Copies of documents relied upon are listed below, attached hereto and/or contained in the Court's file. The statements herein, of material fact(s), are true and correct, to the best of my knowledge and belief, they are within my areas of expertise and are material to the determinations to be made by the Court in response to the Warden's "Motion to Dismiss (under 12(b)(1) and 12(b)(6)) and Alternatively Motion for Summary Judgment" [PageID## 247-361]. The statements made herein are made pursuant to 28 U.S.C. §1746 and under penalties of perjury.

My name is William Maxwell. I am over the age of 18 and, in all ways, capable of making this declaration. I graduated from Baylor University with a BBA in Mgt/Finance. I additionally

1

studied at University of Houston for post-graduate work in Sociology, along with post-juris doctorate work in American Legal History and English Legal History--studying with Professor Palmer. I obtained my Juris Doctorate from Thurgood Marshall School of Law, graduating with honors.

I participated in hundreds of "administrative trials" before the State Office of Administrative Hearings ("SOAH") in Austin regarding health care providers seeking reimbursement for services provided in the Workers' Compensation system in Texas.

I have represented hundreds of defendants and plaintiffs in civil, criminal, and administrative litigation in Texas. I have extensive trial experience and trial practice.

In 2014, after an 8-month trial (jury selected in October 2013), on July 3, a jury found me guilty for a series of conspiracies all conglomorated under a RICO conspiracy in the United States District Court for New Jersey, although my practice did not involve New Jersey, my activities are alleged to take place in Texas, and I am not licensed in New Jersey. (All white collar, non-violent offense charges.)

I was convicted of offenses (white collar) that are not excluded offenders under the First Step Act. I have been incarcerated continually since that time. I do not have any disciplinary incident reports during my entire time in prison. I have continually been employed either as a cook (No. 1 or 2) at FDC Philadelphia and FCI-Beaumont (September 2014 - April 2016) or as a law clerk at the law library (April 2016 - present). These two productive activities were recommended to me and assigned to me (in addition to extensive legal experience, I have extensive

2

restaurant experience with S&A corporation Water Works, Ltd., etc., post-graduation from Baylor). I have worked either 5 or 6 days per week during my entire time in prison. My work schedule and performance reports reflects above average performance during my entire time in the BOP work cadres. Attached hereto and incorporated herein is the inmate work report provided by staff. During my time working in the BOP, I have assisted 28 inmates to receive sentence reduction or reversals of their convictions based on ineffective assistance of counsel, changes in law, and other legal bases. In addition I have assisted 1000s of inmates in preparation and filing of legal documents related to wills, trusts, family law, civil law, state parole and probation issues, as well as time credit litigation under Barden, Willis, and other matters. All work programs and programming were assigned and recommended by my Counselor or Case Manager.

The BOP does not have appropriate educational or additional training opportunities for individuals with doctoral level degrees.

My brother, who was also convicted in my case, has served his entire sentence, has been released to supervised release (10-year sentence) during the pendency of the direct appeal. Both my brother and I were approved by our Unit Teams for home confinement under the CARES Act, applying the 18 U.S.C. §3621(b) factors and §3624(c) as modified by the CARES Act on or about April 16, 2020. Both my brother, John Maxwell, and I signed our transfer papers on or about April 16, 2020. My brother arrived at home confinement on May 1, 2020, and was released from home confinement to supervised release under the First Step Act on or about January 15, 2022.

3.

After I was approved for transfer to home confinement by my Unit Team in 2020, Acting Associate Warden Cutright improperly, and without authority, in violation of the §3621(b) factor analysis, and in violation of the First Step Act, denied my transfer to home confinement using as a pre-textual basis, the percentage of my sentence served without adjusting for FSA Time Credits). Neither the Warden, the Unit Team, nor any institution staff initially raised any issue with my transfer based on the §3621(b) factors. (They could not because there are none.) However, after I began the administrative remedy process, the BOP sought to obstruct, and did obstruct, the administrative remedy process, seeking continual delays, failing to meet its response deadlines, and fabricating justifications for their actions. For example, the Warden, after initially advising my counsel, Arkadiy Grinshpun, in May 2020, that the sole basis for his denial of transfer to home confinement was the percentage of my sentence served, fabricated that I did not have a qualifying CDC comorbidity factor. The Warden did this in bad faith, as on April 10, 2020, the Warden specifically tendered to me a memorandum that I was at high risk for death or severe illness due to COVID. (See attached Exhibit __13__.) As further evidence of the bad faith, the Warden postulated that my offense included some measure of violence. (See attached Exhibit __14__.) That is blatantly false. My case was solely a white collar offense. This is reflected by the PATTERN Score, created by statute, which measures recidivism rates. (See attached Exhibit __11__.) In both incidents, I have a negative score, far below the lowest score of -0-.

4

Next, the BOP's Regional and Central Offices perpetuated these falsehoods. (See attached Exhibits 16+17.) The United States stipulated at my bail hearing, wherein I sought bail during the pendency of my appeal, that I was neither a flight risk nor a danger to the community. (See attached Exhibit 24.) Further still, at the trial of the matter, the Court specifically instructed the jury that no one other than Scarfo and Pelullo were in any way associated with LCN. (See attached Exhibit 23.) Further still, my brother, who was released to home confinement, has the same convictions as I did. The only difference between my brother and myself was length of sentence. (See Attachment 5.)

Additionally, the white collar offenses of Michael Cohen and Paul Manafort are substantively the same or similar as my white collar offenses. Despite the fact that these two high profile and high economic and status individuals had more than 50% of their sentences to serve. With more than 18 months remaining on their sentence, they nevertheless were transferred to home confinement. I have been treated differently from inmates exactly situated as myself (my brother who was located at a different institution, in a different region) and treated differently than inmates who were more socially advantaged than myself, all in violation of §3621(b). (I was not afforded substantive due process.)

I have repeatedly contacted the Warden regarding the First Step Act, the CARES Act, statutes §3621, and §3624, and 34 U.S.C. §60541, via email as instructed by Unit Team staff, all to no avail, as staff at FCI-Beaumont-Low substantively do not respond to email(s), thereby thwarting the administrative remedy process (informal settlement). (See attached Exhibit 25.)

5

I have been approved by the Southern District of Texas Probation Department for transfer to home confinement, and in all ways qualify for all the relief sought herein, as more particularly noted in the Attachments to the responses. (See Attachments 1-5.) I have been approved for transfer to home confinement by my Unit Team Staff, who, pursuant to BOP policy, is the deciding staff representatives regarding transfers to halfway house and home confinement. (See attached Exhibits 7+12 .)

## DOCUMENTS REVIEWED

In support of the affidavit, I reviewed all of the exhibits attached to this response (Exhibits 1-5). Additionally, I reviewed the following documents currently on file with the Court, referenced below both by title and [ECF#s] [PageID##].

* Document 8: Respondent's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment with Exhibits Attached [PageID## 247-361] (Relevant Excerpts Attached).[1]

* Document 17: Court Order [PageID# 770]

* AFGE – MASTER AGREEMENT (excerpts attached) (Exhibit 9 )

* Pub. L. 115-391 First Step Act

* Pub. L. 116-136 CARES Act (in part)

---

[1] Most of the exhibits attached to Justin Thornton's affidavit, in the nature of administrative remedy forms (BP-8, BP-9, BP-10, BP-11, and attachments to each one) are filed in support of Maxwell's petition and the Government's response (Doc. 8). For ease and clarity--and also for admissibility purposes under Rule 56--Maxwell attaches the BOP's copies of such documents. They are admissible as business records, statements against interest, public records, and other exceptions to the hearsay rules under the F.R.E.

6

* Maxwell's PATTERN Score [PageID# 121] (attached) (Exhibit _____ )

* Bureau of Prisons Director's Memo [PageID## 172-175] (attached) (Exhibit _____ )

* 28 CFR §541.3 (Recommended Parole Reduction)

* Court transcript--Rule 38(b)(2) Hearing [PageID## 177-186] (attached) (Exhibit _____ )

* Declaration of Juan A. Segovia--BOP Warden (attached) (Exhibit _____ )

* Declaration of Susan Giddings--Chief of Unit Management Section of the Correctional Programs Branch (attached) (Exhibit _____ )

* Declaration of Nicole Vido--Case Manager Coordinator all United States Penitentiary, Thompson, Illinois (attached) (Exhibit _____ )

* Memorandum Opinion, <u>Stewart, Jr. v. Warden Snider</u>, Case No. 1:22-cv-294-MHH-JHE; United States District Court for the Northern District of Alabama, Eastern Division, Honorable Madeline Hughes Haikola presiding, Doc. 16 (attached) (Exhibit _____ )

* All Maxwell's exhibits attached to his Petition and Memorandum in Support [PageID## 83-221] (portions attached)

* "Maxwell's Motion to Strike Doc. 8," exhibits attached thereto, including admissions made to the Office of Inspector General and admissions made in the public record (Fed. Reg. / Vol. 87,

No. 12 / Wednesday, Jan. 19, 2022 / Rules and Regulations / pp.2705-2719); and in the First Step Act Approved Programs Guide. ATTH. 1+4

## LEGAL MATERIALS REVIEWED

In the preparation of this affidavit, I also reviewed the items in the Table of Authorities. The statutes, CFR, and related items were reviewed exhaustively. The relevant case law was reviewed as part of typical brief preparation.

## BOP ADMISSIONS MADE UNDER OATH

Nicole Vido, Susan Giddings, and Juan A. Segovia have authored statements under oath regarding the First Step Act and the CARES Act, and how the BOP is applying same. Their sworn statements are attached, and relevant portions and admissions therein are noted herein.

Nicole Vido--CMC, in her capacity as a BOP Official, admits, at ¶9: "The Bureau is in the process of incorporating FTC tracking capabilities into SENTRY and updating sentencing computations, when appropriate. The current focus is on inmates closest to their release date first, [ ], and then the Bureau will move on to inmates with later release dates. Central Office disseminates spreadsheets monthly which track the number of time credits inmates who are within 24 months of their release have earned. When inmates reach the 24-month milestone, the Bureau will do a one-time load of time credits on their sentence computation. After that point, any accumulated time credits will be applied to additional time in a pre-release RRC placement." (emphasis added)

8

Susan Giddings, in her capacity as Chief of the Unit Management Section of the Correctional Program Branch, admits, at ¶9: "On January 12, 2022, the BOP established interim procedures to ensure timely impelementation of the FSA final rule. Interim procedures were established to priortize inmates eligible for immediate benefits in terms of release or pre-release community placement. The interim procedures will remain in effect during this initial period and will continue pending the completion of an auto-calculation application to BOP's real-time information system (known as SENTRY) and full integration between SENTRY and BOP's Case Management System (known as INSIGHT)."

At ¶10: "During the initial period and beyond, BOP's focus and attention is on ensuring the accurate calculation and application of FSA time credits."

At ¶11: "For purposes of FSA time credit calculations, BOP is in the process of creating and implementing an application to fully automate calculations so that ORE [Office of Research and Evaluation] will no longer have to manually calculate time credits for each inmate. BOP expects to "go live" with this application in the coming months."

At ¶12: "In the meantime, the BOP decided to set certain cutoff dates for manual FSA time credit calculations to ease the burden on staff. Once an inmate's time credit is calculated, it will not be recalculated again until implementation of the automated computation system."

At ¶13: "Under the interim procedures, the BOP is calculating credit based on the total number of days in the inmate's designated facility, divided by 30 days (one-month average), and

9

multiplied by 15 (the allowable credit for inmates with Low or Minimum risk levels which is applicable to Petitioner)."

At ¶14: "The BOP uses the date in which an inmate arrives at his/her initial designated facility or the FSA enactment date in December 2018, whichever is later, as the start date for calculation purposes. Batch data is available monthly and is extracted on the last Saturday of the last full week of the month. Beginning on December 25, 2021, monthly data sets of inmates, who are within 24 months of their statutory release date, were extracted and time credits were calculated."

<u>Juan A. Segovia</u>, in his capacity as Associate Warden FMC-Ft. Worth and Associate Warden, Oakdale, Louisiana, admits, at ¶21: "Acting upon additional guidance from BOP Regional Office Staff [South Central Region Office, Grand Prairie, Texas—same Regional Office as FCI-Beaumont-Low, Maxwell's facility] on the afternoon of April 9th [2020], the reviewing staff have also expanded the criteria, removing the eighth factor, consideration of whether inmates in low or minimum facilities have served 50% of their sentence."

### ADMISSIONS MADE TO MAXWELL'S COUNSEL

Attached to Maxwell's petition [PageID## 142-143] and the Government's Response [PageID## 340-341], the Government makes the following admission:

> Additional guidance was provided to staff via a May 8, 2020, memorandum regarding this topic. In it, the memorandum states that inmates who have served 50% or more of their

**10**

sentences or have 18 months or less remaining on their sentence and have served 25% or more of their sentence would be prioritized for consideration for home confinement. Inmate Maxwell does not meet this criteria, as his release date is July 17, 2031" [PageID# 143] [PageID# 341]. Ex. 15 attached

## BOP ADMISSIONS MADE IN PUBLIC RECORDS.

The BOP admits in its "First Step Act Approved Programs Guide" that "Productive Activities (PA) include a wide range of activities, including work assignments, community service, inmate-led classes, and other unstructured but valuable ways to spend time." (emphasis added) (Exhibit _ATTACH. 4_ )

### Admissions in the CFR filed January 19, 2022

On January 19, 2022, the BOP filed into the CFR (Fed. Reg. / Vol. 87, No. 12 / Wednesday, January 19, 2022 / 2705-2719) its final rule "codif[ying] the Bureau of Prisons' (Bureau or BOP) procedures regarding the earning and application of time credits as authorized by the First Step Act of 2018 (FSA) ..." (Attachment 1)

In its CFR filings, the BOP makes references to its publications demonstrating and justifying the BOP's FSA activities. These include the admission that prison jobs, assigned and recommended to FSA eligible low or minimum risk level inmates qualified as productive activities (PAs) that earn FSA Time Credits under 18 U.S.C. §3632(d)(4)(A). See Fed. Reg. / Vol. 87, No. 12 / Wednesday, January 19, 2022 / p.2710:

11

"The First Step Act Approved Programs Guide, available on the Bureau's website at https://bop.gov/inmates/fsa/docs/2021/_fsa_program_guide.pdf (Program Guide)" See relevant excerpt attached. (See Attachment 2) (Maxwell Exhibit 25 )

In the BOP "responses" to comments made on the proposed rule and in the "preamble" itself, the BOP makes the following admissions:

(a) The BOP admits: the January 19, 2022 filing is the final rule on FSA Time Credits:

> "Department of Justice
> 28 CFR Parts 523 and 541
> [BOP 1176 P]
> RIN 1120-AB76
> FSA Time Credits
> Agency: Bureau of Prisons, Justice.
> Action: Final Rule."

(See Attachment 1, p.2705).

(b) The BOP admits: the January 19, 2022, filing is the codification of the FSA Time Creits and application thereof:

> This rule codifies the Bureau of Prisons' (Bureau or BOP) procedures regarding the earning and application of time credits as authorized by the First Step Act of 2018 (FSA) hereinafter referred to as 'FSA Time Credits' or 'Time Credits.'

> [ ]

12

The FSA provides that eligible inmates earn FSA Time Credits toward pre-release cusotdy or early transfer [release] to supervised release for successfully completing approved Evidence Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) <u>assigned</u> to each inmate based on the inmate's risk and needs assessment." (emphasis added) (See Attachment 1, p.2705-2706)

(c)    The BOP admits:    The January 19, 2022, filing is pursuant to specific statutory authority:

"This rule codifies the Bureau of Prisons (Bureau) procedures regarding First Step Act (FSA) Time Credits, as authorized by 18 U.S.C. §3632(d)(4) and Section 101 of 2018 (Pub. L. 115-391, December 21, 2018, 132 Stat. 5194) (FSA). The FSA provides that an eligible inmate in Bureau custody who successfully participates in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment will [shall] earn FSA Time Credits (i.e., transfer to a Residential Reentry Center (RRC) [halfway house] or home confinement for service of a portion of the inmate's entence) or transfer to supervised release (i.e., early satisfaction of the inmate's term of imprisonment) under 18 U.S.C. (g)." (Attachment 1, p.2706)

(d)    The BOP admits:    The definition of "a day" for purpsoes of calculating "30 days of successful participation" in 18 U.S.C. (d)(4)(A)(i) and (ii) means any day during which an inmate is enrolled in EBRR programs or PAs:

13.

"The BOP is adopting a simpler FSA Time Credits program award model that will more fully encourage and reward participation in evidence-based recidivism reduction programs and productive activities.

In enacting the FSA, Congress made clear that Time Credits should be broadly applicable to a wide range of activities to maximize their opportunities to reduce recidivism. The proposed definitions [replaced by this final rule] however, would have meant that inmates could do everything asked of them as part of their recommended programming for multiple days (e.g., two hours each day for four days], but be credited only for one day of successful participation.

In addition, the proposed definition [replaced by this final rule] would have required Bureau staff to not only track inmate participation time into individual hours of work, and then aggregate time spent completing other programming. This approach [replaced by this final rule] would have varied the earning of Time Credits by program factors such as intensity, length, and duration that could have been confusing to inmates, burdensome for staff to administer, and inconsistent with the general goal of awarding Time Credits in a consistent manner to inmates who are participating in the full range of programming recommended to them based on the results of their risks and needs assessment.

14

The final rule adopts a more straightforward and more administratively manageable approach that is consistent with the FSA's goal of promoting successful participation in EBRR programs and PAs. For every thirty-day period that an eligible inmate successfully participates in EBRR programs or PAs recommended based on the inmate's risk and needs assessment, the inmate will [shall] earn ten days of FSA Time Credits. If the inmate is determined to be at a minimum or low risk for recidivating and can maintain that risk level for the most recent two consecutive risk and needs assessments, that inmate may [shall] earn an additional five days of FSA Time Credits per thirty-day period.

[ ]

... temporary interruptions in participation that are unrelated to an inmate's refusal to participate or other violation of programming requirements, or that are authorized by the Bureau, such [as] when a recommended program or activity is unavailable or full will not affect the inmate's ability to earn time credits."   (Attachment 1, p.2706-2707)

(e)   The BOP admits: that FSA Time Credits are in addition to rewards and incentives already provided by the BOP.   See 18 U.S.C. §3632(d)(6):

"... some courts have held that eligible inmates should be awarded FSA Time Credits in addition to the pre-FSA incentives already

15

offered by the Bureau ..." (Attachment 1, p.2708).

**(f)** The BOP admits: that because it was unable to track inmates' participation in FSA Time Credit earning EBRR programs and PAs prior to January 2020, the BOP "will excercise its discretion to award FSA Time Credits to inmates otherwise deemed eligible under the First Step Act by applying the same criteria as applied to inmate participation in authorized EBRR programs and PAs recommended based on a risk and needs assessment after January 2020 to determine the inmate's retroactive Time Credit balance. Eligible inmates will be afforded a presumption of participation for the period between December 21, 2018, and January 14, 2020, and be awarded time credits accordingly." (Attachment 1, p.2708)

**(g)** The BOP admits: Inmates will earn FSA Time Credits when either EBRR programs or PAs are unavailable for reasons not caused by or subject to an inmate's control:

> "... inmates will not be penalized if specifically recommended EBRR programs or PAs are unavailable to them or at full enrollment at their facilities." (Attachment 1, p.2711)

> [ ]

> "It is important to note, however, that temporary interruptions in participation that are unrelated to an inmate's refusal or other violation of programming requirements, such as the unavailability of a recommended program or activity or its full enrollment, or interruption authorized by the Bureau,

16

will not affect the inmate's ability to earn Time Credits." (Attachment 1, p.2711)

(h)   The BOP admits: FSA Time Credits are earned for successful participation in EBRR programming and PAs on an ongoing basis, not solely on completion:

> "The Bureau agrees with these comments. As indicated previously, the Bureau is altering and expanding its method for awarding time credits.
>
> The concern of the commentators regarding participation in programming echoes the Bureau's long standing policy of encouraging inmate reentry programming and productive activities throughout each inmate's incarceration, which is consistent with the FSA's goal of attaining maximum recidivism reduction.
>
> [ ]
>
> <u>Toward that end, the Bureau has developed the simpler model which it now adopts for the FSA Time Credits program.  Under this model, each inmate earns Time Credits while participating in recommended EBRR programs and PAs.</u>" (emphasis added) (Attachment 1, p.2711)

(i)   The BOP admits: That during the time of Maxwell's administrative remedy (from 2020 until the present) he is continuing to earn FSA Time Credits:

17

"Time credits for successful participation are awarded at the end of each thirty-day period. By altering the scheme for awarding Time Credits in this manner, the Bureau hopes to increase the amount of FSA Time Credits that may be awarded to the maximum number of eligible inmates." (Attachment 1, p.2711)

(j)  The BOP admits:  Maxwell has liberty interests in his FSA Time Credits:

"The purpose of this rule is to codify the Bureau's procedures regarding the earning and application of time credits as authorized by the FSA. [ ] <u>Given the liberty issues</u> implicated by the prompt implementation of this program and this rule, the Bureau is prepared to begin implementation immediately ..." (Attachment 1, p.2716) (emphasis added)

(k)  The BOP admits that:

"An eligible inmate who successfully participates in an EBRR program or PA recommended by staff based on the inmate's risk and needs assessment may [shall] earn FSA Time Credits to apply toward <u>prerelease</u> custody or <u>transfer</u> to supervised release.

[ ]

The Bureau assures commentators that <u>FSA Time Credits will be applied</u> to early transfer to supervised release, as authorized by the FSA in 18 U.S.C. (d)(4)(C) and 18 U.S.C. §3624(g)." (Attachment 1, p.2712) (emphasis added)

18

## <u>BOP ADMISSIONS MADE TO THE OFFICE OF INSPECTOR GENERAL</u>

On November 15, 2021, the Office of Inspector General filed and published a Management Advisory Memorandum to the BOP on the topic of:

SUBJECT:    Impact of the Failure to Conduct Formal Policy Negotiations on the Federal Bureau of Prisons' Implementation of the First Step Act and Closure of the Inspector General Recommendations

Maxwell filed a copy of the report with his §2241 Petition [PageID## 199-217]. Therein, the BOP made the following admissions to the OIG that are relevant to this case. They are:

(a)  The BOP admits that:  There are 60,000 inmates eligible for FSA Time Credits, allowing them to spend time in halfway house, home confinement, or to have their sentences reduced by up to 12 months under the FSA (the BOP has knowingly, willfully, and intentionally failed and refused to provide FSA Time Credits, despite the liberty interests of these 60,000 inmates, including Maxwell).

> "... we found that the BOP has not applied <u>such statutorily earned time credits</u> to any of the approximately 60,000 eligible inmates who may have completed EBRR programs or productive activities. We are concerned that the delay in applying earned time credits may negatively affect inmates who have earned a reduction in their sentences or earlier placement in the community.

19.

The BOP officials told the OIG that the BOP has not applied time credits to inmates' sentences as directed under the law ..." [PageID# 204] (Attachment 2) (emphasis added) Highlighted

**(b)** The BOP admits that: It has engaged in unlawful conduct, by failing to timely transfer inmates to community confinement or supervised release under the FSA based on statutorily earned FSA Time Credits (earned in addition to other rewards and incentives that existed pre-FSA) because it had not finalized a rule and because it granted its national union a veto over its requirement to uphold the laws of the United States and directives of Congress.

"BOP Officials told the OIG that the BOP has not applied time credits to inmate sentences as directed under the law because:

(1) a rule that would codify the BOP's procedures for time credits has not been finalized, and

(2) the BOP must complete policy negotiations on its time credits policy with the national union (No. 8 in Table A above)

The BOP stated that the time credits policy must be negotiated with the national union because it would create changes to conditions of employment, including determinations and application of earned time credits for inmates, for Unit Team Staff working in BOP institutions who are bargaining unit employees." [PageID# 204] (Attachment 2)

20

(c)   The BOP admits that: Unit Team members determine inmate transfers to RRC or home confinement under the FSA earned time credits:

> "The BOP stated that the time credits policy must be negotiated with the national union because it would create changes to conditions of employment, including determinations and application of earned time credits for inmates, for Unit Team Staff working in BOP institutions who are bargaining unit employees." [PageID# 204] ATTACH. 2

(d)   The BOP admits:   The BOP granted its national union a defacto veto over the statutes of Congress which require the BOP to transfer eligible low or minimum risk and low needs inmates into community custody or supervised release.

> "BOP officials told the OIG that the BOP has not applied time credits to inmate sentences as directed under the law because:
>
>     (2)   the BOP must complete policy negotiations on its time credits policy with the national union ...
>
> The BOP stated that the time credits policy must be negotiated with the national union because it would create changes to conditions of employment, including determinations and application of earned time credits for inmates, for Unit Team Staff working in BOP institutions who are bargaining unit employees." [PageID# 204] ATTACH. 2

21

## SUMMARY

1)   I   exhausted   my   administrative   remedies.   My administrative remedies exhaustion are reflected in both records attached   to   my   §2241   petition   and   the   records   filed   in   the Warden's   Doc.   8.   (For   example,   see   [PageID##   350-351].)   I specifically   requested   relief   and   asserted   my   rights   for:   (1) substantive   due   process;   (2)   relief   under   18   U.S.C.   §3621;   (3)   18 U.S.C.   §3624;   (4)   34   U.S.C.   §60541;   and   the   modifications   made thereto   under   (5)   The   CARES   Act   of   2020;   and   (6)   The   First   Step Act   of   2018;   and   (7)   The   Second   Chance   Act   of   2018   (reauthorized and   modified   by   the   First   Step   Act   of   2018).   The   BOP   never responded   to   anything   but   the   CARES   Act.   I   also   sought   relief under   18   U.S.C.   §3582(c)(1)(A)   [PageID#   346].   I   complained   of   the BOP   obstructing   the   administrative   remedy   process   [PageID##   346-347]   [PageID#   350-351].   I   complained   of   the   false   statements   of the   Warden   and   provided   proof   thereof.   [PageID##   353-361] [PageID#   352]   [PageID##   350-351]   [PageID##   348-349]   [PageID#   310] [PageID##   319-324]   [PageID##   331-336]   [PageID##   340-341]   [PageID# 345].

2)   The   BOP   did   not   respond   properly   to   any   request.   The BOP,   after   delay   and   obstruction   of   the   administrative   process, filed denials of the "CARES Act" release--but nothing else.

3)   I   raised   relief   with   my   Unit   Manager   River   under   the   FSA, elderly   offender,   Second   Chance   Act,   and   CARES   Act.   He   approved my   transfer.   When   there   was   an   unlawful   delay   by   Ms.   Cutwright, Unit   Manager   Rivera   called   Ms.   Hauck,   the   complex   counsel,   in   an attempt   to   correct   the   delay   and   denial.   Ms.   Hauck   chastized   Mr.

22

Rivera for working "too hard" for the inmates as "we were not doing CARES Act and First Step Act" here.

4)    I contacted the Warden both via emails (which were not responded to) and with multiple BP-9s--they were lost, exhibits attached to them were stripped off and lost by the BOP.  The Warden's denial consisted of factually false statements (no medical condition, a violent offense).  I have no violent offenses--as the BOP's documents demonstrate.  I was designated a high risk, due to my severe asthma [PageID# 310], for long term sickness and death from COVID-19.

5)    I sought relief, as explained in my administrative remedies and petition for all items listed in [PageID## 350-351].

6)    The BOP did not consider any relief under 18 U.S.C. §3632, which is incorporated into 18 U.S.C. §§3624(c)(2) and (g).

7)    The relief sought includes a large number of declarations regarding the FSA Time Credits, their required calculation, the accumulation in addition to other rewards and incentives (18 U.S.C. §3632(d)(6).  These calculations and declarations are part and parcel of the relief requested by statute throughout my administrative remedies.  The BOP, in the denial of my requested relief, have impacted a liberty interest that is addressable in court.

9/11/2022
_____                    _____
Date                                   William Maxwell
                                       Reg. No. 71944-279

23

## MAXWELL AFFIDAVIT INDEX

Ex. 1       Declaration of Susan Giddings;

Ex. 2       Declaration of Nicole Vido;

Ex. 3       Declaration of Juan Segovia;

Ex. 4       Maxwell Individual Needs Plan;

Ex. 5       Case Manager West's Statement;

Ex. 6       Inmate Work Detail History;

Ex. 7       U.S. Parole Office Approval [PageID# 336];

Ex. 8       Home Confinement Memo, April 13, 2021;

Ex. 9       Master Agreement (AFGE and BOP);

Ex. 10      Hugh Horowitz April 22, 2020 memo [PageID## 172-175];

Ex. 11      Maxwell July 15, 2020 PATTERN Score [PageID# 359];

Ex. 12      BOP-AO210 Appeal of Transfer [PageID## 360-361];

Ex. 13      COVID-19 High Risk Designation [PageID# 310];

Ex. 14      Warden denial [PageID## 286-287];

Ex. 15      Warden correspondence to Counsel [PageID## 142-143];

Ex. 16      Regional denial [PageID# 167];

Ex. 17      Central Office denial [PageID# 197];

Ex. 18      No Timely Denial [PageID# 170][PageID# 169];

Ex. 19      Records stripped off administrative remedies [PageID# 348];

EX. 20      Adminsitrative Remedy [PageID## 332-333];

Ex. 21      Administrative Remedy [PageID## 350-351];

Ex. 22      Administrative Remedy [PageID## 346-347];

Ex. 23      Trial transcript (no violence)(June 3, 2014)[PageID## 352-358];

Ex. 24      Trial transcript (no danger to community, no flight risk)(October 15, 2015)[PageID## 177-186];

Ex. 25     Emails to Warden regarding:

        Obstruction [PageID# 339]

        Unsafe conditions [PageID# 129]

        Administrative Remedies [PageID# 130]

        Administrative Remedies [PageID##133-136]

        Loss of power and sewage [PageID ##337-338]

        Administrative Remedy [PageID##332-333]

Ex. 26     BP-8 reflecting continued failure to implement FSA;

Ex. 27     Stewart, Jr. v. Warden Snider, U.S. D.C. Alabama. Eastern Division, Cause No. 1:22-cv-294-MHH-JHE; Memorandum Order.

# EXHIBIT

# 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

Robert S. Stewart, Jr.,
Reg. No.

        Petitioner,

        v.

WARDEN, FCI TALLADEGA,

        Respondent.

:
:
:
:
:
:
:
:
:
:

CASE NO.: 1:22-cv-00294-MHH-JHE

## <u>DECLARATION OF SUSAN GIDDINGS</u>

I, SUSAN GIDDINGS, hereby declare and state the following:

1. I am an employee of the United States Department of Justice, Federal Bureau of Prisons ("BOP"). Specifically, I am Chief of the Unit Management Section of the Correctional Programs Branch ("CPB"), which is organized under the Correctional Programs Division ("CPD") in the BOP's Central Office located in Washington, D.C. I have worked for the BOP since February 1991 and have been the Unit Management Section Chief since December 2019.

2. As the Unit Management Section Chief, I am responsible for overseeing Correctional Systems and the BOP's national Victim and Witness Program. Additionally, I have been intimately involved in the development and implementation of the BOP's FSA procedures. As such, I work closely with the Office of Research and Evaluation ("ORE") and the Office of Information Technology ("OIT"). As part of my duties,

I also have access to BOP files maintained in the ordinary course of business related to inmates incarcerated within the BOP, including the SENTRY database.[1]

3.  Petitioner, Robert S. Stewart Jr., federal register number 28576-509, is an inmate currently incarcerated on home confinement. Petitioner alleges that the BOP improperly calculated his First Step Act ("FSA") time credits.

4.  Upon the request of BOP legal staff, I have reviewed the BOP's calculation of Petitioner's FSA time credits. For reasons that are not apparent to me, Petitioner's FSA time credits were in fact incorrectly calculated at the time he filed his petition. I have attached Attachment 1, a copy of the original FSA calculation indicating 61 days of FSA credit, and Attachment 2 that includes the updated FSA calculation indicating Petitioner is receiving 75 days of FSA credit. As reflected below in Attachment 2, Petitioner's FSA time credits are now properly calculated at 75 days. ORE reviewed Petitioner's records and manually calculated his FSA time credits. I personally reviewed ORE's calculation and conducted my own independent calculation. I concur with ORE's calculation of 75 days.

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, participation in programs, administrative remedies, and discipline history.

5. A true and correct copy of Petitioner's complete sentence computation data as it existed at the time that he filed the petition titled "SENTENCE MONITORING COMPUTATION DATA" is attached to this declaration as Attachment 1. This report was generated on April 12, 2022, and shows the following:

    a. On June 16, 2021, the United States District Court in the Eastern District of Virginia sentenced Petitioner to a sentence of 21 months of imprisonment and three years of supervised release in case numbers 1:21CR00005-001 for violating 18 U.S.C. 1001(A)(2), 1343, & 641 for false statements, wire fraud, and theft of government funds. Attachment 1, p. 2.

    b. On July 28, 2021, Petitioner voluntarily surrendered to the Federal Correctional Institution in Talladega, Alabama, ("FCI Talladega") to commence his federal sentence. Petitioner's full term release date is April 7, 2023. Attachment 1, p. 1, & 2.

    c. Petitioner's FSA eligibility status reflects "eligible," meaning he is eligible to apply earned time FSA credits towards his statutory release date. Attachment 1, p. 1.

d. Petitioner's final statutory release date via good conduct time release reflects January 3, 2023. This date is what was formerly referred to as a good conduct time release date. It is calculated by subtracting any earned and projected good conduct time from his full-term release date. In this case, Petitioner's earned and projected good conduct time is 94 days, and his full-term release date is April 7, 2023. His statutory release date is January 3, 2023, because it is 94 days less than his full-term release date. This date does not include his FSA credits. Attachment 1, p. 1.

e. The report generated on April 12, 2022, shows Petitioner's FSA credits reflects 61 days. Attachment 1, p. 1.

f. Petitioner's projected release date via FSA reflects November 3, 2022, which is 61 days less than his statutory release date, January 3, 2023. However, as explained below the FSA credits were calculated incorrectly. Attachment 1 p. 1.

6. BOP recently did a recalculation of Petitioner's FSA credits. A true and correct copy of Petitioner's complete sentence computation data titled "SENTENCE MONITORING COMPUTATION DATA" is attached to this declaration as

-4-

Attachment 2. This report was generated on April 27, 2022 and shows the two changes to Attachment 1, generated on April 12, 2022:

    a.  Petitioner's FSA credits reflects 75 days.[2] Attachment 2, p. 1.

    b.  Petitioner's projected FSA release date reflects October 20, 2022, which is 75 days before his statutory release date via good conduct time release of January 3, 2023. Attachment 2, p. 1.

7.  On January 13, 2022, the Department of Justice announced that BOP had finalized the FSA time credit rule and transmitted it to the Federal Register for publication. The final rule was published on January 19, 2022. This final rule explains BOP procedures regarding implementation of the specific provisions, including those related to the earning and application of FSA time credits.

8.  The BOP has already begun implementing the FSA final rule and will continue to do so on a rolling basis. BOP has already begun applying FSA time credits. As of January 31, 2022, thousands of inmates have already been released to community custody, with hundreds more expected to be released to community supervision

---

[2] This reflects an additional 14 days of FSA credit from the initial calculation in Attachment 1.

within 30 days. It is anticipated that in the months to come, thousands more will be eligible for release.

9. On January 12, 2022, the BOP established interim procedures to ensure timely implementation of the FSA final rule. Interim procedures were established to prioritize inmates eligible for immediate benefit in terms of release or pre-release community placement. These interim procedures will remain in effect during this initial period and will continue pending the completion of an auto-calculation application to BOP's real-time information system (known as SENTRY) and full integration between SENTRY and BOP's case management system (known as INSIGHT).

10. During the initial period and beyond, BOP's focus and attention is on ensuring the accurate calculation and application of FSA time credits.

11. For purposes of FSA time credit calculations, BOP is in the process of creating and implementing an application to fully automate calculations so that ORE will no longer have to manually calculate time credits for each inmate. BOP expects to "go live" with this application in the coming months.

12. In the meantime, the BOP decided to set certain cutoff dates for manual FSA time credit calculations to ease the burden on staff. Once an inmate's time credit is calculated, it will not be recalculated again until implementation of the automated computation system. In other words, until the automated system is implemented, Petitioner's calculation will remain at 75 days despite his eligibility to earn additional days each month.

13. Under the interim procedures, the BOP is calculating credit based on the total number of days in the inmate's designated facility, divided by 30 days (one-month average), and multiplied by 15 (the allowable credit for inmates with Low or Minimum risk levels which is applicable to Petitioner).

14. The BOP uses the date in which an inmate arrives at his/her initial designated facility or the FSA enactment date in December 2018, whichever is later, as the start date for calculation purposes. Batch data is available monthly and is extracted on the last Saturday of the last full week of the month. Beginning on December 25, 2021, monthly data sets of inmates, who are within 24 months of their statutory release data, were extracted and time credits were calculated.

15. Due to his impending statutory release date on January 3, 2023, the BOP grouped Petitioner in the initial batch of calculations with a cutoff date of December 25, 2021. The start date for Petitioner's FSA calculations is July 28, 2021, the date he arrived at his designated institution. He remained at his designated institution, and in good standing between July 28, 2021, and December 25, 2021. Thus, he had a total of 150 days of eligible time. Using the interim procedures, the FSA calculation was done as follows: 150 days, divided by 30 days, times 15 days = 75 days. Accordingly, Petitioner earned 75 days of FSA credit for the time he served between July 28, 2021, and December 25, 2021.

16. To date, ORE has not recalculated Petitioner's time credits to reflect credit for the past four months (January – April) despite his eligibility to earn time credits. Like many other similarly situated BOP inmates, Petitioner's FSA time calculations are governed by the interim guidance. At this time, the BOP does not intend to recalculate FSA time credits for inmates that have already been reviewed, until implementation of the automated system. As stated above, once the automated system is up and running Petitioner's FSA credits will be updated to include any

additional FSA credit that he is entitled to, that have not already been included in this initial calculation.

17. My understanding is that OIT is working diligently to implement the automated system. Although it is unclear when exactly the system will go live, my understanding is that OIT is in the final stages of software testing and could potentially go live within the next 90 days barring any unforeseen circumstances.

18. The BOP does not calculate time credits based on future projected days. Credit is earned as it accumulates. This is because an inmate does not earn time credit for days in custody if they refuse to participate in certain programs or are placed in the Special Housing Unit. It is entirely possible Petitioner may not earn time credits in the future.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of April, 2022.

SUSAN GIDDINGS
Unit Management Section, Chief
Correctional Programs Branch
Federal Bureau of Prisons

# EXHIBIT

# 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

MARC MARIER                                    )
                                               )
            Petitioner,                        )
                                               )        Case No. 22 C 50246
      v.                                       )
                                               )        Hon. Iain D. Johnston
THOMAS BERGAMI, Warden, USP Thomson            )        Magistrate Judge Jensen
                                               )
            Respondent.                        )

## DECLARATION OF NICOLE VIDO

In accordance with the provisions of Section 1746 of Title 28, United States Code, I, the undersigned, Nicole Vido, hereby make the following declaration, under penalty of perjury pursuant to the provisions of 28 U.S.C. § 1746:

1.    I have been employed by the United States Department of Justice, Federal Bureau of Prisons, since September 2011.  I am currently employed as the Case Management Coordinator at the United States Penitentiary in Thomson, Illinois, and I have been employed in this capacity since October 2021.

2.    The statements I make hereinafter are made on the basis of my review of the official files and records of the BOP, my own personal knowledge, or on the basis of information acquired by me through the performance of my official duties.  All documents attached hereto are true and correct copies of files and records maintained by the BOP.

3.    I have reviewed the habeas petition filed by Marc Marier, Register No. 53804-424.  He alleges some, but not all, of his time credits under the First Step Act have been credited against his sentence.  He seeks to apply more time credits.

4.    Marier was convicted of Wire Fraud, in violation of 18 U.S.C. § 1343, and Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957.  *See* Attachment 1, Sentence Monitoring Computation Data as of 08-07-2022, for Marc Marier, Register No. 53804-424.

5.    Marier is eligible to earn time credits under the First Step Act. *See* Attachment 2, Inmate History – First Step, dated 08-07-2022, for Marc Marier, Register No. 53804-424 ("FTC-Eligible – Reviewed").

6.    Marier has been assigned a Minimum on the PATTERN Risk Tool since he was first assessed in April 2021. *See* Attachment 2 ("MINIMUM RISK RECIVIDISM LEVEL").

7.    Marier's current FSA needs are as follows: (1) Anger/Hostility – No; (2) Antisocial Peers – No; (3) Cognitions – No; (4) Dyslexia – No; (5) Education – No; (6) Finance/Poverty – No; (7) Family/Parenting – Yes; (8) Mental Health – No; (9) Medical – No; (10) Recreation/Leisure/Fitness – No; (11) Substance Abuse – No; (12) Trauma – No; and (13) Work – No. *See* Attachment 2 at 1.

8.    Marier has completed, is participating in, or is waitlisted for several EBRR programs and productive activities, including: (1) Managing your Diabetes; (2) Money Smart General Population; (3) Live Healthy with Chronic Conditions; (4) Health and Wellness Lifespan; (5) Brain Health as You Age; (6) Healthier Me; (7) Basic Cognitive Skills; (8) National Parenting Program; (9) VT Welding; (10) ACT Work Keys; and (11) Advanced Work Keys. *See* Attachment 3, Inmate History – PT Other, dated 08-07-2022, for Marc Marier, Register No. 53804-424; Attachment 4, Inmate History – WASPB, dated 08-07-2022, for Marc Marier, Register No. 53804-424; Attachment 5, Inmate Education Data – Transcript, dated 08-07-2022, for Marc Marier, Register No. 53804-424.

9.    The Bureau is in the process of incorporating FTC tracking capabilities into SENTRY and updating sentencing computations, when appropriate. The current focus is on inmates closest to their release date first, like Marier, and then the Bureau will move on to inmates with later release dates. Central Office disseminates spreadsheets monthly which track the number of time credits inmates who are within 24 months of their release have earned. When inmates reach the 24-month milestone, the Bureau will do a one-time load of time credits on their sentence computation. After that point, any accumulated time credits will be applied to additional time in a pre-release RRC placement.

10.   Marier was on the first Central Office roster generated when the Bureau implemented the time credit provisions of the First Step Act. On January 20, 2022, his sentence computation was updated to reflect the application of 120 days of time credits to advance his projected release date from April 21, 2023, via a good conduct time release, to December 22, 2022, via a First Step Act release. *See* Attachment 1.

11.   Based on a December 22, 2022 projected release date, USP Thomson staff submitted Marier for a pre-release home confinement placement to start on September 27, 2022, noting he had earned 120 days of time credits which had been applied to his sentence. *See* Attachment 6, Institutional Referral for CCC Placement, for Marc Marier, Register No. 53804-424. The RRM's Office awarded him a pre-release home confinement date of September 27, 2022.

12.   Marier has continued to earn time credits after this referral was submitted, and as of July 30, 2022, he earned a total of 240 days of time credits.

13.   In light of this petition, USP Thomson staff reached out to the RRM's Office to see if there was capacity to advance Marier's prerelease home confinement date to provide him with the benefit of additional time credits. His home confinement date was advanced to August 15, 2022. *See* Attachment 7, Inmate History – Destination, dated 08-07-2022, for Marc Marier, Register No. 53804-424.

I declare, under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.

Executed this ___8th___ day of August, 2022.

Nicole Vido
Case Management Coordinator
Federal Bureau of Prisons
USP Thomson

# EXHIBIT

# 3

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

BRANDON LIVAS, RICHARD BUSWELL,  )
DEWAYNE CORBETT, JOHNNY SMITH,    )
CARLOS LORENZO MARTIN and         )    CIVIL ACTION NO. 20-cv-00422
GAINES ANDREWS, on behalf of      )
themselves and those similarly situated )
                                  )
                                  )
                                  )    JUDGE DOUGHTY
VERSUS                            )
                                  )
RODNEY MYERS, Warden of Oakdale   )    MAGISTRATE JUDGE KAY
Federal Correctional Institutions; and )
MICHAEL CARVAJAL, Federal Bureau of )
Prisons Director, in their official capacities )
                                  )

20-cv-00422

See paragraphs 19, 4, 31

## DECLARATION OF JUAN A. SEGOVIA

In accordance with 28 U.S.C. § 1746, I, JUAN A. SEGOVIA, make the following declaration, under penalty of perjury, pertinent to the above styled and numbered cause:

1.      I have been employed by the United States Department of Justice, Federal Bureau of Prisons (BOP) since 1991. I am currently an Associate Warden at the Federal Medical Center, in Fort Worth, Texas. From December 2018 through February 2020, I was an Associate Warden at the Federal Correctional Complex in Oakdale, Louisiana (FCC Oakdale). As of April 5, 2020, I have temporarily reported back to FCC Oakdale to assist with the COVID-19 emergency. The statements I make hereinafter are made on the basis of my review of the official files and records of the BOP, my own personal knowledge, or on the basis of information acquired by me through the performance of my official duties.

2.      FCC Oakdale is a complex of separate BOP men's prison facilities. The complex includes FCI Oakdale I and FCI Oakdale II, both low security facilities; and the Satellite Prison Camp (the "Camp"), a minimum security facility. The complex is run by a Complex Warden, who has ultimate authority over all of the facilities.

3.      The BOP's response to the COVID-19 emergency at FCC Oakdale has been swift and now appears to be proving effective. In the two weeks immediately following FCC Oakdale's first positive COVID-19 test, new potential COVID-19 cases were being identified and isolated daily, often with multiple cases each day. Following the implementation of the control measures described below, the last new isolation cases were identified on April 2, 2020 and April 7, 2020. A decline from multiple daily new cases to two new cases in over a week is a positive sign.

1

E    048

GOVERNMENT
EXHIBIT

I

17.    Transfers to Residential Re-Entry Centers (RRC) or Home Confinement: While BOP is not itself empowered to modify an inmate's sentence, Congress has provided the Attorney General and Bureau of Prisons with wide discretion in determining where to confine inmates. See 18 U.S.C. § 3621. Both placement in a RRC (also called a halfway house) and home confinement are forms of confinement, not actual releases from custody. See 18 U.S.C. § 3624(c). Placement in a halfway house and/or home confinement is discretionary. See 18 U.S.C. § 3621(c) ("Such conditions may include a community correctional facility" and "[t]he authority under this subsection may be used to place a prisoner in home confinement.") (emphasis added). While providing a framework of factors to consider inmate placement, Congress also affirmed the breadth of the agency's discretion in such matters, noting that even sentencing court orders regarding inmate placement in a community correction facility "shall have no binding effect," and that "a designation of a place of imprisonment under this subsection is not reviewable by any court." 18 U.S.C. § 3621(b)(5).

18.    While RRC or halfway house placement is considered a beneficial pre-release custody option for appropriate inmates, it requires both significant pre-arrangement and available RRC space before it may allow an inmate to be removed from prison. Pursuant to a March 26, 2020 memorandum from the Attorney General, BOP has prioritized the consideration of home confinement, which has the potential to remove someone from the prison population faster, as a response to the COVID-19 pandemic. Inmates at FCC Oakdale were considered for home confinement under the terms of this memo. Three were thought likely to be approved and were transferred to quarantine in the special housing unit, pending final determination. As the Court is already aware, one of these three were later determined to be ineligible due to a history of sex crimes, one is waiting out his quarantine pending transfer, and one is being re-reviewed based on updated guidance discussed in paragraph 21, below.

19.    Previously, BOP was limited in its authority to allow home confinement the "shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. § 3624. The recently passed Coronavirus Aid, Relief, and Economic Security Act (CARES Act) authorizes the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his findings of emergency conditions which are materially affecting the function of the BOP. On April 3, 2020, the Attorney General made that finding and authorized the Director of the BOP to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale and other BOP facilities where COVID-19 is materially affecting operations. Guidance on implementation of this was previously provided by BOP Central Office, recommending initial review for placement in home confinement of inmates who meet the following nine criteria: 1) Primary Offense is not violent; 2) Primary Offense is not sex offense; 3) Primary Offense is not terrorism; 4) No detainer; 5) Mental Health Care Level is less than IV; 6) PATTERN (BOP's new risk and needs assessment tool) score is MIN; 7) BRAVO (BOP's existing risk evaluation tool) score is LOW or MIN; 8) Completed at least 50% of their sentence; and 9) No Incident Reports in the past 12 months.

20.    Based on this initial set of nine criteria, late on April 6, 2020, BOP's Office of Research and Evaluation identified 4,013 inmates nationwide to be the first cohort reviewed under the extended home confinement timeframe. Of these 4,013 inmates, 58 are currently housed at FCC Oakdale. This review would ordinarily be done by case management staff at FCC Oakdale.

5

E    049

However, circumstances made this a challenge, with a leader in this department being out under quarantine, and other staff having to perform ancillary custody functions to ensure basic needs, orderly operations, safety, and security are provided to FCC Oakdale inmates. On April 8, 2020, I began marshalling resources pulling from temporary staff with experience in case management, seeking remote assistance from other facilities, and freeing up FCC Oakdale's existing case management staff by transferring their emergent custody responsibilities to other temporary staff. We focused on the Camp and FCI Oakdale I inmates, because of COVID-19 cases from those facilities. We have since reviewed vast majority of the 58 originally-listed priority inmates. Six of these have been determined to be potentially eligible and they have already been placed in special housing or will be placed there shortly, allowing them to begin the 14-day pre-transfer quarantine. Of those reviewed, the most common reasons for ineligibility appear to be history of previous violence or sex offenses.

21.    Acting upon additional guidance from BOP Regional Office Staff, on the afternoon of April 9th, the reviewing staff have also expanded the criteria, removing the eighth factor, consideration of whether inmates in low or minimum facilities have served 50% of their sentence. Accordingly, staff reviewed an additional 90 inmates for home confinement eligibility and dozens more are pending review. So far, 15 additional inmates have been determined to be potentially eligible for home confinement, and are being prepared for pre-transfer quarantine.

22.    The primary factors being used to prioritize consideration by BOP staff, including prison disciplinary history, PATTERN score, violence or sex crime history, and classification level, come directly from the Attorney General's March 26th Memorandum. In his April 3rd Memorandum, the Attorney General reiterated that BOP's expanded consideration of inmates for home confinement should continue to be guided by those factors. I have checked BOP records for each of the named petitioners in this matter to determine whether they are likely to be reviewed for consideration under the Attorney General's expansion of home confinement eligibility. Individual Petitioners Livas, Martin, Andrews, and Corbett have PATTERN risk recidivism scores above minimum, removing them from priority consideration. Petitioner Smith is ineligible due to his current offenses, involving the production and possession of child pornography. Finally, based on the new April 9th expanded criteria, Petitioner Buswell appears to be eligible and will be given priority review for home confinement.

23.    Staff continue to receive additional guidance on this matter and the number of inmates being given priority consideration is expanding daily. Once we complete review of the list of FCC Oakdale inmates designated for priority consideration by the Attorney General's memorandum and subsequently received guidance, I have been informed that the institution may consider expanding the criteria for review. I anticipate coordinating with medical staff at FCC Oakdale to continue additional reviews for inmates with the highest COVID-19 medical risk, per CDC guidelines, who might not have met the previous criteria.

24.    Non-Transfer Furlough: Placement in RRC or home confinement, once approved, still requires a number of factors to be satisfied prior to implementation. For example, the release plan needs to be evaluated by the appropriate United States Probation Office. In order to facilitate faster removal of approved inmates from the prison facility, BOP has provided its Wardens with additional guidance allowing the use of non-transfer furloughs up to 30 days in length in specific

6

E    050

circumstances.    As inmates are approved for home confinement through the above-described review process, they may also be considered for such a furlough if they meet the criteria. Furloughs are also currently being evaluated for inmates with previously approved RRC placements.

25.    Keeping our duties to both the general public and to care for those ordered into our custody in mind, BOP staff currently working at FCC Oakdale, and throughout the region, are working very hard to protect all from the effects of the current pandemic. In addition to the specific COVID-19 remediation measures outlined above, BOP is continually working to reduce population at affected facilities. Within the discretion provided to the agency by Congress, BOP staff continue to identify, evaluate, and place appropriately-situated inmates in halfway house or home confinement, removing them from prison facilities. We also continue to work with sentencing courts on sentence reductions and compassionate release motions, as appropriate.

I declare under that the foregoing is true and correct to the best of my knowledge and belief. Executed on April 10, 2020, at Oakdale, Louisiana.

JUAN A. SEGOVIA
Associate Warden

7

E · 051

EXHIBIT

4



| Individualized Needs Plan - Program Review | (Inmate Copy) | SEQUENCE: 01720812 |
|---|---|---|

**Dept. of Justice / Federal Bureau of Prisons**

Plan is for inmate: MAXWELL, WILLIAM  71944-279

Team Date: 01-13-2022

| | | | | |
|---|---|---|---|---|
| Facility: | BML BEAUMONT LOW FCI | | Proj. Rel. Date: | 07-17-2031 |
| Name: | MAXWELL, WILLIAM | | Proj. Rel. Mthd: | GCT REL |
| Register No.: | 71944-279 | | DNA Status: | PHL06380 / 07-03-2014 |
| Age: | 62 | | | |
| Date of Birth: | 05-04-1959 | | | |

## Detainers

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

## Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BML | EDUC | EDUCATION | 04-23-2016 |
| BML | GROUP 4 | QUARANTINE GROUP 4 | 07-02-2020 |

## Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BML | ESL HAS | ENGLISH PROFICIENT | 09-03-2015 |
| BML | GED HAS | COMPLETED GED OR HS DIPLOMA | 12-09-2014 |

## Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| BML | C | EMPLOYMENT SKILLS RPP#2 | 01-15-2020 | 01-15-2020 |
| BML | C | BUSINESS COMMUN. ACE RPP#6 | 10-16-2019 | 12-18-2019 |
| BML | C | BUSINESS WRITING RPP#6 | 07-17-2019 | 09-18-2019 |
| BML | C | REAL ESTATE FOR PROFIT RPP#6 | 07-16-2019 | 09-17-2019 |
| BML | C | ACE PRODUCT DEVELOP RPP#6 | 07-15-2019 | 09-16-2019 |
| BML | C | MONEY SMART, RPP#3 | 04-10-2018 | 06-14-2018 |
| BML | C | TICKET TO THE FUTURE, RPP#2 | 05-09-2018 | 05-30-2018 |
| BML | C | JOB FAIR INFORMATION RPP#2 | 05-30-2018 | 05-30-2018 |
| BML | C | EMPLOYMENT SKILLS RPP#2 | 04-18-2018 | 04-18-2018 |
| BML | C | JOB INTERVIEWING, RPP CT2 | 04-25-2018 | 05-02-2018 |
| BML | C | FIVE SECRETS FINDING JOB RPP#2 | 01-18-2018 | 03-08-2018 |
| BML | C | JOB SUCCESS CLASS, RPP#2 | 01-12-2018 | 03-16-2018 |
| BML | C | EMPLOY OPPORTUNITY, RPP#2 | 01-08-2018 | 03-14-2018 |
| BML | C | RECREATION CALLIGRAPHY RPP#6 | 07-26-2017 | 10-04-2017 |
| BML | C | PARENTING-2 RPP#6 | 12-02-2016 | 02-10-2017 |
| BML | C | PARENTING RPP#6 | 10-07-2016 | 11-18-2016 |
| BML | C | EMPLOY OPPORTUNITY, RPP#2 | 01-11-2016 | 03-14-2016 |
| BML | C | MANAGE CAREER SHU PROGRAM | 12-01-2015 | 12-30-2015 |
| BML | C | RPP CORE 1 - HEALTH | 09-06-2015 | 09-06-2015 |

## Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|
| ** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ** | |

## Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 08-31-2015 |
| CARE2 | STABLE, CHRONIC CARE | 07-16-2020 |

## Current Medical Duty Status Assignments



## Individualized Needs Plan - Program Review    (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: MAXWELL, WILLIAM 71944-279

SEQUENCE: 01720812

Team Date: 01-13-2022

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DAP NO INT | DRUG ABUSE PROGRAM NO INTEREST | 02-13-2019 |
| ED NONE | DRUG EDUCATION NONE | 09-08-2015 |

### FRP Payment Plan

Most Recent Payment Plan

**FRP Assignment:    PART    FINANC RESP-PARTICIPATES    Start: 07-31-2019**

| Inmate Decision: | **AGREED** | **$40.00** | Frequency: | **QUARTERLY** |
|---|---|---|---|---|
| Payments past 6 months: | **$80.00** | | Obligation Balance: | **$14,180,598.00** |

### Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $2,200.00 | $1,739.63 | IMMEDIATE | EXPIRED |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 2 | REST FV | $14,180,798.00 | $14,180,598.00 | IMMEDIATE | AGREED |

| Adjustments: | Date Added | Facl | Adjust Type | Reason | Amount |
|---|---|---|---|---|---|
| | 12-14-2021 | BML | PAYMENT | INSIDE PMT | $40.00 |
| | 09-08-2021 | BML | PAYMENT | INSIDE PMT | $40.00 |

### FRP Deposits

Trust Fund Deposits - Past 6 months:    $ N/A          Payments commensurate ?    N/A

New Payment Plan:    ** No data **

### Current FSA Assignments

| Assignment | Description | Start |
|---|---|---|
| FTC ELIG | FTC-ELIGIBLE - REVIEWED | 12-10-2019 |
| N-ANGER N | NEED - ANGER/HOSTILITY NO | 01-10-2022 |
| N-ANTISO N | NEED - ANTISOCIAL PEERS NO | 01-10-2022 |
| N-COGNTV N | NEED - COGNITIONS NO | 01-10-2022 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-28-2021 |
| N-EDUC N | NEED - EDUCATION NO | 01-10-2022 |
| N-FIN PV N | NEED - FINANCE/POVERTY NO | 01-10-2022 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 01-10-2022 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 01-10-2022 |
| N-MEDICL Y | NEED - MEDICAL YES | 01-10-2022 |
| N-RLF Y | NEED - REC/LEISURE/FITNESS YES | 01-10-2022 |
| N-SUB AB N | NEED - SUBSTANCE ABUSE NO | 01-10-2022 |
| N-TRAUMA N | NEED - TRAUMA NO | 01-10-2022 |
| N-WORK N | NEED - WORK NO | 01-10-2022 |
| R-MIN | MINIMUM RISK RECIDIVISM LEVEL | 01-10-2022 |

### Progress since last review

Progress:  Good; Inmate has continually participated in the recommended academic programs.  He completed his GED and has strived to enhance his education beyond incarceration.

### Next Program Review Goals

Unit Team recommends you enroll in an ACE, VT, or Parenting  class which can assist you with skills that can be used upon release and complete the course, showing at least 70% mastery of the course objectives.  Complete by your next review.

### Long Term Goals

Obtain institutional employment which will provide you with transferable skills.

# EXHIBIT

# 5



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

_____

*P.O. Box 26035*
*Beaumont, Texas 77720*

June 30, 2022

Inmate Maxwell, William, Reg. No. 71944-279, is currently
assigned as an education library clerk in the education
department and has been during his entire time of incarceration.

*L. WEST*

*CASE MANAGER*

# EXHIBIT

# 6

```
 BMLBR  531.01 *              INMATE HISTORY              *      02-15-2022
 PAGE 001 OF 001 *              WRK DETAIL                *      14:45:37

 REG NO..: 71944-279 NAME....: MAXWELL, WILLIAM
 CATEGORY: WRK          FUNCTION: PRT          FORMAT:

 FCL    ASSIGNMENT DESCRIPTION                  START DATE/TIME STOP  DATE/TIME
 BML    EDUC       EDUCATION                    04-23-2016 0001 CURRENT
 BML    GROUP 4    QUARANTINE GROUP 4           07-02-2020 1459 CURRENT
 BML    KITCHEN AM KITCHEN AM SHIFT             01-07-2016 0001 04-23-2016 0001
 BML    UNASSG     UNASSIGNED                   01-03-2016 1749 01-07-2016 0001
 BML    ADM DET    ADMIN DET SHU                12-11-2015 1547 01-03-2016 1749
 BML    KITCHEN AM KITCHEN AM SHIFT             09-30-2015 0001 12-11-2015 1547
 BML    A&O CMPLT  COMPLETED INSTITUTION A&O    09-17-2015 1303 09-30-2015 0001
 BML    PRE-A&O    PRE-ADMISSION & ORIENTATION  08-26-2015 1543 09-17-2015 1303
 PHL    AM COOK    AM COOK FOOD SERVICE         11-10-2014 0807 08-24-2015 0731
 PHL    SANITATION SANITATION FOOD SERVICE      10-09-2014 0818 11-10-2014 0807
 PHL    FOOD SVC   FOOD SERVICE INMATES WAITING 10-09-2014 0738 10-09-2014 0818
 PHL    4S UNASSG  4S UNASSIGNED INMATE         07-03-2014 1732 10-09-2014 0738
 PHL    7N UNASSG  7N UNASSIGNED INMATE         07-03-2014 1715 07-03-2014 1732
 HOU    UNASSG     UNASSIGNED                   11-01-2011 1216 11-02-2011 0718




 G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

# EXHIBIT

# 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**PROBATION OFFICE**

BROWNSVILLE
600 E. HARRISON STREET # 103
BROWNSVILLE 78520-7122
(956) 548-2522

HOUSTON
P. O. BOX 61207
HOUSTON 77208
(713) 250-5266

GALVESTON
P. O. BOX 2670
GALVESTON 77553-2670
(409) 766-3733

LAREDO
1300 VICTORIA, SUITE 2111
LAREDO 78040
(956) 726-2255

CORPUS CHRISTI
1133 N. SHORELINE STE. 124
CORPUS CHRISTI 78401
(361) 888-3145

VICTORIA
P. O. BOX 125
VICTORIA 77902-0125
(361) 579-6640

McALLEN
1701 WEST BUSINESS 83, SUITE 729
McALLEN 78501-5159
(956) 618-8035



May 26, 2020

**REPLY TO: HOUSTON**

FCC Beaumont
Attention: Lee West
Email: lwest@bop.gov

Re:    MAXWELL, William
Reg. No. 71944-279
SD/TX PACTS# 287618
<u>Second Pre-Release Investigation</u>

Dear Mr. West,

We have investigated the release plan submitted by the above noted offender, William Maxwell. Although a home inspection cannot be completed at this time due to COVID 19 concerns; the proposed residence, noted below, has been verified telephonically with H. Kevin McDuff. Mr. Maxwell will reside in a motor home parked at the address noted below. The release plan is approved. Please notify our office at the time of the transfer to the RRC and/or direct release, so that re-entry/case planning services can be provided by our office. Should you have questions, I may be reached at 713-250-5153.

Proposed residence: H. Kevin McDuff, 4400 Country Club Dr., Dickinson, Texas 77539, 832-287-8730

Sincerely,

Elizabeth Martinez
Senior U.S. Probation Officer

Approved:

Reginald C. Hollins
Supervising U.S. Probation Officer

cc:  U.S. Probation, Newark, New Jersey
     njp_NewarkSupervision@njp.uscourts.gov

Page 1 of 1

BP-10-2 (1 of 1)

# EXHIBIT

# 8



U.S. Department of Justice
Memorandum
Federal Bureau of Prisons

*Central Office*                                                    *Washington, DC 20534*

April 13, 2021

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:              ANDRE MATEVOUSIAN, ASSISTANT DIRECTOR
                   CORRECTIONAL PROGRAMS DIVISION

                   SONYA D. THOMPSON, ASSISTANT DIRECTOR
                   REENTRY SERVICES DIVISION

MICHAEL SMITH Digitally signed by MICHAEL SMITH
Date: 2021.04.19 11:27:06 -04'00'

                   M. D. SMITH, ASSISTANT DIRECTOR
                   HEALTH SERVICES DIVISION

SUBJECT:           HOME CONFINEMENT

In our ongoing effort to protect the health and safety of staff and inmates during the COVID-19 pandemic, it is imperative to continue reviewing at-risk inmates for placement on home confinement in accordance with the CARES Act and guidance from the Attorney General. This memorandum provides updated guidance and direction and supercedes the memorandum dated November 16, 2020.

The following factors are to be assessed to ensure inmates are suitable for home confinement under the CARES Act:

- Reviewing the inmate's institutional discipline history for the last twelve months (Inmates who have received a 300 or 400 series incident report in the past 12 months may

be referred for placement on home confinement, if in the Warden's judgement such placement does not create an undue risk to the community);

- Ensuring the inmate has a verifiable release plan;
- Verifying the inmate's current or a prior offense is not violent, a sex offense, or terrorism-related;
- Confirming the inmate does not have a current detainer;
- Ensuring the inmate is Low or Minimum security;
- Ensuring the inmate has a Low or Minimum PATTERN recidivism risk score;
- Ensuring the inmate has not engaged in violent or gang-related activity while incarcerated (must be reviewed by SIS);
- Reviewing the COVID-19 vulnerability of the inmate, in accordance with CDC guidelines; and
- Confirming the inmate has served 50% or more of their sentence; or has 18 months or less remaining on their sentence and have served 25% or more of their sentence.

Additionally, pregnant inmates should be considered for viability of placement in a community program to include Mothers and Infants Together (MINT) programs and home confinement.

If the Warden determines there is a need to refer an inmate for placement in the community due to COVID-19 risk factors who is outside of the criteria listed above, they may forward the home confinement referral to the Correctional Programs Division for further review.

Referrals to a Residential Reentry Management (RRM) Office must be made based on appropriateness for home confinement. This assessment should include verification that the conditions under which the inmate would be confined upon release would be more effective in protecting their health than continued confinement at their present place of incarceration.

To this end, the inmate must be provided education on CDC guidance on how to protect themselves and others from COVID-19 transmission. This education includes, but is not limited to: hand washing, social distancing, wearing of facial coverings and self-assessment for signs and symptoms of COVID-19. Inmates should understand how home confinement provides the opportunity to practice optimal infection control measures, which may mitigate existing risks, based on rates of transmission in the local area, and exercising best practices. The information (education) provided to the inmate must be documented on the BEMR exit summary.

All referrals should clearly document the review of the following items prior to being submitted to the RRM office:

- Specific type of release residence (House/Apt/Group Home etc.);
- List of individuals with whom inmate will be living;
- Any health concerns of individuals in the residence;
- Contact phone numbers of the inmate should he/she be placed on home confinement; and,
- Transportation plan as to how the inmate will be transferred to the home confinement location.

Any questions as to eligibility in relation to the release plan will be referred to the Residential Reentry Management Branch Administrator.

Inmates determined to have a viable release residence will be further screened by Health Services and a determination made as to whether they require frequent and ongoing medical care within the next 90 days. If frequent and on-going medical care is required then:

- Health Services staff will coordinate with RRMB's Health Services Specialists to determine if the inmate's medical needs can be met in the community. RRMB will establish follow-up care prior to inmate transfer. The inmate must transfer with at least 90 days of any prescribed medications.
- If the inmate's medical needs cannot be met in the community, then the inmate will remain at his/her current institution. (If the inmate does not require frequent and on-going medical care then the referral will be processed.)

If an inmate is referred or denied for home confinement once a review is completed, the appropriate Case Management Activity (CMA) assignment should be loaded.

Case Management Coordinators must track all inmates determined to be ineligible for CARES Act home confinement or the Elderly Offender Home Confinement Pilot Program and ensure the appropriate denial code is entered in SENTRY. Reports outlining the reason for denial must be submitted to the Correctional Programs Administrator in the appropriate Regional Office.

If an inmate does not qualify for CARES Act home confinement under the above criteria, they should be reviewed at the appropriate time for placement in a Residential Reentry Center and/or home confinement consistent with applicable laws and BOP policies.

If you have any questions, please contact David Brewer, Administrator, Correctional Programs Branch.

# EXHIBIT

# 9

# MASTER

# AGREEMENT



## Federal Bureau of Prisons

and

## Council of Prison Locals
American Federation of Government Employees



Printed by UNICOR Print Shop
USP Leavenworth, Kansas

## TABLE OF CONTENTS

Preamble .................................................................................... 1
Article 1    - Recognition ............................................................ 2
Article 2    - Joint Labor Management Relations Meetings ................... 3
Article 3    - Governing Regulations ............................................. 5
Article 4    - Relationship of this Agreement to Bureau Policies
               Regulations and Practices ......................................... 7
Article 5    - Rights of the Employer ............................................ 8
Article 6    - Rights of the Employee .......................................... 10
Article 7    - Rights of the Union ............................................... 16
Article 8    - Union Dues  by Payroll Deduction ............................. 19
Article 9    - Negotiations at the Local Level ................................ 21
Article 10   - Union Representation on Committees ......................... 24
Article 11   - Official Time ....................................................... 26
Article 12   - Use of Official Facilities ........................................ 31
Article 13   - Questionnaires ..................................................... 32
Article 14   - Empoyee Performance and Ratings ........................... 33
Article 15   - Outside Employment .............................................. 35
Article 16   - Position Description and Review ............................... 36
Article 17   - Employee Personnel Files ....................................... 37
Article 18   - Hours of Work ..................................................... 38
Article 19   - Annual Leave ...................................................... 44
Article 20   - Sick Leave .......................................................... 47
Article 21   - Training .............................................................. 49
Article 22   - Equal Employment Opportunity ................................ 50
Article 23   - Upward Mobility ................................................... 51
Article 24   - Employment of Relatives ........................................ 52
Article 25   - Reduction in Force, Transfer of Function and Reorganization .......... 53
Article 26   - Retirement and Resignation .................................... 55
Article 27   - Health and Safety ................................................ 56
Article 28   - Uniform Clothing .................................................. 59
Article 29   - Work Site Conditions ............................................ 62
Article 30   - Disciplinary and Adverse Actions ............................. 63
Article 31   - Grievance Procedure ............................................. 65
Article 32   - Arbitration .......................................................... 68
Article 33   - Merit Promotion ................................................... 71
Article 34   - Employee Assistance Program ................................. 72
Article 35   - Priority Placement Program .................................... 74
Article 36   - Human Resource Management ................................. 75
Article 37   - Sexual Harassment ............................................... 76
Article 38   - Qualified Handicapped Employees ............................ 77
Article 39   - Furloughs ........................................................... 78
Article 40   - Asbestos ............................................................ 80
Article 41   - Publication and Distribution of This Agreement ........... 82
Article 42   - Effective Date and Duration of This Agreement ........... 83
Appendix A - Ground Rules for Negotiation of Supplemental Agreements .......... 84
Appendix B - Quarterly Employee Performance Request Form ........... 86
Index        .................................................................................... 87
Signature Page                                                          88

## PREAMBLE

The Federal Bureau of Prisons acknowledges that the participation of its employees in providing input into the development of personnel policies, practices, and procedures which affect conditions of employment, and their assistance in the implementation of policies, practices, and procedures, contributes to the effective operation of Bureau facilities. The Bureau of Prisons will develop and maintain constructive and cooperative relationships with its employees, through their exclusive representative, where applicable, the Council of Prison Locals and the American Federation of Government Employees. The parties respect the rights granted to Management, employees, and the Council of Prison Locals by the Civil Service Reform Act of 1978, as amended.

The parties recognize that efficient and effective service is a paramount requirement and that public interest requires the continual development and implementation of modern and progressive work practices to facilitate improved employee performance and efficiency.

Moreover, the parties recognize that the administration of an agreement depends on a good relationship. This relationship must be built on the ideals of mutual respect, trust, and commitment to the mission and the employees who carry it out. Therefore, the Federal Bureau of Prisons and Federal Prison Industries, Inc..

hereinafter referred to as "the Employer" or "the Agency," and the Council of Prison Locals and the American Federation of Government Employees, hereinafter referred to as "the Union" or "exclusive representative," do hereby agree to:

(A)   focus on problems and ways to deal with them;

(B)   recognize the needs of the other party;

(C)   consider collective bargaining as an opportunity to improve the relationship between the Agency and the Union; and

(D)   recognize that the employees are the most valuable resource of the Agency, and are encouraged, and shall be reasonably assisted, to develop their potential as Bureau of Prisons employees to the fullest extent practicable.

This Agreement and such supplementary agreements and memorandums of understanding by both parties as may be agreed upon hereunder from time to time, together constitute a collective agreement between the Agency and the Union.

## ARTICLE 1 - RECOGNITION

Section a. The Union is recognized as the sole and exclusive representative for all bargaining unit employees as defined in 5 United States Code (USC), Chapter 71.

Section b. The Employer recognizes the Union as the exclusive bargaining agent under the provisions of the Federal Service Labor Management Relations Statute. 5 USC, Chapter 71, 7101 et. seq., hereinafter referred to as "the Statute," and the Civil Service Reform Act of 1978, of all of the employees in the unit, as the recognized Union for bargaining purposes with respect to conditions of employment of employees represented by the Union. The Union has the full authority as provided by Statute to meet and confer with the Agency for the purpose of entering into negotiated agreements, concerning changes in conditions of employment covering bargaining unit employees, and to administer this Collective Bargaining Agreement.

Section c. The former Director, Bureau of Prisons, Commissioner, Federal Prison Industries. Inc., Myrl E. Alexander, in a letter dated January 17, 1968, said letter being issued in accordance with Executive Order 10988, did certify the Council of Prison Lodges (currently known as the "Council of Prison Locals") exclusive recognition as the representative of all employees employed by the Federal Bureau of Prisons, with the exception of the employees of the Central Office. The term "employee" as used in this Agreement means any employee of the Employer represented by the Union and as defined in 5 USC, Chapter 71.

Section d. The Union will have access, using predetermined entry procedures, to properly represent bargaining unit employees located in contract/privatized facilities, in accordance with this Agreement and applicable laws, rules, and regulations.

The Agency will provide a list of all bargaining unit employeees working in a contract facility to the Council of Prison Locals President and appropriate Regional Vice President upon request, but no more frequently than every six (6) months.

## ARTICLE 2 - JOINT LABOR MANAGEMENT RELATIONS MEETINGS

Section a. Representatives of the Employer and ten(10) representatives of the Union, or the number of Employer representatives, whichever is greater, shall meet in person at least four (4) times per year to resolve and/or negotiate, as applicable, on issues regarding personnel policies, practices, conditions of employment, and working conditions.

These meetings may be initiated by either party, but may only be dispensed by mutual consent.

The duration of these meetings will normally be two (2) days; however, by mutual agreement, they may be extended or shortened as determined by both parties. The expense of such meetings will be borne by the Employer.

Union representatives shall be on official time.

Section b. An agenda will be required for all meetings. Each party will exchange agenda items not less than twenty-one (21) calendar days prior to the scheduled meeting.

The Union may revise the number of their representatives, to achieve equal numbers with the Employer, if the number of agency representatives exceeds ten (10).

The party placing an item on the agenda shall describe the issue, concern, or problem in sufficient detail to allow others to understand the situation and prepare for discussion.

Section c. Generally, the issues for discussion will be limited to those placed on the agenda in a timely fashion. Exceptions may be made for pressing issues which arise after the agenda has been established and which should be discussed before the next meeting.

Section d. The Employer will prepare minutes (summary) of the items discussed, agreements reached, and/or suspense dates set for follow-up action. The minutes will be reviewed and approved by the parties upon conclusion of discussion of each issue. A final copy of the minutes will be reviewed and signed by the parties prior to the conclusion of the meeting, and a copy will be provided to each participant.

Section e. Management will provide the Union with updates on issues raised at these meetings in accordance with agreed upon time frames. Should the Union be asked to provide the Agency with an update on any issues raised at national meetings, the responding Union representative will be afforded the use of that amount of official time that both parties at the meeting agree to be reasonable and necessary.

Section f. The parties at the national level endorse the concept of regular labor management meetings at the local level. It is recommended that such

2

meetings occur at least monthly, that there be an established method of written minutes, and that there be suspense dates for responses or corrective action. The actual procedures for local labor management meetings will be negotiated locally.

## ARTICLE 3 - GOVERNING REGULATIONS

Section a. Both parties mutually agree that this Agreement takes precedence over any Bureau policy, procedure, and/or regulation which is not derived from higher government-wide laws, rules, and regulations.

1. local supplemental agreements will take precedence over any Agency issuance derived or generated at the local level.

Section b. In the administration of all matters covered by this Agreement, Agency officials, Union officials, and employees are governed by existing and/or future laws, rules, and government-wide regulations in existence at the time this Agreement goes into effect.

Section c. The Union and Agency representatives, when notified by the other party, will meet and negotiate on any and all policies, practices, and procedures which impact conditions of employment, where required by 5 USC 7106, 7114, and 7117, and other applicable government-wide laws and regulations, prior to implementation of any policies, practices, and/or procedures.

Section d. All proposed national policy issuance, including policy manuals and program statements, will be provided to the Union. If the provisions contained in the proposed policy manual and/or program statement change or affect any personnel policies, practices, or

conditions of employment, such policy issuances will be subject to negotiation with the Union, prior to issuance and implementation.

1. when national policy issuances are proposed, the Employer will ensure that the President, Council of Prison Locals, each member of the Executive Board of the Council of Prison Locals, and each local President receives a copy of the proposed policy issuance within thirty (30) calendar days that the proposed policy issuance is completed. This will be accomplished by the policy issuance being sent, by certified mail; to the appropriate Union official at the institution/location where the Union official is employed;

2. after the last Council of Prison locals Executive Board member receives the proposed policy issuance, the Union, at the national level, will have thirty (30) calendar days to invoke negotiations regarding the proposed policy issuance. The date on the signed "Returned Receipt" card will serve to verify the date that the last Council Executive Board member was notified;

3. should the Union invoke their right to negotiate the proposed policy issuance, absent an overriding exigency, the issuance and implementation of the policy will be postponed, pending the

4

outcome of the negotiations;

4. should the Union, at the national level, fail to invoke the right to negotiate the proposed policy issuance within the time required above, the Agency may issue and implement the proposed policy issuance; and

5. when locally-proposed policy issuances are made, the local Union President will be notified as provide for above, and the manner in which local negotiations are conducted will parallel this article.

Section e. Negotiations under this section will take place within thirty (30) calendar days of the date that negotiations are invoked. Negotiations will take place at a location that is mutually agreeable to the parties, and the Agency will pay all expenses related to the negotiations.

## ARTICLE 4 - RELATIONSHIP OF THIS AGREEMENT TO BUREAU POLICIES, REGULATIONS, AND PRACTICES

Section a. In prescribing regulations relating to personnel policies and practices and to conditions of employment, the Employer and the Union shall have due regard for the obligation imposed by 5 USC 7106, 7114, and 7117. The Employer further recognized its responsibility for informing the Union of changes in working conditions at the local level.

Section b. On matters which are not covered in supplemental agreements at the local level, all written benefits, or practices and understandings between the parties implementing this Agreement, which are negotiable, shall not be changed unless agreed to in writing by the parties.

Section c. The Employer will provide expeditious notification of the changes to be implemented in working conditions at the local level. Such changes will be negotiated in accordance with the provisions of this Agreement.

6

7

Executed this 6th day of February , 1998.

For the Council of Prison Locals, AFGE:

_Dennis J. Bicsik_
Dennis J. Bicsik

_Manuel G. Borquez Jr_
Manuel G. Borquez

_Earl E. Elliott_
Earl E. Elliott

_Philip W. Glover_
Philip W. Glover

_Rick Miller_
Rick Miller

_Joseph T. Mullen_
Joseph T. Mullen

_Larry S. Raney_
Larry S. Raney

_Erica M. Shields_
Erica M. Shields

_James L. Turner_
James L. Turner

_Bobby L. Harnage_
Bobby L. Harnage
National President
AFGE

For the Federal Bureau of Prisons:

_Peter M. Carlson_
Peter M. Carlson

_Joseph E. Chapin_
Joseph E. Chapin

_James P. Foley_
James P. Foley

_Donald J. Laliberte_
Donald J. Laliberte

_Robert L. Matthews_
Robert L. Matthews

_Regina A. Sullivan_
Regina A. Sullivan

_Ronald G. Thompson_
Ronald G. Thompson

_Kathleen M. Hawk_
Kathleen M. Hawk
Director
Federal Bureau of Prisons

92

# EXHIBIT

# 10



U.S. Department of Justice
Memorandum
Federal Bureau of Prisons

---

*Correctional Programs Division*

Central Office
320 First Street, N.W.
Washington, DC 20534

April 22, 2020

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:        Andre Matevousian, Acting Assistant Director
             Correctional Programs Division

**HUGH HURWITZ** Digitally signed by HUGH HURWITZ
Date: 2020.04.22 14:17:15 -04'00'
Hugh J. Hurwitz, Assistant Director
Reentry Services Division

SUBJECT:       Home Confinement

In an effort to protect the health and safety of staff and
inmates during the COVID-19 pandemic, it has become imperative
to review at-risk inmates for placement on home confinement.
This memorandum provides additional guidance and direction and
rescinds the memorandum dated April 3, 2020.

It should be noted that for public safety reasons, in accordance
with the March 26, 2020, memorandum from the Attorney General,
and to ensure BOP is deploying its limited resources in the most
effective manner, the BOP is currently assessing the following
factors to ensure inmates are suitable for home confinement:

- reviewing the inmate's institutional discipline history for
  the last twelve months;
- ensuring the inmate has a verifiable release plan;
- verifying the inmate's primary or prior offense history
  does not include violence, a sex offense, or terrorism
  related;
- confirming the inmate does not have a current detainer;
- reviewing the security level of the facility currently
  housing the inmate, with priority given to inmates residing
  in Low and Minimum security facilities;
- reviewing the inmate's score under PATTERN, with inmates
  who have anything above a minimum score not receiving
  priority treatment;

F    066

BP-8-12 (1 of 4)

- and reviewing the age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines.

In addition, and in order to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who served a certain portion of their sentences, or who only have a relatively short amount of time remaining on those sentences. While these priority factors are subject to deviation in the BOP's discretion in certain circumstances and are subject to revision as the situation progresses, at this time, the BOP is prioritizing for consideration those inmates who either:

- have served 50% or more of their sentences,
- or have 18 months or less remaining on their sentences and have served 25% or more of their sentences.

Additionally, pregnant inmates should be considered for viability of placement in a community program to include Mothers and Infants Together (MINT) programs and home confinement.

All inmates must be reviewed by the SIS Department at the referring facility to determine if the inmate has engaged in violent or gang-related activity in prison. Additionally, inmates must have maintained clear conduct for the past 12 months to be eligible.

Referrals must be made based on appropriateness for home confinement. Consideration should be given to whether the inmate has demonstrated a verifiable reentry plan that will prevent recidivism and maximize public safety, including verification that the conditions which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility.

All referrals should clearly document the review of the following:

- Unit Team staff will screen each inmate identified to determine if they have a viable release residence and ask questions specific to:
  - Specific type of release residence (House/Apt/Group home, etc.),
  - Who will the inmate live with,
  - Any health concerns of individuals in the residence,
  - Contact phone numbers should he/she be placed on home confinement,
  - Transportation plan as to how the inmate will be transferred to the home confinement location.

F    067

BP-8-12 (xerox)

All the above information must be clearly documented on the referral for home confinement prior to submission to the RRM Office.

Inmates determined to have a viable release residence will be screened by Health Services and a determination made as to if the inmate requires frequent and on-going medical care within the next 90 days.  If frequent and on-going medical care is required, then:

- Health Services staff will coordinate with Naphcare and RRMBs Health Services Specialists to determine if the inmate's medical needs can be met in the community at this time.  Naphcare will set up follow-up care prior to the inmate's transfer. An inmate must transfer with AT LEAST 90 days of any prescribed medications.
- If the inmate's medical needs cannot be met in the community at this time, the inmate will remain at the BOP facility.
- If the inmate does not require frequent and on-going medical care, a referral to the community will be processed.
- All the above information must be clearly documented on the referral for home confinement prior to submission to the RRM Office.

Once an inmate is referred for home confinement due to the COVID-19 pandemic, the Case Management Activity (CMA) assignment **CV-COM-REF** should be loaded in SENTRY.

If the Warden determines there is a need to refer an inmate for placement in the community due to risk factors, or as a population management strategy during the pandemic; however, the inmate does not meet the above listed criteria, a packet should be forwarded to the Correctional Programs Division for further review. Packets should be sent to BOP-CPD/Assistant Director from the Warden's general mailbox.

Case Management Coordinators must track all inmates determined to be ineligible for home confinement or the Elderly Offender Pilot Program and enter the appropriate denial code in SENTRY. Reports outlining reason for denial must be reported to BOP-CPD/Unit Management on a weekly basis by Monday at 2:00 p.m. EST.

If an inmate does not currently qualify for home confinement under BOP criteria, they should be reviewed for placement in a

F   068

BP-8-12 (3 of 4)

Residential Reentry Center and for home confinement at a later date, in accordance with applicable laws and BOP policies.

If you have any questions, please contact David Brewer, Acting Senior Deputy Assistant Director, Correctional Programs Division, at (202)353-3638 or Alix McLearen, Senior Deputy Assistant Director, Reentry Services Division, at (202)514-4919.

F    069

BP-8-12 (4of4)